**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ANTONIO CABALLERO, | § | |
| | § | |
| JUDGMENT CREDITOR & | § | |
| GARNISHOR, | § | |
| | § | |
| VS. | § | |
| | § | |
| FUERZAS ARMADAS | § | CASE NO. 4:21-CV-00140 |
| REVOLUCIONARIAS DE COLOMBIA | § | |
| a/k/a FARC-EP a/k/a | § | |
| REVOLUTIONARY ARMED FORCES | § | |
| OF COLOMBIA; and THE NORTE DEL | § | |
| VALLE CARTEL, | § | |
| | § | |
| JUDGMENT DEBTORS. | § | |
| | § | |
| VS. | § | |
| | § | |
| VITOL INC., | § | |
| | § | |
| GARNISHEE. | § | |

## APPENDIX TO GARNISHOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 1, Antonio Caballero's Final Judgment……………………………….…………………3

Exhibit 2, Order from Montgomery County District Court finding Rosneft, S.A.
  is an agent or instrumentality of FARC………………………………………………………5

Exhibit 3, Registration of Cabellero's Judgment in Case No. 4:20-mc-02719
  *Antonio Caballero v. FARC, et al*; In the United States District Court for the
  Southern District of Texas, Houston Division…………………………………………………..9

Exhibit 4, Registration of Cabellero's Judgment in Cause No. 20-09-11744;
  *Antonio Caballero v. FARC, et al*; In the District Courts
  of Montgomery County, Texas, 284th Judicial District………………………………………12

Exhibit 5, Original Writ of Execution & Return of Service………………………………....…23

1

Exhibit 6, Corrected Writ of Execution & Return of Service…………………………………31

Exhibit 7, Order on Motion for Default Judgment in underlying case in the
  Southern District of Florida……………………………………………………………………34

Exhibit 8, Declaration of John Robert McBrien, the former Associate Director
  Global Targeting for the Department of Treasury's Office of Foreign Assets Control………..50

Exhibit 9, Supplemental Declaration of John Robert McBrien, the former Associate Director
  Global Targeting for the Department of Treasury's Office of Foreign Assets Control………..73

Exhibit 10, 148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002) (statement of Sen. Harkin)…100

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:18-cv-25337-KMM

ANTONIO CABALLERO,

    Plaintiff,

v.

FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA, *et al.*,

    Defendants.

_____/

## FINAL JUDGMENT

THIS CAUSE came before the Court upon the Court's Order on Motion for Default Final Judgment. (ECF No. 62.) Pursuant to Rule 58 of the Federal Rules of Civil Procedure, it is hereby ORDERED AND ADJUDGED that Final Judgment is entered in favor of Plaintiff Antonio Caballero in the amount of forty-five million dollars ($45,000,000.00) in actual, compensatory non-economic damages, which is further trebled pursuant to 18 U.S.C. § 2333; one million, seven hundred and twenty-nine thousand, six-hundred and sixty-seven dollars ($1,729.667.00) in actual, compensatory economic damages, which is further trebled pursuant to 18 U.S.C. § 2333; and post-judgment interest at the rate of 0.15% from May 20, 2020, the date of final judgment, on the above-awarded trebled economic and non-economic damages, for which sum let execution issue.

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of May, 2020.

K. MICHAEL MOORE
UNITED STATES CHIEF DISTRICT JUDGE

c: All counsel of record

# EXHIBIT 2

Received and E-Filed for Record
12/1/2020 11:01 AM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Tony Beltran

**CAUSE NO. 20-09-11744**

| | | |
|---|---|---|
| ANTONIO CABALLERO, | § | IN THE DISTRICT COURT OF |
| | § | |
| JUDGMENT CREDITOR, | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| FUERZAS ARMADAS | § | MONTGOMERY COUNTY, TEXAS |
| REVOLUCIONARIAS DE COLOMBIA | § | |
| a/k/a FARC-EP a/k/a | § | |
| REVOLUTIONARY ARMED FORCES | § | |
| OF COLOMBIA; and THE NORTE DE | § | |
| VALLE CARTEL, | § | |
| | § | |
| JUDGMENT DEBTORS. | § | |
| | § | |
| | § | |
| | § | 284TH JUDICIAL DISTRICT |

**ORDER ON JUDGMENT CREDITOR'S**
**MOTION FOR AGENCY OR INSTRUMENTALITY DETERMINATION PURSUANT**
**TO SECTION 201(a) OF THE TERRORISM RISK INSURANCE ACT OF 2002**

THIS CAUSE came before the Court upon Judgment Creditor, Antonio Caballero's

("Caballero") Motion for Agency or Instrumentality Determination Pursuant to Section 201(a) of

the Terrorism Rick Insurance Act of 2002 (the "Motion"). Upon due and careful consideration of

the (i) the Anti-Terrorism Act, 18 U.S.C. § 2333(e); (ii) Section 201(a) of the Terrorism Risk

Insurance Act of 2002 (hereinafter "TRIA"), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322

(codified at 28 U.S.C. § 1610 note); (iii) Rules 657-679 of the Texas Rules of Civil Procedure and

Tex. Civ. Prac. & Rem. Code Ann. §§ 63.001, et seq.; (iv) *Stansell v. Revolutionary Armed Forces*

*of Columbia [sic]*, 771 F.3d 713, 729-730 (11th Cir. 2014) (concluding that in actions to enforce

judgments against terrorists "factors weigh in favor of immediate attachment"); and (v) Exhibits 1

through 13 attached to the Motion,

**IT IS ORDERED** as follows:

1.       This Court has subject matter jurisdiction to conduct post-judgment execution proceedings of a judgment creditor's final judgment under a federal statute (ATA), rendered by a U.S. district court and properly registered in this Court.

2.       The Court grants Judgment Creditor, Antonio Caballero's Motion for Agency or Instrumentality Determination Pursuant to Section 201(a) of the Terrorism Rick Insurance Act of 2002 as to Petroleos de Venezuela, S.A. (a.k.a. PDVSA; a.k.a. PETROLEOS DE VENEZUELA S A; a.k.a. PETROLEOS DE VENEZUELA [____] S.A; a.k.a. REFINERIA EL PALITO) and Rosneft Trading S.A. and denies it as to Kaibab International Corporation ("Kaibab") because of insufficient evidence to find that Kaibab is an agent and/or instrumentality of Fuerzas Armadas Revolucionarias de Columbia.

3.       The Court finds that Petroleos de Venezuela, S.A. (a.k.a. PDVSA; a.k.a. PETROLEOS DE VENEZUELA S A; a.k.a. PETROLEOS DE VENEZUELA S.A; a.k.a. REFINERIA EL PALITO) ̸and̸ Rosneft Trading S.A. ██████████████ are agents and instrumentalities of Fuerzas Armadas Revolucionarias de Colombia (the "FARC").

4.       The Court finds that the assets of Petroleos de Venezuela, S.A. (a.k.a. PDVSA; a.k.a. PETROLEOS DE VENEZUELA S A; a.k.a. PETROLEOS DE VENEZUELA S.A; a.k.a. REFINERIA EL PALITO) ̸and̸ Rosneft Trading S.A. ██████████████ are blocked assets and are executable under TRIA towards satisfaction of Caballero's ATA Final Judgment.

5.       The Court concludes that Caballero, has adequately established that (i) he has obtained an ATA Final Judgment against a terrorist party (i.e., the FARC) that is based on an act of international terrorism, (ii) the assets which Caballero seeks to execute on are "blocked assets" as that term is defined under the TRIA and the ATA, 18 U.S.C. §2333(e), (iii) the total amount of the executions do not exceed the compensatory damages amount with regard to Caballero's ATA Final Judgment, and (iv) the putative owners of the subject blocked assets are each an agent and instrumentality of the FARC.

2

6.    The Court finds that Caballero is authorized to seek writs of garnishment against garnishees to attach any assets within this Court's jurisdiction in the putative name of, held for the benefit of, or that were blocked due to an association with, Petroleos de Venezuela, S.A. (a.k.a. PDVSA; a.k.a. PETROLEOS DE VENEZUELA S A; a.k.a. PETROLEOS DE VENEZUELA S.A; a.k.a. REFINERIA EL PALITO) and/or Rosneft Trading S.A.. ████████████████

7.    The Clerk of the Court is authorized and directed to issue such writs in aid of garnishment to attach to any assets within this Court's jurisdiction in the putative names of, held for the benefit of, or that were blocked due to an association with, Petroleos de Venezuela, S.A. (a.k.a. PDVSA; a.k.a. PETROLEOS DE VENEZUELA S A; a.k.a. PETROLEOS DE VENEZUELA S.A; a.k.a. REFINERIA EL PALITO) and/or Rosneft Trading S.A.. ████████ ████████

**AND IT IS SO ORDERED** this 16th day of December 2020, in Montgomery County, Texas.

12/16/2020 11:11:17 AM

_____
**HONORABLE JUDGE KRISTIN BAYS**

# EXHIBIT 3

AO 451 (Rev. 12/12) Clerk's Certification of a Judgment to be Registered in Another District

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| ANTONIO CABALLERO, | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 18-25337-KMM |
| FUERZAS ARMADAS | ) | |
| REVOLUCIONARIAS DE COLOMBIA, *et al.,* | ) | |
| *Defendant* | | |

## CLERK'S CERTIFICATION OF A JUDGMENT TO BE REGISTERED IN ANOTHER DISTRICT

I certify that the attached judgment is a copy of a judgment entered by this court on *(date)*    05/20/2020    .

I also certify that, as appears from this court's records, no motion listed in Fed. R. App. P. 4(a)(4)(A) is pending before this court, the time for appeal has expired, and no appeal has been filed or, if one was filed, it is no longer pending.

Date: July 2, 2020

**Angela E. Noble**

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

Certified to be a true and
correct copy of the document on file
Angela E. Noble, Clerk,
U.S. District Court
Southern District of Florida

By _____
Deputy Clerk

Date July 2, 2020

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:18-cv-25337-KMM

ANTONIO CABALLERO,

     Plaintiff,

v.

FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA, *et al.*,

     Defendants.

_____/

## FINAL JUDGMENT

THIS CAUSE came before the Court upon the Court's Order on Motion for Default Final

Judgment. (ECF No. 62). Pursuant to Rule 58 of the Federal Rules of Civil Procedure, it is hereby

ORDERED AND ADJUDGED that Final Judgment is entered in favor of Plaintiff Antonio

Caballero in the amount of forty-five million dollars ($45,000,000.00) in actual, compensatory

non-economic damages, which is further trebled pursuant to 18 U.S.C. § 2333; one million, seven

hundred and twenty-nine thousand, six-hundred and sixty-seven dollars ($1,729.667.00) in actual,

compensatory economic damages, which is further trebled pursuant to 18 U.S.C. § 2333; and post-

judgment interest at the rate of 0.15% from May 20, 2020, the date of final judgment, on the above-

awarded trebled economic and non-economic damages, for which sum let execution issue.

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of May, 2020.

_____
K. MICHAEL MOORE
UNITED STATES CHIEF DISTRICT JUDGE

c: All counsel of record

EXHIBIT 4

Received E-Filed for Record
9/28/2020 2:44 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Megan Shiflett

20-09-11744

**CAUSE NO. _____**

| | | |
|---|---|---|
| **ANTONIO CABALLERO,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **JUDGMENT CREDITOR,** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **FUERZAS ARMADAS** | § | **MONTGOMERY COUNTY, TEXAS** |
| **REVOLUCIONARIAS DE COLOMBIA** | § | |
| **a/k/a FARC-EP a/k/a** | § | Montgomery County - 284th Judicial District Court |
| **REVOLUTIONARY ARMED FORCES** | § | |
| **OF COLOMBIA; and THE NORTE DE** | § | |
| **VALLE CARTEL,** | § | |
| | § | |
| **JUDGMENT DEBTORS.** | § | **\_\_\_\_\_ JUDICIAL DISTRICT** |

## NOTICE OF REGISTRATION OF FOREIGN JUDGMENT

Pursuant to Section 35.003 of the Texas Civil Practice and Remedies Code,

Judgment Creditor Antonio Caballero hereby files the attached authenticated,

exemplified Final Judgment dated May 20, 2020 issued by the United States District

Court for the Southern District of Florida (Exhibit 1 hereto).  This notice is also

accompanied by the Affidavit required by Section 35.004 of the Texas Civil Practice

and Remedies Code (Exhibit 2 hereto).

Dated:        September 28, 2020

Respectfully Submitted

FASTHOFF LAW FIRM, PLLC

*Hank Fasthoff*

_____

Hank Fasthoff
Texas Bar No. 24003510
21 Waterway Ave., Suite 300
The Woodlands, Texas 77380
 (Tel) 713.929.9314
hank@fasthofflawfirm.com

# EXHIBIT 1

✎ AO 132 (Rev 12/03) Exemplification Certificate

# UNITED STATES DISTRICT COURT

Southern _____ District of _____ Florida

## EXEMPLIFICATION CERTIFICATE

I, _____ Angela E. Noble _____, Clerk of this United States District Court, keeper of the records and seal, certify that the attached documents:

18cv25337-KMM, Final Judgment-Docket Entry Number 63

are true copies of records of this Court.

In testimony whereof I sign my name and affix the seal of this Court, in this District, at Miami _____ on _____ 7/16/2020 _____

**Angela E. Noble**                    *City*                                        *Date*

*Clerk*                                                          *(By) Deputy Clerk*

I, _____ K. Michael Moore _____, a Judicial Officer of this Court, certify that _____ Angela E. Noble _____, named above, is and was on the date noted, Clerk of this Court, duly appointed and sworn, and keeper of the records and seal, and that this certificate, and the attestation of the record, are in accordance with the laws of the United States.

*July 21st, 2020*

*Date*                                                        *Signature of Judge*

                                        Chief United State District Judge

                                        *Title*

I, _____ Angela E. Noble _____, Clerk of this United States District Court, keeper of the seal, certify that the Honorable _____ K. Michael Moore _____,

                                        *Judge*

named above, is and was on the date noted a Judicial Officer of this Court, duly appointed, sworn and qualified, and that I am well acquainted with the Judge's official signature and know and certify the above signature to be that of the Judge.

In testimony whereof I sign my name, and affix the seal of this Court at Miami _____ in this State, on _____ 7/16/2020 _____

**Angela E. Noble**                    *City*                                        *Date*

*Clerk*                                                          *(By) Deputy Clerk*

AO 451  (Rev. 12/12)  Clerk's Certification of a Judgment to be Registered in Another District

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| ANTONIO CABALLERO, | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action  No.  18-25337-KMM |
| FUERZAS ARMADAS | ) | |
| REVOLUCIONARIAS DE COLOMBIA, *et al.*, | ) | |
| *Defendant* | ) | |

## CLERK'S CERTIFICATION OF A JUDGMENT TO BE REGISTERED IN ANOTHER DISTRICT

I certify that the attached judgment is a copy of a judgment entered by this court on *(date)*      05/20/2020

I also certify that, as appears from this court's records, no motion listed in Fed. R. App. P. 4(a)(4)(A) is pending before this court, the time for appeal has expired, and no appeal has been filed or, if one was filed, it is no longer pending.

Date:  July 2, 2020

Angela E. Noble

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

Certified to be a true and
correct copy of the document on file
Angela E. Noble, Clerk,
U.S. District Court
Southern District of Florida
By
Deputy Clerk
Date July 2, 2020

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 1:18-cv-25337-KMM

ANTONIO CABALLERO,

     Plaintiff,

v.

FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA, *et al.*,

     Defendants.

_____/

## FINAL JUDGMENT

THIS CAUSE came before the Court upon the Court's Order on Motion for Default Final Judgment. (ECF No. 62). Pursuant to Rule 58 of the Federal Rules of Civil Procedure, it is hereby ORDERED AND ADJUDGED that Final Judgment is entered in favor of Plaintiff Antonio Caballero in the amount of forty-five million dollars ($45,000,000.00) in actual, compensatory non-economic damages, which is further trebled pursuant to 18 U.S.C. § 2333; one million, seven hundred and twenty-nine thousand, six-hundred and sixty-seven dollars ($1,729.667.00) in actual, compensatory economic damages, which is further trebled pursuant to 18 U.S.C. § 2333; and post-judgment interest at the rate of 0.15% from May 20, 2020, the date of final judgment, on the above-awarded trebled economic and non-economic damages, for which sum let execution issue.

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of May, 2020.

_____
K. MICHAEL MOORE
UNITED STATES CHIEF DISTRICT JUDGE

c: All counsel of record

# EXHIBIT 2

CAUSE NO. _____

| | | |
|---|---|---|
| **ANTONIO CABALLERO,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **JUDGMENT CREDITOR,** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **FUERZAS ARMADAS** | § | **MONTGOMERY COUNTY, TEXAS** |
| **REVOLUCIONARIAS DE COLOMBIA** | § | |
| **a/k/a FARC-EP a/k/a** | § | |
| **REVOLUTIONARY ARMED FORCES** | § | |
| **OF COLOMBIA; and THE NORTE DE** | § | |
| **VALLE CARTEL,** | § | |
| | § | |
| **JUDGMENT DEBTORS.** | § | **\_\_\_\_ JUDICIAL DISTRICT** |

## AFFIDAVIT FOR ENFORCEMENT OF FOREIGN JUDGMENT

Leon N. Patricios, being first duly sworn on oath, deposes and says:

1.　　My name is Leon N. Patricios. I am a Florida-licensed attorney for Antonio Caballero, the Judgment Creditor in the above civil action. I have personal knowledge of the facts set forth herein, and they are all true and correct.

2.　　Our law firm represents Antonio Caballero in an action before the United States District Court for the Southern District of Florida, Case No. 18-cv-25337-KMM (the "Florida Federal Action").

3.　　On May 20, 2020, the Court in the Florida Federal Action entered a Final Judgment on behalf of the Plaintiff Antonio Caballero and against the Defendants (the "Final Judgment"), which is attached to Plaintiff's Notice of Registration of Foreign Judgment as Exhibit 1. The Final Judgment has not been contested or appealed and is final.

4.　　The address for the Judgment Creditor Antonio Caballero is set forth below:

1

Antonio Caballero
c/o Joseph I. Zumpano or Leon N. Patricios
Zumpano Patricios, P.A.
312 Minorca Ave.
Coral Gables, FL 33134

     5.     The addresses for the Judgment Debtors are set forth below:

FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA a/k/a FARC-EP
c/o Juvenal Ovidio Ricardo Palmera Pineda (BOP Register No. 27896-016)
USP FLORENCE ADMAX
U.S. Penitentiary
5880 Hwy 67 South
Florence, CO 81226

FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA a/k/a FARC-EP
c/o Juvenal Ovidio Ricardo Palmera Pineda (BOP Register No. 27896-016)
USP Florence ADMAX
U.S. Penitentiary
P.O. Box 8500
Florence, CO 81226

THE NORTE DE VALLE CARTEL
c/o Diego Leon Montoya-Sanchez (BOP Register No. 04171-748)
FCI Petersburg Medium
Federal Correctional Institution
1060 River Road
Hopewell, VA 23860

THE NORTE DE VALLE CARTEL
c/o Diego Leon Montoya-Sanchez (BOP Register No. 04171-748)
FCI Petersburg Medium
Federal Correctional Institution
P.O. Box 1000
Petersburg, VA  23804

     FURTHER SAYETH AFFIANT NAUGHT

                                    Leon N. Patricios

STATE OF FLORIDA)

COUNTY OF MIAMI-DADE)

The foregoing instrument was acknowledged before me this ___28___ day of September, 2020, by Leon N. Patricios who is personally known to me.

Notary Public,
State of Florida At-Large

My Commission Expires: 9/11/2023

3

# EXHIBIT 5

# WRIT OF GARNISHMENT AFTER JUDGMENT

Cause No. 20-12-15427

KDO

RUSH

THE STATE OF TEXAS    Receipt# 1553988

Cause # 9857015928

RECEIVED AND FILED FOR RECORD ____ O'Clock 10:50 _____

WRIT OF GARNISHMENT AFTER JUDGMENT

04-7769

JAN 04 2021

Melisa Miller, District Clerk
Montgomery County, Texas
By _____ Deputy

TO:   Vitol Inc.
     Registered Agent CT Corporation System
     1999 Bryan Street Suite 900
     Dallas TX 75201

Whereas in the 284th Judicial District Court, of Montgomery County, Texas, in Cause No. 20-09-11744 wherein Antonio Caballero was/were plaintiff(s) and Fuerzas Armadas Revolucionarias De Colombia a/k/a FARC-EP a/k/a Revolutionary Armed Forces of Colombia; The Norte de Valle Cartel was/were Defendant(s), the Plaintiff(s), on the 20th day of May, 2020, secured a Judgment against said Defendant(s) in the amount of $46,729,667.00,, plus interest and cost of suit. Antonio Caballero has applied for a Writ of Garnishment against you, the said Garnishee:

Vitol Inc.

Registered Agent CT Corporation System
1999 Bryan Street Suite 900
Dallas TX 75201

       THEREFORE YOU ARE HEREBY COMMANDED to file a sworn answer on or before 10:00 o'clock A.M., on the Monday next following the expiration of twenty days from the date of service hereof, then and there to answer up on oath what, if anything, you are indebted to the said defendant and were, when this writ was served upon you; and

1. What effects, if any of the said defendant you had in your possession when this Writ was served or you have received prior to the answer date.
2. What other persons, if any, within your knowledge, are indebted to the said defendant, or have effects belonging to the said defendant in their possession.

YOU ARE FURTHER COMMANDED not to pay any debt to the defendant or to deliver to him any effects pending further order of this court.

TO:   Petroleos de Venezuela, S.A. (a.k.a. PDVSA; a.k.a. PETROLEOS DE VENEZUELA S A;
     a.k.a. PETROLEOS DE VENEZUELA S.A; a.k.a. REFINERIA EL PALITO)
     Edificio Petroleos De Venezuela, Torre Este, Piso 9
     Avenida Libertador con calle El Empalme, La Campina
     Caracas, Venezuela 1010
     Rosneft, Inc.
     26/1 Sofiyskaya Embankment
     Moscow, Russia 115035
     Fuerzas Armadas Revolucionarias De Colombia a/k/a FARC-EP a/k/a Revolutionary
     Armed Forces of Colombia
     C/O Juvenal Ovidio Ricard Palmera Pineda
     BOP Register No 27896-016 USP Florence Admax
     US Penitentiary 5880 Hwy 67 South
     Florence, CO 81226
     The Norte del Valle Cartel

2020 DEC 21 AM 11:10
RECEIVED CONSTABLES OFFICE PCT 1
7201 S. POLK ST.
DALLAS, TEXAS

       You are hereby notified that certain properties alleged to be owned by you have been garnished. If you claim any rights in the property, you are advised:

**"YOU HAVE THE RIGHT TO REGAIN POSSESSION OF THE PROPERTY BY FILING A REPLEVY BOND. YOU HAVE A RIGHT TO ASK TO REGAIN POSSESSION OF THE PROPERTY BY FILING WITH THE COURT A MOTION TO DISSOLVE THIS WRIT."**

       Herein fail not, but make due answer as the Law directs.

       ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court, at Conroe, Texas, on this the 18th day of December, 2020.    12/18/2020 1:27:03 PM

Issued at the request of:

Hank Fasthoff
21 Waterway Ave
Suite 300
The Woodlands TX 77380

Melisa Miller, District Clerk
Montgomery County, Texas
P.O. Box 2985
Conroe, Texas 77305
By: _Beth Rogers_
         Beth Rogers

*(District Court of Montgomery County, Texas seal)*

CERTIFIED TO BE A TRUE AND CORRECT COPY
Montgomery County District Clerk
PAGE _1_ of _5_ _Kcu_
JAN _1_ _08_ _2021_
month day year Initials

# OFFICER'S RETURN

Cause No. 20-12-15427        Court No: 284th Judicial District Court

Style: Antonio Caballero VS. Fuerzas Armadas Revolucionarias De Colombia a/k/a FARC-EP a/k/a Revolutionary Armed Forces of Colombia, The Norte de Valle Cartel

To: Vitol Inc.

Address:      Registered Agent CT Corporation System
             1999 Bryan Street
             Suite 900
             Dallas TX 75201

Came to hand the ____ day of ___**DEC 2 1 2020**___, 20___, at _____ o'clock, and executed in _____ County, Texas by delivering to each of the within named defendants in person, a true copy of this citation with the date of delivery endorsed thereon, together with the accompanying copy of the Writ of Garnishment-After Judgment, at the following times and places, to wit:

Name            Date/Time        Place, Course and distance from Courthouse

_____    _____    _____

Manner of service: _____

\*And not executed as to the defendants(s) _____
The diligence used in finding said defendant(s) being:

_____

And the cause of failure to execute this process is:

_____

And information received as to the whereabouts of said defendant(s) being:

_____

FEES:

Serving Petition and Copy      $_____

TOTAL               $_____

TRACEY GULLEY, CONSTABLE
DALLAS COUNTY PRECINCT 1
                   OFFICER
                  _____County, Texas

By: _____, Deputy

## AFFIANT

Complete if you are a person other than a Sheriff, Constable, or Clerk of the Court. In accordance with Rule 107: the officer, or authorized person who services, or attempts to serve a citation shall sign and return. The return must either be verified or be signed under penalty of perjury.

A return signed under penalty of perjury must contain the statement below in substantially the following form:

My full name is _____

My date of birth is ___/___/_____, and my address is

_____.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT

Executed in_____, County, State of _____, on the ____day of _____, 20____.

_____
Declarant/Authorized Process Server

_____
ID# & Exp. Of Certification

_____
Declarant/Authorized Process Server

_____
ID# & Exp. Of Certification

SWORN AND SUBSCRIBED ON

_____
DATE

_____
NOTARY

CERTIFIED TO BE A TRUE AND CORRECT COPY
Montgomery County District Clerk
PAGE 2 of 5
JAN month 8 day 2021 year RW initials



LAW
FIRM
PLLC

December 17, 2020

Ms. Tracey L. Gulley, Constable
Precinct One
South Dallas Govt. Ctr
7201 S. Polk, Dallas, TX 75232

Re: Cause No. 20-12-15427; *Antonio Caballero v. FARC, et al v. Sumitomo Mitsui Banking Corporation;* In the District Courts of Montgomery County, Texas, 284th Judicial District

Dear Constable Gulley:

Enclosed in the above-captioned matter are two copies of the Writ of Garnishment ("Writ") issued by the Court in the above-styled cause, along with service copies of the Application for Post-Judgment Writ of Garnishment with exhibits and all required attachments (together, the "Application").

**Respectfully, having the Writ and Application served as soon as possible is an urgent matter for our client.** Please serve the Writ and Application upon the following garnishee at the following address:

Vitol Inc.
c/o CT Corporation System
1999 Bryan St., Suite 900
Dallas, TX 75201

Enclosed is a check for $140.00 to cover the service fee.

After service of the Writ and Application, please complete the officer's return and return it to the court pursuant to your normal practice.

Lastly, I am required by law to notify the judgment debtors promptly after the Writ has been served. I ask that the Deputy Constable who is selected to serve the writ telephone me at 713.929.9314 after the Writ has been served so that I may give the statutorily prescribed notice to the judgment debtors.

Your assistance in this matter is greatly appreciated. If you have any questions, please do not hesitate to call me.

CERTIFIED TO BE A TRUE
AND CORRECT COPY
Montgomery County District Clerk
PAGE 3 of 8 JAN 8 2021 RW
month day year Initials

**FASTHOFF** | LAW FIRM PLLC

Sincerely,

Hank Fasthoff

CERTIFIED TO BE A TRUE
AND CORRECT COPY
Montgomery County District Clerk
PAGE 4 of 5
DAW  2  8  2021  RW
month    day    year    initials

21 Waterway Ave, Suite 300
The Woodlands, Texas 77380

700 Milam, Suite 1300,
Houston, Texas 77002

731.929.9314
hank@fasthofflawfirm.com

fasthofflawfirm.com

## CONSTABLE'S RETURN

**Style of Case:** ANTONIO CABALLERO VS. FUERZAS ARMADAS REVOLUCIONARIES DE COLOMBIA A/K/A FARC-EP A/K/A REVOLUNTARY ARMED FORCES OF COLUMBIA, THE NORTE DE VALLE CAMEL

**Came into hand, this** ___21___ **day of** ___DECEMBER___ **,20** _20_ **AT** ___11:10___
o'clock __A__ M. by executing and delivering a **WRIT OF GARNISHMENT AFTER JUDGMENT** issued out of the
state of ___TEXAS___ under cause number: ___201215427___ ___22___ day
___DECEMBER___ , 20 _20_ , at _9:51_ o'clock __A__ M., to:

☐ _____ personally delivered/served true and correct copies of same.

*OTHER NOTES:* _____

☐ _____ pursuant to Rule 106/Rule 536, to an occupant:
_____ over the age of 16 years.

☐ _____ pursuant to Rule 106/Rule 536, by securely attaching
and/or affixing to the _____ of the defendant's last known place of
☐ business ☐ abode.

☐ __VITOL INC.__ ☐ A Corporation ☐ A Business

**Name:** ___CT CORPORATION___ ☐ President ☐ Vice-President ☒ Registered Agent
☒ **By delivering to the defendant's registered agent for service, C.T. CORPORATION SYSTEM,**
through Their authorized agent to accept service: TERRI THONGSAVAT __SOP INTAKE ASSOCIATE__
at 1999 BRYAN ST STE 900 Dallas, Texas 75201.
Service Address: ___1999 BRYAN ST STE 900 DALLAS TEXAS 75201___

☐ **RETURNED TO COURT AND/OR PLAINTIFF FOR THE FOLLOWING REASONS:**

_____

**Service Fees: $** ___140.00___

_[signature]_ Sgt. O. #104

SGT. OLUWOLE #104
TRACEY A. GULLEY, CONSTABLE
**COUNTY OF DALLAS** DALLAS COUNTY PRECINCT 1
**STATE OF TEXAS**

County of Montgomery, I, Melisa Miller, District Clerk ___ certify the ___ ___ ___ ___ ___5___ pages in ___ as a true and correct copy of the original record electronically or physically filed in my office, as it appears on this date. Witness my official hand and seal of office, this the _8_ day of _JAN_ , 2021.
Signed _KW_
Clerk or Deputy

**SIGNED AND SWORN BY SAID** _____ ,before me, this
**Day Of** _____ 20 _____ , to certify which, witness my hand and seal of office.

_____
*NOTARY PUBLIC-IN AND FOR THE STATE OF TEXAS*

## CONSTABLE'S RETURN

**Style of Case:** ANTONIO CABALLERO VS. FUERZAS ARMADAS REVOLUCIONARIES DE COLOMBIA A/K/A FARC-EP A/K/A REVOLUNTARY ARMED FORCES OF COLUMBIA, THE NORTE DE VALLE CAMEL

Came into hand, this __21__ day of __DECEMBER__ ,20 __20__ AT __11:10__

o'clock __A__ M. by executing and delivering a **WRIT OF GARNISHMENT AFTER JUDGMENT** issued out of the

state of __TEXAS__ under cause number: __201215427__ __22__ day

__DECEMBER__ , 20 __20__ , at __9:51__ o'clock __A__ M., to:

☐ _____ personally delivered/served true and correct copies of same.

OTHER NOTES: _____

☐ _____ pursuant to Rule 106/Rule 536, to an occupant:
_____ over the age of 16 years.

☐ _____ pursuant to Rule 106/Rule 536, by securely attaching

and/or affixing to the _____ of the defendant's last known place of
☐ ·business ☐ abode.

☐ VITOL INC. _____ ☐ A Corporation ☐ A Business

**Name:** __CT CORPORATION__ ☐ President ☐ Vice-President ☒ Registered Agent

☒ By delivering to the defendant's registered agent for service, C.T. CORPORATION SYSTEM,

through Their authorized agent to accept service: TERRI THONGSAVAT _SOP INTAKE ASSOCIATE_

at 1999 BRYAN ST STE 900 Dallas, Texas 75201.

Service Address: __1999 BRYAN ST STE 900 DALLAS TEXAS 75201__

☐ RETURNED TO COURT AND/OR PLAINTIFF FOR THE FOLLOWING REASONS:

_____

Service Fees: $ __140.00__

*Sgt. ___ #104*

**SGT. OLUWOLE #104**
**TRACEY L. GULLEY, CONSTABLE**
**DALLAS COUNTY PRECINCT 1**

**COUNTY OF DALLAS**

**STATE OF TEXAS**

SIGNED AND SWORN BY SAID _____ ,before me, this _____

Day Of _____ 20 _____ , to certify which, witness my hand and seal of office.

_____
NOTARY PUBLIC-IN AND FOR THE STATE OF TEXAS

State of Texas, County of Montgomery, I, Melisa Miller, District Clerk of Montgomery County, Texas Certify _____5_____ pages in cause no. 20-12-15427 as a true and correct copy of the original record electronically or physically filed in my office, as it appears on this date. Witness my official hand and seal of office, this the 8 day of JAN, 2021.

Signed _____
Clerk or Deputy

# EXHIBIT 6

Received and E-Filed for Record
Melisa Miller, District Clerk
Montgomery County, Texas
1/4/2021 3:37 PM
Deputy Clerk, Tony Beltran

# WRIT OF GARNISHMENT AFTER JUDGMENT

Cause No. 20-12-15427

THE STATE OF TEXAS

WRIT OF GARNISHMENT
AFTER JUDGMENT

TO:     Vitol Inc.
        Registered Agent CT Corporation System
        1999 Bryan Street Suite 900
        Dallas TX 75201

Whereas in the 284th Judicial District Court, of Montgomery County, Texas, in Cause No. 20-09-11744 wherein Antonio Caballero was/were plaintiff(s) and Fuerzas Armadas Revolucionarias De Colombia a/k/a FARC-EP a/k/a Revolutionary Armed Forces of Colombia; The Norte de Valle Cartel was/were Defendant(s), the Plaintiff(s), on the 20th day of May, 2020, secured a Judgment against said Defendant(s) in the amount of $46,729,667.00, plus interest and cost of suit. Antonio Caballero has applied for a Writ of Garnishment against you, the said Garnishee:

**Vitol Inc.**
**Registered Agent CT Corporation System**
**1999 Bryan Street Suite 900**
**Dallas TX 75201**

        THEREFORE YOU ARE HEREBY COMMANDED to file a sworn answer on or before 10:00 o'clock A.M., on the Monday next following the expiration of twenty days from the date of service hereof, then and there to answer up on oath what, if anything, you are indebted to the said defendant and were, when this writ was served upon you; and

1. What effects, if any of the said defendant you had in your possession when this Writ was served or you have received prior to the answer date.
2. What other persons, if any, within your knowledge, are indebted to the said defendant, or have effects belonging to the said defendant in their possession.

YOU ARE FURTHER COMMANDED not to pay any debt to the defendant or to deliver to him any effects pending further order of this court.

TO:     Petroleos de Venezuela, S.A. (a.k.a. PDVSA; a.k.a. PETROLEOS DE VENEZUELA S A;
        a.k.a. PETROLEOS DE VENEZUELA S.A; a.k.a. REFINERIA EL PALITO)
        Edificio Petroleos De Venezuela, Torre Este, Piso 9
        Avenida Libertador con calle El Empalme, La Campina
        Caracas, Venezuela 1010
        Rosneft Trading, S.A.
        26/1 Sofiyskaya Embankment
        Moscow, Russia 115035
        Fuerzas Armadas Revolucionarias De Colombia a/k/a FARC-EP a/k/a Revolutionary
        Armed Forces of Colombia
        C/O Juvenal Ovidio Ricard Palmera Pineda
        BOP Register No 27896-016 USP Florence Admax
        US Penitentiary 5880 Hwy 67 South
        Florence, CO 81226
        The Norte del Valle Cartel

**You are hereby notified that certain properties alleged to be owned by you have been garnished. If you claim any rights in the property, you are advised:**

        **"YOU HAVE THE RIGHT TO REGAIN POSSESSION OF THE PROPERTY BY FILING A REPLEVY BOND. YOU HAVE A RIGHT TO ASK TO REGAIN POSSESSION OF THE PROPERTY BY FILING WITH THE COURT A MOTION TO DISSOLVE THIS WRIT."**

        Herein fail not, but make due answer as the Law directs.
        ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court, at Conroe, Texas, on this the 23rd day of December, 2020.

Issued at the request of:

Hank Fasthoff
21 Waterway Ave
Suite 300
The Woodlands TX 77380

Melisa Miller, District Clerk
Montgomery County, Texas
P.O Box 2985
Conroe, Texas 77305

By: _Beth Rogers_
12/23/2020 9:10:03 AM

Beth Rogers

CERTIFIED TO BE A TRUE
AND CORRECT COPY
Montgomery County District Clerk
PAGE ___ of ___
JAN 19 2021
month    day    year    initials

# OFFICER'S RETURN

Cause No. 20-12-15427        Court No: 284th Judicial District Court

Style: Antonio Caballero VS. Fuerzas Armadas Revolucionarias De Colombia a/k/a FARC-EP a/k/a Revolutionary Armed Forces of Colombia, The Norte de Valle Cartel

To: Vitol Inc.

Address:    Registered Agent CT Corporation System
           1999 Bryan Street Suite 900
           Dallas TX 75201

Came to hand the _28_ day of _December_ , 20_20_ at _____ o'clock, and executed in _Dallas_ County, Texas by delivering to each of the within named defendants in person, a true copy of this citation with the date of delivery endorsed thereon, together with the accompanying copy of the Writ of Garnishment-After Judgment, at the following times and places, to wit:

Name        Date/Time        Place, Course and distance from Courthouse

_Vitol INC._  _12/29/2020 1:48pm_  _B/5 CT CORP 1999 Bryan St Ste 900 Dallas TX 75201_

Manner of service: _Delivering to Registered Agent CT Corporation_

*And not executed as to the defendants(s) _____
The diligence used in finding said defendant(s) being:

_____

And the cause of failure to execute this process is:

_____

And information received as to the whereabouts of said defendant(s) being:

_____

FEES:
Serving Petition and Copy    $_140.00_

TOTAL    $_140.00_

TRACEY GULLEY, CONSTABLE
DALLAS COUNTY PRECINCT 1 OFFICER
_____ County, Texas
By: _X. Escamilla #19_, Deputy

## AFFIANT

Complete if you are a person other than a Sheriff, Constable, or Clerk of the Court. In accordance with Rule 107: the officer, or authorized person who services, or attempts to serve a citation shall sign and return. The return must either be verified or be signed under penalty of perjury.

A return signed under penalty of perjury must contain the statement below in substantially the following form:
My full name is _____
My date of birth is ___/___/___, and my address is

_____.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT
Executed in_____, County, State of _____, on the _____day of _____, 20____.

_____
Declarant/Authorized Process Server

_____
ID# & Exp. Of Certification

_____
Declarant/Authorized Process Server

_____
ID# & Exp. Of Certification

SWORN AND SUBSCRIBED ON

_____
DATE

_____
NOTARY

State of Texas, County of Montgomery, I, Melisa Miller, District Clerk of Montgomery County, Texas Certify ___2___ pages in cause no. _20-12-15427_ as a true and correct copy of the original record electronically or physically filed in my office, as it appears on this date. Witness my official hand and seal of office, this the _19_ day of _JAN_ _2021_.

Signed _Robert Wilkinson_
        Clerk or Deputy

# EXHIBIT 7

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:18-cv-25337-KMM

ANTONIO CABALLERO,

      Plaintiff,

v.

FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA, *et al.*,

      Defendants.

_____/

### ORDER ON MOTION FOR DEFAULT FINAL JUDGMENT

THIS CAUSE came before the Court upon Plaintiff Antonio Caballero's ("Plaintiff")

Motion for Default Final Judgment Against Defendants Fuerzas Armadas Revolucionarias de

Colombia ("FARC") and Norte de Valle Cartel ("NDVC") (collectively, "Defendants"). ("Mot.")

(ECF No. 58). Defendants did not file a response to the Motion and the time to do so has passed.

The Motion is now ripe for review.

### I.    BACKGROUND

This is an action brought pursuant to 18 U.S.C. § 2333, which is part of the Anti-Terrorism

Act ("ATA"). ("Compl.") (ECF No. 1) ¶ 1. Plaintiff is a national of the United States. *Id.* ¶ 3.

Defendants are criminal narco-terrorist organizations in Colombia. *Id.* ¶ 5.

In 2012, Plaintiff brought an action in the Circuit Court for the Eleventh Judicial Circuit in

and for Miami-Dade County, Florida ("State Court Action") against Defendants and Ejercito de

Liberacion Nacional ("ELN")[1] for, *inter alia*, Defendants' and ELN's extra-judicial kidnapping,

_____

[1] Although ELN was named as a defendant in this action, Plaintiff voluntarily dismissed, without
prejudice, ELN from the case. *See* (ECF No. 57).

torture, and killing of Plaintiff's father to facilitate the trafficking and distribution of illicit drugs throughout the United States. *Id.* ¶ 2. On November 18, 2014, because all three defendants failed to appear or respond, the state court entered final judgment, after a trial, in Plaintiff's favor against all three defendants jointly and severally. *Id.* ¶ 4. Therein, the state court found that Plaintiff, his father, and his family owned and operated farms and properties in the central regions of Colombia, in an area that was strategically located along the defendants' drug trafficking route. *Id.* ¶ 5. Further, the state court found that ELN forces kidnapped Plaintiff's father, who was the former Ambassador to the United Nations, a leading politician, and an outspoken critic of narcotics traffickers in Colombia, to send a message to other potentially uncooperative landowners in the region that resistance to the defendants' demands would not be tolerated and would result in them being targeted for kidnapping for ransom and/or assassination. *Id.* Then, ELN and FARC, abused and tortured Plaintiff's father over a period of approximately six months before brutally murdering him. *Id.* The defendants further threatened Plaintiff, causing him to abandon the family farm and flee Colombia to the United States. *Id.* Accordingly, after a non-jury trial, the state court awarded Plaintiff the following damages:

1.  $45,000,000.00 for actual compensatory damages for non-economic damages, including without limitation, for emotional distress and for physical and psychological pain and suffering;

2.  $5,189,001.00 for trebled actual compensatory damages for losses to his business and property;

3.  $140,189,001.00 for punitive damages, which is equal to three times the Court's award of base actual compensatory damages; and

4.  $1,055,483.56 for prejudgment interest.

*Id.* ¶ 6.

On December 19, 2018, Plaintiff filed the Complaint, seeking damages under the ATA for Defendants' acts of terrorism against him. *See id.* ¶¶ 12–14. Plaintiff served NDVC with a

summons and Complaint on January 17, 2019 and FARC with a summons and Complaint on March 11, 2019. (ECF Nos. 15, 25). Because NDVC and FARC failed to answer the Complaint or otherwise appear, Plaintiff filed Motions for Entry of Default by the Clerk against Defendants, and the Clerk of the Court entered Clerk's Entry Default against them. (ECF Nos. 22, 23, 30, 32). Now, Plaintiff moves for entry of final default judgment against Defendants. *See generally* Mot.

## II.   LEGAL STANDARD

A court may enter default judgment against a defendant pursuant to Federal Rule of Civil Procedure 55(b)(2). "The mere entry of a default by the Clerk of the Court does not in itself warrant the entry of a default judgment by the Court." *Garrido v. Linden Contracting Servs.*, No. 0:14-cv-60469-KMM, 2014 WL 12603170, at *1 (S.D. Fla. Aug. 21, 2014). "Rather, the Court must find that there is a sufficient basis in the pleadings for the judgment to be entered." *Id.* (citation omitted). "A party in default has admitted all well-pleaded allegations of fact." *Id.* (citation omitted).

"Although a defaulted defendant admits well-pleaded allegations of liability, allegations relating to the amount of damages are not admitted by virtue of default. Rather, the Court determines the amount and character of damages to be awarded." *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999) (citations omitted). Damages may be awarded without an evidentiary hearing "only if the record adequately reflects the basis for award via . . . a demonstration by detailed affidavits establishing the necessary facts." *Adolph Coors Co. v. Movement against Racism & Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) (citations and internal quotation marks omitted). In other words, a court may award damages "as long as the record contains evidence allowing the court to ascertain damages from 'mathematical calculations' and

'detailed affidavits.'" *Holtz v. Bagel Mkt., Inc.*, No. 12-62040-CIV-ROSENBAUM, 2013 WL

12141515, at *2 (S.D. Fla. Apr. 29, 2013) (quoting *Adolph*, 777 F.2d at 1543–44).

## III.    DISCUSSION

### A.    <u>Liability</u>

Plaintiff moves for default judgment of his claim for damages pursuant to the ATA.  The

ATA provides:

> Any national of the United States injured in his or her person,
> property, or business by reason of an act of international terrorism,
> or his or her estate, survivors, or heirs, may sue therefor in any
> appropriate district court of the United States and shall recover
> threefold the damages he or she sustains and the cost of the suit,
> including attorney's fees.

18 U.S.C. § 2333(a).  The phrase "act of international terrorism" used in § 2333(a) is defined in

18 U.S.C. § 2331 as:

> activities that (A) involve violent acts or acts dangerous to human
> life that are a violation of the criminal laws of the United States or
> of any State, or that would be a criminal violation if committed
> within the jurisdiction of the United States or of any State; (B)
> appear to be intended (i) to intimidate or coerce a civilian
> population; (ii) to influence the policy of a government by
> intimidation or coercion; or (iii) to affect the conduct of a
> government by mass destruction, assassination, or kidnapping; and
> (C) occur primarily outside the territorial jurisdiction of the United
> States, or transcend national boundaries in terms of the means by
> which they are accomplished, the persons they appear intended to
> intimidate or coerce, or the locale in which their perpetrators operate
> or seek asylum.

§ 2331(1).  A "'national of the United States' means (A) a citizen of the United States, or (B) a

person who, though not a citizen of the United States, owes permanent allegiance to the United

States."  8 U.S.C. § 1101(22).

Here, Plaintiff's allegations state a claim pursuant to § 2333.  First, Plaintiff is a "national

of the United States."  Although Plaintiff was not a national of the United States at the time of the

injury, Plaintiff became a citizen following the filing of the State Court Action. *See* Compl. ¶ 3. Neither the United States Court of Appeals for the Eleventh Circuit nor any court in this District has opined whether a claimant under the ATA must be a U.S. national contemporaneously with the injury rather than at the time that the claim is filed. The statute provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism" may state a claim. § 2333. Thus, the language of the statute does not explicitly require that the claimant be a U.S. national at the time of the injury, only that he is currently a U.S. national and that he was injured by an act of international terrorism at some time in the past.

Further, "Congress intended for the ATA to have a broad scope." *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1338 (D. Utah 2006). For example, courts have held that U.S. nationals can state a claim under the ATA for the death of non-U.S. national family members. *See, e.g.*, *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005) (holding that "U.S. citizens suing for various non-physical injuries, such as emotional distress and loss of consortium, after their family members, who were not U.S. nationals, became victims of acts of international terrorism" could state a claim under the ATA); *Biton v. Palestinian Interim Self–Government Authority*, 310 F. Supp. 2d 172, 181–82 (D.D.C. 2004) (holding that a woman whose husband (a non-U.S. citizen) died in a Gaza Strip bus bombing could maintain an ATA suit even though she was not personally on the bombed bus or injured in the blast). And, courts have permitted survivors of U.S nationals who were killed by acts of international terrorism to state a claim under the ATA even if the survivors are not U.S. nationals. *See Weinstock v. Islamic Republic of Iran*, No. 17-23272-Civ-Scola, 2019 WL 1993778, at *4 (S.D. Fla. May 6, 2019).

In addition, "[the ATA's] purpose is 'to grant a remedy to U.S. nationals and their families who suffered from an injury to an individual or property as a result of international terrorism.'" *Morris*, 415 F. Supp. 2d at 1338  (citation omitted).  Congress intended for the ATA to allow victims to "bring [] terrorists to justice in our courts of law" because they often elude justice and the civil remedy will allow victims to attack the resource that enables terrorists to stay in business—their money.  138 Cong. Rec. S17252, 17254 (1992) (Recommendations of Federal Courts Study Committee).

Moreover, when Congress desires to include a temporal requirement such that the claimant must be a U.S. national at the time of the harm, it has plainly stated it.  For example, under the Crime Victims Fund, a "victim" of international terrorism "means a person who . . . as of the date on which the international terrorism occurred, was a national of the United States or an officer or employee of the United States Government."  34 U.S.C. § 20106.  Accordingly, a reading of the ATA permitting individuals who were not U.S. nationals at the time of the injury but subsequently become U.S. nationals to state a claim is consistent with Congress' intention and furthers the ATA's purpose.  Thus, Plaintiff qualifies as a "U.S. national" under the ATA.

Second, Defendants' conduct constitutes an act of international terrorism.  Defendants kidnapped Plaintiff's father in Colombia, tortured him for approximately six months, and then killed him "to send a message to other potentially uncooperative landowners in the region that resistance to (or failure to comply with) Defendants' demands would not be tolerated and would result in them being targeted for kidnapping for ransom and/or assassination."  Compl. ¶ 5.  Third, Plaintiff "was, and continues to be, injured in his person and property and business by reason of Defendants' acts of international terrorism."  *Id.* ¶ 14.  Specifically, Plaintiff has suffered both

economic and non-economic harm. *Id.* ¶ 6.  Accordingly, Plaintiff states a claim for damages under § 2333.

> **B.**   **Damages**

In addition to entering default judgment on liability, a court must determine the amount of damages to be awarded. *See Holtz*, 2013 WL 12141515, at *2.  The burden is on the plaintiff to prove the amount of damages owed.  *Varela v. Innovating Wiring Sols., LLC*, No. 6:07-cv-165-Orl-28KRS, 2009 WL 1795044, at *4 (M.D. Fla. June 22, 2009).

Plaintiff argues that Defendants are precluded from re-litigating the issue of damages because the State Court Action previously determined the amount of the damages.  Therefore, Plaintiff avers that he is entitled to:

1.   the trebled amount of the following sums:

   a.   Forty-five million dollars ($45,000,000.00) for actual compensatory, non-economic damages; and

   b.   One million, seven hundred and twenty-nine thousand, six hundred and sixty-seven dollars ($1,729,667.00) for actual compensatory, economic damages;

2.   pre-judgment interest on Plaintiff's economic and non-economic damages; and

3.   post-judgment interest at the applciable rate on Plaintiff's non-economic and economic compensatory damages.

Mot. at 16–17.  The Court first addresses issue preclusion, and then turns to the calculation of any damages and interest.

> *i.*   *Issue Preclusion*

"Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim."  *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001).  Issue preclusion, along with

claim preclusion, "protect[s] against 'the expense and vexation attending multiple lawsuits, conserv[es] judicial resources, and foste[rs] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *Montana v. United States*, 440 U.S. 147, 153–154 (1979)).

In issue preclusion, the court applies the preclusion law of the same legal system that determined the underlying case. *See CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1316 (11th Cir. 2003). Because the State Court Action was decided in Florida state court, Florida issue preclusion law applies.

Under Florida law, issue preclusion applies where the same parties, or their privies, have previously fully litigated an identical issue to a final decision by a court of competent jurisdiction. *See Cmty. Bank of Homestead v. Torcise*, 162 F.3d 1084, 1086 (11th Cir. 1998). Specifically, issue preclusion requires that: "(1) an identical issue must have been presented in the prior proceeding; (2) the issue must have been a critical and necessary part of the prior determination; (3) there must have been a full and fair opportunity to litigate that issue; (4) the parties in the two proceedings must be identical; and (5) the issue[] must have been actually litigated." *Felder v. State, Dep't of Mgmt. Servs., Div. of Retirement*, 993 So. 2d 1031, 1034–35 (Fla. Dist. Ct. App. 2008) (internal quotation marks omitted).

Here, issue preclusion bars Defendants from re-litigating the issue of damages. First, FARC and NDVC were defendants in the prior case, and Mr. Caballero was the plaintiff. *See* ("State Ct. J.") (ECF No. 1-1). Second, the precise issue here was presented in the State Court Action. Specifically, at issue here is whether Defendants "injured [Plaintiff] in his . . . person, property, or business by reason of an act of international terrorism," entitling him to "recover threefold the damaged . . . sustain[ed] and the cost of the suit, including attorney's fees." § 2333.

8

In the State Court Action, the court awarded Plaintiff $45,000,000.00 in "actual compensatory damages for non-economic damages, including, without limitation, for emotional distress and for physical and psychological pain and suffering" and $1,729,667.00 in actual compensatory economic damages for losses to Plaintiff's business and property because of Defendants' "(a) hostage-taking, (b) trafficking in-persons, (c) torture, (d) extra judicial killing, and (e) crimes against humanity." State Ct. J. at 89–91. Third, the determination of the damages was a critical and necessary part of the State Court Action determination. The state court explicitly ruled on the issue of damages and incorporated its ruling into the State Court Judgment. *See* State Ct. J. at 91–92. Indeed, as discussed *infra*, the state court held a non-jury trial and made specific findings as to damages.

Finally, Defendants had a full and fair opportunity to litigate the issue and the issue was actually litigated. Default was entered in the State Court Action because Defendants failed to respond or appear. Compl. ¶ 4. However, "even a pure default, where there is no participation by the defendant, triggers [issue preclusion]. Thus[,] a pure default satisfies the 'fully litigated' element of [issue preclusion] under Florida law." *In re Itzler*, 247 B.R. 546, 554 (Bankr. S.D. Fla. 2000); *see also Masciarelli v. Maco Supply Corp.*, 224 So. 329, 330 (Fla. 1969). Moreover, the state court held a non-jury trial before it entered final default judgment. State Ct. J. at 1. The state court concluded that "[b]ased on the substantial and uncontroverted evidence presented at trial . . . Mr. Caballero has met all applicable burdens relevant to the award of damages against" Defendants. *Id.* at 90. Thus, Defendants had a full and fair opportunity to litigate the issue and the issue was fully litigated. Accordingly, Defendants are precluded from re-litigating the issue of damages and the amounts of damages are sufficiently proven.

### ii.    *Trebled Damages*

Plaintiff argues that the Court should treble Plaintiff's economic and non-economic damages.  Mot. at 9.  The ATA provides that a U.S. national injured by an act of international terrorism "shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."  § 2333.  Although neither the Eleventh Circuit nor any court in this District has addressed whether both economic and non-economic damages are trebled under the ATA, the weight of authority in other courts has held that both economic and non-economic damages are trebled.  *See Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 277 (D.R.I. 2004) [hereinafter *Ungar III*] (trebling the plaintiff's economic and non-economic damages); *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 2147, 233–34 (S.D.N.Y. 2003) (same); *see also Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, No. 8:09-cv-2308-T-26MAP, 2010 WL  11507790, at *4 (M.D. Fla. June 14, 2010) (trebling non-economic damages to victim's family members); *Pescatore v. Palmera Pineda*, 345 F. Supp. 3d 68, 78 (D.D.C. 2018) (trebling non-economic damages).  Thus, Plaintiff is entitled to trebling of his economic and non-economic damages.

### iii.    *Pre-Judgment Interest*

Next, Plaintiff argues that the Court should award him pre-judgment interest for his economic and non-economic damages.  Courts have discretion as to whether to award pre-judgment interest.  *See In re Glob. Mfg. Corp.*, 567 F.3d 1291, 1300 (11th Cir. 2009).  Neither the Eleventh Circuit nor any court in this District has determined whether pre-judgment interest should be awarded on damages pursuant to the ATA.

Other courts are split whether damage awards pursuant to the ATA are entitled to pre-judgment interest.  *Compare Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d

216, 266 (D.D.C. 2008) (awarding pre-judgment interest on ATA economic and non-economic damages), *with Estates of Ungar & Ungar ex rel. Strachman v. Palestinian Auth.*, 325 F. Supp. 2d 15, 67–68 (D.R.I. 2004) [hereinafter *Ungar IV*] (declining to award pre-judgment interest on economic and non-economic damages pursuant to the ATA).

In *Pugh*, the court reasoned that "courts in [the District of Columbia Circuit] have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries—including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants. *Pugh*, 53 F. Supp. 2d at 263. Further, the court explained that pre-judgment interest furthers the ATA's deterrent purposes and is part of providing full compensation to the victims because "interest compensates for the time value of money and thus is often necessary for full compensation." *Id.* at 264 (internal quotation marks and citation omitted). Moreover, the court notes that pre-judgment interest is particularly appropriate where the remedy is meant to compensate a victim for harms sustained over a long period of time. *Id.* (citation omitted).

Thus, the *Pugh* court found that pre-judgment interested was warranted to fully compensate the plaintiffs, especially in light of the eighteen (18) year delay between the act of international terrorism and the judgment. *Pugh*, 53 F. Supp. 2d at 264–65. Further, the court noted that "prejudgment interest is particularly appropriate in this case because of the substantial delay in judgment for these plaintiffs caused by Libya's persistent delay tactics over the course of this litigation." *Id.* at 265.

In *Ungar IV*, the court relies upon its finding in its prior decision in *Ungar III* for the proposition that the plaintiffs are not entitled to pre-judgment interest. *See Ungar IV*, 325 F. Supp. 2d at 68. The *Ungar III* court applied the analysis outlined in *Rodgers v. United States*, 332 U.S. 371 (1947), which noted that "penalties imposed by an Act of Congress bear interest only if and

to the extent that interest is required by federal law." *Ungar III*, 304 F. Supp. 2d at 237.  However, the *Rodgers* court further explained that "[a]bsent Congress' unequivocal prohibition of prejudgment interest, courts should grant or deny interest by looking to the congressional purpose underlying the particular statute." *Id.* at 237–38 (citing *Rodgers*, 332 U.S. at 373).

Finding that § 2333 does not directly address whether to award pre-judgment interest, the *Ungar* court turned to analyzing the congressional purposes.  *Id.* at 238.  The court examined Senator Grassley's, the bill's sponsor, statements during the floor debate of the bill and the testimony in the Subcommittee on Courts and Administrative Practice regarding the bill, which demonstrated "unequivocal congressional intent to deter acts of international terrorism and punish those who commit such acts against American citizens."  *Id.* at 238–39.  Thus, the court held that "[g]iven Congress' clear intent to deter and punish terrorist acts, this Court is unable to conclude that Congress also intended to add interest to the substantial penalties of treble damages, court costs, and attorney's fees that are already imposed by the statute."  *Id.* at 239.  Further, the court explained that "[p]rejudgment interest is also inappropriate in this case because the treble damages provision of Section 2333 is overwhelmingly punitive, and prejudgment interest does not apply to a punitive damages award."  *Id.*

Here, the Court finds the *Ungar III* court's analysis persuasive.  Although awarding pre-judgment interest would augment the deterrent effects of the ATA, the trebling of damages and extensive legislative history evidencing the statute's deterrent and punitive purposes counsel against awarding pre-judgment interest pursuant to *Rodgers*.  Further, the Court agrees that § 2333 is punitive in nature and therefore pre-judgment interest does not apply.

Moreover, the instant case is distinguishable from *Pugh*.  In *Pugh*, the court emphasized exacerbating factors which supported awarding pre-judgment interest.  Specifically, the court

observed that the underlying act of terrorism occurred on September 19, 1989, resulting in an approximately eighteen (18) year period between the underlying act of terrorism and the entry of judgment. *Pugh*, 530 F. Supp. 2d at 216, 265.  The court also noted that Libya's persistent delay tactics throughout the litigation further supported the award of pre-judgment interest. *Id.* at 265. Here, although the underlying acts of terrorism occurred in 1999, Plaintiff was not a citizen of the United States until after the filing of the State Court Action in 2012. *See* State Ct. J. at 6; Compl. ¶ 3.  Therefore, the delay in obtaining a judgment pursuant to the ATA was not caused by Defendants' delay tactics but rather because Plaintiff appears to have lacked standing to assert a claim pursuant to the ATA until at least 2012. *See* § 2333 (requiring that a national of the United States be injured by an act of international terrorism to state a claim); *see also* 8 U.S.C. § 1101(22). Further, the time that elapsed between Plaintiff becoming a citizen and this Order is at most approximately eight (8) years, which is significantly less than the delay in *Pugh*. *See* State Ct. J. at 6; Compl. ¶ 3.  Indeed, the period between Plaintiff becoming a citizen and this Order is approximately the same length as between the underlying act of terrorism and the entry of judgment in *Ungar IV*. *See Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 82 (D.R.I. 2004) (providing that the underlying act of terrorism occurred on June 9, 1996); *see generally Ungar IV*, 325 F. Supp. 2d 15 (entering judgment on July 12, 2004).

Accordingly, because the Court finds the *Ungar III* reasoning persuasive and the instant case distinguishable from *Pugh*, Plaintiff is not entitled to pre-judgment interest.

### iv.    *Post-Judgment Interest*

Finally, Plaintiff seeks post-judgment interest at the applicable rate on Plaintiff's economic and non-economic damages.  Mot at 17.  Section 1961, Title 28 of the United States Code provides that post-judgment "[i]nterest shall be allowed on any money judgment in a civil case recovered

in a district court." 28 U.S.C. § 1961.  The statute further provides that "interest shall be calculated

from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant

maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System,

for the calendar week preceding the date of the judgment." *Id.*  Accordingly, Plaintiff is entitled

to post-judgment interest at a rate equal to the weekly average 1-year constant maturity Treasury

yield for the calendar week preceding the date of final judgment.

## IV.    CONCLUSION

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being

otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiff's

Motion for Default Final Judgment Against Defendants FARC and NDVC (ECF No. 58) is

GRANTED.  Accordingly, it is hereby ORDERED AND ADJUDGED that:

A.    Final Judgment is entered in favor of Plaintiff Antonio Caballero and against

Defendants Fuerzas Armadas Revolucionarias de Colombia and Norte de Valle

Cartel, for which sum let execution issue, in the amount of:

i.    Forty-five million dollars ($45,000,000.00) in actual compensatory non-

economic damages, which is further trebled pursuant to 18 U.S.C. § 2333;

ii.    One million, seven hundred and twenty-nine thousand, six-hundred and

sixty-seven dollars ($1,729.667.00) in actual, compensatory economic

damages, which is further trebled pursuant to 18 U.S.C. § 2333; and

iii.    Post-judgment interest at the rate of 0.15% per annum on the above-

awarded trebled economic and non-economic damages;

B.    The Court retains jurisdiction to hear any motion for costs of this suit, including

attorney's fees; and

     C.     The Court retains jurisdiction to enforce this judgment.

The Clerk of the Court is instructed to CLOSE this case.  All pending motions, if any, are DENIED AS MOOT.

     DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of May, 2020.

                          _____

                          K. MICHAEL MOORE

                          UNITED STATES CHIEF DISTRICT JUDGE

c: All counsel of record

# EXHIBIT 8

ANTONIO CABALLERO,

     Plaintiff,

vs.

FUERZAS ARMADAS
REVOLUCIONARIAS DE COLOMBIA,
a/k/a FARC-EP a/k/a REVOLUTIONARY
ARMED FORCES OF COLOMBIA; and
THE NORTE DE VALLE
CARTEL,

     Defendants.

_____/

## SWORN DECLARATION OF JOHN ROBERT MCBRIEN REGARDING AGENCIES AND INSTRUMENTALITIES OF THE FARC

I, John Robert McBrien, declare the following under oath:

### I.    Introduction

1. My name is John Robert McBrien. I am a citizen of the United States and was formerly the Associate Director for Global Targeting in the Office of Foreign Assets Control ("OFAC"), the U.S. Treasury Department's sanctions organization. I held that position from May 2005 to December 2011, when I retired from the Treasury Department. Furthermore, at all times during my employment with OFAC, I was in charge of its designations operations. This covered the period from November 1987 to and throughout the formal creation of OFAC's Office of Global Targeting (OGT) in 2005. Thus, I was in charge of the designations programs of OFAC for more than 24 years. OFAC's Office of Global Targeting is charged with investigating and identifying the foreign entities and individuals that are designated under OFAC's Specially Designated Nationals ("SDN") programs directed against the principals, operatives, and

1

networks of sanctioned countries, regimes, and non-state foreign adversaries.

2.   I am an authority in the employment of U.S. economic sanctions programs and had a seminal role in the conception, design, and development of the Specially Designated Nationals list and targeted sanctions against non-state foreign adversaries. My initiatives have been a key factor in the development of economic sanctions as a major instrument of national security policy.   During my nearly 25 years with OFAC, I participated in the development of every sanctions Executive Order issued in that period and in the implementation of the resulting sanctions programs.

3.      I began my career as an attorney in Washington, D.C. in the United States Justice Department's Organized Crime and Racketeering Section. And, in addition to conducting grand jury investigations, I served as the executive secretary for the Attorney General's National Council on Organized Crime. Nearly 40 years later, I was involved in the development of President Obama's National Strategy on Transnational Organized Crime and the Executive Order imposing sanctions against transnational criminal organizations.

4.   Most of my career, including the nearly 25 years I worked with OFAC, was with the U.S. Treasury Department, where I handled a broad spectrum of cross-cutting national security, intelligence, and law enforcement issues.   Among these was the use of economic sanctions on both strategic and tactical levels.

5.   Subsequent to my service with the Treasury Department, I served, under contract, as a senior advisor in the Narcotics and Transnational Crime Support Center of the Department of Defense, advising on sanctions, illicit finance, and countering threat networks.  In addition, I am a member of the Board of Advisers of the Center on Economic and Financial Power of the

Foundation for Defense of Democracies, and I am a Fellow of the American College of National Security Leaders.

6.   Moreover, I am an expert in the development, coordination, and implementation of inter-disciplinary and collaborative policies and programs affecting U.S. national security.   As noted above, this includes the use of economic sanctions on both strategic and tactical levels. I have broad experience with the national security and defense, foreign policy, intelligence, law enforcement, and legal communities. I was a participant in the U.S. counter-terrorism program from its 1972 inception and in counter-narcotics programs since 1985.   When I retired in December 2011, I held the position of Associate Director for Global Targeting at OFAC.   In that position, I was responsible for targeting investigations, execution of designations, policy development, and interagency collaboration involving OFAC's designation programs.

## II.    Agency and Instrumentality

7.    Historically, the FARC has dominated the Colombian cocaine trade. "[T]he FARC controls approximately 70% of the coca grown in Colombia." Indictment at ¶ 34, *United States v. Marin*, (Apr. 29, 2005 D.D.C.), (No. 04-446), attached hereto as **Exhibit A**. And, Colombia supplies 90% of the cocaine consumed in the United States. *See id.*; *see also Narco-Terror: the Worldwide Connection Between Drugs and Terrorism, Before the Subcomm. On Tech., Terrorism and Gov't. Info*, *Senate Comm. on the Judiciary*, 107th Cong., at 4 (2002), attached hereto as **Exhibit B**. "Therefore, the FARC is responsible for…more than approximately 60% of the cocaine sent to the United States."   Indictment at ¶ 34, *United States v. Marin*, (Apr. 29, 2005 D.D.C.), (No. 04-446); *see also* U.S. GOV'T ACCOUNTABILITY OFF., GAO-09-806, DRUG CONTROL: U.S. COUNTERNARCOTICS COOPERATION WITH VENEZUELA HAS DECLINED, at 4, (2009), attached

3

hereto as **Exhibit C**.

8.      Recently, FARC factions (together with various "Armed Criminal Organizations")

continue to dominate the Colombian drug trade. *See* Drug Enf't Administration, 2019 National

Drug Threat Assessment at 104, (2019).

9.      According to the U.S. Drug Enforcement Administration , ". . . approximately

90% of samples [of cocaine in the U.S. market] analyzed in 2018 originated in Colombia." *See*

*id*. at 69. *See also id*. at 60 (pie chart).

10.     Agents and instrumentalities of the FARC, include anyone or any entity that:

.....is or was ever involved in the cultivation, manufacture, processing, purchase,
sale, trafficking, security, storage, shipment or transportation, distribution of
FARC coca paste or cocaine, or that assisted the FARC's financial or money
laundering network, . . . because it was either:
(1) materially assisting in, or providing financial or technological support for or
to, or providing goods or services in support of, the international narcotics
trafficking activities of . . . [FARC]; and/or
(2) owned, controlled, or directed by, or acting for or on behalf of, . . . [FARC];
and/or
(3) playing a significant role in international narcotics trafficking [related to coca
paste or cocaine manufactured or supplied by the FARC].

*Stansell v. Revolutionary Armed Forces of Columbia*, 771 F.3d 713, 724 n.6 (11th Cir. 2014).

Alex Nain Saab Moran ("Saab") is an agent and instrumentality of the FARC.   Saab was

designated as an SDN by OFAC under the Venezuelan Sanctions Program on July 25, 2019.[1]

Saab is a fugitive of the law and a known money-launderer.[2]

11.     On the same day that Saab was designated as an SDN, the following individuals

---

[1] Office of Foreign Assets Control, *Venezuela Related Designations*, U.S. TREASURY DEPT., (Jul. 25, 2019),
https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20190725.aspx
[2] *See generally* Indictment, *United States v. Saab Moran*, (S.D. Fla. July 2019) (No. 19-20450) (charging Saab with
conspiracy to commit money-laundering and laundering of monetary instruments); *see also* Kejal Vyas, *Key
Financier of Venezuela's Maduro Regime Arrested*, THE WALL STREET JOURNAL, (Jun. 13, 2020),
https://www.wsj.com/articles/key-financier-of-venezuelas-maduro-regime-arrested-11592078537
 (noting that Saab was arrested in Cape Verde and is wanted by the U.S. government).

were designated by OFAC as part Saab's "network of corruption and nepotism" and were "determined to be responsible for or complicit in, or directly or indirectly engaged in, a transaction or series of transactions involving deceptive practices and corruption and the Government of Venezuela or projects or programs administered by the Government of Venezuela, or are immediate adult family members of such persons, or operate in the gold sector of the Venezuelan economy, or are current or former officials of the Government of Venezuela": Walter Jacob Gavidia Flores, Yosser Daniel Gavidia Flores, and Yoswal Alexander Gavidia Flores (Maduro's stepsons - "Los Chamos"); Cilia Adela Flores de Maduro; Carlos Erica Malpica Flores; Tareck Zaidan El Aissami Maddah; Illiana Josefa Ruzza Terán; Alvaro Enrique Pulido Vargas (Pulido); Emmanuel Enrique Rubio Gonzalez (Rubio); Jose Gregorio Vielma Mora (Vielma Mora); Shadi Nain Saab Certain (Shadi); Isham Ali Saab Certain; Mariana Andres Staudinger Lemoine. *See* Press Release, U.S. Treasury Dept., Treasury Disrupts Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP, (Jul. 25, 2019).

12.    OFAC's July 25, 2019 press release detailing its designation of Saab and his "vast corruption network" states:

> ***Several individuals designated today played a role in establishing a global structure of front and shell companies to skim significant sums of money from commercial contracts and business activity created through the scheme.*** By utilizing such a structure of offshore entities to support CLAP operations, it makes it more difficult for U.S. financial institutions to identify corrupt activity related to CLAP-related food operations.
>
> ***The following companies were designated or blocked today for being owned or controlled by the aforementioned individuals, or for being responsible for or complicit in, or for being directly or indirectly involved in, any transaction or series of transactions involving deceptive practices or corruption and the Government of Venezuela or projects or programs administered by the Government of Venezuela.***

*Id.* (emphasis added).

13.     According to the OFAC July 25, 2019 Press Release, the following entities were designated by OFAC "for being owned or controlled by the aforementioned individuals [*see* para. 11 *supra*], or for being responsible for or complicit in, or for being directly or indirectly involved in, any transaction or series of transactions involving deceptive practices or corruption and the Government of Venezuela or projects or programs administered by the Government of Venezuela": Asasi Food FZE; Group Grand Limited; Group Grand Limited, S.A. de C.V.; Group Grand Limited General Trading; Mulberry Proje Yatirim Anonim Sirketi (Mulberry); Seafire Foundation; C I Fondo Global De Alimentos LTDA; Emmr & CIA S.A.S.; Global Structure, S.A.; Multitex International Trading, S.A.; Sun Properties LLC; CLIO Management Corp.; Silver Bay Partners FZE (Silver). *Id.*

14.     Moreover, on September 17, 2019, OFAC designated the following "three individuals and 16 entities for their connections to Alex Nain Saab Moran (Alex Saab) and his business partner, Alvaro Enrique Pulido Vargas (Alvaro Pulido), who have enabled former President Nicolás Maduro (Maduro) and his illegitimate regime to corruptly profit from imports of food aid and distribution in Venezuela": Amir Luis Saab Moran ("Amir Saab"), Luis Alberto Saab Moran ("Luis Saab"), David Nicolas Rubio Gonzalez ("Rubio"). Press Release, U.S. Treasury Dept., Treasury Increases Pressure on Alex Saab and His Network in Venezuela, (Sept. 17, 2019). OFAC stated that such individuals "are immediate adult family members of, and had business ties to, Alex Saab or Alvaro Pulido, two individuals who are responsible for or complicit in, or have directly or indirectly engaged in, any deceptive or corrupt transaction or series of transactions with the Government of Venezuela or projects or programs administered by

the Government of Venezuela." *Id.* Regarding Amir Saab, Luis Saab, and Rubio, OFAC stated as follows:

> • **Amir Luis Saab Moran (Amir Saab)** has been involved in multiple business ventures with his brother, Alex Saab, most notably the Panama-based Seafire Foundation, which was designated on July 25, 2019, for its involvement in Alex Saab's corruption network. As of early 2018, Amir Saab was in charge of the administrations of various companies owned or controlled by Alex Saab. Four companies owned or controlled by Amir Saab in Colombia and Panama are being designated as a result of today's action.
>
> • **Luis Alberto Saab Moran (Luis Saab)** has been involved in multiple business ventures with his brothers, Alex Saab and Amir Saab. Eight companies owned or controlled by Luis Saab across Latin America and Europe are being designated as a result of today's action.
>
> • **David Nicolas Rubio Gonzalez (Rubio)** is the son of Alvaro Pulido and brother of Emmanuel Enrique Rubio Gonzalez, who were previously designated on July 25, 2019. Rubio is a Director at Global Structure, S.A. and an Assistant Manager at C I Fondo Global De Alimentos LTDA. Both of these companies were designated on July 25, 2019. Three additional companies owned or controlled by Rubio in Colombia and Panama are being designated today.

*Id.*

15.     The following companies were designated by OFAC as SDNs for being owned or controlled by, or for having acted or purported to act for or on behalf of, directly or indirectly, Amir Luis Saab Moran ("Amir Saab"), Luis Alberto Saab Moran ("Luis Saab"), David Nicolas Rubio Gonzalez ("Rubio"), or Alex Saab: Fundacion Venedig (Panama); Inversiones Rodime S.A. (Panama); Saafartex Zona Franca SAS (Colombia); Venedig Capital S.A.S. (Colombia); AGRO XPO S.A.S. (Colombia); Alamo Trading S.A. (Colombia); Antiqua Del Caribe S.A.S. (Colombia); Avanti Global Group S.A.S. (Colombia); Global Energy Company S.A.S. (Colombia); Gruppo Domano S.R.L. (Italy); Manara S.A.S. (Colombia); Techno Energy, S.A. (Panama); Corporacion ACS Trading S.A.S. (Colombia); Dimaco Technology, S.A. (Panama); Global De Textiles Andino S.A.S. (Colombia); and Saab Certain & Compania S. En C.

(Colombia). *See Id.*

16.    It is my opinion that the individuals and entities referenced in paragraphs 11, 12, 13, 14, and 15 herein are agents and instrumentalities of the FARC.

17.    Saab has ties to and worked together with various FARC operatives, including, without limitation, the illegitimate occupant of the Venezuelan Presidency Nicolas Maduro ("Maduro"), Tareck Zaidan El Aissami Maddah ("El Aissami"), and Hizballah.  As such, Saab himself is an agent and instrumentality of the FARC.

18.    On July 31, 2017, OFAC designated Maduro as a SDN under Executive Order 13692.[3]  Throughout his regime, Maduro has made Venezuela a safe haven for the FARC.[4]  Moreover, Maduro has provided material support to the FARC.[5]  "Maduro helped manage, and ultimately, lead the Cartel of the Suns, a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials, as he gained power in Venezuela in a corrupt and violent narco-terrorism conspiracy with the Revolutionary Armed Forces of Colombia (FARC)." *See Nicolas Maduro Moros—New Target*, U.S. DEP'T OF STATE (Mar. 26, 2020), https://www.state.gov/nicolas-maduro-moros-new-target/.    "Maduro negotiated multi-ton

---

[3] *See* Office of Foreign Assets Control, *Venezuela Related Designations*, U.S. TREASURY DEPT., (July 31, 2017), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20170731.aspx
[4] *See* Venezuela Investigative Unit, *GameChangers 2019: As Venezuela Sinks, Maduro's Criminal Ties Keep Him Afloat*, INSIGHT CRIME, (Jan. 18, 2020), https://www.insightcrime.org/news/analysis/gamechangers-venezuela-maduro-criminal-ties/ (discussing Maduro's welcome to the FARC and ELN into Venezuela); *see also* Venezuela Investigative Unit, *FARC Dissidents and the ELN Turn Venezuela Into Criminal Enclave,* https://www.insightcrime.org/news/farc-dissidents-eln-turn-venezuela-criminal-enclave/ (Dec. 10, 2018) (detailing Maduro's support to the FARC and ELN "in states such as Apure, Amazonas, and Bolívar, now considered to be criminal enclaves").
[5] *See* Venezuela Investigative Unit, *GameChangers 2019: As Venezuela Sinks, Maduro's Criminal Ties Keep Him Afloat*, INSIGHT CRIME, (Jan. 18, 2020), https://www.insightcrime.org/news/analysis/gamechangers-venezuela-maduro-criminal-ties/ (discussing how Maduro has allowed terrorist agencies such as the FARC and the ELN to dig up Venezuelan gold) ("Maduro has given these guerrillas, especially the ex-FARC mafia, a firm grip on transnational drug trafficking, creating numerous conduits to send cocaine from Colombia through Venezuela to the United States and Europe.").

shipments of FARC-produced cocaine; directed the Cartel of the Suns to provide military-grade weapons to the FARC; during his tenure as Foreign Minister coordinated foreign affairs with Honduras and other countries to facilitate large-scale drug trafficking; and solicited assistance from FARC leadership in training an unsanctioned militia group that functioned, in essence, as an armed forces unit for the Cartel of the Suns. " *Id.* Specifically, Maduro and his regime have facilitated FARC's drug trafficking through Venezuela and to Honduras as follows:

> A sizable fraction of the profits go to countries through which the drugs pass, from the jungles of Colombia through Venezuela and often to the Honduran coastline. A confidential 2018 US radar map of the plane routes seen by CNN shows their departure from northwestern Venezuela's Zulia region, their passage north to the Caribbean, and then their sharp turn West toward their destinations in the remote farmlands of Guatemala, on the Honduran coastline, and some in the Caribbean. From there, the drugs are shipped up to Mexico and then distributed to American cities.

> One US official estimated that in 2018 alone, 240 metric tons (265 tons for US readers) of cocaine crossed into Venezuela from Colombia to be flown out of the country. Other officials involved in combating the drug trade said that estimate was conservative. So much pure Colombian cocaine, when cut and distributed, could fetch around $39 billion on the streets of the US, according to an estimate by the United Nations Office on Drugs and Crime for CNN.

*Corruption in Venezuela has created a cocaine superhighway to the US*, CNN, (April 17, 2019),

https://www.cnn.com/2019/04/17/americas/venezuela-drug-cocaine-trafficking-intl/index.html.

*See also Dominican Republic and Venezuela: Cocaine Across the Carribean,* INSIGHT CRIME,

(May                              24,                              2018),

https://www.insightcrime.org/investigations/dominican-republic-venezuela-cocaine-across-carib

bean/.

Los Cachiros transport FARC cocaine in Honduras and Guatemala. "It is reported that [the] Los Cachiros controls 90 percent of the clandestine airstrips in Honduras, and it uses these

airstrips to facilitate the entry of drugs into Honduras and Guatemala."[6] Controlling 90% of the clandestine airstrips in Honduras for entry of cocaine from the FARC, the supplier of more than 50% of the world's supply of cocaine, means that the Los Cachiros is the transport arm for the FARC in Honduras. The U.S. government has identified the Los Cachiros and several of its members as Specially Designated Narcotics Traffickers (SDNTKs) pursuant to the Foreign Narcotics Kingpin Designation Act.[7] The Los Cachiros is an agency and instrumentality of the FARC as they transport FARC cocaine. They are in essence the FARC cocaine transporter in Honduras - controlling virtually all clandestine Honduran airstrips for transport of FARC cocaine, and otherwise materially assisting in, or otherwise providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of the FARC. Therefore, Maduro, by facilitating FARC's drug trafficking through Venezuela, to Honduras, and eventually to the U.S, materially assists and otherwise provides support to the FARC. Maduro is therefore an agent and instrumentality of the FARC by ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6.

---

[6] *"Treasury Targets 'Los Cachiros' Drug Trafficking Organization in Honduras,"* U.S. ~~DEP'T OF~~ TREAS. DEPT. (Sept. 19, 2013), ~~https://www.treasury.gov/press-center/press-releases/Pages/jl2168.aspx~~ https://www.treasury.gov/press-center/press-releases/Pages/jl2168.aspx (emphasis added); *see also* THE WHITE HOUSE, *Presidential Letter-- Kingpin Designation Act,* EIN PRESSWIRE, (May 31, 2013), https://www.einpresswire.com/article/152311309/presidential-letter-kingpin-designation-act (explaining how the President named the Los Cachiros DTO as a "Tier I" drug kingpin ("Significant Foreign Narcotics Trafficker") in May 2013. OFAC began designations of Los Cachiros leadership and other key persons in September 2013. Those tier II designations and the earlier Tier I determination were all added to the OFAC SDN list as SDNTKs).

[7] 21 U.S.C.1901-1908, 8 U.S.C.1189; *see also* Los Cachiros Drug Trafficking Organization Chart U.S. TREAS. DEPT. (Sept. 2 013), https://www.treasury.gov/resourcecenter/sanctions/Programs/Documents/20130919_los_cachiros.pdf; OFAC, *Kingpin Act Designations; Foreign Sanctions Evaders Designations; Executive Order 13622 Designations; Iran Sanctions Designations; Non-proliferation Designations; Counter Terrorism Designations* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20130531.aspx (May 31, 2013).

19.     Saab is "a frontman for Maduro," as well as a "key financier" for Maduro's illegitimate government. *See Alex Saab*, INSIGHT CRIME, (Jun. 14, 2020), https://www.insightcrime.org/venezuela-organized-crime-news/alex-saab/ (discussing how "Maduro would pay hundreds of millions of dollars to Saab," as well as Saab's money-laundering crimes related to the Venezuelan government); Kejal Vyas, *Key Financier of Venezuela's Maduro Regime Arrested*, THE WALL STREET JOURNAL, (Jun. 13, 2020), https://www.wsj.com/articles/key-financier-of-venezuelas-maduro-regime-arrested-11592078537 (discussing how Saab "stash[ed] hundreds of millions of dollars in proceeds from no-bid state contracts for projects ranging from housing construction to food distribution" and how he "created a vast financial network to move money on Caracas' behalf"). Saab "has been implicated in several corruption schemes involving the Maduro regime" and has assisted Nicolas Maduro and other Venezuelan government officials to "launder hundreds of millions of dollars in corruption proceeds." *See* Claudia Fernandez, Moises Rendon, *Corruption in Venezuela: The Alex Saab Case*, CENTER FOR STRATEGIC AND INTERNATIONAL STUDIES, (Jun. 24, 2020), https://www.csis.org/analysis/corruption-venezuela-alex-saab-case; *see also* Indictment, *United States v. Saab Moran*, at 9, ¶ 8 (S.D. Fla. July 2019 (No. 19-20450) (discussing how Saab and his co-conspirators made corrupt payments to Venezuelan government officials in exchange for approval of fraudulent invoices "for goods that were never imported into Venezuela"). Saab has been heavily involved in the Venezuelan government's Local Storage and Production Committees ("CLAP") aid program and illicit gold extraction program. Press Release, U.S. Treasury Dept. , Treasury Increases Pressure on Alex Saab and His Network in Venezuela (Sep. 17, 2019). Saab's activities have "enabled former President Nicolas Maduro (Maduro) and his

illegitimate regime to corruptly profit from imports of food aid and distribution in Venezuela."
*Id.* (discussing Saab's involvement in the corrupt CLAP program); *see also* U.S. Dept. of the
Treasury Financial Crimes Enforcement Network, UPDATED ADVISORY ON WIDESPREAD PUBLIC
CORRUPTION IN VENEZUELA FIN-2019-A002 (May 3, 2019) (explaining how Maduro's regime
received kickbacks from the CLAP program through inflated contract prices). Press Release,
U.S. Treasury Dept. Treasury Disrupts Corruption Network Stealing From Venezuela's Food
Distribution Program, CLAP, (Jul. 25, 2019) (discussing Saab's involvement in the gold
extraction program, used by Maduro to keep his regime solvent); Venezuela Investigative Unit,
*The Fall of Álex Saab, The Venezuelan Regime's Trusted Money Man*, INSIGHT CRIME, (Jun. 15,
2020), https://www.insightcrime.org/news/brief/fall-alex-saab-venezuela/ (discussing that, "[t]he
arrest of Alex Saab not only takes away a key Maduro ally but is a blow to the government's
ability to prop itself up through illicit proceeds). Moreover, Saab's illicit activity includes
enriching Maduro's immediate family members by bribing the stepsons of Maduro, funneling
money to them "in exchange for access to contracts with the Government of Venezuela,
including its food subsidy program." Press Release, U.S. Treasury Dept., Treasury Disrupts
Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP, (July 25,
2019), https://home.treasury.gov/news/press-releases/sm741; *see also* Annie Todd, *Stepsons of
Venezuelan President Sanctioned by the US*, ORGANIZED CRIME AND CORRUPTION REPORTING
PROJECT,                          (Jul.                          29,                          2019),
https://www.occrp.org/en/daily/10333-stepsons-of-venezuelan-president-sanctioned-by-the-us
(discussing how Saab leveraged his relationships with Maduro's stepsons to gain access to key
officials such as Maduro and El Aissami and to Venezeulan governmental contracts).

12

20.     Because Saab laundered money, and engaged in other illegal activities, for Maduro – or otherwise provided material assistance to or coordinated with – Maduro who is an agent and instrumentality of the FARC, Saab is an agent and instrumentality of the FARC. Through his assistance and support for Maduro through the illicit activities referenced above (among others), Saab has engaged in: ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6. Saab is thus an agent and instrumentality of the FARC.

21.     El Aissami, current Venezuelan Minister of Industry and National Production, has been designated by OFAC as an SDNTK.[8]   El Aissami has played "a significant role in international narcotics trafficking." *See* Press Release, U.S. Treasury Dept., Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami And His Primary Frontman Samark Lopez Bello (Feb. 13, 2017). Specifically,

> [El Aissami] facilitated shipments of narcotics from Venezuela, to include control over planes that left from a Venezuelan air base and drug routes through the ports in Venezuela. In his previous positions, he oversaw or partially owned narcotics shipments of more than 1,000 kilograms from Venezuela on multiple occasions, including those with the final destinations of Mexico and the United States.

*See id.*

22.     El Aissami has collaborated specifically with Los Zetas, a Mexican cartel, and with Daniel Barrera Barrera, a known Colombian drug lord. *See id.* Both Los Zetas and Daniel Barrera Barrera have been designated pursuant to the Kingpin Act for their narcotics trafficking dealings. *See id.* And, on November 18, 2014, the Eleventh Judicial Circuit Court found that Los

---

[8] *See* Press Release, U.S. Treasury Dept. Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello (Feb. 13, 2017)

Zetas and Daniel Barrera Barrera are agencies and instrumentalities of the FARC. *See* Final Judgment Ex. L at 1, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 12-48803 (11th Judicial Fla. Cir. Ct. Nov. 18, 2014); *see also* Final Judgment Ex. I at 1, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 12-48803 (11th Judicial Fla. Cir. Ct. Nov. 18, 2014). El Aissami has also collaborated with Hizballah, another known agency and instrumentality of the FARC [*see* par. 22, infra].[9] Thus, by collaborating with Los Zetas, Daniel Barrera Barrera, and Hizballah, El Aissami acted as an agency and instrumentality of the FARC by ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6.

23.     Saab has coordinated and provided material assistance to El Aissami regarding several illicit operations, including but not limited to, the CLAP program and the illicit operations involving the Venezuelan gold sector. *See* Press Release, U.S. Treasury Dept.Treasury Disrupts Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP, (July 25, 2019), https://home.treasury.gov/news/press-releases/sm741. Specifically,

> From early 2018, as the Government of Venezuela's shortage of foreign exchange became increasingly acute, *the Government started using gold resources to pay some contracts, to include CLAP food contracts*, and Saab began working with Simon Alejandro Zerpa Delgado (Zerpa) to help the Government liquidate gold mined in Venezuela and convert it into foreign currency. Zerpa was designated on July 26, 2017 pursuant to E.O. 13692 for being a current or former official of the Government of Venezuela. *Saab, in turn, worked with members of the Venezuelan government including El*

---

[9] *See also* Venezuela Investigative Unit, *Key Criminal Revelations From Former Venezuela Intelligence Chief*, INSIGHT                      CRIME,                      (Feb.                      25,                      2019) https://www.insightcrime.org/news/analysis/key-revelations-venezuela-intelligence-chief-maduro/   (referencing accusations by General Hugo Carvajal Barrios: "Carvajal also accused former Venezuela Vice President Tareck El Aissami of having significant links to the Lebanese terrorist group Hezbollah. He said that he accompanied El Aissami on a 2009 trip to Iran, which included a stop in Syria to invite Hezbollah militants to come and work with FARC fighters in Venezuela."

> *Aissami, the current Minister of Industries and National Production and former Executive Vice President, to create a structure for the Government of Venezuela to sell gold to Turkey.* As a result of the Government of Venezuela's corrupt operations in the gold sector, and to prevent Maduro and his corrupt associates from further exploiting Venezuela's people and resources, the gold sector of the Venezuelan economy was identified as subject to sanctions by Secretary Mnuchin in November 2018.

*See Id.* (emphasis added). Moreover, "Saab is alleged to have helped negotiate the Iran [gold] deal with Maduro's new Oil Minister Tareck el Aissami. The two had previously worked together to strengthen Venezuela's relationship with Turkey, which included shipments of at least $900 million in gold to the nation in 2018." Patricia Laya, *Maduro's U.S.-Charged Dealmaker Saab Detained in Cabo Verde*, BLOOMBERG, (Jun. 13, 2020), https://www.bloomberg.com/news/articles/2020-06-13/maduro-s-u-s-charged-dealmaker-alex-saab-detained-in-cabo-verde; *see also* Rico, *Nicolas Maduro's Main Front Man, Alex Saab, Is Arrested In Africa*, QCOSTA RICA, (Jun. 14, 2020), https://qcostarica.com/nicolas-maduros-main-front-man-alex-saab-is-arrested-in-africa/ (detailing how Saab and El Aissami worked together to implement the illicit gold extraction program). Alex Saab, "Tareck's key facilitator . . . profited off the regime's corruption, as he secured gold from miners at an inflated market rate and had close connections to many of the officials leading the state-run mining conglomerate in Venezuela." Joseph M. Humire, *Iran, Turkey, and Venezuela's Super Facilitator: Who is Alex Saab?*, CENTER FOR A SECURE FREE SOCIETY, (Jun. 30, 2020) https://www.securefreesociety.org/research/who-is-alex-saab/.  As part of the illicit gold program:

> Miners extract gold from the Arco Minero in eastern Venezuela under the supervision of the Colombian guerilla groups ELN and FARC. The gold is then purchased by Venezuela's state-owned gold company, Minerven, through a joint gold venture with Turkey called Mibiturven, S.A. The gold is then turned over to CVG MINERVEN, the state-owned Venezuelan mining conglomerate that

15

processes the gold and packages it for transport to Caracas. Once processed, the gold is transported by the Venezuelan National Guard to the Central Bank of Venezuela (BCV), who prepares it for international shipment. The gold is moved from BCV to Maiquetia International Airport using the private security firm Transporte Panamericano and loaded onto one of several, private airliners, or a commercial Turkish Airlines flight, with weekly service to Istanbul via Havana.

*Id.*

24.     In addition, Saab provided material assistance to El Aissami and the Maduro regime by jointly orchestrating a money scheme involving Venezuelan-origin crude oil with El Aissami. *See Press Release*, U.S. Treasury Dept., Treasury Targets Sanctions Evasion Network Supporting       Corrupt       Venezuelan       Actors       (June       18,       2020), https://home.treasury.gov/news/press-releases/sm1038.  Specifically,

> Since at least 2019, the illegitimate Maduro regime and PdVSA have cooperated with U.S.-designated Alex Nain Saab Moran (Saab) and Leal to evade U.S. sanctions and assist in the sale of Venezuelan-origin crude oil. One of Saab and Leal's recent schemes to sell Venezuelan-origin crude oil was under the guise of an "oil-for-food" program that never resulted in food deliveries to Venezuela . . .
>
> In lieu of pre-payment for the contracted corn and water trucks, ***Libre Abordo agreed to lift and broker the sale of Venezuelan-origin crude oil supplied by PdVSA in a scheme orchestrated by Saab and El Aissami*** . . .
>
> Leal is the critical conduit between Libre Abordo, Schlager Business Group, and their owners, and PdVSA and Saab. . .

*See id.* (emphasis added). The Treasury press release discusses how "Libre Abordo is based in Mexico City, Mexico and had no prior experience in the global oil sector before entering into an agreement with the Government of Venezuela and PdVSA." *See id.*

25.     Because Saab has provided material assistance to El Aissami and coordinated with El Aissami who is an agent and instrumentality of the FARC, Saab is an agent and instrumentality of the FARC. Through his assistance and support for El Aissami, and through

(among others) the illicit activities referenced above, such as regarding the CLAP and illicit gold sector program—the latter of which involved direct supervision by the FARC and ELN, Saab has engaged in: ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6. Saab is thus an agent and instrumentality of the FARC.

26.     Hizballah is one of the most dangerous terrorist groups in the world and has been designated by the Secretary of State as a Foreign Terrorist Organization (FTO) and by OFAC as a Specially Designated Global Terrorist ("SDGT").[10] Hizballah has been involved in drug trafficking throughout South America, including with the FARC, and has used the proceeds from such trafficking to finance its terrorist activity worldwide.[11]   In addition, Hizballah launders money from cocaine dealing on behalf of the FARC, oftentimes through a Hizballah-controlled money laundering infrastructure.[12] In testimony before the House Committee on Foreign Affairs in 2017, Donald Semesky, former Chief of DEA's Office of Financial Operations, discussing

[10]  U.S. Dep't Treasury, ALPHABETICAL LISTING OF SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS ("SDN List"), https://www.treasury.gov/ofac/downloads/sdnlist.txt. See footnote 19 for definition references to FTO, SDGT, SDNTK and SDN.

[11]  *See* Press Release, U.S. Drug Enforcement Administration, DEA And European Authorities Uncover Massive Hizballah Drug And Money Laundering (Feb. 1, 2016); *see also* Press Release, U.S. Treasury Dept., Treasury Targets Major Money Laundering Network Linked to Drug Trafficker Ayman Joumaa and a Key Hizballah Supporter in South America (Jun. 27, 2012) (discussing Hizballah's money-laundering enterprise in the Americas: "'The Joumaa network is a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hizballah,' said under Secretary for Terrorism and Financial Intelligence David S. Cohen. 'We and our partners will continue to aggressively map, expose and disable this network, as we are doing with today's sanctions.'"); *see also* Vanessa Neumann, *E-Notes, Foreign Policy Research institute,* at 2 (Dec. 2011), https://www.fpri.org/docs/media/201112.neumann.narcoterrorism.pdf. (discussing Hizballah's facilitation of FARC cocaine shipments: "As the cocaine is transported through Africa and into Europe, its safe passage is guaranteed (much as it was in Latin America) by terrorist groups—most prominently, Al Qaeda and Hezbollah.")

[12]  *See* Vanessa Neumann, *E-Notes, Foreign Policy Research institute,* (Dec. 2011, https://www.fpri.org/docs/media/201112.neumann.narcoterrorism.pdf at 3 (discussing Hizballah high-level officials who are directly involved in the South American cocaine trade and its most violent cartels, including the Mexican gang Los Zetas, a known agent and instrumentality of the FARC).

17

links between "many of the State Department's designated [FTOs] and Foreign Drug Trafficking Organizations" testified that, "as in the case of the ...FARC and Hezbollah, they become, to some extent, one and the same."[13]   The Hizballah-FARC relationship is described by other experts: "Hezbollah's involvement in Latin America's drug trade is significant and expanding.  The group -- often referred to as the 'A-Team' of international terrorism - has reportedly formed partnerships with several of the region's most notorious crime syndicates, including Mexico's Zetas [and] Colombia's FARC."[14] Hizballah is an agency and instrumentality of the FARC by ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6. Saab has coordinated with and provided material assistance to Hizballah by  "oversee[ing] 'illegal operations' aimed at providing funds to finance party activities." *tayyar.org – Urgent – "Hezbollah Man" Wanted by Washington Arrest of Alex Saab*, Saudi 24 News, (Jun. 14, 2020), https://www.saudi24.news/.sa/2020/06/tayyar-org-urgent-hezbollah-man-wanted-by-washington-arrest-of-alex-saab.html ("Information indicates that Saab is the Hizballah man in Latin America, where he oversees 'illegal operations' aimed at providing funds to finance party activities."), attached hereto as **Exhibit D**. Saab is currently being investigated for his "suspected nexus with the terrorist group Hezbollah, which is thought to have established relations with Venezuela through Tareck El Aissami." *Alex Saab*, InSight Crime, (Jun. 14, 2020),

---

[13] "Examining the Effectiveness of the Kingpin Designation Act in the Western Hemisphere," Testimony of Donald C. Semesky, Jr.,House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, November 8, 2017.

[14] Ottolenghi, E., and Stein, J.L., "Trump Should Cut Hezbollah's Lifeline in the Americas," Foreign Policy, December 13,2018.https://foreignpolicy.com/2028/12/12/trump-should-cut-hezbollahs-lifeline-in-the-americas//

https://www.insightcrime.org/venezuela-organized-crime-news/alex-saab/; *see also* Samir Salama, *Alex Saab, Hezbollah's money man in Latin America, Arrested in Cape Verde*, Gulf News, (Jun. 14, 2020), https://gulfnews.com/world/mena/alex-saab-hezbollahs-money-man-in-latin-america-arrested-in-cape-verde-1.72040582 ("Alex Saab, who is considered the conduit for the Hezbollah militia in Latin America"); *See also tayyar.org – Urgent – "Hezbollah Man" Wanted by Washington .. Arrest of Alex Saab*, Saudi 24 News, (Jun. 14, 2020), https://www.saudi24.news/.sa/2020/06/tayyar-org-urgent-hezbollah-man-wanted-by-washington-arrest-of-alex-saab.html.

27.     Because Saab has coordinated with and provided material assistance to Hizballah, which is an agent and instrumentality of the FARC, including by providing funding to Hizballah, and is considered the "conduit for the Hezbollah militia in Latin America" [*see* para. 22, supra.], Saab is an agent and instrumentality of the FARC. More specifically, Saab is an agent and instrumentality of the FARC through his assistance and support for Hizballah. Through the illicit activities referenced above (among others), Saab has engaged in: ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6. Saab is thus an agent and instrumentality of the FARC.

28.     Saab's status as an agent and instrumentality of the FARC is further evidenced by his ties to the CLAP Program [*see* paras. 14, 18 *supra*]. The CLAP program is used by Mexican cartels to camouflage cash payments for drug shipments:

> Investigations by the United States Treasury Department and other Washington agencies warned that Venezuela used food shipments sent from Mexico, within the framework of its CLAP program, to receive camouflaged cash from Mexican

cartels as payment for drug shipments referred by the Chavista leaders.

*Cae testaferro de Maduro ligado a caso Alunasa*, Diario Extra, http://www.diarioextra.com/Noticia/detalle/421777/cae-testaferro-de-maduro-ligado-a-caso-alunasa[15]; Sabrina Martin, *Mexican Sinaloa Cartel Has Taken Over a Venezuelan City*, Panam Post, (Apr. 10, 2020), https://panampost.com/sabrina-martin/2020/04/10/sinaloa-cartel-venezuelan-city/.

Given the Sinaloa Cartel's heavy presence in the state of Zulia, Venezuela, its control over airstrips in Venezuela, and its ties to the Cartel of the Suns and the Maduro regime the drug money camouflaged in CLAP shipments are directly linked to illicit drug proceeds of the Sinaloa Cartel. *See id.* (discussing the Sinaloa Cartel's occupancy in Zulia and noting that "Mexican traffickers in Venezuela may have taken over about 400 clandestine airstrips in the state of Zulia alone, on the border with Colombia, with the help of the National Liberation Army (ELN) and Venezuelan armed forces.") ("The Suns and Sinaloa cartels reportedly move between 200 and 250 tons of Colombian cocaine a year to the United States."). Significantly, on November 18, 2014, the Eleventh Judicial Circuit Court found that the Sinaloa Cartel (or Sinaloa Federation) is an agency and instrumentality of the FARC. *See* Final Judgment Ex. L at 1, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 12-48803 (11th Judicial Fla. Cir. Ct. Nov. 18, 2014). The Sinaloa Cartel is FARC's main distributor of cocaine in Mexico.[16]

---

[15] The quoted material herein has been translated from Spanish to English. In its original form, the quotation is as follows: "Las Investigaciones del Departamento del Tesoro de Estados Unidos y otras agencias de Washington advertían que Venezuela utilizó cargamentos de alimentos enviados desde México, en el marco de su programa de CLAP, para recibir camuflado dinero en efectivo de carteles mexicanos como pago por los envíos de droga remitidos por los dirigentes chavistas."

[16] Sam Logan and Ashley Morse, *The FARC'S International Presence*, 13-14 (Dec. 2006), https://www.files.ethz.ch/isn/46399/The-FARCs-International-Presence.pdf; Jeremy McDermott, *Criminal Activities of the FARC and Rebel Earnings*, INSIGHT CRIME (May 20, 2013), https://www.insightcrime.org/investigations/farc-criminal-activities-income/; Elyssa Pachico, *Link Between Sinaloa*

29.     Given Saab's critical involvement in CLAP (which was used by Mexican drug cartels to camouflage and transport illicit drug payments to Venezuela), Saab is an agent and instrumentality of the FARC.   Through Saab's involvement in the CLAP program, which camouflages drug proceeds from Mexican Cartels, Saab has engaged in ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6. Saab is thus an agent and instrumentality of the FARC.

30.     Along with Alex Saab, Los Cachiros, Maduro, El Aissami, and Hizballah, (as well as the aforementioned persons and/or entities in paragraphs 11, 12, 13, 14, 15, 18, 22, and 29), all of which OFAC has designated as Specially Designated Nationals[17] and all of whom I have opined herein are agents and instrumentalities of the FARC (the "FARC Agents"), the following are also agencies and instrumentalities of the FARC: any entity owned in the

---

*Cartel   and   Colombia   Arrested*, INSIGHT CRIME (Apr. 18, 2011), https://www.insightcrime.org/news/analysis/link-between-sinaloa-cartel-and-colombia-arrested/; *Computer Shows FARC   Links   to   Sinaloa   Cartel*, INSIGHT CRIME (Dec. 22, 2010), https://www.insightcrime.org/news/analysis/computer-shows-farc-links-to-sinaloa-cartel/; Marguerite Cawley, *Colombia Homicide Case Points to FARC-Sinaloa Cartel Links*, INSIGHT CRIME (Jun. 10, 2013), https://www.insightcrime.org/news/brief/colombia-homicide-case-points-to-farc-sinaloa-cartel-links/; *FARC's Cocaine Sales to Mexico Cartels Prove Too Rich to Subdue*, BLOOMBERG NEWS, at 3 (Jan 20, 2010), attached hereto as **Exhibit E**; *Sinaloa Cartel Buys Cocaine Franchises From Colombia's FARC*, FOX NEWS LATINO (Mar. 12, 2013), https://www.foxnews.com/world/sinaloa-cartel-buys-cocaine-franchises-from-colombias-farc.amp; *Gangsters Eye Conquest of El Salvador*, MAFIA TODAY (Mar. 15, 2013), attached hereto as **Exhibit F**; James Bargent, *FARC Selling Off   Colombia   Drug   Franchises   to   Sinaloa   Cartel*, INSIGHT CRIME (Mar. 11, 2013), https://www.insightcrime.org/news/brief/farc-selling-off-drug-franchises-sinaloa-cartel-in-colombia/.

[17] Other than the Cartel of the Suns, which is composed of government and military officials of Venezuela. Key to OFAC's implementation and enforcement of sanctions programs is the publication of a list of individuals, companies and other entities owned or controlled by, or acting for or on behalf of, targeted countries or foreign non-state actors such as narcotics traffickers and terrorists designated under dedicated programs that are not country specific. Collectively, such individuals, companies, and other entities and organizations are called "Specially Designated Nationals" or "SDNs." The assets of SDNs are blocked, and U.S. persons are generally prohibited from dealing with them. "Specially Designated National" is the general term for all designated persons, but program-specific variations relevant to this matter are used in the Kingpin Act sanctions program, "Specially Designated Narcotics Trafficker," and in the terrorism program, "Specially Designated Global Terrorist." The definition of Specially Designated National" ("SDN") is found at 31 C.F.R. 595.306. "Specially Designated Narcotics Trafficker" ("SDNTK") is found at 31 C.F.R. 598.314. "Significant Foreign Narcotics Trafficker" (31 C.F.R.598.313) is covered by the definition at 598.314(a). "Specially Designated Global Terrorist" ("SDGT") is defined at 31 C.F.R.594.310.   "Foreign Terrorist Organization" ("FTO") is defined at 31 C.F.R. 597.309.

aggregate, directly or indirectly, 50 percent or more by one or more of the FARC Agents, and each such entity (an "Owned Entity") is a blocked person.  Further, each such Owned Entity that is listed as blocked by OFAC is also an agent and instrumentality of the FARC. *See* U.S. Dep't Treasury, Revised Guidance on Entities Owned by Persons Whose Property and Interests in Property are Blocked, (Aug. 13, 2014), attached hereto as **Exhibit G**. And further, the property and interests in property of any such an Owned Entity are blocked regardless of whether the entity itself is listed in the annex to an Executive order or otherwise placed on OFAC's list of Specially Designated Nationals ("SDNs"). *Id.*

31.     The assets of such aforementioned agents and instrumentalities of the FARC are "blocked assets" executable under TRIA, as are property of any entity in which such blocked persons own, whether individually or in the aggregate, directly or indirectly a 50% or greater interest. *See id.*

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

John Robert McBrien

Dated: July 14, 2020

# EXHIBIT 9

ANTONIO CABALLERO,

     Plaintiff,

vs.

FUERZAS ARMADAS
REVOLUCIONARIAS DE COLOMBIA,
a/k/a FARC-EP a/k/a REVOLUTIONARY
ARMED FORCES OF COLOMBIA; and
THE NORTE DE VALLE
CARTEL,

     Defendants.

_____/

### SUPPLEMENTAL SWORN DECLARATION OF JOHN ROBERT MCBRIEN REGARDING AGENTS AND INSTRUMENTALITIES OF THE FARC

I, John Robert McBrien, declare the following under oath:

1.     On July 14, 2020, I executed a Sworn Declaration of John Robert McBrien Regarding Agencies and Instrumentalities of the FARC (the "**July McBrien Sworn Declaration**").  I hereby opine that the more appropriate plural of the term of art "agent and instrumentality" is "agents and instrumentalities," and that latter phrase is used throughout this declaration.  In all cases in this and prior declarations the phrase "agencies and instrumentalities" means "agents and instrumentalities."

2.     I hereby further opine that all of the individuals and entities referenced in the June 18, 2020 U.S. Treasury Department Press Release, which is referenced in paragraph 24 of my July McBrien Sworn Declaration, and that were designated Specially Designated Nationals ("**SDN**") by the Office of Foreign Assets Control ("**OFAC**") on June 18, 2020, are agents and instrumentalities of the FARC. *See Press Release*, U.S. Treasury Dept., Treasury Targets Sanctions Evasion Network Supporting Corrupt Venezuelan Actors (June 18, 2020),

1

https://home.treasury.gov/news/press-releases/sm1038; *see also* Office of Foreign Assets Control, *Venezuela-Related Designations and Designations Removals; Issuance of Venezuela-related General License,* U.S. treasury dep't., (July 18, 2020), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20200618.aspx; *see also* Alex Nain SAAB MORAN & Joaquin LEAL JIMENEZ: Sanctions Evasion via "Oil for Food" Scheme Using Mexico-based Front Companies U.S. TREAS. DEP'T. (June 2020), https://www.treasury.gov/resource-center/sanctions/Programs/Documents/pdvsa_network_chart_20200618.pdf.   Such agents and instrumentalities of the FARC include: Joaquin Leal Jimenez; Veronica Esparza Garcia; Olga Maria Zepeda Esparza; Libre Abordo, S.A. DE C.V.; Schlager Business Group S. DE R.L. De C.V.; Alel Technologies LLC; Luzy Technologies LLC; Cosmo Resources PTE. LTD; Washington Trading LTD; Delos Voyager Shipping Ltd; and Romina Maritime Co Inc ("**June 2020 Designated Individuals and Entities**").

### Petroleos de Venezuela, S.A. ("PdVSA") and the Venezuela Oil Sector

3.      OFAC has stated: "PdVSA is a Venezuelan state-owned oil company and a primary source of Venezuela's income and foreign currency." *See* Press Release, U.S. Dep't of Treasury, Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A. (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594. "PdVSA has long been a vehicle for corruption.  A variety of schemes have been designed to embezzle billions of dollars from PdVSA for the personal gain of corrupt Venezuelan officials and businessmen." *Id*. On January 28, 2019, OFAC designated PdVSA as an SDN under Executive Order 13850. *Id*.

4.      According to the U.S. State Department's Bureau for International Narcotics and Law Enforcement Affairs, Venezuela is "a major transit country for illicit drug trafficking,"

"predominantly cocaine," due to its "porous western border with Colombia, current economic crisis, weak judicial system, sporadic international drug control cooperation, and permissive and corrupt environment …" *See* U.S. Dep't of State, Bureau for International Narcotics and Law Enforcement Affairs, International Narcotics Control Strategy Rep., Vol. I, Drug and Chemical Control (March 2018) at 282, attached hereto as **Exhibit A**. Of the hundreds of tons of cocaine passing through Venezuela each year about two-thirds is targeted to the United States. *See* Antonio Maria Delgado, *Alianza con las FARC termino convirtiendo a Venezuela en un narcoestado,* EL NUEVO HERALD (June 26, 2017), attached hereto as **Exhibit B**.

5.      Venezuela also harbors the FARC, in addition to being a transit country for cocaine. Some years ago, a bipartisan Congressional Delegation ("**CODEL**") "examine[d] ... the threat to the Southwest border [of South America] from terrorists and drug cartels…" *See* U.S. H. Comm. on Homeland Security, 112th Cong., Rep. on a Line in the Sand: Countering crime, Violence and Terror at the Southwest Border (2d Sess. 2012) (containing Subcommittee Chairman McCaul Letter to National Security Advisor on Congressional Delegation Findings) *(*"**A Line in the Sand**") attached hereto as **Exhibit C**. The CODEL also observed that **"Venezuela is a safe haven for not only Iran and Hezbollah, but also the FARC."** *Id.* at 3 (emphasis added). And, it noted the Colombian government's "evidence of a Venezuelan Army helicopter providing operational support to the FARC." *Id.* And it also noted "evidence of Venezuelan government officials working for the FARC narco-terrorist organization." *Id.*

6.      Venezuela supports the FARC in order to "mitigate the perceived threat of United States intervention in the region." *See id.* at 12. The FARC has also trained "pro-Chavez militants" and has assassinated "anti-Chavez politicians within Venezuela." *See id*. The FARC

3

has also **"exchang[ed] military training for access to health care and other logistical support**
…" *See* Int'l Institute for Strategic Studies, the FARC Files: Venezuela Ecuador and the Secret
Archive of 'Raul Reyes (2011) ("**The FARC Files**") at 62, attached hereto as **Exhibit D**
(emphasis added).

7.      In March of 2008, Colombian armed forces raided a FARC jungle camp in
Ecuador. *See* The FARC Files at 15. That Operation killed FARC operatives, including FARC
secretariat Luis Edgar Devia Silva (a/k/a Raul Reyes). *Id.* During the raid, Devia's metal briefcase
was seized and within it computers and data "holding sensitive correspondence and documents."
*Id.* at 16.

8.      The data revealed "direct channels of communication … between FARC and the
Venezuelan government at the highest level, principally through Rodriguez Chacin as [former
Venezuelan President] Chavez's delegate." *See Id.* at 62. The "close ties" between Rodriguez
Chacin and Chavez "allowed the [Venezuelan] administration's relationship with FARC, and
particularly its most sensitive dimensions, to be managed when necessary outside institutional
channels and on the basis of direct presidential authority." *Id.* Furthermore, the data revealed
FARC ties to "other members of Chavez's staff, the Venezuelan Foreign Ministry, other
ministries." *Id.*

9.      Notably, Hugo Chavez offered the FARC at least two vehicles for receiving
substantial income from the sale of Venezuelan oil, "in both cases with the cooperation of the
manager of PDVSA." *See* The FARC Files at 148. The FARC could either do so through "a
business in which we [FARC] receive a quota of oil in order to sell it abroad, which would leave
us [FARC] with a juicy profit," or the FARC could  "use funds from the 'dossier' to create 'a

profitable business for investments in Venezuela' that would sell 'petrol to Colombia, or in Venezuela' and be awarded 'state contracts.'" *Id*.

10.     PdVSA became a front organization for illicit activity, first with former Venezuelan President Chavez, following with current Venezuelan President Nicolas Maduro ("**Maduro**"). *See* Roger F. Noriega, *Venezuela: Rise of a Narcostate*, American Enterprise Institute (Aug. 11, 2015), http://www.aei.org/ publication/venezuela-rise-of-a-narcostate/; *see also* Press Release, U.S. Dep't of Treasury, Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A. (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594. "[B]eginning in 2005, **Chavez personally directed the exchange of vast sums of oil revenue for cocaine with the Colombian Fuerzas Armadas Revolucionarias de Colombia (FARC) guerrillas** . . . ." *See* Roger F. Noriega, *Venezuela: Rise of a Narcostate*, American Enterprise Institute (Aug. 11, 2015), http://www.aei.org/ publication/venezuela-rise-of-a-narcostate/.

11.     Douglas Farah has testified that "[t]he primary money laundering structure for the FARC (as well as the Maduro regime and other criminal groups) is the Venezuelan state oil company PDVSA . . . ." *See Adapting US. Counternarcotics Efforts in Colombia: Hearing Before the Senate Caucus on International Narcotics Control* (Sept. 12, 2017) (testimony of Douglas Farah, President, IBI Consultants LLC, and Senior Visiting Research Fellow, National Defense University Center for Complex Operations) at 5 attached hereto as **Exhibit E**.

12.     In addition to money laundering, PdVSA has also helped the FARC purchase arms. PdVSA was involved in a proposed "three-way deal under which China would give some weapons to Venezuela and others to FARC . . . ." The FARC Files at 96. As compensation for the agreement, "Venezuela would give China oil to pay for both its own and FARC's weapons,

5

and FARC would pay Venezuela the difference in cash." *Id*. The FARC sought "[s]urface-to-air missles," *id*. "0.5 calibre machine guns, rifles and ammunition," *id*., to fulfill the FARC's "Strategic Plan." *Id*. It is my opinion that PdVSA is an agent and instrumentality of the FARC.

13.     It is also my opinion that subsidiaries owned, directly or indirectly, 50 percent or more by PdVSA, are also blocked entities and that any assets titled in or held in the name of such subsidiary entities are blocked assets.    Specifically, PdVSA owns, directly or indirectly, 50 percent or more of the following entities:  PDV Marina SA; Aceites Y Solventes Venezolanos SA; Petro San Felix SA a/ka/ Petroanzoategui SA; Vanfleet Asphalt Ltd.; Vanfleet Products Ltd; and Vanfleet Ltd.  My conclusion that PdVSA owns 50% or more of the aforementioned entities is supported by information obtained from a bank who has blocked accounts in the names of such entities on the grounds that its records show for each entity that "This entity is majority owned (50% or more) by Petroleos de Venezuela S.A. (PdVSA) . . . ."  In addition, I have reviewed materials from PdVSA's website or from the website of a government agency (the "Ministerio deo Poder Popular para el Processo Social de Trabajo"), attached hereto as **Exhibit I**, that include its 2016 audited financial statements and official communications of PdVSA.

### The Scheme to Avoid U.S. Sanctions on Venezuela's Oil Sector

14.     As stated in the June 18, 2020 Press Release, the aforementioned June 2020 Designated Individuals and Entities were designated as SDNs by OFAC for their involvement with the "illegitimate Maduro regime," which includes Maduro's oil minister and U.S.-designated Kingpin Tareck El Aissami Maddah ("**El Aissami**"), and "Petroleos de Venezuela, S.A. (PdVSA), its primary conduit for corruption," for "their activities in or associated with a network attempting to evade United States sanction on Venezuela's oil sector." *See Press Release*, U.S. Treasury Dept., Treasury Targets Sanctions Evasion Network Supporting Corrupt Venezuelan

Actors (June 18, 2020), https://home.treasury.gov/news/press-releases/sm1038 ("Maduro's oil minister and U.S.-designated Kingpin Tareck El Aissami Maddah (El Aissami) has enlisted a network of facilitators, some of whom are designated today, to orchestrate opaque schemes to broker the re-sale of over 30 million barrels of Venezuelan-origin crude oil in order to benefit from the proceeds.").

15.     The June 2020 Designated Individuals and Entities, including Joaquin Leal Jimenez ("**Leal**"), have cooperated with FARC Agent and Instrumentality Alex Nain Saab Moran ("**Saab**") and FARC operatives within the illegitimate Maduro Regime "to evade U.S. sanctions and assist in the sale of Venezuelan-origin crude oil." Such June 2020 Designated Individuals and Entities have coordinated with, and/or assisted, various FARC operatives, including without limitation, Maduro, Saab, and El Aissami.

16.     Further, according to the June 18, 2020 Press Release:

> ***In lieu of pre-payment for the contracted corn and water trucks, Libre Abordo agreed to lift and broker the sale of Venezuelan-origin crude oil supplied by PdVSA in a scheme orchestrated by Saab and El Aissami.***
>
> After the OFAC designation of Rosneft Trading and TNK Trading International in February and March 2020, PdVSA leadership and regime oil minister El Aissami sought new intermediaries to facilitate the sale of PdVSA crude to buyers primarily located in Asia. Libre Abordo agreed with PdVSA to facilitate the re-sale of a significant amount of crude oil in a scheme to help PdVSA evade U.S. sanctions. ***Libre Abordo largely replicated Rosneft Trading's operations***, including by marketing Venezuelan oil to the same buyers in Asia, and using virtually the same routes and shipment processes…Libre Abordo played a critical role in helping PdVSA liquidate a significant amount of its inventory and drain its limited oil storage facilities. As of May 31, 2020, when Libre Abordo claimed that it was bankrupt, it lifted and re-sold over 30 million barrels of Venezuelan crude oil. ***Libre Abordo was designated today for operating in the oil sector of the Venezuelan economy and because it has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, PdVSA***.

*See Press Release*, U.S. Treasury Dept., Treasury Targets Sanctions Evasion Network Supporting Corrupt Venezuelan Actors (June 18, 2020), https://home.treasury.gov/news/press-releases/sm1038[1] (emphasis added). Moreover, "Schlager Business Group was designated today for operating in the oil sector of the Venezuelan economy and because it has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, PdVSA." *Id.*

And, furthermore with respect to Veronica Esparza Garcia, Olga Maria Zepeda, and Libre Abordo, S.P. de C.B. OFAC has stated:

> [Olga Maria] Zepeda [Esparza] and [Veronica] Esparza [Garcia] were both designated today *for operating in the oil sector of the Venezuelan economy and for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, PdVSA.*

*Id.* (emphasis added). With respect to Joaquin Leal's involvement in the scheme, OFAC stated:

> *Leal is the critical conduit between Libre Abordo, Schlager Business Group, and their owners, and PdVSA and Saab.* Leal has been coordinating the purchase and sale of Venezuelan-origin crude oil from PdVSA and its subsidiary, PdVSA Petroleo, S.A., bringing knowledge of the global oil sector and facilitating the transport and re-sale to buyers.

---

[1] On February 18, 2020, OFAC designated Rosneft Trading S.A. ("RTSA") as an SDN and on March 12, 2020, OFAC designated TNK Trading International S.A. ("TTI") as an SDN. *See Press Release*, U.S. Treasury Dept., Treasury Targets Additional Russian Oil Brokerage Firm for Continued Support of Maduro Regime (March 12, 2020), https://home.treasury.gov/news/press-releases/sm937. "TNK International S.A. is another Rosneft Subsidiary brokering the sale and transport of Venezuelan crude oil, which is subject to sanction." *See id.* "TTI is involved in the trading, processing, and transport of raw materials, in particular unrefined petroleum and petroleum products." *Id.* "OFAC also designated RTSA in February of this year for operating in the oil sector of the Venezuelan economy as well as its president Didier Casimiro for having acted or purposed to act for or on behalf of, directly, or indirectly, RTSA." *Id.* OFAC stated:

> as a result of today's action, all property and interests in property of TTI that are in the United States or in the possession or control of U.S. persons, and of any entities that are owned, directly or indirectly, 50 percent or more by the designated individuals and entity, are blocked and must be reported to OFAC.

*Id.* Both Rosneft and TNK Trading International S.A. "handled a large percentage of Venezuela's oil exports in 2019. In January 2020, TTI [TNK Trading International] purchased nearly 14 million barrels of crude oil from Petroleos de Venezuela (PdVSA)." *Id.* Given the activities of TTI and RTSA, it is my opinion that TTI, RTSA, and Didier Casimiro, are agents and instrumentalities of the FARC.

> Leal was designated today for operating in the oil sector of the Venezuelan economy and for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, PdVSA.

*Id.* (emphasis added).

17.     Further, it is my opinion that Leal used Panama as a venue for hiding the proceeds relating to his illicit activities on behalf of El Aissami and PdVSA above. For example, Kaibab International Corp. is a Panamanian entity whose directors and officers include straw men such as Ilvis Kemion Avila, Ivan Alexis Iturralde Moreno, and Omar Jose Labrador Romero. *See* Gonzalo Guillén, *The Panamanian Front Firm of the Colombian Attorney General Has Executives Linked to the Convicted Fraudster David Murcia Guzmán,* La Nueva Prensa (October 22, 2018) https://www.lanuevaprensa.com.co/component/k2/la-firma-pantalla-panamena-del-fiscal-general-colombiano-tiene-directivos-ligados-al-estafador-convicto-david-murcia-guzman (last visited September 1, 2020) (title translated from Spanish original). These are documented straw men to wit:

> Ultra Mega Develoment S.A. and two other Panamanian shell companies (HBM BVI Ltda. and Point Financial Ltda.) renounced the on-site signature of the Colombian Prosecutor by means of the writing mentioned above and were replaced by the **prestanombres Ilvis Kemion Ávila, Iván Alexis Iturralde Moreno and Ómar José Labrador Romero**, who continue today on the board of directors of Amanda Advisors SA, that of the Colombian Prosecutor.

*Id.* (emphasis added and text translated from Spanish original). The law firm that appears as agent in Kaibab International Corp.'s corporate records on **Exhibit F**, has been fined by the British Virgin Islands Financial Services Commission in the amount of $20,000,000 for its "contraventions of the following sections of the Anti-Money Laundering and Terrorist Financing Code of Practice, 2008." *See* British Virgin Islands Financial Services Commision, Patton, Moreno and Asvat (BVI) Limited (Enforcement Action Date: April 9, 2015),

https://www.bvifsc.vg/publications/patton-moreno-and-asvat-bvi-limited-0 (last visited September 1, 2020). It is my opinion that Kaibab International Corp. and its directors above are presta-nombres for FARC Operative Leal and therefore are also agents and instrumentalities of the FARC, as Leal is involved in material assistance, financial support, or providing goods or services in support of, El Aissami and PdVSA both of whom materially support and assist the FARC in international narcotics trafficking activities.

18.     Given the information contained herein (including, without limitation, under paragraph numbers 2 through 11 above), and contained in the source material cited herein, and given my knowledge and understanding of the operation of the FARC and its agents and instrumentalities, it is my opinion that the June 2020 Designated Individuals and Entities are agents and instrumentalities of the FARC.

19.     I hereby further opine that Samark Lopez Bello ("**Lopez Bello**") and all of the individuals and entities that are referenced in the February 13, 2017, U.S. Treasury Department Press Release titled "Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello" (referenced in paragraph 21 of my July McBrien Sworn Declaration) and/or appear on the related OFAC Chart, which were designated as SDNs by OFAC on February 13, 2017 (the "**El Aissami and Lopez Bello Network**"), are agents and instrumentalities of the FARC. *See* July McBrien Sworn Declaration at ¶ 21; *see also* Press Release, U.S. Treasury Dept., Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami And His Primary Frontman Samark Lopez Bello (Feb. 13, 2017) (the "**February 2017 OFAC Press Release**"); see also El Aissami and Lopez Bello Network Chart U.S. TREAS. DEPT. (Feb.              13,               2017),               https://www.treasury.gov/resource-center/sanctions/Programs/Documents/20170213_el_aissami_lopez_bello_network.pdf.       Such

entities and individuals include: Lopez Bello, Yakima Trading Corporation, Yakima Oil Trading, LLP, Profit Corporation, C.A., Grupo Sahect, C.A., MFAA Holdings Limited, Servicios Tecnologicos Industriales, C.A., SMT Tecnologia, C.A., Alfa One, C.A., Agusta Grand I LLC, 1425 Brickell Ave 63-F LLC, 1425 Brickell Avenue 64E LLC, 1425 Brickell Avenue Unit 46B, LLC, 200G PSA Holdings LLC, blocked aircraft N200VR, Gulfstream 200, Manufacturer's Serial Number 133.

20.     According to the February 2017 OFAC Press Release "El Aissami's primary frontman, Venezuelan national Samark Jose Lopez Bello (Lopez Bello), was also designated for providing material assistance, financial support, or goods or services in support of the international narcotics trafficking activities of, and acting for or on behalf of, El Aissami." *See* February 2017 OFAC Press Release. And, as I previously opined in paragraph 22 of my July McBrien Sworn Declaration, El Aissami acted as an agency and instrumentality of the FARC by "... materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of ... [FARC] ...." *See* July McBrien Sworn Declaration at ¶ 22 (citations omitted). I opine again, and re-affirm, that El Aissami is an agent and instrumentality of the FARC, and that as primary frontman to El Aissami, Lopez Bello is also an agent and instrumentality of the FARC.

21.     Furthermore, the affidavits of experts Colonel Luis Miguel Cote and Douglas Farah, which were presented to the U.S. District Court for the Middle District of Florida on February 12, 2019 in *Stansell, et al., v. FARC, et al.*, No. 19-cv-20896-RNS (S.D. Fla. Feb. 19, 2019) also confirm that Lopez Bello and those that are part of the El Aissami and Lopez Bello Network are agents and instrumentalities of the FARC. *See* Affidavit of Colonel Luis Miguel

Cote and Affidavit of Douglas Farah, D.E. 17-1 and D.E. 17-2, respectively, *Stansell, et al., v. FARC, et al.*, No. 19-cv-20896-RNS (S.D. Fla. Feb. 12, 2019).

22.     And, in his February 19, 2019 Order in *Stansell, et al., v. FARC, et al.*, No. 19-cv-20896-RNS (S.D. Fla. Feb. 19, 2019), after reviewing copious amounts of evidence presented by the Stansell plaintiffs, Judge Scola determined that all individuals and entities that are part of the El Aissami and Lopez Bello Network are agents and instrumentalities of the FARC:

> …that ***the OFAC Kingpin Act designated members of the "EL AISSAMI & LOPEZ BELLO NETWORK" (identified on OFAC Chart, ECF No. 18-1) are each an agency or instrumentality of the FARC, and their blocked assets are therefore subject to attachment and execution pursuant to TRIA and 18 U.S.C. 2333(e).***

Sealed Order (subsequently unsealed), D.E. 22 at 1-2, *Stansell, et al., v. FARC, et al.*, No. 19-cv-20896-RNS (S.D. Fla. Feb. 19, 2019) (emphasis added).

23.     Furthermore, as previously stated in my July McBrien Sworn Declaration:

> [A]ny entity owned in the aggregate, directly or indirectly, 50 percent or more by one or more of the FARC Agents, and each such entity (an "Owned Entity") is a blocked person. Further, each such Owned Entity that is listed as blocked by OFAC is also an agent and instrumentality of the FARC. *See* U.S. Dep't Treasury, Revised Guidance on Entities Owned by Persons Whose Property and Interests in Property are Blocked, (Aug. 13, 2014), attached hereto as **Exhibit G**. And further, the property and interests in property of any such an Owned Entity are blocked regardless of whether the entity itself is listed in the annex to an Executive order or otherwise placed on OFAC's list of Specially Designated Nationals ("SDNs").

*See* July McBrien Sworn Declaration at ¶ 30.

24.     Therefore, PYP International LLC is also an agent and instrumentality of the FARC because Lopez Bello, an agent and instrumentality of the FARC, owns "in the aggregate, directly or indirectly, 50 percent or more" of PYP International LLC. In fact, according to

production provided by Interaudi Bank on August 20, 2020, the pertinent part of which is attached

hereto as **Exhibit G**, Lopez Bello has an 80% ownership interest in PYP International LLC.

### Simon Zerpa Delgado, The Banco Central de Venezuela, and the Ministerio de Poder Popular de Economia y Finanzas

25.     In my July McBrien Sworn Declaration, I discussed how Alex Saab, El Aissami,

Joaquin Leal  Jimenez, Schlager Business Group S. de R.L de C.V. and Libre Abordo, S.A. de

C.V. cooperated to evade U.S. sanctions and assist in the sale of Venezuela oil, including under

the guise of the "oil for food" program. *See* July McBrien Sworn Declaration at ¶ 23. In my July

McBrien Sworn Declaration, I stated:

> From early 2018, as the Government [of Venezuela]. . . started using gold
> currency to pay some contracts, to include the CLAP food contracts, and
> Saab began ***working with Simon Alejandro Zerpa Delgado (Zerpa)*** to
> help the government liquidate gold mined in Venezuela and convert it into
> foreign currency. Zerpa was designated on July 26, 2017 . . . .

*Id.* (emphasis added); *see also* Press Release, U.S. Treasury Dep't Disrupts Corruption Network

Stealing From Venezuela's Food Distribution Program, CLAP (July 25, 2019)

https://home.treasury.gov/news/press-releases/sm74. It is my opinion that given Simon

Alejandro Zerpa Delgado's ("**Zerpa**") activities, including, but not limited to, cooperating with

Saab in the illicit gold program, Zerpa is an agent and instrumentality of the FARC.

26.     Zerpa's illicit activities are carried out using the Banco Central de Venezuela.

The Banco Central de Venezuela ("**BCV**") has also been designated a SDN by OFAC, and has

been under the control of multiple OFAC designated individuals holding leadership position at the

Bank, including Zerpa and William Antonio Contreras, both of whom OFAC stated "…are

Directors of the bank and were designated by OFAC pursuant to E.O. 13692…" *See* Press

Release, Treasury Sanctions Central Bank of Venezuela and Director of the Central Bank of

Venezuela (April 17, 2019) https://home.treasury.gov/news/press-releases/sm661.

27.     The BCV is a central player along with the FARC in carrying out the illicit gold mining program of Venezuela.  The scheme works as follows:

1.  Miners extract gold from the Arco Minero in eastern Venezuela under the supervision of the Colombian guerrilla groups ELN and FARC. The gold is then purchased by Venezuela's state-owned gold company, Minerven, through a joint gold venture with Turkey called Mibiturven S.A.

2. The gold is then turned over to CVG MINERVEN, the state-owned Venezuelan mining conglomerate that processes the gold and packages it for transport to Caracas.

3. Once processed, the gold is transported by the Venezuelan National Guard to the **Central Bank of Venezuela (BCV), who prepares it for international shipment.** The gold **is moved from BCV to Maiquetia International Airport** using the private security firm Transporte Panamericano **and loaded onto one of several, private airliners, or a commercial Turkish Airlines flight**, with weekly service to Istanbul via Havana…

*See* Joseph M. Humire, *Iran, Turkey, and Venezuela's Super Facilitator: Who is Alex Saab?*, Center for a Secure Free Society (June 30, 2020), https://www.securefreesociety.org/research/who-is-alex-saab/ (last visited September 8, 2020) *(emphasis added)*.

28.     The role of BCV is critical to both the FARC and the Cartel of the Suns.  By preparing the gold for international shipment, the BCV enables the sale of the illicit gold which perpetuates the symbiotic relationship between the Maduro regime and the FARC, to wit:

The ELN, as well as the FARC, serves the dual purpose of providing funds to the Maduro regime while also helping the regime retain territorial control in remote, but strategically vital areas bordering Colombia and Guyana. The armed groups and the regime have a complex scheme in which the former operate the mines and the latter sells the minerals through state-owned companies.

*See* Diego Area, Domingo Sadurní, Douglas Farah, *The Maduro Regime's Illicit Activities: A Threat to Democracy in Venezuela and Security in Latin America*, Atlantic Council (August 13,

2020) https://www.atlanticcouncil.org/in-depth-research-reports/issue-brief/the-maduro-regimes-illicit-activities-a-threat-to-democracy-in-venezuela-and-security-in-latin-america/ (last visited Sept. 8, 2020). A recent example of the results of the illicit gold mining and sale activities to which the BCV is a key player, is as follows:

> …. the Maduro regime sold 73.2. tons of Venezuelan gold to companies in the United Arab Emirates and Turkey in 2018…. But despite the regime's sales in 2018, gold reserves in the BCV grew by eleven tons. Given the regime's known criminal partnership with the ELN and FARC, the gold is likely to have been mined illegally, sold to the regime at a significant discount, moved to Guyana, Suriname, or Nicaragua, and exported as originating in those countries rather than Venezuela in order to avoid detection.

*See id.*

29. The BCV's role is also a "hedge bet" or "offset" to the narcotrafficking efforts of the FARC and the Cartel of the Suns. A recent Insight Crime Report by the Venezuela Investigate Unit described the "hedge" or "offset as follows:

> Meanwhile, heightened US anti-narcotics operations in the Caribbean have made several large seizures allegedly linked to the Maduro government, and are likely making it more difficult for foreign currency to enter Venezuela through drug trafficking.
>
> *All this means that gold – long an important economic crutch for the Maduro government – is now more vital than ever.*
>
> *The precious metal, seen as a safe investment in troubled times, has reached a multi-year trading high since the onset of the coronavirus.*
>
> The result has been an accelerated draining of gold reserves from the Venezuelan Central Bank (Banco Central de Venezuela – BCV), including large quantities swapped for oil refinery parts with international allies such as Iran. ***Nine tons of gold were traded from the BCV in April alone, leaving Venezuela with its lowest hard currency reserves in 30 years, according to Bloomberg.***

*See* Venezuela Investigative Unit, *Venezuela Relies on Gold as Other Criminal Economies Dry Up*, InSight Crime (June 1, 2020) https://www.insightcrime.org/news/analysis/venezuela-depends-gold-industry/ (last visited Sept. 8, 2020) (emphasis in original and emphasis added).

30.     Given the critical role of the BCV in perpetuating the illicit gold program run by the Maduro regime and the FARC, including without limitation, by participating in the international shipment and sale of illicitly mined gold and by providing the "hedge" or "offset" against narco-trafficking losses incurred due to US anti-narcotics operations, the activities of the BCV have materially assisted in, and provided financial or technological support for or to, or providing of goods or services in support of, the international narcotics trafficking activities of the FARC.   I hereby opine that the BCV is an agent and instrumentality of the FARC.

31.     Zerpa is also the Minister of Economy and Finance (i.e. Ministerio de Poder Popular de Economia y Finanzas) serving as a member of Maduro's Cabinet. This purported governmental organ of the Maduro regime is under the direct control of Maduro through Zerpa. This ministry serves to support the Maduro regime's grip on power which enables the Cartel of the Suns headed by Maduro to move FARC cocaine to the United States and other nations.   The activities of this government agency are intrinsically tied to Zerpa's role in perpetuating the illicit activities of the Cartel of the Suns and Maduro regime, and cannot be divorced from the control of Maduro and Zerpa – his designee to run that purported agency. Thus, it is my opinion that the Ministerio de Poder Popular de Economia y Finanzas is also an agent and instrumentality of the FARC, as under the control of Maduro and Zerpa, this ministry materially assists and provides financial and technical support for the international narcotics trafficking activities of the FARC.

**The Venezuela Currency Exchange Scheme**

32.        From 2003 to 2019, the Venezuelan regime enacted currency controls. The currency control program that began as a counter-measure against the effects of a two month strike that decimated the oil exports from Venezuela,[2] devolved into a primary vehicle for money laundering for FARC operatives within or surrounding the Maduro regime (including immediate family members of FARC agent and instrumentality Maduro).

33.        It is my opinion that the Venezuela currency exchange program existed to empower certain Venezuelan government officials and/or business associates selected by the Maduro regime to launder funds for FARC agents and instrumentalities, such as Maduro's three stepsons, Walter Jacob Gavidia Flores, Yosser Daniel Gavidia Flores, and Yoswal Alexander Gavidia Flores (collectively a/k/a "**Los Chamos**").[3] It is also my opinion that the currency exchange program was inextricably tied to financial support of FARC operatives such as Cilia

---

[2] *See* Erin Fletcher, *Bolívar Distorted: The Effects of Exchange Controls on the Venezuelan Economy Or "Perhaps Chávez spent too much time reading Machiavelli and not enough time reading Adam Smith."* Fall 2004. Duke Journal of Economics (Available at: https://sites.duke.edu/djepapers/files/2016/08/Fletcher.pdf).

[3] It is my opinion that all three of Los Chamos are agents and instrumentalities of the FARC. They provided material support and assistance to FARC operative Saab (who I have opined is a FARC agent and instrumentality in paragraph 10 of my July McBrien Sworn Declaration) and are responsible for much of Saab's opportunity to work with the Maduro regime officials on his myriad of illicit activities. As OFAC stated in its July 25, 2019 Press Release designating Cilia Adela Flores de Maduro's sons (Maduro's stepsons) - Los Chamos:

> **SAAB MEETS "LOS CHAMOS"**
>
> In 2011, Saab gave Cilia Adela Flores de Maduro's (Flores) three sons Walter, Yosser, and Yoswal (also known as "Los Chamos") and their cousin, Carlos Erica Malpica Flores (Malpica), a contract to clear land for the construction of homes in the Venezuelan State of Vargas….Saab's relationship with Flores, Los Chamos, and Malpica was key for Saab and Pulido's access to Government of Venezuela officials, allowing them to pay the requisite bribes and kickbacks to obtain government contracts. Los Chamos would also receive kickbacks from Saab's companies in return for government contracts. Los Chamos had frequent access to Maduro and Tareck Zaidan El Aissami Maddah (El Aissami), who was designated on February 13, 2017 pursuant to the Foreign Narcotics Kingpin Designation Act for playing a significant role in international narcotics trafficking; El Aissami is the current Minister of Industries and National Production and former Executive Vice President of Venezuela. As a result, Los Chamos were able to manipulate the recipients of government contracts, and Saab had the opportunity to work with the highest levels of the Venezuelan government.

*See* Press Release, U.S. Treasury Dept., Treasury Disrupts Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP, (Jul. 25, 2019), https://home.treasury.gov/news/press-releases/sm741.

Adela Flores de Maduro, the purported First Lady of Venezuela, who was designated by OFAC on September 25, 2018 pursuant to E.O. 13692, and who is a member of the Cartel of the Suns.[4] The example set by Raul Gorrin Bellisario ("**Gorrin**") and former National Treasurers of Venezuela - Alejandro Jose Andrade Cedeno ("**Andrade**") and Claudia Patricia Diaz Guillen ("**Diaz**") illustrate how their control over the Venezuela exchange program achieved these goals.

34.    On January 8, 2019, the U.S. Treasury Department issued a press release titled "Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders" that were designated as SDNs by OFAC on January 8, 2019, are agentsand instrumentalities of the FARC. *See Press Release*, U.S. Treasury Dept., Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders (January 8, 2019), https://home.treasury.gov/news/press-releases/sm583 (the "**January 8, 2019 Press Release**"). The individuals and entities designated in the January 8, 2019 Press Release by OFAC included Gorrin and Diaz among others to wit: Claudia Patricia Diaz Guillen, Raul Antonio Gorrin Belisario, Adrian Jose Velasquez Figueroa, Leonardo Gonzalez Dellan, Gustavo Adolfo Perdomo Rosales, Maria Alexandra Perdomo Rosales, Mayela Antonina Tarascio-Perez, Globovision Tele C.A., Globovision Tele CA, Corp., Seguros La Vitalicia, Corpomedios GV Inversiones, C.A., Corpomedios LLC, RIM Group

---

[4] It is my opinion that Cilia Adele Flores de Maduro, spouse of Maduro, is an agent and instrumentality of the FARC for materially assisting and supporting FARC operative and - head of the Cartel of Suns -  Maduro to maintain his grip on power while he has engaged in narcotics trafficking of FARC cocaine. Per OFAC's September 25, 2018 designation:

> OFAC designated Nicolas Maduro on July 31, 2017.  Today's designations target key current or former officials of the Venezuelan government.  Maduro has relied on key figures, such as previously designated Cabello and El Aissami, and those officials being designated today, to maintain his grip on power.

*See Press Release,* U.S. Treasury Dept., Treasury Targets Venezuelan President Maduro's Inner Circle and Proceeds of Corruption in the United States (Sept. 25, 2018), https://home.treasury.gov/news/press-releases/sm495. Cilia Adele Flores is also herself a member of the Cartel of the Suns. *See Venezuela: A Mafia State*?, Insight Crime (available at: https://es.insightcrime.org/wp-content/uploads/2018/05/Venezuela-a-Mafia-State-InSight-Crime-2018.pdf) (last visited September 8, 2020)

Investments, Corp., RIM Group Investments I Corp., RIM Group Investments II Corp., RIM

Group Investments III Corp., RIM Group Properties of New York, Corp., RIM Group Properties

of New York II Corp., Magus Holdings USA, Corp., Magus Holding LLC, Magus Holding II

LLC, Tindaya Properties Holding USA Corp., Tindaya Properties of New York, Corp., Tindaya

Properties of New York II Corp., Posh 8 Dynamic Inc., Constello No. 1 Corporation, Constello

Inc., Windham Commercial Group Inc., Planet 2 Reaching Inc., Potrico Corp., and N133JA (a

Dassault Mystere Falcon 50EX private aircraft) ("**January 2020 Designated Individuals and**

**Entities**"). *See id.*

35.     According to the January 8, 2019 Press Release, the January 2020 Designated

Individuals and Entities were involved "in a significant corruption scheme designed to take

advantage of the Government of Venezuela's currency exchange practices, generating more than

$2.4 billion in corrupt proceeds." *Id.*  The January 8, 2019 Press Release further states:

> Today's designations target individuals who took advantage of a corrupt
> system within the Venezuelan ONT [Office of the National Treasury],
> stealing billions of dollars from the Venezuelan people since 2008, under
> the watch of two Venezuelan National Treasurers, Alejandro Jose Andrade
> Cedeno (Andrade) and [former Venezuelan National Treasurer Claudia
> Patricia Diaz Guillen] Diaz.  Andrade was sentenced by the United States
> District Court for the Southern District of Florida on November 27, 2018,
> to 10 years in prison for accepting over $1 billion in bribes for his role in
> the below scheme.

*Id.*

The January 8, 2019 Press Release went on to describe the involvement of Gorrin,

Andrade, and Diaz in the Venezuela currency exchange program:

> Both Andrade and Diaz, while occupying the role of National Treasurer,
> used their official positions to give Gorrin, a prominent Venezuelan
> businessman, access to the ONT's preferred exchange rates to maximize
> profits on currency transactions moving through the casas de bolsa, which
> Gorrin, amongst a select few others that were approved by the ONT,
> controlled.  While Andrade was National Treasurer, he awarded the ONT

19

exchange business to a limited number of individuals, including Gorrin and Leonardo Gonzalez Dellan (Gonzalez).

*In return for their selection as the only currency exchange houses approved by the ONT, Gorrin and Gonzalez, another Venezuelan businessman, paid hundreds of millions of dollars in bribes to Andrade. Andrade facilitated the continuation of the bribery scheme by introducing Gorrin to Andrade's successor, Diaz, when he left the ONT. Gorrin compensated Andrade for introducing him to Diaz, and as a result, allowed the bribery scheme to continue, undeterred. From at least 2011 to 2013, Gorrin paid bribes to Diaz, wiring money to her and her husband, Adrian Jose Velasquez Figueroa (Velasquez), and purchasing assets on their behalf, to include a residence in Cap Cana, Dominican Republic, and an aircraft.*

*Id.* (emphasis added).

36.    Gorrin used his involvement in the Venezuela currency exchange program to launder funds for members of Maduro's inner circle. He at times worked with Mathias Krull to accomplish the task. Mathias Krull is a German national who was banker to Gorrin.[5] Special Agent George F. Fernandez's Affidavit in support of the Criminal Complaint in *United States of America v. Francisco Convit Guruceaga, et al.*, Case No. 18-MJ-03119-TORRES (S.D. Fla. July 24, 2018) (the "**Fernandez Affidavit**") describes the role of Krull and Conspirator 7 in the money laundering of PDVSA proceeds on behalf of FARC agents and instrumentalities - Los Chamos:

> 96. In October 2016, the CS met with KRULL in Panama. KRULL explained that he was looking for a bank to deposit approximately 600,000,000 U.S. Dollar from a currency exchange with PDVSA on behalf of a client, "CONSPIRATOR 7" …
> …
> 98. … Per the CS, KRULL explained that the funds came from exchange contracts which generated around 1.2 billion U.S. Dollars. KRULL explained that, in addition to the 600-million-dollar solution for CONSPIRATOR 7, KRULL needed an additional solution for 200 million U.S. Dollars held in European Financial Institution 1 in the name of a

---

[5] *See* Criminal Complaint, Affidavit of George F. Fernandez (Special Agent with Homeland Security Investigations), *United States of America v. Francisco Convit Guruceaga, et al.*, Case No. 18-MJ-03119-TORRES (S.D. Fla. July 24, 2018), D.E. 3 at 3 ¶ 12 (Available at https://content.maltatoday.com.mt/ui/files/usa_v._francisco_convit_guruceaga_et_al-_criminal_complaint.pdf.) ("Matthias KRULL is a German national and Panamanian resident. KRULL was a high-level banker at a large Swiss bank, specializing in Venezuelan clients. KRULL is the personal banker of CONSPIRATOR 7 and others. KRULL manages "banking" activities for numerous Venezuelan officials and kleptocrats.").

straw owner, "CONSPIRATOR 8." (The CS recognized CONSPIRATOR 8 as a straw owner, previously proposed to be used to conceal the money for the stepsons of VENEZUELAN OFFICIAL 2, a.k.a "los chamos," during a prior meeting with the CONSPIRATOR 8, CONVIT, and "los chamos.")

99. On November 30, 2016, KRULL sent the CS a WhatsApp message with photos of CONSPIRATORS 7 and 8's Venezuelan passports. KRULL also forwarded an email to the CS explaining the European Financial Institution 1 structure; the email was in fact a string of previously forwarded emails attaching documents from European Financial Institution 1, which had been sent from AMPARAN to "CONSPIRATOR 9," to CONSPIRATOR 7, to KRULL, and to the CS.

100. In early December 2016, the CS informed KRULL of a solution for laundering the additional PDVSA funds….

101. In a recorded January 9, 2017 meet [sic] with GUSTAVO in Miami, the CS asked…for a solution similar to…for CONSPIRPATOR's 7 & 8. …

102. In a January 10, 2017 recorded conversation, KRULL noted that "[CONSPIRATOR 7]" is asking if the money can be sent. In another, on January 23, 2017, KRULL said the money at European Financial Institution 1 is ready to be moved to CONSPIRATOR 8 and that "I met the dude, and also met the guy that represents him." The CS asked, "Are these guys sons?" (meaning the stepsons of VENEZUELAN OFFICIAL 2), and KRULL responded, "Nah, Don't, don't, don't, ask." …

105. On March 16, 2017 the CS met with KRULL and Conspirator 8 in Panama…During the meeting, CONSPIRATOR 8 stated that he "represented three persons." After the meeting, KRULL confided to the CS that he had once seen CONSPIRATOR 8 at CONSPIRATOR 7's office having lunch with 'los chamos," i.e., the stepsons of VENEZUELAN OFFICIAL 2.

*See* Fernandez Affidavit at 27- 30, ¶¶ 96-105.

And, although "Conspirator 7" is unidentified, footnote 12 of the Fernandez Affidavit

states that "CONSPIRATOR 7 is another reported billionaire member of the "boliburgues" and

owner of a television network in Venezuela." *See id.* at 27, fn. 12. Having reviewed the Criminal

Complaint, including the Fernandez Affidavit, and based upon my research, I opine that Gorrin

is Conspirator 7. This opinion is also supported by credible news articles that covered the

Criminal Complaint to wit:

According to the Miami Herald:

> A Venezuelan TV mogul who has amassed a real estate fortune in South Florida and New York is now at the center of a $1.2 billion money-laundering investigation — put there by a Swiss banker who has admitted guilt and is helping Miami prosecutors build a criminal case against him. Raúl Gorrín, owner of the Globovisión network in Caracas, is suspected of steering $600 million from the country's state-owned oil company to a European bank to enrich himself, the three stepsons of President Nicolás Maduro and other members of Venezuela's politically connected elite, according to new court records and multiple sources familiar with the federal probe in Miami. Identified only as "Conspirator 7" in court records, Gorrín collaborated with Swiss banker Matthias Krull to make the massive wire transfer two years ago, sources say.

*See* Jay Weaver and Antonio Maria Delgado, *Media Mogul with Miami Mansion Emerges as Key Suspect in Venezuela Corruption Case,* Miami Herald (August 24, 2018), https://www.miamiherald.com/article217285655.html (last visited September 1, 2020); s*ee also* Brian Bandell, *Luxury Miami Condo Linked to Alleged Billion-dollar Money Laundering Scheme,* South Florida Business Journal (June 26, 2018), https://www.bizjournals.com/southflorida/news/2018/07/26/luxury-miami-condo-linked-to-allegedbillion-dollar.html (last visited September 1, 2020).

According to an Associated Press article:

> In court papers. Krull also was referred to as the "personal banker" for "Conspirator 7," who is described as the owner of a Venezuelan TV network and billionaire member of the so-called "boliburgues" elites that made fortunes under the Bolivarian revolution started by the late Hugo Chavez. **The two people familiar with the case said Conspirator 7 is Raul Gorrin, who became president of Globovision** shortly after he and others purchased the popular network in 2013 and softened its anti-government coverage.

*See Swiss banker gets 10 years for Venezuela graft case,* Associated Press (October 29, 2018),

https://apnews.com/ba0d18b4c16b4567a1832d98cb64bdaa (last visited September 1, 2020)

(emphasis added).

37.     Furthermore, OFAC has also described Gorrin's role in money laundering for

Venezuela government officials of the Maduro regime in the January 8, 2019 Press Release:

> Raul Gorrin Belisario was indicted by the United States Attorney's Office
> for the Southern District of Florida in August 2018 for conspiring to
> violate the Foreign Corrupt Practices Act, and *for conspiring to bribe*
> *Venezuelan officials and commit money laundering by hiding embezzled*
> *government funds, totaling more than $1 billion, in Florida and New York.*
> *Gorrin was also being investigated for misappropriating billions of*
> *dollars from Venezuela's state-owned oil company, Petroleos de*
> *Venezuela, S.A. (PDVSA).*
>
> *Gorrin is also thought to have paid several officials* **to have access to**
> **Venezuelan politicians and government officials, and was believed to**
> **hold funds on behalf of these individuals in the same way he held funds**
> **for Andrade.**   These individuals include, but are not limited to, Elvis
> Eduardo Hidrobo Amoroso, who was designated by OFAC on November
> 9, 2017, and Maikel Jose Moreno Perez, a close friend of Gorrin, who was
> designated by OFAC on May 18, 2017 pursuant to Executive Order (E.O.)
> 13692.

*See* January 8, 2019 Press Release (emphasis added).

38.     Moreover, the January 8, 2019 Press Release also went on to document Gorrin's

involvement in providing financial support to FARC agent and instrumentality Cilia Adela Flores

de Maduro: "*Gorrin also purchased gifts for Cilia Adela Flores de Maduro, the First Lady of*

*Venezuela, who was designated by OFAC on September 25, 2018 pursuant to E.O. 13692.*" *See*

*id.* (emphasis added).

39.     Furthermore, Gorrin's indictment recounts how he paid bribes in support of other

individuals that support FARC agent and instrumentality Maduro in order to secure his power

over the Venezuela currency exchange program. The indictment alleges:

> *. . . that Gorrin paid millions of dollars in bribes to two high-level Venezuelan officials, including Andrade, to secure the rights to conduct foreign currency exchange transactions at favorable rates for the Venezuelan government.* In addition to wiring money to and for the officials, Gorrin allegedly purchased and paid expenses for them related to private jets, yachts, homes, champion horses, high-end watches and a fashion line. To conceal the bribe payments, Gorrin made payments through multiple shell companies. *Gorrin allegedly partnered with Jimenez to acquire Banco Peravia, a bank in the Dominican Republic, to launder bribes paid to Venezuelan officials and proceeds of the scheme.*
>
> *As part of his guilty plea, Andrade admitted that he received over $1 billion in bribes from Gorrin and other co-conspirators in exchange for using his position as Venezuelan national treasurer to select them to conduct currency exchange transactions for the Venezuelan government.* As part of his plea agreement, Andrade agreed to a forfeiture money judgment of $1 billion and forfeiture of all assets involved in the corrupt scheme, including real estate, vehicles, horses, watches, aircraft and bank accounts.

*See* Justice News, U.S. Dept. of Justice, Venezuelan Billionaire News Network Owner, Former Venezuelan National Treasurer and Former Owner of Dominican Republic Bank Charged in Money Laundering Conspiracy Involving Over $1 Billion in Bribes (Nov. 20, 2018) https://www.justice.gov/opa/pr/venezuelan-billionaire-news-network-owner-former-venezuelan-national-treasurer-and-former (emphasis added)*; see also United States of America v. Raul Gorrin Belisario*, Case No. 9:18-cr-80160-WPD (S.D. Fla. Aug. 17, 2018), D.E. 3 (Available at https://www.justice.gov/criminal-fraud/file/1120281/download).

40.      It is my opinion that former Venezuelan National Treasurers, Andrade and Diaz, Gorrin, and the January 2020 Designated Individuals and Entities, are agents and instrumentalities of the FARC for their involvement and activities regarding the Venezuela currency exchange program, which served as a primary vehicle for money laundering for, and which was inextricably tied to the bribery of, FARC operatives within or surrounding the Maduro regime (such as his three stepsons, Los Chamos), while such FARC operatives were acting in support of Maduro's

grip on power which enabled his vast international narcotics trafficking of FARC cocaine (with impunity in Venezuela). Thus, it is my opinion that Andrade, Diaz, and Gorrin are each agents and instrumentalities of the FARC, as their activities materially assisted in, and provided financial or technological support for or to, or providing of goods or services in support of, the international narcotics trafficking activities of the FARC. [6]

41.    Along with the aforementioned June 2020 Designated Individuals and Entities, PdVSA, those in the El Aissami and Lopez Bello Network, Diaz, Gorrin, Cilia Adela Flores de Maduro, Los Chamos, and the January 2020 Designated Individuals and Entities, all of which OFAC has designated as SDNs and all of whom I have opined herein are agents and instrumentalities of the FARC, the following are also agents  and instrumentalities of the FARC: any entity owned in the aggregate, directly or indirectly, 50 percent or more by one or more of the June 2020 Designated Individuals and Entities, PdVSA,  those in the El Aissami and Lopez Bello Network, Diaz, Gorrin, Cilia Adela Flores de Maduro, Los Chamos, or the January 2020 Designated Individuals and Entities, and each such entity (a "**SDN-Owned Entity**") is a blocked person.  Further, each such SDN-Owned Entity that is listed as blocked by OFAC is also an agent and instrumentality of the FARC. *See* U.S. Dep't Treasury, Revised Guidance on Entities Owned

---

[6] It is also well documented that the Venezuela currency exchange program is a critical component in enabling money laundering of proceeds from the sale of FARC cocaine.  As documented by the Sun Sentinel, the money laundering of narco-trafficked funds worked as follows:

> Federal authorities say the scheme often works like this: Drug traffickers in the United states make millions of dollars selling heroin and cocaine smuggled from South America. They pay someone to pick up the cash in Puerto Rico or New York and bring it to South Florida.
>
> Brokers in South Florida buy the tainted money and sell it at an inflated price to businesses in Venezuela. The brokers use the drug dollars to pay U.S. bills on behalf of the business owners, who in turn deposit bolivares in Venezualan banks.
>
> The Bolivares pay off drug traffickers in Venezuela and the cycle begins again.

*See* Alexia Campbell, *Drug money laundered in South Florida fuels U.S.-Venezuela trad*e, Sun Sentinel (Dec. 18, 2011)         https://www.sun-sentinel.com/news/fl-xpm-2011-12-18-fl-venezuelan-money-laundering-20111217-story.html (last visited September 1, 2020).

by Persons Whose Property and Interests in Property are Blocked, (Aug. 13, 2014), attached hereto as **Exhibit H**. And further, the property and interests in property of any such SDN-Owned Entity are blocked regardless of whether the entity itself is listed in the annex to an Executive Order or otherwise placed on OFAC's list of Specially Designated Nationals. *Id.*

42.     The assets of such agents and instrumentalities of the FARC are "blocked assets" executable under TRIA, as are property of any entity in which such blocked persons own, whether individually or in the aggregate, directly or indirectly a 50% or greater interest. *See id.*

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

John Robert McBrien

Dated: September 8, 2020

26

EXHIBIT 10

the fourth Circuit in 3 years, and confirmed the first African American appointed to that court in American history, even though that nominee and 6 other nominees of President Clinton to the Fourth Circuit, for a total of 7 in that circuit alone, never received hearings during Republican control of the Senate. Today, another of President Bush's nominees was confirmed to that circuit. These are just a few of the firsts we have achieved in just 16 months.

There were many other firsts in courts across the Nation. For example, we held hearings for and confirmed the first judges appointed to the Federal courts in the Western District of Pennsylvania in almost 7 years, even though several of President Clinton's nominees to the courts in that district were blocked by Republicans. They allowed none of President Clinton's nominees to be confirmed to that court during the entire period of Republican control. They also blocked the confirmation of a Pennsylvania nominee to the Third Circuit, among others. Democrats confirmed the first nominees to the Third Circuit and Ninth Circuit in 2 years, even though the last nominees to those seats never received hearings during Republican control of the Senate.

We have had hearings for a number of controversial judicial nominees and brought many of them to votes this year just as I said we would when I spoke to the Senate at the beginning of the year. Of course, it would have been irresponsible to ignore the number of vacancies we inherited and concentrate solely on the most controversial, time consuming nominees to the detriment of our Federal courts. The President has made a number of divisive choices for lifetime seats on the courts and they take time to bring to a hearing and a vote. None of his nominees, however, have waited as long for a hearing or a vote as some of President Clinton's judicial nominees, such as Judge Richard Paez who waited 1,500 days to be confirmed and 1,237 days to get a final vote by the Republican-controlled Senate Judiciary Committee or Judge Helene White whose nomination languished for more than 1,500 without ever getting a hearing or a committee vote.

As frustrated as Democrats were with the lengthy delays and obstruction of scores of judicial nominees in the prior 6½ years of Republican control, we never attacked the chairman of the committee in the manner as was done in recent weeks. Similarly, as disappointed as Democrats were with the refusal of Chairman HATCH to include Allen Snyder, Bonnie Campbell, Clarence Sundram, Fred Woocher, and other nominees on an agenda for a vote by the committee following their hearings, we never resorted to the tactics and tone used by Republican members of this committee in committee statements, in hallway discussions, in press conferences, or in Senate floor statements. As frustrated and disappointed

as we were that the Republican majority refused to proceed with hearings or votes on scores of judicial nominees, we never sought to override Senator HATCH's judgments and authority as chairman of the committee.

The President and partisan Republicans have spared no efforts in making judicial nominations a political issue, without acknowledging the progress made in these past months when 102 of this President's judicial choices have been given committee votes. One indication of the fairness with which we have proceeded is my willingness to proceed on nominations that I do not support. We have perhaps moved too quickly on some, relaxing the standards for personal behavior and lifestyle for Republican nominees, being more expeditious and generous than Republicans were to our nominees, and trying to take some of them at their word that they will follow the law and the ethical rules for judges.

For example, as I noted on October 2, 2002, we confirmed a personal friend of the President's, Ron Clark, to an emergency vacancy in the United States District Court for the Eastern District of Texas. Clark's commission was not signed and issued promptly. We learned later that Clark was quoted as saying that he asked the White House, and the White House agreed, to delay signing his commission while he ran as a Republican for reelection to a seat in the Texas legislature so that he could help Republicans keep a majority in the Texas State House until the end of the session in mid-2003. The White House was apparently complicit in these unethical partisan actions by a person confirmed to a lifetime appointment to the Federal bench. Clark, who was confirmed to a seat on the Federal district court in Texas, was actively campaigning for election despite his confirmation.

These actions bring discredit to the court to which Judge Clark was nominated by the President and confirmed by the Senate, and calls into question Judge Clark's ability to put aside his partisan roots and be an impartial adjudicator of cases. Even in his answers under oath to this committee, he swore that if he were "confirmed" he would follow the ethical rules. Canon 1 of the Code of Conduct for United States Judges explicitly provides that the code applies to "judges and nominees for judicial office" and Canon 7 provides quite clearly that partisan political activity is contrary to ethical rules. In his answers to me, the chairman of this committee, Clark promised "[s]hould I be confirmed as a judge, my role will be different than that of a legislator." As the Commentary to the Code of Conduct for United States Judges, (which applies to judges and nominees), states, "Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges [which] depend in turn upon their acting without fear or favor. Although

judges should be independent, they should comply with the law as well as the provisions of this Code." The code sets standards intended to help ensure that the public has access to Federal courts staffed with judges who not only appear to be fair but are actually so.

Yet he was flouting the standards set by the code and the promises he made to me personally and to the Senate Judiciary Committee and, by proxy, to the Senate as a whole. That the White House was prepared to go along with these shenanigans reveals quite clearly the political way they approach judicial nominations. Only after the New York Times reported these unseemly actions, did the President sign Judge Clark's appointment papers. As Judge Clark hoped, he "won" the election and so the Republican Governor of Texas may be able to name a Republican to replace him in the state legislature.

With a White House that is politicizing the Federal courts and making so many divisive nominations, especially to the circuit courts, to appease the far-right wing of the Republican party, it would be irresponsible for us to turn a blind eye to this and simply rubber-stamp such appointees to lifetime seats. Advice and consent does not mean giving the President carte blanche to pack the courts with ideologues from the right or left. The system of checks and balances in our Constitution does not give the power to make lifetime appointments to one person alone to pack the courts with judges whose views are outside of the mainstream and whose decisions would further divide our nation.

I have worked hard to bring to a vote the overwhelming majority of this President's judicial nominees, but we cannot afford to make errors in these lifetime appointments out of haste or sentimental considerations, however well intentioned. To help smooth the confirmation process, I have gone out of my way to encourage the White House to work in a bipartisan way with the Senate, like past Presidents, but, in all too many instances, they have chosen to bypass bipartisanship cooperation in favor of partisanship and a campaign issue. Arbitrary deadlines will not ensure that nominees will be fairminded judges who are not activists or ideologues. The American people have a right to expect the Federal courts to be fair forums and not bastions of favoritism on the right or the left. These are the only lifetime appointments in our whole government, and they matter a great deal to our future. I will continue to work hard to ensure the independence of our Federal judiciary.

—————

TERRORISM RISK INSURANCE ACT
OF 2002—CONFERENCE REPORT

The PRESIDING OFFICER. Under the previous order, the Chair lays before the Senate the conference report to accompany H.R. 3210.

The legislative clerk read as follows:

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 3210) to ensure the continued financial capacity of insurers to provide coverage for risks from terrorism, having met, have agreed that the House recede from its disagreement to the amendment of the Senate, and agree to the same with an amendment, signed by a majority of the conferees on the part of both Houses.

The PRESIDING OFFICER. The Senate will proceed to the consideration of the conference report.

(The report is printed in the House proceedings of the RECORD of November 13, 2002.)

CLOTURE MOTION

The PRESIDING OFFICER. Under the previous order, pursuant to rule XXII the Chair lays before the Senate the pending cloture motion, which the clerk will report.

The legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of Rule XXII of the Standing Rules of the Senate, hereby move to bring to a close the debate on the conference report to accompany H.R. 3210, the Terrorism Risk Protection Act.

Christopher Dodd, Zell Miller, Joseph Lieberman, Harry Reid, Jack Reed, Jon Corzine, Debbie Stabenow, Hillary Rodham Clinton, Charles Schumer, Maria Cantwell, Paul Sarbanes, Byron L. Dorgan, Tom Carper, Jeff Bingaman, Tom Daschle, Barbara Boxer.

The PRESIDING OFFICER. There are 2 minutes of debate evenly divided before the vote. Who yields time?

Mr. SARBANES. Mr. President, I urge Members to vote in favor of invoking cloture. I am not quite sure why we are doing the cloture vote, but in any event, so we can get to the legislation and pass it—this is worthy legislation—I hope the Senate will first impose cloture, and then, under the unanimous consent agreement, we would go to a final vote on the legislation.

The PRESIDING OFFICER. The Senator from Texas is recognized.

Mr. GRAMM. Mr. President, much good work has gone into this bill. I am going to vote against cloture. I don't think the industry retention figures are high enough. I think the taxpayer is too exposed. I am afraid the secondary market will not develop under these circumstances, and, despite all our efforts, the bill still retains the provision that will produce punitive damage judgments against victims of terrorism. In my mind, that is licensing piracy on hospital ships and should not be allowed.

The PRESIDING OFFICER. Is all time yielded back?

All time is yielded back.

By unanimous consent, the mandatory quorum call under the rule is waived.

The question is, Is it the sense of the Senate that debate on the conference report accompanying H.R. 3210, the Terrorism Risk Protection Act, shall be brought to a close?

The yeas and nays are required under the rule.

The clerk will call the roll.

The assistant legislative clerk called the roll.

Mr. NICKLES. I announce that the Senator from North Carolina (Mr. HELMS), the Senator from Alaska (Mr. MURKOWSKI), and the Senator from Arkansas (Mr. HUTCHINSON) are necessarily absent.

The yeas and nays resulted—yeas 85, nays 12, as follows:

[Rollcall Vote No. 251 Leg.]

YEAS—85

| | | |
|---|---|---|
| Akaka | Dayton | Lott |
| Allard | DeWine | Lugar |
| Allen | Dodd | McCain |
| Barkley | Domenici | McConnell |
| Baucus | Dorgan | Mikulski |
| Bayh | Durbin | Miller |
| Bennett | Edwards | Murray |
| Biden | Feingold | Nelson (FL) |
| Bingaman | Feinstein | Nelson (NE) |
| Bond | Fitzgerald | Reed |
| Boxer | Frist | Reid |
| Breaux | Graham | Roberts |
| Brownback | Gregg | Rockefeller |
| Bunning | Hagel | Sarbanes |
| Burns | Harkin | Schumer |
| Byrd | Hatch | Smith (NH) |
| Campbell | Hollings | Smith (OR) |
| Cantwell | Inhofe | Snowe |
| Carnahan | Inouye | Specter |
| Carper | Jeffords | Stabenow |
| Chafee | Johnson | Stevens |
| Cleland | Kennedy | Thompson |
| Clinton | Kerry | Thurmond |
| Cochran | Kohl | Torricelli |
| Collins | Landrieu | Voinovich |
| Conrad | Leahy | Warner |
| Corzine | Levin | Wyden |
| Crapo | Lieberman | |
| Daschle | Lincoln | |

NAYS—12

| | | |
|---|---|---|
| Craig | Grassley | Santorum |
| Ensign | Hutchison | Sessions |
| Enzi | Kyl | Shelby |
| Gramm | Nickles | Thomas |

NOT VOTING—3

| | | |
|---|---|---|
| Helms | Hutchinson | Murkowski |

The PRESIDING OFFICER. On this vote, the ayes are 85, the nays are 12. Three-fifths of the Senators duly chosen and sworn having voted in the affirmative, the motion is agreed to.

Mr. HATCH. Mr. President, today I rise to speak on final passage of H.R. 3210, the conference report to the Terrorism Risk Insurance Act of 2002. Most of us agree that something needs to be done in this area. This legislation is important to our economy and the many jobs and construction projects that have been in limbo due to the uncertainty following the tragic events of September 11th. My constituents have come to me on multiple occasions, imploring that the Senate act on this issue. They are genuinely concerned about the negative impact lack of coverage has had on their businesses and their employees. Without insurance, our economic growth is in jeopardy, businesses will fail and jobs will be lost. For that reason, I will support final passage.

However, I am concerned that we have not addressed the issue in a prudent and responsible manner that provides the appropriate stability to our economy without exposing our taxpayers to an unreasonable financial burden. In this legislation, we have failed to provide elements that are nec-

essary to the businesses that are themselves the victims of the terrorist attacks, those very same businesses that provide the thousands of jobs in this country that we are seeking to preserve. Moreover, I have concerns about implementing a program such as this without ensuring that the hardworking taxpayers in this county are not forced to pick up the tab for the overzealous and unrestrained trial bar. With the type of litigation that would likely result from massive losses, even just from one attack, it defies common sense that some would oppose implementing principles of litigation management to ensure that all victims get treated fairly and jury awards, based more on emotion rather than actual legal culpability, do not dry up the resources of defendant businesses, which in turn hurts victims, employees and taxpayers.

In a letter dated June 10, 2000, from the Treasury Department and signed by not only the Secretary of the Treasury, but the Director of the Office of Management and Budget, the Director of the National Economic Council and the Director of Economic Advisers really underscores the serious ramifications to our economy that have resulted from a lack of coverage for terrorist acts and supports Congressional action in this area. But it also emphasizes that we must do so in a responsible manner.

One important issue for the availability of terrorism insurance is the risk of unfair or excessive litigation against American companies following an attack. Many for-profit and charitable companies have been unable to obtain affordable and adequate insurance, in part because of the risk that they will be unfairly sued for the acts of international terrorists . . . It makes *little economic sense* to pass a terrorism insurance bill that leaves our economy exposed to such *inappropriate and needless legal uncertainty*. [emphasis added]

In seeking to provide stability to our economy we must not act irresponsibly. The conference report on H.R. 3210, while providing a necessary backstop to our economy, includes some weaknesses that concern me. While I believe this measure is necessary and should be enacted as soon as possible, I sincerely hope this body will address my concerns in the next Congress.

Mr. GRASSLEY. Mr. President, I rise to express my concern about the conference report to H.R. 3210, the Terrorism Risk Insurance Act. When the Senate first considered this bill in June, I expressed the hope that Congress would send the President a bill that was fair and balanced with respect to basic liability protections for all victims of terrorism. However, I believe that the conference report before us fails to provide reasonable restrictions on lawsuit liability, and instead exposes the American taxpayer to potentially excessive costs of unmitigated litigation as a result of terrorist attacks beyond anyone's control. Consequently, I am reluctant to vote for final passage of this conference report.

I am glad that the final version of the terrorism reinsurance legislation is only a temporary fix. As a general matter, the Government should not be in the business of writing claims.

Some have implied that we wrongly predicted an insurance crisis following the events of September 11, 2001, which was the reason for this temporary backstop. The insurance companies have survived without government support thus far, and banks are still lending where there is solvent risks. According to the Wall Street Journal, "the economy has continued to grow, albeit slowly, and some companies have started offering insurance again, albeit at very high premiums." The article states that a short-term solution would be nice, but the bill is "a bonanza for the trial lawyers, an entitlement for insurers."

Again, I do not believe that this legislation contains adequate liability protections. While some restrictions were negotiated in conference, I don't believe that they go far enough. Basically, American companies that are themselves victims of terrorists acts should not be subject to predatory lawsuits or unfair and excessive punitive damages. If that happens, not only will Americans be the victims of another attack, but the taxpayers will be the victims of trial lawyers who will seek the deepest pocket and rush to the courthouse to sue anyone regardless of fault. There needs to be careful restrictions on lawsuit liability to protect taxpayer funds from being exposed to opportunistic, predatory assaults on the United States Treasury.

In fact, I agree with an editorial in the Washington Post: the other side of the aisle should be "embarrassed by their efforts to defend trial lawyers at the expense of the American economy." Rather, we should be working to enforce the long-standing Federal policies behind the Federal Tort Claims Act: namely, that lawyers should not be making handsome profits when they are paid from the U.S. Treasury. I agree with a statement made by House Judiciary Chairman SENSENBRENNER, that "especially today, in a time of war, excessive lawyer fees drawn from the U.S. Treasury should not be allowed to result in egregious war profiteering at the expense of victims, jobs and businesses."

Many say we can come back and revisit these provisions later. I say we get it right the first time we sign it into law.

I ask unanimous consent to print the Wall Street Journal article to which I referred in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

[From the Wall Street Journal, Nov. 6, 2002]

A TERRIFYING INSURANCE DEAL

A BONANZA FOR THE TRIAL LAWYERS, AN ENTITLEMENT FOR INSURERS

After the elections the 107th Congress is threatening to return to pass some unfinished business, including a compromise on terrorism insurance. Having looked at the details of the insurance deal, we can only hope they'll all stay home.

The two parties have been battling for a year over this bill, especially the extent to which trial lawyers could profit from acts of terror. Republicans and some Democrats want to ban punitive damages against property owners. But Tom Daschle, carrying his usual two oceans of water for the plaintiff's bar, resisted any erosion in the right to sue the owner should a plane crash into his or her building.

And it looks like Mr. Daschle has prevailed. The compromise permits such suits, albeit before a single federal court as opposed to the more accommodating state courts. In other words, the White House appears to have caved, and after months of arguing the opposite now says terror insurance is about "jobs, not tort reform."

Well, we're not sure it's still about jobs either. The bill makes insurance companies liable for claims amounting to a certain percentage of their premiums, puts the government on the hook for 90% of losses over that deductible, and allows the government to recover some portion of its payment by levying a surcharge on all policy owners. The best news is that government help sunsets in 2005, or at least that's the promise.

Unfortunately, the bill ignores the crucial problem of risk. Risk-based premiums—which reward the careful and punish the careless—are a superb tool for reducing risk. Consider: There are lots of things property owners can do to reduce the damage from terrorism—retrofitting air-filtration systems to guard against biological agents, redesigning underground parking garages to prevent bomb attacks, fireproofing steel girders to minimize fire damage. And insurance companies can discipline them to take these measures by charging risk-based premiums.

If insurers were required to pay premiums to the government based on the premiums they receive, market incentives to reduce risk would improve markedly. If, on the other hand, terror insurance is essentially free, as it would be under the current bill, insurers have less incentive to charge the full cost of risk; instead they have every incentive to underprice it.

An alternative has been suggested by David Moss, an economist at Harvard Business School: Let the federal government pay 80% of losses from a terrorist attack, as long as insurers also pass along 80% of the premiums they collect. This way, says Mr. Moss, insurers would price risk near or at its full cost, exerting discipline against the careless, and prices would be set in the private market.

We mention Mr. Moss's idea because, despite heavy breathing by the insurance industry, it isn't at all clear that there's an immediate economic need for this legislation. It's true that right after 9/11 the property insurance market seized up. Insurers didn't know how to price for the risk of another attack, and so rent their garments that the economy would collapse without government reinsurance. We were also prone to the idea, but it turns out they were wrong. The economy has continued to grow, albeit slowly, and some companies have started offering insurance again, albeit at very high premiums.

We aren't arguing that a federal backstop might not perk up business in the short term, or that some sort of insurance wouldn't be nice to have in place before another attack. But the assertion that billions of dollars of projects have been shelved and 300,000 jobs lost is bogus. Despite efforts to quantify a slowdown, including a survey by the Fed, evidence of suffering is scattered and anecdotal—and mostly confined to trophy properties.

The bigger point here is that any legislation is likely to be permanent, since no entitlement of this size has ever been allowed to ride quietly into the sunset. That argues for doing it right, and waiting until the next Congress if need be. Many Republicans are privately unhappy with the deal the White House has cut with Mr. Daschle. We hope they'll urge President Bush to insist on something better.

Mr. HARKIN. Mr. President, I am very pleased that this conference report includes bipartisan legislation that I authored with my colleague, Senator ALLEN of Virginia, which will make state sponsors of terrorism and their agents literally pay for the dastardly attacks they perpetrate on innocent Americans.

Last June, the Senate approved our amendment to the terrorism insurance bill on an 81 to 3 vote to mandate that at least $3.7 billion in blocked assets of foreign state sponsors of terrorism and their agents, at the current disposal of the U.S. Treasury Department, be used—first and foremost—to compensate American victims of their terrorist attacks. That lop-sided vote made it very clear that most Americans and their elected representatives understand the importance of making the rogue governments who sponsor international terrorism pay literally, instead of blithely dunning the American taxpayer to compensate the victims of their outrageous attacks or doing nothing.

Our global struggle against terrorism must be fought and won on multiple fronts. In so doing, we cannot forget that terrorist attacks are ultimately stories of human tragedy. The young woman from Waverly, IA—Kathryn Koob—seeking to build cross-cultural ties between the Iranian people and the American people only to be held captive for 444 days in the U.S. Embassy in Tehran. The teenage boy from LeClaire, Iowa—Taleb Subh—who was visiting family in Kuwait in 1990, and who was terrorized by Saddam Hussein and Iraqi troops in the early stages of the invasion of Kuwait. The U.S. aid worker from Virginia—Charles Hegna—who was tortured and killed in 1984 by Iranian-backed hijackers in order "to punish" the United States. These are only a few of the American families victimized by terrorist attacks abroad I have come to know. There is not a Senator in this body who cannot count additional American victims of state-sponsored terrorism among his or her constituents.

What do we say to these families, the wives, mothers and fathers, sons and daughters? More importantly, what can we do, as legislators and policymakers, to mitigate their suffering and to answer their cries for justice?

Those who sponsor as well as those who commit these inhumane acts must pay a price. That is why I sponsored the Terrorism Victim's Access to Compensation Act, whose key provisions are included in this conference agreement.

In 1996, the Congress passed an important law—the Anti-Terrorism and Effective Death Penalty Act—with bipartisan support and with the support of the U.S. State Department. That statute allows American victims of state-sponsored terrorism to seek redress and pursue justice in our Federal courts. A central purpose of that law is to make the international terrorists and their sponsors pay an immediate price for their attacks on innocent Americans abroad. For the first time starting in 1996, the money of foreign sponsors of terrorism and their agents that is frozen bank accounts in the United States and under the direct control of the U.S. Treasury was to have become available to compensate American victims of state-sponsored terrorism who bring lawsuits in federal court and win judgments on the merits against the perpetrators of such attacks.

The law enacted in 1996 only applies to seven foreign governments officially designated by the U.S. State Department as state sponsors of international terrorism. They are the governments of Iran, Iraq, Libya, Syria, Sudan, North Korea, and Cuba. It is these state sponsors of international terrorism, not the American taxpayer, who must be compelled first and foremost to compensate the American victims of their inhumane attacks.

The U.S. Treasury Department currently and lawfully controls at least $3.7 billion in blocked or frozen assets from these seven state sponsors of terrorism. But some officials of the U.S. Treasury and State Departments who think they know better, until now, have been flaunting the law, ignoring the clear intent of the Congress, and opposing the use of these blocked assets of Saddam Hussein, the ruling mullahs in Iran, and other state sponsors of terrorism to compensate American victims of terrorist attacks. In fact, in the on-going case involving the 53 Americans taken hostage in the U.S. Embassy in Iran in 1979 and held in captivity for 444 days and their families, U.S. Justice Department and State Department attorneys have intervened in federal court to have their lawsuit dismissed in its entirety, thus de facto siding with the Government of Iran.

Incredibly, since 1996 American victims of state-sponsored terrorism have been actively encouraged to seek redress and compensation in our federal courts. These long-suffering American families have complied with all requirements of existing U.S. law and many have actually won court-ordered judgments, only to be denied any compensation and what little justice they seek in a court of law. The opponents of this legislation apparently want American taxpayers to foot the bill for what could amount to hundreds of millions of dollars instead of making the terrorists and their sponsors pay.

With the passage of this new legislation, the Congress is requiring that this misguided policy be abandoned. Holding the blocked assets of state sponsors of terrorism in perpetuity might make sense in the pristine world of high diplomacy, but not in the real world after the September 11 terrorist attacks on America.

First, paying American victims of terrorism from the blocked and frozen assets of these rogue governments and their agents will really punish and impose a heavy cost on those aiding and abetting the terrorists. This tougher U.S. policy will provide a new, powerful disincentive for any foreign government to continue sponsoring terrorist attacks on Americans, while also discouraging any regimes tempted to get into the ugly business of sponsoring future terrorist attacks.

Second, making the state sponsors actually lose billions of dollars will more effectively deter future acts of terrorism than keeping their assets blocked or frozen in perpetuity in pursuit of the delusion that long-standing, undemocratic, brutish governments like those in Iran and Iraq can be moderated.

Third, American victims of state-sponsored terrorism and their families will finally be able to secure some measure of justice and compensation. Public condemnation by the U.S. Government of state-sponsored terrorism only goes so far. This new legislation enables American victims to fight back, to hold the terrorists who are responsible accountable to the rule of law, and to make the perpetrators and their sponsors pay a heavy price.

In his last days in office, former President Clinton signed a law endorsing a policy of paying American victims of terrorism from blocked assets, while simultaneously signing a waiver of the means to make this policy work. The Bush administration has not changed this mistaken policy as yet. That is why Senator ALLEN joined me in pushing this bipartisan legislation to establish two new policy cornerstones for our Nation's struggle against international terrorism. First, the U.S. will first require that compensation be paid from the blocked and frozen assets of the state sponsors of terrorism in cases where American victims of terrorism secure a final judgment in our Federal courts and are awarded compensation. Second, the U.S. Government will provide a level playing field for all American victims of state-sponsored terrorism who are pursuing redress by providing equal access to our federal courts.

American victims of state-sponsored terrorism deserve and want to be compensated for their losses from those who perpetrated the attacks upon them, including our former hostages in Iran and their families. The Congress should clear the way for them to get some satisfaction of court-ordered judgments and, in so doing, help deter future acts of state-sponsored terrorism against innocent Americans.

Mr. KYL. Mr. President, I rise today to express my opposition to the conference report on H.R. 3210, the terrorism insurance bill.

I had hoped that Congress would approve legislation that encouraged building construction, gave business owners limited liability protection in the event of a terrorist attack, and protected taxpayers from exorbitant costs. These goals were all enunciated by President Bush when he pressed Congress to act on this issue after months of delay.

Unfortunately, the legislation in its current form fails to meet any of those objectives.

First, the conference report subjects victims of terrorism to potentially unlimited liability by placing no restrictions on court awards of punitive damages or non-economic damages. This has the potential of encouraging a slew of frivolous lawsuits against business owners whose business may be destroyed in terrorist attacks. Certainly no business that was located in the World Trade Center, for example, should be held at fault for the unforeseeable tragedy that took place on September 11.

As several of the President's economic advisors noted in a June 10, 2002 letter to Senate Minority Leader LOTT, "the victims of terrorism should not have to pay punitive damages. Punitive damages are designed to punish criminal or near-criminal wrongdoing." The letter goes on to say "the availability of punitive damages in terrorism cases would result in inequitable relief for injured parties, threaten bankruptcies for American companies and a loss of jobs for American workers."

I strongly agree with that position and am troubled that the conferees did not take these concerns into account before bringing this legislation to the Senate floor.

Additionally, I am concerned that this legislation leaves taxpayers open to liability for terrorist attacks. One of the original goals of this bill was to allow the Secretary of the Treasury to sign off on out-of-court settlements to protect the taxpayers from exorbitant costs. Without such a provision, taxpayers, who are liable for as much as 90 percent of property and casualty costs after a terrorist attack, could be gouged by trial attorneys. That is primarily because insurers, with only a ten percent stake in the outcome of litigation, will favor faster, rather than fairer, settlements—at the taxpayers' expense.

Of additional concern, the low percompany deductibles will impede the development of a private reinsurance market and will increase the likelihood that this temporary federal program becomes permanent. Since the Federal Government limits each company's liability, rather than that of the entire industry, insurance companies have less incentive to spread their risk.

I am also troubled by certain provisions in Title II of this legislation covering victim compensation through

seized assets from terrorists and terrorist-sponsoring states. As the conference report stands now, this provision would create a race to the courthouse benefiting a small group of Americans over a far larger group of victims just as deserving of compensation.

Economic sanctions against terrorist states have kept the economic activity of those states to a minimum. Yet this limited pool of frozen assets and diplomatic property would be exhausted quickly as large, and often uncontested, compensatory and punitive damage awards are satisfied, leaving most victims with nothing. For example, the special provisions for terrorism victims of Iran expands the number of judgment holders eligible for payment under the 2000 Act (to approximately eight), but metes out all of the approximately $30 million remaining in the fund to satisfy judgments in only two cases. And there are a number of ongoing lawsuits by terrorism victims and their families against Iran that will be foreclosed under this agreement.

This section would also disproportionately benefit trial lawyers, since plaintiff's lawyers whose fees are contingent upon satisfying their clients' judgments stand to gain the lion's share of the compensation, not the victims.

Overall, this legislation is far from what President Bush wanted. It is a major disappointment that literally benefits trial lawyers at the expense of the taxpayers.

I realize that many of my colleagues want to support this bill, despite its flaws. And I understand that. It is regrettable that special-interest groups exerted so much influence in the drafting of this legislation, leaving the President with a bill that amounts to little more than the best he could get from this Congress.

But as it stands today, I cannot ask Arizona taxpayers to absorb the potential losses they might incur because of the self-serving and unjustified lawsuits that are the all but inevitable outcome of this legislation.

Mr. HARKIN. Mr. President, I rise to address a portion of this conference agreement relating to enforcement of judgments obtained by victims of terrorism against state sponsors of terrorism. These provisions strike an important blow in our global struggle against terrorism.

The purpose of title II is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties. As the conference committee stated, this title establishes, once and for all, that such judgments are to be enforced against any assets available in the U.S., and that the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act.

Title II expressly addresses three particular issues which have vexed victims of terrorism in this context. First, there has been a dispute over the availability of "agency and instrumentality" assets to satisfy judgments against a terrorist state itself. Let there be no doubt on this point. Title II operates to strip a terrorist state of its immunity from execution or attachment in aid of execution by making the blocked assets of that terrorist state, including the blocked assets of any of its agencies or instrumentalities, available for attachment and/or execution of a judgment issued against that terrorist state. Thus, for purposes of enforcing a judgment against a terrorist state, title II does not recognize any juridical distinction between a terrorist state and its agencies or instrumentalities.

Second, title II amends Section 2002 of the Justice for Victims of Terrorism Act of 2000 to address a miscarriage of justice in the drafting and implementation of that act. In that provision, Congress had directed that specified claimants against Iran receive payment in satisfaction of judgments from two specified accounts, namely Iran's Foreign Military Sales, "FMS", Trust Account and the proceeds of rental of certain Iranian government properties. Contrary to Congressional intent, the legislative language has been construed by the Departments of State and Treasury to exclude unspecified claimants and to allow the executive branch to bar enforcement of their awards against other blocked assets. As one United States District Court has noted, the result is a gross injustice that demands immediate correction.

To address this injustice, we are adding to the list of those to be compensated, all persons who meet two criteria—either, 1, they had a claim filed when Section 2002 was enacted and have already received a final judgment on that claim as of the date of enactment, or 2 were added to the list by the State Department Reauthorization Bill enacted last month. In accordance with amended Section 2002(b)(2)(B), each of these claimants are to be treated as if they were originally included in Section 2002, and are to be paid an amount determined by the Secretary of the Treasury to have been available for payment of their judgment on the date their judgment was issued. Once these amounts are paid, any remaining amounts in these accounts are to be paid to remaining claimants under the formula specified in amended Section 2002(d).

Moreover, to address this injustice, this amendment will treat all of these victims—those originally included in Section 2002 and those now being added—equally to the maximum extent possible. No priority is given to one group or the other. Those in each group which have filed timely lawsuits and received a final judgment by the enactment of this Act are to be paid within

the strict deadlines set in the Act, i.e., within 60 days, without delay. Those not included within this time frame may pursue satisfaction from blocked assets. This will necessarily include some who, for whatever reason, have failed to obtain a judgment in their lawsuit by the date of enactment of this act.

Third, the term "blocked asset" has been broadly defined to include any asset of a terrorist party that has been seized or frozen by the United States in accordance with law. This definition includes any asset with respect to which financial transactions are prohibited or regulated by the U.S. Treasury under any blocking order under the Trading With the Enemy Act, the International Emergency Economic Powers Act, or any proclamation, order, regulation, or license. Moreover, by including the phrase "seized by the United States" in this section, it is our intent to include within the definition of "blocked asset" any asset of a terrorist party that is held by the United States. This is intended as an explicit waiver of any principle of law under which the United States might not be subject to service and enforcement of any judicial order or process relating to execution of judgments, or attachments in aid of such execution, in connection with terrorist party assets that happen to be held by the United States. In this respect, the United States is to be treated the same as any private party or bank which holds assets of a terrorist party, and such terrorist party assets held by the United States are not immunized from court procedures to execute against such assets. However, any assets as to which the United States claims ownership are not included in the definition of "blocked assets" and are not subject to execution or attachment under this provision.

Mr. ENZI. Mr. President, first of all, I want to thank all of the conferees for the long hours and late nights they here worked to complete this bill. I know this has been a difficult process and a long year.

Unfortunately, now I kind myself in a very difficult position. I find myself forced to oppose this legislation even though it is a Presidential priority and even though I support the underlying goals.

It was a little over a year ago that Senators SARBANES, GRAMM, DODD, and I announced an agreement for terrorism risk insurance legislation. That agreement outlined the parameters that we thought were a reasonable response to disruptions occurring in the marketplace as a result of the lack of reinsurance. This agreement outlined very limited and specific liability protections that would protect both the taxpayer's pocketbook and businesses which may themselves be victim's of terrorism from frivolous lawsuits after future terrorist attack.

These limited protections were: First, suits filed as a result of a terrorist attack would be consolidated

into a Federal district court; second, punitive damages would not be allowed; and third, the Secretary of the Treasury was given the ability to agree to out-of-court settlements.

Now, in this new conference report, two out of these three protections have been eliminated. The new program in this conference report will allow frivolous lawsuits to be filed against businesses that may be victims of the terrorist act themselves. Think about a business located in the World Trade Center on 9/11. This business was destroyed and likely lost a number of its employees. The next thing that happens is while attempting to rebuild, the business gets slapped with a frivolous lawsuit by a greedy trial lawyer. It is ridiculous to believe that a business could have prevented an attack of this kind. Yet this legislation will subject them to the will of the trial bar.

This conference report keeps America's businesses and the taxpayer subject to punitive damages. I have a Statement of Administration Policy from the executive Office of the President's Office of Management and Budget. In the second paragraph of the letter dated June 13, 2002, it states "the Administration cannot support enactment of any terrorism insurance bill that leaves the Nation's economy and victims of terrorist acts subject to predatory lawsuits and punitive damages."'

Also from the administration, I have a letter signed by Treasury Secretary O'Neill, OMB Director Daniels, Director of the National Economic Council Lindsey, and Director of the Council of Economic Advisors Glenn Hubbard dated June 10, 2002. This letter states "the victims of terrorism should not have to pay punitive damages. Punitive damages are designed to punish criminal or near-criminal wrongdoing." It goes on the say "the availability of punitive damages in terrorism cases would in inequitable relief for injured parties, threaten bankruptcies for American companies and a loss of jobs for American workers." I could not agree more with the administration's position from just a few months ago that this legislation could lead to the bankruptcies of American companies who were victims of terrorist acts themselves.

In addition, this conference report does not include a provision which allows the Secretary of the treasury to agree to out-of-court settlements. This legislation has the American taxpayer pay potentially 90 percent of property and casualty costs after a terrorist attack. I can think of no other instance where the group liable for paying 90 percent of a lawsuit is unable to agree to an out-of-court settlement. If another catastrophic terrorist attack occurs, every trial lawyer in America will file a lawsuit because they know that the insurance company, which only pays 10 percent of the settlement, will agree immediately. The mansions of the trial lawyers will be built with the dollars of the American taxpayer.

I do not consider the inclusion of these protections to be extreme measures and I do not think that most of the members of this chamber believe them to be unreasonable. They are very simple and reasonable protections that basically say the trial bar should not take advantage of tragedies caused by terrorists.

The President invited Senate Republican conferees to the White House a few weeks ago where concerns were raised regarding the lack of these specific taxpayer protections. Unfortunately, these protections were not reintroduced into the legislation and now this conference report comes to the floor of the Senate without a single Senate Republican conferee's signature.

For these reasons, I am unable to support passage of this legislation. I support the program and understand the possible economic problems by not passing the legislation. I cannot in good faith subject the hard-working taxpayers of Wyoming to the potential losses they might incur because of the self-serving and unjustified lawsuits which may result.

However, even though I cannot support this bill because of the lack of taxpayer protections, I would like to commend those who have worked so diligently on the legislation for over a year now. Senator DODD, in particular, has given more time and effort to this project than probably anyone. He and his staff, Alex Sternhell, have remained committed to seeing the passage of this legislation and have done remarkable work to bring the issues that relate to the structure of the program to a compromise. I have to say that I agree with Senator DODD's position on the structure of the program and always felt confident in the manner which he negotiated these provisions.

Mr. President, my position on this legislation has not changed since the very beginning. I believe we need a Federal backstop and I believe at one point we had a bill that did just that. I am sorry the trial bar was able to derail the bill for over a year now. I can only hope that the trial lawyers of America will stop to realize that subjecting Americans to lawsuits to line their pockets after the devastation of a terrorist attack is simply the wrong thing to do .

Mr. President, I yield the floor.

Mr. LEAHY. Mr. President, I am pleased to support this conference report to provide a federal backstop for terrorism insurance. I believe this bipartisan bill will boost our economy by providing extra protection against terrorist attacks for buildings and construction projects with resulting new jobs in Vermont and across the nation. I agree with President Bush that this legislation is essential for our future economic growth.

I worked with the distinguished Majority Leader, Senator DODD, Senator SARBANES, Senator SCHUMER and oth-

ers to craft a balanced compromise in the conference report on legal procedures for civil actions involving acts of terrorism covered by the legislation. The conference report protects the rights of future terrorism victims and their families while providing federal court jurisdiction of civil actions related to acts of terrorism, consolidating of such cases on a pre-trial and trial basis, and excluding punitive damages from government-backed insurance coverage under the bill. These provisions do not limit the accountability of a private party for its actions in any way.

Further, the conference report, identical to the Senate-passed bill, fully protects federal taxpayers from paying for punitive damage awards. Under the conference report only corporate wrongdoers pay punitive damages, not U.S. taxpayers as some incorrectly claimed on the Senate floor during consideration of the Senate-passed bill.

The U.S. Chamber of Commerce has declared that the conference report "will improve the legal rights of plaintiffs and defendants and, importantly, will help American workers and the economy." I agree.

I thank the conferees for rejecting the special legal protections in the House-passed bill. The liability limits for future terrorist attacks in the House-passed bill were irresponsible because they restricted the legal rights of victims and their families and discouraged private industry from taking appropriate precautions to promote public safety. Restricting damages against a wrongdoer in terrorism-related civil actions involving personal injury or death, for example, could discourage corporations from taking the necessary precautions to prevent loss of life or limb in a future terrorist attack. There is no need to enact these special legal protections and take away the legal rights of victims of terrorism and their families.

For example, the House-passed bill would have permitted a security firm to be protected from punitive damages if the private firm hired incompetent employees or deliberately failed to check for weapons and a terrorist act resulted.

The threat of punitive damages is a major deterrent to wrongdoing. Eliminating punitive damages under the House-passed bill would have severely undercut this deterrent and permitted reckless or malicious defendants to find it more cost effective to continue their wanton conduct without the risk of paying punitive damages. Without the threat of punitive damages, callous corporations could have decided it is more cost-effective to cut corners that put American lives at risk. This approach failed to protect public safety, and the conferees rightly rejected it.

In addition, I thank the managers for including language in the conference report to help captive insurance companies participate in the federal backstop program. Many captives deal in

property and casualty lines, but some do not. Senator JEFFORDS and I strongly support language in the conference report to allow those captives in property and casualty the option of participating in the program while not requiring other captives to start offering terrorism risk insurance.

The state of Vermont is the premier U.S. domicile for captive insurance companies. Vermont's captive owners represent a wide range of industries including multinational corporations, associations, banks, municipalities, transportation and airline companies, power producers, public housing authorities, higher education institutions, telecommunications suppliers, shipping companies, insurance companies and manufacturers, among others. Since 1981, Vermont has averaged approximately 25 captives licensed annually, and those numbers are on the rise. Vermont closed 2001 with 38 new captives, 37 pure and I sponsored, for a total of 527 at year-end. The first half of 2002 saw 26 new captives licensed in Vermont setting a record pace, according to the Vermont Department of Banking, Insurance and Health Care Administration.

At a time when the American people are looking for Congress to take measured actions to protect them from acts of terror and jump-start our economy, this conference report is a shining example of bipartisan progress. I applaud Senator DASCHLE, SENATOR DODD, Senator SARBANES, Senator SCHUMER and the other Senate and House conferees on their good work on this bipartisan conference report.

The PRESIDING OFFICER. The majority leader is recognized.

Mr. DASCHLE. Mr. President, I have consulted with the chairman and the ranking member of the Appropriations Committee. As I think our colleagues know, the next order of business is a debate and then a vote on the continuing resolution. I am told they will need no more than 40 minutes. So Senators should be prepared to vote on final passage on the continuing resolution at about 9:10 to 9:15 p.m. Please return to the Chamber if you are not going to stay. That will be the final vote of the evening. We will vote at approximately 9:10 to 9:15 p.m., following this vote.

The PRESIDING OFFICER. Under the previous order, cloture having been invoked, the question is on agreeing to the conference report to accompany H.R. 3210.

Mr. DODD. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. NICKLES. I announce that the Senator from North Carolina (Mr. HELMS), the Senator from Arkansas (Mr. HUTCHINSON), and the Senator from Alaska (Mr. MURKOWSKI) are necessarily absent.

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 86, nays 11, as follows:

[Rollcall Vote No. 252 Leg.]

YEAS—86

Akaka
Allard
Allen
Barkley
Baucus
Bayh
Bennett
Biden
Bingaman
Bond
Boxer
Breaux
Brownback
Bunning
Burns
Byrd
Campbell
Cantwell
Carnahan
Carper
Chafee
Cleland
Clinton
Cochran
Collins
Conrad
Corzine
Crapo
Daschle
Dayton
DeWine
Dodd
Domenici
Dorgan
Durbin
Edwards
Ensign
Feingold
Feinstein
Fitzgerald
Frist
Graham
Gregg
Hagel
Harkin
Hatch
Hollings
Inhofe
Inouye
Jeffords
Johnson
Kennedy
Kerry
Kohl
Landrieu
Leahy
Levin
Lieberman
Lincoln
Lott
Lugar
McCain
Mikulski
Miller
Murray
Nelson (FL)
Nelson (NE)
Reed
Reid
Roberts
Rockefeller
Santorum
Sarbanes
Schumer
Smith (NH)
Smith (OR)
Snowe
Specter
Stabenow
Stevens
Thompson
Thurmond
Torricelli
Voinovich
Warner
Wyden

NAYS—11

Craig
Enzi
Gramm
Grassley
Hutchison
Kyl
McConnell
Nickles
Sessions
Shelby
Thomas

NOT VOTING—3

Helms
Hutchinson
Murkowski

The conference report was agreed to.

Mr. REID. Mr. President, I ask unanimous consent that the Senator from Georgia, Mr. CLELAND, be recognized for up to 10 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

## SERVICE IN THE SENATE

Mr. CLELAND. Mr. President, I rise today to reflect on a 6 year term in the Senate which has been simultaneously the most challenging, yet most rewarding, experience of my life. I have had the chance to realize a lifelong dream by following in the footsteps of one of my personal my heroes, Senator Richard Russell of Georgia. I have been able to represent the state I love in an institution I revere. And I have been able to add my voice to the others that have risen before me in this chamber, from William Fulbright to Harry Truman to John Kennedy to Everett Dirksen to so many other outstanding men and women of history.

In my Senate office, I have surrounded myself with small reminders of the men I most admire. I sit at Richard Russell's desk. On my walls, I have photographs of just two people. President Franklin Roosevelt and Prime Minister Winston Churchill. Theirs were no ordinary times, and we can safely say now, neither are ours. After the Pentagon was attacked on September 11th, I looked at FDR's picture and finally understood the gravity of his day of infamy, because this genera-

tion now had one of its own. I have used Churchill's and Roosevelt's examples of strength and courage to make it through every day in this town. Some days have been better than others, but every one has been a gift because this has been the life of my dreams.

When I came to the Senate, I came to do the best job I could for the people of Georgia and the people of the United States, particularly our men and women in uniform. I am proud of what we've accomplished since then. Today, over 60% of our service members are married, and their benefits have finally begun to reflect that fact in order to retain those talented professionals. We knew that the decision to stay in the military is made at the dinner table, not the conference table, so we've increased pay for service members by nearly 20% since I came to the Senate. We've modernized the G.I. bill so that service members can transfer their benefits to start a college fund for their children. We set a schedule to eliminate out of pocket housing expenses and we even added a measure to help families take their pets with them when serving in Hawaii. Keeping the family dog may not be the highest priority for some lawmakers, but it's the whole world to a child moving around the globe as their mother or father serves our country. The family matters to the military member, so the family has mattered to me in my time here.

Beyond these individual personnel matters, I became deeply concerned about the shrinking numbers of our U.S. military, and this year was able to raise the ceiling of our force strength. In our new war on what Sam Nunn calls "catastrophic terrorism," we must continue to go on the strategic offensive. Our military may be winning the battle, but we will lose the war if we continue to ignore the fact that our forces are critically over-deployed and being asked to do too much with too little. We are out of balance. Our commitments are far outpacing our troop levels, and the situation is only getting worse.

Since the end of Operation Desert Storm in 1991, the armed forces have downsized by more than half a million personnel, but our commitments have increased by nearly 300%, including new deployments to Afghanistan, Yemen, the Philippines, Georgia, and Pakistan. Today, a Desert Storm-size deployment to Iraq would require 86% of the Army's deployable end strength, including all stateside deployable personnel, all overseas-deployable personnel, and most forward-stationed personnel.

To make the war on terrorism possible, we have activated more than 80,000 guard and reserve troops and instituted stop-loss for certain specialties. This is no way to fight a war when our strategic national interests are at stake. The President has rightly told the country to be prepared for a long commitment. But the Pentagon has not requested an increase in end