# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

ANTONIO CABALLERO,

    *Judgment Creditor & Garnishor,*

v.

FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA a/k/a FARC-EP a/k/a
REVOLUTIONARY ARMED FORCES OF
COLOMBIA; and THE NORTE DEL VALLE
CARTEL,

    *Judgment Debtors,*

v.

VITOL INC.,

    *Garnishee.*

_____

VITOL INC.,

    *Third-Party Petitioner.*

v.

ANTONIO CABALLERO; ROSNEFT
TRADING, S.A.; and LDC SUPPLY
INTERNATIONAL, LLC,

    *Third-Party Respondents.*

CIVIL ACTION NO. 4:21-cv-00140

United States Courts Southern
District of Texas
FILED

*August 13, 2021*

Nathan Ochsner, Clerk of Court

## MOTION TO DISSOLVE THE DECEMBER 23, 2020 WRIT OF GARNISHMENT, TO VACATE THE UNDERLYING ORDER DIRECTING ITS ISSUANCE, AND FOR OTHER RELIEF

# I.   <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ................. 2

III.    STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ............ 2

IV.    STATEMENT OF FACTS ................................................................................... 3

    *Plaintiff's litigation against the FARC* ..................................................................... 3

    *Background of RTSA* .............................................................................................. 5

    *Plaintiff takes advantage of OFAC designation* ..................................................... 6

V.     ARGUMENT ....................................................................................................... 8

    A. Summary of the Argument ................................................................................. 8

    B. The Court has Authority Under Federal Rule of Civil Procedure 69 and Texas Rule of Civil Procedure 664a to Dissolve the Ex Parte Writ and Vacate the Ex Parte Agent or Instrumentality Order ................................................................................................. 9

    C. The Court Must Grant an Immediate Stay of the Ex Parte Writ While it Considers this Motion ............................................................................................................. 10

    D. The Court Must Dissolve the Ex Parte Writ .................................................... 10

       i. The Ex Parte Writ is Procedurally Defective ............................................ 10

          1. Plaintiff's Attempt to Serve the Ex Parte Writ on RTSA Violated the Hague Service Convention ............................................................................... 12

          2. Plaintiff's Attempt to Serve the Writ Violated Rule 663a ...................... 14

       ii. The Ex Parte Writ is Substantively Defective ......................................... 17

          1. The Texas State Court Lacked Subject Matter Jurisdiction to Adjudicate the Issue at the Heart of the Ex Parte Writ ......................................................... 17

          2. Plaintiff Improperly Attempts to Abrogate RTSA's Due Process Rights ............ 20

          3. Plaintiff's Ex Parte Motion Did Not and Could Not Establish that RTSA is an "Agent or Instrumentality" of the FARC ........................................................ 22

             (1)   *a. Plaintiff's reliance on the OFAC designation is insufficient as a matter of law to prove RTSA is an "agent or instrumentality" of the FARC* ................................... 24

             (2)   *b. Plaintiff's evidence is deficient because it purports to link RTSA to PdVSA—not to the FARC* ................................................................................................. 24

             (3)   *c. Plaintiff failed to provide the Court with key information—namely that the FARC did not exist at the time RTSA allegedly acted as its agent or instrumentality* .. 25

    E. The Court Should Vacate the Ex Parte Agent or Instrumentality Order ................... 28

VI.    PRAYER FOR RELIEF ...................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arriaga v. Jess Enters.*,
   No. 3:12-cv-094-L, 2014 WL 1875917 (N.D. Tex. Apr. 10, 2014) ........................................11

*Baca v. Hoover, Bax & Shearer*,
   823 S.W.2d 734 (Tex. App.—Houston [14th Dist.] 1992, writ denied)................................11

*Barrow v. Wells Fargo Bank, N.A.*,
   587 S.W.3d 137 (Tex. App.—Ft. Worth 2019, no pet) ....................................................11, 14

*Butler v. Polk*,
   592 F.2d 1293 (5th Cir. 1979) ...........................................................................................29

*Caballero v. Fuerzas Aramadas Revolucionarias de Colombia*,
   No. 1:20-mc-00040-LJV, ECF No. 37 (W.D.N.Y. Feb. 2, 2021) ...........................................25

*Caballero v. Fuerzas Aramadas Revolucionarias de Colombia*,
   No. 154864/2020, 2020 N.Y. Misc. LEXIS 10368 (N.Y. Sup. Ct. Dec. 12,
   2020) .............................................................................................................................24, 28

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
   No. 12-48803-CA-02, 2013 WL 10967065 (Fla. Cir. Ct. Mar. 20, 2013)..........................3, 26

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
   No. 3:20-cv-04485-MGL, ECF No. 11 (D.S.C. Feb. 5, 2021) .............................................25

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
   No. 4:20-mc-02719 (S.D. Tex. filed Sept. 23, 2020).................................................................4

*Cadle Co. v. Davis*,
   No. 04-09-00763-CV, 2010 WL 5545389 (Tex. App.—San Antonio Dec. 29,
   2010, pet. denied) (mem. op.)...............................................................................................22

*Counsel Fin. Servs., L.L.C. v. David McQuade Leibowitz, P.C.*,
   311 S.W.3d 45 (Tex. App.—San Antonio 2010, pet. denied) ................................................17

*Dusenbery v. United States*,
   534 U.S. 161 (2002)..............................................................................................................21

*Elobied v. Baylock*,
   299 F.R.D. 105 (E.D. Pa. 2014)...........................................................................................13

*Exterior Bldg. Supply, Inc. v. Bank of Am., N.A.*,
   270 S.W.3d 769 (Tex. App.—Dallas 2008, no pet.)...............................................................22

*F.D.I.C. v. Taylor*,
   727 F.Supp. 326 (S.D. Tex. 1989) .......................................................................................29

*FG Hemisphere Assoc., LLC v. Republique du Congo,*
    455 F.3d 575 (5th Cir. 2006) ...................................................................9

*Henningsmeyer v. First State Bank of Conroe,*
    109 Tex. 116 (1917)...............................................................................29

*Jerez v. Republic of Cuba,*
    775 F.3d 419 (D.C. Cir. 2014) ..............................................................20

*Kiobel v. Royal Dutch Petroleum Co.,*
    569 U.S. 108 (2013)...............................................................................19

*Kirschenbaum v. 650 Fifth Avenue & Related Props.,*
    830 F.3d 107 (2d Cir. 2016)...................................................................19

*Lease Fin. Grp., LLC v. Childers,*
    310 S.W.3d 120 (Tex. App.—Fort Worth 2010, no pet.)........................14

*Levin v. Bank of N.Y. Mellon,*
    No. 09-cv-5900 (JPO), 2019 U.S. Dist. LEXIS 22788 (S.D.N.Y. Feb. 12,
    2019) ......................................................................................................25

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Allied Bank of Texas,*
    704 S.W.2d 919 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd) . As the
    Ex Parte Agent or Instrumentality Order ...............................................28

*Nat'l Loan Inv'rs, L.P. v. Fidelity Bank, NA,*
    51 F.3d 1045, No. 94-10173, 1995 WL 153421 (5th Cir. 1995) (per curiam) ................10, 11

*Pescatore v. Pineda,*
    No. 08-2245 (RMC), 2019 U.S. Dist. LEXIS 84048 (D.D.C. May 20, 2019) .......................24

*Stansell v. Revolutionary Armed Forces of Colombia,*
    771 F.3d 713 (11th Cir. 2014) ...................................................... *passim*

*In re United Servs. Auto. Ass'n,*
    307 S.W.3d 299 (Tex. 2010)...............................................................17, 20

*Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser,*
    140 S.W.3d 351 (Tex. 2004)...................................................................17

*Volkswagenwerk Aktiengesellschaft v. Schlunk,*
    486 U.S. 694 (1988)...............................................................................12

*Walnut Equip. Leasing Co. v. J-V Dirt & Loam,*
    907 S.W.2d 912 (Tex. App.—Austin 1995, writ denied)...........................12, 16, 22

*Water Splash, Inc. v. Menon,*
    137 S. Ct. 1504 (2017)...........................................................................13

*Wease v. Bank of Am.,*
    No. 05-14-00867, 2015 WL 4051974 (Tex. App.—Dallas July 2, 2015, no
    pet.) .......................................................................................................10

*Weinstein v. Islamic Republic of Iran*,
   609 F.3d 43 (2d Cir. 2010), *abrogated on other grounds by Rubin v. Islamic
   Republic of Iran*, 138 S. Ct. 816 (2018)..................................................................19

*Zeecon Wireless Internet, LLC v. Am. Bank of Tex., N.A.*,
   305 S.W.3d 813 (Tex. App.—Austin 2010, no pet.) ............................................28

**Rules and Statutes**

18 U.S.C. § 2338 ...........................................................................................................18, 19

28 U.S.C. § 1331 ...................................................................................................................20

28 U.S.C. § 1350 ...................................................................................................................19

28 U.S.C. § 1610 note .....................................................................................................7, 18, 19

28 U.S.C. § 1610 ...................................................................................................................19

Anti-Terrorism Act of 2002, 18 U.S.C. § 2333(e)...........................................4, 7, 18, 19

Federal Rule of Civil Procedure 69 ...........................................................................1, 9

Foreign Judgments Act ...................................................................................................17

Tex. R. of Prof. Conduct 3.03(a)(3)..............................................................................27

Rules 657–679 of the Texas Rules of Civil Procedure ...........................................18, 20

Tex. Civ. Prac. & Rem. Code § 35.003(c)....................................................................18

Texas Rule of Civil Procedure 108a ............................................................................12

Tex. R. Civ. P. 658.............................................................................................................20

Tex. R. Civ. P. 659.............................................................................................................20

Tex. R. Civ. P. 663a ..................................................................................................... *passim*

Tex. R. Civ. P. 664a ..................................................................................................... *passim*

Chapter 35 of the Texas Civil Practice and Remedies Code ......................................17

Chapter 63 of the Texas Civil Practice and Remedies Code ...................................18, 20

UEFJA.................................................................................................................................17, 18

**Other Authorities**

Final Agreement For Ending the Conflict and Building a Stable and Lasting
   Peace, Colombia-FARC, Nov. 24, 2016,
   https://colombia.unmissions.org/sites/default/files/s-2017-272_e.pdf ...................26

PDV Holding, https://www.pdvholding.com/index.html (last visited Feb. 22, 2021) ...............................................................................................................6

Declarations and Reservations of Switzerland, Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, available at https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=424&disp=resdn; ...............................................13

*Country Analysis Executive Summary: Venezuela*, U.S. Energy Information Administration (Nov. 30, 2020). https://www.eia.gov/international/content/analysis/countries_long/Venezuela/ venezuela_exe.pdf........................................................................................6

*Directors*, Rosneft.com, https://www.rosneft.com/governance/board/ ...........................................5

*Global 2000: The World's Largest Public Companies*, Forbes, May 13, 2020, https://www.forbes.com/global2000/#5ae8f99d335d.................................5

H.R. Rep. No. 107-779 (2002).................................................................................19

*Last March of the FARC: Colombia's hardened fighters reach for a normal life*, the Guardian, Feb. 3, 2017, https://www.theguardian.com/world/2017/feb/03/farc-colombia-peace-deal-transition-normal-life ...............................................................................3, 26

National Drug Threat Assessment 2019 ..............................................................27

*Worldwide Report*, Oil & Gas Journal, at 7 (Dec. 2, 2019)............................................5

*Shareholder Structure*, Rosneft.com (Oct. 1, 2020), https://www.rosneft.com/Investors/Equity/Shareholder_structure/ (last visited Feb. 22, 2021) ...............................................................................................5

*Treasury Targets Russian Oil Brokerage Firm for Supporting Illegitimate Maduro Regime*, U.S. Department of the Treasury (Feb. 18, 2020), https://home.treasury.gov/news/press-releases/sm909 ...............................6

U.S. Const. art. VI, cl.2........................................................................................12, 13

*World's Top Oil Companies*, Offshore Technology, Jan. 31, 2020, https://www.offshore-technology.com/features/companies-by-oil-production/.......................5

TO THE HONORABLE JUDGE OF THIS COURT:

Third-Party Respondent Rosneft Trading, S.A. ("RTSA" or the "Respondent") files, pursuant to Federal Rule of Civil Procedure 69 and Texas Rule of Civil Procedure 664a, this Motion to Dissolve the December 23, 2020 Writ of Garnishment, to Vacate the Underlying Order Directing Its Issuance, and For Other Relief, and in support shows as follows:

## I.   INTRODUCTION

Plaintiff has obtained a $46 million default judgment against a former Colombian narco-terrorist paramilitary group that he alleges kidnapped, tortured, and killed his father twenty-two years ago, at the height of the group's armed conflict with the government of Colombia.

Plaintiff's zeal to collect this judgment has led him to institute a pinwheel of state and federal court cases: as he cannot collect from the paramilitary group (because, *inter alia*, the group no longer exists), Plaintiff has decided to pursue satisfaction of the damages award by going after completely unrelated entities like Rosneft Trading, S.A. ("RTSA"), an oil trading company formed in Switzerland in 2011 and affiliated with Rosneft Oil Company, one of the world's largest publicly traded petroleum companies. In the instant case, Plaintiff would have the Court believe that, because RTSA conducted arms-length, commercial transactions with Petróleos de Venezuela S.A. ("PdVSA"), a leading global crude oil exporter, in 2019 and 2020, and because Plaintiff believes that PdVSA had ties to the paramilitary group before it formally laid down arms in 2017, RTSA should be liable for the loss of Plaintiff's father in 1999. By Plaintiff's logic, any company that has dealt with PdVSA since the turn of the century can be deemed an agent of Colombian terrorists.

Plaintiff's tortured legal theory strains credulity and the bounds of federal and state law. In pursuit of his judgment, Plaintiff has: (a) sought to seize more than $12 million from a company

1

he has never bothered to name as a party in any litigation; (b) obtained ex parte orders from courts lacking subject matter jurisdiction based on dubious and deficient evidence; and (c) violated international treaties and failed to provide proper and timely notice of these serious proceedings.

Each of these flaws is fatal; together, they compel the dissolution of the writ and an order vacating the order directing the writ's issuance. Therefore, RTSA respectfully asks this Court to: (1) immediately stay enforcement of the December 23, 2020 Writ of Garnishment pending the outcome of this motion pursuant to Texas Rule of Civil Procedure 664a; (2) dissolve the December 23, 2020 Writ of Garnishment; and (3) vacate the order directing the issuance of the Writ and finding RTSA derivatively liable for Plaintiff's judgment—the product of related ex parte proceedings below.

## II.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

1.   RTSA brings this motion under Rule 664a of the Texas Rules of Civil Procedure to dissolve the writ of garnishment issued in the above captioned matter in the 284th District Court of Montgomery County, Texas (No. 20-12-15427) on December 23, 2020 (the "Ex Parte Writ"), and to vacate the order issued on December 16, 2020 in the 284th District Court of Montgomery County, Texas, (No. 20-09-11744) (the "Ex Parte Agent or Instrumentality Order"). *See* Dkt 1-6; Dkt. 1-8, Ex. 4. Plaintiff initiated this matter without naming RTSA as a defendant. Garnishee Vitol removed this matter to federal court on January 15, 2021 and filed an interpleader petition against RTSA on January 22, 2021. Dkt. 7.

## III.   STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

2.   Before the Court on this motion are three issues: (1) whether the court should issue a temporary stay pending the resolution of this motion, (2) whether it should dissolve the Ex Parte Writ, and (3) whether it should dissolve the Ex Parte Order. Texas Rule of Civil Procedure 664a

mandates that any further proceedings under the writ be stayed pending a hearing on, and resolution of, this motion. Appx. C at A-6, Tex. R. Civ. P. 664a ("The filing of the motion shall stay any further proceedings under the writ…until a hearing is had, and the issue is determined."). A Rule 664a motion "may seek to vacate, dissolve or modify the writ of garnishment, and the order directing its issuance, for any grounds or cause, extrinsic or intrinsic." *Id*. The writ of garnishment "shall be dissolved unless, at such hearing, the plaintiff shall prove the grounds relied upon for its issuance, but the court may modify its previous order granting the writ and the writ issued pursuant thereto." *Id*.

## IV.   STATEMENT OF FACTS

*Plaintiff's litigation against the FARC*

3.   Plaintiff alleges that his father, a prominent Colombian politician and former ambassador to the United Nations, was kidnapped, tortured, and murdered in 1999 by the Revolutionary Armed Forces of Colombia (the "Fuerzas Armadas Revolucionarias de Colombia" or "FARC") while that group was in armed conflict with the Colombian government from 1964 to 2017. *See* Dkt. 19-1, Ex. 7, at 2. Appx. D, Pl. Second Amend. Compl.¶ 1, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 12-48803-CA-02, 2013 WL 10967065 (Fla. Cir. Ct. Mar. 20, 2013)

4.   In 2017, the FARC and the Government of Colombia entered into an historic peace agreement ending the armed conflict and committing the FARC to demilitarize, disarm, and transition into a new, legal political party in Colombia. *See* Appx. E at A-10, *Last March of the FARC: Colombia's hardened fighters reach for a normal life*, the Guardian, Feb. 3, 2017, https://www.theguardian.com/world/2017/feb/03/farc-colombia-peace-deal-transition-normal-life, at 2.

3

5.     Both before and after the FARC agreed to end hostilities, Plaintiff filed numerous actions in the federal and state courts of the United States seeking damages related to his father's death, including a daisy chain of at least five actions directly related to the instant matter:[1]

- A 2012 action in state court in Miami-Dade County, Florida, accusing the FARC and another narco-terrorist group, the National Liberation Army ("NLA") of violating the Alien Tort Statute ("ATS"), Federal RICO, and the laws of Florida and Colombia (the "Florida State Court Action"). The Court awarded Plaintiff a default judgment of $45,000,000 in compensatory damages. Dkt. 19-1, Ex. 7, at 2.

- A 2018 action against the FARC, the NLA, and the Norte del Valle Cartel ("NDVC") in the U.S. District Court for the Southern District of Florida, seeking damages for the same acts under the Anti-Terrorism Act of 2002 (the "Florida Federal Court Action"). The Court awarded Plaintiff a default judgment against the FARC and the NDVC and based its damages award on the damages in the Florida State Court Action. Dkt. 19-1, Ex. 3., at 2.

- A 2020 action against the FARC and the NDVC in this District seeking to domesticate the judgment from the Florida Federal Court Action.[2] *See* Appx. G at A-43, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 4:20-mc-02719 (S.D. Tex. filed Sept. 23, 2020).

- A 2020 action against the FARC and the NDVC in the 284th District Court of Montgomery County, Texas, (No. 20-09-11744), seeking to domesticate the judgment from the Florida Federal Court Action (the "First Texas State Court Action"). Dkt. 19-1, Ex. 4. As discussed in more detail *infra*, on December 16, 2020, Plaintiff sought and obtained an ex parte order in this action declaring RTSA to be an agent or instrumentality of the FARC. Dkt. 1-8, Ex. 4 at 2-3.

- A related 2020 action against Vitol, Inc. in the 284th District Court of Montgomery County, Texas (No. 20-12-15427), using the ex parte order from the First Texas State Court Action to obtain a Writ of Garnishment against more than $12 million of RTSA's assets in Vitol's possession (the "Second Texas State Court Action"). Dkt. 1-7. Vitol removed the Second Texas State Court Action to this Court on January 15, 2021. Dkt. 1.

6.     Although Plaintiff's object is to collect on his damages award against the FARC and the NDVC from third parties like RTSA, Plaintiff has failed to name RTSA in any of these actions.

---

[1] In addition to these actions directly related to the instant matter, RTSA has identified 24 suits filed by Plaintiff in the state and federal courts of nine states and the Territory of Puerto Rico relating to the same underlying facts. *See* Appx. F at a-17.

[2] Upon information and belief, Plaintiff has not prosecuted this action.

4

*Background of RTSA*

7.   RTSA is a Swiss-incorporated subsidiary of Rosneft Oil Company ("Rosneft Oil"). From its formation in 2011 until it ceased operations in April 2020, RTSA conducted international marketing and distribution activities for its parent company, including the trading, processing, and transport of raw materials, in particular unrefined petroleum and petroleum products in over 20 countries. Appx. A, Richard Declaration, at 2.

8.   Rosneft Oil is one of the world's largest public companies and among the top oil producers globally. *See* Appx. H at A-49, *Global 2000: The World's Largest Public Companies*, Forbes, May 13, 2020, https://www.forbes.com/global2000/#5ae8f99d335d (ranking Rosneft Oil the world's 53rd largest public company); Appx. I at A-67, *Ranking the World's Top Oil Companies*, Offshore Technology, Jan. 31, 2020, https://www.offshore-technology.com/features/companies-by-oil-production/ (ranking Rosneft Oil the world's second-largest oil company by production). It is international in scope: its largest shareholders are the Government of the Russian Federation (through JSC Rosneftegaz) and British Petroleum, its chairman is former German Chancellor Gerhard Schröder, and its shares are traded on the London Stock Exchange. Appx. J at A-74, *Shareholder Structure*, Rosneft.com, (Oct. 1, 2020), https://www.rosneft.com/Investors/Equity/Shareholder_structure/ (last visited Feb. 22, 2021); Appx. K at A-76, *Board of Directors*, Rosneft.com, https://www.rosneft.com/governance/board/.

9.   As the entity charged with managing Rosneft Oil's international trading activities, RTSA conducted business with companies all over the world. Appx. A, Richard Declaration, at 2. One such company was PdVSA, an enterprise owned by the Government of Venezuela that as of 2019 controls the world's largest proven oil reserves. Appx. L at A-84, *Worldwide Report*, Oil & Gas Journal, at 7 (Dec. 2, 2019). PdVSA is also the ultimate parent company of Citgo Petroleum

Corporation. Appx. M at A-86, PDV Holding, https://www.pdvholding.com/index.html (last visited Feb. 22, 2021). RTSA was one of PdVSA's many international business partners. Appx. N at A-92, *Country Analysis Executive Summary: Venezuela*, U.S. Energy Information Administration (Nov. 30, 2020). https://www.eia.gov/international/content/analysis/countries_long/Venezuela/venezuela_exe.pdf

10. Citing RTSA's commercial relationship with PdVSA, including its shipment of PdVSA crude oil to various worldwide markets in late 2019 and early 2020, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated RTSA a specially designated national ("SDN") in February 2020 and blocked its property in the United States. Appx. O at A-98, *Treasury Targets Russian Oil Brokerage Firm for Supporting Illegitimate Maduro Regime*, U.S. Department of the Treasury, (Feb. 18, 2020), https://home.treasury.gov/news/press-releases/sm909. Then-Treasury Secretary Steven Mnuchin stated that the rationale for blocking RTSA's property was its commercial relationship with PdVSA. *Id*. The OFAC designation made no reference to any connection between RTSA and the FARC— nor, for that matter, is there any such connection. Appx. A, Richard Declaration, at 2.

*Plaintiff takes advantage of OFAC designation*

11. Despite OFAC's silence as to any entity other than PdVSA in its designation of RTSA, Plaintiff took advantage of OFAC's order blocking RTSA's property to collect on his judgment against the FARC. Proceeding in the First Texas State Court Action, Plaintiff sought and obtained an ex parte order declaring RTSA to be an "agent or instrumentality" of the FARC (the "Ex Parte Agent or Instrumentality Order") on the premise that OFAC's designation of RTSA arising from its commercial dealings with PdVSA rendered RTSA an affiliate of a Colombian terrorist group. Dkt. 1-8, Ex. 4, at 3, ¶3.

12. Plaintiff has used this specious order to recover his damages against the FARC from RTSA, among others, under the Anti-Terrorism Act of 2002 ("ATA"), 18 U.S.C. § 2333(e), and the Terrorism Risk Insurance Act ("TRIA"), 28 U.S.C. § 1610 note. Plaintiff's sole evidence of RTSA's purported connection to the FARC is a declaration by John McBrien, a former OFAC official who retired from the Treasury Department in 2011. Dkt. 1-4, at 3. Mr. McBrien noted, in a single footnote, that RTSA conducted commercial transactions with PdVSA in 2019 and had been designated an SDN on that basis, then, on the strength of these facts, expressed his "opinion" that RTSA was an "agent or instrumentality" of the FARC under federal case law interpreting the TRIA. Dkt. 19-1, Ex. 9, at 8, n. 1.

13. Despite the limited evidentiary foundation presented by Plaintiff, the Court issued the Ex Parte Agent or Instrumentality Order on December 16, 2020 without holding a hearing or even notifying RTSA so that RTSA could assert its due process rights, present evidence, or defend itself. Dkt. 1-8, Ex. 4 at 6. Not only did the Ex Parte Agent or Instrumentality Order contain an express factual finding that RTSA was an "agent or instrumentality" of the FARC, it also directed the Montgomery County Clerk of Court to issue "writs in aid of garnishment to attach to any assets within this Court's jurisdiction" of RTSA.  Dkt. 1-8, Ex. 4 at 2-3. Plaintiff immediately initiated the Second Texas State Court Action (again without naming RTSA as a party) and requested a Writ of Garnishment against more than $12 million of RTSA's assets held by Vitol. Dkt. 1-7.

14. The Montgomery County Clerk of Court issued the Ex Parte Writ on December 18, 2020, erroneously naming "Rosneft, Inc." at a Moscow address, then issued a corrected version of the Writ naming RTSA (albeit still at a Moscow address) on December 23, 2020.[3] Dkt. 1-7, at 6, 59. Despite securing an order authorizing the seizure of $12.6 million from RTSA, Plaintiff exhibited

---

[3] The initial writ improperly named "Rosneft, Inc.," and a corrected writ was issued on December 23, 2020. Dkt. 1-7, at 6, 59. Service to Vitol, Inc. was completed on December 22, 2020. Dkt. 1-2

no urgency in notifying the company as required under Texas law. It was only on December 29, 2020, eleven days after the first writ was issued, that Plaintiff made any effort to serve RTSA with notice that its assets were subject to forfeiture. Dkt. 19-1, Ex. 6. Even then, Plaintiff disregarded the strictures of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention"), mailing a copy of the Ex Parte Writ to RTSA in Switzerland via the U.S. Postal Service. Dkt. 1-7, at 56.

15. RTSA did not receive this copy of the Ex Parte Writ until January 18, 2021, a full month after the original Ex Parte Writ was issued. Appx. A, Richard Declaration, at 2. Plaintiff's delay in notifying RTSA of the Ex Parte Writ is especially troubling because Plaintiff has never made any other attempt to inform RTSA of the almost decade-long legal campaign that led to Plaintiff's effort to seize over $12 million of RTSA's assets. Appx. A, Richard Declaration, at 2.

16. RTSA is not an "agent or instrumentality" of the FARC. Appx. A, Richard Declaration, at 2. RTSA has never conducted any business with the FARC; the only acts that Plaintiff claims tie RTSA to the FARC are no more than routine, commercial transactions with PdVSA, one of the world's largest oil companies. Appx. A, Richard Declaration, at 2. Moreover, Plaintiff's allegations concern conduct that did not occur until 2019, twenty years after the death of Plaintiff's father's, five years after the Plaintiff's default judgment against the FARC, and two years after the FARC disbanded.

## V.    ARGUMENT

### A. Summary of the Argument

17. Plaintiff's action is plagued with deficiencies that require this Court to grant RTSA's motion and provide the requested relief. Plaintiff's Ex Parte Writ is procedurally defective because it was: (1) impermissibly served on RTSA in violation of the Hague Service Convention;  (2) was not served upon RTSA "as soon as practicable" in violation of Texas garnishment law; and (3) did

not include all documents necessary to constitute effective service. *See* Appx. P at A-100,  Tex. R. Civ. P. 663a.

18. In addition to the serious procedural defects, the Ex Parte Writ is substantively defective under federal and state law. The Texas state court lacked subject matter jurisdiction to make the factual findings, rooted in federal law, that underlie the Ex Parte Writ. Further, Plaintiff's course of conduct while attempting to collect his judgment has infringed upon RTSA's due process rights. Finally, Plaintiff's Ex Parte Writ must be dissolved because he has failed to meet his evidentiary burden—the evidence supplied by Plaintiff in his ex parte motion is patently insufficient to establish that RTSA is an "agent or instrumentality" of the FARC.

**B. The Court has Authority Under Federal Rule of Civil Procedure 69 and Texas Rule of Civil Procedure 664a to Dissolve the Ex Parte Writ and Vacate the Ex Parte Agent or Instrumentality Order**

19. Under Federal Rule of Civil Procedure 69, the procedures for executing on judgments in federal court are generally governed by the law of the state where the federal court sits, unless a conflicting federal statute applies. Fed. R. Civ. P. 69(a)(1). The Fifth Circuit has held that under Rule 69 garnishment actions are governed by state law. *See FG Hemisphere Assoc., LLC v. Republique du Congo*, 455 F.3d 575, 595 (5th Cir. 2006) (noting that "as actions supplemental to or in aid of execution according to [Rule 69], garnishment actions are governed by state law to the extent it does not conflict with federal law"). While the Fifth Circuit has not spoken directly on the issue, the Eleventh Circuit has held that state law applies to garnishment proceedings invoking the TRIA in federal court. *See, e.g., Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 730 (11th Cir. 2014). Accordingly, Texas state law should apply to the garnishment proceedings here.

20. Texas Rule of Civil Procedure 664a sets out the procedure for a garnishee or a nonparty affected by the garnishment to vacate, dissolve, or modify a writ of garnishment *and* the order

9

directing its issuance. Appx. C at A-6, Tex. R. Civ. P. 664a. Under Rule 664a, a party who claims an interest in property that is subject to a writ of garnishment may "seek to vacate, dissolve, or modify the writ of garnishment, and the order directing its issuance, for any grounds or cause, extrinsic or intrinsic." *Id.* The Ex Parte Agent or Instrumentality Order expressly "authorized and directed" the Clerk of Court "to issue such writs in aid of garnishment to attach to any assets within this Court's jurisdiction in the putative names of, held for the benefit of, or that were blocked due to an association with . . . [RTSA]" Dkt. 1-8, Ex. 4 at 3. The Clerk, in turn, issued the Writ on this order. As a result, this Court has the authority to dissolve not only the Ex Parte Writ, but also the Ex Parte Agent or Instrumentality Order.

21. Movants are required under Rule 664a to admit or deny each of the findings contained in the order directing the writ. Accordingly, RTSA's statements regarding the findings contained in the order directing the Ex Parte Writ are appended to this motion as Appendix B.

## C. The Court Must Grant an Immediate Stay of the Ex Parte Writ While it Considers this Motion

22. Motions filed under Rule 664a must be resolved within ten days of filing, and, until the matter is determined, movants are entitled to an automatic stay of any further proceedings under the writ. Appx. C, Tex. R. Civ. P. 664a. A hearing on the motion is mandatory. Appx. Q at A-102, *Nat'l Loan Inv'rs, L.P. v. Fidelity Bank, NA*, 51 F.3d 1045, No. 94-10173, 1995 WL 153421, at *2 (5th Cir. 1995) (per curiam); *see also* Appx. R at A-106, *Wease v. Bank of Am.*, No. 05-14-00867, 2015 WL 4051974, at *3 (Tex. App.—Dallas July 2, 2015, no pet.) (reversing trial court's ruling for failure to stay proceeding and hold hearing on Rule 664a motion). Therefore, in accordance with Rule 664a, the Court must immediately stay the enforcement of the Ex Parte Writ pending a hearing and a decision on this motion. *See* Appx. C at A-6, Tex. R. Civ. P. 664a

## D. The Court Must Dissolve the Ex Parte Writ
### i. The Ex Parte Writ is Procedurally Defective

10

23. Plaintiff's attempt to serve the Ex Parte Writ on RTSA violates important procedural safeguards in numerous ways: (1) Plaintiff failed to timely serve RTSA as soon as practicable via the only legally permissible method; (2) the legally impermissible method selected by Plaintiff was, in and of itself, untimely; and (3) the documents Plaintiff purported to serve were not just incomplete but actively misleading. Each of these deficiencies is fatal given Plaintiff's obligation to strictly comply with applicable law when effecting proper service of the writ.

24. A plaintiff seeking to enforce a writ of garnishment must provide a "defendant" with "a copy of the writ of garnishment, the application, accompanying affidavits and orders of the court as soon as practicable following the service of the writ." Appx. P at A-100, Tex. R. Civ. P. 663a. For the purposes of Rule 663a, "defendant" means "judgment debtor." Appx. Q at A-102, *Nat'l Loan Inv'rs.*, 51 F.3d 1045, No. 94-10173, 1995 WL 153421, at *2; *accord Barrow v. Wells Fargo Bank, N.A.*, 587 S.W.3d 137, 140 (Tex. App.—Ft. Worth 2019, no pet). Because Plaintiff argues that RTSA stands in the shoes of the judgment debtor (the FARC) for the purposes of the Ex Parte Writ, Plaintiff was required to strictly follow the requirements of Rule 663a and other applicable law to effect proper service on RTSA "as soon as practicable". *See* Appx. P at A-100, Tex. R. Civ. P. 663a.

25. "The requirement of service on the debtor is not a mere technicality but is an integral part of the statutory requirements in a garnishment proceeding." Appx. S at A-107, *Arriaga v. Jess Enters.*, No. 3:12-cv-094-L, 2014 WL 1875917, at *1 (N.D. Tex. Apr. 10, 2014) *report and recommendation adopted*, 2014 WL 1882002 (N.D. Tex. May 2, 2014). Because "[t]he remedy of garnishment is summary and harsh," garnishment proceedings "should not be sustained unless there is strict compliance with statutory requirements." Appx. Q at A-102, *Nat'l Loan Inv'rs*, 51 F.3d 1045, 1995 WL 153421, at *2 (quoting Appx. T at A-115, *Baca v. Hoover, Bax & Shearer*,

823 S.W.2d 734, 738 (Tex. App.—Houston [14th Dist.] 1992, writ denied)); *see also* Appx. U at A-123, *Walnut Equip. Leasing Co. v. J-V Dirt & Loam*, 907 S.W.2d 912, 917 (Tex. App.—Austin 1995, writ denied) (upholding trial court's judgment dissolving writ of garnishment for failure to properly adhere to service guidelines).

### 1. Plaintiff's Attempt to Serve the Ex Parte Writ on RTSA Violated the Hague Service Convention

26. In order to serve RTSA "as soon as practicable," as Rule 663a requires, Plaintiff should have immediately initiated service in a legally permissible manner which, in this instance, means that he should have initiated service through the Hague Service Convention as soon as he obtained the Ex Parte Writ. Appx. P at A-100, Tex. R. Civ. P. 663a. Generally, Texas Rule of Civil Procedure 108a governs service on foreign entities "pursuant to the terms and provisions of any applicable international agreement" or "by other means not prohibited by international agreement or the foreign country's law as the court orders". Appx. V at A-124, Tex. R. Civ. P. 108a. Because RTSA is a foreign corporation registered in Switzerland, service must comply with the Hague Service Convention. The Hague Service Convention applies in all civil or commercial matters where it is necessary "to transmit a judicial or extrajudicial document for service abroad." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988) (citing Hague Service Convention, 20 U.S.T. at 362). As an international treaty, the Hague Service Convention is of equivalent rank to the United States Constitution, and supersedes any conflicting law. *See* U.S. Const. art. VI, cl.2.

27. Plaintiff did not attempt—and, upon information and belief, has never attempted—to properly deliver the Ex Parte Writ to RTSA by complying with the requirements of the Hague Service Convention.

28. Rather than immediately initiating service under the Hague Service Convention, Plaintiff waited ten days after the issuance of the first writ to attempt any service of the Ex Parte Writ. Dkt. 1-7, at 56-58. When Plaintiff did finally initiate service, he merely mailed the service documents via registered U.S. mail to RTSA's office in Switzerland. *Id*. This method of service contravenes the Hague Service Convention as ratified by Switzerland.

29. Under the Hague Service Convention, service by mail is effective only if the receiving country has not objected to Article 10 of the Hague Service Convention. *See Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1513, (2017). Switzerland has objected to Article 10; therefore, service via mail on a Swiss entity is ineffective. *See* Appx. W at A-126, Declarations and Reservations of Switzerland, Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, available at [https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=424&disp=resdn](https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=424&disp=resdn); *see also Elobied v. Baylock*, 299 F.R.D. 105, 108 (E.D. Pa. 2014) (noting Switzerland's opposition to service through "postal channels" under Art. 10 and finding that the Hague Service Convention "[does] not permit international service of process upon individuals located in Switzerland other than by transmission of service through the Swiss Central Authority"). Because service to Switzerland is ineffective via mail, service must be made pursuant to Article 5 of the Hague Service Convention. *Elobied*, 299 F.R.D. at 108. Switzerland requires that Article 5 service be made via a central authority (in the case of Geneva-based RTSA, the designated official in the Canton of Geneva), and the service must be translated into the local language (i.e., French). *See* Appx. W at A-126, Declarations and Reservations of Switzerland. Plaintiff did neither. Dkt. 1-7 at 56-58. His attempted service therefore was ineffective under the Hague Service Convention. Not only did Plaintiff violate an international treaty, then, he also

failed to "strictly conform" with the notice requirements of Texas law. *Barrow*, 587 S.W.3d at 139.

### 2. Plaintiff's Attempt to Serve the Writ Violated Rule 663a

30. Even if, *arguendo*, the Hague Service Convention did not govern service of the Writ on RTSA, Plaintiff still failed to properly effect service on RTSA. Plaintiff's purported service violated Rule 663a insofar as it was (a) untimely and (b) incomplete and misleading.

31. The Ex Parte Agent or Instrumentality Order was issued on December 16, 2020, and the original Ex Parte Writ on December 18, 2020.[4] *See* Dkt. 1-8, Ex. 4 at 2-3. Plaintiff served the original Ex Parte Writ on Vitol, the Garnishee, on December 22, 2020. Dkt. 1-2 (showing a service date of 12/22/20 on Vitol).

32. It was not until December 29, 2020—i.e., 11 days after the writ was originally issued and a full week after Vitol was served—that Plaintiff even attempted to initiate service on RTSA via U.S. registered mail. Dkt. 19-1, Ex. 5; Dkt. 1-7 at 56. Because Plaintiff chose this method of shipment, RTSA did not even receive a copy of the Ex Parte Writ until January 18, 2021—four weeks after the original writ was issued. Appx. A, Richard Declaration, at 2. In fact, the action was removed to this Court before RTSA received any notice of Plaintiff's efforts to seize $12 million of its assets. Appx. A, Richard Declaration, at 2.

33. Given the dramatic consequences of garnishment, an unreasonable delay in service of the writ violates Rule 663a and is fatal to the proceedings. *See Lease Fin. Grp., LLC v. Childers*, 310 S.W.3d 120, 126 (Tex. App.—Fort Worth 2010, no pet.). Delays of as little as fifteen days— roughly half the time it took RTSA to receive a copy of the Writ in violation of a multilateral treaty—have been held to contravene Texas law. *See id.* at 126-27 (holding garnishor did not serve

---

[4] As noted *supra*, this initial writ improperly named "Rosneft, Inc.," and a corrected writ was issued on December 23, 2020. Dkt. 1-7, at 6, 59.

judgment debtor "as soon as practicable" where garnishor could have reasonably served judgment debtor fifteen days before it did). In addition, the fact that RTSA, whose assets are at risk under the Ex Parte Writ, did not receive a copy of the Ex Parte Writ until 27 days after Plaintiff served Vitol by itself makes the purported service on RTSA untimely and contrary to Rule 663a. Appx. S at A-108, *Arriaga v. Jess Enterprises*, at *1 (service of writ of garnishment on judgment debtor 18 days after service on garnishee was "patently untimely").

34. In addition to being untimely, attempted service of the Writ on RTSA was incomplete. As noted *infra*, for service to be effective under Rule 663a, Plaintiff must provide the judgment debtor (i.e., under Plaintiff's theory, RTSA) with a copy of the writ of garnishment, the application, and the accompanying affidavits and orders of the court as soon as practicable following the service of the writ. Appx. P at A-100, Tex. R. Civ. P. 663a.

35. A copy of the documents Plaintiff purported to serve on RTSA is appended to this motion as Appendix X, at A-127. Plaintiff sent RTSA a copy of the Ex Parte Writ and a copy of Plaintiff's Application for Post-Judgment Writ of Garnishment, which itself had three exhibits:

- an affidavit of one of Plaintiff's lawyers;
- the docket of a case in New York federal court in which Plaintiff alleges that PdVSA (but not RTSA) is an agent or instrumentality of the FARC; and
- Plaintiff's Notice of Registration of Foreign Judgment in the First Texas State Court Action.

36. Conspicuously missing from this list is the Ex Parte Agent or Instrumentality Order. This absence is shocking: the Ex Parte Agent or Instrumentality Order not only directed the issuance of the Ex Parte Writ, but also declared RTSA to be an agent or instrumentality of the FARC, thereby providing the purported link between the two entities. It is quite literally the key order in this action. The order was issued on December 16, 2020, two days before the issuance of the Ex Parte

Writ, and it not just *could have been* included in Plaintiff's mailing—it *needed to be* included. Dkt. 1-8, Ex. 4

37. Because Plaintiff failed to provide this crucial document (or the filings supporting its issuance) and never named RTSA as a party in any of the relevant suits, Plaintiff could not have expected RTSA to have an understanding of the basis for Plaintiff's claims against it.

38. Worse, the contents of Plaintiff's delivery to RTSA were misleading. Other than stating that Vitol is indebted to RTSA in the amount of $12,661,259.98, the only mention of RTSA in the papers Plaintiff enclosed with the Ex Parte Writ was a single sentence in the affidavit of Plaintiff's counsel indicating that counsel "has reason to believe the Court will determine that [RTSA] is an agent or instrumentality of the [FARC]". Appx. X at A-133, Documents mailed to RTSA, Application for Ex Parte Writ at 4, ¶ 6-7. There was no indication in the papers of *why* a court might link RTSA and the FARC. Yet the Ex Parte Agent or Instrumentality Order was issued on December 16, 2020. By the time Plaintiff dropped these papers in the mail to RTSA on December 29, that sentence had been out of date for nearly two weeks: the Court was not *considering* whether RTSA was an agent or instrumentality of the FARC, it *had decided as much* on the basis of Plaintiff's ex parte record.

39. Contrary to Plaintiff's representation that RTSA was properly served, *see* Dkt. 19 ¶ 12, Plaintiff did not provide RTSA with legally effective notice "as soon as practicable" under both the Hague Service Convention and Rule 663a. Because Plaintiff has failed to strictly comply with Rule 663a, the Court must dissolve the Ex Parte Writ and vacate the Ex Parte Agent or Instrumentality Order. *See* Appx. U at A-123, *Walnut Equip.*, 907 S.W.2d at 915 (upholding trial court's judgment dissolving writ of garnishment for failure to properly adhere to service guidelines).

### ii. The Ex Parte Writ is Substantively Defective

#### 1. The Texas State Court Lacked Subject Matter Jurisdiction to Adjudicate the Issue at the Heart of the Ex Parte Writ

40. Independent of the procedural deficiencies just detailed, the Writ also must be dissolved due to a host of fatal substantive defects. Most fundamentally, the state court lacked subject matter jurisdiction to entertain Plaintiff's motion to designate RTSA an "agency or instrumentality" of the FARC. Subject matter jurisdiction is a fundamental prerequisite to any judicial proceedings in Texas. *See, e.g.*, *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser*, 140 S.W.3d 351, 358 (Tex. 2004) (reaffirming "the longstanding principle that subject-matter jurisdiction is a power that 'exists by operation of law only, and cannot be conferred upon any court by consent or waiver'"). Indeed, "[a] judgment is void if rendered by a court without subject matter jurisdiction." *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 309 (Tex. 2010). As a result, "[n]ot only *may* an issue of subject matter jurisdiction 'be raised for the first time on appeal by the parties or by the court,' a court is *obliged* to ascertain that subject matter jurisdiction exists regardless of whether the parties have questioned it." *Loutzenhiser*, 140 S.W.3d at 358.

41. Plaintiff instituted the First Texas State Court Action as a registration of a foreign judgment under the Texas Uniform Enforcement of Foreign Judgments Act ("UEFJA"), codified in Chapter 35 of the Texas Civil Practice and Remedies Code. Dkt. 19-1, Ex. 4, at 1. "When a judgment creditor chooses to proceed under the UEFJA, the filing of a foreign judgment is in the 'nature of both a plaintiff's original petition and a final judgment: the filing initiates the enforcement proceeding, but it also instantly creates a Texas judgment that is enforceable.'" *Counsel Fin. Servs., L.L.C. v. David McQuade Leibowitz, P.C.*, 311 S.W.3d 45, 50 (Tex. App.—San Antonio 2010, pet. denied). A foreign judgment registered under the UEFJA "is treated in the same manner as a judgment of the court [in] which the foreign judgment is filed," meaning that it "has 'the same

effect and is subject to the same procedures, defenses, and proceedings for reopening, vacating, staying, enforcing, or satisfying a judgment as a judgment of the court in which it is filed.'" *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 35.003(c)). Texas law and procedure, in short, governs the ensuing enforcement proceedings.

42. After registering the judgment, Plaintiff filed what he styled a "Motion for Agency or Instrumentality Determination Pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002" (the "TRIA Motion"). Dkt. 1-4. The TRIA Motion cited four putative authorities for the desired relief: (1) the ATA;[5] (2) Section 201(a) of the TRIA;[6] (3) Rules 657–679 of the Texas Rules of Civil Procedure and Chapter 63 of the Texas Civil Practice and Remedies Code; and (4) *Stansell*, 771 F.3d at 729–30. *Id.* The resulting Ex Parte Agent or Instrumentality Order, in turn, declared that the court had given "due and careful consideration" to each of those authorities, then—without support—expressly found that it "ha[d] subject matter jurisdiction to conduct post-judgment execution proceedings of a judgment creditor's final judgment under a federal statute (ATA), rendered by a U.S. district court and properly registered in this Court." Dkt. 1-8, Ex. 4 at 2, ¶ 1.

43. Even if the state court has jurisdiction to conduct *enforcement* proceedings under the UEFJA, that jurisdiction did not extend to rendering a factual finding under federal law—the ATA and the TRIA—as to RTSA's alleged status as an "agency or instrumentality" of the FARC. On the contrary, none of the cited authorities supplies an independent basis for such jurisdiction. The ATA, Plaintiff's primary authority for both the Florida Federal Court Action and the Motion, confers exclusive jurisdiction on the federal courts. *See* 18 U.S.C. § 2338.

---

[5] 18 U.S.C. § 2333(e).
[6] 28 U.S.C. § 1610 note.

44. Section 201 of the TRIA is codified in a note to 28 U.S.C. § 1610—part of the Foreign Sovereign Immunities Act ("FSIA")—and, to the extent it contains any grant of subject matter jurisdiction, it is tied to the FSIA or to the statute(s) underlying the judgment—here, the ATS and the ATA. *See* 28 U.S.C. § 1610 note;[7] *see also Kirschenbaum v. 650 Fifth Avenue & Related Props.*, 830 F.3d 107, 131 (2d Cir. 2016) ("The TRIA provides jurisdiction for execution and attachment proceedings to satisfy a judgment *for which there was original jurisdiction under the FSIA* if certain statutory elements are satisfied." (emphasis added) (citing *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 52 (2d Cir. 2010), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018)); Appx. Y at A-184, H.R. Rep. No. 107-779, at 27 (2002) (Conf. Rep.) ("Section 201 builds upon and extends *the principles in section 1610(f)(1) of the Foreign Sovereign Immunities Act* . . . [and] authorizes the enforcement of judgments against terrorist organizations . . . , thereby making clear that all such judgments are enforceable against any assets or property *under any authorities referenced in Section 1610(f)(1)*." (emphases added)). None of the predicate proceedings in this case have even touched the FSIA—not the Florida State Court Action from 2012, not the Florida Federal Court Action from 2018, and not the First Texas State Court Action in 2020. The ATS, meanwhile, confers original jurisdiction on "[t]he district courts" of the United States, 28 U.S.C. § 1350, "allow[ing] federal courts to recognize certain causes of action based on sufficiently definite norms of international law." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). And the ATA, as noted, prescribes exclusive federal jurisdiction. *See* 18 U.S.C. § 2338.

---

[7]*See* 28 U.S.C. § 1610 note ("Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on *a claim based upon an act of terrorism*, *or for which a terrorist party is not immune under* [*the FSIA*], the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." (emphasis added)).

45. Likewise, Rules 657–679 of the Texas Rules of Civil Procedure and Chapter 63 of the Texas Civil Practice and Remedies Code simply lay out the procedures for securing a writ of garnishment, a remedy that is predicated on the existence of valid legal proceedings and that can be secured only through a separate adversarial case. *See* Appx. Z at A-186, Tex. R. Civ. P. 658; Appx. AA at A-187, Tex. R. Civ. P. 659. And the Eleventh Circuit's decision in *Stansell*, for its part, does no more than assess the application of the TRIA to proceedings instituted in federal court, where subject matter jurisdiction lies under 28 U.S.C. § 1331. *Stansell*, 771 F.3d at 722, 737.

46. As the state court was without jurisdiction to decide Plaintiff's TRIA Motion, its order is void. *United Servs.*, 307 S.W.3d at 309. This Court, moreover, is fully empowered to vacate the writ. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 425 (D.C. Cir. 2014) (affirming district court's order vacating writ of attachment based on state and federal court default judgments entered without jurisdiction under the FSIA).

## 2. Plaintiff Improperly Attempts to Abrogate RTSA's Due Process Rights

47. Plaintiff has represented to this Court that it need not examine the issue of whether RTSA is an agent or instrumentality of the FARC before executing the Ex Parte Writ against RTSA's assets. Dkt. 19, at n.2 (When considering whether to execute against RTSA's assets, "an independent agent or instrumentality determination by [this] Court is not necessary because such a determination has already been made."). That position is incorrect. As Plaintiff previously represented to the Court considering the First Texas State Court Action, due process requires RTSA be given an opportunity to challenge the agent or instrumentality designation before the execution of any writ. Dkt. 1-4, at 10 ("[A]fter attachment should . . . [RTSA] wish to challenge any determination as to [its] agent or instrumentality status, [it is] free [to] do so in accordance with applicable law"). The substantive question of whether RTSA is an "agent or instrumentality"

of the FARC is at the heart of the grounds for the Ex Parte Writ, and RTSA has not been afforded the opportunity to challenge that designation. Because RTSA has not been afforded such due process rights, this Court must dissolve the Ex Parte Writ and vacate the Ex Parte Agent or Instrumentality Order.

48. Plaintiff's own authority supports RTSA's due process rights. Plaintiff relies heavily on the Eleventh Circuit's decision in *Stansell*. As Plaintiff has admitted, *Stansell* is clear that when a court makes an initial, ex parte determination that an individual or entity is an "agent or instrumentality" under the TRIA, that individual or entity must be granted significant due process rights, including the right to challenge an "agent or instrumentality" designation, before the execution of any writ of garnishment. Dkt. 1-4 at 10.

49. As the Eleventh Circuit explained, "because an agency or instrumentality determination carries drastic results—the attachment and execution of property—it undeniably implicates due process concerns." *Stansell*, 771 F.3d. at 726 (internal citations omitted). Therefore, "parties whose assets are under threat of execution pursuant to TRIA § 201 are entitled to notice and an opportunity to be heard in order to rebut the allegations and preserve their possessory interest in blocked assets." *Id.* (quoting *Dusenbery v. United States,* 534 U.S. 161, 167 (2002)). Due process "contemplates offering a party an opportunity to rebut charges leveled against it." *Id.* at 727. Federal due process requirements entitle third parties to notice and the opportunity to be heard before execution. *Id.* at 729. Thus, before executing the Ex Parte Writ, this Court should analyze whether Plaintiff has provided sufficient evidence to make a prima facie showing that RTSA is an agent or instrumentality of the FARC and, only once that showing has been made, provide RTSA with significant process rights to challenge that designation. As discussed *infra*, the evidence

Plaintiff provided in support of the Ex Parte Agent or Instrumentality Order is insufficient to sustain that order and the Ex Parte Writ.

### 3. Plaintiff's Ex Parte Motion Did Not and Could Not Establish that RTSA is an "Agent or Instrumentality" of the FARC

50. In a Rule 664a motion, Plaintiff, not the movant, bears the burden of proof. A court "shall [] dissolve[] the writ unless, at such hearing, the plaintiff shall prove the grounds relied upon for its issuance." Appx. C at A-6, Tex. R. Civ. P. § 664a.; *see also* Appx. U at A-120, *Walnut Equip.*, 907 S.W.2d at 917. In a proceeding concerning a post-judgment writ of garnishment, the garnishor must "prove it has a valid, subsisting judgment and, within its knowledge, the judgment debtor does not possess property in Texas subject to execution sufficient to satisfy the judgment." *Exterior Bldg. Supply, Inc. v. Bank of Am., N.A.,* 270 S.W.3d 769, 771 (Tex. App.—Dallas 2008, no pet.). The garnishor must establish that defendant was the party against whom the underlying judgment was issued. *See id.* (affirming dissolution of writ where plaintiff failed to prove that the entity whose assets the writ sought to garnish was the entity against whom plaintiff obtained default judgment). Any failure on the garnishor's "part to carry that burden requires the trial court to dissolve the writ." Appx. AB at A-191, *Cadle Co. v. Davis*, No. 04-09-00763-CV, 2010 WL 5545389, at *5 (Tex. App.—San Antonio Dec. 29, 2010, pet. denied) (mem. op.). Here, Plaintiff's theory is that RTSA stands in the shoes of FARC, the judgment debtor; therefore, in order to prove that it is the party against whom the judgment is issued, it bears the burden of proving that RTSA is an agent or instrumentality of the FARC.

51. The evidence Plaintiff offered to support this key holding is woefully inadequate. The Ex Parte Agent or Instrumentality Order  notes that the Court relied on various state and federal laws

and judicial holdings, as well as Exhibits 1 through 12 appended to Plaintiff's TRIA Motion,[8] as grounds for the order. Dkt. 1-8, Ex. 4, at 1-2. This evidence: (a) was insufficient as a matter of law; and (b) omitted key facts crucial to the determination of the issue.

52. The only exhibit Plaintiff provided to the Court that even mentions RTSA is the supplemental declaration of Mr. McBrien, the retired OFAC official. Dkt. 19-1, Ex. 8, 9. In the 48 pages of Mr. McBrien's two declarations RTSA is mentioned exactly once (in a single paragraph noting that RTSA no longer conducts business with PdVSA, supposedly the crucial link between it and the FARC and in one accompanying footnote). Dkt. 19-1, Ex. 9, at 7-8. These references, which largely quote an OFAC press release, form the entire evidentiary support for the Ex Parte Order. *Id*.

53. Much of Mr. McBrien's declarations are dedicated to alleging that PdVSA, one of the world's largest oil companies, is an "agent or instrumentality" of the FARC. Mr. McBrien's only factual allegation concerning RTSA stems from OFAC's SDN designation of RTSA in 2020: quoting an OFAC press release averring that RTSA "handled a large percentage of Venezuela's oil exports in 2019," Mr. McBrien concludes that, "[g]iven the activities of . . . RTSA, it is my opinion that . . . RTSA [and others] . . . are agents and instrumentalities of the FARC." *Id.* In short, a single footnote in an untested declaration filed in ex parte proceedings supplies the entire basis for designating a Swiss oil trading company an affiliate of a Colombian terrorist group and seizing more than $12 million of its assets.

---

[8] For avoidance of doubt, although the Court in the Ex Parte Agent or Instrumentality Order stated that it considered, *inter alia*, "Exhibits 1 through 13 attached to the Motion", Plaintiff attached only 12 exhibits to the motion.  Dkt. 1-4.

(1)     *a.  Plaintiff's reliance on the OFAC designation is insufficient as a matter of law to prove RTSA is an "agent or instrumentality" of the FARC*

54. As noted *supra*, the entire evidentiary foundation for Plaintiff's allegation that RTSA is an "agent or instrumentality" of the FARC is RTSA's SDN designation in 2020. This is facially insufficient to support the court's TRIA § 201 finding as a matter of law. *See* Appx. AC at A-197, *Pescatore v. Pineda*, No. 08-2245 (RMC), 2019 U.S. Dist. LEXIS 84048, at *7 (D.D.C. May 20, 2019) (an individual's designation by OFAC as a Specially Designated Narcotics Trafficker ("SDNT") was insufficient to establish that the individual was an "agent or instrumentality" of the FARC). As other federal courts have explained, "[i]t is 'not proper for the [court] to rely solely on [an] OFAC designation as creating an irrebuttable presumption of agency or instrumentality status." *Id.* To the contrary, basing an "agent or instrumentality" determination on an OFAC designation alone raises serious due process concerns given the designee's lack of involvement in OFAC's determination. *Stansell*, 771 F.3d at 726. Indeed, Plaintiff should know as much; his own motions for TRIA findings in other venues have been denied on these grounds.[9]

(2)     *b.  Plaintiff's evidence is deficient because it purports to link RTSA to PdVSA—not to the FARC*

55. Plaintiff's theory of liability vis-à-vis RTSA is based on its affiliation with PdVSA, not with the FARC. As discussed *supra*, Mr. McBrien's declaration makes no allegation that RTSA ever spoke with, entered into an agreement with, or had anything at all to do with any current or former FARC member. Moreover, even accepting that RTSA has a commercial relationship with a major oil producer like PdVSA, does not and cannot establish that RTSA is an "agent or

---

[9] *See* Appx. AD at A-201, *Caballero v. Fuerzas Aramadas Revolucionarias de Colombia*, No. 154864/2020, 2020 N.Y. Misc. LEXIS 10368, at *5 (N.Y. Sup. Ct. Dec. 12, 2020) (dismissing Plaintiff's motion to declare other parties to be "agents or instrumentalities" of the FARC based on their OFAC designation). Even if, *arguendo*, an OFAC designation by itself could be considered sufficient to designate an entity as an agent or instrumentality of a terrorist organization under the TRIA, the OFAC designation related to RTSA would still be insufficient because "no evidence indicates that [the OFAC designation] originated from a connection to FARC, rather than for an entirely separate reason." *Id.*

instrumentality" of a Colombian narco-terrorist group. Appx. AE at A-231, *Levin v. Bank of N.Y. Mellon*, No. 09-cv-5900 (JPO), 2019 U.S. Dist. LEXIS 22788, at *89-94 (S.D.N.Y. Feb. 12, 2019) (disregarding an expert's opinion that a claimant's status as an "agent or instrumentality" of Hezbollah meant that he was an "agent or instrumentality" of Iran because "none of the evidence establishing [claimant's] relationship with Hezbollah actually link[ed] him to Iran."). This Court is faced with the exact same situation as in *Levin*: Mr. McBrien alleges that RTSA is an "agent or instrumentality" of PdVSA but provides absolutely no evidence linking RTSA to the FARC.

56. Additionally, PdVSA is contesting its designation as an "agent or instrumentality" of the FARC in other jurisdictions where Plaintiff has secured ex parte orders against it—a right Plaintiff concedes due process gives to PdVSA.[10] *See* Dkt. 1-4 at 10. Moreover, PdVSA's "agent or instrumentality" status is essential to Mr. McBrien's opinion as to RTSA, and, in turn, to the Ex Parte Order.

(3)      *c. Plaintiff failed to provide the Court with key information—namely that the FARC did not exist at the time RTSA allegedly acted as its agent or instrumentality*

57. Plaintiff alleges that the FARC was designated as a Specially Designated Global Terrorist by the United States in 2001 and that the Court in the Florida Federal Court Action found that the FARC's conduct constituted an act of international terrorism.  Dk. 1-4, at 10–11. By Plaintiff's account, it is this very designation that allows him to pursue the FARC and its alleged "agents and instrumentalities" under the TRIA. *Id.*

---

[10] *See* Appx. AF at A-234, Motion to Intervene and Memo. of Law in Supp. by Petroleos de Venezuela, S.A., *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 3:20-cv-04485-MGL, ECF No. 11, (D.S.C. Feb. 5, 2021); Appx. AG at A-246, Limited Motion to Intervene and Memo. of Law in Supp. by Petroleos de Venezuela, S.A., *Caballero v. Fuerzas Aramadas Revolucionarias de Colombia*, No. 1:20-mc-00040-LJV, ECF No. 37 (W.D.N.Y. Feb. 2, 2021).

58. However, earlier proceedings in this matter have clarified the definition of the FARC for the purposes of this litigation: both Plaintiff and the courts have recognized that the FARC was a paramilitary group engaged in armed conflict against the Government of Colombia. Appx. D at A-8, Pl. Second Amend. Compl. ¶ 38, *Caballero v. Fuerzas Armadas Revolucionarias de Colom.,* No. 12-48803-CA-02, 2013 WL 10967065 (Fla. Cir. Ct. Mar. 20, 2013) (describing the FARC as one of "two predominant rebel groups actively engaged against the Colombian government in a decades—long civil war, which has been ongoing since about 1964."); Appx. AH at A-265, Mem. Op. ¶ 2, *Caballero v. Fuerzas Armadas Revolucionarias de Colom.,* No. 12-48803-CA-02, Doc. 67 (Fla. Cir. Ct. Nov. 18, 2014) (finding that the FARC was an "active participant[] in the ongoing war against the Colombian government" and that it was "an organization . . . with a well defined organizational structure and line of command.").

59. That group no longer exists and has not existed since for nearly four years. In 2017, the FARC and the Government of Colombia entered into a series of agreements by which the FARC agreed to disarm, enter designated "demobilization zones," and become civilians. Appx. E at A-10, *Last March of the FARC: Colombia's hardened fighters reach for a normal life*, the Guardian, Feb. 3, 2017, https://www.theguardian.com/world/2017/feb/03/farc-colombia-peace-deal-transition-normal-life, at 2. As part of the agreement, the FARC agreed to hand over their weapons to the United Nations and many of its members formed a legal political party in Colombia. *Id; see also* Appx. AI at 319, Final Agreement For Ending the Conflict and Building a Stable and Lasting Peace, Colombia-FARC, Nov. 24, 2016, https://colombia.unmissions.org/sites/default/files/s-2017-272_e.pdf.

60. In other words, the group identified by Plaintiff and the Court as the judgement debtor (i.e., FARC)—the group "with a well defined organizational structure and line of command" that was

"actively engaged against the Colombian government in a decades-long civil war" and that is allegedly so closely affiliated with RTSA to warrant holding the latter liable for a judgment against the former—no longer exists.  In fact, that group ceased to exist at least two years before any of the acts of RTSA that Plaintiff cites as evidence.

61. Plaintiff failed to apprise the Court of these crucial facts in its motion for an order finding, as a matter of federal law, that RTSA constituted an "agent or instrumentality" of the FARC and approving the seizure of $12.6 million of its assets to satisfy a judgment for the FARC's acts of terrorism two decades earlier. This failure is especially galling given the ex parte nature of the proceedings below.[11] Mr. McBrien's declaration, which discussed the FARC at length, never mentioned that the FARC signed a peace agreement with the Government of Colombia and laid down arms two years before the alleged transactions between PdVSA and RTSA that supposedly links RTSA to the FARC. Dkt. 19-1, Ex. 8, 9. In fact, most of Mr. McBrien's sources describing the FARC were published well before 2017 and therefore do not accurately describe the present situation.[12] Simply put, even if Plaintiff's allegations against RTSA were taken as true, RTSA *still* could not be an "agent or instrumentality" of the FARC because Plaintiff's charge is based on RTSA's alleged conduct in 2019—more than two years after the FARC ceased to exist.

62. Plaintiff surely knows the importance of demonstrating a temporal connection between an alleged terrorist group and its agents or instrumentalities: Plaintiff presented another court with a

---

[11] Ethical canons of professional conduct mandate a duty of candor in such proceedings. *See, e.g.* Tex. Disciplinary R. of Prof. Conduct 3.03(a)(3) ), reprinted in TEX. GOV'T. CODE ANN., tit. 2, Subt. G, App. A, Art. X, § 9 Rule 3.03) (West 2019) "A lawyer shall not knowingly, in an ex parte proceeding, fail to disclose to the tribunal an unprivileged fact which the lawyer reasonable believes should be known by that entity for it to make an informed decision."

[12] Three of the four sources Mr. McBrien cited in his description of the FARC were published in 2002, 2005, and 2009, respectively.  Dkt. 19-1, Ex. 8, at 3. While Mr. McBrien did cite one post-2017 source related to the FARC in his account of activities in Colombia, he failed to disclose that his source identified the subjects of the report as *dissidents* of the FARC. *Compare* Dkt. 19-1, Ex. 8, at 4 *with* Appx. AJ at A-597, Excerpt of Drug Enforcement Administration, 2019 National Drug Assessment, at 104.

declaration from Mr. McBrien in support of a finding under TRIA § 201 just last year, and that court rebuffed Plaintiff's request. *See* Appx. AD at A-201, *Caballero v. Fuerzas Aramadas Revolucionarias de Colombia*, No. 154864/2020, 2020 N.Y. Misc. LEXIS 10368, at *5 (N.Y. Sup. Ct. Dec. 12, 2020). In that action, Plaintiff again attempted to use a declaration from Mr. McBrien to establish that two individuals were agents or instrumentalities of the FARC "based on two OFAC publications and a United States Department of the Treasury press release" which purported to link the individuals and their organization to an international drug trafficking group and other entities "which do not include the FARC." *Id.* at *3. In denying Plaintiff's motion for declaratory judgment, the Court found that Plaintiff provided evidence only that the FARC was connected to the international drug trafficking groups (via an intermediary) in 2014, which "does not necessarily establish that [the individuals] are agents or instrumentalities of FARC in 2020." *Id.* at *4.

63. As the writ is the product of fatal procedural and substantive defects, and the best evidence that Plaintiff could muster without the check of an adversarial process is woefully deficient to support the extraordinary relief Plaintiff secured on an ex parte basis, the Court should promptly schedule a hearing, hold Plaintiff to his burden, and enter an order dissolving the writ.

**E. The Court Should Vacate the Ex Parte Agent or Instrumentality Order**

64. Rule 664a allows a garnishee or judgment debtor to "seek to vacate, dissolve or modify the writ of garnishment, *and the order directing its issuance*, for any grounds, extrinsic or intrinsic." Appx. C at A-6, Tex. R. Civ. P. 664a. (emphasis added). In orders dissolving writs of garnishment, courts routinely vacate the underlying orders directing their issuance. *See, e.g., Zeecon Wireless Internet, LLC v. Am. Bank of Tex., N.A.*, 305 S.W.3d 813, 820 (Tex. App.—Austin 2010, no pet.) (dissolving writ of garnishment and voiding portion of lower court's judgment disbursing funds); Appx. AK at A-600, *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Allied Bank of Texas,* 704 S.W.2d 919, 920 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd) (vacating a writ of

garnishment and reversing the trial court's order entering default judgment). As the Ex Parte Agent or Instrumentality Order directed the Clerk to issue "writs in aid of garnishment to attach to any assets within this Court's jurisdiction . . . [of RTSA]," Rule 664a expressly authorizes the Court to vacate that order. *See* Dkt. 1-8, Ex. 4 at 3

65. That the Ex Parte Order was entered in a separate proceeding below, with a different cause number, is no bar to relief. Beyond the plain text of Rule 664a. This Court also has the authority to vacate the Ex Parte Order by virtue of the removal of the entire controversy. *See F.D.I.C. v. Taylor*, 727 F.Supp. 326, 329 (S.D. Tex. 1989) ("In obtaining removal jurisdiction over a case, a federal district court sits not as an appellate tribunal but as the surrogate of the state trial court. It assumes that everything that transpired in the case prior to removal occurred in the federal court."). Texas law recognizes that, within the same term, a court may set aside an order and may enter another order in its place, either on its own motion or on the motion of a party. *See* Appx. AL at A-603, *Henningsmeyer v. First State Bank of Conroe*, 109 Tex. 116, 117 (1917) ("we do not question the authority of the Court of Civil Appeals to set aside its former order…it has full control of its judgments during its term"). The Fifth Circuit, moreover, treats writs of garnishment as removable, independent suits. *Butler v. Polk*, 592 F.2d 1293, 1295 (5th Cir. 1979) (the independence of garnishment suits reflects a "recognition that actions such as this are in effect suits involving a new party litigating the existence of a new liability"). By virtue of the removal of the garnishment proceedings, this Court's authority extends to the review and dissolution of the underlying Ex Parte Agent or Instrumentality Order.

## VI.    PRAYER FOR RELIEF

Wherefore, Third-Party Respondent RTSA respectfully requests that this Court grant an immediate

stay against any enforcement under the Writ of Garnishment dated December 23, 2020, and that,

upon full consideration, grant this motion and enter an order that:

a.  The Writ of Garnishment dated December 23, 2020, is dissolved; and

b.  The order from the 284th District Court of Montgomery County, Texas dated December

16, 2020, is vacated.

Dated:    February 25, 2021           NORTON ROSE FULBRIGHT US LLP
          Austin, Texas

                                      By: /s/ Mark Oakes
                                         Mark Oakes
                                         98 San Jacinto Boulevard, Suite 1100
                                         Austin, Texas 78701-4255
                                         Tel.: 512.474.5201
                                         Fax: 512.536.4598
                                         mark.oakes@nortonrosefulbright.com

                                          *Attorney for Third-Party Respondent Rosneft*
                                          *Trading, S.A.*

## **CERTIFICATE OF SERVICE**

I certify that on February 25, 2021, this document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

NORTON ROSE FULBRIGHT US LLP

By: /s/ Mark Oakes
  Mark Oakes
  98 San Jacinto Boulevard, Suite 1100
  Austin, Texas 78701-4255
  Tel.: 512.474.5201
  Fax: 512.536.4598
  mark.oakes@nortonrosefulbright.com

  *Attorney for Third-Party Respondent Rosneft Trading S.A.*

## **CERTIFICATE OF CONFERENCE**

I certify that on February 22, 2021, counsel for Rosneft Trading, S.A. conferred with counsel for Vitol, Inc.  Counsel for Vitol, Inc. does not oppose this motion. On February 22, 2021, counsel for Rosneft Trading, S.A. contacted Henry James Fasthoff , IV, counsel for Antonio Caballero.  Mr. Fasthoff indicated Caballero opposes this motion without stating specific grounds for opposition.

NORTON ROSE FULBRIGHT US LLP

By: /s/ Mark Oakes
  Mark Oakes
  98 San Jacinto Boulevard, Suite 1100
  Austin, Texas 78701-4255
  Tel.: 512.474.5201
  Fax: 512.536.4598
  mark.oakes@nortonrosefulbright.com

  *Attorney for Third-Party Respondent Rosneft Trading S.A.*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ANTONIO CABALLERO, | |
| *Judgment Creditor & Garnishor,* | |
| v. | |
| FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA a/k/a FARC-EP a/k/a REVOLUTIONARY ARMED FORCES OF COLOMBIA; and THE NORTE DEL VALLE CARTEL, | |
| *Judgment Debtors,* | |
| v. | |
| VITOL INC., | CIVIL ACTION NO. 4:21-cv-00140 |
| *Garnishee.* | |
| VITOL INC., | |
| *Third-Party Petitioner.* | |
| v. | |
| ANTONIO CABALLERO; ROSNEFT TRADING, S.A.; and LDC SUPPLY INTERNATIONAL, LLC, | |
| *Third-Party Respondents.* | |

**ORDER GRANTING TEMPORARY STAY**

This Court, having considered Third-Party Respondent Rosneft Trading, S.A.'s Motion to Dissolve the December 23, 2020 Writ Of Garnishment, to Vacate the Underlying Order Directing Its Issuance, and For Other Relief, and arguments of counsel, is of the opinion that the Motion should be Granted. It is, therefore,

ORDERED that the matter is STAYED pending resolution of Third-Party Respondent RTSA's

Motion to Dissolve the December 23, 2020 Writ Of Garnishment, to Vacate the Underlying

Order Directing Its Issuance, and For Other Relief.


SIGNED this _____ day of _____, 2021.



_____

Judge Andrew S Hanen

33

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ANTONIO CABALLERO, | |
|      *Judgment Creditor & Garnishor,* | |
| v. | |
| FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA a/k/a FARC-EP a/k/a REVOLUTIONARY ARMED FORCES OF COLOMBIA; and THE NORTE DEL VALLE CARTEL, | |
|      *Judgment Debtors,* | |
| v. | |
| VITOL INC., | CIVIL ACTION NO. 4:21-cv-00140 |
|      *Garnishee.* | |
| _____ | |
| VITOL INC., | |
|      *Third-Party Petitioner.* | |
| v. | |
| ANTONIO CABALLERO; ROSNEFT TRADING, S.A.; and LDC SUPPLY INTERNATIONAL, LLC, | |
|      *Third-Party Respondents.* | |

## ORDER DISSOLVING WRIT OF GARNISHMENT AND VACATING UNDERLYING ORDER

This Court, having considered Third-Party Respondent Rosneft Trading, S.A.'s Motion to Dissolve the December 23, 2020 Writ Of Garnishment, to Vacate the Underlying Order Directing Its Issuance, and For Other Relief, and arguments of counsel, is of the opinion that the Motion should be Granted. It is, therefore,

ORDERED that the December 23, 2020 Writ of Garnishment issued on is DISSOLVED;

IT IS FURTHER ORDERED that the December 16, 2020 Order Directing its Issuance from the

284th District Court of Montgomery County, Texas is VACATED.


SIGNED this _____ day of _____, 2021.



_____

Judge Andrew S Hanen

**Table of Contents**

| Appendix No. | Description | Page |
|---|---|---|
| A | Declaration of Daniel Richard | A-1 |
| B | Admissions of Rosneft Trading, S.A. pursuant to Tex. R. Civ. P. 664a | A-4 |
| C | Tex. R. Civ. P. 664a | A-6 |
| D | Excerpt of Pl. Second Amend. Compl., *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 12-48803-CA-02, 2013 WL 10967065 (Fla. Cir. Ct. Mar. 20, 2013) | A-7 |
| E | *Last March of the FARC: Colombia's hardened fighters reach for a normal life*, the Guardian, Feb. 3, 2017, https://www.theguardian.com/world/2017/feb/03/farc-colombia-peace-deal-transition-normal-life, at 2 | A-9 |
| F | First page of docket sheet of 24 actions filed by Plaintiff styled *Caballero v. Fuerzas Armadas Revolucionarias de Colombia* | A-17 |
| G | Docket of *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 4:20-mc-02719 (S.D. Tex. filed Sept. 23, 2020) | A-43 |
| H | *Global 2000: The World's Largest Public Companies*, Forbes.com, (May 13, 2020) https://www.forbes.com/global2000/#5ae8f99d335d. | A-44 |
| I | *Ranking the World's Top Oil Companies*, Off-shore-technology.com (Jan. 31st 2020), https://www.offshore-technology.com/features/companies-by-oil-production/ | A-65 |
| J | *Shareholder Structure*, Rosneft.com, (Oct. 1, 2020), https://www.rosneft.com/Investors/Equity/Shareholder_structure/ | A-74 |
| K | *Board of Directors*, Rosneft.com, https://www.rosneft.com/governance/board/ | A-76 |
| L | Worldwide Report, Oil & Gas Journal, at 7 (Dec. 2, 2019) | A-78 |
| M | PDV Holding, pdvholding.com, https://www.pdvholding.com/index.html | A-85 |
| N | *Country Analysis Executive Summary: Venezuela*, U.S. Energy Information Administration (Nov. 30, 2020). https://www.eia.gov/international/content/analysis/countries_long/Venezuela/venezuela_exe.pdf | A-89 |
| O | *Treasury Targets Russian Oil Brokerage Firm for Supporting Illegitimate Maduro Regime*, U.S. Department of the Treasury, (Feb. 18, 2020), https://home.treasury.gov/news/press-releases/sm909 | A-97 |
| P | Tex. R. Civ. P. 663a | A-100 |
| Q | *Nat'l Loan Inv'rs, L.P. v. Fidelity Bank, N.A.*, 51 F.3d 1045, No. 94-10173, 1995 WL 153421, at *2 (5th Cir. March 30, 1995) (per curiam) | A-101 |
| R | *Wease v. Bank of Am.*, No. 05-14-00867, 2015 WL 4051974, at *3 (Tex. App.—Dallas July 2, 2015, no pet.) | A-104 |
| S | *Arriaga v. Jess Enterprises*, 2014 WL 1875917, at *1 (N.D. Tex. Apr. 10, 2014) *report and recommendation adopted* 2014 WL 1882002 (N.D. Tex. May 2, 2014) | A-107 |

**Table of Contents**

| Appendix No. | Description | Page |
|---|---|---|
| T | *Baca v. Hoover, Bax & Shearer* , 823 S.W.2d 734, 738 (Tex. App.—Houston [14th Dist.] 1992, writ denied) | A-111 |
| U | *Walnut Equip. Leasing Co. v. J-V Dirt & Loam* , 907 S.W.2d 912, 917 (Tex. App.—Austin 1995, writ denied). | A-118 |
| V | Tex. R. Civ. P. 108a. | A-124 |
| W | Declarations and Reservations of Switzerland, Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=424&disp=resdn | A-126 |
| X | Envelope, Ex Parte Writ, and Application for Post-Judgment Writ of Garnishment and exhibits mailed to RTSA. | A-127 |
| Y | H.R. Rep. No. 107-779, at 27 (2002) (Conf. Rep.) | A-182 |
| Z | Tex. R. Civ. P. 658 | A-186 |
| AA | Tex. R. Civ. P. 659 | A-187 |
| AB | *Cadle Co. v. Davis* , No. 04-09-00763-CV, 2010 WL 5545389, at *5 (Tex. App.—San Antonio Dec. 29, 2010, pet. denied). | A-188 |
| AC | *Pescatore v. Pineda* , No. 08-2245 (RMC), 2019 U.S. Dist. LEXIS 84048, at *7 (D.D.C. May 20, 2019). | A-195 |
| AD | *Caballero v. Fuerzas Aramadas Revolucionarias de Colombia* , No. 154864/2020, 2020 N.Y. Misc. LEXIS 10368, at *5 (N.Y. Sup. Ct. Dec. 12, 2020) | A-199 |
| AE | *Levin v. Bank of N.Y. Mellon* , No. 09-cv-5900 (JPO), 2019 U.S. Dist. LEXIS 22788, at *89-94 (S.D.N.Y. Feb. 12, 2019) | A-203 |
| AF | Motion to Intervene and Memo. of Law in Supp. by Petroleos de Venezuela, S.A., Caballero v. Fuerzas Armadas Revolucionarias de Colombia, No. 3:20-cv-04485-MGL, ECF No. 11, (D.S.C. Feb. 5, 2021) | A-234 |
| AG | Limited Motion to Intervene and Memo. of Law in Supp. by Petroleos de Venezuela, S.A., Caballero v. Fuerzas Aramadas Revolucionarias de Colombia, No. 1:20-mc-00040-LJV, ECF No. 37 (W.D.N.Y. Feb. 2, 2021). | A-246 |
| AH | Mem. Opinion, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia* , No. 12-48803-CA-02, Doc. 67 (Fla. Cir. Ct. Nov. 18, 2014) | A-261 |
| AI | Final Agreement For Ending the Conflict and Building a Stable and Lasting Peace, Colombia-FARC, Nov. 24, 2016, https://colombia.unmissions.org/sites/default/files/s-2017-272_e.pdf. | A-319 |
| AJ | Excerpt of Drug Enforcement Administration, 2019 National Drug Assessment | A-596 |
| AK | *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Allied Bank of Texas* , 704 S.W.2d 919, 920 (Tex. App.—Houston [14th Dist.] 1986, writ refused) | A-599 |

**Table of Contents**

| Appendix No. | Description | Page |
|---|---|---|
| AL | *Henningsmeyer v. First State Bank of Conroe*, 109 Tex. 116, 117 (1917) | A-602 |

# Appendix A

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| ANTONIO CABALLERO, | |
|     *Judgment Creditor & Garnishor,* | |
| v. | |
| FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA a/k/a FARC-EP a/k/a REVOLUTIONARY ARMED FORCES OF COLOMBIA; and THE NORTE DEL VALLE CARTEL, | |
|     *Judgment Debtors,* | CIVIL ACTION NO. 4:21-cv-00140 |
| v. | |
| VITOL INC., | |
|     *Garnishee.* | |
| _____ | |
| VITOL INC., | |
|     *Third-Party Petitioner.* | |
| v. | |
| ANTONIO CABALLERO; ROSNEFT TRADING, S.A.; and LDC SUPPLY INTERNATIONAL, LLC, | |
|     *Third-Party Respondents* . | |

**A-1**

## <u>DECLARATION OF DANIEL RICHARD</u>

I, Daniel Richard, pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, declare under penalty of perjury:

1.　My name is Daniel Richard. I am over twenty-one (21) years of age, of sound mind, under no legal disability, have never been convicted of a felony or a crime involving moral turpitude, and am capable of making this declaration.

2.　I am a Member of the Board of Directors of Rosneft Trading, S.A. ("RTSA"). I have held that position since January 2011.

3.　The facts herein stated in paragraphs 7, 9 through 10, 15 through 16, and 32 as well as Exhibit A of Third Party Respondent RTSA's Motion to Dissolve the December 23, 2020 Writ Of Garnishment, to Vacate the Underlying Order Directing Its Issuance, and For Other Relief, in the above-captioned matter are true and correct, and are based on my personal knowledge obtained as Member of the Board of Directors of RTSA.

4.　Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, my date of birth is August 4, 1950 and my business address is No. 8 Avenue Jules Crosnier, 1206, Geneva, Switzerland. I, Daniel Richard, declare under penalty of perjury that the foregoing is true and correct.

A-2

Executed in Geneva, Switzerland on the 24th day of February, 2021.

_____
Daniel Richard

# Appendix B

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| ANTONIO CABALLERO, | |
| *Judgment Creditor & Garnishor,* | |
| v. | |
| FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA a/k/a FARC-EP a/k/a REVOLUTIONARY ARMED FORCES OF COLOMBIA; and THE NORTE DEL VALLE CARTEL, | |
| *Judgment Debtors,* | CIVIL ACTION NO. 4:21-cv-00140 |
| v. | |
| VITOL INC., | |
| *Garnishee.* | |
| _____ | |
| VITOL INC., | |
| *Third-Party Petitioner.* | |
| v. | |
| ANTONIO CABALLERO; ROSNEFT TRADING, S.A.; and LDC SUPPLY INTERNATIONAL, LLC, | |
| *Third-Party Respondents* | |
| . | |

**Admissions by Rosneft Trading, S.A., Pursuant to Texas Rule of Civil Procedure 664a**

Rosneft Trading, S.A. ("RTSA") has filed its Motion to Dissolve the December 23, 2020

Writ of Garnishment, to Vacate the Underlying Order Directing its Issuance, and for Other Relief

under Texas Rule of Civil Procedure 664a. Texas Rule of Civil Procedure Rule 664a requires a

movant to admit or deny "each finding of the order directing the issuance of the writ." *See* Tex. R.

A-4

Civ. P. 664a. The order directing the issuance of the December 23, 2020 writ is the Court's December 16, 2020 Order on Judgment Creditor's Motion for Agency or Instrumentality Determination Pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002. Dxt. 1-8, Ex. 4 at 3. That order makes two factual findings: (1) "that Petroleos de Venezuela, S.A. (a.k.a. PDVSA; a.k.a. PETROLEOS DE VENEZUELA S A; a.k.a. PETROLEOS DE VENEZUELA S.A and [RTSA] are agents and instrumentalities of Fuerzas Armadas Revolucionarias de Colombia (the "FARC")"; and (2) "that the assets of [PdVSA and RTSA] are blocked assets and are executable under TRIA towards satisfaction of [Plaintiff] Caballero's ATA Final Judgment." Dkt. 1-8, Ex. 4 at 2-3.

Pursuant to Rule 664a, RTSA states as follows:

- In respect of Finding (1): RTSA denies the finding to the extent that it purports to designate RTSA an "agent or instrumentality" of the FARC. RTSA is unable to admit or deny the remainder of the allegations in Finding (1) as it does not have knowledge of the status of the other entities described in the finding.

- In respect of Finding (2): RTSA is unable to admit or deny the finding because: (a) to the extent Finding (2) purports to find that assets of RTSA may be executed under TRIA towards satisfaction of Plaintiff's final judgment, that finding calls for a legal conclusion that is irrelevant to the grounds stated in RTSA's Motion to Dissolve the December 23, 2020 Writ of Garnishment, to Vacate the Underlying Order Directing its Issuance, and for Other Relief ; and (b) to the extent that Finding (2) refers to the assets of other entities, RTSA does not have sufficient knowledge of the status of the other entities' assets.

A-5

# Appendix C

Vernon's Texas Rules Annotated
Texas Rules of Civil Procedure
Part VI. Rules Relating to Ancillary Proceedings
Section 4. Garnishment (Refs & Annos)

TX Rules of Civil Procedure, Rule 664a

Rule 664a. Dissolution or Modification of Writ of Garnishment

Effective: June 1, 2020
Currentness

A defendant whose property or account has been garnished or any intervening party who claims an interest in such property or account, may by sworn written motion, seek to vacate, dissolve or modify the writ of garnishment, and the order directing its issuance, for any grounds or cause, extrinsic or intrinsic. Such motion shall admit or deny each finding of the order directing the issuance of the writ except where the movant is unable to admit or deny the finding, in which case movant shall set forth the reasons why he cannot admit or deny. Unless the parties agree to an extension of time, the motion shall be heard promptly, after reasonable notice to the plaintiff (which may be less than three days), and the issue shall be determined not later than ten days after the motion is filed. The filing of the motion shall stay any further proceedings under the writ, except for any orders concerning the care, preservation or sale of any perishable property, until a hearing is had, and the issue is determined. The writ shall be dissolved unless, at such hearing, the plaintiff shall prove the grounds relied upon for its issuance, but the court may modify its previous order granting the writ and the writ issued pursuant thereto. The movant shall, however, have the burden to prove that the reasonable value of the property garnished exceeds the amount necessary to secure the debt, interest for one year, and probable costs. He shall also have the burden to prove facts to justify substitution of property.

The court's determination may be made upon the basis of affidavits, if uncontroverted, setting forth such facts as would be admissible in evidence; otherwise, the parties shall submit evidence. The court may make all such orders including orders concerning the care, preservation or disposition of the property (or the proceeds therefrom if the same has been sold), as justice may require. If the movant has given a replevy bond, an order to vacate or dissolve the writ shall vacate the replevy bond and discharge the sureties thereon, and if the court modifies its order or the writ issued pursuant thereto, it shall make such further orders with respect to the bond as may be consistent with its modification.

**Credits**
July 11, 1977, eff. Jan. 1, 1978.

Notes of Decisions (38)

Vernon's Ann. Texas Rules Civ. Proc., Rule 664a, TX R RCP Rule 664a
Current with amendments received through January 1, 2021

End of Document                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix D

2013 WL 10967065 (Fla.Cir.Ct.) (Trial Pleading)
Circuit Court of Florida.
Miami-dade County

Antonio CABALLERO,

v.

FUERZAS ARMADAS REVOLUCIONARIAS DE COLUMBIA, et al.

No. 12-48803-CA-02.
March 20, 2013.

General Jurisdiction Division

**Corrected Second Amended Complaint**

Joseph I Zumpano, Florida Bar No. 0056091, Jzumpano@zpwlaw.com, Leon N. Patricios, Florida Bar No. 0012777, lpatricios@zpwlaw.com, Zumpano Patricios & Winker, P.A., 312 Minorca Avenue, Coral Gables, FL 33134, Tel: 305-444-5565, Fax: 305-444-8588.

Plaintiff, ANTONIO CABALLERO ("Plaintiff"), files this corrected Second Amended Complaint (correcting a scrivener's error), and sues Defendants, FUERZAS ARMADAS REVOLUCIONARIOS DE COLOMBIA ("FARC"), EJERCITO DE LIBERACION NACIONAL ("ELN"), and THE NORTE DE VALLE CARTEL ("NDVC") (collectively "Defendants"), and alleges as follows:

**PRELIMINARY STATEMENT**

1. This is a civil action for damages in excess of one hundred million dollars arising out of injury to Plaintiff due to the Defendants' unlawful kidnapping, trafficking, detention, torture, and killing of Plaintiffs father, Senator and Ambassador of the nation of Colombia, Carlos Caballero ("the Victim"), as well as the threat to Plaintiff's life which deprived them of their property and businesses in Colombia, in violation of international law (via the Alien Tort Statute), Colombian law (via Florida's "significant relationship" choice of law test), Federal law (via Civil Racketeer Influenced and Corrupt Organizations) and Florida law (via Florida's long arm statute).

**THE PARTIES**

2. At the time of the filing of this Complaint, Plaintiff is a resident alien of the United States residing in Florida with a present intent to make Florida his permanent home. Although a citizen of Colombia, the Defendants' actions forced Plaintiff to flee his native country and obtain political asylum in the United States.

3. At all relevant times to this Complaint, Defendant, Fuerzas Armadas Revolucionarias de Colombia ("FARC"), has been a terrorist organization and narcotics trafficker operating in and out of Colombia. Consequently, FARC has earned condemnation from the United States as:

a) a Foreign Terrorist Organization pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1189;

32. South Florida is a principal arrival zone and distribution center for powder cocaine and South American heroin.[8]

33. Cocaine poses a serious threat to Florida, and is more often associated with violent crime than any other illicit drug in the State. Colombian criminal groups control transportation of cocaine to Florida and are the primary wholesale distributors of powdered cocaine.[9]

34. Thus, Florida has become a primary point of entry and target market for FARC's cocaine trafficking.

35. FARC operates in roughly one-third of Colombia's geographic territory.[10]

36. In November 1998, then-President Andres Pastrana ceded a 42,000-square-mile area (roughly the size of Switzerland) in south-central Colombia to the FARC's control.

37. FARC has actively, widely, and systematically targeted civilians during its terrorist attacks against the Colombian government.

38. FARC and ELN are the two predominant rebel groups actively engaged against the Colombian government in a decades-long civil war, which has been ongoing since about 1964.

39. "In addition to its attacks on Colombian military, political and economic targets, the FARC's various fronts are deeply involved in narcotics trafficking, kidnapping for ransom, extortion, murder and other criminal activities."[11]

40. FARC also operates outside the country of Colombia.[12]

**The Global Terrorist Organization ELN**

41. ELN is the second largest insurgent group in Colombia, after FARC, and, as a result of its longstanding history of extreme brutality, has also earned universal condemnation from the United States and the international community:[13]

a) In 1997, ELN was designated by the United States as a Foreign Terrorist Organization;

b) In 2001, ELN was designated by the United States as a Specially Designated Global Terrorist;

c) The European Union has designated and sanctioned the ELN as a terrorist organization for its breaches of international humanitarian law.

42. As part of its campaign of terror, ELN strategically targets high profile Colombian citizens, such as politicians and businessmen, using tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia while also silencing those adverse to ELN's violent agenda.

43. In order to finance its terrorist objectives, ELN engages in narcotics manufacturing and trafficking as the primary means of funding its terrorist activities.

44. Similarly to FARC, ELN maintains considerable control of areas with significant coca and opium poppy cultivation.[14]

45. ELN has been affirmatively linked to other narco-terrorist organizations.[15]

A-8

# Appendix E



**Farc**

# Last march of the Farc: Colombia's hardened fighters reach for a normal life

**Sibylla Brodzinsky** *in Colinas*

Fri 3 Feb 2017 05.00 EST

ver his 18 years as a member of the revolutionary armed forces of Colombia, German became accustomed trekking for days through jungles and over mountains with a heavy pack on his back and an AK-47 strapped across his chest.

But, this week, as he and thousands of other rebels began to make the final journey of their 52-year war, the hardened guerrilla fighter was filled with equal measures of expectation and trepidation.

"Now we're facing a different kind of battle," said Germán, 34, who was a member of a senior Farc commander's security detail.

At a temporary guerrilla camp near one of the demobilization sites, Mauricio Jaramillo, the commander of the Farc's powerful Eastern bloc, gave a pre-dawn briefing to the 190 rebels amassed there.

"Start packing up your things," he told the troops in a large open-sided tent that served as a classroom, meeting hall and TV room. "We are getting ready for our last march," he said.

As part of a historic peace deal with the government, thousands of guerrillas began traveling this week by foot, truck, bus and boat to demobilization zones throughout the country. By 31 May about 6,300 guerrillas are to have handed over all their weapons to a UN mission and should be well on their way to becoming civilians.

Winning approval for the peace deal – reached after four years of talks in Havana – faced enormous obstacles after Colombians initially rejected the agreement in a referendum. Likewise, implementing the revised accord has been slow, clumsy and complicated.



0:00 / 1:34

▲ 'It's the start of the construction of peace': Colombians react to peace treaty – video Guardian

Initially, the rebels were meant to have reached the zones by 31 December, but the logistics of setting up housing, power and other services in remote areas has overwhelmed the government agencies charged with coordinating them.

Just a few days before the new deadline of 31 January, the 16-hectare demobilization zone in the remote eastern province of Guaviare that Germán and nearly 500 other guerrillas were supposed to occupy was far from finished.

According to plans, housing, classrooms, water tanks and a water treatment system should already have been constructed, but this week, the site was still an empty field with nothing but a few dozen wooden planks and a tent.

"We will go into the demobilization zones because it was an order from commanders," said Germán at the morning meeting, who like many rebels, feared that conditions of the peace deal could soon be broken. "But if the government is not living up to its promises with us still in arms, what's going to happen once we get in there?" he asked.

"All they're interested in is that we hand over our rifles," he said of the government. "Once we give them that they won't do what they promised."

Fundación Paz y Reconciliación, a conflict thinktank based in Bogotá, said in a report this week that 23 of the 26 camps were still incomplete even though the government had seven months to plan them.

In many of the zones, the guerrillas themselves have agreed to build their own housing, but some worry that it will take time from their studies and training programs that were supposed to smooth the transition to civilian life.

Despite the difficulties, Mauricio said he knew there was no turning back. "We are committed to making this transition to a legal political party," he said.

But that doesn't mean the Farc's struggle has come to an end, he said. "There is a peace agreement but we still have to fight for everything. For now we have to fight so that the government complies with what has been negotiated," Mauricio said.

The government is also fighting to make the Farc comply with the terms of the deal.

Even before a final accord was reached in August, the guerrilla leadership had vowed to hand over all minors in the rebel ranks to child welfare agency so they could be returned to their families. However, only 13 children were released last year, said Sergio Jaramillo, the government's peace commissioner. The Farc now say they will hand them over once they are all in the demobilization zones.

And in Guaviare, the guerrillas share some of the blame for the lack of infrastructure: a 2015 Farc attack on a power pylon left the remote jungle region disconnected from the national grid.

Despite the setbacks, the sight of thousands of Farc troops marching toward their demobilization throughout the country is nothing short of remarkable.

A-11



▲ Members of the Farc make their journey towards a demobilization zone. At its height the group claimed as many as 20,000 members. Photograph: Christian Escobar Mora/EPA

The Farc's first long march was more of a scramble. In 1964, the government bombed a small communist enclave known as Marquetalia and a ragtag group of peasants who claimed independence from the government scattered into the jungle.

They quickly regrouped and formed the Revolutionary Armed Forces of Colombia, which went on to become Latin America's largest, strongest and most formidable guerrilla group, claiming as many as 20,000 fighters at the height of their power.

By the mid-1990s the Colombian state could barely fight off the advance of the guerrillas, often relying on far-right paramilitary forces to do the job. The Farc engaged in forced recruitment, mass displacement, kidnapping, and extortion while reaping huge benefits from the expanding drug trade in areas under its control.

Launching bold attacks on military outposts and rural towns, they captured hundreds of policemen and soldiers and held them for years in barbed wire cages in the jungle, calling them "prisoners of war". To the broader Colombian society they were simply hostages.

The change today is dramatic in its mundanity. On the mud road between the demobilization zone and the guerrilla camp in Colinas, a group of five soldiers stood relaxed on the crest of a hill.

Mauricio, who participated in attacks on the towns of Mitu and Miraflores where dozens of servicemen were captured, passed in a pickup truck with his guards, honking the horn in greeting.

The soldiers – now charged with their former enemies' security – offered a friendly wave back, but the apparent calm belies the urgency of the army's new mission.

Criminal gangs, so-called "neo-paramilitary" groups and the smaller ELN rebel group have already begun filling the power vacuum left by the Farc's retreat around the country, and taking over the criminal economies once controlled or regulated by the Farc. Of the 242 municipalities where the Farc were present, new armed groups have expanded to at least 90 of them, according to Paz y Reconciliación.

In the case of Guaviare, a group of Farc dissidents have taken over.

Arsenio Mejía commander of the Farc's First Front, saw his unit fall apart when a group of fighters announced that they would not accept a peace pact with the government. Then another group split off in December under the command of Gentil Duarte – a top Farc leader who had participated in the peace talks in Havana – claiming to represent the ideals of the Farc's founders.

"It was painful to see that happen," said Mejía, also known as "Kokorikó". "They were my comrades, we fought together, and now they are traitors," he said.

On Tuesday, a policeman participating in a mission to eradicate coca crops in the area of Guaviare where the dissident group is operating was killed by a sniper, although it is not yet clear whether it was a member of the dissident group who fired the shot.

**❝ Farc members have a justified fear that once they lay down their arms and enter civilian life they could be targeted**

According to a classified security assessment of the area, seen by the Guardian, Duarte and about 30 men are acting in the name of the Farc, and could pose a threat to the demobilization process.

They have called meetings of local communities to demand payment of "war taxes". The government – and their former comrades – say the dissidents are hiding behind ideology to continue participating in the flourishing cocaine trade in the area; Duarte's defection came just days after mafia groups appeared in the area, according to several sources.

But Farc leaders believe the dissidents also left the group because they fear facing the transitional justice system that will be set up under the accord to prosecute guerrillas

for war crimes. "Each of us fears for what he has done," said one Farc member.

And while the Farc don't believe their former comrades pose a threat to them directly, they are extremely concerned by the murders of community leaders and leftwing activists seen as being politically aligned with the Farc.

At least 17 social leaders have been killed since implementation of the peace accord began 1 December, according to the government's Victim's Unit.

Although there is no evidence that the murders are linked, Alan Jara, who was held hostage by the Farc for more than seven years and is now director of the Victims Unit, said that "social leaders are being massacred".

Farc members have a justified fear that once they lay down their arms and enter civilian life they could also be targeted; looming over the process is the fate of the Patriotic Union party, a political party set up by the Farc during a previous attempt to make peace in 1984. Thousands of members of the party and other leftist movements were systematically hunted down and killed by rightwing paramilitaries.

Germán worries history could repeat itself, but for now he is hopeful. He is hoping to become a certified physical therapist, expanding on the skills he learned in the Farc where he helped wounded comrades in rehabilitation through exercise massage and acupuncture.

"Let's see if they let us," he said.

## As 2021 unfolds ...

... we have a small favour to ask. Through these turbulent and challenging times, millions rely on the Guardian for independent journalism that stands for truth and integrity. Readers chose to support us financially more than 1.5 million times in 2020, joining existing supporters in 180 countries.

For 2021, we're committing to another year of high-impact reporting that can counter misinformation and offer an authoritative, trustworthy source of news for everyone. With no shareholders or billionaire owner, we set our own agenda and provide independent journalism that's free from commercial and political influence. When it's never mattered more, we can investigate and challenge without fear or favour.

Unlike many others, we have never put up a paywall. We have chosen to keep Guardian journalism free and open for all readers, regardless of where they live or what they can afford to pay. We do this because we believe everyone deserves to read accurate news and thoughtful analysis.

In the last year alone, we offered readers a comprehensive, international perspective on critical events – from the Black Lives Matter protests, to the US presidential election, Brexit, and the ongoing pandemic. We enhanced our reputation for urgent, powerful reporting on the climate emergency, and made the decision to reject advertising from fossil fuel companies, divest from the oil and gas industries, and set a course to achieve net zero emissions by 2030.

If there were ever a time to join us, it is now. Every contribution, however big or small, powers our journalism and helps sustain our future. **Support the Guardian from as little as $1 – and it only takes a minute. Thank you.**

**Support the Guardian** →     ( **Remind me in April** )

## comments (24)

Sign in or create your Guardian account to join the discussion.

# Appendix F

# 1:20cv11738, Caballero V. Fuerzas Revolucionarias De Colombia The Norte De Valle Cartel

US District Court Docket

US District Court for the District of Massachusetts

(Boston)

**This case was retrieved on 09/23/2020**

## Header

| | |
|---|---|
| **Case Number:** 1:20cv11738 | **Class Code:** Closed |
| **Date Filed:** 09/23/2020 | **Closed:** 10/01/2020 |
| **Nature of Suit:** Other Statutory Actions (890) | **Statute:** 28:1331 |
| **Cause:** Federal Question: Enforcement of Judgment | **Jury Demand:** None |
| **Lead Docket:** None | **Demand Amount:** $0 |
| **Other Docket:** None | **NOS Description:** Other Statutory Actions |
| **Jurisdiction:** Federal Question | |

## Litigants

Antonio **_Caballero_**
**Plaintiff**

Fuerzas Revolucionarias de Colombia The Norte de Valle Cartel
**Defendant**

## Attorneys

James N. Doherty , Jr.
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Doherty Law Offices, LLC
Suite 308 800 Turnpike Street
North Andover, MA 01845
USA
978-689-9292    Fax: 978-689-9595
Email:Jim@dohertylawoffices.Com

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 09/25/2020 | COMPLAINT against Massachusetts Department of Motor Vehicles, Massachusetts Department of Revenue Child Support Division, filed by Ernest Preciado. (Attachments: # 1 Exhibit, # 2 Civil Cover Sheet, # 3 Category Form)(Baker, Casey) (Entered: 09/25/2020) | Events since last full update |
| 2 | 09/25/2020 | AFFIDAVIT in Support re 1 Complaint. (Baker, Casey) (Entered: 09/25/2020) | Events since last full update |

**A-17**

**Current on Bloomberg Law as of** 2021-02-22 19:46:32

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)**
**CIVIL DOCKET FOR CASE #: 2:20-cv-07602-JWH**

# Antonio Caballero v. Fuerzas Armadas Revolucionarias de Colombia et al

| | |
|---|---|
| **Date Filed:** | Aug 14, 2020 |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Assigned to:** | Judge John W. Holcomb |
| **Case in other court:** | USDC Southern District of Florida, 18-25337 KMM |
| **Cause:** | Civil Miscellaneous Case |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |
| **Related cases:** | 2:20-mc-00077 |

## Parties and Attorneys

| Plaintiff | Antonio Caballero | |
|---|---|---|
| **Representation** | **Joseph I Zumpano** | **Leon N. Patricios** |
| | *Zumpano Patricios PA* | *Zumpano Patricios PA* |
| | 312 Minorca Avenue | 312 Minorca Avenue |
| | Coral Gables, FL 33134 | Coral Gables, FL 33134 |
| | (305) 444-5565 | (305) 444-5565 |
| | Fax: (305) 444-8588 | Fax: (305) 444-8588 |
| | jzumpano@zplaw.com | lpatricios@zplaw.com |
| | PRO HAC VICE | PRO HAC VICE |
| | ATTORNEY TO BE NOTICED | ATTORNEY TO BE NOTICED |
| | **Richard Henderson Coombs ,** | **Darren J. Devlin** |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Antonio Caballero v. Fuerzas Armadas Revolucionarias de Colombia et al, Docket No. 2:20-mc-00077 (C.D. Cal. Au

**Current on Bloomberg Law as of** 2021-02-22 19:46:40

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)**
**CIVIL DOCKET FOR CASE #: 2:20-mc-00077**

# Antonio Caballero v. Fuerzas Armadas Revolucionarias de Colombia et al

| | |
|---|---|
| **Date Filed:** | Aug 14, 2020 |
| **Status:** | Closed |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Case in other court:** | USDC Southern District of Florida, 18-25337 KMM |
| **Cause:** | Civil Miscellaneous Case |
| **Date terminated:** | 2020-08-14 |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |
| **Related cases:** | 2:20-cv-07602-JWH |

# Parties and Attorneys

---

| **Plaintiff** | **Antonio Caballero** | |
|---|---|---|
| **Representation** | **Joseph I Zumpano** | **Leon N. Patricios** |
| | *Zumpano Patricios PA* | *Zumpano Patricios PA* |
| | 312 Minorca Avenue | 312 Minorca Avenue |
| | Coral Gables, FL 33134 | Coral Gables, FL 33134 |
| | (305) 444-5565 | (305) 444-5565 |
| | Fax: (305) 444-8588 | Fax: (305) 444-8588 |
| | jzumpano@zplaw.com | lpatricios@zplaw.com |
| | PRO HAC VICE | PRO HAC VICE |
| | ATTORNEY TO BE NOTICED | ATTORNEY TO BE NOTICED |

**Bloomberg Law** ®

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Case 4:21-cv-00140   Document 61   Filed on 08/13/21 in TXSD   Page 70 of 686

Antonio Caballero vs. The Norte de Valle Cartel, Fuerzas Armadas Revolucionarias de Colombia, Ejercito de Libe

**Current on Bloomberg Law as of** 2021-02-22 19:28:34

**Minnesota 4th Judicial District**
**Hennepin County**
**Docket for Case #: 27-CV-20-16663**

# Antonio Caballero vs. The Norte de Valle Cartel, Fuerzas Armadas Revolucionarias de Colombia, Ejercito de Liberacion Nacional

| | |
|---|---|
| **Date Filed:** | Dec 17, 2020 |
| **Case location:** | - Hennepin Civil |
| **Case Type:** | Foreign Judgment |

# Parties and Attorneys

---

**Plaintiff**  **Caballero, Antonio**
Coral Gables, FL 33134

   **Representation**  **GREGORY RONALD MERZ**
Retained
612-632-3000

---

**Defendant**  **Ejercito de Liberacion Nacional**

   **Representation**  **Pro Se**

---

**Defendant**  **Fuerzas Armadas Revolucionarias de Colombia**
Florence, CO 81226

   **Representation**  **Pro Se**

---

**Defendant**  **The Norte de Valle Cartel**

**Bloomberg Law** ®

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2021-02-22 19:51:54

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:20-mc-00249-AJN**

# Caballero v. Fuerzas Armadas Revolucionarias de Colombia et al

| | |
|---|---|
| **Date Filed:** | Jul 6, 2020 |
| **Status:** | Closed |
| **Assigned to:** | Judge Alison J. Nathan |
| **Cause:** | M 18-302 Registration of Foreign Judgment |
| **Date terminated:** | 2020-07-13 |

# Parties and Attorneys

---

| **Plaintiff** | **Antonio Caballero** | |
|---|---|---|
| **Representation** | **Charles Nicholas Rostow , I** | **Joseph I. Zumpano** |
| | *Zumpano Patricios & Popok* | *Zumpano Patricios, P.A.* |
| | 417 Fifth Avenue | 312 Minorca Avenue |
| | Ste 826 | Coral Gables, FL 33134 |
| | New York, NY 10001 | (305) 444-5565 |
| | (212) 381-9999 | Fax: (305) 444-8588 |
| | nrostow@zplaw.com | jzumpano@zplaw.com |
| | New York | LEAD ATTORNEY |
| | LEAD ATTORNEY | ATTORNEY TO BE NOTICED |
| | ATTORNEY TO BE NOTICED | |
| | | |
| | **Leon Patricios** | |
| | *Zumpano Patricios, P.A.* | |
| | 312 Minorca Avenue | |
| | Coral Gables, FL 33134 | |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2021-02-22 19:30:21

**US District Court Electronic Case Filing System**
**District of Utah (Central)**
**CIVIL DOCKET FOR CASE #: 2:20-mc-00845**

# Caballero v. Fuerzas Armadas Revolucionarias De Colombia et al

| | |
|---|---|
| **Date Filed:** | Nov 25, 2020 |
| **Status:** | Closed |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Case in other court:** | USDC Southern District of Florida, 1:18-cv-25337 |
| **Cause:** | Registration of Foreign Judgment |
| **Date terminated:** | 2020-11-25 |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |

# Parties and Attorneys

---

| **Plaintiff** | **Antonio Caballero** |
|---|---|
| **Representation** | **Bradley R. Helsten**<br>*ZUMPANO PATRICIOS*<br>*WINKER & HELSTEN LLC*<br>2061 E MURRAY HOLLADAY RD<br>HOLLADAY, UT 84117<br>(801) 839-5538<br>brad@helsten.com<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED |

---

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2021-02-22 19:30:12

**U.S. District Court**
**District of South Carolina (Columbia)**
**CIVIL DOCKET FOR CASE #: 3:20-cv-04283-MGL**

# Caballero v. Fuerzas Armadas Revolucionarias de Colombia et al

| | |
|---|---|
| **Date Filed:** | Dec 10, 2020 |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Assigned to:** | Honorable Mary Geiger Lewis |
| **Case in other court:** | Richland County Court of Common Pleas, 2020-CP-40-03495 |
| **Cause:** | Application for a Writ of Garnishment |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |
| **Related cases:** | 3:20-cv-04485-MGL |

# Parties and Attorneys

| | | |
|---|---|---|
| **Plaintiff** | **Antonio Caballero** | |
| **Representation** | **William Norman Nettles** | **Joseph Ignacio Zumpano** |
| | *Bill Nettles Law* | *Zumpano Patricios PA* |
| | 2008 Lincoln Street | 312 Minorca Avenue |
| | Columbia, SC 29201 | Coral Gables, FL 33134 |
| | (803) 814-2826 | (305) 444-5565 |
| | Fax: (888) 745-1381 | Fax: (305) 444-8588 |
| | bill@billnettleslaw.com | jzumpano@zplaw.com |
| | LEAD ATTORNEY | PRO HAC VICE |
| | ATTORNEY TO BE NOTICED | ATTORNEY TO BE NOTICED |
| | **Leon N Patricios** | |

Caballero v. Fuerzas Armadas Revolucionarias De Colombia et al, Docket No. 3:20-cv-04485 (D.S.C. Dec 29, 2020)

**Current on Bloomberg Law as of** 2021-02-22 19:23:30

**U.S. District Court**
**District of South Carolina (Columbia)**
**CIVIL DOCKET FOR CASE #: 3:20-cv-04485-MGL**

# Caballero v. Fuerzas Armadas Revolucionarias De Colombia et al

| | |
|---|---|
| **Date Filed:** | Dec 29, 2020 |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Assigned to:** | Honorable Mary Geiger Lewis |
| **Case in other court:** | Richland County Common Pleas, 2020-CP-40-03495 |
| **Cause:** | Application for a Writ of Garnishment |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |
| **Related cases:** | 3:20-cv-04283-MGL |

# Parties and Attorneys

---

| **Plaintiff** | **Antonio Caballero** | |
|---|---|---|
| **Representation** | **William Norman Nettles**<br>*Bill Nettles Law*<br>2008 Lincoln Street<br>Columbia, SC 29201<br>(803) 814-2826<br>Fax: (888) 745-1381<br>bill@billnettleslaw.com<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED | **Joseph Ignacio Zumpano**<br>*Zumpano Patricios PA*<br>312 Minorca Avenue<br>Coral Gables, FL 33134<br>(305) 444-5565<br>Fax: (305) 444-8588<br>jzumpano@zplaw.com<br>PRO HAC VICE<br>ATTORNEY TO BE NOTICED |
| | **Leon N Patricios** | |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Bloomberg Law**®

**Current on Bloomberg Law as of** 2021-02-22 19:47:02

**U.S. District Court**
**California Northern District (San Francisco)**
**CIVIL DOCKET FOR CASE #: 3:20-cv-06019**

# Caballero v. Fuerzas Armadas Revolucionarias de Colombia et al

| | |
|---|---|
| **Date Filed:** | Aug 27, 2020 |
| **Status:** | Closed |
| **Nature of suit:** | 360 P.I.: Other |
| **Case in other court:** | Southern District of Florida, 18-cv-25337 |
| **Cause:** | Civil Miscellaneous Case |
| **Date terminated:** | 2020-09-03 |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |

# Parties and Attorneys

---

**Plaintiff**          **Antonio Caballero**

    **Representation**

**Joseph I Zumpano**
312 Minorca Ave
Coral Gables, FL 33134
(305) 444-5565
jzumpano@zplaw.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Leon N Patricios**
*Zumpano Patricios, PA*
312 Minorca Ave
Coral Gables, FL 33134
(305) 444-5565
lpatricios@zplaw.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Darren John Devlin**
*Law Offices of Darren J. Devlin*

Antonio Caballero vs. Fuerzas Armadas Revolucionarias de Colombia a/k/a FARC-EP a/k/a Revolutionary Armed Forc

**Current on Bloomberg Law as of** 2021-02-09 10:29:17

**Minnesota 4th Judicial District**
**Hennepin County**
**Docket for Case #: 27-CV-19-16374**

# Antonio Caballero vs. Fuerzas Armadas Revolucionarias de Colombia a/k/a FARC-EP a/k/a Revolutionary Armed Forces of Colombia, Ejercito de Liberacion Nacional a/k/a ELN a/k/a National Liberation Army, The Norte de Valle Cartel

| | |
|---|---|
| **Date Filed:** | Sep 27, 2019 |
| **Case location:** | - Hennepin Civil |
| **Case Type:** | Foreign Judgment |

# Parties and Attorneys

| | | |
|---|---|---|
| **Plaintiff** | | **Caballero, Antonio**<br>Coral Gables, FL 33134 |
| | **Representation** | **GREGORY RONALD MERZ**<br>Retained<br>612-632-3000 |
| **Defendant** | | **Ejercito de Liberacion Nacional** |
| **Defendant** | | **Fuerzas Armadas Revolucionarias de Colombia**<br>Florence, CO 81226 |
| **Defendant** | | **The Norte de Valle Cartel**<br>Hopewell, VA 23860 |

**Bloomberg Law**®

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2020-06-03 15:18:42

**U.S. District Court**
**U.S. District of Minnesota (DMN)**
**CIVIL DOCKET FOR CASE #: 0:20-cv-01304**

# Caballero v. Fuerzas Armadas Revolucionarias de Colombia

| | |
|---|---|
| **Date Filed:** | Jun 3, 2020 |
| **Nature of suit:** | 999 Miscellaneous civil case |
| **Case in other court:** | Southern District of Florida, 1:18-cv-25337-KMM |
| **Cause:** | Civil Miscellaneous Case |
| **Jurisdiction:** | Federal Question |

# Parties and Attorneys

---

| **Plaintiff** | **Antonio Caballero** |
|---|---|
| **Representation** | **Gregory R Merz** |
| | *Lathrop GPM LLP* |
| | 80 S 8th St |
| | Ste 500 IDS Center |
| | Minneapolis, MN 55402 |
| | (612) 632-3000 |
| | gregory.merz@lathropgpm.com |
| | ATTORNEY TO BE NOTICED |

---

| **Defendant** | **Fuerzas Armadas Revolucionarias de Colombia** |
|---|---|

# Notes

Proceedings for case 0:20-cv-01304 are not available

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2020-06-04 10:04:05

**U.S. District Court**
**U.S. District of Minnesota (DMN)**
**CIVIL DOCKET FOR CASE #: 0:20-mc-00045**

# Caballero v. Fuerzas Armadas Revolucionarias de Colombia

| | |
|---|---|
| **Date Filed:** | Jun 4, 2020 |
| **Nature of suit:** | 999 Miscellaneous civil case |
| **Case in other court:** | Southern District of Florida, 1:18-cv-25337-KMM |
| **Cause:** | Civil Miscellaneous Case |
| **Jurisdiction:** | Federal Question |

# Parties and Attorneys

---

**Plaintiff**           **Antonio Caballero**

**Representation**      **Gregory R Merz**
*Lathrop GPM LLP*
80 S 8th St
Ste 500 IDS Center
Minneapolis, MN 55402
(612) 632-3000
gregory.merz@lathropgpm.com
ATTORNEY TO BE NOTICED

---

**Defendant**          **Fuerzas Armadas Revolucionarias de Colombia**

# Docket Entries

Numbers shown are court assigned numbers.

**Current on Bloomberg Law as of** 2020-08-31 12:20:38

**United States District Court**
**District of Puerto Rico (San Juan)**
**CIVIL DOCKET FOR CASE #: 3:20-cv-01452**

# Caballero v. Fuerzas Armadas Revolucionarias de Colombia

| | |
|---|---|
| **Date Filed:** | Aug 31, 2020 |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Cause:** | Registration of Foreign Judgment |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |

# Parties and Attorneys

---

**Plaintiff**     **Antonio Caballero**

   **Representation**     **Harold D. Vicente-Colon**
*Vicente & Cuebas*
P. O. BOX 11609
San Juan, PR 00910-1609
(787) 751-8000
Fax: (787) 756-5250
hdvc@vclawpr.com
ATTORNEY TO BE NOTICED

---

   **Defendant**     **Fuerzas Armadas Revolucionarias de Colombia**

# Docket Entries

Numbers shown are court assigned numbers.

**Current on Bloomberg Law as of** 2020-09-02 13:20:37

**United States District Court**
**District of Puerto Rico (San Juan)**
**CIVIL DOCKET FOR CASE #: 3:20-cv-01458**

# caballero v. Fuerzas Armadas Revolucionarias de Colombia

| | |
|---|---|
| **Date Filed:** | Sep 2, 2020 |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Cause:** | Civil Miscellaneous Case |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |

# Parties and Attorneys

---

| | |
|---|---|
| **Plaintiff** | **antonio caballero** |
| **Representation** | **Harold D. Vicente-Colon**<br>*Vicente & Cuebas*<br>P. O. BOX 11609<br>San Juan, PR 00910-1609<br>(787) 751-8000<br>Fax: (787) 756-5250<br>hdvc@vclawpr.com<br>ATTORNEY TO BE NOTICED |

---

| | |
|---|---|
| **Defendant** | **Fuerzas Armadas Revolucionarias de Colombia** |

# Docket Entries

Numbers shown are court assigned numbers.

**Bloomberg Law**®

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2021-02-22 19:26:02

**U.S. District Court**
**District of Connecticut (New Haven)**
**CIVIL DOCKET FOR CASE #: 3:20-cv-01939-RNC**

# Caballero v. Fuerzas Armadas Revolucionarias De Colombia

| | |
|---|---|
| **Date Filed:** | Dec 22, 2020 |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Assigned to:** | Judge Robert N. Chatigny |
| **Case in other court:** | 3:20-mc-00090 |
| **Cause:** | Registration of Foreign Judgment |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |

# Parties and Attorneys

**Plaintiff**          **Antonio Caballero**

**Representation**     **Houston Putnam Lowry**          **Joseph I. Zumpano**
*Ford & Paulekas, LLP*                                   *Zumpano Patricios, P.A.*
280 Trumbull Street-Suite 2200                           312 Minorca Avenue
Ste 2200                                                 Coral Gables, FL 33134
Hartford, CT 06103                                       (305) 444-5565
(860) 808-4213                                           Fax: (305) 444-8588
Fax: (860) 249-7500                                      jzumpano@zplaw.com
ptl@hplowry.com                                          LEAD ATTORNEY
LEAD ATTORNEY                                            ATTORNEY TO BE NOTICED
ATTORNEY TO BE NOTICED

**Leon Patricios**
*Zumpano Patricios, P.A.*
312 Minorca Avenue

**Bloomberg Law**® © 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Case 4:21-cv-00140   Document 61   Filed on 08/13/21 in TXSD   Page 82 of 686

Caballero v. Fuerzas Armadas Revolucionarias De Colombia, Docket No. 3:20-mc-00090 (D. Conn. Oct 16, 2020), Co

**Current on Bloomberg Law as of** 2021-02-22 19:40:23

**U.S. District Court**
**District of Connecticut (New Haven)**
**CIVIL DOCKET FOR CASE #: 3:20-mc-00090-RNC**

# Caballero v. Fuerzas Armadas Revolucionarias De Colombia

| | |
|---|---|
| **Date Filed:** | Oct 16, 2020 |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Assigned to:** | Judge Robert N. Chatigny |
| **Case in other court:** | 3:20-cv-01939 |
| **Cause:** | Registration of Foreign Judgment |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |

# Parties and Attorneys

---

| **Plaintiff** | **Antonio Caballero** | |
|---|---|---|
| **Representation** | **Houston Putnam Lowry** | **Joseph I. Zumpano** |
| | *Ford & Paulekas, LLP* | *Zumpano Patricios, P.A.* |
| | 280 Trumbull Street-Suite 2200 Ste 2200 | 312 Minorca Avenue |
| | Hartford, CT 06103 | Coral Gables, FL 33134 |
| | (860) 808-4213 | (305) 444-5565 |
| | Fax: (860) 249-7500 | Fax: (305) 444-8588 |
| | ptl@hplowry.com | jzumpano@zplaw.com |
| | LEAD ATTORNEY | LEAD ATTORNEY |
| | ATTORNEY TO BE NOTICED | ATTORNEY TO BE NOTICED |
| | | |
| | **Leon Patricios** | |
| | *Zumpano Patricios, P.A.* | |
| | 312 Minorca Avenue | |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2021-02-22 19:40:30

**United States District Court**
**District of Puerto Rico (San Juan)**
**CIVIL DOCKET FOR CASE #: 3:20-mc-00293-JAG**

# Caballero v. Fuerzas Armadas Revolucionarias de Colombia

| | |
|---|---|
| **Date Filed:** | Sep 1, 2020 |
| **Assigned to:** | Judge Jay A. Garcia-Gregory |
| **Case in other court:** | Southern District of Florida, 18-25337 |
| | KMM |
| **Cause:** | Civil Miscellaneous Case |

# Parties and Attorneys

---

**Plaintiff**                    **Antonio Caballero**

**Representation**

| **Harold D. Vicente-Colon** | **Joseph I. Zumpano** |
|---|---|
| *Vicente & Cuebas* | *Zumpano Patricios, P.A.* |
| P. O. BOX 11609 | 312 Minorca Avenue |
| San Juan, PR 00910-1609 | Coral Gables, FL 33134 |
| (787) 751-8000 | (305) 444-5565 |
| Fax: (787) 756-5250 | Fax: (305) 444-8588 |
| hdvc@vclawpr.com | jzumpano@zplaw.com |
| LEAD ATTORNEY | LEAD ATTORNEY |
| ATTORNEY TO BE NOTICED | PRO HAC VICE |
| | ATTORNEY TO BE NOTICED |

**Leon N. Patricios**
*Zumpano Patricios, P.A.*
312 Minorca Avenue,
Coral Gables, FL 33134
(305) 444-5565
Fax: (305) 444-8588
lpatricios@zplaw.com

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2021-02-22 19:30:29

**U.S. District Court**
**Middle District of Florida (Tampa)**
**CIVIL DOCKET FOR CASE #: 8:20-mc-00105-VMC-TGW**

# Caballero v. Fuerzas Armadas Revolucionarias de Colombia

| | |
|---|---|
| **Date Filed:** | Nov 23, 2020 |
| **Status:** | Closed |
| **Assigned to:** | Judge Virginia M. Hernandez Covington |
| **Case in other court:** | Southern District of Florida, 1:18-cv-25337-KMM |
| **Cause:** | Registration of Foreign Judgment |
| **Date terminated:** | 2020-11-23 |
| **Referred to:** | Magistrate Judge Thomas G. Wilson |

# Parties and Attorneys

| **Plaintiff** | **Antonio Caballero** | |
|---|---|---|
| **Representation** | **Joseph Ignacio Zumpano**<br>*Zumpano Patricios, P.A.*<br>312 Minorca Avenue<br>Coral Gables, FL 33134<br>(305) 444-5565<br>Fax: (305) 444-8588<br>jzumpano@zpwlaw.com<br>ATTORNEY TO BE NOTICED | **Leon N. Patricios**<br>*Zumpano, Patricios & Winker, PA*<br>312 Minorca Ave<br>Coral Gables, FL 33134<br>(305) 444-5565<br>Fax: (305) 444-8588<br>lpatricios@zpwlaw.com<br>ATTORNEY TO BE NOTICED |

| **Defendant** | **Fuerzas Armadas Revolucionarias de Colombia** |
|---|---|

**Bloomberg Law**®

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

// PAGE 1

A-34

**Current on Bloomberg Law as of** 2021-02-22 19:41:02

**U.S. District Court**
**California Northern District (Oakland)**
**CIVIL DOCKET FOR CASE #: 4:20-mc-80146-JST**

# Caballero v. Fuerzas Armadas Revolucionarias de Colombia, et al.

| | |
|---|---|
| **Date Filed:** | Aug 31, 2020 |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Assigned to:** | Judge Jon S. Tigar |
| **Cause:** | Civil Miscellaneous Case |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |

# Parties and Attorneys

---

**Plaintiff**          **Antonio Caballero**

**Representation**     **Darren John Devlin**            **Joseph I Zumpano**
                       *Law Offices of Jason C. Tatman,*  312 Minorca Ave
                       *A.P.C.*                           Coral Gables, FL 33134
                       5677 Oberlin Drive                 (305) 444-5565
                       Suite 210                          jzumpano@zplaw.com
                       San Diego, CA 92121                LEAD ATTORNEY
                       (844) 252-6972                     ATTORNEY TO BE NOTICED
                       Fax: (858) 348-4976
                       darren@resolutionfunding.net
                       LEAD ATTORNEY
                       ATTORNEY TO BE NOTICED

                       **Leon N Patricios**
                       *Zumpano Patricios, PA*

**Bloomberg Law** ®

**Current on Bloomberg Law as of** 2021-02-22 20:19:05

**U.S. DISTRICT COURT**
**U.S. District Court, Western District of New York (Buffalo)**
**CIVIL DOCKET FOR CASE #: 1:20-mc-00040-LJV**

# Caballero v. Fuerzas Armadas Revolucionarias De Coloumbia, et al

| | |
|---|---|
| **Date Filed:** | Sep 10, 2020 |
| **Assigned to:** | Hon. Lawrence J. Vilardo |
| **Case in other court:** | United States District Court - SDFL, 18-25337 |
| **Cause:** | No cause code entered |

# Parties and Attorneys

| | |
|---|---|
| **Plaintiff** | **Antonio Caballero** |

| | | |
|---|---|---|
| **Representation** | **Joseph I. Zumpano** | **Leon N. Patricios** |
| | *Zumpano Patricios, P.A.* | *Zumpano Patricios, P.A.* |
| | 312 Minorca Avenue | 312 Minorca Avenue |
| | Coral Gables, FL 33134 | Coral Gables, FL 33134 |
| | (305) 444-5565 | (305) 444-5565 |
| | Fax: (305) 444-8588 | Fax: (305) 444-8488 |
| | jzumpano@zplaw.com | lpatricios@zplaw.com |
| | PRO HAC VICE | PRO HAC VICE |
| | ATTORNEY TO BE NOTICED | ATTORNEY TO BE NOTICED |
| | | |
| | **Mitchell G. Mandell** | |
| | *Zumpano Patricios & Popok, PLLC* | |
| | 417 Fifth Avenue | |
| | Suite 826 | |
| | New York, NY 10016 | |
| | (212) 542-8125 | |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2021-02-22 20:19:30

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:20-cv-11061-ALC**

# Caballero v. Fuerzas Armadas Revolucionarias de Columbia et al

| | |
|---|---|
| **Date Filed:** | Dec 30, 2020 |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Assigned to:** | Judge Andrew L. Carter, Jr |
| **Case in other court:** | Supreme Court of the State of New York, 154864/2020 |
| **Cause:** | 28:1441nr Notice of Removal |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |

# Parties and Attorneys

| | |
|---|---|
| **Plaintiff** | **Antonio Caballero** |
| **Representation** | **Charles Nicholas Rostow , I** |
| | *Zumpano, Patricios & Popok PLLC* |
| | 417 Fifth Avenue |
| | Suite 826 |
| | New York, NY 10005 |
| | (212) 381-9914 |
| | nrostow@zplaw.com |
| | New York |
| | LEAD ATTORNEY |
| | ATTORNEY TO BE NOTICED |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Bloomberg Law** ®

**Current on Bloomberg Law as of** 2021-02-22 20:24:16

**U.S. District Court**
**District of South Dakota (Southern Division)**
**CIVIL DOCKET FOR CASE #: 4:19-cv-04011-KES**

# Caballero v. Fuerzas Armadas Revolucionarias de Columbia et al

| | |
|---|---|
| **Date Filed:** | Jan 18, 2019 |
| **Nature of suit:** | 150 Contract: Recovery of Overpayment & Enforcement of Judgment |
| **Assigned to:** | U.S. District Judge Karen E. Schreier |
| **Cause:** | 28:1331 Fed. Question |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |
| **Related cases:** | 4:19-cv-04141-KES |

# Parties and Attorneys

| Plaintiff | Antonio Caballero | |
|---|---|---|
| Representation | **James R. Myers** | **Joshua D. Zellmer** |
| | *Myers Billion, LLP* | *Myers Billion, LLP* |
| | PO Box 1085 | PO Box 1085 |
| | Sioux Falls, SD 57101-1085 | Sioux Falls, SD 57101-1085 |
| | (605) 336-3700 | (605) 336-3700 |
| | Fax: (605) 336-3786 | Fax: (605) 336-3786 |
| | jmyers@myersbillion.com | jzellmer@myersbillion.com |
| | LEAD ATTORNEY | LEAD ATTORNEY |
| | ATTORNEY TO BE NOTICED | ATTORNEY TO BE NOTICED |
| | **Charles Nicholas Rostow** | **Joseph I. Zumpano** |
| | *Zumpano Patricios & Popak,* | *Zumpano Patricios, P.A.* |

Case 4:21-cv-00140   Document 61   Filed on 08/13/21 in TXSD   Page 89 of 686

Caballero v. Fuerzas Armadas Revolutionarias de Colombia et al, Docket No. 0:20-cv-00492 (D. Minn. Feb 11, 202

**Current on Bloomberg Law as of** 2021-02-22 20:00:12

**U.S. District Court**
**U.S. District of Minnesota (DMN)**
**CIVIL DOCKET FOR CASE #: 0:20-cv-00492-ECT-ECW**

# Caballero v. Fuerzas Armadas Revolutionarias de Colombia et al

| | |
|---|---|
| **Date Filed:** | Feb 11, 2020 |
| **Nature of suit:** | 360 P.I.: Other |
| **Demand:** | $9,999,000 |
| **Assigned to:** | Judge Eric C. Tostrud |
| **Cause:** | 28:1332 Diversity-Personal Injury |
| **Jurisdiction:** | Diversity |
| **Jury demand:** | None |
| **Referred to:** | Magistrate Judge Elizabeth Cowan Wright |

# Parties and Attorneys

| **Plaintiff** | **Antonio Caballero** |
|---|---|
| **Representation** | **Gregory R Merz**<br>*Lathrop GPM LLP*<br>80 S 8th St<br>Ste 500 IDS Center<br>Minneapolis, MN 55402<br>(612) 632-3000<br>gregory.merz@lathropgpm.com<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Bloomberg Law**®

Case 4:21-cv-00140   Document 61   Filed on 08/13/21 in TXSD   Page 90 of 686

Caballero v. Fuerzas Revolucionarias de Colombia The Norte de Valle Cartel, Docket No. 1:20-mc-91476 (D. Mass.

**Current on Bloomberg Law as of** 2021-02-22 20:14:26

**United States District Court**
**District of Massachusetts (Boston)**
**CIVIL DOCKET FOR CASE #: 1:20-mc-91476-IT**

# Caballero v. Fuerzas Revolucionarias de Colombia The Norte de Valle Cartel

| | |
|---|---|
| **Date Filed:** | Sep 23, 2020 |
| **Nature of suit:** | 890 Other Statutory Actions |
| **Assigned to:** | Judge Indira Talwani |
| **Case in other court:** | USDC, Southern District of Florida, 18-cv-25337-KMM |
| **Cause:** | 28:1331 Federal Question: Enforcement of Judgment |
| **Jurisdiction:** | Federal Question |
| **Jury demand:** | None |

# Parties and Attorneys

| Plaintiff | Antonio Caballero | |
|---|---|---|
| **Representation** | **James N. Doherty , Jr.**<br>*Doherty Law Offices, LLC*<br>Suite 308<br>800 Turnpike Street<br>North Andover, MA 01845<br>(978) 689-9292<br>Fax: (978) 689-9595<br>jim@dohertylawoffices.com<br>LEAD ATTORNEY<br>ATTORNEY TO BE NOTICED | **Joseph I. Zumpano**<br>*Zumpano Patricios*<br>312 Minorca Avenue<br>Coral Gables, FL 33134<br>(305) 444-5565<br>lpatricios@zplaw.com<br>PRO HAC VICE<br>ATTORNEY TO BE NOTICED |
| | **Leon N. Patricios** | |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2021-02-19 22:05:53

**New York Supreme Court**
**New York County**
**Docket for Case # 154864/2020**

# CABALLERO, ANTONIO vs. FUERZAS ARMADAS

| | |
|---|---|
| **Date Filed:** | Jun 30, 2020 |
| **Status:** | Active |
| **Assigned to:** | LATIN, RICHARD G. |
| **Case Type:** | E-OTHER TORTS |
| **Action Description:** | MOTION |
| **Category:** | E-FILED GENERAL CASES |
| **Complexity:** | Standard, Computer Assigned |
| **Damages:** | Personal Injury |
| **Part:** | 46M |
| **Preference:** | General Preference |
| **RJI Entry Date:** | Jul 15, 2020 |
| **RJI Filed Date:** | Jun 30, 2020 |
| **RJI Type:** | E-FILING SUBMISSIONS CALENDAR |

# Parties and Attorneys

| | |
|---|---|
| **Plaintiff** | **CABALLERO, ANTONIO** |
| **Representation** | **ZUMPANO PATRICIOS & POPOK PLLC** |
| | 417 FIFTH AV., SUITE 826 |
| | NEW YORK, NY 10016 |
| | (212) 542-2564 |
| **Defendant** | **FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, A/K/** |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**Current on Bloomberg Law as of** 2019-10-07 16:14:23

**New York Supreme Court**
**New York County**
**Docket for Case # 159404/2018**

# CABALLERO, ANTONIO vs. FUERZAS ARMADAS

| | |
|---|---|
| **Date Filed:** | Oct 10, 2018 |
| **Status:** | Disposed |
| **Assigned to:** | PERRY, W. FRANC |
| **Case Type:** | E-OTHER TORTS |
| **Action Description:** | MOTION |
| **Category:** | E-FILED GENERAL CASES |
| **Complexity:** | Standard, Computer Assigned |
| **Damages:** | Personal Injury |
| **Disposition Date:** | Aug 9, 2019 |
| **Part:** | 23EFM |
| **Preference:** | General Preference |
| **RJI Entry Date:** | Oct 11, 2018 |
| **RJI Filed Date:** | Oct 10, 2018 |
| **RJI Type:** | EFSUBM |

# Parties and Attorneys

| | |
|---|---|
| **Plaintiff** | **CABALLERO, ANTONIO** |
| **Representation** | **PORZIO BROMBERG & NEWMAN, PC** 156 W 56TH ST, STE 803 NEW YORK, NY 10019 (212) 265-6888 |

# Appendix G

**Current on Bloomberg Law as of** 2021-02-05 10:56:25

**U.S. District Court**
**SOUTHERN DISTRICT OF TEXAS (Houston)**
**CIVIL DOCKET FOR CASE #: 4:20-mc-02719**

# v. Fuerzas Revolucionarias de Colombia The Norte de Valle Cartel

| | |
|---|---|
| **Date Filed:** | Sep 23, 2020 |
| **Assigned to:** | Judge Charles Eskridge |

# Parties and Attorneys

| | |
|---|---|
| **Debtor** | **Fuerzas Revolucionarias de Colombia The Norte de Valle Cartel** |

# Docket Entries

Numbers shown are court assigned numbers.

| Entry # | Filing Date | Description |
|---|---|---|
| 1 | Sep 23, 2020 | REGISTRATION of Foreign Judgment ( Filing fee $ 47 receipt number 0541-25244935.) filed by Antonio Caballero. (Attachments: # 1 Civil Cover Sheet)(Fasthoff, Henry) (Entered: 09/23/2020) |
| 2 | Sep 23, 2020 | MOTION for Leon Patricios to Appear Pro Hac Vice by Antonio Caballero, filed. Motion Docket Date 10/14/2020. (Fasthoff, Henry) (Entered: 09/23/2020) |
| 3 | Sep 23, 2020 | MOTION for Joseph Zumpano to Appear Pro Hac Vice by Antonio Caballero, filed. Motion Docket Date 10/14/2020. (Fasthoff, Henry) (Entered: 09/23/2020) |
| 4 | Sep 28, 2020 | ORDER granting 2 MOTION for Leon Patricios to Appear Pro Hac Vice (Signed by Judge Charles Eskridge) Parties notified.(jengonzalez, 4) (Entered: 09/28/2020) |
| 5 | Sep 28, 2020 | ORDER granting 3 MOTION for Joseph Zumpano to Appear Pro Hac Vice (Signed by Judge Charles Eskridge) Parties notified.(jengonzalez, 4) (Entered: 09/28/2020) |
| 6 | Jan 22, 2021 | NOTICE of Related Litigation by Antonio Caballero, filed. (Fasthoff, Henry) (Entered: 01/22/2021) |

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

# Appendix H

May 13, 2020, 6:00am | EDITOR'S PICK

# GLOBAL 2000

## The World's Largest Public Companies

By Andrea Murphy, Hank Tucker, Marley Coyne and Halah Touryalai.



**J**ust how enormous is the economic crisis caused by the COVID-19 pandemic? Forbes' 18th annual ranking of the world's 2,000 largest public companies illustrates the magnitude of the global shutdowns and serves as a warning for more trouble ahead in the coming months.

Most companies on this year's Global 2000 list have seen their market values drop considerably since last year, and woeful first-quarter

airlines, which saw demand drop lower than after 9/11. American Airlines, for instance, fell from No. 372 on the list to 967th after losing a staggering $2.2 billion in its first quarter.

Not all companies are being negatively affected by the pandemic, however. The biggest players in e-commerce—including Amazon, Alibaba and Walmart—have all experienced growth thanks to the rise in online shopping. All three moved up on this year's list.

On the financial front, the Industrial and Commercial Bank of China remained in the top spot for the eighth straight year with more than $4.3 trillion in assets. China's "big four" state-owned banks all wound up in this year's top 10. JPMorgan Chase is the largest U.S. company at No. 3, falling one spot from last year.

In other bright spots, the largest IPO of 2019, Saudi Aramco, debuted at No. 5 on the list, while Zoom and Slack (which both IPOed last year) have also been instant beneficiaries of the new work-from-home realities. Both companies made an inaugural appearance on the Global 2000—virtually overnight.

ADVERTISEMENT

◄ [_____] ►

# THE LIST: 2020 GLOBAL 2000

SEARCH BY COUNTRY/TERRITORY                                                SEARCH BY NAME

[                              ▼]                    OR                    [                            🔍]

| Rank | Company | Country/Territory | Sales | Profits |
|------|---------|-------------------|-------|---------|
| 1 | ICBC | China | $177.2 B | $45.3 B |
| 2 | China Construction Bank | China | $162.1 B | $38.9 B |
| 3 | JPMorgan Chase | United States | $142.9 B | $30 B |
| 4 | Berkshire Hathaway | United States | $254.6 B | $81.4 B |
| 5 | Agricultural Bank of China | China | $148.7 B | $30.9 B |
| 5 | Saudi Arabian Oil Company (Saudi Aramco) | Saudi Arabia | $329.8 B | $88.2 B |
| 7 | Ping An Insurance Group | China | $155 B | $18.8 B |
| 8 | Bank of America | United States | $112.1 B | $24.1 B |
| 9 | Apple | United States | $267.7 B | $57.2 B |
| 10 | Bank of China | China | $135.4 B | $27.2 B |
| 11 | AT&T | United States | $179.2 B | $14.4 B |
| 11 | Toyota Motor | Japan | $280.5 B | $22.7 B |
| 13 | Alphabet | United States | $166.3 B | $34.5 B |

| 13 | Microsoft | United States | $138.6 B | $46.3 B |

ADVERTISEMENT



| 16 | Samsung Electronics | South Korea | $197.6 B | $18.4 B |
| 17 | Wells Fargo | United States | $98.9 B | $14.3 B |
| 18 | Citigroup | United States | $104.4 B | $17.1 B |
| 19 | Walmart | United States | $524 B | $14.9 B |
| 20 | Verizon Communications | United States | $131.4 B | $18.4 B |
| 21 | Royal Dutch Shell | Netherlands | $311.6 B | $9.9 B |
| 22 | Amazon | United States | $296.3 B | $10.6 B |
| 23 | Volkswagen Group | Germany | $275.2 B | $12 B |
| 24 | UnitedHealth Group | United States | $246.3 B | $13.8 B |
| 25 | Allianz | Germany | $122.4 B | $8.9 B |
| 26 | China Merchants Bank | China | $58.4 B | $13.7 B |
| 27 | Comcast | United States | $108.7 B | $11.7 B |
| 28 | China Mobile | Hong Kong | $108.1 B | $15.5 B |
| 29 | Total | France | $176.2 B | $11.3 B |

ADVERTISEMENT

| 31 | Alibaba Group | China | $70.6 B | $24.7 B |
| 32 | Gazprom | Russia | $122.6 B | $22.7 B |
| 32 | PetroChina | China | $364.1 B | $6.6 B |
| 34 | Johnson & Johnson | United States | $82.8 B | $17.2 B |
| 35 | RBC | Canada | $50.9 B | $10 B |
| 36 | Walt Disney | United States | $74.8 B | $10.4 B |
| 37 | China Life Insurance | China | $103.7 B | $8.5 B |
| 38 | Intel | United States | $75.7 B | $22.7 B |
| 39 | Facebook | United States | $73.4 B | $21 B |
| 40 | CVS Health | United States | $256.8 B | $6.6 B |
| 41 | Nestlé | Switzerland | $93.1 B | $12.7 B |
| 42 | BNP Paribas | France | $128 B | $8.7 B |
| 43 | Nippon Telegraph & Tel | Japan | $109.6 B | $7.9 B |
| 44 | HSBC Holdings | United Kingdom | $67.2 B | $3.8 B |
| 45 | Bank of Communications | China | $66.6 B | $11.2 B |

| 46 | TD Bank Group | Canada | $44.8 B | $9.3 B |
| 47 | Goldman Sachs Group | United States | $53.9 B | $7.4 B |
| 48 | Morgan Stanley | United States | $53 B | $8.3 B |
| 49 | Pfizer | United States | $50.7 B | $15.8 B |
| 50 | Tencent Holdings | China | $54.6 B | $13.5 B |
| 51 | IBM | United States | $76.5 B | $9 B |
| 52 | Mitsubishi UFJ Financial | Japan | $60.1 B | $5.4 B |
| 53 | General Electric | United States | $99.9 B | $6.3 B |
| 53 | Rosneft | Russia | $126.9 B | $10.9 B |
| 55 | Santander | Spain | $89.2 B | $7.3 B |
| 56 | Anheuser-Busch InBev | Belgium | $52.3 B | $9.1 B |
| 57 | Industrial Bank | China | $50.2 B | $9.2 B |
| 58 | Reliance Industries | India | $84.8 B | $6.2 B |
| 58 | Sony | Japan | $79.2 B | $6 B |
| 60 | Sinopec | China | $369.2 B | $3.3 B |

| 61 | Chevron | United States | $140.1 B | $2.9 B |
| 62 | Siemens | Germany | $97.4 B | $5.9 B |
| 63 | Cigna | United States | $154.5 B | $4.9 B |
| 64 | AXA Group | France | $150 B | $4 B |
| 65 | Shanghai Pudong Development | China | $50 B | $8.6 B |
| 66 | AIA Group | Hong Kong | $40.9 B | $6.6 B |
| 66 | Softbank | Japan | $87.4 B | $2.9 B |
| 68 | Novartis | Switzerland | $48.6 B | $12.2 B |
| 69 | Deutsche Telekom | Germany | $90.1 B | $4.3 B |
| 70 | Petrobras | Brazil | $78.9 B | $10.2 B |
| 71 | Procter & Gamble | United States | $70.3 B | $5 B |
| 72 | Japan Post Holdings | Japan | $112.3 B | $4.7 B |
| 73 | LVMH Moët Hennessy Louis Vuitton | France | $60.1 B | $8 B |
| 74 | Roche Holding | Switzerland | $61.9 B | $13.6 B |
| 75 | BMW Group | Germany | $116.6 B | $5.5 B |

ADVERTISEMENT

| 76 | Zurich Insurance Group | Switzerland | $71.8 B | $4.1 B |
| 77 | CITIC | Hong Kong | $72.3 B | $6.9 B |
| 78 | Itaú Unibanco Holding | Brazil | $52 B | $6.9 B |
| 79 | China State Construction Engineering | China | $203 B | $6.1 B |
| 80 | MetLife | United States | $69 B | $5.9 B |
| 80 | Sumitomo Mitsui Financial | Japan | $48.4 B | $6.4 B |

Global 2000 - The World's Largest Public Companies 2020

| 83 | Honda Motor | Japan | $142.4 B | $4.3 B |
| 84 | Commonwealth Bank | Australia | $27.3 B | $7 B |
| 85 | Bank of Nova Scotia | Canada | $34.8 B | $6.4 B |
| 86 | Raytheon Technologies | United States | $77.1 B | $5.5 B |
| 87 | PepsiCo | United States | $68.2 B | $7.2 B |
| 88 | American Express | United States | $46.8 B | $5.5 B |
| 89 | General Motors | United States | $137.2 B | $6.7 B |
| 90 | China Minsheng Bank | China | $48.5 B | $7.8 B |

ADVERTISEMENT

| 91 | British American Tobacco | United Kingdom | $33 B | $7.3 B |
| 92 | Merck & Co. | United States | $47.9 B | $10.1 B |
| 93 | BHP Group | Australia | $45.8 B | $9.4 B |
| 94 | Oracle | United States | $39.8 B | $10.8 B |
| 95 | Brookfield Asset Management | Canada | $69.1 B | $2.8 B |
| 96 | Coca-Cola | United States | $37.2 B | $10 B |
| 97 | Enel | Italy | $86.6 B | $2.4 B |
| 97 | GlaxoSmithKline | United Kingdom | $44.7 B | $6.8 B |
| 99 | LukOil | Russia | $116.3 B | $9.9 B |
| 100 | China Vanke | China | $53.5 B | $5.6 B |

« PREVIOUS            NEXT »

Companies do not pay a fee for placement on the list, which is independently determined by Forbes.
Companies with listings in bold have paid a fee to do so.



Use Forbes logos and quotes in your marketing.

| Logo Licensing | Reprints/Plaques |
| --- | --- |
| Spreadsheet | Custom Profile |

ADVERTISEMENT

# INSIDE THE GLOBAL 2000

Global 2000 Highlights: Inside The Numbers Of The World's Largest Public Companies

**A-52**

America's Largest Public Companies In 2020: JPMorgan Chase Leads The Way

World's Largest Banks 2020: Mega-Sized Lenders Deal With Coronavirus Fallout

Case 4:21-cv-00140 Document 61 - Filed on 08/13/21 in TXSD Page 106 of 686

**World's Largest Technology Companies 2020: Apple Stays On Top, Zoom And Uber Debut**

**Saudi Aramco Debuts As World's Largest Oil Company While Industry Reels From Crisis**

World's Largest Retailers 2020: Walmart, Amazon Increase Lead Ahead Of The Pack

World's Largest Food And Restaurant Companies 2020: Nestle's Profit Soars

Case 4:21-cv-00140   Document 61 - Filed on 08/13/21 in TXSD   Page 108 of 686

**World's Largest Transportation Companies 2020: Coronavirus Devastates Major Airlines**

**As The Coronavirus Crisis Continues, These Are Europe's Largest Public Companies**

Medtronic, Abbott And Thermo Fisher Are The World's Largest Healthcare Companies In 2020

These Are The World's Largest Drug And Biotech Companies In The Coronavirus Era

Hotels Are Getting Crushed By Coronavirus. How Will They Recover?

Global 2000 Shows Nothing Can Stop Russia's Oil Beasts

Global 2000 - The World's Largest Public Companies 2020

IPOs Help Lift China To Another Record On Global 2000 List

India Punches Well Below Its Weight On Global 2000

Global 2000 - The World's Largest Public Companies 2020

World's Largest Media Companies 2020: Comcast And Disney Hold A Precarious Lead

World's Largest Apparel Companies 2020: LVMH On Top While Nike Gains Foothold

World's Largest Public Real Estate Companies 2020: Brookfield Keeps Top Spot

Global 2000: Coronavirus Pandemic Will Roil The Insurance Sector

All Eyes On Zoom: How The At-Home Era's Breakout Tool Is Coping With Surging Demand

Read More: It's Still Not Clear How Effective Gilead's Antiviral Remdesivir Is Against COVID-19

# METHODOLOGY

sales, profits, assets and market value. Our market value calculation is as of April 30, 2020, closing prices and includes all common shares outstanding.

We first create four separate lists of the 2000 biggest companies in each of the metrics: sales 2000, profits 2000, assets 2000, and market value 2000. Each of the lists has a minimum cutoff value in order for a company to qualify: sales of $4.79 billion, profits of $323.2 million, assets of $11.63 billion and a market value of $5.27 billion. A company needs to qualify for at least one of the lists in order to be eligible for the final Global 2000 ranking. This year about 3,600 companies were needed to fill out the four lists of 2000, each company qualifying for at least one of the lists. Each company receives a separate score for each metric based on where in ranks on the metric's 2000 list. If a company ranks below any metric's 2000 list cutoff (see above for minimum cutoff values), it receives a zero score for that metric. We add up all the scores for all four metrics (equally weighted) and compile a composite score for each company based on their rankings for sales, profits, assets and market value. We sort the companies in descending order by the highest composite score and then apply our Forbes Global 2000 rank. The highest composite score gets the highest rank.

All figures are consolidated and in U.S. dollars. We use the latest-12-months' financial data available to us. We rely heavily on the databases for all data, as well as the latest financial period available for our rankings (the final database screen was run in late-April). Many factors play into which financial period of data is available for the companies and used in our rankings: the timeliness of our data collection/screening and company reporting policies, country-specific reporting policies and the lag time between when a company releases its

ability using other data sources and available company financial statements.

Publicly traded subsidiaries for which the parent company consolidates figures are excluded from our list. For most countries, the accounting rules for the consolidation of a subsidiary is when the parent's ownership (control) of the subsidiaries stock is more than 50%. Some countries accounting rules allow for the consolidation of a subsidiary at less than 50% ownership.

# Forbes

© 2021 Forbes Media LLC. All Rights Reserved.

AdChoices     Privacy Statement     Terms and Conditions     Contact Us     Send Us Feedback     Jobs At Forbes

Reprints & Permissions     Forbes Press Room     Forbes Quote of the Day     Advertise

# Appendix I

Latest Analysis

s in Africa with

Keeping the faith: new issue of Offshore
Technology Focus out now

3 days

The
hist

4 da

Analysis

# Top ten companies by oil production

Umar Ali  |  14 May 2019 (Last Updated January 31st, 2020 07:38)

Oil and gas plays a hugely important role in the economies of many countries
around the world, which has led to oil and gas companies growing and becoming
more influential. Offshore Technology profiles the top ten largest companies by oil
production.



Offshore Technology explores the top ten companies by oil production. Credit: Saudi Aramco.

Share
Article 

Oil currently amounts for just under a third of the world's
energy, and oil companies have invested a great deal in
exploration and overseas projects to ensure they can

continue to help meet global energy demands.

About 6000 kinds of products and goods are also made from oil, ranging from household goods to pharmaceutical products and the automotive industry. This commercial utility means the demand for oil extends beyond the energy sector, and has ensured that oil companies have an important role throughout society.

# Largest oil companies by production: ranking the top ten

This significant impact on the energy and manufacturing sectors, among others, has made oil an important commodity for decades now.

But which companies are leading in this booming sector?

(The production statistics quoted in this feature come from GlobalData's analyst team and are for 2018.)

# 1) Saudi Aramco – 10,963,091bbl/day

The Saudi Arabian Oil Company, better known as Saudi Aramco, is the world leader in oil production with a production rate of over 10 million barrels of oil per day (mbbl/day).

The company has the world's second-largest proven crude oil reserves with 261.5 billion barrels of oil equivalent (BBOe), which accounts for about 10% of the world's crude oil supply.

Saudi Aramco is also one of the largest and most profitable companies in the world, with a net income of $111.1bn in 2018

A-66

companies in the world, with a net income of $111.1bn in 2018.

---

Poll   |

**Which has the most impact on the petrochemical industry in Asia?**

○ Fall in petrochemicals demand

○ Spending cuts for 2020

○ Project delays or cancellations

○ Slower growth among some of Asian economies

Submit

# 2) Rosneft – 42,17,780bbl/day

Russian integrated energy company Rosneft is the second-largest producer of oil in the world, as well as the world's largest publicly-traded petroleum company, with a production rate of over 4.2mbbl/day.

**THEMATIC REPORTS**

Are you worried about the pace of innovation in your industry?

GlobalData's TMT Themes 2021 Report tells you everything you need to know about disruptive tech themes and which companies are best placed to help you digitally transform your business.

**Find out more**

The company's proven hydrocarbon resources are around 41BBOe, with a number of exploration operations increasing Rosneft's resources in recent years.

Must Read



Top five offshore oil fields by remaining reserves

Rosneft is the third-largest company in Russia, and accounts for over 40% of Russia's crude and condensate production. These production levels are expected to continue through to 2021, bolstered by a number of discoveries and projects launched in 2018.

# 3) KPC – 3,412,203bbl/day

The state-owned Kuwait Petroleum Company (KPC) is the third-largest producer of oil in the world, with a production rate of over 3.4mbbl/day.

The company produces approximately 7% of the world's total crude oil, with proven reserves of about 111BBOe.

At the end of 2018, KPC announced an investment plan worth

approximately $115bn, as part of its intention to increase oil production to 4mbbl/day by 2020.

# 4) NIOC – 3,256,486bbl/day

The National Iranian Oil Company (NIOC) is an important company in the oil and gas market despite US-imposed sanctions on Iran, with a production rate of over 3.2mbbl/day.

While the sanctions placed on Iran due to the country's nuclear programme have deterred overseas investments in Iranian oil and gas, the NIOC continues to invest in exploration projects to utilise the 200 undeveloped oil and gas fields in the country.

# 5) CNPC – 2,981,246bbl/day

The state-owned China National Petroleum Company (CNPC) is the largest producer of oil in East Asia, with a production rate of just under 3mbbl/day.

CNPC is also one of the largest oil and gas companies by revenue, with revenues of $326bn The company ranked #4 in Forbes' Global Fortune 500 from 2017-2019.

The company's international diversification in recent years has contributed to its influence in the global energy market, even with the ongoing trade dispute between China and the US.

# 6) ExxonMobil – 2,294,701bbl/day

As a member of "Big Oil," American energy company ExxonMobil is one of the world's most influential companies

ExxonMobil is one of the world's most influential companies and the largest producer by oil in the US, with a production rate of 2.3mbbl/day.

ExxonMobil is also one the world's largest companies by revenue, with revenues of $244.3bn.

The company has recently expanded its global portfolio through a number of overseas exploration and production projects, in addition to increased production in the US.

## 7) Petrobras – 1,987,950bbl/day

Brazilian multinational Petroleo Brasiliero, better known as Petrobras, is the largest producer of oil in South America with a production rate of just under 2mbbl/day.

Petrobras is one of the most influential companies in the oil and gas industry, ranking at #73 in the 2018 Global Fortune 500.

While the company has struggled with corruption scandals and debt woes in recent years, Petrobras has shown signs of recovery and is involved in a number of planned exploration and production projects.

## 8) ADNOC – 1,973,135bbl/day

With a production rate of just under 2mbbl/day, the UAE's state-owned Abu Dhabi National Oil Company (ADNOC) is a significant player in the Organization of the Petroleum Exporting Countries (OPEC).

The company works with overseas contractors and multinationals to expand the UAE's offshore industry. Recently, this includes initiating exploration bidding rounds for blocks in the UAE and awarding a number of contracts to develop offshore oil and gas in the country.

**A-70**

develop offshore oil and gas in the country.

# 9) Chevron – 1,830,537bbl/day

American multinational Chevron was one of the "Seven Sisters" that dominated the global oil and gas industry from 1940-1970 and continues to be an influential company in modern markets, with a production rate of 1.8mbbl/day.

In April 2019 Chevron signed a deal to acquire hydrocarbon exploration company Anadarko for $50bn, but this merger deal is likely to be terminated following Occidental Petroleum's acquisition of Anadarko in May 2019.

# 10) Pemex – 1,813,360bbl/day

State-owned petroleum company Petroleo Mexicanos, better known as Pemex, is one of the largest companies in Latin America with a production rate of 1.8mbbl/day.

Although Pemex has had problems with debt in recent years, the company has invested in a number of operations over 2018 to mitigate its financial woes and boost its crude output.

---

**Related Companies**

---

### SiiTech
E-Navigation Solution for Offshore Platforms

28 Aug 2020



---

### Offshore Technical Compliance
Compliance Inspection and Training Services for the Oil and Gas Industry



Ranking the world's top oil companies by oil production

Gas Industry



## Pilgrim International

Bolting and Tensioning Equipment for the Offshore Industry



## Top 5 Most Read

Analysis   3 days

**Keeping the faith: new issue of Offshore Technology Focus out now**

1

Analysis   4 days

**BP and Chevron invest in Canadian geothermal technology**

2

Analysis   4 days

**The five most-fined companies in US oil and gas history**

3

News   5 days

**The American Petroleum Institute welcomes clean energy funding**

4

Analysis   6 days

**How has Covid-19 disrupted oilfield decommissioning?**

5

# Up Next

Analysis

**Keeping the faith: new issue of Offshore**

Analysis

**The five most-fined companies in US oil and gas**

Analysis

**How has Covid-19 disrupted oilfield**

Analysis

**Q&A: the outlook for oil and gas in Africa with the**

| Technology Focus out now | history | decommissioning? | African Energy Chamber |
|---|---|---|---|
| 18 Feb 2021 | 17 Feb 2021 | 16 Feb 2021 | 10 Feb 2021 |

Powered by GlobalData.

About Us          Editorial Approach          Contact Us          Terms and Conditions
Privacy Policy

© Copyright 2021 Verdict Media Limited.

# Appendix J

Shareholder structure



**8 (499) 517-88-99**   **8 (800) 500-11-00**   **8 (800) 200-10-70**   **8 (800) 500-25-45**      **For Visually Impaired**
Rosneft Contact Centre   Hotline for Rosneft Shareholders   Gas stations customers   Hot line of safety Rosneft
                         (Free Domestic Calls)   support Hotline                                   На Русском        Sitemap

Contact Us        Career at Rosneft

[                    ]            [ Select a section ]

ABOUT ROSNEFT | CORPORATE GOVERNANCE | BUSINESS | FOR INVESTORS AND SHAREHOLDERS | SUSTAINABLE DEVELOPMENT | NEWS ROOM

Corporate documents

Financial statements,
presentations, annual reports

LSE RNS disclosure

Investor calendar

Rosneft: Contributing to
Implementation of UN
Sustainable Development Goals

ESG

Equity

> Securities information
> **Shareholder structure**
> IPO
> Consolidation
> Share buyback

For Insiders

Shareholder's Personal Account

General shareholders' meeting

Dividends

Questions and answers for
shareholders

Investor tools

Contacts

Beware of fraud!

Search in Sections

RSS

Notifications

Calendar

Main page → For Investors and Shareholders → Equity → Shareholder structure

# Shareholder structure

Rosneft's Shareholders as of October 1, 2020*

|  | Number of Shares | Equity Stake, % |
|---|---|---|
| JSC ROSNEFTEGAZ[1] (shareholder) | 4,281,663,840 | 40.40 |
| BP Russian Investments Limited (shareholder) | 2,092,900,097 | 19.75 |
| QH Oil Investments LLC (shareholder) | 2,006,045,126 | 18.93 |
| National Settlement Depository (nominal shareholder central depository) | 1,105,907,848 | 10.43 |
| LLC RN-NeftKapitalInvest | 1,017,425,070 | 9.60 |
| LLC RN-Capital | 58,231,968 | 0.55 |
| Russian Federation (through the Federal Agency for State Property Management) (shareholder) | 1 | less than 0.01 |
| Other minority shareholders (incl. individuals and legal entities) | 36,003,867 | 0.34 |
| **Total** | **10,598,177,817** | **100** |

* – Information in accordance with the data from Rosneft's Shareholders Register.

1 – JSC ROSNEFTEGAZ is in 100% federal ownership. The Russian Government's direct share (through the Federal Agency for State Property Management) in Rosneft's equity is 0.000000009%.

In July 2006, Rosneft carried out listing of Global Depositary Receipts (GDRs) on the London Stock Exchange. Issue of GDRs, which certify rights in respect of ordinary shares of Rosneft, in accordance with foreign law, was carried out by J.P. Morgan Europe Limited. One Global Depositary Receipt is equivalent to one common share of Rosneft. As of October 1, 2020, GDRs were issued for 571 mln ordinary shares, which is 5.4% of total shares.

Rosneft management has no information about any shareholders with equity stakes exceeding 5% (all shareholders of Rosneft with equity stakes exceeding 5% of total issue), other than those listed above.

Information about the rights (including voting rights) granted by Rosneft ordinary shares are specified in Article 5.8 of the Company's Charter.

| « | January, 2021 | | | | | » |
|---|---|---|---|---|---|---|
| Mo | Tu | We | Th | Fr | Sa | Su |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**8 (800) 500-11-00**

Hotline for Rosneft shareholders
(Free Domestic Calls)

**8 (800) 200-10-70**

Gas stations customers
support Hotline

Select a section

Sitemap

About rosneft     Corporate governance     Business     For Investors and Shareholders     Sustainable Development     News room

© ROSNEFT, 2021     Find Us on Social Media:

На Русском     Formal Notice     Contact Us     Subscribe     About Project

# Appendix K

Board of Directors



**8 (499) 517-88-99**
Rosneft Contact Centre

**8 (800) 500-11-00**
Hotline for Rosneft Shareholders
(Free Domestic Calls)

**8 (800) 200-10-70**
Gas stations customers
support Hotline

**8 (800) 500-25-45**
Hot line of safety Rosneft

**For Visually Impaired**

На Русском          Sitemap

Contact Us          Career at Rosneft

Select a section

MOBILE APP
**ROSNEFT**
PETROL STATIONS

ABOUT ROSNEFT | **CORPORATE GOVERNANCE** | BUSINESS | FOR INVESTORS AND SHAREHOLDERS | SUSTAINABLE DEVELOPMENT | NEWS ROOM

Board of Directors

Committees of Board of Directors

Board of Directors Performance

Remuneration of Members of the
Board of Directors

Shares Held by the Members of
the Board of Directors and
Management Board

Management board

Risk Management and Internal
Control

Internal control and audit

Corporate documents

Search in Sections

RSS

Notifications

Calendar

February, 2021

| Mo | Tu | We | Th | Fr | Sa | Su |
|----|----|----|----|----|----|----|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |

Main page  →  Corporate governance  →  Board of Directors

## Board of Directors



**Gerhard Schroeder**
Chairman of the Board of
Directors of Rosneft,
Independent Director



**Igor Sechin**
Chief Executive Officer,
Chairman of the
Management Board, Deputy
Chairman of the Board of
Directors of Rosneft



**Matthias Warnig**
Deputy Chairman of the
Board of Directors of
Rosneft, Independent
Director



**Faisal Alsuwaidi**
Member of the Board of
Directors of Rosneft



**Hamad Rashid Al-
Mohannadi**
Member of the Board of
Directors of Rosneft



**Oleg Viyugin**
Member of the Board of
Directors of Rosneft,
Independent Director



**Robert Dudley**
Member of the Board of
Directors of Rosneft



**Bernard Looney**
Member of the Board of
Directors of Rosneft



**Alexander Novak**
Member of the Board of
Directors of Rosneft



**Maxim Oreshkin**
Member of the Board of
Directors of Rosneft



**Hans-Georg Rudloff**

Member of the Board of
Directors of Rosneft,

Independent Director

Members of Rosneft's Board of Directors are elected by the General Shareholders Meeting for a term until the close of the next Annual General Shareholders Meeting.

The procedure for the nomination by the shareholders of a candidate to the Company's Board of Directors is stipulated by clause № 53 of the federal law "On joint-stock companies" and by clause 9.6 of the Company's Charter.

Rosneft's Board of Directors consists of eleven members, and has a balanced combination of executive, non-executive, and independent directors.

The Board's principal role, powers, and functions, including the procedure for introduction of amendments to the agenda of Board's meeting, are regulated by the internal documents.

Information on Rosneft Corporate Secretary

---

**8 (800) 500-11-00**

Hotline for Rosneft shareholders
(Free Domestic Calls)

**8 (800) 200-10-70**

Gas stations customers
support Hotline

Select a section

Sitemap      About rosneft    Corporate governance    Business    For Investors and Shareholders    Sustainable Development    News room

© ROSNEFT, 2021    Find Us on Social Media:      На Русском    Formal Notice    Contact Us    Subscribe    About Project

# Appendix L



DEC 2, 2019 | USD 15

# OIL&GAS JOURNAL

International Petroleum News and Technology | www.ogj.com

ENDEAVOR
BUSINESS MEDIA

WORLDWIDE
REPORT

YPF TIGHT GAS PORE PRESSURE
ANGOLAN GINDUNGO CRUDE ASSAY
RSS, MUD MOTORS
MEXICO ENERGY DEVELOPMENT

A-78



LOGOUT

HOME  |  GENERAL INTEREST

# Worldwide reserves edge higher; oil production growth faded

According to OGJ's annual assessment, the world's proved oil reserves total 1.68 trillion bbl at yearend 2019, 0.6% higher than a year earlier.

**Author** — Conglin Xu,  Laura Bell

Dec 2nd, 2019

According to Oil & Gas Journal's annual assessment, the world's proved oil reserves total 1.68 trillion bbl at yearend 2019, 0.6% higher than a year earlier. Worldwide proved natural gas reserves are 7.25 quadrillion cf (quads), up from 7.14 quads reported in the previous year's survey.

OGJ data for oil reserves and production increasingly include natural gas liquids. Some countries' gas reserves changed to dry gas reserves after adding NGL reserves explicitly into oil reserves.

The published reserves figures rely on survey responses and official updates released by individual countries, which are not provided every year in many cases. OGJ changes its estimate for a country only when it receives evidence that a change is in order. Therefore, in a given reserves summary, a year-to-year change—or lack thereof—may not necessarily reflect a change that applies to the calendar year alone.

When the original oil data are reported in metric tons, OGJ converted the data to volume unit b/d by applying conversion factors suggested by the International Energy Agency for each country.

OGJ expects worldwide oil production in 2019 to average 94.4 million b/d vs. a 2018 average of 93.8 million b/d (+0.6%), with production cuts from the Organization of Petroleum Exporting Countries largely offsetting non-OPEC production growth. This compares with a nearly 3% increase seen in 2018.

**Reserves changes**

According to the 2019 China Mineral Resources Report (CMR), China's proved remaining oil reserves at yearend 2018 total 3.57 billion tons (26.15 billion bbl), a 0.9% growth from 3.54 billion tons at yearend 2017. China's remaining reserves for conventional natural gas, coalbed methane, and shale gas increased by 4.9%, 8.9% and 0.7%, respectively, from the previous year's levels. In total, China's gas reserves increased by 5% to 222.98 tcf.

According to the latest report from the Directorate General of Oil and Gas, Indonesia's proven oil reserves as of Jan. 1, 2018 totaled 3.15 billion bbl, down from 3.17 billion bbl a year ago. Its proven gas reserves declined from 100.4 tcf to 96 tcf.



According to the Norwegian Petroleum Directorate (NPD), at yearend 2018, Norway's proven oil reserves, including oil, condensate, and NGL, amounted to 8.45 billion bbl, an increase of 3% compared with the previous year (Norway's oil reserves at yearend 2017 was revised down by NPD). The increase was due to reserve growth on several producing fields, submission of the Plans for Development and Operation (PDO) for Johan Sverdrup construction phase 2 and Nova field. Norway's proven gas reserves at yearend 2018 declined to 57 tcf from 61 tcf at yearend 2017.

According to the Geological Survey of the Netherlands, the country's estimated natural gas reserves as of Jan. 1, 2019 amount to 6.9 tcf, down dramatically from the 24.5 tcf recorded a year earlier. This major reduction compared to Jan. 1, 2018 is due to the write-down of Groningen reserves. The oil reserves as of Jan. 1, 2019 amount to 114.5 million bbl, up from 74.2 million bbl a year ago.

According to the latest estimates from the UK Oil & Gas Authority, UK's proved oil reserves at yearend 2018 increased by 200 million bbl to 2.7 billion bbl. Proven gas reserves were little changed.

According to the Danish Energy Agency, Denmark's proved gas reserves increased to 1.043 tcf, compared to 968 bcf in last year's survey. Proved oil reserves also increased 3% to 441 million bbl.

Canadian conventional crude and condensate reserves are now estimated at 4.36 billion bbl, up 11% from a year ago, according to the latest evaluations by the Canadian Association of Petroleum Producers (CAPP). The latest evaluation of Canadian oil sands reserves remained unchanged at 163.5 billion bbl. Canadian gas reserves moved down again to 71.3 tcf from 72.4 tcf a year ago.

According to Pemex's hydrocarbon annual evaluations, as of Jan. 1, 2019, Mexico's estimated proved oil reserves totaled 5.78 billion bbl, down from 6.43 billion bbl as of Jan. 1, 2018. The current oil reserves consisted of 5.33 billion bbl of crude, 62.4 million bbl of condensate, and 390.8 million bbl of NGL. Mexico's proved dry gas reserves total 6.4 tcf, down from 6.6 tcf a year ago. Associated gas represents 59.9% of the total.

The latest estimates of Brazilian National Petroleum Agency (ANP) show that crude oil reserves in Brazil increased by 3% to 13.24 billion bbl in 2018, while its gas reserves continued to decline to an estimated 13.01 tcf.

According to the Argentinian Institute of Oil & Gas (IAPG), Argentina's proved crude oil reserves at yearend 2018 totaled 2.39 billion bbl, an increase of 18.4% from a year ago. Its proved gas reserves increased to 13.12 tcf from 12.55 tcf in the previous evaluation.

Colombia's crude oil reserves were up 9.9% to 1.96 billion bbl at yearend 2018. Gas reserves decreased 2.9% to 3.78 tcf. This according to the country's energy ministry.

**OPEC, Russia reserves**

The reserves figures reported for OPEC members are referenced from the organization's latest annual statistical bulletin.

Total proved crude oil reserves for the current OPEC members are largely flat from a year ago at 1,190 billion bbl and total natural gas reserves moved up slightly by 0.6% to 2,570 tcf.

OPEC's oil reserves account for 71% of the worldwide total and gas reserves account for 35% of the world's gas

LOGOUT

According to the Russian Ministry of Natural Resources, the volume of reserves proved up to A+B+C1 status in 2018 is 550 million tons of oil and 700 billion cu m (bcm) of gas. In 2017, 550 million tons of oil and 890 bcm of gas were proved up to A+B+C1 status.

The Minister of Energy Alexander Novak says that Russia's A+B+C1+C2 oil reserves amounted to 29 billion tons, but commercially recoverable reserves given the current fiscal system and oil prices are only 15 billion tons, or 109 billion bbl.

Meantime, many Russian oil and gas companies in recent years have released proven reserves under SEC and PRMS classifications with the help of foreign independent auditing companies. For example, Lukoil has proved oil reserves of 11.57 billion bbl (SEC classification) in Russia territory, compared to 11.4 billion bbl in 2017. Its proven gas reserves in Russia were around 16 tcf for both years. Rosneft reported its whole proven oil reserves to be 31.5 billion bbl (PRMS) for 2018, up from 22 billion bbl in 2017. Gazprom has proved gas reserves of 631.7 tcf in 2018 (PRMS), down from 644.6 tcf in 2017.

**US reserves**

Proved reserves of crude oil in the US increased by 19.5%, or 6.4 billion bbl, to 39.2 billion bbl at yearend 2017, according to the 2018 reserves report from the US Energy Information Administration. Proved lease condensate reserves increased 16% to 2.8 billion bbl at yearend 2017. Combined, US crude oil and lease condensate proved reserves increased by 6.8 billion bbl, or 19.2%, in 2017.

Texas saw the largest net increase in crude oil and lease condensate proved reserves (3.3 billion bbl) of all states in 2017—an increase of 24% from 2016. In 2017, the largest proved reserves gains were in the Permian basin of West Texas where operators developed the Wolfcamp/Bone Spring shale play within the Delaware basin and the Spraberry Trend Area of the Midland basin.

The second-largest net increase in crude oil and lease condensate proved reserves were in New Mexico (+1.0 billion bbl) in 2017—an increase of 62% from 2016. In eastern New Mexico operators developed the Wolfcamp shale play and the Bone Spring formation.

The US had 464.3 tcf of proved natural gas reserves as of December 31, 2017. US proved reserves of total natural gas (including natural gas plant liquids) increased by 123.2 tcf, or 36.1%.

The estimated volume of natural gas plant liquids contained in proved reserves of total natural gas increased from 14.7 billion bbl in 2016 to 19.2 billion bbl in 2017, a 30% increase.

US dry natural gas proved reserves increased from an estimated 322.2 tcf in 2016 to 438.5 tcf in 2017, an increase of 36%.

EIA is scheduled to release the yearend 2018 estimates of proved reserves in December. As OGJ went to press at the end of November and the figures were not yet available, OGJ made forecasts based on reserves information released by the OGJ150 companies.



LOGOUT

The strong worldwide oil production growth seen in 2018 halted in 2019. Oil production is expected to increase by only 0.6% this year, compared to a 2.7% increase in 2018. Oil production volumes are expected to average 94.4 million b/d vs. an estimated 2018 average of 93.8 million b/d.

OGJ forecasts that total OPEC oil production this year—including crude oil, condensate, and NGLs—will average 35.82 million b/d, down from 37.22 million b/d last year, due to OPEC+ supply cuts as well as massive losses in Iran and Venezuela due mostly to sanctions. Saudi Arabia's crude oil production could drop from 10.33 million b/d during 2018 to around 9.8 million b/d in 2019.

Russia's oil production is expected to average 11.45 million b/d this year, up 0.8% from the year-ago level. According to Russian Energy Minister Alexander Novak, seasonally higher gas production at the end of the year led to higher gas condensate production, which is included in the official crude oil statistics.

In the US, crude oil production is forecast to rise to 12.29 million b/d this year, up from 10.99 million b/d last year. Although overall US crude oil production continues to increase, the growth rate is slowing largely because of a decline in oil-directed rigs. US NGLs production is expected to increase to 4.9 million b/d, a gain of about 500,000 b/d from the year-ago level, thanks to higher gas production. Hence, total US oil supplies are forecast to reach 17.2 million b/d this year, compared to 15.35 million b/d in 2018.

Canadian oil production is expected to increase by 2% this year to 5.3 million b/d, thanks to relaxation of the cuts mandated by the Albertan government, additional pipeline capacity, and increased access to rail cars.

Underpinned by gains from new production units, including those in Buzios and Lula pre-salt fields in the Santos Basin, Brazilian oil production is set to increase by 5.8% to 2.85 million b/d this year. Brazil will also be a major source of global oil growth in 2020.

Norwegian oil output is expected to decline nearly 8% from last year due to field declines and heavy maintenance at Ekofisk. However, with support from Johan Sverdrup field and other projects coming online, Norwegian output in 2020 will post impressive gains, making Norway one of the largest contributors to global oil supply growth.

The fall of oil production in the Asia-Pacific region has been stabilized in 2019, mainly thanks to higher production from China. Oil production in China for 2019 will increase around 2% to 3.85 million b/d, thanks to a significant increase in upstream investment by China's largest producers. Australia's production is also expected to increase significantly. On the other hand, production from Malaysia and Indonesia are both declining.

# WORLDWIDE LOOK AT RESERVES AND PRODUCTION

| | ESTIMATED PROVED RESERVES | | | | OIL PRODUCTION | | |
| | Jan. 1, 2020 | | Jan. 1, 2019 | | Forecast | Change | Estimated |
| COUNTRY | Oil, [1] 1,000 bbl | Gas, bcf | Oil, [1] 1,000 bbl | Gas, bcf | 2019 1,000 b/d | from 2018 % | 2018 1,000 b/d |
|---|---|---|---|---|---|---|---|
| **ASIA-PACIFIC** | | | | | | | |
| Afghanistan . . . . . . . . . . . . . . . . . . . . | — | 1,750 | — | 1,750 | | | |
| Australia . . . . . . . . . . . . . . . . . . . . . . | 2,446,000 | 113,530 | 2,446,000 | 113,530 | 380.0 | 10.9 | 342.5 |
| Bangladesh . . . . . . . . . . . . . . . . . . . . | 28,000 | 4460 | 28,000 | 5,957 | 11.0 | (6.0) | 11.7 |
| Brunei . . . . . . . . . . . . . . . . . . . . . . . . | 1,100,000 | 9,200 | 1,100,000 | 9,200 | 117.0 | 5.0 | 111.4 |
| China . . . . . . . . . . . . . . . . . . . . . . . . . | 26,154,360 | 222,981 | 25,927,440 | 212,615 | 3,845.0 | 1.8 | 3,777.8 |
| China, Taiwan. . . . . . . . . . . . . . . . . . | 2,380 | 220 | 2,380 | 220 | 0.2 | 0.0 | 0.2 |
| India . . . . . . . . . . . . . . . . . . . . . . . . . | 4,423,006 | 47,306 | 4,423,006 | 47,306 | 816.0 | (3.1) | 842.0 |
| Indonesia . . . . . . . . . . . . . . . . . . . . . | 3,150,000 | 96,060 | 3,170,000 | 100,400 | 774.0 | (3.0) | 798.0 |
| Japan. . . . . . . . . . . . . . . . . . . . . . . . . | 44,115 | 738 | 44,115 | 738 | 11.2 | 1.8 | 11.0 |
| Malaysia . . . . . . . . . . . . . . . . . . . . . . | 3,600,000 | 41,765 | 3,600,000 | 41,765 | 660.0 | (5.7) | 700.0 |
| Myanmar . . . . . . . . . . . . . . . . . . . . . . | 139,000 | 22,500 | 139,000 | 22,500 | 11.0 | 0.0 | 11.0 |
| New Zealand . . . . . . . . . . . . . . . . . . . | 43,296 | 1,045 | 48,538 | 991 | 31.0 | 1.6 | 30.5 |
| Pakistan. . . . . . . . . . . . . . . . . . . . . . . | 334,830 | 11,257 | 342,830 | 14,190 | 89.0 | (2.2) | 91.0 |
| Papua New Guinea . . . . . . . . . . . . . . | 158,157 | 6,687 | 171,429 | 7,052 | 52.0 | 4.0 | 50.0 |
| Philippines . . . . . . . . . . . . . . . . . . . . | 138,500 | 3,480 | 138,500 | 3,480 | 14.3 | 10.9 | 12.9 |
| South Korea . . . . . . . . . . . . . . . . . . . | — | 250 | — | 250 | 0.5 | 0.0 | 0.5 |
| Thailand. . . . . . . . . . . . . . . . . . . . . . . | 292,600 | 6,058 | 322,500 | 6,410 | 224.0 | 0.0 | 224.0 |
| Vietnam . . . . . . . . . . . . . . . . . . . . . . . | 4,400,000 | 24,700 | 4,400,000 | 24,700 | 238.0 | (4.0) | 248.0 |
| **Total Asia-Pacific . . . . . . . . . . . . . . .** | **46,454,243** | **613,987** | **46,303,738** | **613,053** | **7,274.2** | **0.2** | **7,262.5** |
| **WESTERN EUROPE** | | | | | | | |
| Austria . . . . . . . . . . . . . . . . . . . . . . . | 37,000 | 197 | 38,000 | 219 | 12.7 | (4.5) | 13.3 |
| Denmark . . . . . . . . . . . . . . . . . . . . . . | 441,000 | 1,043 | 428,000 | 968 | 112.0 | (2.8) | 115.3 |
| France . . . . . . . . . . . . . . . . . . . . . . . | 55,855 | 283 | 61,719 | 290 | 14.7 | (8.1) | 16.0 |
| Germany . . . . . . . . . . . . . . . . . . . . . . | 102,240 | 1,003 | 113,040 | 1,222 | 38.0 | (7.3) | 41.0 |
| Greece . . . . . . . . . . . . . . . . . . . . . . . | 10,000 | 35 | 10,000 | 35 | 4.1 | 2.5 | 4.0 |
| Ireland . . . . . . . . . . . . . . . . . . . . . . . | — | 350 | — | 350 | | | |
| Italy . . . . . . . . . . . . . . . . . . . . . . . . . | 517,933 | 1,712 | 534,407 | 1,578 | 83.0 | (7.3) | 89.6 |
| Netherlands . . . . . . . . . . . . . . . . . . . | 114,474 | 6,922 | 74,220 | 24,533 | 20.0 | (13.0) | 23.0 |
| Norway . . . . . . . . . . . . . . . . . . . . . . . | 8,219,287 | 57,265 | 8,047,227 | 61,061 | 1,690.0 | (8.2) | 1,840.0 |
| Spain . . . . . . . . . . . . . . . . . . . . . . . . | 150,000 | 90 | 150,000 | 90 | 4.0 | 0.0 | 4.0 |
| Turkey . . . . . . . . . . . . . . . . . . . . . . . | 366,000 | 134 | 324,000 | 170 | 56.6 | 4.0 | 54.4 |
| United Kingdom . . . . . . . . . . . . . . . . | 2,700,000 | 6,380 | 2,500,000 | 6,380 | 1,103.0 | 2.3 | 1,078.0 |
| **Total Western Europe . . . . . . . . . . .** | **12,713,789** | **75,413** | **12,280,611** | **96,896** | **3,138.1** | **(4.3)** | **3,278.5** |
| **EASTERN EUROPE and FSU** | | | | | | | |
| Albania . . . . . . . . . . . . . . . . . . . . . . . | 150,000 | 201 | 168,332 | 201 | 15.0 | (3.8) | 15.6 |
| Azerbaijan . . . . . . . . . . . . . . . . . . . . | 7,000,000 | 45,000 | 7,000,000 | 35,000 | 772.0 | (3.3) | 798.5 |
| Belarus . . . . . . . . . . . . . . . . . . . . . . . | 198,000 | 100 | 198,000 | 100 | 34.0 | 3.0 | 33.0 |
| Bulgaria . . . . . . . . . . . . . . . . . . . . . . | 15,000 | 200 | 15,000 | 200 | 1.0 | 0.0 | 1.0 |
| Croatia . . . . . . . . . . . . . . . . . . . . . . . | 71,000 | 880 | 71,000 | 880 | 15.0 | 0.0 | 15.0 |
| Czech Republic . . . . . . . . . . . . . . . . . | 15,000 | 140 | 15,000 | 140 | 2.0 | 0.0 | 2.0 |
| Georgia . . . . . . . . . . . . . . . . . . . . . . . | 35,000 | 300 | 35,000 | 300 | 0.4 | 0.0 | 0.4 |
| Hungary. . . . . . . . . . . . . . . . . . . . . . . | 18,300 | 212 | 20,400 | 202 | 25.0 | 11.1 | 22.5 |
| Kazakhstan . . . . . . . . . . . . . . . . . . . . | 30,000,000 | 85,000 | 30,000,000 | 85,000 | 1,956.0 | 0.0 | 1,956.0 |
| Kyrgyzstan . . . . . . . . . . . . . . . . . . . . | 40,000 | 200 | 40,000 | 200 | 1.0 | 0.0 | 1.0 |
| Lithuania . . . . . . . . . . . . . . . . . . . . . | 12,000 | — | 12,000 | — | 2.0 | 0.0 | 2.0 |
| Poland . . . . . . . . . . . . . . . . . . . . . . . | 119,000 | 3,178 | 124,000 | 3,120 | 21.0 | (4.5) | 22.0 |
| Romania . . . . . . . . . . . . . . . . . . . . . . | 600,000 | 3,725 | 600,000 | 3,725 | 73.0 | 0.0 | 73.0 |
| Russia . . . . . . . . . . . . . . . . . . . . . . . | 80,000,000 | 1,688,228 | 80,000,000 | 1,688,228 | 11,450.0 | 0.8 | 11,357 |
| Serbia . . . . . . . . . . . . . . . . . . . . . . . | 77,500 | 1,700 | 77,500 | 1,700 | 17.0 | (6.8) | 18.3 |
| Slovakia . . . . . . . . . . . . . . . . . . . . . . | 9,000 | 500 | 9,000 | 500 | — | — | — |
| Tajikistan . . . . . . . . . . . . . . . . . . . . . | 12,000 | 200 | 12,000 | 200 | 0.2 | 0.0 | 0.2 |
| Turkmenistan . . . . . . . . . . . . . . . . . . | 600,000 | 350,000 | 600,000 | 265,000 | 277.0 | 0.2 | 276.5 |
| Ukraine . . . . . . . . . . . . . . . . . . . . . . . | 395,000 | 39,000 | 395,000 | 39,000 | 54.4 | 7.7 | 50.5 |
| Uzbekistan. . . . . . . . . . . . . . . . . . . . . | 594,000 | 65,000 | 594,000 | 65,000 | 54.0 | (0.5) | 54.3 |
| **Total Eastern Europe and FSU . . . . . .** | **119,960,800** | **2,283,765** | **119,986,232** | **2,188,696** | **14,770.0** | **0.5** | **14,698.7** |
| **MIDDLE EAST** | | | | | | | |
| Bahrain . . . . . . . . . . . . . . . . . . . . . . . | 94,600 | 6,800 | 108,000 | 7,400 | 51.0 | 0.0 | 51.0 |
| Iran . . . . . . . . . . . . . . . . . . . . . . . . . . | 155,600,000 | 1,197,109 | 155,600,000 | 1,193,966 | 3,440.0 | (22.7) | 4,448.0 |
| Iraq . . . . . . . . . . . . . . . . . . . . . . . . . . | 145,019,000 | 131,686 | 147,223,000 | 132,220 | 4,800.0 | 3.7 | 4,630.0 |
| Israel . . . . . . . . . . . . . . . . . . . . . . . . | 12,730 | 6,216 | 12,730 | 6,216 | 1.0 | 0.0 | 1.0 |

| | ESTIMATED PROVED RESERVES | | | | OIL PRODUCTION | | |
| | Jan. 1, 2020 | | Jan. 1, 2019 | | Forecast | Change | Estimated |
| COUNTRY | Oil,[1]<br>1,000 bbl | Gas,<br>bcf | Oil,[1]<br>1,000 bbl | Gas,<br>bcf | 2019<br>1,000 b/d | from 2018<br>% | 2018<br>1,000 b/d |
|---|---|---|---|---|---|---|---|
| Jordan | 1,000 | 213 | 1,000 | 213 | — | — | — |
| Kuwait* | 101,500,000 | 63,000 | 101,500,000 | 63,000 | 2,970.0 | 2.0 | 2,912.0 |
| Oman | 5,373,000 | 31,218 | 5,373,000 | 31,218 | 982.0 | (0.4) | 986.0 |
| Qatar | 25,244,000 | 842,098 | 25,244,000 | 842,627 | 1,820.0 | 2.8 | 1,770.0 |
| Saudi Arabia* | 267,026,000 | 320,257 | 266,260,000 | 307,747 | 12,000.0 | (2.5) | 12,314.0 |
| Syria | 2,500,000 | 8,500 | 2,500,000 | 8,500 | 30.0 | 0.0 | 30.0 |
| United Arab Emirates | 97,800,000 | 215,098 | 97,800,000 | 215,098 | 3,980.0 | 5.6 | 3,770.0 |
| Yemen | 3,000,000 | 16,900 | 3,000,000 | 16,900 | 40.0 | 0.0 | 40.0 |
| **Total Middle East** | **803,170,330** | **2,839,094** | **804,621,730** | **2,825,105** | **30,114.0** | **(2.7)** | **30,952.0** |
| **AFRICA** | | | | | | | |
| Algeria | 12,200,000 | 159,054 | 12,200,000 | 159,054 | 1,567.0 | (0.5) | 1,575.0 |
| Angola | 8,160,000 | 13,525 | 8,384,000 | 14,913 | 1,543.0 | (6.8) | 1,656.0 |
| Benin | 8,000 | 40 | 8,000 | 40 | — | — | — |
| Cameroon | 200,000 | 4,770 | 200,000 | 4,770 | 69.0 | 0.0 | 69.0 |
| Chad | 1,500,000 | — | 1,500,000 | — | 128.0 | (3.0) | 132.0 |
| Congo | 2,982,000 | 10,064 | 2,982,000 | 10,064 | 360.0 | (1.9) | 367.0 |
| Egypt | 3,300,000 | 63,000 | 3,300,000 | 63,000 | 660.0 | (1.2) | 668.0 |
| Equatorial Guinea | 1,100,000 | 5,015 | 1,100,000 | 5,121 | 160.0 | (13.0) | 184.0 |
| Ethiopia | 428 | 880 | 428 | 880 | — | — | — |
| Gabon | 2,000,000 | 918 | 2,000,000 | 918 | 201.0 | 3.1 | 195.0 |
| Ghana | 660,000 | 800 | 660,000 | 800 | 193.0 | 11.6 | 173.0 |
| Ivory Coast | 100,000 | 1,000 | 100,000 | 1,000 | 30.0 | 0.0 | 30.0 |
| Libya | 48,363,000 | 53,144 | 48,363,000 | 53,144 | 1,140.0 | 5.9 | 1,076.0 |
| Mauritania | 20,000 | 1,000 | 20,000 | 1,000 | 5.0 | 0.0 | 5.0 |
| Morocco | 684 | 51 | 684 | 51 | — | — | — |
| Mozambique | — | 100,000 | — | 100,000 | — | — | — |
| Namibia | — | 2,200 | — | 2,200 | — | — | — |
| Niger | 150,000 | — | 150,000 | — | — | — | — |
| Nigeria | 36,972,000 | 200,407 | 36,182,000 | 198,707 | 2,065.0 | 1.2 | 2,040.0 |
| Rwanda | — | 2,000 | — | 2,000 | — | — | — |
| Somalia | — | 200 | — | 200 | — | — | — |
| South Africa | 15,000 | — | 15,000 | — | 2.0 | 0.0 | 2.0 |
| Sudan and South Sudan | 5,000,000 | 3,000 | 5,000,000 | 3,000 | 251.0 | 13.6 | 221.0 |
| Tanzania | — | 230 | — | 230 | — | — | — |
| Tunisia | 425,000 | 2,300 | 425,000 | 2,300 | 41.5 | 0.0 | 41.5 |
| Uganda | 2,500,000 | 500 | 2,500,000 | 500 | — | — | — |
| **Total Africa** | **125,656,112** | **624,099** | **125,090,112** | **623,893** | **8,415.5** | **(0.2)** | **8,434.5** |
| **WESTERN HEMISPHERE** | | | | | | | |
| Argentina | 2,388,841 | 13,121 | 2,016,761 | 12,553 | 603.0 | 1.9 | 592.0 |
| Barbados | 2,123 | 5 | 2,356 | 5 | 0.7 | 0.0 | 0.7 |
| Belize | 6,700 | — | 6,700 | — | 2.0 | 0.0 | 2.0 |
| Bolivia | 240,900 | 10,700 | 211,450 | 10,450 | 74.0 | 0.0 | 74.0 |
| Brazil | 13,238,530 | 13,011 | 12,835,060 | 13,063 | 2,850.0 | 5.8 | 2,693.0 |
| Canada | 167,896,000 | 71,267 | 167,401,306 | 73,933 | 5,300.0 | 1.9 | 5,200.0 |
| Chile | 150,000 | 3,460 | 150,000 | 3,460 | 3.0 | 0.0 | 3.0 |
| Colombia | 1,960,000 | 3,783 | 1,782,208 | 3,896 | 896.0 | 3.4 | 866.5 |
| Cuba | 124,000 | 2,500 | 124,000 | 2,500 | 50.0 | 0.0 | 50.0 |
| Ecuador | 8,273,000 | 385 | 8,273,000 | 385 | 529.0 | 1.7 | 520.0 |
| Guatemala | 89,415 | — | 91,633 | — | 9.7 | 1.0 | 9.6 |
| Mexico | 5,786,100 | 6,398 | 6,427,000 | 6,593 | 1,900.0 | (7.9) | 2,063.0 |
| Peru | 985,060 | 12,880 | 1,224,625 | 16,091 | 136.0 | 1.5 | 134.0 |
| Suriname | 74,400 | — | 84,400 | — | 14.5 | (14.7) | 17.0 |
| Trinidad and Tobago | 242,982 | 10,520 | 242,982 | 9,920 | 81.0 | (6.9) | 87.0 |
| United States | 70,992,000 | 467,003 | 61,200,000 | 438,500 | 17,200.0 | 12.0 | 15,354.0 |
| Venezuela | 302,809,000 | 200,372 | 302,809,000 | 201,537 | 1,070.0 | (30.1) | 1,531.0 |
| **Total Western Hemisphere** | **575,259,051** | **815,404** | **564,882,482** | **792,886** | **30,718.9** | **5.2** | **29,196.8** |
| **TOTAL WORLD** | **1,683,214,325** | **7,251,762** | **1,673,164,905** | **7,140,528** | **94,430.7** | **0.6** | **93,823.0** |
| **Total OPEC** | **1,189,804,000** | **2,570,034** | **1,190,676,000** | **2,555,874** | **35,825.0** | **(3.7)** | **37,218.0** |

\* Includes half of Neutral Zone production.

1: Includes crude oil, lease condensate, natural gas liquids, and oil sands.

# Appendix M



PDV

Home (index.html)      Who We Are (WhoWeAre.html)      Activities (Activities.html)

News (News.html)      Español (ES/index.html)

PDV Holding, Inc., a United
States subsidiary of the
Venezuelan National oil and gas
company, Petróleos de
Venezuela, S.A. ("PDVSA"), is a
non-operating stock holding
company incorporated in
Delaware and headquartered in
Texas. PDVH is the indirect sole
stockholder of CITGO Petroleum

**A-85**

Corporate Structure





Corporation, through ownership of 100% of the shares of its direct subsidiary CITGO Holding, Inc. (CITGO Holding, Inc. is the sole stockholder of CITGO Petroleum Corp.)



©2020 PDV Holding, Inc.   ‖   ✈ info@pdvh.com (mailto:info@pdvh.com)

# Appendix N



*Independent Statistics & Analysis*
U.S. Energy Information Administration

# Country Analysis Executive Summary: Venezuela

Last Updated: November 30, 2020

## Overview

- Although one of the original five large oil-producing countries that created the Organization of Petroleum Exporting Countries (OPEC) in 1960, Venezuela fell to the fourth-smallest producer among OPEC's 13 members in 2019, ranked higher than only Congo-Brazzaville, Gabon, and Equatorial Guinea.
- Reduced capital expenditures by state-owned oil and natural gas company Petróleos de Venezuela, S.A. (PdVSA), along with increased U.S. sanctions, have resulted in foreign partners continuing to cut activities in the oil sector, making crude oil production losses increasingly widespread.
- Venezuela's revenue from oil exports is severely constricted because few of the exports generate cash revenues. The remaining crude oil exports are sold domestically at a loss or sent as loan repayments to China, Russia, and European companies Repsol and ENI.
- In January 2019, the United States imposed further sanctions, making it increasingly difficult for foreign companies to conduct business in Venezuela. Further U.S. sanctions in February 2020, May 2020, and June 2020 have placed further restrictions on foreign companies.

## Petroleum and other liquids

- In January 2020, Venezuela had 303 billion barrels of proved oil reserves, the largest in the world.[1]

### Exploration and production

- Venezuela's crude oil production has declined rapidly to historically low levels. In 2019, Venezuela's average crude oil production (including condensates) was 877,000 barrels per day (b/d), a decrease of more than one million b/d since 2017, when the United States first imposed sanctions on crude oil exports (Figure 1).



Figure 1. Venezuela's annual average crude oil production

Source: U.S. Energy Information Administration, *International Energy Statistics* and the *October 2020 Short-Term Energy Outlook*. Note: Data for 2020 is calculated as the first six months average of 2020.

- Several compounding factors have contributed to this steep decline in oil production:
  - A lack of maintenance
  - The faltering financial state of national oil company PDVSA
  - A diminishing workforce
  - National power outages in 2019 that continue to affect western Venezuela's production
  - Sanctions imposed in 2019 and 2020 that have reduced foreign investments and markets for Venezuelan oil
  - Shortages of diluents needed for heavy oil
- As of August 2020, Venezuela's crude oil production (excluding condensates) was 360,000 b/d, the lowest level since EIA started recording production in 1973 (Figure 2).

2

**A-90**



Figure 2. Venezuela's crude oil production and total rig count

Source: Venezuela's crude oil production: U.S. Energy Information Administration, Short-Term Energy Outlook October 2020; Rig count: Baker Hughes
Note: Reported data available through September 2020.

- The number of active rigs fell from 69 in the first quarter of 2016 to 2 reported rigs in May 2020 (Figure 2), although news sources state that the last active drilling rig left Venezuela in early August.[2] Several factor continue to drive down crude oil production:
  - Missed payments to oil service companies
  - A lack of working upgraders
  - A lack of knowledgeable and able managers and workers
  - Declines in oil industry capital expenditures will continue to drive down crude oil production[3]

## Refining

- Venezuela had 1.3 million b/d of domestic nameplate crude oil refining capacity in 2019, which PdVSA operated.[4] However, actual refining throughput in 2019 was at an estimated 10% of its nameplate capacity, or 135,000 b/d, down from approximately 40% in 2017.[5] Refining throughput fell because of a lack of refinery maintenance, power blackouts, and feedstock availability after the 2019 sanctions. With its refinery infrastructure in this state, Venezuela must import petroleum products for domestic consumption.
- In 2019, the Puerto La Cruz refinery was formally shut down after two years of low processing rates.[6]

3

**A-91**

- PdVSA also operates significant refining capacity outside the country. The largest share of Venezuela's foreign downstream operations is in the United States, followed by significant operations in the Caribbean and stakes in Europe.

## Trade

### *Exports*

- Venezuela exported an average of 772, 000 b/d of crude oil (including lease condensates) in 2019, or about 40% lower than the 2018 level.
- Europe is now the largest destination for Venezuelan crude oil exports, with ENI and Reliance lifting crude oil for debt repayment.
- The United States had historically been the primary destination for Venezuela's crude oil shipments, and at its peak in 2007, U.S. imports of Venezuela's crude oil averaged 1.1 million b/d.  In January 2019, the United States placed sanctions on Venezuela that prohibited crude oil imports from the country,[7] and all U.S. imports of Venezuela's crude oil ceased in March 2019 (Figure 3).
- In the beginning of 2019, in anticipation of future sanctions, other countries began to wind down imports of Venezuela's crude oil. In 2019, Venezuela exported primarily to India (321,000 b/d), China (147,000 b/d), and Malaysia (119,000 b/d) (Figure 3).

A-92



Figure 3. Venezuela's exports of crude oil, January 2018-December 2019
thousand barrels per day

Source: U.S. Energy Information Administration based on data published by Clipper Data Inc.
Note: since Venezuela came under sanctions, loadings have become more difficult to track. Clipper export data does not match EIA US import data as a result of timing issues.

- In the first half of 2020, exports of Venezuela's crude oil fell to an average of 500,000 b/d, based on tanker loadings data.
- The United States had been a significant importer of petroleum products from Venezuela (Figure 4), but sanctions resulted in the halt of all petroleum product trade after March 2019 as well.



Figure 4. U.S. petroleum products imports from Venezuela and U.S. Virgin Islands
thousand barrels per day

Source: U.S. Energy Information Administration

Note: Before 2012, the United States imported Venezuelan petroleum products through the U.S. Virgin Islands. However,  because the U.S. Virgin Islands' Hovensa refinery was shut down in 2012, the U.S. Virgin Islands' no longer exports refined Venezuelan petroleum.

- In 2019, Venezuela exported crude oil from seven loading points. Venezuela's largest terminal by barrels loaded is the Jose Terminal, located offshore of the Jose industrial complex in northeast Venezuela (Table 1). The Jose Terminal consists of two berths that can accommodate 300,000 deadweight tons at an average of 55,000 barrels per hour.[8]

**Table 1. PdVSA's crude oil loading terminals and percentage shares of total exports, 2019**

| Loading point | Percentage of total loadings during 2019 |
| --- | --- |
| Jose Terminal | 89% |
| Amuay Bay Lightering Zone | 5% |
| Puerto Miranda Terminal | 4% |
| Puerto De La Cruz | 1% |
| Amuay Bay Terminal | 1% |
| St. Eustatius Terminal | 1% |
| Bajo Grande Terminal | 0.4% |
| Curacao Terminal | 0.2% |

Source: U.S. Energy Information Administration, based on information published by ClipperData, Inc., tanker tracking database
Note:  Percentages may not sum to 100% as a result of independent rounding.

- In addition to crude oil, PdVSA has exported refined products from Curacao. However, Curacao is pursuing a $162 million arbitration claim against Venezuela's state-run PdVSA oil firm over its management of the island's oil refinery. NuStar Energy operates the loading terminal at St.

6

Eustatius, and PdVSA rents storage tanks for exporting crude oil. PdVSA and Citgo lease a refinery and a storage terminal in Aruba, but crude oil is not exported from that island.

*Imports*

- In 2019, U.S petroleum product exports to Venezuela fell to 12,000 b/d on average because of sanctions that took effect mid-year (Figure 5).



Figure 5. U.S. exports of petroleum products to Venezuela, by type
thousand barrels per day

Source: U.S.Energy Information Administration

## Natural gas

- Venezuela had 200 trillion cubic feet (Tcf) of proved natural gas reserves at the beginning of 2020, the tenth-largest in the world.[9]

## Exploration and production

- Natural gas production has been falling since 2016. In 2018, Venezuela produced 2.6 billion cubic feet per day (Bcf/d) of natural gas and consumed 2.4 Bcf/d of natural gas.
- Historically, 90% of the country's natural gas production has been associated with oil (mostly in eastern Venezuela). As oil production has declined, natural gas production has also declined.

Other factors such as operational and maintenance issues and decreased domestic gas consumption have contributed to a lack of further production increases.[10]

- In early 2020, Trinidad and Tobago canceled an agreement with Venezuela for the joint development of the Loran-Manatee natural gas field on their shared maritime border because of U.S. sanctions on Venezuela's state energy company PdVSA.[11]

## Electricity

- In 2019, Venezuela generated more than 85 billion kilowatthours of electricity, a decrease of more than 19% compared with the previous year.[12] Lower electric generation in 2019 was primarily the result of power blackouts throughout the year and subsequent electricity rationing.
- Recent declines in generation are the result of technical failures affecting both the hydropower and thermal electric power generation plants. These issues include the government's inability to repair or maintain facilities that are vital to electric power generation.

## Notes

- Data presented in the text are the most recent available as of October 2020.
- Data are EIA estimates unless otherwise noted.

## Endnotes

[1] *Oil and Gas Journal*, "Worldwide Reserves Report," January 2020.
[2] Forbes, "The Last Oil Drilling Rig Leaves Venezuela," August 5, 2020.
[3] Reuters, "Venezuela's deteriorating oil quality riles major refiners," October 18, 2017.
[4] *Oil and Gas Journal*, "Worldwide Refining Survey," January 2020.
[5] BP Statistical Review of World Energy, 2020
[6] IPD Latin America, "Venezuela Refining Report 2019-January 2020," (February 2, 2020).
[7] Center for International & Strategic Studies (CSIS)," Are Sanctions Working in Venezuela?," September 3, 2019.
[8] Clipper Data, Inc. tanker loadings (accessed August 2020) and Energy Intelligence World Crude Oil Data, Venezuela" (accessed April 2018).
[9] *Oil and Gas Journal*, "Worldwide Reserves Report," January 2020.
[10] IPD Latin America, "Where Venezuela's Natural Gas Operations Stand," (May 2, 2019)
[11] Reuters, "Trinidad cancels gas deal over U.S. sanctions on state-run Venezuelan company," February 3, 2020.
[12] BP Statistical Review of World Energy, 2020

8

**A-96**

# Appendix O

Venezuela-related Designations; Issuance of Venezuela-related General License; Issuance of Venezuela-related Frequently Asked Ques…

U.S. DEPARTMENT OF THE TREASURY

## RECENT ACTIONS

Enforcement Actions

General Licenses

Misc./Other

Regulations and Guidance

Sanctions List Updates

# Venezuela–related Designations; Issuance of Venezuela–related General License; Issuance of Venezuela–related Frequently Asked Questions; Update to the Sectoral Sanctions Identfications List

02/18/2020

The Department of the Treasury's Office of Foreign Assets Control (OFAC) is issuing Venezuela-related General License 36      "Authorizing Certain Activities Necessary to the Wind Down of Transactions Involving Rosneft Trading S.A." OFAC is also issuing new Venezuela-related frequently asked questions.

## IN ADDITION, OFAC HAS ADDED THE FOLLOWING NAMES TO ITS LIST OF SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS.

### The following individual has been added to OFAC's SDN List:

CASIMIRO, Didier, Moscow, Russia; DOB 15 Nov 1966; POB Vilvoorde, Belgium; Gender Male (individual) [VENEZUELA-EO13850] (Linked To: ROSNEFT TRADING S.A.).

## The following entity has been added to OFAC's SDN List:

ROSNEFT TRADING S.A., Rue Place du Lac 2, 1204, Geneva, Switzerland; Website www.rosneft.com; Executive Order 13662 Directive Determination - Subject to Directive 2; alt. Executive Order 13662 Directive Determination - Subject to Directive 4; Tax ID No. CHE-309.842.573 (Switzerland); Registration Number CH-660.0.257.011-8 (Switzerland); For more information on directives, please visit the following link: http://www.treasury.gov/resource-center/sanctions/Programs/Pages/ukraine.aspx#directives. [UKRAINE-EO13662] [VENEZUELA-EO13850] (Linked To: OPEN JOINT-STOCK COMPANY ROSNEFT OIL COMPANY).

## The following changes have been made to OFAC's Sectoral Sanctions Identifications List:

ROSNEFT TRADING S.A., 2, Rue Place du Lac, 1204, Geneva, Switzerland; Website www.rosneft.com; Executive Order 13662 Directive Determination - Subject to Directive 2; alt. Executive Order 13662 Directive Determination - Subject to Directive 4; For more information on directives, please visit the following link: http://www.treasury.gov/resource-center/sanctions/Programs/Pages/ukraine.aspx#directives. [UKRAINE-EO13662] (Linked To: OPEN JOINT-STOCK COMPANY ROSNEFT OIL COMPANY). -to- ROSNEFT TRADING S.A., **Rue Place du Lac 2, 1204, Geneva, Switzerland; Website www.rosneft.com; Executive Order 13662 Directive Determination - Subject to Directive 2; alt. Executive Order 13662 Directive Determination - Subject to Directive 4; Tax ID No. CHE-309.842.573 (Switzerland); Registration Number CH-660.0.257.011-8 (Switzerland); For more information on directives, please visit the following link: http://www.treasury.gov/resource-center/sanctions/Programs/Pages/ukraine.aspx#directives. [UKRAINE-EO13662] [VENEZUELA-EO13850]** (Linked To: OPEN JOINT-STOCK COMPANY ROSNEFT OIL COMPANY).

### Press Release Link

Treasury Targets Russian Oil Brokerage Firm for Supporting Illegitimate Maduro Regime

## SEARCH RECENT ACTIONS

2/21/2021 Venezuela-related Designations; Issuance of Venezuela-related General License; Issuance of Venezuela-related Frequently Asked Ques...

Case 4:21-cv-00140 Document 61 Filed on 08/13/21 in TXSD Page 157 of 686

Start Date

| mm/dd/yyyy |

End date

| mm/dd/yyyy |

SEARCH

SUBSCRIBE TO THE OFAC RSS FEED

SIGN UP FOR OFAC RECENT ACTIONS E-MAIL UPDATES

RSS Feed Validator

# Appendix P

Vernon's Texas Rules Annotated
    Texas Rules of Civil Procedure
        Part VI. Rules Relating to Ancillary Proceedings
            Section 4. Garnishment (Refs & Annos)

TX Rules of Civil Procedure, Rule 663a

Rule 663a. Service of Writ on Defendant

Effective: June 1, 2020

Currentness

The defendant shall be served in any manner prescribed for service of citation or as provided in Rule 21a with a copy of the writ of garnishment, the application, accompanying affidavits and orders of the court as soon as practicable following the service of the writ. There shall be prominently displayed on the face of the copy of the writ served on the defendant, in ten-point type and in a manner calculated to advise a reasonably attentive person of its contents, the following:

"To _____, Defendant:

You are hereby notified that certain properties alleged to be owned by you have been garnished. If you claim any rights in such property, you are advised:

"YOU HAVE A RIGHT TO REGAIN POSSESSION OF THE PROPERTY BY FILING A REPLEVY BOND. YOU HAVE A RIGHT TO SEEK TO REGAIN POSSESSION OF THE PROPERTY BY FILING WITH THE COURT A MOTION TO DISSOLVE THIS WRIT."

**Credits**
July 11, 1977, eff. Jan. 1, 1978.

Notes of Decisions (20)

Vernon's Ann. Texas Rules Civ. Proc., Rule 663a, TX R RCP Rule 663a
Current with amendments received through January 1, 2021

End of Document                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Q

51 F.3d 1045

This case was not selected for
publication in the Federal Reporter.

Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

NATIONAL LOAN Investors, L.P., Plaintiff
Garnishor-Counter Defendant-Appellee,

v.

FIDELITY BANK, NA,
Defendant Garnishee-Appellee,

v.

Danny D. Pitzer, Judgment Debtor-
Counter Plaintiff-Appellant,

v.

George S. Henry, Counter Defendant-Appellee.

No. 94-10173.
|
Summary Calendar.
|
March 30, 1995.

Appeal from the United States District Court for the Northern
District of Texas (3:93-CV-2308-X).

Before SMITH, EMILIO M. GARZA, and PARKER, Circuit
Judges.

**Opinion**

PER CURIAM. [*]

**\*1** Danny Duane Pitzer failed to make timely payments
pursuant to an agreed judgment entered by the district court.
In response, National Loan Investors ("NLI") obtained a
writ of garnishment from the court. Pitzer filed a motion
to dissolve the writ of garnishment, which the district court
denied. Pitzer appeals the denial of his motion; we vacate and
remand.

I

NLI is the holder in due course of two promissory notes
executed by Danny Duane Pitzer. The parties reached a
settlement agreement, under which Pitzer agreed to pay NLI
$16,500.00 in sixty monthly installments of $275.00. Pitzer
failed to make three monthly payments in a timely manner.
NLI, seeking to enforce the agreed judgment, petitioned
the district court for a writ of garnishment. Pitzer filed a
motion to dissolve the writ of garnishment that included
counterclaims against NLI and its attorney, George Henry, for
violations of the Texas Deceptive Trade Practices Act, unfair
debt collection, abuse of process, and negligent infliction
of emotional distress. NLI responded with a motion to
strike Pitzer's counterclaims and a motion for misjoinder of
George Henry. Without holding a hearing, the district court
denied Pitzer's motion and granted NLI's motions, striking
all claims and counterclaims against Henry. Pitzer appeals
the district court's denial of his motion to dissolve the writ
of garnishment, claiming that the district court erred by (1)
failing to require service of process on the judgment debtor,
(2) failing to hear evidence in support of Pitzer's motion
to dissolve the writ before denying the motion, (3) failing
to require a sufficient affidavit to support NLI's writ of
garnishment, (4) failing to allow the judgment debtor an
opportunity to present defenses to the garnishment action and
to present his DTPA claims, and (5) denying his motion in
violation of his due process rights.

II

A

The Federal Rules of Civil Procedure require that federal
courts conduct garnishment proceedings pursuant to the
law of the state in which the district court sits. *See*
Fed.R.Civ.P. 64 (providing generally for seizure of persons
or property); *see also* Fed.R.Civ.P. 69 (giving rules for
executions on judgments). Thus, because NLI sought the writ
of garnishment from the United States District Court for the
Northern District of Texas, we apply Texas garnishment law
to the present case. Appellees NLI and Henry assert that an
order denying a motion to dissolve a writ of garnishment is

interlocutory and thus not appealable, and cite *Bowden
v. Hunt*, 571 S.W.2d 550, 551 (Tex.Civ.App.) (Dallas 1978,
no writ), as support. However, the *Bowden* court limited

its holding to prejudgment garnishment actions, *id.* at 551, whereas the present case involves a postjudgment writ of garnishment. Generally, "[a] garnishment action, although ancillary to the underlying suit, is a separate proceeding.... Because it is a separate proceeding, an appeal will lie from a final judgment in a garnishment suit independently of the underlying suit." *Varner v. Koons,* 888 S.W.2d 511, 513 (Tex.App.) (El Paso 1994, n.w.h.) (citations omitted). Because the denial of a motion to dissolve a postjudgment writ of garnishment is a final judgment, Pitzer's appeal from the district court's order is properly before this court. *See* Fed. R. Civ. Pro. 1291 (granting federal courts of appeals jurisdiction over appeals from federal district courts' final judgments).

B

**\*2** Pitzer claims that NLI and Henry violated Texas law by failing to serve him with notice of the garnishment action. Rule 663a of the Texas Rules of Civil Procedure requires that the garnishor notify the judgment debtor of the garnishment proceedings. [1] *Hering v. Norbanco Austin I, Ltd.,* 735 S.W.2d 638, 641 (Tex.App.) (Austin 1987, writ denied). NLI and Henry contend that they properly served Pitzer by certified mail. We need not address this factual issue because Pitzer filed an answer to the writ of garnishment. A defendant's right to notice is waived if the defendant makes a general appearance. *See Dura-Stilts Co. v. Zachry,* 697 S.W.2d 658, 660 (Tex.App.) (Houston [1st Dist.] 1985, writ ref'd n.r.e.) (holding that general appearance waives any error in citation); *Dodson v. Seymour,* 664 S.W.2d 158, 161 (Tex.App.) (San Antonio 1983, no writ) (maintaining that appearance waives service of process); *see also Terry v. Caldwell,* 851 S.W.2d 875, 876 (Tex.App.) (Houston [14th Dist.] 1993, no writ) (noting that policy guiding Rule 124 of

Texas Rules of Civil Procedure, which allows party to waive service of process, "is to assure the defendant knows about the proceedings and can, therefore, defend against them"). [2] Thus, the district court did not err in denying Pitzer's motion to dissolve the writ of garnishment for failure to give proper notice.

C

Pitzer asserts next that the district court erred in failing to hear evidence in support of his motion to dissolve the writ of garnishment, which the district court denied without a hearing. The Texas Rules of Civil Procedure require the trial court to hold a hearing on a motion to either dissolve or modify a writ of garnishment. [3] "[T]he remedy of garnishment is summary and harsh and should not be sustained unless there is strict compliance with statutory requirements." *Baca v. Hoover, Bax & Shearer,* 823 S.W.2d 734, 738 (Tex.App.) (Houston [14th Dist.] 1992, writ denied). Thus, the district court erred in not holding a hearing on Pitzer's motion to dissolve the writ of garnishment, and we remand to the district court for such a hearing. [4]

III

For the foregoing reasons, we VACATE the district court's order denying Pitzer's motion to dissolve the writ of garnishment and REMAND to that court for further proceedings consistent with this opinion.

**All Citations**

51 F.3d 1045, 1995 WL 153421

**Footnotes**

\*   Local Rule 47.5.1 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that Rule, the Court has determined that this opinion should not be published.

1   Rule 663a provides:

> The defendant shall be served in any manner prescribed for service of citation or as provided in Rule 21a with a copy of the writ of garnishment, the application, accompanying affidavits and orders of the court as soon as practicable following the service of the writ.

Tex.R. Civ. P. 663a.

2   Pitzer relies in part on *Hering,* 735 S.W.2d at 641, in which a Texas court of appeals held that a creditor's failure to serve the judgment debtor with notice of the garnishment action is fatal to the judgment. *Id.* However, in *Hering,* there is no indication that the judgment debtor filed a responsive pleading. In the present case, Pitzer appeared and waived his right to notification when he filed an answer to the writ of garnishment despite his claims that he was not properly served.

3   Rule 664a provides in pertinent part:

> Such motion [for dissolution or modification of writ of garnishment] shall admit or deny each finding of the order directing the issuance of the writ except where the movant is unable to admit or deny the finding, in which case movant shall set forth the reasons why he cannot admit or deny. Unless the parties agree to an extension of time, the motion shall be heard promptly, after reasonable notice to the plaintiff (which may be less than three days), and the issue shall be determined not later than ten days after the motion is filed. The filing of the motion shall stay any further proceedings under the writ, except for any orders concerning the care, preservation or sale of any perishable property, until a hearing is had, and the issue is determined.

Tex.R. Civ. P. 664a; *see also Swiderski v. Victoria Bank & Trust Co.,* 706 S.W.2d 676, 678 (Tex.App.) (Corpus Christi 1986, writ ref'd n.r.e.) (holding that Rule 664a mandates hearing on motion to dissolve writ of garnishment).

4   Because we remand for a hearing on Pitzer's motion to dissolve the writ of garnishment, we need not address Pitzer's remaining claims.

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

# Appendix R

Case 4:21-cv-00140   Document 61   Filed on 08/13/21 in TXSD   Page 165 of 686

Wease v. Bank of America, Not Reported in S.W. Rptr. (2015)

2015 WL 4051974
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Dallas.

Michael WEASE, Appellant
v.
BANK OF AMERICA and
James Castleberry, Appellees

No. 05–14–00867–CV
|
Opinion Filed July 2, 2015

**On Appeal from the 255th Judicial District Court, Dallas County, Texas, Trial Court Cause No. DF–14–06455.** Lori Hockett, Judge.

**Attorneys and Law Firms**

Michael Wease, pro se.

Evan A. Moelle, Houston, TX, William E. Sollors, Lisa E. McKnight, Dallas, TX, for appellees.

Before Justices Lang, Stoddart, and Schenck

**MEMORANDUM OPINION**

Opinion by Justice Lang

 *1  This is an appeal from a post-judgment garnishment action. In one issue on appeal, Michael Wease ("Wease"), a purported owner of the garnished bank account, contends the trial court erred in "accepting an Agreed Judgment" between James Castleberry ("Castleberry"), the garnishor, and Bank of America, the garnishee, without conducting a hearing or deciding Wease's motion to dissolve the writ of garnishment. We decide in favor of Wease. We reverse and remand this case to the trial court for further proceedings consistent with this opinion.

*I. FACTUAL AND PROCEDURAL BACKGROUND*

According to the record, Castleberry obtained a final judgment against his former wife, Candi Sue Wease a/k/a Candi Sue Castleberry ("Candi"), for $5,425.00 plus interest. On April 3, 2014, Castleberry filed this garnishment action asserting that Candi lacked sufficient property in Texas to satisfy the judgment and that Bank of America was "indebted to, or possess[ed] non-exempt property belonging to, Judgement Debtor, Candi Sue Wease a/k/a Candi Sue Castleberry." Bank of America filed an answer to the writ of garnishment, stating it was indebted to Candi "in the amount of $1,899.48 in an account styled 'Michael R. Wease or Candi C. Wease.' " Appellant Wease is Candi's husband.

On May 20, 2014, a "Notice of Hearing" on Castleberry's writ of garnishment was filed in the trial court. The blanks for date and time on the file stamped notice in the clerk's record are not filled in with any date or time. However, an entry in the district clerk's case summary, described as "Writ of Garnishment" and "Case Closed," shows that a "*Canceled* Motion Hearing," was set for June 23, 2014, at 1:30 p.m. (emphasis in original).

On June 2, 2014, Wease filed in the trial court a sworn document entitled, "Motion to Dissolve Writ of Garnishment, Sanctions." In that motion, Wease asserted that he was the owner of the bank account, which Bank of America identified in its answer to the writ of garnishment, and that "Garnishee [Bank of America] has no debt to Defendant Candi Wease." No response was filed to Wease's motion to dissolve, and no hearing was held on the motion. The record reflects that on June 6, 2014, an agreed judgment was approved in writing by Castleberry and Bank of America and signed by the trial court. The agreed judgment provided that Castleberry recover $1,199.48 against Bank of America "to be credited to the judgment [against Candi]." By rendering the agreed judgment, the trial court implicitly denied Wease's motion to dissolve the writ of garnishment See TEX.R.APP. P. 33.1(a)(2)(A); *Rosemond v. Al–Lahiq,* 331 S.W.3d 764, 767 (Tex.2011). This appeal followed.

*II. AGREED JUDGMENT*

Wease contends the trial court "violated rule 664 of the [Texas Rules of Civil Procedure] by not staying 'further proceedings' " when it rendered the agreed judgment between Castleberry and Bank of America before conducting a hearing on Wease's motion to dissolve the writ of garnishment. Castleberry raises two points in response: (1) Wease "lacks standing to contest the issuance of [the] writ"; and (2) Wease's motion "is

Case 4:21-cv-00140 Document 61 Filed on 08/13/21 in TXSD Page 166 of 686

Wease v. Bank of America, Not Reported in S.W. Rptr. (2015)

insufficient on its face to establish a defense to the proposed garnishment." Bank of America did not file a brief, but it filed a letter with this Court, stating "Bank of America does not oppose the relief Mr. Wease seeks from this Court."

### A. Standard of Review

**\*2** We review a trial court's ruling on a motion to dissolve a writ of garnishment for an abuse of discretion. *Jacobs v. Jacobs,* 448 S.W.3d 626, 631 (Tex.App.–Houston [14th Dist.2014, no pet.). "[A] trial court abuses its discretion if, under the record, it reasonably could have reached only one conclusion and it failed to do so." *Moroch v. Collins,* 174 S.W.3d 849, 864 (Tex.App.–Dallas 2005, pet. denied) (citing 🔖 *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992)). "However, because a trial court has no discretion in determining what the law is or applying the law to the facts, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Id.* at 864–65.

### B. Applicable Law

"Garnishment is a statutory proceeding whereby the property, money, or credits of a debtor in the possession of another are applied to the payment of the debt." *Bank One, Tex., N.A. v. Sunbelt Sav., F.S.B.,* 824 S.W.2d 557, 558 (Tex.1992). "The garnishee is a third party who owes a debt to or holds property of the debtor. The plaintiff or garnishor is a creditor of the debtor and requests the court to issue the writ of garnishment to the garnishee." *Tenet Health Sys. Hosps. Dallas, Inc. v. N. Tex. Hosp. Physicians Grp., P.A.,* 438 S.W.3d 190, 197 (Tex.App.–Dallas 2014, no pet.). "It has long been recognized in this state that the remedy of garnishment is summary and harsh, and should not be sustained unless there is strict compliance with the statutory requirements." *In re Tex. Am. Express, Inc.,* 190 S.W.3d 720, 725 (Tex.App.–Dallas 2005, orig. proceeding).

Garnishment proceedings are governed by Chapter 63 of the Texas Civil Practices and Remedies Code and Rules 657 through 679 of the Texas Rules of Civil Procedure. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 63.001–.008 (West 2015); TEX.R. CIV. P. 657–79. When a garnishee responds to a writ of garnishment by answering that it actually holds funds belonging to the debtor, the garnishee's answer "establishes prima facie proof that the debtor owns the funds, and without

further evidence the garnishee may have those funds applied to pay the debt owed by the debtor." *Bechem v. Reliant Energy Retail Servs., LLC,* 441 S.W.3d 839, 843 (Tex.App.–Houston [14th Dist.] 2014, no pet.). "A debtor may controvert the garnishee's answer, however, or a third party may intervene claiming an interest in the garnished property." *Id.* (citing TEX.R. CIV. P. 664a, 673). "[A]n intervention is timely and proper if brought anytime before the judge renders his judgment." *Jefferson Sav. & Loan Ass'n v. Adams,* 802 S.W.2d 811, 813 (Tex.App.—San Antonio 1990, writ denied) (holding intervention in garnishment proceeding was timely when motion to intervene was filed one day before the trial court entered judgment); *see also* 🔖 *Texas Mut. Ins. Co. v. Ledbetter,* 251 S.W.3d 31, 36 (Tex.2008) ("There is no deadline for intervention in the Texas Rules of Civil Procedure," but "[g]enerally one cannot intervene after final judgment.").

Rule 664a of the Texas Rules of Civil Procedure provides the framework for the dissolution or modification of a writ of garnishment. Rule 664a states that "any intervening party who claims an interest" in a garnished account may, by sworn written motion, seek to dissolve the writ of garnishment and the order directing its issuance "for any grounds or cause, extrinsic or intrinsic." TEX.R. CIV. P. 664a. Further, a motion filed under Rule 664a "shall be heard promptly," and the filing of such a motion, "shall stay any further proceedings under the writ ... until a hearing is had and the issue is determined." *Id.* "The issue to be determined in a Rule 664a hearing is that 'the plaintiff shall prove the grounds relied upon for its (the writ of garnishment's) issuance.' " *Swiderski v. Victoria Bank & Trust Co.,* 706 S.W.2d 676, 678 (Tex.App.–Corpus Christi 1986, writ ref'd n.r.e.) (quoting TEX.R. CIV. P. 664a). Finally, "[t]he writ shall be dissolved" unless the plaintiff meets this burden at the hearing. TEX.R. CIV. P. 664a.

### C. Application of the Law to the Facts

**\*3** We address the standing issue first. *See Mazon Assocs., Inc. v. Comerica Bank,* 195 S.W.3d 800, 803 (Tex.App.–Dallas 2006, no pet.) ("Standing is a constitutional prerequisite to maintaining a suit under Texas law."). "Typically standing is a component of subject matter jurisdiction. In that context, lack of standing cannot be waived and can be raised for the first time on appeal." 🚩 *Thompson v. Harco Nat. Ins. Co.,* 997 S.W.2d 607, 616 (Tex.App.– Dallas 1998, pet. denied) (emphasis in original) (footnotes

Case 4:21-cv-00140   Document 61   Filed on 08/13/21 in TXSD   Page 167 of 686

Wease v. Bank of America, Not Reported in S.W. Rptr. (2015)

omitted), *overruled in part on other grounds by* 📙 *John v. Marshall Health Servs., Inc.,* 58 S.W.3d 738, 741 (Tex.2001). "In contrast, standing under Rule 664a is a *procedural* issue; it does not affect the trial court's jurisdiction over the garnishment proceeding or over the parties." *Id.* Accordingly, lack of standing under Rule 664a must be brought to the trial court's attention before a party may complain of error on appeal. *Id.* Castleberry did not object to Wease's alleged lack of standing under Rule 664a or otherwise raise the issue in the trial court. We conclude Castleberry did not preserve this issue for appellate review. *See* TEX.R.APP. P. 33.1(a); 🚩 *Thompson,* 997 S.W.2d at 616.

Next, we address whether the trial court erred in failing to conduct a hearing on Wease's motion to dissolve before rendering the agreed judgment. Four days before final judgment was rendered, Wease filed a sworn written motion, seeking to dissolve the writ of garnishment, denying that Candi had an interest in the account with Bank of America, and asserting that he was the owner of the bank account. *See* TEX.R. CIV. P. 664a. Although Castleberry argues generally that Wease's motion was "insufficient on its face to establish a defense to the proposed garnishment," the merits of the proposed garnishment are not before this Court. Rule 664a requires the trial court to hold a hearing on a motion to dissolve a writ of garnishment. *See id.*; *Nat'l Loan Investors, L.P. v. Fid. Bank, NA,* No. 94–10173, 1995 WL 153421, at *2 (5th Cir. Mar. 30, 1995) (per curiam) (not designated for publication) (applying Rule 664a and concluding the trial court erred in denying a motion to dissolve without holding the required hearing); *Swiderski,* 706 S.W.2d at 678 ("Rule 664a now provides for a hearing when the defendant debtor chooses to intervene in either a prejudgment or postjudgment garnishment proceeding."). Because Wease filed a motion to dissolve the writ of garnishment, the trial court was required to "stay any further proceedings under the writ ... until a hearing is had and the issue is determined." *See* TEX.R. CIV. P. 664a; *Nat'l Loan,* 1995 WL 153421, at *2; *Swiderski,* 706 S.W.2d at 678. We conclude that the trial court erred in failing to conduct a hearing on Wease's motion to dissolve before rendering the agreed judgment. *See* TEX.R.APP. P. 664a. We decide Wease's sole issue in his favor.

## III. CONCLUSION

The trial court erred in failing to conduct a hearing on Wease's motion to dissolve the writ of garnishment before rendering the agreed judgment between Castleberry and Bank of America. We reverse and remand this case to the trial court for further proceedings consistent with this opinion.

**All Citations**

Not Reported in S.W. Rptr., 2015 WL 4051974

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix S

2014 WL 1875917
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

Pedro Garcia ARRIAGA, Plaintiff,
v.
JESS ENTERPRISES, Sej Properties, L.P.,
Califco, LLC, and Elias Shokrian, Defendants.

Civil Action No. 3:12–CV–094–L–BK.
|
Signed April 10, 2014.

**Attorneys and Law Firms**

Jamie Harrison Zidell, Robert Lee Manteuffel, JH Zidell PC, Dallas, TX, for Plaintiff.

Tom A. Carse, Carse Law Firm, Dallas, TX, for Defendants.

*FINDINGS, CONCLUSIONS,
AND RECOMMENDATION*

RENÉE HARRIS TOLIVER, United States Magistrate Judge.

**\*1** Pursuant to the District Court's *Order of Reference* dated April 1, 2014, this cause is before the undersigned on Defendants' *Motion to Dissolve Writ of Garnishment(Doc. 71), Motion to Stay Garnishment Proceedings and Request for Emergency Hearing(Doc. 74), Amended Opposed Motion for Permission to File Irrevocable Letter of Credit in Lieu of Supersedeas Bond and Stay of Garnishment Proceedings(Doc. 78),* and Plaintiff's *Motion to Disburse Garnished Funds(Doc. 79* ). For the reasons that follow, it is recommended that Defendants' *Motion to Dissolve Writ of Garnishment(Doc. 71* ) be **GRANTED,** Defendants' *Motion to Stay Garnishment Proceedings and Request for Emergency Hearing(Doc. 74* ) and *Amended Opposed Motion for Permission to File Irrevocable Letter of Credit(Doc. 78* ) be **DENIED,** and Plaintiff's *Motion to Disburse Garnished Funds(Doc. 79* ) be **DENIED.**

**A. Background**
Following a bench trial, the District Court entered judgment in Plaintiff's favor for $29,000.62 in damages, $85,245.00

in attorneys' fees, and $4,136.80 in costs. (Docs.48, 52, 58). On December 4, 2013, Defendants appealed the Court's award of attorneys' fees. (*Doc.62* ). At Plaintiff's request, the Clerk issued a writ of garnishment to JPMorgan Chase Bank ("Chase") based on Plaintiff's representation that Chase possessed property belonging to Defendants that could be used to satisfy the judgment. (*Doc. 59 at 2; Doc. 67* ). Chase filed its answer on March 26, 2014, and asserted a counterclaim for attorneys' fees of $600 against Defendants and Plaintiff. (*Doc.73* ). Defendants now move to dissolve the writ, to stay these garnishment proceedings, and to provide alternate security while Plaintiff seeks the release of the garnished funds to satisfy the judgment in his favor.

**B. Applicable Law**
Pursuant to Federal Rule of Civil Procedure 69(a)(1), a money judgment is enforced by a writ of execution. The procedure for execution and supplementary proceedings, including garnishment, must accord with the procedure of the state where the court is located, in this case Texas. *See*

FG Hemisphere Assoc., LLC v. Republique du Congo, 455 F.3d 575, 595 *(5th Cir.2006* ) (noting that "as actions supplemental to or in aid of execution according to [*Rule 69* ], garnishment actions are governed by state law to the extent it does not conflict with federal law"). *Texas Rule of Civil Procedure 663a* requires that the judgment debtor be served with specified garnishment documents in a precise way and "as soon as practicable following the service of the writ."

The purpose of the service requirement is to advise the debtor that the writ has issued and to inform him of his rights to contest the garnishment. *Zeecon Wireless Internet, LLC v. Am. Bank of Texas, N.A., 305 S.W.3d 813, 817–18 (Tex.App.-Austin, 2010* ). "The requirement of service on the debtor is not a mere technicality but is an integral part of the statutory requirements in a garnishment proceeding." *Id. at 818.* If any of the statutory requirements are not met, the right to have a garnishment judgment rendered against the property of the debtor fails. *Id. at 816* (citing *St. Louis, Brownsville & Mexico R.R. v. Dallas Cooperage & Woodenware Co., 268 S.W. 769, 771 (Tex.Civ.App.-Dallas 1925)* ). Though the requirement that a judgment debtor be served with a garnishment writ "as soon as practicable" is not susceptible to an exact definition, the requirement does establish a prescribed period in which the garnishor must serve the writ on the debtor, and a 15–day delay does not comply with such requirement. *Lease Finance Group,*

*LLC v. Childers, 310 S.W.3d 120, 126* (Tex.App.-Ft.Worth, 2010 ).

## C. Arguments and Analysis

*1. Motion to Dissolve Writ of Garnishment (Doc. 71); Motion to Stay Garnishment Proceedings and for Emergency Hearing (Doc. 74); Motion to Disburse Garnished Funds (Doc. 79)*

**\*2** As an initial matter, Defendants argue that this Court should dissolve the writ on jurisdictional grounds because the Court relinquished control of the case when Defendants appealed. (*Doc. 71 at 2,* 7–8). This argument is misplaced. The "filing of a valid notice of appeal from a final order of the district court divests that court of jurisdiction to act on the matters involved in the appeal, except to ... enforce its judgment so long as the judgment has not been stayed or superseded." *Ross v. Marshall, 426 F.3d 745, 751 (5th Ci r.2005);seeFG Hemisphere, 455 F.3d at 595* (noting that garnishment actions are governed by state law to the extent it does not conflict with federal law). The Court's judgment in this case has not been stayed or superseded, thus the Clerk had jurisdiction to issue the writ. Moreover, the garnishment remains in effect unless the Court's judgment is reversed.

*Matter of Bohart, 743 F.2d 313, 324* (5th Cir.1984 ) (holding that a post-judgment garnishment was effective after its service and until the decision of the Texas Court of Appeals reversed the judgment of the garnishor against the debtor, and the garnishment became effective again after the Texas Supreme Court reinstated the trial court's judgment).

Defendants next contend that the writ should be dissolved because Plaintiff did not comply with the notice requirements of *Rule 663a* by serving them with the writ as soon as practicable following service upon Chase. (*Doc. 71 at 1,* 3, 7). Plaintiff responds that he properly served Defendants with notice of the writ as soon as practicable after service on Chase. (*Doc. 75 at 6*). The writ was issued on March 3, 2014, served on Chase by the constable on March 6, and the return of service was filed on March 12 and entered on the docket sheet on March 13. (*Doc. 67; Doc. 70* ). Plaintiff filed and served his *Notice of Garnishment* on March 24, 2014. (*Doc.72* ).

Upon consideration of the law and the parties' arguments, the Court finds that dissolution of the writ is warranted because Plaintiff did not timely serve Defendants with notice of the writ under the circumstances. *Rule 663a* requires that the judgment debtor be served with notice of the writ "as soon

as practicable following the *service of the writ.*" Here, the writ was served on Chase on March 6, 2014, but Plaintiff did not provide notice of the writ to Defendants until March 24, 2014–18 days later. (*Doc. 70; Doc. 72* ). This is patently untimely. *Lease Finance Group, 310 S.W.3d at 126.* Although Plaintiff represents to the Court that the attorney responsible for this case left the firm the day after the return of service was filed, that is not sufficient cause to excuse the untimely service. (*Doc. 75 at 7* n.2). First, Plaintiff's counsel should have kept better track of their process server and learned prior to the return being filed in court when the writ was served on Chase, as the statute tasks them with such knowledge. Second, two other attorneys have been listed as counsel of record for Plaintiff since January 2012, and there does not appear to be any reason why these attorneys did not timely take action at this critical juncture of the case. (*Doc. 1 at 5; Doc.* 5). Thus, the Court should grant Defendants' motion and dissolve the writ; however the dissolution of the writ should be without prejudice to Plaintiff's refiling.

**\*3** Defendants also request that the Court stay these garnishment proceedings pending an immediate hearing, arguing that they are entitled to a stay under *Texas Rule of Civil Procedure Rule 664a. (Doc. 71 at 3; Doc. 74 at 2). Rule 664a* provides that a defendant whose account has been garnished may seek to dissolve the writ, and the filing of the motion shall stay any further proceedings under the writ except for any orders concerning the care, preservation or sale of any perishable property, until a hearing is had and the issue is determined. Given the Court's recommendation to grant Defendants' request to dissolve the writ of garnishment, the Court should **DENY** as unnecessary Defendants' request for a stay and an emergency hearing. Further, Plaintiff's Motion to Disburse Garnished Funds (*Doc.79* ) in the total amount of $118,382.42 should be **DENIED.**

*2. Amended Opposed Motion for Permission to File Irrevocable Letter of Credit in Lieu of Supersedeas Bond and Stay of Garnishment Proceedings (Doc. 78 )*

Defendants next request that the Court allow them to secure Plaintiff's judgment with an irrevocable letter of credit instead of a supersedeas bond and stay these proceedings for ten days while they procure and file the letter. (*Doc. 78 at 2–3* ). Defendants state that use of a letter of credit in lieu of a supersedeas bond will avoid unnecessary fees and premiums associated with bond procurement while assuring the same level of judgment security for Plaintiff. (*Doc. 78 at 3* ).

Plaintiff opposes Defendants' motion, arguing that Defendants have not offered sufficient justification for providing a letter of credit as security instead of posting a supersedeas bond. (*Doc. 82 at 3* ). Additionally, Plaintiff maintains that Defendants have not demonstrated either that extraordinary circumstances exist for posting this alternate method of security or that a letter of credit is sufficient to protect his rights. (*Doc. 82 at 4–5* ).

The Court of Appeals for the Fifth Circuit has stated that the amount of a supersedeas bond should include the entire amount of the judgment remaining unsatisfied, costs on appeal, interest, and damages for delay unless the district court, after notice and hearing and for good cause shown, fixes a different amount or orders a security other than a bond. *Poplar Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc., 600 F.2d 1189, 1191 (5th Cir.1979* ). Thus, where a judgment debtor objectively demonstrates a present financial ability to easily pay a money judgment and presents to the court a financially secure plan for maintaining the same degree of solvency during the appeal, the district court may exercise its discretion to substitute some other form of guarantee for the usual supersedeas bond. *Id.* "If a court chooses to depart from the usual requirement of a full security supersedeas bond to suspend the operation of an unconditional money judgment, it should place the burden on the moving party to objectively demonstrate the reasons for such a departure." *Id.*

**\*4** In this case, Defendants have not objectively demonstrated the need for the Court to depart from its usual procedure of requiring a supersedeas bond to secure a judgment pending appeal. *Id.* Moreover, Defendants have not shown that they have the present financial ability to easily pay the judgment nor have they presented the Court with a plan to maintain their solvency during the pendency of this appeal. *Id.* Accordingly, Defendants' *Amended Opposed Motion for Permission to File Irrevocable Letter of Credit in Lieu of Supersedeas Bond and Stay of Garnishment Proceedings(Doc. 78* ) should be **DENIED,** and Defendants should be ordered to post a supersedeas bond forthwith if they desire to stay the execution of the judgment pending the outcome of their appeal.

### D. Conclusion

For the foregoing reasons, it is recommended that Defendants' *Motion to Dissolve Writ of Garnishment(Doc. 71* ) be **GRANTED,** Defendants' *Motion to Stay Garnishment Proceedings and Request for Emergency Hearing(Doc. 74* ) and *Amended Opposed Motion for Permission to File Irrevocable Letter of Credit(Doc. 78* ) be **DENIED,** and Plaintiff's *Motion to Disburse Garnished Funds(Doc. 79* ) be **DENIED.**

### All Citations

Not Reported in F.Supp.3d, 2014 WL 1875917

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1882002
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

Pedro Garcia ARRIAGA, Plaintiff,

v.

JESS ENTERPRISES; SEJ Properties, L.P.;
Califco, LLC; and Elias Shokrian, Defendants.

Civil Action No. 3:12–CV–94–L.
|
Signed May 2, 2014.

**Attorneys and Law Firms**

Jamie Harrison Zidell, Robert Lee Manteuffel, J.H. Zidell
P.C., Dallas, TX, for Plaintiff.

Tom A. Carse, Carse Law Firm, Dallas, TX, for Defendants.

**ORDER**

SAM A. LINDSAY, District Judge.

 **\*1** Before the court is Defendants' Motion to Dissolve
Writ of Garnishment (Doc. 71), filed March 21, 2014;
Defendants' Motion to Stay Garnishment Proceedings and
Request for Emergency Hearing (Doc. 74), filed March 26,
2014; Defendants' Amended Opposed Motion for Permission
to File Irrevocable Letter of Credit in Lieu of Supersedeas
Bond and Stay of Garnishment Proceedings (Doc. 78),
filed March 28, 2014; and Plaintiff's Motion to Disburse
Garnished Funds (Doc. 79), filed March 31, 2014. The
postjudgment motions were referred to Magistrate Judge
Renee Harris Toliver, who entered Findings, Conclusions
and Recommendation of the United States Magistrate Judge
("Report") on April 10, 2014, recommending that the court:
grant Defendants' Motion to Dissolve Writ of Garnishment
(Doc. 71); deny Defendants' Motion to Stay Garnishment
Proceedings and Request for Emergency Hearing (Doc. 74);
deny Defendants' Amended Opposed Motion for Permission
to File Irrevocable Letter of Credit in Lieu of Supersedeas
Bond and Stay of Garnishment Proceedings (Doc. 78); and
deny Plaintiff s Motion to Disburse Garnished Funds (Doc.
79). Plaintiff filed objections to the Report on April 24, 2014,
to which Defendants responded.

Having reviewed the motions, file, record in this case,
Report, Plaintiff's objections to the Report, and Defendants'
response in opposition to Plaintiff's objections, the court
determines that the findings and conclusions of the magistrate
judge are correct, **accepts** them as those of the court,
and **overrules** Plaintiff's objections. Accordingly, the court
**grants** Defendants' Motion to Dissolve Writ of Garnishment
(Doc. 71); **denies** Defendants' Motion to Stay Garnishment
Proceedings and Request for Emergency Hearing (Doc.
74); **denies** Defendants' Amended Opposed Motion for
Permission to File Irrevocable Letter of Credit in Lieu of
Supersedeas Bond and Stay of Garnishment Proceedings
(Doc. 78); and **denies** Plaintiff's Motion to Disburse
Garnished Funds (Doc. 79).

**It is so ordered.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1882002

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**A-110**

# Appendix T

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Stewart A. Feldman & Associates, L.L.P. v. Industrial
Photographic Supply, Inc.,   Tex.App.-Hous. (14 Dist.),   September 12,
2002

823 S.W.2d 734
Court of Appeals of Texas,
Houston (14th Dist.).

Joseph Fred BACA and Pamela Baca, Appellants,

v.

HOOVER, BAX, & SHEARER, Appellee.

No. A14–90–00466–CV.

|

Jan. 16, 1992.

|

Rehearing Denied Feb. 6, 1992.

**Synopsis**

Attorneys brought action for fees against their client. Trial
court granted the attorneys' motion for summary judgment
in underlying suit for fees. Subsequently, attorneys and bank
entered into agreed final judgment in garnishment proceeding
ordering attorneys to recover from bank moneys bank was
indebted to clients. Thereafter, Court of Appeals dismissed
summary judgment in underlying suit for attorney's fees, and
clients filed motion for restitution. Clients brought motion
to dismiss underlying action. The County Court at Law No.
3, Harris County, Carolyn Day Hobson, J., granted motion
and entered order discharging writ of attachment. Clients
appealed. The Court of Appeals, Cannon, J., on rehearing,
held that after trial court reversed underlying judgment,
clients were entitled to restitution.

Reversed, rendered and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss;
Motion for Summary Judgment.

West Headnotes (21)

**[1]**   **Pretrial Procedure**   Counterclaim or other
request for affirmative relief, effect of

**Pretrial Procedure**   Trial, dismissal during

Plaintiff has absolute right to take nonsuit before
resting its case against defendant, provided that

defendant does not have pending claim for
affirmative relief. Vernon's Ann.Texas Rules
Civ.Proc., Rule 162.

2 Cases that cite this headnote

**[2]**   **Pretrial Procedure**   Counterclaim or other
request for affirmative relief, effect of

"Claim for affirmative relief" brought by
a defendant, which precludes plaintiff from
taking a nonsuit, must be pleading that states
facts showing cause of action independent of
plaintiff's claim and allows defendant to recover
benefits, compensation, or relief even though
plaintiff has abandoned his cause of action or
failed to establish it. Vernon's Ann.Texas Rules
Civ.Proc., Rule 162.

7 Cases that cite this headnote

**[3]**   **Pretrial Procedure**   Counterclaim or other
request for affirmative relief, effect of

Whether defendant's pleading is affirmative
claim for relief, so as not to allow plaintiff to take
nonsuit, is determined by facts alleged and not by
name given plea or by form of prayer for relief.
Vernon's Ann.Texas Rules Civ.Proc., Rule 162.

6 Cases that cite this headnote

**[4]**   **Pretrial Procedure**   Counterclaim or other
request for affirmative relief, effect of

Claim is "pending," for purposes of allowing
plaintiff to take nonsuit if defendant does not
have "pending" claim for affirmative relief,
from time it has been filed until it is finally
and conclusively disclosed. Vernon's Ann.Texas
Rules Civ.Proc., Rule 162.

1 Cases that cite this headnote

**[5]**   **Pretrial Procedure**   Counterclaim or other
request for affirmative relief, effect of

Facts alleged in plea, not name of plea, determine
whether it is claim for affirmative relief,
for purposes of determining whether plaintiff
can take nonsuit. Vernon's Ann.Texas Rules
Civ.Proc., Rule 162.

**[6]** **Pretrial Procedure** 🔑 **Counterclaim or other request for affirmative relief, effect of**

Clients' motion for restitution which was pending at time of attorneys' nonsuit was "pending claim for affirmative relief" and, thus, trial court had jurisdiction to hear that motion, even after attorneys, who were plaintiffs, took a nonsuit. Vernon's Ann.Texas Rules Civ.Proc., Rule 162.

2 Cases that cite this headnote

**[7]** **Creditors' Remedies** 🔑 **Relief from Judgment or Order**

Validity of judgment in garnishment action rests upon finality of underlying debt judgment.

6 Cases that cite this headnote

**[8]** **Creditors' Remedies** 🔑 **Relief from Judgment or Order**

If underlying judgment has not reached that stage of judicial process in which it is not subject to being set aside by trial or appellate court, then judgment in ancillary garnishment action cannot stand.

7 Cases that cite this headnote

**[9]** **Creditors' Remedies** 🔑 **Relation to principal action**

**Creditors' Remedies** 🔑 **Jurisdiction of principal action**

Garnishment is not original suit, but ancillary to main one, and for that reason takes jurisdiction from main suit.

6 Cases that cite this headnote

**[10]** **Appeal and Error** 🔑 **Attachment and garnishment**

**Appeal and Error** 🔑 **Effect of affirmance**

When trial court loses jurisdiction in main suit by reason of appeal, it likewise loses jurisdiction in ancillary garnishment proceeding, but if

judgment in main suit is affirmed, trial court regains jurisdiction over garnishment action.

3 Cases that cite this headnote

**[11]** **Creditors' Remedies** 🔑 **Judgments and Orders on Which Garnishment Is Authorized**

If judgment in main suit is reversed, garnishment proceedings become nullity and writs issued thereunder are functus officio, or of no force or authority.

4 Cases that cite this headnote

**[12]** **Pretrial Procedure** 🔑 **Right in general**

Rule allowing nonsuit is to be construed liberally in favor of right to nonsuit. Vernon's Ann.Texas Rules Civ.Proc., Rule 162.

1 Cases that cite this headnote

**[13]** **Creditors' Remedies** 🔑 **Particular Remedies—Garnishment**

**Creditors' Remedies** 🔑 **Proceedings**

Remedy of garnishment is summary and harsh and should not be sustained unless there is strict compliance with statutory requirements.

3 Cases that cite this headnote

**[14]** **Appeal and Error** 🔑 **Making or compelling restitution**

When erroneous judgment has not been suspended pending appeal and relief granted has already been obtained, successful appellant may reclaim what he has been deprived of, but he must do so in normal course of judicial process by proper pleading, citation to all interested parties, and evidence establishing denial of his rights.

4 Cases that cite this headnote

**[15]** **Appeal and Error** 🔑 **Making or compelling restitution**

Successful appellant may reclaim relief without resorting to new suit.

**[16]** **Implied and Constructive Contracts** 🔑 Restitution

Party may have restitution upon its own motion after evidentiary hearing establishing with certainty what he had lost.

1 Cases that cite this headnote

**[17]** **Appeal and Error** 🔑 Restitution

Abuse of discretion standard governed review of trial court's decision overruling defendants' motion for restitution.

**[18]** **Appeal and Error** 🔑 Abuse of discretion

Test for "abuse of discretion" is whether court acted without reference to any guiding rules and principles.

**[19]** **Appeal and Error** 🔑 Abuse of discretion

Mere fact or circumstance that trial judge may decide matter within his discretionary authority in manner different from what appellate judgment would decide if placed in similar circumstance does not demonstrate abuse of discretion has occurred.

**[20]** **Appeal and Error** 🔑 Substitution of reviewing court's discretion or judgment

When reviewing under abuse of discretion standard, appellate court must not substitute its judgment for trial court, rather, it must decide whether trial court's decision was arbitrary or unreasonable.

**[21]** **Implied and Constructive Contracts** 🔑 Restitution

Debtor was entitled to restitution of money provided to garnishor under writ of garnishment after summary judgment in favor of garnishor in underlying proceeding was reversed, even though debtor did not appeal from garnishment action; garnishment proceeding had become nullity and writs issued thereunder were of no further force or authority when summary judgment was reversed.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*736** Michael Louis Minns, Wolf D. Schroeter, Scott L. Franck, Houston, for appellants.

Hal G. Wolff, Larry Huelbig, Houston, for appellee.

Before MURPHY, SEARS and CANNON, JJ.

MAJORITY OPINION ON REHEARING

CANNON, Justice.

This appeal arises from a suit for attorney's fees. The Bacas bring four points of error. We reverse and render.

On January 5, 1988, the law firm of Hoover, Bax, and Shearer (HBS) filed suit against Joseph and Pamela Baca to recover attorney's fees for legal services allegedly rendered on behalf of the Bacas. HBS sought recovery under theories of sworn account and quantum meruit.

At the same time, HBS initiated a garnishment action against Texas Commerce Bank–Westlake Park and Baca Landata, Inc. That proceeding was docketed separately from the suit for attorney's fees and given a different cause number. On January 6, 1988, the trial court granted HBS's prejudgment applications for writs of garnishment and writ of attachment. On that same date, a writ of garnishment was served upon Texas Commerce Bank National Association (Texas Commerce), the successor by merger to Texas Commerce Bank–Westlake Park. On February 1, 1988, Texas Commerce answered and admitted it was indebted to the Bacas in the sum of $32,582.22. That sum represented the balance in two checking accounts owned by the Bacas. A writ of garnishment was also served on Baca Landata, Inc., but it did not timely answer. Baca Landata, however, was not indebted to the Bacas and was eventually dismissed from the garnishment proceeding by agreement. The writ of attachment was also executed on certain property owned by the Bacas.

On February 17, 1988, the trial court granted HBS's motion for summary judgment in the underlying suit for attorney's fees. On April 18, 1988, the Bacas perfected **\*737** an appeal from that summary judgment. On April 21, 1988, HBS and Texas Commerce entered into an agreed final judgment in the garnishment proceeding. That judgment ordered HBS to recover $32,332.22 from Texas Commerce. It also allowed Texas Commerce to recover $250.00 in attorney's fees from the Bacas. On April 26, 1988, HBS received from Texas Commerce a check in the amount of $32,332.22 that was credited to the February 17 summary judgment in the underlying action.

On March 9, 1989, this Court, in an unpublished opinion reversed the summary judgment. The Court held that recovery by HBS on a theory of sworn account was improper where the petition named the Bacas as defendants, but the attached invoices named only Baca Publications, Inc. The Court also held that the trial court misplaced the burden of proof in overruling the Bacas' motion to dissolve the writ of attachment and remanded to the trial court for redetermination of that motion. On remand, Pamela Baca moved for partial summary judgment. That motion was granted on June 6, 1989. On February 26, 1990, the Bacas filed in the underlying action a combined motion for restitution, dissolution of writ of attachment, and dissolution of writ of garnishment (motion for restitution). The motion for restitution sets out all the facts necessary to support a cause of action for restitution. On March 2, 1990, HBS moved to dismiss the underlying action pursuant to TEX.R.CIV.P. 162. On that same date, the trial court granted HBS's motion and entered an order discharging the writ of attachment. After a hearing on March 28, 1990, the trial court denied the Bacas' motion for restitution. The Bacas appeal from that order.

In their first point of error, the Bacas contend the trial court erred in denying their motion for restitution.

Before we address this point, we must direct our attention to HBS's contention that the trial court did not have jurisdiction to hear the Bacas' motion because it granted a nonsuit to HBS. The nonsuit was granted after the Bacas filed their motion for restitution. In the absence of the nonsuit, the order denying the Bacas' motion for restitution purports to dispose of all issues and all parties since it states that "any relief not granted is hereby denied." *Teer v. Duddlesten,* 664 S.W.2d 702, 704 (Tex.1984).

[1] [2] [3] [4] TEX.R.CIV.P. 162 provides that a plaintiff has an absolute right to take a nonsuit before resting its case against the defendant, provided that the defendant does not have a pending claim for affirmative relief. *Johnson v. Harless,* 651 S.W.2d 259, 260 (Tex.1983); *Weaver v. Jock,* 717 S.W.2d 654, 657 (Tex.App.—Waco 1986, writ ref'd n.r.e.). A "claim for affirmative relief" must be a pleading that states facts showing a cause of action independent of the plaintiff's claim. *Greenberg v. Brookshire,* 640 S.W.2d 870, 872 (Tex.1982) (per curiam); *Progressive Ins. Co. v. Hartman,* 788 S.W.2d 424, 426 (Tex.App.—Dallas 1990, no writ); *Weaver,* 717 S.W.2d at 657. Such a claim allows the defendant to recover benefits, compensation, or relief even though the plaintiff has abandoned his cause of action or failed to establish it. *Weaver,* 717 S.W.2d at 657. If the defendant is doing nothing more than resisting the plaintiff's recovery, the pleading cannot be construed as requesting affirmative relief. *Lipsey v. Lipsey,* 660 S.W.2d 149, 151 (Tex.App.—Waco 1983, no writ). Whether a pleading is an affirmative claim for relief is determined by the facts alleged and not by the name given the plea or by the form of the prayer for relief. *Progressive Ins. Co.,* 788 S.W.2d at 426. A claim is "pending" from the time it has been filed until it is finally and completely disposed of. *Tri–M Erectors, Inc. v. Clearwater Constructors, Inc.,* 788 S.W.2d 906, 908 (Tex.App.—Austin 1990, writ denied).

It is beyond dispute that the Bacas' motion for restitution was pending at the time of HBS's nonsuit. At issue is whether that motion is a claim for affirmative relief. HBS contends that the motion for restitution is not a claim for affirmative relief because it was not a proper pleading under the Rules of Procedure and it was not filed **\*738** timely in the proper proceeding. HBS argues that a claim for affirmative relief can only be made through pleadings, as distinguished from a mere motion. Under TEX.R.CIV.P. 47, pleadings that set forth a claim for relief include a petition, counterclaim, crossclaim, or third-party claim. Since the Bacas' motion for restitution is not any of the above, HBS asserts that it is not a claim for affirmative relief. HBS also argues that the Bacas should have filed their motion for restitution in the garnishment proceeding, instead of in the underlying action. By failing to do so, the Bacas waived any attack on the garnishment judgment since it became final thirty days after it was signed. *Glenn W. Casey Constr., Inc. v. Citizen's Nat'l Bank,* 611 S.W.2d 695, 701–702 (Tex.App.—Tyler 1980, no writ); *Southern Pipeline Co., Inc. v. Humble Oil and*

*Refining Co.,* 496 S.W.2d 248 (Tex.App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.); TEX.R.CIV.P. 329b.

**[5]  [6]**  The Bacas' motion for restitution seeks the return of monies garnished by HBS in the absence of an underlying final judgment on the debt. While it is not one of the pleadings enumerated in 🚩 TEX.R.CIV.P. 47, that fact alone is not fatal. The facts alleged in the plea, not the name of the plea, determine whether it is a claim for affirmative relief. *Progressive Ins. Co.,* 788 S.W.2d at 426. We hold that the Bacas' motion for restitution was a pending claim for affirmative relief and that the trial court had jurisdiction to hear that motion.

**[7]  [8]  [9]  [10]  [11]**  Further, it is a well-established and longstanding rule that the validity of judgment in a garnishment action rests upon the finality of the underlying debt judgment. 🚩 *Taylor v. Trans–Continental Properties, Ltd.,* 670 S.W.2d 417, 419 (Tex.App.—Tyler 1984, *rev'd on other grounds,* 717 S.W.2d 890 (Tex.1986);* 🚩 *Tom Benson Chevrolet Co., Inc. v. Beall,* 567 S.W.2d 857, 859 (Tex.App.—San Antonio 1978, writ ref'd n.r.e.). If the underlying judgment has not reached that stage of the judicial process in which it is not subject to being set aside by the trial or appellate court, then the judgment in the ancillary garnishment action cannot stand. 🚩 *Taylor,* 670 S.W.2d at 419. A garnishment is not an original suit, but ancillary to the main one, and for that reason takes its jurisdiction from the main suit. *Id.* (citing *King & King v. Porter,* 113 Tex. 198, 252 S.W. 1022 (1923)). Thus, when the trial court loses jurisdiction in the main suit by reason of an appeal, it likewise loses jurisdiction in the ancillary garnishment proceeding. 🚩 *Taylor,* 670 S.W.2d at 419. If the judgment in the main suit is affirmed, the trial court regains jurisdiction over the garnishment action. *Id.* If the judgment in the main suit is reversed, the garnishment proceedings become a nullity and the writs issued thereunder are *functus officio,* or of no further force or authority. *Id.* (Emphasis added).

**[12]  [13]**  We are aware that TEX.R.CIV.P. 162 is to be construed liberally in favor of the right to nonsuit. 🔖 *Greenberg,* 640 S.W.2d at 872. We are also aware that the remedy of garnishment is summary and harsh and should not be sustained unless there is strict compliance with statutory requirements. *Fogel v. White,* 745 S.W.2d 444, 446 (Tex.App.—Houston [14th Dist.] 1988, orig. proceeding [leave denied] ). Here, the Bacas posted a $20,000.00 cash

deposit in lieu of a supersedeas bond when they appealed the summary judgment. Nonetheless, HBS obtained a judgment in the garnishment proceeding while that appeal was pending. It continued to hold the garnished funds after the underlying judgment was reversed. On remand, HBS abandoned its underlying cause of action for the debt without ever obtaining a judgment or otherwise having proven the Bacas' liability for the debt.

**[14]  [15]  [16]**  When an erroneous judgment has not been suspended pending appeal and the relief granted has already been obtained, the successful appellant may reclaim what he has been deprived of. *Salgo v. Hoffman,* 521 S.W.2d 922, 925 (Tex.App.—Dallas 1975, no writ). He must do so in the normal course of judicial process by proper pleading, citation to all interested parties, and evidence establishing the  **\*739** denial of his rights. 🔖 *Currie v. Drake,* 550 S.W.2d 736, 740 (Tex.App.—Dallas 1977, writ ref'd n.r.e.); *Salgo,* 521 S.W.2d at 925. The successful appellant may reclaim relief without resorting to a new suit. *Id.* It would be unreasonable to impose technical formalities on a party attempting to recover wrongfully taken property to which he is entitled, so long as basic requirements of notice and hearing are met. 🔖 *Currie,* 550 S.W.2d at 740. A party may have restitution upon its own *motion* after an evidentiary hearing establishing with certainty what he has lost. *Id.* (Emphasis added). The Bacas' have complied with these requirements.

**[17]  [18]  [19]  [20]**  Having determined that the trial court had jurisdiction to hear the Bacas' motion for restitution, we must now decide whether it was proper for the trial court to overrule that motion. The Bacas do not say what standard of review applies. HBS states that the standard of review is "abuse of discretion." Since that standard governs the review of virtually all pretrial rulings, we apply it here. The test for abuse of discretion is whether the court acted without reference to any guiding rules and principles. 🔖 *Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.Comm.App.1939, opinion adopted). The mere fact or circumstance that a trial judge may decide a matter within his discretionary authority in a manner different from what an appellate judge would decide if placed in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Jones v. Strayhorn,* 159 Tex. 421, 321 S.W.2d 290, 295 (Tex.1959). The appellate court must not substitute its judgment for the trial court, rather, it must decide whether the trial court's decision was arbitrary or

unreasonable. *Landry v. Travelers Ins. Co.,* 458 S.W.2d 649, 651 (Tex.1970).

Although it acknowledged error in rendering a judgment in the garnishment proceeding before the underlying judgment became final, the trial court denied the Bacas' motion for restitution stating that it could not correct the error since the Bacas did not appeal from the garnishment action. The trial court's ruling relied solely on the holding in *Glenn W. Casey Constr., Inc.* There, the garnishor obtained a default judgment against the garnishee in a garnishment action before obtaining judgment in the underlying debt action. Fifty-seven days later, the garnishor obtained a judgment against the debtor in the underlying action. At the same time, the trial court set aside the earlier default judgment in the garnishment action and entered a second default judgment based on the judgment in the underlying action. 611 S.W.2d at 697.

On appeal by writ of error from the garnishment proceeding, the garnishee argued that the first default judgment be set aside because it was entered before the garnishor obtained the judgment in the underlying debt action. The garnishee also argued that the court lacked jurisdiction to set aside the first default judgment and enter a second default judgment. 611 S.W.2d at 698. The Court of Appeals held that the trial court erred in entering a default judgment in the ancillary garnishment proceeding before rendering judgment in the underlying action and before that judgment became final. 611 S.W.2d at 701. The court, concluding that the garnishment judgment was not void, also held that the trial court lacked jurisdiction to set aside the first default judgment after the expiration of 30 days absent an appeal, bill of review, or writ of error. Since the garnishee properly brought a writ of error complaining of both default judgments in the garnishment proceeding, both of those judgments were set aside. 611 S.W.2d at 702.

[21] When the summary judgment was reversed in the instant case, the garnishment proceeding became a nullity and the writs issued thereunder were of no further force or authority. *Taylor,* 670 S.W.2d at 420. As a result, the Bacas were not required to appeal from the garnishment action. We are aware of this Court's holding in *Southern Pipeline.* There, the garnishor obtained a default judgment against the debtor in the underlying action. Six days later, the garnishor entered into an agreed **\*740** judgment with the garnishee in the ancillary garnishment action. Shortly thereafter, the

debtor filed a motion for new trial in the underlying action. The trial court entered an order granting the debtor's motion for new trial and setting aside the garnishment judgment. The garnishee then moved to vacate that part of the court's order setting aside the garnishment judgment. That motion was granted and the debtor appealed. This Court held that while the judgment in the garnishment action was erroneously rendered before the judgment in the underlying action became final, the debtor could have cured the error by a timely appeal from the garnishment judgment. 496 S.W.2d at 248–49.

On the facts of this case, it was not necessary for the Bacas to appeal from the garnishment judgment. Garnishment is but a mode of enforcing execution of the court's judgment. *Tom Benson Chevrolet,* 567 S.W.2d at 859. A judgment that is nonexistent will not support a garnishment judgment. *Id.* Here, there is no underlying judgment to support the garnishment judgment. The Bacas successfully appealed the summary judgment in the underlying debt action. On remand, the trial court did not hold proceedings or render judgment to establish the Bacas' liability, if any, for the debt. As previously noted, HBS sued under theories of sworn account and quantum meruit. The trial court on remand granted partial summary judgment in favor of Pamela Baca, finding that she was not liable for the debt under a theory of sworn account. The trial court did not determine her liability under a theory of quantum meruit, nor did it determine Joseph Baca's liability for the debt under either a sworn account or a quantum meruit theory. Yet, HBS still held in its possession more than $32,000.00 of the Bacas' funds as a result of garnishment.

The Bacas were a party to the underlying debt action, not the garnishment action. Certainly, the Bacas were not required to appeal from a judgment rendered in a proceeding in which they were not a party. The validity of a garnishment judgment is solely dependent on the validity of the underlying debt claim and not vice-versa. If the Bacas had intervened and appealed only from the garnishment judgment, HBS would no doubt be arguing that the Bacas waived error by failing to appeal from the underlying debt judgment. At the very least, the Bacas were entitled to a determination of their liability for the debt. They were deprived of that opportunity when HBS abandoned its cause of action. Likewise, HBS was not entitled to garnish monies allegedly owed them by the Bacas without ever having proven that the Bacas, in fact, incurred the debt. Such would be the case if we were to allow the trial court's ruling to stand.

Hence, we hold that the trial court abused its discretion in overruling the Bacas motion for restitution and we sustain the Bacas' first point of error. In light of our disposition of the Bacas' first point of error, we need not address their remaining points of error. Because HBS abandoned its cause of action for the debt, the Bacas' motion for restitution is the only claim pending before the trial court, and they are entitled to recover the funds as a matter of law. Accordingly, we reverse the judgment of the trial court and render judgment that the Bacas recover $32,332.22 from HBS and $250.00 from Texas–Commerce. We further remand to the trial court to determine the amount of interest that the Bacas are entitled to recover.

**All Citations**

823 S.W.2d 734

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix U

KeyCite Yellow Flag - Negative Treatment
Distinguished by  Jacobs v. Jacobs,   Tex.App.-Hous. (14 Dist.),   October 2, 2014

907 S.W.2d 912
Court of Appeals of Texas,
Austin.

WALNUT EQUIPMENT LEASING CO., Appellant,

v.

J–V DIRT & LOAM, A DIVISION
OF J–V MARBLE MFG., INC., and
NationsBank of Texas, N.A., Appellees.

No. 03–95–00060–CV.
|
Sept. 20, 1995.
|
Rehearing Overruled Nov. 8, 1995.

**Synopsis**

In garnishment action, judgment debtor moved to dissolve writ of garnishment and sought damages for wrongful garnishment. The County Court at Law No. 1, Travis County, Steve Russell, J., rendered judgment dissolving writ and dismissed action. Judgment creditor appealed. The Court of Appeals held that: (1) judgment debtor's voluntary appearance at garnishment proceedings did not cure judgment creditor's failure to serve judgment debtor with copy of writ; (2) evidence supported trial court's finding that third party on whom writ was served was entity distinct from debtor, and that judgment debtor was not properly served; and (3) even if judgment creditor sustained its burden to prove grounds for issuing writ of garnishment, judgment creditor's failure to serve judgment debtor with writ established independent grounds for quashing writ.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (18)

**[1]**    **Creditors' Remedies** 🔑 **Particular Remedies—Garnishment**

Writ of garnishment affords harsh remedy.

**[2]**    **Creditors' Remedies** 🔑 **Particular Remedies—Garnishment**

Garnishment was not known to common law, but is purely statutory.

2 Cases that cite this headnote

**[3]**    **Creditors' Remedies** 🔑 **Applicable rules of procedure**

Garnishment proceedings cannot be sustained unless they strictly conform to statutory requirements and related rules. Vernon's Ann.Texas Rules Civ.Proc., Rule 663a.

5 Cases that cite this headnote

**[4]**    **Creditors' Remedies** 🔑 **Service**

**Creditors' Remedies** 🔑 **Defects, objections, and amendment**

Garnishor must strictly comply with requirement that it serve debtor, and its failure to comply is not mere irregularity. Vernon's Ann.Texas Rules Civ.Proc., Rule 663a.

8 Cases that cite this headnote

**[5]**    **Creditors' Remedies** 🔑 **Defects, objections, and amendment**

When judgment debtor voluntarily answers and appears in garnishment suit, debtor waives only irregularities in writ of garnishment and not necessity for writ itself. Vernon's Ann.Texas Rules Civ.Proc., Rule 663a.

5 Cases that cite this headnote

**[6]**    **Creditors' Remedies** 🔑 **Defects, objections, and amendment**

Judgment debtor's voluntary appearance in garnishment proceedings did not cure judgment creditor's failure to serve judgment debtor with copy of writ of garnishment. Vernon's Ann.Texas Rules Civ.Proc., Rule 663a.

8 Cases that cite this headnote

**[7]**    **Creditors' Remedies**  &#9756;  Form, requisites, and sufficiency

Actual notice to debtor of garnishment action does not constitute sufficient notice under rules governing garnishment. Vernon's Ann.Texas Rules Civ.Proc., Rule 663a.

1 Cases that cite this headnote

**[8]**    **Creditors' Remedies**  &#9756;  Weight and Sufficiency

Testimony of principal owner of judgment debtor that judgment debtor's name did not include "doing business as" designation and that judgment debtor had never done business under name specified on writ of garnishment as well as testimony that leased equipment was used at location other than judgment debtor's, that judgment creditor billed third party for lease payments, and that judgment creditor assumed that third party was part of judgment debtor was legally and factually sufficient to support trial court's finding that third party was entity distinct from judgment debtor and that service on third party of writ of garnishment was not sufficient to constitute service on judgment debtor. Vernon's Ann.Texas Rules Civ.Proc., Rule 663a.

**[9]**    **Creditors' Remedies**  &#9756;  Evidence, hearing, and determination

Apart from proof of grounds supporting issuance of writ of garnishment, party moving to dissolve writ bears burden to prove ground for dissolution. Vernon's Ann.Texas Rules Civ.Proc., Rule 664a.

5 Cases that cite this headnote

**[10]**    **Appeal and Error**  &#9756;  Review for factual or legal sufficiency; "no evidence" review

**Appeal and Error**  &#9756;  Any evidence

To review no evidence challenge, Court of Appeals considers only evidence and inferences tending to support finding; if any probative evidence supports finding, it must be upheld.

**[11]**    **Appeal and Error**  &#9756;  On review of verdict, findings, and sufficiency of evidence

**Appeal and Error**  &#9756;  Clear or plain weight; clearly or plainly contrary

To review factual sufficiency challenge, Court of Appeals considers all evidence and will set aside finding only if evidence supporting it is so weak, or evidence to contrary so overwhelming, as to make it clearly wrong and unjust.

**[12]**    **Creditors' Remedies**  &#9756;  Right to Relief; Grounds, Defenses, and Factors Considered

Evidence was legally and factually sufficient to support trial court's finding that judgment debtor did not and had never done business at address specified in writ of garnishment and had never represented to anyone that such address was its correct or proper address, justifying dissolution of writ of garnishment due to lack of service of writ on debtor. Vernon's Ann.Texas Rules Civ.Proc., Rule 664a.

**[13]**    **Appeal and Error**  &#9756;  Specification of Errors

Trial court's findings not attacked by appellant are binding on appeal.

2 Cases that cite this headnote

**[14]**    **Appeal and Error**  &#9756;  Verdict, Findings, Sufficiency of Evidence, and Judgment

Court of Appeals need not consider grounds not made basis for judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 299.

**[15]**    **Creditors' Remedies**  &#9756;  Right to Relief; Grounds, Defenses, and Factors Considered

Even if judgment creditor sustained its burden to prove grounds for issuing writ of garnishment, judgment creditor's failure to serve writ on judgment debtor was independent ground for

dissolving writ. Vernon's Ann.Texas Rules Civ.Proc., Rules 663a, 664a.

2 Cases that cite this headnote

**[16]   Appeal and Error** 👉 **Necessity of ruling on exception**

Judgment creditor's failure to obtain ruling on its exception to affidavit of judgment debtor's officer which was attached to motion to dissolve writ of garnishment on basis that affidavit did not show officer's personal knowledge waived claim on appeal. Vernon's Ann.Texas Rules Civ.Proc., Rule 90; Rules App.Proc., Rule 52(a).

3 Cases that cite this headnote

**[17]   Appeal and Error** 👉 **Dismissal or nonsuit and striking from docket**

Judgment creditor's failure to object in trial court that judgment debtor's motion to dismiss garnishment action was unsworn waived claim on appeal. Vernon's Ann.Texas Rules Civ.Proc., Rules 90, 664a; Rules App.Proc., Rule 52(a).

1 Cases that cite this headnote

**[18]   Creditors' Remedies** 👉 **Motions in general**

Although motion to dissolve writ of garnishment must be sworn, unsworn motion does not present jurisdictional or fundamental defect. Vernon's Ann.Texas Rules Civ.Proc., Rules 663a, 664a.

1 Cases that cite this headnote

## Attorneys and Law Firms

**\*914** William A. Petersen, Jr., Houston, for Appellant.

David G. Caldwell, Austin, for J–V Dirt & Loam.

Jeffrey J. Brookner, Hirsch & Westheimer, P.C., Houston, for NationsBank of Texas.

Before CARROLL, C.J., and ABOUSSIE and JONES, JJ.

## Opinion

PER CURIAM.

This appeal arises from a proceeding to dissolve a writ of garnishment. Appellant Walnut Equipment Leasing Company obtained a writ of garnishment against appellee NationsBank of Texas, N.A. The writ impounded funds of appellee J–V Dirt & Loam, a Division of J–V Marble Manufacturing, Inc., against whom Walnut had previously obtained a judgment. The underlying judgment was based on J–V's breach of a lease for cellular telephones. J–V moved to dissolve the writ and also sought damages for wrongful garnishment. After a hearing before the trial court, the court rendered judgment dissolving the writ of garnishment. We will affirm the trial court's judgment.

A garnishor must serve the judgment debtor with a copy of the writ of garnishment, the application, accompanying affidavits, and orders of the court as soon as practicable following service of the writ on the garnishee. Tex.R.Civ.P. 663a. In point of error one, Walnut asserts that J–V waived the requirement of service when it moved to dissolve the writ and appeared before the trial court. The trial court's findings of fact reveal that it dissolved the writ based on Walnut's failure to serve J–V as Rule 663a required. Walnut does not dispute its failure to serve J–V with a copy of the writ.

Following Walnut's service of the writ on NationsBank, J–V filed a "Motion To Dissolve  **\*915** Writ of Garnishment and for Damages, Costs, and Attorney's Fees." The court held an evidentiary hearing, in which J–V participated and adduced evidence on its damages for wrongful garnishment. Several months later, J–V filed a "Motion To Release Garnished Funds and for Dismissal." The court then signed its order dissolving the writ of garnishment and dismissing the cause.

[1]   [2]   [3]   [4]   [5]   The writ of garnishment affords a harsh remedy. It was not known to the common law, but is purely statutory. *Beggs v. Fite,* 130 Tex. 46, 106 S.W.2d 1039, 1042 (1937); *see* Tex.Civ.Prac. & Rem.Code Ann. §§ 63.001–.005 (West 1986 & Supp.1995); Tex.R.Civ.P. 657–679. For this reason, garnishment proceedings cannot be sustained unless they strictly conform to the statutory requirements and related rules. *Fite,* 106 S.W.2d at 1042; *Pinkston v. Victoria Bank & Trust Co.,* 215 S.W.2d 245, 247 (Tex.Civ.App.—Waco 1948, no writ). The garnishor must strictly comply with the requirement that it serve the debtor, and its failure to comply is not a mere irregularity. *Small*

*Business Inv. Co. v. Champion Int'l Corp.,* 619 S.W.2d 28, 30 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). When the judgment debtor voluntarily answers and appears in a garnishment suit, the debtor waives only irregularities in the writ of garnishment and not the necessity for the writ itself. *Id.; e.g., Long v. Cosden Petroleum Corp.,* 407 S.W.2d 1, 2–3 (Tex.Civ.App.—Texarkana 1966, no writ) (debtor who filed general pleading waived technical defect in writ of garnishment); *see* 38 C.J.S. *Garnishment* § 165 (1943) (garnishment void because properly certified copy of writ was not left with debtor is not validated by debtor's appearance).

 **[6]** **[7]** Given the requirement that a garnishor strictly comply with rules governing garnishment proceedings, we hold that J–V's voluntary appearance did not cure Walnut's failure to serve it with a copy of the writ. *Small Business Inv. Co.,* 619 S.W.2d at 30. This holding is in accord with our previous holding that actual notice to the debtor of a garnishment action does not constitute sufficient notice under Rule 663a. *See* *Hering v. Norbanco Austin I, Ltd.,* 735 S.W.2d 638 (Tex.App.—Austin 1987, writ denied). We note that the court of appeals in *DEL–PHI Eng'g Assocs., Inc. v. Texas Commerce Bank–Conroe, N.A.,* held that judgment debtors, who had not been served with a copy of the writ of garnishment, waived notice by agreeing to the second hearing on their motion to dissolve. 771 S.W.2d 589, 591 (Tex.App.—Beaumont 1989, no writ). To the extent that *DEL–PHI* compels a determination that J–V waived service of the writ in this case, we decline to follow it. We overrule point one.

 **[8]** In its second point of error, Walnut challenges the legal and factual sufficiency of the evidence to support the trial court's finding of fact number two. This finding states, "The Defendant does not now and has never at any time done business under the name Turner and Associates." In finding number four, which Walnut does not challenge, the trial court states that Walnut served J–V "doing business as Turner and Associates" at 3510 Rivercrest Drive, Austin, Texas 78746.

 **[9]** **[10]** **[11]** Apart from proof of the grounds supporting issuance of the writ, the party moving to dissolve the writ bears the burden to prove the ground for dissolution. *See* Tex.R.Civ.P. 664a; 38 C.J.S. *Garnishment* § 272(c) (1943); *e.g., Jefferson Sav. & Loan Ass'n v. Adams,* 802 S.W.2d 811, 813 (Tex.App.—San Antonio 1990, writ denied). To review Walnut's no-evidence challenge, we consider only the evidence and inferences tending to support the finding. If any

probative evidence supports the finding, it must be upheld. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.,* 774 S.W.2d 666, 668 (Tex.1989); *Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989). To review Walnut's factual-sufficiency challenge, we consider all the evidence and will set aside the finding only if the evidence supporting it is so weak, or the evidence to the contrary so overwhelming, as to make it clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); **\*916** *West v. Watkins,* 594 S.W.2d 800, 802 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.).

Walnut does not challenge the court's finding number one, which states, "The correct name of the Defendant herein is J–V Dirt and Loam, a Division of Marble Manufacturing, Inc." We are therefore bound by this finding. *Des Champ v. Featherston,* 886 S.W.2d 536, 541 (Tex.App.—Austin 1995, no writ). John Sprenkle, the principal owner of J–V, denied that the company's name included "d/b/a Turner and Associates." He testified that J–V Dirt & Loam, a Division of J–V Marble Manufacturing, Inc., had never done business under the name of Turner and Associates.

William Shapiro, president of Walnut, testified that Walnut received a check in partial payment of the lease from "Turner Trucking Company, debtor in possession." He also stated that Sprenkle told Walnut that the leased equipment would be in the possession of Turner Trucking. Each month, Walnut billed J–V by sending an invoice to the address J–V directed; J–V frequently changed the address for invoicing. At some point, Walnut was told to send invoices to Turner and Associates.

The trial court admitted in evidence Walnut's business records along with the affidavit of Shapiro. The records and affidavit show that shortly after signing the lease, J–V told Walnut to send its bills to the attention of Joanne Turner at the address given in the lease for the location of the leased phones. About one month later, Sprenkle informed Walnut that it should contact Bill Turner about the leased equipment. The next month, Sprenkle told Walnut to talk to Joanne Turner of the National Safety Association to verify the information in the lease. Sprenkle said that Joanne was the person who was using the leased equipment and who was to pay the invoices. Joanne Turner confirmed with Walnut that the leased equipment had been installed in vehicles at her place of business. On September 30, 1991, Walnut sent Sprenkle an invoice that was returned with a notation by the post office giving the address of Turner and Associates.

Shapiro states in his affidavit that because Sprenkle had told Walnut that Turner and Associates possessed the leased equipment, Walnut assumed that Turner and Associates was associated with or was a division of J–V Marble Manufacturing, Inc.

Sprenkle's testimony that J–V's name did not include "d/b/a Turner and Associates" and that J–V had never done business as Turner and Associates is clearly some evidence to support the challenged finding. The remaining evidence, including testimony that the leased equipment was used at a location other than J–V's, that Walnut billed Turner and Associates for lease payments, and that Walnut assumed that Turner and Associates was part of J–V, does not overcome Sprenkle's testimony. Because both legally and factually sufficient evidence support the trial court's finding that Turner and Associates was an entity distinct from J–V, we overrule point two.

[12] In its third point of error, Walnut challenges the legal and factual sufficiency of the evidence to support the trial court's fact finding number three. This finding states, "The Defendant does not now and has never done business at 3510 Rivercrest Drive, Austin, Texas 78746, nor has Defendant ever represented to anyone that was its correct or proper address."

Regarding J–V's address, Shapiro testified that Walnut sent invoices on the lease to the addresses furnished to its employees. Walnut's business records, as well as Shapiro's affidavit, document several addresses for J–V. The lease, signed August 12, 1991, gave J–V's address as 12009 Harold Green in Austin and the location of the leased equipment as 9390 Research in Austin. On August 27, J–V requested that all bills be sent to the Kaleido Building at 9390 Research. One month later, Sprenkle requested a copy of the lease, which Walnut sent to 12009 Harold Green. Sprenkle told Walnut on October 3, however, that he had not received the lease, that the Harold Green address was incorrect, and that the correct address was 305 Industrial Boulevard in Austin. The location at **917** Harold Green was apparently property on which J–V was building. Walnut sent a copy of the lease to 305 Industrial Boulevard, and Sprenkle confirmed on October 23 that he had received the lease.

Invoices sent to J–V were returned on October 3 with a notation by the post office that the new address was "Turner and Associates; P.O. Box 201414" in Austin. The evidence does not show the address to which the returned invoices were

sent. Shapiro states in his affidavit that a new address, "3510 Rivercrest; Austin, Texas 78746" was obtained from the post office and was the last address known to Walnut. A memo among Walnut's business records dated February 15, 1993, notes that the new address for Turner and Associates is 3510 Rivercrest, Austin, Texas 78746. In testifying on his attorney's fees, Walnut's attorney stated that the last address Walnut had been sending invoices to, and apparently receiving checks from, was 3510 Rivercrest.

The facts shown are that J–V itself changed addresses once and that it directed invoices under the lease to a second address. Several months after the lease was signed, Walnut's invoices were returned. Nothing in the evidence, however, connects the address at Rivercrest to J–V. The evidence shows, legally and factually, that during the time in question J–V had addresses other than 3510 Rivercrest. The evidence also shows that, as to the relations between the parties, J–V never represented 3510 Rivercrest to be its correct address. The evidence is legally and factually sufficient to support the trial court's third finding of fact. We therefore overrule point three.

[13] [14] In points of error four and five, Walnut complains that the evidence is legally and factually insufficient to support the trial court's dismissal of the writ of garnishment. Walnut first argues that the dismissal cannot be supported by J–V's claim that the underlying judgment, obtained in Pennsylvania, is invalid. The trial court's fact findings four and five reveal, however, that it based the dismissal on Walnut's failure to serve the writ of garnishment on J–V as required by Rule 663a. Because Walnut does not attack these findings, they are binding on appeal. *Des Champ*, 886 S.W.2d at 541. We need not consider grounds not made the basis for the judgment. *See* Tex.R.Civ.P. 299.

[15] Walnut next asserts that because it proved the grounds relied on for issuance of the writ of garnishment, it was entitled to a judgment upholding the writ. On a motion to dissolve the writ, Texas Rule of Civil Procedure 664a assigns to the garnishor the burden to prove the grounds relied on to issue the writ. *See* Tex.Civ.Prac. & Rem.Code Ann. § 63.001 (West 1986). [1] At the same hearing, however, the party whose property has been garnished may seek dissolution of the writ "for any grounds or cause, extrinsic or intrinsic." Tex.R.Civ.P. 664a. Even if Walnut sustained its burden to prove the grounds for issuing the writ, J–V was entitled to assert independent reasons for quashing it. If J–V established its independent ground for dissolving the writ, Walnut's proof

would not preclude dissolution. In this case, the trial court concluded that J–V established Walnut's failure to serve it. We therefore disagree that Walnut's proof of the grounds for issuing the writ compelled a denial of the motion. We overrule points four and five.

 [16]    In its sixth point of error, Walnut claims that J–V's pleadings were insufficient to support the judgment. Walnut first argues that the motion to dissolve and the motion to dismiss lacked the sworn denials required by Rule of Civil Procedure 664a. Rule 664a states that a judgment debtor may seek to dissolve a writ of garnishment by sworn written motion. Tex.R.Civ.P. 664a. Without addressing the question whether the  *918  motion to dismiss superseded the motion to dissolve, we determine that Walnut has waived its objection to the lack of sworn pleadings by failing to object and obtain a ruling in the trial court. See Tex.R.Civ.P. 90; Tex.R.App.P. 52(a).

 [17]    [18]    Walnut specially excepted to the affidavit of Sprenkle, which was attached to the motion to dissolve, on the basis that it did not show Sprenkle's personal knowledge. By failing to obtain a ruling on its exception, however, Walnut has waived the claim for review. Tex.R.Civ.P. 90; Tex.R.App.P. 52(a);  Olney Sav. and Loan Ass'n v. Farmers Market of Odessa, Inc., 764 S.W.2d 869, 871 (Tex.App.—El Paso 1989, writ denied). Walnut never objected in the trial court that J–

V's motion to dismiss was unsworn. Although a motion to dissolve a writ of garnishment must be sworn, an unsworn motion does not present a jurisdictional or fundamental defect. See Sherry Lane Nat'l Bank v. Bank of Evergreen, 715 S.W.2d 148, 150 (Tex.App.—Dallas 1986, writ ref'd n.r.e.) (unsworn application for garnishment, though required to be sworn, did not present fundamental error);  Hudler–Tye Constr., Inc. v. Pettijohn & Pettijohn Plumbing, Inc., 632 S.W.2d 219, 223 (Tex.App.—Fort Worth 1982, no writ); Gottesman v. Toubin, 353 S.W.2d 294, 299 (Tex.Civ.App.—Houston [1st Dist.] 1962, no writ).

Walnut next claims that the grounds in the motion to dissolve concerning the validity of the underlying judgment were insufficient to support the dissolution. Because the trial court dissolved the writ on another basis, the grounds Walnut attacks are of no consequence. We overrule point six.

NationsBank independently asserts two points of error that, in view of our disposition of this case, we need not address.

We affirm the judgment of the trial court.

**All Citations**

907 S.W.2d 912

---

## Footnotes

1    A writ of garnishment is available if a plaintiff has a valid, subsisting judgment and makes an affidavit stating that, within the plaintiff's knowledge, the defendant does not possess property in Texas subject to execution sufficient to satisfy the judgment. Tex.Civ.Prac. & Rem.Code Ann. § 63.001(3) (West 1986).

---

**End of Document**                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix V

KeyCite Red Flag - Severe Negative Treatment
Enacted Legislation  Amended by   2020 TEXAS COURT ORDER 0040 (C.O. 0040),

Vernon's Texas Rules Annotated
   Texas Rules of Civil Procedure
      Part II. Rules of Practice in District and County Courts
         Section 5. Citation (Refs & Annos)

TX Rules of Civil Procedure, Rule 108a

Rule 108a. Service of Process in Foreign Countries

Effective: December 31, 2020

Currentness

**(a)** *Method.* Service of process may be effected on a party in a foreign country if the citation and petition is served:

(1) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

(2) as the foreign authority directs in response to a letter rogatory or letter of request;

(3) as provided by Rule 106(a);

(4) pursuant to the terms and provisions of any applicable international agreement;

(5) by diplomatic or consular officials when authorized by the United States Department of State; or

(6) by other means not prohibited by international agreement or the foreign country's law, as the court orders.

The method for service of process in a foreign country must be reasonably calculated, under all of the circumstances, to give actual notice of the proceedings to the defendant in time to answer and defend. A defendant served with process under this rule must appear and answer in the same manner and time and under the same penalties as if the defendant had been personally served with citation within this state to the full extent that the defendant may be required to appear and answer under the Constitution of the United States or under any applicable international agreement in an action either in rem or in personam.

**(b)** *Return.* Proof of service may be made as prescribed by the foreign country's law, by court order, by Rule 107, or by a method provided in any applicable international agreement.

**Credits**
Dec. 5, 1983, eff. April 1, 1984. Amended by orders of Aug. 21, 2020, and Dec. 18, 2020, eff. Dec. 31, 2020.

A-124

**Editors' Notes**

**COMMENT TO 2020 CHANGE**

Rule 108a is revised to provide that "other means" of service ordered under (a)(6) must not be prohibited by international agreement. Other clarifying and stylistic changes have been made.

Notes of Decisions (5)

Vernon's Ann. Texas Rules Civ. Proc., Rule 108a, TX R RCP Rule 108a
Current with amendments received through January 1, 2021

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**A-125**

# Appendix W

# DECLARATION/RESERVATION/NOTIFICATION

Declarations
Reservations

Articles: 1,5,8,10,15

**(Click here for the Central Authority designated by Switzerland and other practical information)**

**Text of the declarations:**

*(Translation)*
Re Article 1
1. With regard to Article 1, Switzerland takes the view that the Convention applies exclusively to the Contracting States. In particular, it believes that documents which are effectively addressed to a person resident abroad cannot be served on a legal entity who is not authorized to receive them in the country in which they were drawn up without derogating from Articles 1 and 15, first paragraph, of the Convention.

(...)
Re Article 5, third paragraph
3. Switzerland declares that in cases where the addressee does not voluntarily accept a document, it cannot officially be served on him or her in accordance with Article 5, first paragraph, unless it is in the language of the authority addressed, i.e. in German, French or Italian, or accompanied by a translation into one of these languages, depending on the part of Switzerland in which the document is to be served (cf. annex).

(...)
Re Articles 8 and 10
5. In accordance with Article 21, second paragraph (a), Switzerland declares that it is opposed to the use in its territory of the methods of transmission provided for in Articles 8 and 10.
(...)

# Appendix X



AR
Avis de réception



REGISTERED MAIL™
UNITED STATES POSTAL SERVICE®

RF 299 063 327 US

PSN 7690-03-000-9311

Label 200, August 2005

RETURN RECEIPT
REQUESTED

U.S. POSTAGE PAID
FCMILE
CORAL GABLES, FL
33134
DEC 29, 20
AMOUNT
**$31.41**
R2305E123548-15

9400                    00112

8010 Zürich-Mülligen BZI

**R** DIE POST
LA POSTE
LA POSTA

98.40.472361.06246053
Import

Rosneft Trading S.A.
Rue Place du Lac 2
Geneva, Switzerland 1204

Zumpano Patricios, P.A.
312 Minorca Ave
Coral Gables, FL 33134

A-127

# WRIT OF GARNISHMENT AFTER JUDGMENT

Cause No. 20-12-15427

THE STATE OF TEXAS

WRIT OF GARNISHMENT
AFTER JUDGMENT

TO:   Vitol Inc.
      Registered Agent CT Corporation System
      1999 Bryan Street Suite 900
      Dallas TX  75201

Whereas in the 284th Judicial District Court, of Montgomery County, Texas, in Cause No. 20-09-11744 wherein Antonio Caballero was/were plaintiff(s) and Fuerzas Armadas Revolucionarias De Colombia a/k/a FARC-EP a/k/a Revolutionary Armed Forces of Colombia; The Norte de Valle Cartel was/were Defendant(s), the Plaintiff(s), on the 20th day of May, 2020, secured a Judgment against said Defendant(s) in the amount of $46,729,667.00, plus interest and cost of suit. Antonio Caballero has applied for a Writ of Garnishment against you, the said Garnishee:

**Vitol Inc.**
**Registered Agent CT Corporation System**
**1999 Bryan Street Suite 900**
**Dallas TX  75201**

THEREFORE YOU ARE HEREBY COMMANDED to file a sworn answer on or before 10:00 o'clock A.M., on the Monday next following the expiration of twenty days from the date of service hereof, then and there to answer up on oath what, if anything, you are indebted to the said defendant and were, when this writ was served upon you; and

1. What effects, if any of the said defendant you had in your possession when this Writ was served or you have received prior to the answer date.
2. What other persons, if any, within your knowledge, are indebted to the said defendant, or have effects belonging to the said defendant in their possession.

YOU ARE FURTHER COMMANDED not to pay any debt to the defendant or to deliver to him any effects pending further order of this court.

TO:   **Petroleos de Venezuela, S.A. (a.k.a. PDVSA; a.k.a. PETROLEOS DE VENEZUELA S A;**
      **a.k.a. PETROLEOS DE VENEZUELA S.A; a.k.a. REFINERIA EL PALITO)**
      **Edificio Petroleos De Venezuela, Torre Este, Piso 9**
      **Avenida Libertador con calle El Empalme, La Campina**
      **Caracas, Venezuela 1010**
      **Rosneft Trading, S.A.**
      **26/1 Sofiyskaya Embankment**
      **Moscow, Russia 115035**
      **Fuerzas Armadas Revolucionarias De Colombia a/k/a FARC-EP a/k/a Revolutionary**
      **Armed Forces of Colombia**
      **C/O Juvenal Ovidio Ricard Palmera Pineda**
      **BOP Register No 27896-016 USP Florence Admax**
      **US Penitentiary 5880 Hwy 67 South**
      **Florence, CO 81226**
      **The Norte del Valle Cartel**

You are hereby notified that certain properties alleged to be owned by you have been garnished.  If you claim any rights in the property, you are advised:

**"YOU HAVE THE RIGHT TO REGAIN POSSESSION OF THE PROPERTY BY FILING A REPLEVY BOND. YOU HAVE A RIGHT TO ASK TO REGAIN POSSESSION OF THE PROPERTY BY FILING WITH THE COURT A MOTION TO DISSOLVE THIS WRIT."**

Herein fail not, but make due answer as the Law directs.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court, at Conroe, Texas, on this the 23rd day of December, 2020.

Issued at the request of:

Hank Fasthoff
21 Waterway Ave
Suite 300
The Woodlands TX 77380

Melisa Miller, District Clerk
Montgomery County, Texas
P.O Box 2985
Conroe, Texas 77305

By: *Beth Rogers*
12/23/2020 9:10:03 AM

Beth Rogers

**A-128**

# OFFICER'S RETURN

Cause No. 20-12-15427                                    Court No: 284th Judicial District Court
Style: Antonio Caballero VS. Fuerzas Armadas Revolucionarias De Colombia a/k/a FARC-EP a/k/a Revolutionary
Armed Forces of Colombia, The Norte de Valle Cartel
To: Vitol Inc.
Address:       Registered Agent CT Corporation System
               1999 Bryan Street Suite 900
               Dallas TX 75201


Came to hand the ___ day of _____, 20__, at _____ o'clock, and executed in _____ County,
Texas by delivering to each of the within named defendants in person, a true copy of this citation with the date of
delivery endorsed thereon, together with the accompanying copy of the Writ of Garnishment-After Judgment, at the
following times and places, to wit:
Name                    Date/Time              Place, Course and distance from Courthouse
_____ _____    _____

Manner of service: _____

*And not executed as to the defendants(s) _____
The diligence used in finding said defendant(s) being: _____
_____
And the cause of failure to execute this process is: _____
_____
And information received as to the whereabouts of said defendant(s) being: _____
_____
FEES:
Serving Petition and Copy       $_____

                                                _____OFFICER
TOTAL            $_____
                                                _____County, Texas

                                        By: _____, Deputy


## AFFIANT

Complete if you are a person other than a Sheriff, Constable, or Clerk of the Court. In accordance with Rule 107: the officer, or
authorized person who services, or attempts to serve a citation shall sign and return. The return must either be verified or be
signed under penalty of perjury.

A return signed under penalty of perjury must contain the statement below in
substantially the following form:                              _____
My full name is _____          Declarant/Authorized Process Server
My date of birth is ___/___/____, and my address is           _____
_____.                 ID# & Exp. Of Certification
I DECLARE UNDER PENALTY OF PERJURY THAT THE
FOREGOING IS TRUE AND CORRECT                                   SWORN AND SUBSCRIBED ON
Executed in_____, County, State of _____, on the
_____ day of _____, 20____.                          _____
                                                                                    DATE

                        _____
                        Declarant/Authorized Process Server   _____
                        _____                        NOTARY
                         ID# & Exp. Of Certification

**A-129**

Received and E-Filed for Record
12/16/2020 6:15 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Kayla Adams

CAUSE NO. 20-12-15427

| | | |
|---|---|---|
| ANTONIO CABALLERO, | § | IN THE DISTRICT COURT OF |
| | § | |
| **JUDGMENT CREDITOR &** | § | |
| **GARNISHOR,** | § | |
| | § | |
| VS. | § | |
| | § | |
| **FUERZAS ARMADAS** | § | **MONTGOMERY COUNTY, TEXAS** |
| **REVOLUCIONARIAS DE COLOMBIA** | § | |
| **a/k/a FARC-EP a/k/a** | § | |
| **REVOLUTIONARY ARMED FORCES** | § | |
| **OF COLOMBIA; and THE NORTE DEL** | § | |
| **VALLE CARTEL,** | § | |
| | § | |
| **JUDGMENT DEBTORS.** | § | |
| | § | |
| VS. | § | |
| | § | |
| **VITOL INC.,** | § | |
| | § | |
| **GARNISHEE.** | § | **284TH JUDICIAL DISTRICT** |

## APPLICATION FOR
## POST-JUDGMENT WRIT OF GARNISHMENT

Judgment Creditor & Garnishor Antonio Caballero ("Caballero"), by and
through undersigned counsel, files this Application for Writ of Garnishment pursuant
to Rules 657-679 of the TEXAS RULES OF CIVIL PROCEDURE and TEXAS CIVIL PRACTICE
& REMEDIES CODE §§ 63.001, *et seq.*, respectfully showing the Court as follows:

1

A-130

## I. PARTIES

1. Judgment Creditor & Garnishor is Antonio Caballero, whose address is c/o Joseph I. Zumpano or Leon N. Patricios, Zumpano Patricios, P.A., 312 Minorca Ave. Coral Gables, FL 33134.

2. Garnishee Vitol Inc. is a Delaware limited liability company doing business in Texas and that maintains a place of business in Texas is located at 2925 Richmond Ave., 11th Floor Houston, TX 77098. Vitol Inc. may be served by delivery of the writ and other process to its registered agent, CT Corporation System, at its registered office located at 1999 Bryan St., Suite 900 Dallas, TX 75201, or at any other location in the state where it may be found.[1]

## II. EXHIBITS

3. This application is supported by the following exhibits:

- Affidavit of Leon Patricios, Ex. 1;

- Docket Sheet from Case No.1:18-mc-00545-ALC; *Olivia Pescatore v. Juvenal Ovidio Ricardo Palmera Pineda, et al*; In the United States District Court for the Southern District of New York, Foley Square (Dkt Nos. 38 and 40); and Docket Sheet from Case No. 1:16-MC-00405-ALC; *Keith Stansell, et al. v. Revolutionary Armed forces of Colombia (FARC)*; In the United States District Court for the Southern District of New York, Foley Square (Dkt. Nos. 109 and 114); and

---

[1] Any district court may issue a writ of garnishment. TEX. CIV. PRAC. & REM. CODE § 63.002. If the Garnishee's answer in this case is controverted, the case must be tried in this court because Garnishee is a foreign corporation. TEX. CIV. PRAC. & REM. CODE § 63.002(b).

- Judgment in Cause No. 20-09-11744, 20-09-11744; *Antonio Caballero v. Fuerzas Armadas Revolucionarias de Colombia, et al*; In the District Courts of Montgomery County, Texas, 28th Judicial District, Ex. 3

All Exhibits attached hereto are incorporated herein by reference, and they are true and correct copies of the original documents.

### III. **PROCEDURAL HISTORY**

4. On May 20, 2020, Chief Judge Michael K. Moore of the United States District Court for the Southern District of Florida ("S.D. Fla.") entered a final judgment in favor of Caballero against the Judgment Debtors in the amount of $46,729,667.00, which was trebled pursuant to Section 18 U.S.C. § 2333, and which included post-judgment interest at the rate of 0.15% from May 20, 2020, the date of the final judgment (the "Final Judgment"). The outstanding balance of the non-trebled portion of the compensatory damages award is $41,734,153.93 and the amounts sought in each of the pending applications for garnishments before this Court will not exceed such amount.[2]

5. On September 28, 2020, in Cause No. 20-09-11744 on the docket of this Court, styled *Antonio Caballero, Judgment Creditor v. Fuerzas Armadas Revolucionarias de Colombia a/k/a FARC-EP a/k/a Revolutionary Armed Forces of Colombia and the Norte De Valle Cartel* (hereinafter the "Judgment Debtors"), Caballero registered his Final Judgment issued by the S.D. Fla. against the Judgment

---

[2] Whether TRIA judgment creditors – such as Caballero – are permitted to collect their total trebled final judgments is currently on appeal before the Eleventh Circuit Court of Appeals (the "Eleventh Circuit") in *Caballero v. Stansell, et al.*, No. 20-13102 (11th Cir. 2020). The Eleventh Circuit appeal will resolve whether Caballero is permitted to seek turnover of the outstanding balance of his trebled damages award (i.e., $135,193,487.93) plus interest, or only the outstanding non-trebled portion of his compensatory damages award (i.e., $41,734,153.93) plus interest.

Debtors. The Final Judgment is to be treated the same as any final judgment issued by this Court pursuant to Section 35.003(b) of the TEXAS CIVIL PRACTICE AND REMEDIES CODE. The Final Judgment is valid and subsisting and remains unsatisfied.

## IV. **RELEVANT BACKGROUND FACTS**

6.    The Office of Foreign Assets Control ("OFAC"), the U.S. Treasury Department's sanctions organization, is responsible for maintaining the Specially Designated Nationals and Blocked Persons List. Through post-judgment discovery efforts in the S.D. Fla. action, including a subpoena to OFAC, Caballero has learned that Garnishee is holding blocked assets in the putative name of, or for the benefit of Rosneft Trading, S.A. ("Rosneft") in the amount of $12,661,259.98, and the Venezuelan stated owned oil company Petroleos de Venezuela, S.A. (a.k.a. PDVSA; a.k.a. PETROLEOS DE VENEZUELA S A; a.k.a. PETROLEOS DE VENEZUELA S.A; a.k.a. REFINERIA EL PALITO) ("PdVSA") in the amount of $9,444,116.76.

7.    The United States District Court for the Southern District of New York has twice determined that PdVSA is an agent or instrumentality of the Judgment Debtor Fuerzas Armadas Revolucionarias de Colombia ("FARC") as set forth in Exhibit 2 attached hereto, and Judgment Creditor has reason to believe the Court will determine that Rosneft is an is an agent or instrumentality of the Judgment Debtor Fuerzas Armadas Revolucionarias de Colombia ("FARC") as set forth in Judgment Debtor's Motion for Agent or Instrumentality Determination filed in Cause No. 20-09-11744 filed in this Court.

4

**A-133**

8.   As set forth in the Affidavit of Leon Patricios, Caballero has reason to believe, and does believe, that Judgment Debtors do not possess property in Texas titled in their names subject to execution sufficient to satisfy said Final Judgment. Ex. 1. TEX. R. CIV. P. 658 (authorizing attorney to execute supporting affidavit).

9.   Caballero has reason to believe, and does believe, that Garnishee is indebted to Rosneft, as an agent or instrumentality of the FARC, in the amount of $12,661,259.98, and is indebted to PdVSA, as an agent or instrumentality of the FARC, in the amount of $9,444,116.76, Ex. 1.

10.   Plaintiff seeks a writ of garnishment so that justice may be done, and such writ is not sought to injure Judgment Debtors or Garnishee.

Judgment Creditor & Garnishor Antonio Caballero respectfully asks the Court to (i) grant this application, (ii) instruct the clerk of the court to issue a writ of garnishment for service upon Garnishee, (iii) enter judgment in favor against of Caballero against Garnishee, (iv) award to Caballero all attorney's fees and costs of court incurred herein and (v) grant to Caballero all other relief to which he may be entitled.

Respectfully Submitted,
FASTHOFF LAW FIRM, PLLC

/s/ Hank Fasthoff
Hank Fasthoff
Texas Bar No. 24003510
Federal Bar No. 22959
21 Waterway Ave., Suite 300
The Woodlands, Texas 77380
(Tel) 713.929.9314
hank@fasthofflawfirm.com

5

*/s/ Joseph Zumpano*
Joseph Zumpano
Florida Bar Number: 0056091
jzumpano@zplaw.com
(Admitted Pro Hac Vice)
Leon Patricios
Florida Bar Number: 0012777
lpatricios@zplaw.com
(Admitted Pro Hac Vice)
ZUMPANO PATRICIOS, P.A.
312 Minorca Avenue
Coral Gables, FL 33134
Telephone: (305) 444-5565

***Attorneys for Judgment Creditor
Antonio Caballero***

# EXHIBIT 1

CAUSE NO. _____

| | | |
|---|---|---|
| ANTONIO CABALLERO, | § | IN THE DISTRICT COURT OF |
| | § | |
| **GARNISHOR,** | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | |
| **FUERZAS ARMADAS** | § | MONTGOMERY COUNTY, TEXAS |
| **REVOLUCIONARIAS DE COLOMBIA** | § | |
| a/k/a FARC-EP a/k/a | § | |
| **REVOLUTIONARY ARMED FORCES** | § | |
| **OF COLOMBIA; and THE NORTE DE** | § | |
| **VALLE CARTEL,** | § | |
| | § | |
| **JUDGMENT DEBTORS.** | § | |
| | § | |
| VS. | § | |
| | § | |
| **VITOL INC.,** | § | |
| | § | |
| **GARNISHEE.** | § | 284TH JUDICIAL DISTRICT |

## AFFIDAVIT FOR POST-JUDGMENT WRIT OF GARNISHMENT

| | |
|---|---|
| THE STATE OF FLORIDA | § |
| | § |
| COUNTY OF MIAMI-DADE | § |

BEFORE ME, the undersigned authority, on this day personally appeared Leon N. Patricios, who, being by me duly sworn, on oath stated:

1.      My name is Leon N. Patricios. I am a Florida-licensed attorney for Antonio Caballero, the Judgment Creditor in the above civil action, and I have been admitted *pro hac vice* in related Cause No. *Antonio Caballero v. Fuerzas Armadas Revolucionarias de Colombia, et al*; In the District Court of Montgomery County,

1

Texas, 284th Judicial District. I have personal knowledge of the facts set forth herein, and they are all true and correct. I am authorized to make this affidavit in support of Caballero's Application for Post-Judgment Writ of Garnishment.

2.      Zumpano Patricios, P.A. represents Antonio Caballero in an action before the United States District Court for the Southern District of Florida, Case No. 18-cv-25337-KMM (the "Florida Federal Action").

3.      On May 20, 2020, the Court in the Florida Federal Action entered a Final Judgment on behalf of the Plaintiff Antonio Caballero and against the Judgment Creditors herein (the "Final Judgment").

4.      The Final Judgment was registered with this Court on September 28, 2020 and a Certificate of Mailing was served on the Defendants on September 28, 2020. A Certificate of Service of Mailing Registration of Foreign Judgment was also filed with the Court on September 28, 2020.

5.      The Final Judgment, which is treated the same as a final judgment issued by this Court pursuant to Section 35.003(b) of the TEXAS CIVIL PRACTICE AND REMEDIES CODE, was entered in favor of Judgment Creditor and against Judgment Debtors in the amount of $46,729,667.00, which was trebled pursuant to Section 18 U.S.C. § 2333, and which included post-judgment interest at the rate of 0.15% from May 20, 2020, the date of the Final Judgment.

2

6.     The Final Judgment is valid and subsisting and remains unsatisfied. The Final Judgment has not been contested or appealed and is final.

7.     Within my knowledge, Judgment Debtors do not possess property in Texas titled in their name subject to execution sufficient to satisfy said Final Judgment. The Judgment Debtors are terrorist parties who do not title assets in their own names. Instead, they use "straw men" to hold their assets.

8.     The United States District Court for the Southern District of New York has determined Petroleos de Venezuela, S.A. (a/k/a PDVSA; a/k/a PETROLEOS DE VENEZUELA S A; a/k/a PETROLEOS DE VENEZUELA S.A; a/k/a REFINERIA EL PALITO)   ("PdVSA") and its subsidiaries are agents or instrumentalities of Defendant Fuerzas Armadas Revolucionarias de Colombia ("FARC").   While the orders are currently under seal, the docket sheets reflect that such relief has been granted.  See Exhibit 2 to the Application for Post-Judgment Writ of Garnishment.

9.     Within my knowledge, Garnishee Vitol Inc. is indebted to Rosneft in the amount of $12,661,259.98, and is indebted to PdVSA in the amount of $9,444,116.76. My knowledge is based upon Garnishee's written response to a subpoena issued in another case.

10.    The garnishment applied for is not sued out to injure either the Judgment Debtors or the Garnishee, but is sought so that justice may be done.

3

**A-139**

FURTHER SAYETH AFFIANT NAUGHT

_____
Leon N. Patricios

STATE OF FLORIDA          )
                          )
COUNTY OF MIAMI-DADE  )

The foregoing instrument was acknowledged before me this 16 day of

December, 2020, by Leon N. Patricios who is personally known to me.

_____
Notary Public, State of Florida

My Commission Expires: 9/11/2023

4

# EXHIBIT 2

12/16/2020                                    SDNY CM/ECF NextGen Version 1.2

Query   Reports   Utilities   Help   Log Out

CLOSED

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:18-mc-00545-ALC

PESCATORE et al                                    Date Filed: 11/26/2018
Assigned to: Judge Andrew L. Carter, Jr            Date Terminated: 11/29/2018
Cause: M 18-302 Registration of Foreign Judgment

**Plaintiff**

**OLIVIA PESCATORE**                 represented by   **Nathaniel A. Tarnor**
                                                      Hagens Berman Sobol Shapiro LLP
                                                      555 Fifth Avenue
                                                      Suite 1700
                                                      New York, NY 10017
                                                      646-543-4992
                                                      Email: nt@tarnor.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOSH PESCATORE**                   represented by   **Nathaniel A. Tarnor**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JADA PESCATORE**                   represented by   **Nathaniel A. Tarnor**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JARROD PESCATORE**                 represented by   **Nathaniel A. Tarnor**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JORDAN PESCATORE**                 represented by   **Nathaniel A. Tarnor**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Estate of Frank Pescatore, Sr.**   represented by   **Nathaniel A. Tarnor**
                                                      (See above for address)

**A-142**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CAROL PESCATORE HARPSTER**              represented by   **Nathaniel A. Tarnor**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**RICHARD PESCATORE**                     represented by   **Nathaniel A. Tarnor**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN PESCATORE**                        represented by   **Nathaniel A. Tarnor**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**JUVENAL OVIDIO RICARDO
PALMERA PINEDA**
*also known as*
Cristo Rey Mariscal Peralta
*also known as*
SIMON TRINIDAD

**Defendant**

**FUERZAS ARMADAS
REVOLUCIONARIAS DE COLOMBIA**
*also known as*
FARC
*also known as*
REVOLUTIONARY ARMED FORCES
OF COLOMBIA

V.

**Garnishee**

**Citibank, N.A.**                        represented by   **Michael S. Flynn**
                                                            Davis Polk & Wardwell LLP
                                                            450 Lexington Avenue
                                                            New York, NY 10017
                                                            (212)-450-4766
                                                            Fax: (212)-450-5586
                                                            Email: michael.flynn@davispolk.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**A-143**

**Craig Thomas Cagney**
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212)-450-3162
Fax: (212)-701-6162
Email: craig.cagney@davispolk.com
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Mr. Samark Jose Lopez Bello**                 represented by **Eric Insuk Yun**
Archer & Greiner, PC
Three Logan Square
1717 Arch Street
Suite3500
Philadelphia, PA 19103
215-246-3137
Email: eyun@archerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey M Scott**
Archer & Greiner, P.C.
1717 Arch Street
Suite 3500
Philadelphia, PA 19103
215-963-3300
Fax: 215-963-9999
Email: jscott@archerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kerri Chewning**
Archer & Greiner
One Centennial Square
Haddonfield, NJ 08033
856-616-2685
Email: kchewning@archerlaw.com
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Yakima Trading Corporation**                 represented by **Eric Insuk Yun**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey M Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kerri Chewning**

**A-144**

12/16/2020 SDNY CM/ECF NextGen Version 1.2

(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/27/2018 | 1 | MISCELLANEOUS CASE INITIATING DOCUMENT - REGISTRATION OF FOREIGN JUDGMENT FROM UNITED STATES DISTRICT COURT Judgment in favor of Estate of Frank Pescatore, Sr. against FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, JUVENAL OVIDIO RICARDO PALMERA PINEDA ; in favor of JADA PESCATORE against FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, JUVENAL OVIDIO RICARDO PALMERA PINEDA ; in favor of JARROD PESCATORE against FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, JUVENAL OVIDIO RICARDO PALMERA PINEDA ; in favor of JOHN PESCATORE against FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, JUVENAL OVIDIO RICARDO PALMERA PINEDA ; in favor of JORDAN PESCATORE against FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, JUVENAL OVIDIO RICARDO PALMERA PINEDA ; in favor of JOSH PESCATORE against FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, JUVENAL OVIDIO RICARDO PALMERA PINEDA ; in favor of OLIVIA PESCATORE against FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, JUVENAL OVIDIO RICARDO PALMERA PINEDA ; in favor of RICHARD PESCATORE against FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, JUVENAL OVIDIO RICARDO PALMERA PINEDA ; in favor of CAROL PESCATORE HARPSTER against FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, JUVENAL OVIDIO RICARDO PALMERA PINEDA in the amount of $ 69,000,000. Other Court Name: United States District Court - District of Columbia. Other Court Case Number: 1:08-cv-02245. Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER. (Tarnor, Nathaniel) (Entered: 11/27/2018) |
| 11/28/2018 | | ***NOTICE TO ATTORNEY TO ELECTRONICALLY FILE MISCELLANEOUS COVER SHEET. Notice to Attorney Stephen Clark Mouritsen. Attorney must electronically file the Miscellaneous Cover Sheet. Use the event type Miscellaneous Cover Sheet found under the event list Other Documents. (bcu) Modified on 11/28/2018 (bcu). (Entered: 11/28/2018) |
| 11/28/2018 | 2 | MISCELLANEOUS COVER SHEET filed. (Attachments: # 1 Appendix Judgment from U.S. District Court for the District of Columbia)(Tarnor, Nathaniel) (Entered: 11/28/2018) |
| 11/29/2018 | | MISCELLANEOUS CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge J. Paul Oetken. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (bcu) (Entered: 11/29/2018) |
| 08/19/2019 | 3 | EX PARTE MOTION for Writ of Execution against Citibank, N.A.; UBS Financial Services, Inc.; Morgan Stanley Smith Barney, LLC; Safra National Bank of New York ., EX PARTE MOTION to Appoint Special Process Server . Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER. (Attachments: # 1 Memorandum of |

**A-145**

12/16/2020                                          SDNY CM/ECF NextGen Version 1.2

| | | |
|---|---|---|
| | | Law, # 2 Declaration of Plaintiffs Counsel, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Text of Proposed Order, # 11 Writ)(Tarnor, Nathaniel) (Entered: 08/19/2019) |
| 08/23/2019 | 4 | EX PARTE LETTER MOTION to Stay re: 3 EX PARTE MOTION for Writ of Execution against Citibank, N.A.; UBS Financial Services, Inc.; Morgan Stanley Smith Barney, LLC; Safra National Bank of New York .EX PARTE MOTION to Appoint Special Process Server . addressed to Judge J. Paul Oetken from Nathaniel Tarnor dated 08/23/2019. Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER. (Tarnor, Nathaniel) (Entered: 08/23/2019) |
| 08/30/2019 | 5 | ORDER terminating 3 Motion for Writ of Execution; terminating 3 Motion to Appoint Special Process Server; granting 4 Letter Motion to Stay. Granted. This matter is hereby stayed. Plaintiffs shall file a letter within 14 days of the resolution of the action in the Southern District of Florida regarding whether the stay should be lifted. The Clerk of Court is directed to close the motions at Docket Numbers 3 and 4. (Signed by Judge J. Paul Oetken on 8/29/2019) (ne) (Entered: 08/30/2019) |
| 05/04/2020 | 6 | LETTER MOTION to Reopen Case addressed to Judge J. Paul Oetken from Nathaniel A. Tarnor dated May 4, 2020. Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER. (Attachments: # 1 Exhibit April 29, 2020 Order, # 2 Exhibit Updated Writ, # 3 Text of Proposed Order).(Tarnor, Nathaniel) (Entered: 05/04/2020) |
| 05/04/2020 | 7 | ORDER granting 6 Letter Motion to Reopen Case. So Ordered. (Signed by Judge J. Paul Oetken on 5/4/2020) (js) Transmission to Orders and Judgments Clerk for processing. Modified on 5/5/2020 (js). (Entered: 05/05/2020) |
| 05/07/2020 | | Writ of Execution Issued on May 7, 2020, as per the judgment at document #1. (Signed by Clerk of Court Ruby Krajick on 5/7/2020).(km) (Entered: 05/07/2020) |
| 06/03/2020 | 8 | LETTER addressed to Judge J. Paul Oetken from Eric I. Yun, Esq. dated June 3, 2020 re: Intervenors' Request for a Pre-Motion Conference. Document filed by Samark Jose Lopez Bello, Yakima Trading Corporation. (Attachments: # 1 Exhibit Exhibit A to Intervenors' Letter Requesting Pre-Motion Conference).(Yun, Eric) (Entered: 06/03/2020) |
| 06/05/2020 | 9 | LETTER addressed to Judge J. Paul Oetken from Nathaniel A. Tarnor, Esq. dated June 5, 2020 re: Response to Intervenors' Request for a Pre-Motion Conference. Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER..(Tarnor, Nathaniel) (Entered: 06/05/2020) |
| 06/08/2020 | 10 | NOTICE OF APPEARANCE by Eric Insuk Yun on behalf of Samark Jose Lopez Bello, Yakima Trading Corporation..(Yun, Eric) (Entered: 06/08/2020) |
| 06/12/2020 | 11 | ORDER: Intervenors Samark Jose Lopez Bello and Yakima Trading Corporation have filed a letter requesting leave to file a motion to intervene in this miscellaneous case, which is a post-judgment executing proceeding. (Dkt. No. 8.) Because Plaintiffs do not oppose intervention (see Dkt. No. 9), and it seems appropriate, Intervenors' letter is deemed a motion to intervene and is hereby GRANTED. The parties shall appear for a telephonic conference in the case on June 22, 2020, at 11:30 a.m. At the appointed time, counsel shall call (888) 557-8511, and use the access code 9300838. SO ORDERED., ( |

**A-146**

|            |    |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                     |
|------------|----|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |    | Telephone Conference set for 6/22/2020 at 11:30 AM before Judge J. Paul Oetken.) (Signed by Judge J. Paul Oetken on 6/12/2020) (ama) (Entered: 06/12/2020) |
| 06/18/2020 | 12 | MOTION for Kerri E. Chewning to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20314788. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Samark Jose Lopez Bello. (Attachments: # 1 Text of Proposed Order, # 2 Affidavit, # 3 Exhibit Certificate of Good Standing).(Chewning, Kerri) (Entered: 06/18/2020) |
| 06/18/2020 | 13 | MOTION for Jeffrey M. Scott to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20314925. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Samark Jose Lopez Bello, Yakima Trading Corporation. (Attachments: # 1 Affidavit, # 2 Text of Proposed Order, # 3 Exhibit Certificate of Good Standing).(Scott, Jeffrey) (Entered: 06/18/2020) |
| 06/18/2020 |    | >>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 12 MOTION for Kerri E. Chewning to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20314788. Motion and supporting papers to be reviewed by Clerk's Office staff., 13 MOTION for Jeffrey M. Scott to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20314925. Motion and supporting papers to be reviewed by Clerk's Office staff.. The filing is deficient for the following reason(s): the affidavits are not notarized;. Re-file the motions as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (ad) (Entered: 06/18/2020) |
| 06/18/2020 | 14 | MOTION for Jeffrey M. Scott to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff. Filing fee $ 200.00, receipt number ANYSDC-20314925. Document filed by Samark Jose Lopez Bello, Yakima Trading Corporation. (Attachments: # 1 Affidavit, # 2 Text of Proposed Order, # 3 Exhibit Certificate of Good Standing).(Scott, Jeffrey) Modified on 6/18/2020 (ad). (Entered: 06/18/2020) |
| 06/18/2020 | 15 | MOTION for Kerri E. Chewning to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff. Filing fee $ 200.00, receipt number ANYSDC-20314788 Document filed by Samark Jose Lopez Bello, Yakima Trading Corporation. (Attachments: # 1 Affidavit, # 2 Text of Proposed Order, # 3 Exhibit Certificate of Good Standing).(Chewning, Kerri) Modified on 6/18/2020 (ad). (Entered: 06/18/2020) |
| 06/18/2020 |    | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 15 MOTION for Kerri E. Chewning to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff., 14 MOTION for Jeffrey M. Scott to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The documents have been reviewed and there are no deficiencies. (ad) (Entered: 06/18/2020) |
| 06/19/2020 | 16 | ORDER granting 14 Motion to Appear Pro Hac Vice; granting 15 Motion to Appear Pro Hac Vice GRANTED. SO ORDERED. (HEREBY ORDERED by Judge J. Paul Oetken) (Text Only Order) (dm) (Entered: 06/19/2020) |
| 06/22/2020 |    | Minute Entry for proceedings held before Judge J. Paul Oetken: Telephone Conference held on 6/22/2020. (kgo) (Entered: 06/22/2020) |
| 06/26/2020 | 17 | LETTER MOTION for Extension of Time *before July 3rd* addressed to Judge J. Paul Oetken from Nathaniel A. Tarnor, Esq. dated 06/26/2020. Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD |

| | | |
|---|---|---|
| | | PESCATORE, CAROL PESCATORE HARPSTER. (Attachments: # 1 Text of Proposed Order).(Tarnor, Nathaniel) (Entered: 06/26/2020) |
| 06/29/2020 | 18 | ORDER granting 17 Letter Motion for Extension of Time. (5) Accordingly, the Plaintiffs' motion for a time extension under N.Y. C.P.L.R. § 5234(c) is granted and the execution proceedings in this matter will remain tolled until this Court rules otherwise. So Ordered.. (Signed by Judge J. Paul Oetken on 6/29/2020) (js) (Entered: 06/29/2020) |
| 07/23/2020 | 19 | STATUS REPORT. Document filed by Estate of Frank Pescatore, Sr., Samark Jose Lopez Bello, JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER, Yakima Trading Corporation..(Tarnor, Nathaniel) (Entered: 07/23/2020) |
| 07/24/2020 | 20 | LETTER MOTION for Extension of Time addressed to Judge J. Paul Oetken from Nathaniel A. Tarnor, Esq. dated 07/24/2020. Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER. (Attachments: # 1 Text of Proposed Order).(Tarnor, Nathaniel) (Entered: 07/24/2020) |
| 07/24/2020 | 21 | ORDER granting 20 Motion for Extension of Time. It is ORDERED AND ADJUDGED as follows: Accordingly, the Plaintiffs' motion for a time extension under N.Y. C.P.L.R. § 5232(a) is granted and the levy and execution proceedings in this matter will remain tolled until this Court rules otherwise. SO ORDERED. (Signed by Judge J. Paul Oetken on 7/24/2020) (ks) (Entered: 07/24/2020) |
| 07/28/2020 | 22 | TRANSCRIPT of Proceedings re: CONFERENCE held on 6/22/2020 before Judge J. Paul Oetken. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/18/2020. Redacted Transcript Deadline set for 8/28/2020. Release of Transcript Restriction set for 10/26/2020..(McGuirk, Kelly) (Entered: 07/28/2020) |
| 07/28/2020 | 23 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 6/22/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 07/28/2020) |
| 08/17/2020 | 24 | MOTION to Enforce Judgment . Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER..(Tarnor, Nathaniel) (Entered: 08/17/2020) |
| 08/17/2020 | 25 | MEMORANDUM OF LAW in Support re: 24 MOTION to Enforce Judgment . . Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER.. (Tarnor, Nathaniel) (Entered: 08/17/2020) |
| 08/17/2020 | 26 | DECLARATION of Nathaniel A. Tarnor, Esq. in Support re: 24 MOTION to Enforce Judgment .. Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH |

A-148

12/16/2020 SDNY CM/ECF NextGen Version 1.2

| | | |
|---|---|---|
| | | PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER. (Attachments: # 1 Statement of Material Facts, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32).(Tarnor, Nathaniel) (Entered: 08/17/2020) |
| 08/17/2020 | 27 | PROPOSED ORDER. Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER. Related Document Number: 24 ..(Tarnor, Nathaniel) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 08/17/2020) |
| 08/18/2020 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 27 Proposed Order was reviewed and approved as to form. (km) (Entered: 08/18/2020)** |
| 08/19/2020 | 28 | FIRST LETTER MOTION for Extension of Time *to Adjourn and Respond to Motion to Enforce Judgment, and Motion for Case Management Order* addressed to Judge J. Paul Oetken from Jeffrey M. Scott dated 8/19/2020. Document filed by Samark Jose Lopez Bello, Yakima Trading Corporation..(Scott, Jeffrey) (Entered: 08/19/2020) |
| 08/21/2020 | 29 | LETTER RESPONSE to Motion addressed to Judge J. Paul Oetken from Nathaniel A. Tarnor, Esq. dated 8/21/2020 re: 28 FIRST LETTER MOTION for Extension of Time *to Adjourn and Respond to Motion to Enforce Judgment, and Motion for Case Management Order* addressed to Judge J. Paul Oetken from Jeffrey M. Scott dated 8/19/2020. . Document filed by JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER..(Tarnor, Nathaniel) (Entered: 08/21/2020) |
| 08/21/2020 | 30 | NOTICE OF APPEARANCE by Michael S. Flynn on behalf of Citibank, N.A...(Flynn, Michael) (Entered: 08/21/2020) |
| 08/21/2020 | 31 | NOTICE OF APPEARANCE by Craig Thomas Cagney on behalf of Citibank, N.A... (Cagney, Craig) (Entered: 08/21/2020) |
| 08/21/2020 | 32 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Citigroup Inc. for Citibank, N.A.. Document filed by Citibank, N.A...(Cagney, Craig) (Entered: 08/21/2020) |
| 08/21/2020 | 33 | LETTER RESPONSE to Motion addressed to Judge J. Paul Oetken from Craig T. Cagney dated August 21, 2020 re: 28 FIRST LETTER MOTION for Extension of Time *to Adjourn and Respond to Motion to Enforce Judgment, and Motion for Case Management Order* addressed to Judge J. Paul Oetken from Jeffrey M. Scott dated 8/19/2020. . Document filed by Citibank, N.A...(Cagney, Craig) (Entered: 08/21/2020) |
| 08/25/2020 | | NOTICE OF CASE REASSIGNMENT to Judge Andrew L. Carter, Jr. Judge J. Paul Oetken is no longer assigned to the case..(wb) (Entered: 08/25/2020) |
| 08/26/2020 | 34 | LETTER addressed to Judge Andrew L. Carter, Jr. from Jeffrey S. Scott/Kerri Chewning/Eric Yun dated 8/26/20 re: Adjournment of Pescatore Plaintiff's Motion for Summary Judgment and Intervenors' Opposition. Document filed by Samark Jose Lopez Bello, Yakima Trading Corporation. (Attachments: # 1 Attachment 1, # 2 Attachment 2, # 3 Attachment 3, # 4 Attachment 4, # 5 Attachment 5, # 6 Attachment 6).(Yun, Eric) (Entered: 08/26/2020) |

**A-149**

12/16/2020                               SDNY CM/ECF NextGen Version 1.2

| 08/26/2020 | 35 | PROPOSED STIPULATION AND ORDER. Document filed by Citibank, N.A...(Cagney, Craig) (Entered: 08/26/2020) |
|---|---|---|
| 12/10/2020 | 36 | EX PARTE LETTER MOTION to Seal addressed to Judge Andrew L. Carter, Jr. from Nathaniel A. Tarnor, Esq. dated 12-10-20. Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER. Return Date set for 12/17/2020 at 05:00 PM..(Tarnor, Nathaniel) (Entered: 12/10/2020) |
| 12/10/2020 | 37 | ***EX-PARTE*** MOTION for Writ of Execution . Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER. Return Date set for 12/17/2020 at 05:00 PM. (Attachments: # 1 Exhibit SDFL Order, # 2 Exhibit SDFL Order, # 3 Affidavit Doug Farah, # 4 Affidavit David Gaddis, # 5 Affidavit Brian Fonseca, # 6 Text of Proposed Order proposed Order, # 7 Exhibit proposed writ of execution)Motion or Order to File Under Seal: 36 .(Tarnor, Nathaniel) (Entered: 12/10/2020) |
| 12/10/2020 | 38 | NOTICE of SUPPLEMENTAL APPENDIX IN SUPPORT OF POST-JUDGMENT EXECUTION AGAINST AGENCIES AND INSTRUMENTALITIES OF THE FARC (Venezuelan Cartel of the Suns re: 37 MOTION for Writ of Execution .. Document filed by Estate of Frank Pescatore, Sr., JADA PESCATORE, JARROD PESCATORE, JOHN PESCATORE, JORDAN PESCATORE, JOSH PESCATORE, OLIVIA PESCATORE, RICHARD PESCATORE, CAROL PESCATORE HARPSTER. (Attachments: # 1 Exhibit DOJ Press Release March 26, 2020: Maduro-FARC-Cartel of the Suns indictment, # 2 Exhibit DOJ Corrupt Venezuelan Regime Chart, # 3 Exhibit DOJ Cocaine Air Bridge Map from Venezuela, # 4 Exhibit DEA Wanted Poster $15,000,000 reward Nicolas Maduro-Moros, # 5 Exhibit USA v. Nicolas Maduro et al (FARC-Cartel of the Suns) Narcotics Conspiracy Indictment, # 6 Exhibit June 2020 OFAC Chart: PDVSA-El Aissami-Alex Saab Network, # 7 Exhibit Executive Order 13850, # 8 Exhibit Executive Order 13857, # 9 Exhibit Nov. 18, 2020 Infodio: PDVSA run by narcos, # 10 Exhibit DHS Wanted Poster El Aissami, # 11 Exhibit USA v. Lennys Rangel money laundering indictment,, # 12 Exhibit USA v. Lennys Rangel Factual Proffer on Guilty Plea, # 13 Exhibit Riskscreen.com Aug. 21, 2020: Guilty Plea Entered in PdVSA Corruption Investigation, # 14 Exhibit USA v. Leonardo Santilli money laundering Criminal Complaint, # 15 Exhibit USA v. Natalino DAmato money laundering indictment, # 16 Exhibit Douglas Farah: HOW TO MAKE A BILLION DOLLARS DISAPPEAR-Jos Luis Merino, PDVSA, Alba Petrleos and the Bukele Administrations enduring ties to transnational criminal structures, # 17 Exhibit OFAC Press Release March 22, 2019: Treasury Sanctions BANDES, Venezuelas National Development Bank, and Subsidiaries, # 18 Exhibit Douglas Farah: THE MADURO REGIMES ILLICIT ACTIVITIES: A Threat to Democracy in Venezuela and Security in Latin America, # 19 Exhibit Venezuelan-Nicaraguan Company, Albanisa, the PDVSA Laundering Machine, # 20 Exhibit Maduro Dictatorship Protects ELN and FARC Dissidents, Says Colombian President, # 21 Exhibit DHS Wanted Poster Samark Lopez Bello, # 22 Exhibit Doug Farah Congressional Testimony: Adapting U.S. Counternarcotics Efforts in Colombia, # 23 Exhibit April 2, 2020 Congressional Research Service U.S. Indictment of Top Venezuelan Officials, # 24 Exhibit Jan. 8, 2019 Treasury Press Release: Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders, # 25 Exhibit USA v. Edoardo Orsoni (former PDVSA and Petrocedeno SA general counsel) money laundering indictment, # 26 Exhibit USA v. Edoardo Orsoni Factual Proffer for Guilty Plea).(Tarnor, Nathaniel) (Entered: 12/10/2020) |
| 12/15/2020 | 39 | ORDER granting 36 Letter Motion to Seal: SO ORDERED. (Signed by Judge Andrew L. |

**A-150**

| | | Carter, Jr on 12/15/2020) (jwh) (Entered: 12/15/2020) |
|---|---|---|
| 12/15/2020 | 40 | ***SELECTED PARTIES*** ORDER granting 37 Motion for Writ of Execution.it is ORDERED AND ADJUDGED as follows: (1) This Court has subject matter jurisdiction to conduct post- judgment execution proceedings of plaintiffs' final judgment under a federal statute (ATA), rendered by a U.S. district court and properly registered in this district pursuant to 28 U.S.C. §1963, with post- judgment execution under the ATA and TRIA §201. (2) Plaintiffs' Ex Parte Motion is hereby granted; (3) Based upon the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") factual findings and Plaintiffs' supporting expert witness testimony and appendices, the Court finds that the OFAC IEEPA sanctioned PDVSA subsidiaries (identified in plaintiffs' Motion DE 37, p. 21) are each an agency or instrumentality of the FARC, and their blocked assets are therefore subject to attachment and execution pursuant to TRIA; (4) The Clerk of Court is hereby directed to issue the writ of execution in the form attached to Plaintiffs' Ex Parte Motion [DE37-7], (held by chambers) for service and levy on garnishees by the U.S. Marshals or the specially appointed process server, Mike Levey, NY Server LLC [Order DE 7]; and (5) The Clerk of this Court is authorized and directed to issue such further writs in aid of execution as warranted under, and in accordance with, Rule 69 of the Federal Rules of Civil Procedure, consistent with the Court's Order. (6) The Clerk of this Court shall file this Order so that it is only viewable byPlaintiffs, in accordance with this Court's Order [DE 39]. So Ordered. (Signed by Judge Andrew L. Carter, Jr on 12/15/2020) (js) Transmission to Orders and Judgments Clerk for processing. (Entered: 12/16/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/16/2020 12:52:00 | | |
| **PACER Login:** | zumpanopatricios | **Client Code:** | 01877 |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-mc-00545-ALC |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**A-151**

12/16/2020                          SDNY CM/ECF NextGen Version 1.2

**Q**uery    Reports    <u>U</u>tilities    Help    Log Out

STAYED,CLOSED,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:16-mc-00405-ALC

Stansell et al v. Revolutionary Armed forces of Colombia (FARC)      Date Filed: 11/10/2016
et al                                                                Date Terminated: 11/10/2016
Assigned to: Judge Andrew L. Carter, Jr
Cause: M 18-302 Registration of Foreign Judgment

**<u>Plaintiff</u>**

**Keith Stansell**                           represented by  **Newton Porter**
                                                             Porter & Krovick, P.A.
                                                             9655 S. Dixie Highway, Suite 208
                                                             Miami, FL 33156
                                                             (305) 373-5040
                                                             Fax: (305) 668-9154
                                                             Email: nporter@porterandkorvick.com
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Tony Korvick**
                                                             Porter & Korvick, P.A.
                                                             9655 S. Dixie Highway, Suite 208
                                                             Miami, FL 33156
                                                             (305)-373-5040
                                                             Fax: (305)-668-9154
                                                             Email: tkorvick@porterandkorvick.com
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Marc Gonsalves**                           represented by  **Newton Porter**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Tony Korvick**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Thomas Howes**                             represented by  **Newton Porter**

**A-152**

SDNY CM/ECF NextGen Version 1.2

                                     (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tony Korvick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Judith G. Janis**                               represented by **Newton Porter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tony Korvick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Christopher T. Janis**                          represented by **Newton Porter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tony Korvick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Greer C. Janis**                                represented by **Newton Porter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tony Korvick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael J. Janis**                              represented by **Newton Porter**
(See above for address)

12/16/2020                                   SDNY CM/ECF NextGen Version 1.2

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tony Korvick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jonathan N. Janis**                        represented by **Newton Porter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tony Korvick**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Revolutionary Armed forces of Colombia
(FARC) et al**

V.

**Garnishee**

**Citibank, N.A.**                           represented by **Craig Thomas Cagney**
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212)-450-3162
Fax: (212)-701-6162
Email: craig.cagney@davispolk.com
*ATTORNEY TO BE NOTICED*

**Michael S. Flynn**
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212)-450-4766
Fax: (212)-450-5586
Email: michael.flynn@davispolk.com
*ATTORNEY TO BE NOTICED*

V.

**A-154**

12/16/2020                                   SDNY CM/ECF NextGen Version 1.2

**Respondent**

**Olivia Pescatore**                        represented by **Nathaniel A. Tarnor**
                                            Hagens Berman Sobol Shapiro LLP
                                            555 Fifth Avenue
                                            Suite 1700
                                            New York, NY 10017
                                            646-543-4992
                                            Email: NathanT@hbsslaw.com
                                            *ATTORNEY TO BE NOTICED*

**Respondent**

**Josh Pescatore**                          represented by **Nathaniel A. Tarnor**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Respondent**

**Jada Pescatore**                          represented by **Nathaniel A. Tarnor**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Respondent**

**Jarrod Pescatore**                        represented by **Nathaniel A. Tarnor**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Respondent**

**Jordan Pescatore**                        represented by **Nathaniel A. Tarnor**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Respondent**

**Carol Pescatore Harpster, individually**  represented by **Nathaniel A. Tarnor**
**and as the Representative of the Estate of**              (See above for address)
**Frank Pescatore, Sr.**                                   *ATTORNEY TO BE NOTICED*

**Respondent**

**Richard Pescatore**                       represented by **Nathaniel A. Tarnor**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Respondent**

**John Pescatore**                          represented by **Nathaniel A. Tarnor**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Cross Defendant**

**SIX SIS Ltd.**                            represented by **Melissa Errine Byroade**
                                            Kelley Drye & Warren LLP
                                            101 Park Avenue
                                            New York, NY 10178
                                            (212)-808-7772
                                            Fax: (212)-808-7897

12/16/2020                                     SDNY CM/ECF NextGen Version 1.2

Email: mbyroade@kelleydrye.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Samark Lopez Bello**                        represented by   **Jeffrey M Kolansky**
Archer & Greiner, P.C.
1717 Arch Street
Suite 3500
Philadelphia, PA 19103
215-963-3300
Fax: 215-963-9999
Email: jkolansky@archerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allison Leigh Borgatti**
Archer & Greiner, P.C.
1717 Arch Street
Suite 3500
Philadelphia, PA 19103
215-246-3116
Email: aborgatti@archerlaw.com
*ATTORNEY TO BE NOTICED*

**Jeffrey M Scott**
Archer & Greiner, P.C.
1717 Arch Street
Suite 3500
Philadelphia, PA 19103
215-963-3300
Fax: 215-963-9999
Email: jscott@archerlaw.com
*ATTORNEY TO BE NOTICED*

**Kerri Chewning**
Archer & Greiner
One Centennial Square
Haddonfield, NJ 08033
856-616-2685
Email: kchewning@archerlaw.com
*ATTORNEY TO BE NOTICED*

**Timothy Browne Collier**
218 Arch Street
Apt. 517
19106
Philadelphia, PA 19106
215-470-1881
Email: tcollier@archerlaw.com
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Yakima Trading Corp.**

**A-156**

12/16/2020                                    SDNY CM/ECF NextGen Version 1.2

| Date Filed | # | Docket Text |
|---|---|---|
| 11/10/2016 | 1 | MOTION for Tony Korvick to Appear Pro Hac Vice. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell.(wb) (Entered: 11/10/2016) |
| 11/10/2016 | 2 | MOTION for Newton Porter to Appear Pro Hac Vice. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell.(wb) (Entered: 11/10/2016) |
| 11/10/2016 | | CASHIERS OFFICE REMARK on 1 Motion to Appear Pro Hac Vice, 2 Motion to Appear Pro Hac Vice, in the amount of $400.00, paid on 11/10/2016, Receipt Number 465401167075,465401167079. (wb) (Entered: 11/10/2016) |
| 11/10/2016 | 3 | ORDER granting 1 Motion for Tony Korvick to Appear Pro Hac Vice. (Signed by Judge William H. Pauley, III on 11/7/2016) (wb) (Entered: 11/10/2016) |
| 11/10/2016 | 4 | ORDER granting 2 Motion for Newton Porter to Appear Pro Hac Vice. (Signed by Judge William H. Pauley, III on 11/7/2016) (wb) (Entered: 11/10/2016) |
| 11/10/2016 | | Case Designated ECF. (wb) (Entered: 11/10/2016) |
| 11/10/2016 | 5 | REGISTRATION OF FOREIGN JUDGMENT from the United States District Court - Middle District of Florida; in favor of Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Keith Stansell, Marc Gonsalves, Michael J. Janis, Thomas Howes against Revolutionary Armed forces of Colombia (FARC) et al. in the amount of 74,010,000.00 jointly and severally Other Court Name: USDC-MDFCV. Other Court Case No.: 09CV2308. (Filing Fee $ 46.00, Receipt Number 465401167074)Document filed by Thomas Howes, Jonathan N. Janis, Marc Gonsalves, Keith Stansell, Christopher T. Janis, Greer C. Janis, Judith G. Janis, Michael J. Janis.(wb) Modified on 11/28/2017 (wb). (wb). (Entered: 11/10/2016) |
| 12/19/2018 | | Writ of Execution Issued as to Revolutionary Armed Forces of Columbia (FARC), et al., on December 19, 2018, in the amount of $ 301,276,178.28 in favor of Keith Stansell, et al., against Revolutionary Armed Forces of Columbia (FARC), et al., (Signed by Clerk of Court Ruby Krajick on 12/19/2018) (dt) . Original Mailed by Clerk's Office, with Customer's Fed Ex Air Bill Receipt # 8139 3139 3803 on December 19, 2018, to Porter A. Korvick P.A., 9655 S. Dixie Hwy, Suite 208 Miami, Fl 33156, att: Tony Korvick. (Entered: 12/19/2018) |
| 01/08/2019 | 6 | LETTER MOTION to Expedite *Service* addressed to Judge Richard M. Berman from TONY KORVICK, ESQ. dated January 8, 2019. (Filing Fee $ 46.00.) Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis.(Korvick, Tony) (Entered: 01/08/2019) |
| 01/08/2019 | 7 | ORDER with respect to 6 Letter Motion to Expedite. The Court needs more detail (via Atty. Affirmation) re: (i) NY Server, LLC; (ii) the garnishee bank; and (iii) prior proceedings in this case. SO ORDERED,. (Signed by Judge Richard M. Berman Part I on 1/08/2019) (ama) (Entered: 01/08/2019) |
| 01/08/2019 | 8 | LETTER MOTION to Expedite *and Affirmation Response to Order DE 7* addressed to Judge Richard M. Berman from TONY KORVICK, ESQ. dated January 8, 2019. (Filing Fee $ 46.00.) Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, |

**A-157**

12/16/2020 SDNY CM/ECF NextGen Version 1.2

| | | |
|---|---|---|
| | | Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis.(Korvick, Tony) (Entered: 01/08/2019) |
| 01/08/2019 | 9 | ORDER denying 8 Letter Motion to Expedite. ENDORSEMENT: Court cannot will not supersede the U.S. Marshals without more detailed information about the proposed process server (including licenses #, ETC) + about the garnishee banks. SO ORDERED. (Signed by Judge Richard M. Berman on 1/8/2019) (ks) Modified on 1/9/2019 (ks). (Entered: 01/08/2019) |
| 01/11/2019 | 10 | MISCELLANEOUS CASE INITIATING DOCUMENT - REGISTRATION OF FOREIGN JUDGMENT FROM UNITED STATES DISTRICT COURT Judgment # Docket Entry 232-233 in favor of Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Keith Stansell, Marc Gonsalves, Michael J. Janis, Thomas Howes against Revolutionary Armed forces of Colombia (FARC) et al in the amount of $ 318030000.00. Other Court Name: United States District Court - Middle District of Florida. Other Court Case Number: 8:09-cv-2308. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis. (Korvick, Tony) (Entered: 01/11/2019) |
| 01/14/2019 | 11 | LETTER MOTION for Conference *Requesting Assistance with Permanent Judge Assignment* addressed to Judge Jesse M. Furman from Tony Korvick dated 01/14/2019. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis.(Korvick, Tony) (Entered: 01/14/2019) |
| 01/14/2019 | 12 | EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Writ of Execution against Redacted . (Filing Fee $ 47.00, Receipt Number ANYSDC-16185900)Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis. (Attachments: # 1 Exhibit OFAC Chart, # 2 Exhibit OFAC Press Release, # 3 Text of Proposed Order, # 4 Exhibit proposed Writ of Execution Redacted)(Korvick, Tony) (Entered: 01/14/2019) |
| 01/14/2019 | 13 | DECLARATION of Tony Korvick in Support re: 12 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Writ of Execution against Redacted . (Filing Fee $ 47.00, Receipt Number ANYSDC-16185900). Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis. (Attachments: # 1 Exhibit MDFL Order DE 232, # 2 Exhibit MDFL Judgment DE 233, # 3 Exhibit MDFL Order DE 322)(Korvick, Tony) (Entered: 01/14/2019) |
| 01/14/2019 | 14 | NOTICE of of Filing Expert Witness Affidavits re: 12 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Writ of Execution against Redacted . (Filing Fee $ 47.00, Receipt Number ANYSDC-16185900). Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis. (Attachments: # 1 Exhibit Expert Witness Affidavit Col. Cote 2011, # 2 Exhibit Expert Witness Affidavit Col. Cote 2018, # 3 Exhibit Expert Witness Affidavit Doug Farah 2018)(Korvick, Tony) (Entered: 01/14/2019) |
| 01/14/2019 | 15 | NOTICE of OF FILING PLAINTIFFS APPENDIX IN SUPPORT OF POST-JUDGMENT EXECUTION AGAINST AGENCIES OR INSTRUMENTALITIES OF THE FARC re: 12 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Writ of Execution against Redacted . (Filing Fee $ 47.00, Receipt Number ANYSDC-16185900). Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 |

A-158

| | | |
|---|---|---|
| | | Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit)(Korvick, Tony) (Entered: 01/14/2019) |
| 01/14/2019 | 16 | NOTICE of OF FILING PLAINTIFFS APPENDIX ON OFAC DESIGNATED EL AISSAMI & LOPEZ BELLO NETWORK re: 12 EX PARTE MISCELLANEOUS CASE INITIATING DOCUMENT - MOTION for Writ of Execution against Redacted . (Filing Fee $ 47.00, Receipt Number ANYSDC-16185900). Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit)(Korvick, Tony) (Entered: 01/14/2019) |
| 01/15/2019 | 17 | PROPOSED ORDER. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis. Related Document Number: 12 . (Korvick, Tony) Proposed Order to be reviewed by Clerk's Office staff. (Entered: 01/15/2019) |
| 01/15/2019 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PROPOSED ORDER. Notice to attorney Tony Korvick to RE-FILE Document No. 17 Proposed Order. The filing is deficient for the following reason(s): Remove Done and Ordered in Washington, D.C. and Add SO ORDERED above signature line, and then add to the left of Signture Line Dated: New York New York, then underneath January, 2019. After the Order is Signed?, the Writ of exeuction with the Attorneys Origibnal Signature, (INK), no /s/ or electronic sign must be either brought into the Court to Orders & Judgmnets to be issued, or the Original must be mailed to Orders and Judgments with a SASE to be returned to the attorney so that they may execute it with the U.S. Marshalls (dt) (Entered: 01/15/2019) |
| 01/15/2019 | 18 | PROPOSED ORDER. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis. Related Document Number: 12 . (Korvick, Tony) Proposed Order to be reviewed by Clerk's Office staff. (Entered: 01/15/2019) |
| 01/15/2019 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 18 Proposed Order, was reviewed and approved as to form. Sent to Judge Furman as a Part I matter. (dt) (Entered: 01/15/2019) |
| 01/15/2019 | | NOTICE OF CASE REASSIGNMENT to Judge Andrew L. Carter, Jr. Judge Part One is no longer assigned to the case. (ad) (Entered: 01/15/2019) |
| 01/23/2019 | 19 | ORDER granting 12 Motion for Writ of Execution. It is ORDERED AND ADJUDGED as follows: (1) This court has subject matter jurisdiction to conduct post-judgment execution proceedings of plaintiffs' final judgment under a federal statute (ATA), rendered by a U.S. district court and properly registered in this district pursuant to 28 U.S.C. §1963, with post-judgment execution under the ATA and TRIA §201.(2) Plaintiffs' Ex Parte Application and Motion are hereby granted; (3) Based upon the U.S. Treasury Department's Office of Foreign Assets Control ("OF AC") factual findings and Plaintiffs' supporting expert witness testimony and appendices, the court finds that the OF AC Kingpin Act designated members of the "EL AISSAMI & LOPEZ BELLO NETWORK" (identified on OFAC Chart Dkt. Entry 12-1) are each an agency or instrumentality of the F ARC, and their blocked assets are therefore subject to attachment and execution pursuant to TRIA and 18 U.S.C. 2333(e); (4) The Clerk of Court is hereby directed to issue the writ of execution in the form attached to Plaintiffs' Ex Parte |

**A-159**

| | | |
|---|---|---|
| | | Application [DE 12-4], (held by chambers) for service and levy on garnishees by the U.S. Marshal; and (5) The Clerk of this Court is authorized and directed to issue such further writs in aid of execution as warranted under, and in accordance with, Rule 69 of the Federal Rules of Civil Procedure, consistent with the Court's Order. SO ORDERED. (Signed by Judge Andrew L. Carter, Jr on 1/23/2019) (jca) Transmission to Orders and Judgments Clerk for processing. (Entered: 01/23/2019) |
| 01/25/2019 | | Writ of Execution Issued as to Revolutionary Armed Forces of Columbia (FARC), et al., on January 25, 2019, in the amount of $ 301,276,178.28 in favor of Keith Stansell, et al., against Revolutionary Armed Forces of Columbia (FARC), et al., (Signed by Clerk of Court Ruby Krajick on 1/25/2019 (dt). (Signed by Clerk of Court Ruby Krajick on 01/25/2019). Picked up by Tony Korvick on January 25, 2019. (dt) (Entered: 01/25/2019) |
| 01/25/2019 | 20 | EX PARTE LETTER MOTION to Expedite *REQUESTING EXPEDITED APPOINTMENT OF SPECIAL PROCESS SERVER* addressed to Judge Andrew L. Carter, Jr. from Newt Porter and Tony Korvick dated January 25, 2019. (Filing Fee $ 46.00.) Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis.(Korvick, Tony) (Entered: 01/25/2019) |
| 01/26/2019 | 21 | PROPOSED ORDER. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis. Related Document Number: 20 . (Korvick, Tony) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 01/26/2019) |
| 01/28/2019 | | **\*\*\*NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 21 Proposed Order, was reviewed and approved as to form. (dt)** (Entered: 01/28/2019) |
| 01/29/2019 | 22 | ORDER granting 20 Letter Motion to Expedite. It is ORDERED AND ADJUDGED as follows: Plaintiffs' motion is hereby granted. The Court does hereby specially appoint Mike Levey, NY Server LLC as an additional authorized server to serve and levy the court-ordered writ(s) of execution in this action on financial institutions, with affidavits of service to be filed in compliance with Fed. Rule Civ. P. 4(1). SO ORDERED. (Signed by Judge Andrew L. Carter, Jr on 1/29/2019) (ne) (Entered: 01/29/2019) |
| 02/06/2019 | 23 | LETTER addressed to Judge Andrew L. Carter, Jr. from Counsel for Intervenors dated 2/6/2019 re: Request for Pre-Motion Conference for Leave to File Motion to Intervene. Document filed by Samark Lopez Bello.(Horn, Michael) (Entered: 02/06/2019) |
| 02/08/2019 | 24 | LETTER addressed to Judge Andrew L. Carter, Jr. from Newton P. Porter dated February 8, 2019 re: Stansell Plaintiffs' Response to DE 23. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis.(Porter, Newton) (Entered: 02/08/2019) |
| 02/12/2019 | 25 | AFFIDAVIT OF SERVICE of writ of execution served on Branch Banking and Trust Company on 01/30/2019. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 02/12/2019) |
| 02/12/2019 | 26 | AFFIDAVIT OF SERVICE of writ of execution served on Citibank, N.A. on 01/30/2019. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 02/12/2019) |
| 02/12/2019 | 27 | AFFIDAVIT OF SERVICE of writ of execution served on First Republic Bank on 01/30/2019. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 02/12/2019) |

12/16/2020                                    SDNY CM/ECF NextGen Version 1.2

| 02/12/2019 | 28 | AFFIDAVIT OF SERVICE of writ of execution served on Fidelity Brokerage Services, LLC on 01/30/2019. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 02/12/2019) |
| --- | --- | --- |
| 02/12/2019 | 29 | AFFIDAVIT OF SERVICE of writ of execution served on National Financial Services LLC on 01/30/2019. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 02/12/2019) |
| 02/12/2019 | 30 | CERTIFICATE OF SERVICE of writ of execution served on SAMARK JOSE BELLO LOPEZ, PROFIT CORPORATION CA, YAKIMA TRADING CORP., MFAA HOLDINGS LIMITED, SMT TECNOLOGIA, C.A. on 02/01/2019. Service was made by Mail. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 02/12/2019) |
| 02/12/2019 | 31 | AFFIDAVIT OF SERVICE of writ of execution served on UBS Financial Services, Inc. on 02/04/2019. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 02/12/2019) |
| 02/12/2019 | 32 | AFFIDAVIT OF SERVICE of writ of execution served on Morgan Stanley Smith Barney LLC on 02/04/2019. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 02/12/2019) |
| 02/12/2019 | 33 | AFFIDAVIT OF SERVICE of writ of execution served on Safra National Bank of New York on 02/04/2019. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 02/12/2019) |
| 02/12/2019 | 34 | CERTIFICATE OF SERVICE of writ of execution served on SAMARK JOSE BELLO LOPEZ, YAKIMA TRADING CORP. on 02/07/2019. Service was made by Mail. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 02/12/2019) |
| 02/12/2019 | 35 | ORDER: The Court is in receipt of the letters from the Parties regarding Defendants' request for leave to file a motion to intervene. ECF Nos. 23-24. Defendants' request is hereby GRANTED. The Parties are hereby ORDERED to adhere to the following briefing schedule: Defendants' Motion to Intervene: March 5, 2019, Plaintiffs' Response to Defendant's Motion: March 19, 2019, Defendants' Reply to Plaintiffs' Response: March 26, 2019. SO ORDERED. (Signed by Judge Andrew L. Carter, Jr on 2/12/2019) ( Motions due by 3/5/2019., Responses due by 3/19/2019, Replies due by 3/26/2019.) (ks) (Entered: 02/12/2019) |
| 02/19/2019 | 36 | MOTION for Timothy Browne Collier to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16371453. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Samark Lopez Bello. Return Date set for 2/19/2019 at 05:06 PM. (Attachments: # 1 Text of Proposed Order, # 2 Affidavit, # 3 Exhibit Certificate of Good Standing)(Collier, Timothy) (Entered: 02/19/2019) |
| 02/20/2019 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 36 MOTION for Timothy Browne Collier to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16371453. Motion and supporting papers to be |

A-161

SDNY CM/ECF NextGen Version 1.2

| | | |
|---|---|---|
| | | reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb) (Entered: 02/20/2019) |
| 02/20/2019 | 37 | MOTION for Allison L. Borgatti to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16373741. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Samark Lopez Bello. (Attachments: # 1 Text of Proposed Order, # 2 Affidavit, # 3 Exhibit Certificate of Good Standing)(Borgatti, Allison) (Entered: 02/20/2019) |
| 02/20/2019 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 37 MOTION for Allison L. Borgatti to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16373741. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu) (Entered: 02/20/2019) |
| 02/20/2019 | 38 | MOTION for Jeffrey M. Kolansky to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16374498. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Samark Lopez Bello. (Attachments: # 1 Text of Proposed Order, # 2 Affidavit, # 3 Exhibit Certificate of Good Standing)(Kolansky, Jeffrey) (Entered: 02/20/2019) |
| 02/20/2019 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 38 MOTION for Jeffrey M. Kolansky to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16374498. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb) (Entered: 02/20/2019) |
| 02/20/2019 | 39 | MOTION for Kerri E. Chewning to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16374705. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Samark Lopez Bello. (Attachments: # 1 Text of Proposed Order, # 2 Affidavit, # 3 Exhibit Certificate of Good Standing)(Chewning, Kerri) (Entered: 02/20/2019) |
| 02/20/2019 | 40 | ORDER granting 36 Motion for Timothy Browne Collier to Appear Pro Hac Vice. (Signed by Judge Andrew L. Carter, Jr on 2/20/2019) (rj) (Entered: 02/20/2019) |
| 02/20/2019 | 41 | ORDER granting 37 Motion for Allison L. Borgatti to Appear Pro Hac Vice. (Signed by Judge Andrew L. Carter, Jr on 2/20/2019) (rj) (Entered: 02/20/2019) |
| 02/20/2019 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 39 MOTION for Kerri E. Chewning to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16374705. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb) (Entered: 02/20/2019) |
| 02/20/2019 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 39 MOTION for Kerri E. Chewning to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16374705. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu) (Entered: 02/20/2019) |
| 02/20/2019 | 42 | MOTION for Jeffrey M. Scott to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16375296. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Samark Lopez Bello. (Attachments: # 1 Text of Proposed Order, # 2 Affidavit, # 3 Exhibit Certificate of Good Standing)(Scott, Jeffrey) (Entered: 02/20/2019) |
| 02/20/2019 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. |

A-162

| | | |
|---|---|---|
| | | **42** MOTION for Jeffrey M. Scott to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-16375296. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ma) (Entered: 02/20/2019) |
| 02/21/2019 | 43 | ORDER granting 42 Motion for Jeffrey M. Scott to Appear Pro Hac Vice. (Signed by Judge Andrew L. Carter, Jr on 2/21/2019) (rj) (Entered: 02/21/2019) |
| 02/21/2019 | 44 | ORDER granting 39 Motion for Kerri E. Chewning to Appear Pro Hac Vice. (Signed by Judge Andrew L. Carter, Jr on 2/21/2019) (rj) (Entered: 02/21/2019) |
| 02/21/2019 | 45 | ORDER granting 38 Motion for Jeffrey M. Kolansky to Appear Pro Hac Vice. (Signed by Judge Andrew L. Carter, Jr on 2/21/2019) (rj) (Entered: 02/21/2019) |
| 02/26/2019 | 46 | LETTER addressed to Judge Andrew L. Carter, Jr. from Tony Korvick, Esq. dated 2-26-19 re: Letter Requesting Pre-Motion Conference to File Motion to Stay. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell.(Korvick, Tony) (Entered: 02/26/2019) |
| 03/04/2019 | 47 | LETTER addressed to Judge Andrew L. Carter, Jr. from Jeffrey M. Scott dated 03/04/2019 re: Plaintiffs' Letter of February 26, 2019 Requesting Stay. Document filed by Samark Lopez Bello.(Scott, Jeffrey) (Entered: 03/04/2019) |
| 03/05/2019 | 48 | MOTION to Intervene . Document filed by Samark Lopez Bello. (Attachments: # 1 Text of Proposed Order, # 2 Memorandum of Law In Support of Motion to Intervene)(Scott, Jeffrey) (Entered: 03/05/2019) |
| 03/05/2019 | 49 | ORDER: The Court is in receipt of the letters from the Parties discussing a stay in this case. ECF Nos. 46-47. The Parties are hereby ORDERED to appear in person in Courtroom 1306 at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY, on March 20, 2019 at 11:30 a.m. SO ORDERED. (Status Conference set for 3/20/2019 at 11:30 AM in Courtroom 1306, 40 Centre Street, New York, NY 10007 before Judge Andrew L. Carter Jr.) (Signed by Judge Andrew L. Carter, Jr on 3/5/2019) (js) (Entered: 03/06/2019) |
| 03/19/2019 | 50 | RESPONSE in Opposition to Motion re: 48 MOTION to Intervene . *& OPPOSITION TO ADDITIONAL RELIEF SOUGHT IN THE MOTION & STATUS OF SDFL PROCEEDINGS.* Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Attachments: # 1 Exhibit SDFL Feb. 15, 2019 Order DE 22 (now unsealed))(Korvick, Tony) (Entered: 03/19/2019) |
| 03/19/2019 | 51 | NOTICE of OF STRIKING RESPONSE DE 50 FOR SCRIVENER'S ERROR re: 50 Response in Opposition to Motion,. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 03/19/2019) |
| 03/19/2019 | 52 | RESPONSE in Opposition to Motion re: 48 MOTION to Intervene . *CORRECTED RESPONSE TO MOTION TO INTERVENE & OPPOSITION TO ADDITIONAL RELIEF SOUGHT IN THE MOTION & STATUS OF SDFL PROCEEDINGS.* Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Attachments: # 1 Exhibit SDFL Feb. 15, 2019 Order DE 22 (now unsealed))(Korvick, Tony) (Entered: 03/19/2019) |
| 03/20/2019 | 53 | ORDER, Pursuant to the Joint Status Conference held by the Court on March 20, 2019, the Parties are hereby ORDERED to proceed in accordance with the following briefing schedule: Motion to Dismiss: April 10, 2019 Opposition to Motion to Dismiss: May 1, |

| | | |
|---|---|---|
| | | 2019 Response to Opposition: May 8, 2019 The Court will toll the time in which Plaintiffs' must file their Motion for Turnover until there is a ruling on the Motion to Dismiss. SO ORDERED. (Motions due by 4/10/2019., Responses due by 5/1/2019, Replies due by 5/8/2019.) (Signed by Judge Andrew L. Carter, Jr on 3/20/19) (yv) (Entered: 03/20/2019) |
| 03/20/2019 | | Minute Entry for proceedings held before Judge Andrew L. Carter, Jr: Status Conference held on 3/20/2019. Newton Porter and Tony Korvick for Plaintiff(s). Jeffrey M. Scott and Kerri Chewning for Defendant(s). See Docket No. 53. (Court Reporter: Rose Prater) (tdh) (Entered: 03/26/2019) |
| 04/09/2019 | 54 | TRANSCRIPT of Proceedings re: conference held on 3/20/2019 before Judge Andrew L. Carter, Jr.. Court Reporter/Transcriber: Rose Prater, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/30/2019. Redacted Transcript Deadline set for 5/10/2019. Release of Transcript Restriction set for 7/8/2019.(McGuirk, Kelly) (Entered: 04/09/2019) |
| 04/09/2019 | 55 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 3/20/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 04/09/2019) |
| 04/10/2019 | 56 | MOTION to Dismiss *Writs of Attachment*. Document filed by Samark Lopez Bello. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Supplement Notice of Motion)(Collier, Timothy) (Entered: 04/10/2019) |
| 05/01/2019 | 57 | MEMORANDUM OF LAW in Opposition re: 56 MOTION to Dismiss *Writs of Attachment*. . Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 05/01/2019) |
| 05/08/2019 | 58 | REPLY MEMORANDUM OF LAW in Support re: 56 MOTION to Dismiss *Writs of Attachment*. . Document filed by Samark Lopez Bello. (Attachments: # 1 Exhibit A-Part I, # 2 Exhibit A-Part II)(Scott, Jeffrey) (Entered: 05/08/2019) |
| 05/13/2019 | 59 | NOTICE of NOTICE OF FILING U.S.A. STATEMENT OF INTEREST. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Attachments: # 1 Exhibit USA Statement of Interest April 26, 2019)(Korvick, Tony) (Entered: 05/13/2019) |
| 06/17/2019 | 60 | NOTICE of of Filing Minute Entry for Evidentiary Hearing Completed in SDFL June 11, 2019 re: 57 Memorandum of Law in Opposition to Motion,. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Attachments: # 1 Exhibit SDFL Minute Entry for June 11, 2019 Evidentiary Hearing on Agency or Instrumentality issue) (Korvick, Tony) (Entered: 06/17/2019) |
| 06/17/2019 | 61 | NOTICE of of Supplemental Authority re: 57 Memorandum of Law in Opposition to Motion,. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Korvick, Tony) (Entered: 06/17/2019) |
| 10/02/2019 | 62 | NOTICE of OF FILING SDFL ORDER DENYING CLAIMANTS MOTIONS TO DISSOLVE WRITS OF GARNISHMENT. Document filed by Marc Gonsalves, Thomas |

| | | |
|---|---|---|
| | | Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Attachments: # 1 Exhibit SDFL Order Sept. 26, 2019, # 2 Exhibit SDFL Megistrate Judge R/R Aug. 21, 2019)(Korvick, Tony) (Entered: 10/02/2019) |
| 10/07/2019 | 63 | BRIEF re: 62 Notice (Other), . Document filed by Samark Lopez Bello. (Attachments: # 1 Exhibit Exhibits A-D in Response to Pls Submission of the 9.26.19 Order)(Chewning, Kerri) (Entered: 10/07/2019) |
| 01/24/2020 | 64 | ORDER: The Court is aware of potentially relevant opinions that were filed in the Southern District of Florida and the Eleventh Circuit after the Parties completed briefing on the Intervenors' motion to dismiss. See Stansell v. Revolutionary Armed Forces of Columbia, 2019 WL 5290922 (S.D. Fla. Sept. 26, 2019); Stansell v. Lopez Bello, 2020 WL 290423 (11th Cir. Jan. 21, 2020). The Parties are hereby ORDERED to respond, on or before February 7, 2020, indicating how, if at all, these decisions impact the pending motion to dismiss. (Signed by Judge Andrew L. Carter, Jr on 1/24/2020) (mro) (Entered: 01/24/2020) |
| 02/07/2020 | 65 | STATUS REPORT. *regarding 11th Cir. Opinion* Document filed by Samark Lopez Bello.. (Scott, Jeffrey) (Entered: 02/07/2020) |
| 02/07/2020 | 66 | SUPPLEMENTAL MEMORANDUM OF LAW in Opposition re: 56 MOTION to Dismiss *Writs of Attachment. PLAINTIFFS RESPONSE TO COURT ORDER OF JANUARY 24, 2020*. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell.. (Korvick, Tony) (Entered: 02/07/2020) |
| 03/10/2020 | 67 | OPINION AND ORDER: re: 48 MOTION to Intervene filed by Samark Lopez Bello, 56 MOTION to Dismiss Writs of Attachment filed by Samark Lopez Bello. For the reasons set forth above, this case is STAYED pending a decision of the Southern District of Florida in the six turnover motions filed by Plaintiff. The Intervenor's pending motion to dismiss is DENIED without prejudice. Within fourteen days of decision in the SDFL resolving all six pending turnover motions, the Parties should submit a joint status report indicating the impact of the decisions. As indicated in this Court's previous orders, Plaintiff's time for filing a turnover motion in this District will remained tolled until this Court rules otherwise. SO ORDERED. (Signed by Judge Andrew L. Carter, Jr on 3/10/2020) (ama) (Entered: 03/10/2020) |
| 03/10/2020 | | Case Stayed (ama) (Entered: 03/10/2020) |
| 05/07/2020 | 68 | NOTICE of WITHDRAWAL WITH PREJUDICE OF WRITS OF EXECUTION LEVIED ON THREE Garnishees National Financial Services LLC d/b/a Fidelity Investments Fidelity Brokerage Services LLC and/or First Republic Bank re: 28 Affidavit of Service Other, 29 Affidavit of Service Other, 27 Affidavit of Service Other,. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Korvick, Tony) (Entered: 05/07/2020) |
| 05/14/2020 | 69 | STATUS REPORT. *JOINT STATUS REPORT ON IMPACT OF SDFL RULINGS pursuant to Court Order March 10, 2020* Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Samark Lopez Bello, Keith Stansell. (Attachments: # 1 Exhibit SDFL April 30, 2020 Turnover Order DE 339, # 2 Exhibit SDFL April 30, 2020 Transfer Order DE 340). (Korvick, Tony) (Entered: 05/14/2020) |
| 05/14/2020 | 70 | LETTER addressed to Judge Andrew L. Carter, Jr. from Tony Korvick (Plaintiffs' counsel) dated May 14, 2020 re: Requesting pre-motion conference. Document filed by |

12/16/2020                                    SDNY CM/ECF NextGen Version 1.2

| | | Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Korvick, Tony) (Entered: 05/14/2020) |
|---|---|---|
| 05/22/2020 | 71 | LETTER addressed to Judge Andrew L. Carter, Jr. from Jeffrey M. Scott dated 5/20/2020 re: Requesting a Pre-Motion Conference. Document filed by Samark Lopez Bello.. (Chewning, Kerri) (Entered: 05/22/2020) |
| 05/26/2020 | 72 | LETTER addressed to Judge Andrew L. Carter, Jr. from Tony Korvick (Plaintiffs' counsel) dated May 26, 2020 re: Plaintiffs opposition to Intervenors May 22, 2020 letter requesting pre-motion conference on Rule 16. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Korvick, Tony) (Entered: 05/26/2020) |
| 05/26/2020 | 73 | NOTICE OF APPEARANCE by Michael S. Flynn on behalf of Citibank, N.A...(Flynn, Michael) (Entered: 05/26/2020) |
| 05/26/2020 | 74 | NOTICE OF APPEARANCE by Craig Thomas Cagney on behalf of Citibank, N.A... (Cagney, Craig) (Entered: 05/26/2020) |
| 05/26/2020 | 75 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Citigroup Inc. for Citibank, N.A.. Document filed by Citibank, N.A...(Cagney, Craig) (Entered: 05/26/2020) |
| 05/26/2020 | 76 | LETTER addressed to Judge Andrew L. Carter, Jr. from Craig T. Cagney dated May 26, 2020 re: Stansell et al. v. Revolutionary Armed Forces of Colombia ("FARC") et al., Case No. 1:16-mc-00405. Document filed by Citibank, N.A.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5).(Cagney, Craig) (Entered: 05/26/2020) |
| 05/28/2020 | 77 | LETTER addressed to Judge Andrew L. Carter, Jr. from Newton P. Porter dated May 28, 2020 re: Plaintiffs' Response to Citibank's May 26, 2020 letter on further motion practice. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Porter, Newton) (Entered: 05/28/2020) |
| 06/05/2020 | 78 | LETTER addressed to Judge Andrew L. Carter, Jr. from Craig T. Cagney dated June 5, 2020 re: Responding to Plaintiffs' Letter dated May 28, 2020. Document filed by Citibank, N.A...(Cagney, Craig) (Entered: 06/05/2020) |
| 06/08/2020 | 79 | LETTER addressed to Judge Andrew L. Carter, Jr. from Tony Korvick dated June 8, 2020 re: Plaintiffs Response to Citibanks June 5, 2020 letter. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Attachments: # 1 Exhibit SIX SIS Ltd. Answer to Citibank interpleader cross-claim).(Korvick, Tony) (Entered: 06/08/2020) |
| 06/08/2020 | 80 | LETTER addressed to Judge Andrew L. Carter, Jr. from Jeffrey M. Scott dated 6/8/2020 re: Response to Plaintiffs' letter of June 8, 2020 requesting immediate briefing schedule for Summary Judgment. Document filed by Samark Lopez Bello..(Scott, Jeffrey) (Entered: 06/08/2020) |
| 06/09/2020 | 81 | ORDER: The Court is in receipt of the Parties' Letters indicating how they would like to proceed in this case. ECF Nos. 6972, 7680. The Parties are hereby ORDERED to appear for a Telephone Conference on July 9, 2020 at 2:00 p.m. The Parties should contact the Court at (888) 363-4749 (access code: 3768660)., Telephone Conference set for 7/9/2020 at 02:00 PM before Judge Andrew L. Carter Jr. (Signed by Judge Andrew L. Carter, Jr on 6/9/2020) (rj) (Entered: 06/09/2020) |
| 06/17/2020 | 82 | NOTICE OF APPEARANCE by Melissa Errine Byroade on behalf of SIX SIS Ltd... (Byroade, Melissa) (Entered: 06/17/2020) |

**A-166**

| 07/06/2020 | 83 | LETTER addressed to Judge Andrew L. Carter, Jr. from Tony Korvick (Plaintiffs' counsel) dated July 6, 2020 re: requesting pre-motion conference for a motion to compel discovery. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell.. (Korvick, Tony) (Entered: 07/06/2020) |
| --- | --- | --- |
| 07/08/2020 | 84 | STATUS REPORT. *ON SDFL TURNOVERS* Document filed by Marc Gonsalves, Christopher T. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell.. (Korvick, Tony) (Entered: 07/08/2020) |
| 07/09/2020 | 85 | LETTER addressed to Judge Andrew L. Carter, Jr. from Jeffrey M. Scott dated 7/9/2020 re: Response to Plaintiffs' letter for pre-motion conference. Document filed by Samark Lopez Bello..(Scott, Jeffrey) (Entered: 07/09/2020) |
| 07/09/2020 | | Minute Entry for proceedings held before Judge Andrew L. Carter, Jr: Telephone Status Conference held on 7/9/2020. Newton Porter, Tony Krovick and Richard Rosenthal for Plaintiff(s). Craig Cagney for Garnishee, Citibank, N.A. Melissa Byroade for Cross Defendant Six Sis Ltd. Jeffrey Scott and Kerri Chewining for Intervenor, Samark Lopez Bello. Parties should brief the issues that were discussed and agreed upon. Brief due by 7/20/2020. Responses to Brief due by 7/27/2020. Reply(ies) to Response to Brief due by 8/3/2020. (Court Reporter: Karen Gorlaski)(tdh) (Entered: 07/10/2020) |
| 07/20/2020 | 86 | BRIEF *Plaintiffs' MEMORANDUM ON THE PHASE I QUESTIONS POSED BY THE COURT AT THE JULY 9, 2020 STATUS CONFERENCE.* Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Korvick, Tony) (Entered: 07/20/2020) |
| 07/28/2020 | 87 | OPPOSITION BRIEF re: 86 Brief, . Document filed by Samark Lopez Bello. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit).(Scott, Jeffrey) (Entered: 07/28/2020) |
| 07/31/2020 | 88 | PROPOSED STIPULATION AND ORDER. Document filed by Citibank, N.A.. (Attachments: # 1 Redline of Second Amended Answer of Citibank, N.A. to Writ of Garnishment/Execution and Counterclaim and Crossclaims Seeking Relief in the Nature of Interpleader).(Cagney, Craig) (Entered: 07/31/2020) |
| 07/31/2020 | 89 | LETTER addressed to Judge Andrew L. Carter, Jr. from Craig T. Cagney dated July 31, 2020 re: Forthcoming Amendment to Interpleader Claims. Document filed by Citibank, N.A...(Cagney, Craig) (Entered: 07/31/2020) |
| 08/03/2020 | 90 | BRIEF re: 87 Opposition Brief, 86 Brief, *Plaintiffs' Reply Brief on Phase I Questions.* Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Attachments: # 1 Exhibit Intervenors' SDFL Objections to Magistrate Judge Torres' Turnover Report & Recommendations).(Korvick, Tony) (Entered: 08/03/2020) |
| 08/03/2020 | 91 | NOTICE of OF FILING PARTIAL SDFL DOCKET. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Korvick, Tony) (Entered: 08/03/2020) |
| 08/04/2020 | 92 | LETTER addressed to Judge Andrew L. Carter, Jr. from Samark Jose Lopez Bello dated 8/4/2020 re: Requesting Permission to File a Reply Brief. Document filed by Samark Lopez Bello..(Chewning, Kerri) (Entered: 08/04/2020) |
| 08/04/2020 | 93 | ANSWER to Writ of Garnishment *Second Amended Answer to Wit of Garnishment/Execution and Counterclaim and Crossclaims Seeking Relief in the Nature of Interpleader.* Document filed by Citibank, N.A...(Cagney, Craig) (Entered: 08/04/2020) |

| 08/05/2020 | 94 | LETTER addressed to Judge Andrew L. Carter, Jr. from Tony Korvick (Plaintiffs' counsel) dated August 5, 2020 re: Plaintiffs opposition to Intervenors August 4, 2020 letter requesting Reply. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Korvick, Tony) (Entered: 08/05/2020) |
|---|---|---|
| 08/05/2020 | 95 | SUPPLEMENTAL LETTER addressed to Judge Andrew L. Carter, Jr. from Tony Korvick (Plaintiffs' counsel) dated August 5, 2020 re: SUPPLEMENTAL opposition to Intervenors August 4, 2020 letter requesting Reply. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Korvick, Tony) (Entered: 08/05/2020) |
| 08/14/2020 | 96 | BRIEF re: 94 Letter, . Document filed by Samark Lopez Bello..(Chewning, Kerri) (Entered: 08/14/2020) |
| 08/18/2020 | 97 | CONSENT LETTER MOTION for Extension of Time to File Answer re: 93 Answer to Writ of Garnishment *Extension of Time to Answer Citibank's Counterclaim* addressed to Judge Andrew L. Carter, Jr. from Tony Korvick (Plaintiffs' counsel) dated August 18, 2020. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Korvick, Tony) (Entered: 08/18/2020) |
| 08/18/2020 | 98 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent SIX Group Ltd. for SIX SIS Ltd.. Document filed by SIX SIS Ltd...(Byroade, Melissa) (Entered: 08/18/2020) |
| 08/18/2020 | 99 | RESPONSE re: 93 Answer to Writ of Garnishment . *SIX SIS LTD.'S ANSWER TO AMENDED INTERPLEADER CLAIMS*. Document filed by SIX SIS Ltd...(Byroade, Melissa) (Entered: 08/18/2020) |
| 08/18/2020 | 100 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Yakima Trading Corp...(Scott, Jeffrey) (Entered: 08/18/2020) |
| 08/18/2020 | 101 | RESPONSE re: 93 Answer to Writ of Garnishment . Document filed by Samark Lopez Bello, Yakima Trading Corp...(Scott, Jeffrey) (Entered: 08/18/2020) |
| 08/19/2020 | 102 | NOTICE of Supplemental Authority on Phase I re: 90 Brief,. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Korvick, Tony) (Entered: 08/19/2020) |
| 08/21/2020 | 103 | REPLY re: 93 Answer to Writ of Garnishment *REPLY TO GARNISHEE CITIBANK, N.A.s SECOND AMENDED ANSWER PURSUANT TO FLA. STAT. § 77.061*., TRAVERSE to: 93 Answer to Writ of Garnishment. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Korvick, Tony) (Entered: 08/21/2020) |
| 08/26/2020 | 104 | WAIVER OF SERVICE RETURNED EXECUTED. Document filed by Citibank, N.A... (Cagney, Craig) (Entered: 08/26/2020) |
| 09/18/2020 | 105 | NOTICE of OF SUPPLEMENTAL AUTHORITY ON PHASE I. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Attachments: # 1 Exhibit MDFL Oral Order Sept. 1, 2020, # 2 Exhibit MDFL Hearing transcript Sept. 1, 2020).(Korvick, Tony) (Entered: 09/18/2020) |
| 10/05/2020 | 106 | NOTICE of Supplemental Authority Phase I. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Attachments: # 1 Exhibit Oct.5, 2020 Order MDFL |

**A-168**

| | | Denying Rule 60(a) Motion Amend ATA Judgment).(Porter, Newton) (Entered: 10/05/2020) |
|---|---|---|
| 10/13/2020 | 107 | NOTICE OF APPEARANCE by Nathaniel A. Tarnor on behalf of Jada Pescatore, Jarrod Pescatore, John Pescatore, Jordan Pescatore, Josh Pescatore, Olivia Pescatore, Richard Pescatore, Carol Pescatore Harpster, individually and as the Representative of the Estate of Frank Pescatore, Sr...(Tarnor, Nathaniel) (Entered: 10/13/2020) |
| 10/14/2020 | 108 | FIRST RESPONSE re: 93 Answer to Writ of Garnishment *Joint Answer to Citibank's Counterclaim Crossclaims seeking Interpleader Relief DE 93*. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Greer C. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell..(Porter, Newton) (Entered: 10/14/2020) |
| 12/10/2020 | 109 | NOTICE of SUPPLEMENTAL APPENDIX IN SUPPORT OF POST-JUDGMENT EXECUTION AGAINST AGENCIES AND INSTRUMENTALITIES OF THE FARC (Venezuelan Cartel of the Suns - Volume 2). Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. (Attachments: # 1 Exhibit DOJ Press Release March 26, 2020: Maduro-FARC-Cartel of the Suns indictment, # 2 Exhibit DOJ Corrupt Venezuelan Regime Chart, # 3 Exhibit DOJ Cocaine Air Bridge Map from Venezuela, # 4 Exhibit DEA Wanted Poster $15,000,000 reward Nicolas Maduro-Moros, # 5 Exhibit USA v. Nicolas Maduro et al (FARC-Cartel of the Suns) Narcotics Conspiracy Indictment, # 6 Exhibit June 2020 OFAC Chart: PDVSA-El Aissami-Alex Saab Network, # 7 Exhibit Executive Order 13850, # 8 Exhibit Executive Order 13857, # 9 Exhibit Nov. 18, 2020 Infodio: PDVSA run by narcos, # 10 Exhibit DHS Wanted Poster El Aissami, # 11 Exhibit USA v. Lennys Rangel money laundering indictment, # 12 Exhibit USA v. Lennys Rangel Factual Proffer on Guilty Plea, # 13 Exhibit Riskscreen.com Aug. 21, 2020: Guilty Plea Entered in PdVSA Corruption Investigation, # 14 Exhibit USA v. Leonardo Santilli money laundering Criminal Complaint, # 15 Exhibit USA v. Natalino DAmato money laundering indictment, # 16 Exhibit Douglas Farah: HOW TO MAKE A BILLION DOLLARS DISAPPEAR-Jos Luis Merino, PDVSA, Alba Petrleos and the Bukele Administrations enduring ties to transnational criminal structures, # 17 Exhibit OFAC Press Release March 22, 2019: Treasury Sanctions BANDES, Venezuelas National Development Bank, and Subsidiaries, # 18 Exhibit Douglas Farah: THE MADURO REGIMES ILLICIT ACTIVITIES: A Threat to Democracy in Venezuela and Security in Latin America, # 19 Exhibit Venezuelan-Nicaraguan Company, Albanisa, the PDVSA Laundering Machine, # 20 Exhibit Maduro Dictatorship Protects ELN and FARC Dissidents, Says Colombian President, # 21 Exhibit DHS Wanted Poster Samark Lopez Bello, # 22 Exhibit Doug Farah Congressional Testimony: Adapting U.S. Counternarcotics Efforts in Colombia, # 23 Exhibit April 2, 2020 Congressional Research Service U.S. Indictment of Top Venezuelan Officials, # 24 Exhibit Jan. 8, 2019 Treasury Press Release: Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders, # 25 Exhibit USA v. Edoardo Orsoni (former PDVSA and Petrocedeno SA general counsel) money laundering indictment, # 26 Exhibit USA v. Edoardo Orsoni Factual Proffer for Guilty Plea). (Korvick, Tony) (Entered: 12/10/2020) |
| 12/10/2020 | 110 | EX PARTE LETTER MOTION to Seal addressed to Judge Andrew L. Carter, Jr. from Newt Porter and Tony Korvick dated 12-10-20. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. Return Date set for 12/17/2020 at 05:00 PM..(Korvick, Tony) (Entered: 12/10/2020) |
| 12/10/2020 | 111 | ***EX-PARTE*** MOTION for Writ of Execution . Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. Return Date set for 12/17/2020 at 05:00 PM. |

**A-169**

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit SDFL Order, # 2 Exhibit SDFL Order, # 3 Affidavit Doug Farah, # 4 Affidavit David Gaddis, # 5 Affidavit Brian Fonseca, # 6 Text of Proposed Order proposed order, # 7 Exhibit proposed writ of execution)Motion or Order to File Under Seal: 110 .(Korvick, Tony) (Entered: 12/10/2020) |
| 12/10/2020 | 112 | ***EX-PARTE*** MOTION for Writ of Execution *Amended Proposed Order*. Document filed by Marc Gonsalves, Thomas Howes, Christopher T. Janis, Jonathan N. Janis, Judith G. Janis, Michael J. Janis, Keith Stansell. Return Date set for 12/17/2020 at 05:00 PM.Motion or Order to File Under Seal: 110 .(Korvick, Tony) (Entered: 12/10/2020) |
| 12/15/2020 | 113 | ORDER granting 110 Letter Motion to Seal: SO ORDERED. (Signed by Judge Andrew L. Carter, Jr on 12/15/2020) (jwh) (Entered: 12/15/2020) |
| 12/15/2020 | 114 | ***SELECTED PARTIES*** ORDER granting 111 Motion for Writ of Execution; granting 112 Motion for Writ of Execution. It is ORDERED AND ADJUDGED as follows: (1) This court has subject matter jurisdiction to conduct post-judgment execution proceedings of plaintiffs' final judgment under a federal statute (ATA), rendered by a U.S. district court and properly registered in this district pursuant to 28 U.S.C. §1963, with postjudgment execution under the ATA and TRIA §201. (2) Plaintiffs' Ex Parte Motion is hereby granted; (3) Based upon the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") factual findings and Plaintiffs' supporting expert witness testimony and appendices, the court finds that the OFAC IEEPA sanctioned PDVSA subsidiaries (identified in plaintiffs' Motion DE 111, p. 21) are each an agency or instrumentality of the FARC, and their blocked assets are therefore subject to attachment and execution pursuant to TRIA; (4) The Clerk of Court is hereby directed to issue the writ of execution in the form attached to Plaintiffs' Ex Parte Motion [DE111-7], (held by chambers) for service and levy on garnishees by the U.S. Marshal or the specially appointed process server, Mike Levey, NY Server LLC [Order DE 22]; and (5) The Clerk of this Court is authorized and directed to issue such further writs in aid of execution as warranted under, and in accordance with, Rule 69 of the Federal Rules of Civil Procedure, consistent with the Court's Order. (6) The Clerk of this Court shall file this Order so that it is only viewable by Plaintiffs, in accordance with this Court's Order [DE 113]. (Signed by Judge Andrew L. Carter, Jr on 12/15/2020) (tro) Transmission to Orders and Judgments Clerk for processing. (Entered: 12/16/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/16/2020 12:45:07 | | |
| PACER Login: | zumpanopatricios | **Client Code:** | 01877 |
| Description: | Docket Report | **Search Criteria:** | 1:16-mc-00405-ALC |
| Billable Pages: | 17 | **Cost:** | 1.70 |

# EXHIBIT 3

Received and E-Filed for Record
9/28/2020 2:44 PM
Melisa Miller, District Clerk
Montgomery County, Texas
Deputy Clerk, Megan Shiflett

20-09-11744

CAUSE NO. _____

| | | |
|---|---|---|
| ANTONIO CABALLERO, | § | IN THE DISTRICT COURT OF |
| | § | |
| **JUDGMENT CREDITOR,** | § | |
| | § | |
| VS. | § | |
| | § | |
| FUERZAS ARMADAS | § | MONTGOMERY COUNTY, TEXAS |
| REVOLUCIONARIAS DE COLOMBIA | § | |
| a/k/a FARC-EP a/k/a | § | Montgomery County - 284th Judicial District Court |
| REVOLUTIONARY ARMED FORCES | § | |
| OF COLOMBIA; and THE NORTE DE | § | |
| VALLE CARTEL, | § | |
| | § | |
| **JUDGMENT DEBTORS.** | § | _____ JUDICIAL DISTRICT |

## <u>NOTICE OF REGISTRATION OF FOREIGN JUDGMENT</u>

Pursuant to Section 35.003 of the Texas Civil Practice and Remedies Code,

Judgment Creditor Antonio Caballero hereby files the attached authenticated,

exemplified Final Judgment dated May 20, 2020 issued by the United States District

Court for the Southern District of Florida (Exhibit 1 hereto).  This notice is also

accompanied by the Affidavit required by Section 35.004 of the Texas Civil Practice

and Remedies Code (Exhibit 2 hereto).


Dated:        September 28, 2020


MINUTE 12/17/2020

**A-172**

Respectfully Submitted

FASTHOFF LAW FIRM, PLLC

*Hank Fasthoff*

Hank Fasthoff
Texas Bar No. 24003510
21 Waterway Ave., Suite 300
The Woodlands, Texas 77380
(Tel) 713.929.9314
hank@fasthofflawfirm.com

# EXHIBIT 1

AO 132  (Rev. 12/03) Exemplification Certificate

# UNITED STATES DISTRICT COURT

Southern _____ District of _____ Florida

## EXEMPLIFICATION CERTIFICATE

I, _____ Angela E. Noble _____ , Clerk of this United States District Court, keeper of the records and seal, certify that the attached documents:

18cv25337-KMM, Final Judgment-Docket Entry Number 63

are true copies of records of this Court.

In testimony whereof I sign my name and affix the seal of this Court, in this District, at

Miami
_____          on _____ 7/16/2020
_____ City _____                              _____ Date _____

**Angela E. Noble**
_____          _____
Clerk                                                    (By) Deputy Clerk

I, _____ K. Michael Moore _____ , a Judicial Officer of this Court, certify that _____ Angela E. Noble _____ , named above, is and was on the date noted, Clerk of this Court, duly appointed and sworn, and keeper of the records and seal, and that this certificate, and the attestation of the record, are in accordance with the laws of the United States.

_____          _____
Date                                                     Signature of Judge

                                                         Chief United State District Judge
                                                         _____
                                                         Title

I, _____ Angela E. Noble _____ , Clerk of this United States District Court, keeper of the seal, certify that the Honorable _____ K. Michael Moore _____ .
                                                                              Judge
named above, is and was on the date noted a Judicial Officer of this Court, duly appointed, sworn and qualified, and that I am well acquainted with the Judge's official signature and know and certify the above signature to be that of the Judge.

In testimony whereof I sign my name, and affix the seal of this Court at

Miami
_____          in this State, on _____ 7/16/2020
_____ City _____                                                  _____ Date _____

**Angela E. Noble**
_____          _____
Clerk                                                    (By) Deputy Clerk

MINUTE 12/17/2020

**A-175**

AO 451 (Rev. 12/12)  Clerk's Certification of a Judgment to be Registered in Another District

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| ANTONIO CABALLERO, | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action  No.  18-25337-KMM |
| FUERZAS ARMADAS | ) | |
| REVOLUCIONARIAS DE COLOMBIA, *et al.*, | ) | |
| *Defendant* | ) | |

## CLERK'S CERTIFICATION OF A JUDGMENT TO BE REGISTERED IN ANOTHER DISTRICT

I certify that the attached judgment is a copy of a judgment entered by this court on *(date)*       05/20/2020

I also certify that, as appears from this court's records, no motion listed in Fed. R. App. P. 4(a)(4)(A) is pending before this court, the time for appeal has expired, and no appeal has been filed or, if one was filed, it is no longer pending.

Date:  July 2, 2020

### Angela E. Noble

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

Certified to be a true and
correct copy of the document on file.
Angela E. Noble, Clerk,
U.S. District Court
Southern District of Florida

By _____
Deputy Clerk
Date July 2, 2020

MINUTE 12/17/2020

**A-176**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:18-cv-25337-KMM

ANTONIO CABALLERO,

    Plaintiff,

v.

FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA, *et al.*,

    Defendants.

_____/

## FINAL JUDGMENT

THIS CAUSE came before the Court upon the Court's Order on Motion for Default Final Judgment. (ECF No. 62). Pursuant to Rule 58 of the Federal Rules of Civil Procedure, it is hereby ORDERED AND ADJUDGED that Final Judgment is entered in favor of Plaintiff Antonio Caballero in the amount of forty-five million dollars ($45,000,000.00) in actual, compensatory non-economic damages, which is further trebled pursuant to 18 U.S.C. § 2333; one million, seven hundred and twenty-nine thousand, six-hundred and sixty-seven dollars ($1,729.667.00) in actual, compensatory economic damages, which is further trebled pursuant to 18 U.S.C. § 2333; and post-judgment interest at the rate of 0.15% from May 20, 2020, the date of final judgment, on the above-awarded trebled economic and non-economic damages, for which sum let execution issue.

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of May, 2020.

K. MICHAEL MOORE
UNITED STATES CHIEF DISTRICT JUDGE

c: All counsel of record

# EXHIBIT 2

CAUSE NO. _____

| | | |
|---|---|---|
| ANTONIO CABALLERO, | § | IN THE DISTRICT COURT OF |
| | § | |
| JUDGMENT CREDITOR, | § | |
| | § | |
| VS. | § | |
| | § | |
| FUERZAS ARMADAS | § | MONTGOMERY COUNTY, TEXAS |
| REVOLUCIONARIAS DE COLOMBIA | § | |
| a/k/a FARC-EP a/k/a | § | |
| REVOLUTIONARY ARMED FORCES | § | |
| OF COLOMBIA; and THE NORTE DE | § | |
| VALLE CARTEL, | § | |
| | § | |
| JUDGMENT DEBTORS. | § | \_\_\_\_\_ JUDICIAL DISTRICT |

## AFFIDAVIT FOR ENFORCEMENT OF FOREIGN JUDGMENT

Leon N. Patricios, being first duly sworn on oath, deposes and says:

1.     My name is Leon N. Patricios. I am a Florida-licensed attorney for Antonio Caballero, the Judgment Creditor in the above civil action. I have personal knowledge of the facts set forth herein, and they are all true and correct.

2.     Our law firm represents Antonio Caballero in an action before the United States District Court for the Southern District of Florida, Case No. 18-cv-25337-KMM (the "Florida Federal Action").

3.     On May 20, 2020, the Court in the Florida Federal Action entered a Final Judgment on behalf of the Plaintiff Antonio Caballero and against the Defendants (the "Final Judgment"), which is attached to Plaintiff's Notice of Registration of Foreign Judgment as Exhibit 1. The Final Judgment has not been contested or appealed and is final.

4.     The address for the Judgment Creditor Antonio Caballero is set forth below:

1

**A-179**

Antonio Caballero
c/o Joseph I. Zumpano or Leon N. Patricios
Zumpano Patricios, P.A.
312 Minorca Ave.
Coral Gables, FL 33134

      5.     The addresses for the Judgment Debtors are set forth below:

FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA a/k/a FARC-EP
c/o Juvenal Ovidio Ricardo Palmera Pineda (BOP Register No. 27896-016)
USP FLORENCE ADMAX
U.S. Penitentiary
5880 Hwy 67 South
Florence, CO 81226

FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA a/k/a FARC-EP
c/o Juvenal Ovidio Ricardo Palmera Pineda (BOP Register No. 27896-016)
USP Florence ADMAX
U.S. Penitentiary
P.O. Box 8500
Florence, CO 81226

THE NORTE DE VALLE CARTEL
c/o Diego Leon Montoya-Sanchez (BOP Register No. 04171-748)
FCI Petersburg Medium
Federal Correctional Institution
1060 River Road
Hopewell, VA 23860

THE NORTE DE VALLE CARTEL
c/o Diego Leon Montoya-Sanchez (BOP Register No. 04171-748)
FCI Petersburg Medium
Federal Correctional Institution
P.O. Box 1000
Petersburg, VA  23804

      FURTHER SAYETH AFFIANT NAUGHT

                               Leon N. Pátricios

**A-180**

STATE OF FLORIDA)

COUNTY OF MIAMI-DADE)

The foregoing instrument was acknowledged before me this __28__ day of September, 2020, by Leon N. Patricios who is personally known to me.

Christina trueba
Notary Public,
State of Florida At-Large

My Commission Expires: 9/11/2023

3

MINUTE 12/17/2020

**A-181**

# Appendix Y

H.R. CONF. REP. 107-779, H.R. Rep. No. 779, 107TH Cong., 2ND
Sess. 2002, 2002 WL 31529126, 2002 U.S.C.C.A.N. 1430 (Leg.Hist.)
P.L. 107-297, TERRORISM  **1**   **1430**  RISK INSURANCE ACT OF 2002

TERRORISM RISK PROTECTION ACT

DATES OF CONSIDERATION AND PASSAGE

House: November 29, 2001
Senate: July 25, 2002
Cong. Record Vol. 148 (2002)

House Conference Report 107-779
No. 107-779, November 13, 2002
[To accompany H.R. 3210]

HOUSE CONFERENCE REPORT NO. 107−779

**\*\*0**  November 13, 2002

Mr. Oxley, from the committee of conference, submitted the following

CONFERENCE REPORT

[To accompany H.R. 3210]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 3210), to ensure the continued financial capacity of insurers to provide coverage for risks from terrorism, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment, insert the following:

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

(a) Short Title.–This Act may be cited as the "Terrorism Risk Insurance Act of 2002".

(b) Table of Contents.–The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.

TITLE I–TERRORISM INSURANCE PROGRAM

Sec. 101. Congressional findings and purpose.

Section 104. General authority and administration of claims

The Secretary shall have the powers and authorities necessary to carry out the Program. The Secretary shall annually compile information on the terrorism risk insurance premium rates of insurers **\*26** for the preceding year. To the extent that such information is not otherwise available, the Secretary may require insurers to submit their terrorism risk insurance premium rates to the NAIC, which shall make such information available to the Secretary.

Section 105. Preemption and nullification of pre-existing terrorism exclusions

This section voids any commercial property and casualty terrorism insurance exclusion that is in force on the date of the enactment of this Act to the extent that it excludes that in force on the date of the enactment of this Act to the extent that it excludes losses that would otherwise be insured losses. Any Sate approval of any commercial property and casualty terrorism insurance exclusion in force on the date of enactment is also void to the extent that it excludes losses that would otherwise be insured losses.

This provision is intended to create immediate terrorism coverage for commercial property and casualty policyholders upon enactment for a short window of time, while allowing insurers to immediately send notices of the increased premium for such coverage and giving policyholders the option within 30 days of such notice to pay such increased premium or allow reinstatement of any preexisting terrorism exclusion.

Section 106. Preservation provisions

This section preserves State regulatory authority except as specifically provided in this legislation. A uniform definition of a terrorist act is established in this legislation. Until the end of 2003, States would be required to allow rate and form changes to take **\*\*1434** effect immediately but would retain authority to disapprove any rates as excessive, inadequate, or unfairly discriminatory and where a State has prior approval authority for forms, subsequent review of such forms is permitted. During the period in which the Secretary's authority to carry out the Program is in effect, the Secretary would have access to any books and records of insurers that are relevant to the Program.

**\*27** Section 107. Litigation management

The Conferees agreed to a provision on litigation management.

Section 108. Termination of program

This section provides a three-year program (with a transition period for the balance of 2002) that terminates on December 31, 2005. The Secretary shall conduct a study and report to Congress no later than June 30, 2005 on the effectiveness of the Program and the likely capacity of the property and casualty insurance industry to offer insurance for terrorism risk after termination of the Program, and the availability and affordability of such insurance for various policyholders, including railroads, trucking, and public transit.

TITLE II–TREATMENT OF TERRORIST ASSETS

Section 201. Satisfaction of judgments from blocked assets of terrorists, terrorist organizations, and state sponsors of terrorism

The purpose of Section 201 is to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment

**A-183**

of blocked assets of terrorist parties. It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced. Section 201 builds upon and extends the principles in section 1610(f)(1) of the Foreign Sovereign Immunities Act (28 U.S.C. S 1610(f)(1)), authorizes the enforcement of judgments against terrorist organizations and eliminates the effect of any Presidential waiver issued prior to the date of enactment purporting to bar or restrict enforcement of such judgments, thereby making clear that all such judgments are enforceable against any assets or property under any authorities referenced in Section 1610(f)(1).

Section 201(c) establishes a special rule for cases against Iran. In Section 2002 of the Victims of Trafficking and Violence Protection Act of 2000 (2000 Act), Congress directed that specified claimants against Iran under Section 1605(a)(7) of the Foreign Sovereign Immunities Act receive payment in satisfaction of judgments. Unfortunately, several victims and families of victims who brought suit against Iran, were left out of the 2000 Act. The Conferees have sought to correct this injustice.

In order to accommodate additional dates within the equitable formula for payment of remaining amounts in the accounts and rental proceeds, the Conferees added to Section (c) an adjustment to the proportional formula for payment to qualifying claimants.

In Section 201(d), the Conferees broadened the definition of "act of terrorism" for purposes of that section; defined the term "blocked assets"; and clarified the term "terrorist organization" to mean any entity included in the definition provided in Section **1435** 212(a)(3)(B)(vi) of the Immigration and Nationality Act, (8 U.S.C. S 1182(a)(3)(B)(vi)). This provision is intended to reach terrorist organizations.

## *28  TITLE III–FEDERAL RESERVE BOARD PROVISIONS

Section 301. Certain authority of the Board of Governors of the Federal Reserve System

The Conferees agreed to certain changes to Section 11 of the Federal Reserve Act.

From the Committee on Financial Services, for consideration of the House bill and the Senate amendment thereto, and modifications committed to conference:

Michael G. Oxley,

Richard H. Baker,

Robert W. Ney,

Sue W. Kelly,

Christopher Shays,

Vito Fossella,

Michael Ferguson,

John J. LaFalce,

Paul E. Kanjorski,

Ken Bentsen,

James H. Maloney,

Darlene Hooley,

   From the Committee on the Judiciary, for consideration of sec. 15 the House bill and secs. 10 and 11 of the Senate amendment thereto, and modifications committed to conference:

John Conyers, Jr.,

Managers on the Part of the House.

Paul Sarbanes,

Christopher J. Dodd,

Jack Reed,

Charles Schumer,

Managers on the Part of the Senate.

H.R. CONF. REP. 107-779, H.R. Rep. No. 779, 107TH Cong., 2ND Sess. 2002, 2002 WL 31529126, 2002 U.S.C.C.A.N. 1430 (Leg.Hist.)

**End of Document**                                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

A-185

# Appendix Z

Vernon's Texas Rules Annotated
    Texas Rules of Civil Procedure
        Part VI. Rules Relating to Ancillary Proceedings
            Section 4. Garnishment (Refs & Annos)

TX Rules of Civil Procedure, Rule 658

Rule 658. Application for Writ of Garnishment and Order

Effective: June 1, 2020

Currentness

Either at the commencement of a suit or at any time during its progress the plaintiff may file an application for a writ of garnishment. Such application shall be supported by affidavits of the plaintiff, his agent, his attorney, or other person having knowledge of relevant facts. The application shall comply with all statutory requirements and shall state the grounds for issuing the writ and the specific facts relied upon by the plaintiff to warrant the required findings by the court. The writ shall not be quashed because two or more grounds are stated conjunctively or disjunctively. The application and any affidavits shall be made on personal knowledge and shall set forth such facts as would be admissible in evidence; provided that facts may be stated based upon information and belief if the grounds of such belief are specifically stated.

No writ shall issue before final judgment except upon written order of the court after a hearing, which may be ex parte. The court in its order granting the application shall make specific findings of facts to support the statutory grounds found to exist, and shall specify the maximum value of property or indebtedness that may be garnished and the amount of bond required of plaintiff. Such bond shall be in an amount which, in the opinion of the court, shall adequately compensate defendant in the event plaintiff fails to prosecute his suit to effect, and pay all damages and costs as shall be adjudged against him for wrongfully suing out the writ of garnishment. The court shall further find in its order the amount of bond required of defendant to replevy, which, unless defendant exercises his option as provided under Rule 664, shall be the amount of plaintiff's claim, one year's accrual of interest if allowed by law on the claim, and the estimated costs of court. The order may direct the issuance of several writs at the same time, or in succession, to be sent to different counties.

**Credits**
Aug. 18, 1947, eff. Dec. 31, 1947. Amended by order of July 11, 1977, eff. Jan. 1, 1978.

Notes of Decisions (52)

Vernon's Ann. Texas Rules Civ. Proc., Rule 658, TX R RCP Rule 658
Current with amendments received through January 1, 2021

                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix AA

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part VI. Rules Relating to Ancillary Proceedings
      Section 4. Garnishment (Refs & Annos)

TX Rules of Civil Procedure, Rule 659

Rule 659. Case Docketed

Effective: June 1, 2020

Currentness

When the foregoing requirements of these rules have been complied with, the judge, or clerk, or justice of the peace, as the case may be, shall docket the case in the name of the plaintiff as plaintiff and of the garnishee as defendant; and shall immediately issue a writ of garnishment directed to the garnishee, commanding him to appear before the court out of which the same is issued at or before 10 o'clock a.m. of the Monday next following the expiration of twenty days from the date the writ was served, if the writ is issued out of the district or county court; or the Monday next after the expiration of ten days from the date the writ was served, if the writ is issued out of the justice court. The writ shall command the garnishee to answer under oath upon such return date what, if anything, he is indebted to the defendant, and was when the writ was served, and what effects, if any, of the defendant he has in his possession, and had when such writ was served, and what other persons, if any, within his knowledge, are indebted to the defendant or have effects belonging to him in their possession.

**Credits**

Sept. 20, 1941, eff. Dec. 31, 1941. Amended by orders of Aug. 18, 1947, eff. Dec. 31, 1947; July 11, 1977, eff. Jan. 1, 1978.

Notes of Decisions (13)

Vernon's Ann. Texas Rules Civ. Proc., Rule 659, TX R RCP Rule 659
Current with amendments received through January 1, 2021

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix AB

2010 WL 5545389
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
San Antonio.

The CADLE COMPANY, Appellant

v.

Mark T. DAVIS and Alamo
Title Company, Appellees.

No. 04–09–00763–CV.
|
Dec. 29, 2010.
|
Rehearing Overruled April 13, 2011.

From the 408th Judicial District Court, Bexar County, Texas,
Trial Court No. 2006–CI–05826; Larry Noll, Judge Presiding.

**Attorneys and Law Firms**

Jeffrey S. Lowenstein, Bell Nunnally & Martin LLP, Dallas,
TX, for Appellant.

Randal L. Telford, Patricia A. Peterson, Attorney at Law,
Irving, TX, Troy A. Glander, Davis, Cedillo & Mendoza, Inc.,
San Antonio, TX, for Appellees.

Sitting: CATHERINE STONE, Chief Justice, SANDEE
BRYAN MARION, Justice, STEVEN C. HILBIG, Justice.

**MEMORANDUM OPINION**

Opinion by STEVEN C. HILBIG, Justice.

*1 The Cadle Company appeals the judgment awarding
Mark T. Davis damages and attorney's fees on his breach of
contract claim. We reverse the judgment and remand Davis's
breach of contract and wrongful garnishment claims to the
trial court.

**BACKGROUND**

Mark Davis borrowed money from San Antonio Savings
Association and secured the loan with a first mortgage on
property he owned in Comal County. Cadle obtained the
indebtedness through a series of transactions. In 1993, Cadle
brought suit to convert the loan into a judgment. Cadle and
Davis entered into a consent judgment in the amount of
$45,167.74, and Cadle obtained a lien on the Comal County
property. At some point, the Internal Revenue Service ("IRS")
also placed a lien on the Comal County property. Davis
testified that over the course of four years following the entry
of the consent judgment Cadle regularly contacted him to
inquire about non-exempt property and ask for payments to
satisfy the consent judgment. Davis testified he gave a non-
stenographic deposition regarding his assets in 1994.

In 1997, Pete Barta, a representative of Cadle, began
discussions with Davis about selling the Comal County
property. Davis claims that Barta offered to settle and release
all claims relating to the consent judgment if Davis resolved
the tax lien issue, sold the property, and gave Cadle the
proceeds remaining after paying the IRS. Davis testified Barta
said "if you can sell it [the property], I will work out a deal
with the IRS and we will get all of this behind us and be
through with it." However, Barta testified he told Davis that
if he could persuade the IRS to accept a small portion of the
proceeds of the sale in order to release its lien, Cadle would
likewise agree to release its deed of trust in exchange for a
portion of the proceeds. Barta testified he never agreed to
release the consent judgment. A buyer for the property was
found and Davis contacted the IRS to negotiate a release of
the tax lien. The IRS agreed to release the lien for a portion
of the sale proceeds. After the IRS was paid, Cadle received
$7,500 from the sale.

In the present litigation, Davis asserts the 1997 sale and
agreement satisfied the consent judgment. Davis contends
numerous documents demonstrate that Cadle agreed to not
only release the lien but also the judgment when Cadle
received a portion of the proceeds on the property sale. Cadle,
on the other hand, contends the payment of the $7,500 was for
release of the lien only, and it did not forgive the entire debt.
Among other evidence, Cadle refers to Barta's testimony that
the agreement was only to release the lien, as demonstrated
by the Release of Deed of Trust executed by Cadle.

Both parties agree that from 1997 until 2003, Cadle took no
action to collect on the consent judgment. Davis testified that
in September 2003, a Bexar County deputy sheriff left a card
at his mother's residence. Davis stated he called the deputy,

who told him he had a document directing the sheriff to collect on the Cadle judgment. Davis testified he told the deputy he had no non-exempt property, and the deputy took no further action.

**\*2** Davis testified that approximately two months later Ted Lance, another Cadle representative, contacted him regarding the judgment. Davis said he told Lance the judgment was settled in 1997, but Lance insisted it was not. Davis testified Lance warned him that if he did not pay the judgment, Cadle would seize the money in Davis's IBC bank account. Davis sent Cadle financial information showing he had no assets. Davis testified he received harassing phone calls from Cadle and he decided to make a good faith payment and consult a lawyer. Davis hired an attorney who sent several letters to Lance in March and April of 2004. Davis claims Lance and Cadle did not respond to the letters, but stopped harassing him.

In March 2006, Cadle garnished Davis's IBC account. Davis learned of the garnishment when he attempted to withdraw money from the account on March 29, 2006. Davis contacted his attorney that day, who then tried to contact Cadle's counsel to discuss the matter. On April 11, 2006, Davis filed an emergency motion to dissolve the writ of garnishment, which was heard the next day. The court granted the motion, dissolved the writ, and dismissed the garnishment suit with prejudice. Cadle appealed, and the order dissolving the writ of garnishment was affirmed by this court. *Cadle Co. v. Int'l Bank of Commerce,* No. 04–06–00456–CV, 2007 WL 752260 (Tex.App.-San Antonio Mar. 14, 2007, pet. denied).

On April 12, 2006, Davis filed suit against Cadle for breach of contract, wrongful garnishment, and fraud.[1] Cadle counterclaimed, asserted affirmative defenses, and filed a third party action against Alamo Title[2] based on Davis's assertion that he was misled by the closing document prepared by Alamo. Davis's claims are based on Cadle's efforts to collect on the consent judgment that Davis contends was satisfied in 1997.

In his pleadings, Davis alleged the ruling in the garnishment case collaterally estopped Cadle from asserting that the judgment was not satisfied. Cadle disputed the application of collateral estoppel and asked the court to rule on the issue pretrial. After hearing argument of counsel and reviewing various exhibits, the trial court ruled Cadle was collaterally estopped from asserting that the 1993 consent judgment had

not been legally satisfied. Before opening statements, the trial court instructed the jury as follows:

> Therefore, as you listen to the evidence in this case and consider the evidence in this matter, you are instructed to accept as a matter of law that the 1993 judgment of The Cadle Company versus Mark Davis has been satisfied. That issue is not a question for you to have to decide.

At the conclusion of Davis's case, Cadle moved for a directed verdict on Davis's claims for fraud and breach of contract. The motion was denied. After Cadle rested, Davis moved for directed verdict on two elements of the breach of contract claim—the existence of a contract and breach of the contract. Davis's argument for the directed verdict was grounded on the trial court's ruling on collateral estoppel. The trial court granted Davis's motion and included the following instruction in the jury charge: "You are instructed that in 1997 there was an agreement between Davis and Cadle to satisfy the 1993 Consent Judgment and that Cadle has breached that agreement."

**\*3** The jury returned a verdict in favor of Davis on his claims of wrongful garnishment, fraud, and breach of contract. Davis sought as damages for all three claims the attorney's fees he incurred in 2004 and in the garnishment action, the money paid to Cadle in 2004, and bank service charges. Davis elected to recover on his contract claim, and the trial court rendered judgment, awarding damages in the amount of $273,926, which represents the actual damages ($20,642 .00 for attorney's fees in garnishment action and $85 for out-of-pocket), and attorney's fees for preparation of the case through trial ($253,199.00).

Cadle appeals, claiming the trial court erred in denying its motion for directed verdict on the contract claim because (1) the claim was barred by either the statute of limitations or the statute of frauds, (2) the evidence is legally and factually insufficient that an agreement was reached, and (3) there was no evidence of an agreement not to collect on the "allegedly satisfied judgment." Cadle also asserts the trial court improperly instructed the jury on collateral estoppel, which caused an improper verdict.

Cadle also argues the jury's affirmative finding of wrongful garnishment was erroneous because an element of a wrongful garnishment claim is whether there was a valid judgment and the court erroneously instructed them that Cadle could not assert otherwise. Additionally, Cadle claims Davis failed to prove fraud because there is no legal or factually sufficient evidence of an actionable misrepresentation, and the claim is barred by limitations.

Lastly, Cadle claims Davis was not entitled to an award of damages because (1) there was no legal basis to award Davis attorney's fees related to the garnishment action, (2) the trial court admitted highly prejudicial evidence to justify the fees, and (3) the pleadings did not support the award. Cadle asserts the award of attorney's fees is excessive and Davis did not properly segregate the fees.

**STATUTE OF LIMITATIONS AND FRAUDS**

Cadle moved for a directed verdict on Davis's contract claim asserting it was barred by the statute of limitations or alternatively the statute of frauds. As a general rule, the statute of limitations for a breach of contract action is four years from the day the cause of action accrues. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004 (West 2002); *Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 315 (Tex.2006). A breach of contract occurs when a party fails or refuses to do something he has promised to do. *Mays v. Pierce,* 203 S.W.3d 564, 575 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). A breach of contract cause of action accrues when a party has been injured by actions or omissions of another. *Barker v. Eckman,* 213 S.W.3d 306, 311 (Tex.2006) (citing *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990) ("A cause of action can generally be said to accrue when the wrongful act effects an injury")); *see also Stine v. Stewart,* 80 S.W.3d 586, 592 (Tex.2002). "The accrual of the cause of action 'means the right to institute and maintain a suit; and whenever one person may sue another a cause of action has accrued, and the statute begins to run .' " *Port Arthur Rice Milling Co. v. Beaumont Rice Mills,* 105 Tex. 514, 143 S.W. 926, 928 (1912)(emphasis omitted).

**\*4** Davis based his contract claim on the alleged oral agreement between Cadle and Davis that the 1993 judgment would be satisfied by Cadle's receipt of a portion of the proceeds from the sale of the Comal County property. Cadle

contends that if there was a breach of contract, it occurred in 1997 when it failed to release the judgment and Cadle informed Alamo Title it would not release the debt. However, Davis argues the breach occurred when Cadle attempted to collect on the judgment. Davis testified that he had no contact from Cadle regarding debt collection efforts until September 2003. Nothing in the record suggests Cadle attempted to collect on the consent judgment prior to September 2003. Because the petition alleged that the agreement was that the judgment was satisfied by the proceeds from the sale of the property, we agree with Davis that any breach occurred when efforts to collect on the judgment were made. Suit was filed in 2006, within the statute of limitations. Therefore, the claim is not barred by limitations.

Nor does the purported agreement fall within the statute of frauds. The statute of frauds provides that an agreement "which is not to be performed within one year from the date of making the agreement" is not enforceable unless it is in writing. *See* TEX. BUS. & COM.CODE ANN. § 26.01(a), (b)(6) (West 2009). For the one-year provision to apply, performance within one year must be impossible. *See Chacko v. Mathew,* No. 14–07–00613–CV, 2008 WL 2390486, at *3– 4 (Tex.App.-Houston [14th Dist.] June 12, 2008, pet. denied) (mem.op.); *Cruikshank v. Consumer Direct Mortg., Inc.,* 138 S.W.3d 497, 501 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). When an agreement falls within the statute of frauds is a question of law. *Tabrizi v. Daz–Rez Corp.,* 153 S.W.3d 63, 66 (Tex.App.-San Antonio 2004, no pet.). The purported contract between the parties was an agreement that the judgment would be satisfied upon the sale of the Comal County property and Cadle's receipt of the sale proceeds. This obligation is clearly performable in one year and does not fall within the statute of frauds.

**COLLATERAL ESTOPPEL**

Cadle argues the trial court improperly ruled and instructed the jury on collateral estoppel, resulting in an improper verdict. Cadle contends it should not have been collaterally estopped from asserting that the judgment had not been satisfied because the issue was not fully and fairly litigated in the garnishment action and the issue of satisfaction of the judgment was not essential to the garnishment judgment.

The applicability of collateral estoppel to a particular judgment is a question of law. *James v. City of Houston,* 138 S.W.3d 433, 437 (Tex.App.-Houston [14th Dist] 2004,

no pet.); *Nu–Way Energy Corp. v. Delp,* 205 S.W.3d 667, 678 (Tex.App.-Waco 2006, pet. denied), *cert. denied,* 552 U.S. 1039, 128 S.Ct. 652, 169 L.Ed.2d 509 (2007); *Martin v. U.S. Trust Co. of N.Y.,* 690 S.W.3d 300, 307 (Tex.App.-Dallas 1985, writ ref'd n.r.e.). The doctrine of collateral estoppel is designed to promote judicial efficiency, protect parties from multiple lawsuits, and prevent inconsistent judgments by precluding the relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit.

*Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.3d 796, 801 (Tex.1994); *Tarter v. Metro. Sav. & Loan Ass'n,* 744 S.W.3d 926, 927 (Tex.1988).

**\*5** "A party seeking to assert the bar of collateral estoppel must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst,* 90 S.W.3d 268, 288 (Tex.2002)(quoting *Sysco,* 890 S.W.2d at 801). Collateral estoppel extends only to those issues of fact or law that were expressly or necessarily determined in the prior action. *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.3d 816, 818 (Tex.1984); *SWEPI, L.P. v. Camden Res., Inc.,* 139 S.W.3d 332, 339 (Tex.App.-San Antonio 2004, pet. denied).

To have collateral estoppel effect, the particular issue in the current case must have been actually litigated in the earlier proceeding, which means that the issue was raised by the pleadings or otherwise submitted for determination and was determined by the fact finder. *Rexrode v. Bazar,* 937 S.W.2d 614, 617 (Tex.App.-Amarillo 1997, no writ) (citing *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.3d 381, 384 (Tex.1985)). The issue decided in the prior action must be identical to the issue in the pending action. *State & Cnty. Mut. Fire Ins. Co. v. Miller,* 52 S.W.3d 693, 696 (Tex.2001); *Getty Oil Co. v. Ins. Co. of North Am.,* 845 S.W.3d 794, 802 (Tex.1992), *cert. denied,* 510 U.S. 820, 114 S.Ct. 76, 126 L.Ed.2d 45 (1993); *SWEPI, L.P.,* 139 S.W.3d at 339.

Davis argues Cadle was properly estopped from asserting the judgment had not been satisfied because of the judgment rendered in the garnishment proceeding and its affirmance on

appeal. To resolve this point, we must decide what issues were actually litigated and finally determined in the garnishment proceeding.

Rule 664a of the Texas Rules of Civil Procedure governs the dissolution of a writ of garnishment and permits a defendant to seek dissolution for grounds or cause, extrinsic or intrinsic.

TEX.R. CIV. P. 664a.; *Thompson v. Harco Nat'l Ins. Co.,* 997 S.W.3d 607, 612 (Tex.App.-Dallas 1998, pet. denied), *overruled in part on other grounds by John v. Marshall Health Servs., Inc.,* 585 S.W.3d 738, 741 (Tex.2001). Rule 664a provides a writ shall be dissolved unless at the hearing on the motion to dissolve the garnishor proves the grounds relied upon for its issuance. TEX.R. CIV. P. 664a; *Thompson,* 997 S.W.3d at 612. "In the context of a post judgment garnishment proceeding, this means the garnishor must prove (a) it has a valid, subsisting judgment and (b) that within the garnishor's knowledge, the judgment debtor does not possess property in the state subject to execution sufficient to satisfy the judgment." *Id.* Since the garnishor has the burden of proof, any failure on its part to carry that burden requires the trial court to dissolve the writ. *Id.* at 613; *Huie–Clark Joint Venture v. Am. States Ins. Co.,* 629 S.W.3d 109, 110–11 (Tex.App.-Dallas 1981, writ ref'd n.r.e.).

**\*6** At the hearing on Davis's emergency motion to dissolve the writ of garnishment, Cadle had the burden of proving that the 1993 judgment was a valid and subsisting judgment. During the hearing, counsel for Davis discussed the exhibits attached to the motion to dissolve the writ, including the affidavit of Davis. The exhibits included the following:

1. Release of Deed of Trust;

2. 1993 consent judgment;

3. Correspondence to IRS, Alamo Title, Davis, Cadle, and the parties' attorneys;

4. Affidavit as to Debts & Liens, prepared by Davis, which states that Davis's first mortgage loan that was transferred to Cadle and that "entire amount was being "released" as the judgment was being satisfied";

5. The Alamo Title Company closing documents, which reflect that $7500 was to pay off the first mortgage;

6. The cancelled check;

7. Writ of Garnishment;

8. Application for Writ of Garnishment;

9. Execution on 1993 judgment; and

10. Abstract of judgment.

Davis's affidavit identified the exhibits and set out the facts leading up to the garnishment. In the affidavit Davis denied that there was a valid and subsisting judgment.

Lance testified at the hearing as to Cadle's general practices and acknowledged he was not an employee of Cadle in 1997 when Davis sold the Comal County property. Lance had no personal knowledge of Cadle's actions prior to 2000, other than what he learned from the review of documents. After a brief hearing, the trial court dissolved the writ and stated:

> I am going to dissolve the writ. I guess I am troubled by that lack of evidence on Cadle's part of how they treated the $7500 payment. There was no communication in that six-year period that this was applied to a balance still due and owing. Cadle just didn't get that release drafted and filed is what it looks like to me at this point. But I understand that might be a subject of some other proceeding.

No formal findings of fact were entered by the trial court. Davis argues the statement in the garnishment judgment that the writ was dissolved "for the reason that the subject Judgment has been satisfied" is a fact finding. Although the statement is a factual assertion, findings of fact in judgments are forbidden and may not be considered on appeal. TEX.R. CIV. P. 299a; *Lafrensen v. Lafrensen,* 106 S.W.3d 876, 878 (Tex.App.-Dallas 2003, no pet.); *Frommer v. Frommer,* 981 S.W.2d 811, 812–14 (Tex.App.-Houston [1st Dist.] 1998, pet. dism'd).

A basic tenet of collateral estoppel is that an issue must have been actually resolved for it to have preclusive effect. *SWEPI, L .P.,* 139 S.W.3d at 339. Where the first fact finder did not determine the ultimate fact question at issue in the second proceeding, but merely determined a party failed to set forth proof to meet its burden in the first action,

collateral estoppel does not apply. *See id.* The issue of whether Davis satisfied the judgment was not actually resolved in the garnishment proceeding. The trial court and this court simply determined Cadle did not meet its burden of proof. [3]

**\*7** Additionally, even when the identical issue is litigated and determined by a valid and final judgment, relitigation is not precluded when the party against whom the preclusion is sought had a higher burden of proof in the initial action than in the subsequent action. *Sysco,* 890 S.W.2d at 802 (citing RESTATEMENT (SECOND) OF JUDGMENTS §§ 28(4), 29 (1982)); *see also Scurlock Oil Co., v. Smithwick,* 724 S.W.2d 1, 7 (Tex.1986); *SWEPI, L.P.,* 139 S.W.3d at 339 n. 10. In the garnishment proceeding, Cadle had the burden to prove there was a valid and subsisting judgment. In this case, Davis had the burden to prove there was no valid and subsisting judgment because he and Cadle had entered into a contract to resolve the debt, and the debt was satisfied. Accordingly, the garnishment judgment did not collaterally estop Cadle from contending in this case that there was no agreement to satisfy the judgment, and the trial court erred in instructing the jury on collateral estoppel. The erroneous application of collateral estoppel and the giving of the jury instructions that the 1993 consent judgment was satisfied led to the rendition of an improper verdict on Davis's contract and wrongful garnishment claims. [4] TEX.R.APP. P. 44(a)(1) & (2).

Cadle argues that if we determine collateral estoppel is inapplicable then it is entitled to a reversal and rendition on the breach of contract claim. Cadle contends the alleged oral statements by Cadle are too indefinite to support the existence of an enforceable agreement as a matter of law. Cadle also contends that there is no evidence of consideration for Cadle to release its judgment.

"As long as there is a probability that a case has for any reason not been fully developed, an appellate court has the discretion to remand rather than render a decision." *Pena v. Smith,* 321 S.W.3d 755, 759 (Tex.App.-Fort Worth 2010, no pet.); *see also Scott E. Bader, Inc., v. Sandstone Prod., Inc.,* 248 S.W.3d 802, 822 (Tex.App.-Houston [1st Dist.] 2008, no pet.); *Zion Missionary Baptist Church v. Pearson,* 695 S.W.2d 609, 613 (Tex.App.-Dallas 1985, writ ref'd n.r.e.). Here, the trial court's ruling on collateral estoppel affected the presentation of the case because the ruling relieved Davis of the burden to establish the terms of

Cadle Co. v. Davis, Not Reported in S.W.3d (2010)

the purported agreement. Davis contends his trial strategy would have been different had the trial court not ruled that Cadle was collaterally estopped to assert the 1997 judgment was not satisfied and instructed the jury accordingly. *See Scott E. Badar, Inc.,* 248 S.W.3d at 822 (remand necessary because sanction order by trial court affected and shaped the presentation and development of case).

The collateral estoppel ruling affected Davis's claims for breach of contract and wrongful garnishment, as both are premised on whether the 1997 consent judgment was satisfied. Because of our conclusion that the trial court erred in applying collateral estoppel and instructing the jury as it did, and in the interest of justice, we remand this case for further proceedings on Davis's contract and wrongful garnishment causes of action. TEX.R.APP. P .44(a)(1) & (2).

## FRAUD

**\*8** Cadle contends there is legally and factually insufficient evidence of an actionable misrepresentation.[5] Cadle argues that the only representation identified by Davis was an alleged statement by Pete Barta that "if you sell it [the Comal property], I will work out a deal with the IRS and we will get this behind us and be through with it." Cadle contends this statement is not sufficiently definite and specific to trigger Davis's reasonable reliance to support a fraud claim.

The elements of fraud are: (1) a false, material representation; (2) that was either known to be false when made or was made without knowledge of its truth; (3) that was intended to be acted upon; (4) that was relied upon; and (5) that caused injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998). The mere failure to perform a contract is not evidence of fraud. But a promise of future performance is actionable if at the time the promise was made the promisor intended to deceive and had no intention of performing. *See id.* at 48; *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986). Promises must be specific and definite enough for it to be reasonable to rely upon them. *See Gilmartin v. KVTV–Channel 13,* 985 S.W.2d 553, 559 (Tex.App.-San Antonio 1998, no pet.). Vague assurances that no reasonable person would rely upon are not actionable misrepresentations. *See id.*

Davis argues on appeal that his fraud claim is "based on representations that were made to induce [him] to enter into the 1997 agreement—that the Judgment would be satisfied with the sale of the Comal County property." Davis does not identify these "representations" or cite the record where there is testimony regarding the representations. Rather, Davis simply refers to the general statement that they would "get this behind us" and to the instruction on collateral estoppel. Vague representations cannot constitute a material representation actionable under our laws. *See In re Media Arts Group, Inc.,* 116 S.W.3d 900, 910 (Tex. App .-Houston [14th Dist.] 2003, orig. proceeding [man. denied] )(statement "don't worry about it" too vague to constitute material misrepresentation in claim of fraudulent inducement); *see also Bank One, Tex., N.A. v. Little,* 978 S.W.2d 272, 280 (Tex.App.-Fort Worth 1998, pet. denied)(imprecise or vague representation constitutes mere opinion and is not actionable misrepresentation under DTPA); *Hedley Feedlot, Inc., v. Weatherly Trust,* 855 S.W.2d 826, 839 (Tex.App.-Amarillo 1993, writ denied)(imprecise statement not actionable misrepresentation under DTPA). We hold the evidence is legally insufficient to support the jury's finding on fraud because there is no evidence of a specific and definite misrepresentation. Therefore, a finding of fraud cannot support an alternate ground for judgment in favor of Davis and he is not entitled to a new trial on fraud.

## CONCLUSION

**\*9** We hold Davis's breach of contract claim is not barred by limitations or the statute of frauds. We also hold that collateral estoppel does not apply in this case. The trial court erred in instructing the jury the 1993 judgment had been satisfied, that there was an agreement between Davis and Cadle to satisfy the 1993 consent judgment, and Cadle breached that agreement. We reverse the judgment and remand Davis's breach of contract and wrongful garnishment claims for a new trial because of the improper application of collateral estoppel. We do not address Cadle's sufficiency challenges to the Davis's contract claim because there is a probability that Davis did not fully develop his breach of contract case due to the trial court's ruling on collateral estoppel. We also do not address Cadle's complaint regarding the jury's verdict on wrongful garnishment because the trial court's erroneous ruling on collateral estoppel and improper jury instructions requires a remand of the wrongful garnishment claim. We hold there is no evidence of an actionable misrepresentation.

A-193

We need not address Davis's remaining issues on the award of actual damages and attorney's fees because we reverse and remand the breach of contract and wrongful garnishment claims for new trial.

**All Citations**

Not Reported in S.W.3d, 2010 WL 5545389

## Footnotes

1    Davis plead other causes of action, but these were resolved by either a dismissal or a directed verdict and these orders are not challenged on appeal.

2    Alamo received a take nothing judgment and there are no issues on appeal related to it.

3    On appeal we affirmed the trial court's judgment but noted: "We express no opinion as to whether The Cadle Company would be able to garner sufficient evidence to establish a valid and subsisting judgment in any subsequent proceeding between the parties. We only hold that The Cadle Company failed to introduce sufficient evidence to satisfy its burden in the underlying garnishment proceeding." *Cadle Co. v. Int'l Bank of Commerce,* No. 04–06–00456–CV, 2007 WL 752260, at *4 n. 1 (Tex.App.-San Antonio Mar. 14, 2007, pet. denied).

4    A garnishment is wrongful if the factual allegations in the affidavit, including allegations that there is a valid and subsisting judgment and the judgment debtor does not possess property in Texas to satisfy the judgment, are false. TEX. CIV. PRAC. & REM.CODE § 63.001 (West 2008); *Jamison v. Nat'l Loan Investors, L.P.,* 4 S.W.3d 465, 468 (Tex.App.-Houston [1st Dist.] 1999, pet denied). Because the jury was improperly instructed to accept as a matter of law that the 1993 judgment of had been satisfied, the garnishment claim must be remanded along with the contract claim. TEX.R.APP. P. 44(a)(1) & (2).

5    Although judgment was not rendered on this issue, we address Cadle's complaint regarding the jury's finding of fraud because the jury's verdict allows for an alternate recovery based on the fraud claim.

---

**End of Document**                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   7

# Appendix AC

Ⓐ Neutral
As of: February 18, 2021 3:52 PM Z

# *Pescatore v. Pineda*

United States District Court for the District of Columbia

May 20, 2019, Decided; May 20, 2019, Filed

Civil Action No. 08-2245 (RMC)

**Reporter**
2019 U.S. Dist. LEXIS 84048 *; 2019 WL 2173835

OLIVIA PESCATORE, et al., Plaintiffs, v. JUVENAL OVIDIO RICARDO PALMERA PINEDA, et al., Defendants.

**Prior History:** *Pescatore v. Pineda, 345 F. Supp. 3d 68, 2018 U.S. Dist. LEXIS 186862 (D.D.C., Nov. 1, 2018)*

## Core Terms

Intervenors, instrumentalities, intervene, blocked, motion to intervene, designation

**Counsel:** **[*1]** For OLIVIA PESCATORE, JOSH PESCATORE, JADA PESCATORE, JARROD PESCATORE, JORDAN PESCATORE, CAROL PESCATORE HARPSTER, as the representative of the Estate of Frank Pescatore, Sr., RICHARD PESCATORE, JOHN PESCATORE, CAROLYN PESCATORE, Plaintiffs: Nathaniel A. Tarnor, LEAD ATTORNEY, HAGENS BERMAN SOBOL SHAPIRO LLP, New York, NY; Peter G. Safirstein, PRO HAC VICE, SAFIRSTEIN METCALF LLP, New York, NY.

**Judges:** ROSEMARY M. COLLYER, United States District Judge.

**Opinion by:** ROSEMARY M. COLLYER

## Opinion

### MEMORANDUM OPINION

Frank Thomas Pescatore, Jr., was kidnapped in 1996, held for ransom, and ultimately killed by the Fuerzas Armadas Revolucionarias de Colombia (FARC). Members of the Pescatore family (Plaintiffs) sued FARC and senior FARC commander Juvenal Ovidio Ricardo Palmera Pineda under the *Antiterrorism Act, 18 U.S.C. § 2333 et seq.*, and this Court granted default judgment and damages. Plaintiffs now seek to enforce the Court's Order for damages against Samark Jose Lopez Bello and his company, the Yakima Trading Corporation, as agents or instrumentalities of FARC. Mr. Lopez and Yakima, neither of which was a party to the underlying lawsuit, move to intervene so that they may defend themselves against execution of the judgment order. Because Mr. **[*2]** Lopez and Yakima are entitled to an opportunity to defend their interests in this action, the Court will grant their motion to intervene.

### I. BACKGROUND

In November 2018, after ten years of litigation both here and as part of a multi-district case in Florida, s*ee Stansell v. Revolutionary Armed Forces of Columbia, 771 F.3d 713 (11th Cir. 2014)*, Plaintiffs secured from this Court an Order of default judgment against Mr. Pineda and FARC totaling $69 million. *See Pescatore v. Pineda, 345 F. Supp. 3d 68 (D.D.C. 2018)*. Section 201(a) of the Terrorism Risk Insurance Act (TRIA), *28 U.S.C. § 1610 et seq.*, allows Plaintiffs to satisfy this judgment against "blocked assets" of "agents or instrumentalities" of FARC. *See Stansell, 771 F.3d at 722-23*. Assets are blocked when the United States Department of Treasury Office of Foreign Assets Control (OFAC) designates their owner a Specially

Designated Narcotics Trafficker (SDNT). However, it is up to the courts to determine whether a person is an agent or instrumentality of FARC. *Id. at 726-27* ("Before a writ of garnishment or execution pursuant to TRIA § 201 issues, a district court must determine that the property owner is . . . an agency or instrumentality of the judgment debtor terrorist party.").

OFAC has designated Mr. Lopez and Yakima (together, Intervenors) SDNTs. *See* Opp'n, Ex. 1, Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His **[*3]** Primary Frontman Samark Lopez Bello [Dkt. 79-1]. Based on this, and without a court finding that Intervenors are agents or instrumentalities of FARC, Plaintiffs sent writs of attachment to several banks attempting to seize Intervenors' assets, copies of which were also mailed to properties owned by Mr. Lopez and Yakima but blocked by OFAC. *See* Pls.' Mot. to Enforce Their Judgment Against the Blocked Assets of FARC and FARC's Agencies and Instrumentalities (Motion to Enforce) [Dkt. 68] at 3. Co-plaintiffs from the *Stanell* litigation (*Stansell* Plaintiffs) moved to dismiss these writs, protesting that Plaintiffs were attempting to gain lien priority on those assets improperly by skipping this crucial finding. On January 18, 2019, Plaintiffs responded by moving this Court to find that Mr. Lopez and Yakima are agents or instrumentalities of FARC. *See* Motion to Enforce.

Meanwhile, on January 22, 2019, the *Stansell* Plaintiffs—who have moved another court in this district to find Mr. Lopez and Yakima are, along with others, agents or instrumentality of FARC—emailed a copy of their motion to dismiss to Mr. Lopez's counsel. *See* Mot., Ex. 2, Decl. of Jeffrey M. Kolansky in Supp. of Mot. to Intervene [Dkt. 77-2] ¶ 3. Mr. Lopez and Yakima moved to intervene in this case on February 11, 2019. Plaintiffs oppose.[1]

## II. LEGAL STANDARD [*4]

A party may intervene in an action as of right when that party "claims an interest relating to the property or

transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." *Fed. R. Civ. P. 24(a)(2)*. The D.C. Circuit has "identified four prerequisites to intervene as of right: (1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of applicant's interests." *Karsner v. Lothian, 532 F.3d 876, 885, 382 U.S. App. D.C. 275* (internal cites and quotes omitted).

## III. ANALYSIS

Plaintiffs contest only the first two factors: timeliness and the interest at stake.

## A. Timeliness

Timeliness "is to be judged in consideration of all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." **[*5]** *Id. at 886* (internal cites and quotes omitted). Timeliness depends on when the movant "knew or should have known that any of its rights would be directly affected by this litigation." *Nat'l Wildlife Fed'n v. Burford, 878 F.2d 422, 434, 278 U.S. App. D.C. 320 (D.C. Cir. 1989)*. That said, "[t]he most important consideration in deciding whether a motion for intervention is untimely is whether the delay in moving for intervention will prejudice the existing parties to the case." 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1916 (2019). "Since in situations in which intervention is of right the would-be intervenor may be seriously harmed if intervention is denied, courts should be reluctant to dismiss such a request as untimely." *Id.*

Although Plaintiffs have been litigating this case for almost a decade, at no point had Plaintiffs named or otherwise referred to Mr. Lopez or Yakima until now; Plaintiffs' case against Mr. Lopez and Yakima is new and Plaintiffs do not explain why Intervenors should bear the consequences of Plaintiffs' extended litigation in this Court and in Florida. Plaintiffs argue that the motion to intervene should have been filed earlier, after

---

[1] *See* Samark Jose Lopez Bello's & Yakima Trading Corp.'s Mot. to Intervene & Request for Stay [Dkt. 77]; Samark Jose Lopez Bello's & Yakima Trading Corp.'s Mem. in Supp. of Mot. to Intervene (Mem.) [Dkt. 77-1]; Pesctore Pls.' Opp'n to Samark Jose Lopez Bello's & Yakima Trading Corp.'s Mot. to Intervene (Opp'n) [Dkt. 79]; *see also* Samark Jose Lopez Bello's & Yakima Corp.'s Reply Mem. in Supp. of Mot. to Intervene (Reply) [Dkt. 80].

2019 U.S. Dist. LEXIS 84048, *5

Plaintiffs mailed copies of their writs to Mr. Lopez's OFAC-blocked addresses on December 24, 2018. **[*6]** However, Intervenors note that, because those addresses were blocked, Mr. Lopez could not reside there and so could not receive notice—which Plaintiffs should have known. Reply at 3. More to the point, even if Intervenors were aware of their interest in this case by the end of 2018, Plaintiffs do not explain why a few weeks' delay should be dispositive, especially since Plaintiffs did not file to enforce their writs until mid-January 2019. Certainly, this case has withstood longer delays. *See, e.g.*, 8/10/2010 Order to Show Cause; 10/5/2009 Order to Show Cause.

Most importantly, Plaintiffs do not explain how they will be prejudiced if the Court grants intervention. Although Plaintiffs fear Intervenors mean to "reopen the underlying case that Plaintiffs have spent over a decade litigating," Opp'n at 7, this fear is without basis since Intervenors explicitly state that their intervention will "not affect the underlying judgment against the FARC defendants," and their motion references only the enforcement of judgment against them. Mem. at 8.

Intervenors filed their motion to intervene within a mere 1-2 months of receiving notice that their rights were implicated by this case. Any related **[*7]** delays will not prejudice Plaintiffs in this case. The Courts finds Intervenors' motion timely.

## B. Interest

"Interests in property are the most elementary type of right that *Rule 24(a)* is designed to protect." *Diaz v. S. Drilling Corp., 427 F.2d 1118, 1124 (5th Cir. 1970)*. Because Plaintiffs seek to enforce their Order for default judgment against third-party Intervenors' assets, Plaintiffs face an uphill battle at preventing their intervention.

Undeterred, Plaintiffs first argue that there is nothing left to litigate because the OFAC designation alone is itself enough to find Intervenors agents or instrumentalities of FARC. Not so. "[T]he agency or instrumentality determination is separate from the determination that an asset is blocked and carries more immediate and substantial consequences than does the SDNT designation." *Stansell, 771 F.3d at 727*. *Stansell*, which Plaintiffs cite as support, actually made it clear that while a district court may appropriately cite an OFAC designation as evidence of agency and instrumentality, it must also make an independent determination apart

from OFAC on those points; it is "not proper for the district court to rely solely on OFAC designation as creating an irrebuttable presumption of agency or instrumentality status." *Id. at 732 n.13*. Indeed, Plaintiffs **[*8]** apparently recognized as much when they filed their Motion to Enforce with this Court.

Plaintiffs next argue that Intervenors have already forfeited their property interest because their assets are blocked by OFAC. The argument suggests that if Intervenors cannot currently access their property, then surely it makes no difference to them if Plaintiffs take it. This argument borders on the frivolous. Intervenors can work with, or litigate against, OFAC to secure the return of their property. But if this Court determines that Intervenors are agents or instrumentalities of FARC and, therefore, allows Plaintiffs to execute against their assets, those assets will be gone forever.

## C. Motion Defects

Plaintiffs also quibble about the form of the motion to intervene.

First, Local Civil Rule 7(j) requires a motion to intervene to be "accompanied by an original of the pleading setting forth the claim or defense for which intervention is sought." LCvR 7(j). Plaintiffs complain that no such pleading accompanied Intervenors' motion. However, Plaintiffs' own pleadings make no mention of Mr. Lopez or Yakima or their assets and Plaintiffs do not identify the missing pleading.

Second, Plaintiffs complain that Intervenors refuse **[*9]** to subject themselves fully to the jurisdiction of this Court, and that their motion should be rejected in this basis alone. Intervenors clarify that they mean preserve their right to argue subject matter jurisdiction and venue. Reply at 4 n.1. Ultimately, the Court will decide its jurisdiction; Plaintiffs' objection is insufficient to cause the Court to reject the motion to intervene.

## IV. CONCLUSION

Plaintiffs' Motion to Enforce carries significant implications for Intervenors and their property. Intervenors have timely moved to intervene. The Motion to Intervene and Request for Stay, Dkt. 77, will be granted in part and denied in part. Intervention will be granted. Since Intervenors plan to file "additional motions to vacate or modify the Court's Order, to dissolve the writs, and to stay the execution of

judgment," Mem. at 3, the motion for a stay will be denied at this time.

A memorializing Order accompanies this Memorandum Opinion.

Date: May 20, 2019

/s/ Rosemary M. Collyer

ROSEMARY M. COLLYER

United States District Judge


**ORDER**

For the reasons stated in the Memorandum Opinion issued contemporaneously with this Order, it is hereby

**ORDERED** that Samark Jose Lopez Bello's & Yakima Trading Corp.'s **[*10]** Mot. to Intervene & Request for Stay, Dkt. 77, is **GRANTED** in part and **DENIED** in part; and it is

**FURTHER ORDERED** that Samark Jose Lopez Bello and Yakima Trading Corp. may intervene as defendants in this case; and it is

**FURTHER ORDERED** that the request for stay is **DENIED**; and it is

**FURTHER ORDERED** that Mr. Lopez and Yakima shall respond to Plaintiffs' Motion to Enforce Their Judgment Against the Blocked Assets of FARC and FARC's Agencies and Instrumentalities, Dkt. 68, by June 10, 2019.

Date: May 20, 2019

/s/ Rosemary M. Collyer

ROSEMARY M. COLLYER

United States District Judge

---

End of Document

# Appendix AD



**User Name:** John Heath
**Date and Time:** Sunday, February 21, 2021 10:16:00 AM CST
**Job Number:** 137078594

## Document (1)

1. *Caballero v Fuerzas Armadas Revolucionarias De Colombia, 2020 N.Y. Misc. LEXIS 10368*
   **Client/Matter:** 1001154315/18125
   **Search Terms:** "agent or instrumentality
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

Ⓐ Neutral

As of: February 21, 2021 4:16 PM Z

## *Caballero v Fuerzas Armadas Revolucionarias De Colombia*

Supreme Court of New York, New York County

December 4, 2020, Decided

154864/2020

**Reporter**

2020 N.Y. Misc. LEXIS 10368 \*; 2020 NY Slip Op 34026(U) \*\*

 **[\*\*1]** ANTONIO CABALLERO, Plaintiff - against - FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, a/k/a/ FARC-EP a/k/a REVOLUTIONARY ARMED FORCES OF COLOMBIA, and NORTE DE VALLE CARTEL, Defendants Index No. 154864/2020

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**Prior History:** *Caballero v. Fuerzas Armadas Revolucionarias de Colombia, 2020 N.Y. Misc. LEXIS 10188 (N.Y. Sup. Ct., Nov. 20, 2020)*

## Core Terms

instrumentality, blocked, entities, terrorist organization, linked, designated, trafficker, website, narcotics trafficking, declaratory judgment, judicial notice, press release, documents, narcotics, alliance, includes, attests, leader

**Judges:** **[\*1]** LUCY BILLINGS, J.S.C.

**Opinion by:** LUCY BILLINGS

## Opinion

DECISION AND ORDER

LUCY BILLINGS, J.S.C.:

Plaintiff's action seeks to enforce a federal judgment from the Southern District of Florida, now domesticated in New York by the Erie County Clerk. *C.P.L.R. § 5018(b)*. Plaintiff moves for a declaratory judgment, *C.P.L.R. § 3001*, that Julio Cesar Alvarez Montelongo and Rafael Marquez are agents or instrumentalities of defendant Fuerzas Armada Revolucionarias de Colombia (FARC) under *28 U.S.C. § 1610* n., so that plaintiff may enforce his judgment against them. *Kirschenbaum v. 650 Fifth Ave., 830 F.3d 107, 132-33 (2d Cir. 2016)*.

The federal district court for the Southern District of Florida determined that defendants FARC and Norte de Valle Cartel **[\*\*2]** are narcoterrorist organizations engaged in international terrorism and entered a final judgment against them in plaintiff's favor. A terrorist organization includes any organization designated as a Foreign Terrorist Organization under *8 U.S.C. § 1189*, any organization designated in the Federal Register as a terrorist organization, or a group of two or more individuals who engage in terrorist activities. *8 U.S.C. § 1182(a)(3)(B)(iv)*; *Kirschenbaum v. 650 Fifth Ave., 830 F.3d at 131-33*. An ***agent or instrumentality*** of a terrorist organization such as FARC includes a person who materially assisted in, provided financial or technical support to, or provided merchandise or services **[\*2]** in support of the international narcotics trafficking activities of a narcotics trafficker such as FARC or was controlled by or acted for a narcotics trafficker. *Kirschenbaum v. 650 Fifth Ave., 830 F.3d at 135*; *Stansell v. Revolutionary Armed Forces of*

John Heath

2020 N.Y. Misc. LEXIS 10368, *2; 2020 NY Slip Op 34026(U), **2

*Columbia, 771 F.3d 713, 724 n.6, 731-32 (11th Cir. 2014)*.

To establish that Montelongo and Marquez both are agents or instrumentalities of FARC, plaintiff presents an affidavit by John Robert McBrien, the former Associate Director for Global Targeting in the Office of Foreign Assets Control (OFAC) of the United States Department of the Treasury. Aff. of Nicholas [**3] Rostow Ex. A. McBrien attests that Montelongo and Marquez are FARC's agents or instrumentalities based on two OFAC publications and a United States Department of the Treasury press release in August 2017, which identified individuals and entities linked to the Flores Drug Trafficking Organization (DTO), including Montelongo and Marquez and entities linked to them, which do not include FARC. Aff. of John Robert McBrien (Rostow Aff. Ex. A) Exs. D-F. While the court may take judicial notice of these documents published on the United States Department of the Treasury's website, *People v. Schreier, 22 N.Y.3d 494, 498 n. (2014, 982 N.Y.S.2d 822, 5 N.E.3d 985)*; *Travelers Prop. Cas. Co. of Am. v. Archibald, 124 A.D.3d 480, 481, 2 N.Y.S.3d 92 (1st Dep't 2015)*; *LaSonde v. Seabrook, 89 A.D.3d 132, 137 n.8, 933 N.Y.S.2d 195 (1st Dep't 2011)*; *L & O Realty Corp. v. Assessor, 71 A.D.3d 1025, 1026, 896 N.Y.S.2d 886 (1st Dep't 2012)*, this evidence does not establish that Montelongo or Marquez is FARC's *agent or instrumentality*. The evidence shows only that Montelongo and [*3] Marquez are linked to the Flores DTO.

The evidence does not show that the Flores DTO is an *agent or instrumentality* of FARC, as neither the OFAC documents nor the United States Department of the Treasury press release mentions FARC. At most, plaintiff establishes a strategic alliance between Raul Flores Hernandez, the leader of the Flores DTO, and [**4] the leaders of the Sinaloa Cartel, McBrien Aff. Ex. F, at 1, which *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 12-48803, slip op. at 1 (11th Judicial Fla. Cir. Ct. Nov. 18, 2014), found was an agency or instrumentality of FARC in 2014. Montelongo's and Marquez's link to the Flores DTO and an alliance between the Flores DTO and the Sinaloa Cartel, which was an *agent or instrumentality* of FARC in 2014, does not necessarily establish that Montelongo and Marquez are agents or instrumentalities of FARC in 2020.

McBrien also attests that OFAC blocked assets linked to Montelongo and Marquez, McBrien Aff. ¶¶ 34, 35, based on the "Revised Guidance on Entities Owned by Persons Whose Property and Interests in Property Are Blocked," published by the United States Department of the Treasury August 13, 2014. Id. Ex. O. "Blocked" persons are persons who own "blocked" assets, which the United [*4] States has seized or frozen under *50 U.S.C. §§ 1701-1702* or 50 U.S.C. App. § 5(b). *28 U.S.C. § 1610* n.; *Kirschenbaum v. 650 Fifth Ave., 830 F.3d at 137*; *Stansell v. Revolutionary Armed Forces of Columbia, 771 F.3d at 723*. The court similarly may take judicial notice of the Revised Guidance on the Department of the Treasury's website. *People v. Schreier, 22 N.Y.3d at 498* n.; *Travelers Prop. Cas. Co. of Am. v. Archibald, 124 A.D.3d at 481*; [**5] *LaSonde v. Seabrook, 89 A.D.3d at 137 n.8*; *L & O Realty Corp. v. Assessor, 71 A.D.3d at 1026*.

This evidence, however, shows only that OFAC may "block" individuals, entities, and assets pursuant to an Executive Order or OFAC regulations and not that Montelongo and Marquez are blocked individuals, are associated with blocked entities, or own blocked assets. McBrien Aff. Ex. O. Moreover, even if plaintiff established that the United States Department of the Treasury blocked Montelongo and Marquez, their associated entities, or their assets, no evidence indicates that such a designation originated from a connection to FARC, rather than for an entirely separate reason.

In total, plaintiff's combined evidence does not establish that Montelongo or Marquez assisted in, provided support to, were controlled by, or acted for FARC or its international narcotics trafficking activities, to qualify as its *agent or instrumentality* under *28 U.S.C. § 1610* n. Plaintiff fails to present evidence, from OFAC's website or otherwise, identifying Montelongo or Marquez as FARC's *agent or instrumentality*, or showing a direct connection between FARC [*5] and Montelongo or Marquez. Because plaintiff has failed to establish that Julio Cesar Alvarez Montelongo or Rafael Marquez is an *agent or* [**6] *instrumentality* of defendant Fuerzas Armada Revolucionarias de Colombia (FARC) under *28 U.S.C. § 1610* n., the court denies plaintiff's motion for a declaratory judgment declaring that Montelongo and Marquez are agents or instrumentalities of FARC, without prejudice to a future motion presenting such evidence. *C.P.L.R. § 3001*.

DATED: December 4, 2020

/s/ Lucy Billings

LUCY BILLINGS, J.S.C.

2020 N.Y. Misc. LEXIS 10368, *5; 2020 NY Slip Op 34026(U), **6

**End of Document**

# Appendix AE

 Neutral
As of: February 18, 2021 4:04 PM Z

## *Levin v. Bank of N.Y. Mellon*

United States District Court for the Southern District of New York

February 12, 2019, Decided; February 12, 2019, Filed

09-CV-5900 (JPO)

**Reporter**
2019 U.S. Dist. LEXIS 22788 *; 2019 WL 564341

JEREMY LEVIN and LUCILLE LEVIN, Plaintiffs, -v-
THE BANK OF NEW YORK MELLON, et al.,
Defendants.JPMORGAN CHASE BANK, N.A., Third-
Party Plaintiff, -v- KASSIM TAJIDEEN, et al., Third-
Party Defendants.

**Prior History:** *Levin v. Bank of N.Y., 2010 U.S. Dist.
LEXIS 53282 (S.D.N.Y., May 26, 2010)*

## **Core Terms**

blocked, funds, terrorist, judgment creditor, summary
judgment, instrumentality, turnover, parties, summary
judgment motion, life insurance policy, designation,
regulations, blocked account, Third-Party, surrender,
Treasury, FAQ, supplemental complaint, genuine
dispute, surrender value, press release, deposited

**Counsel: [*1]** For Jeremy Levin, Dr. Lucille Levin,
Plaintiffs, Counter Defendants: Curtis Campbell
Mechling, LEAD ATTORNEY, Stroock & Stroock &
Lavan LLP, New York, NY; Don Howarth, Suzelle Moss
Smith, LEAD ATTORNEYS, Howarth & Smith (LA), Los
Angeles, CA; Kathryn Lee Crawford, Brownstein Hyatt
Farber Schreck LLP (Los Angeles), Los Angeles, CA.

For Jay Glenn, Movant: Daniel Cobrinik, LEAD
ATTORNEY, Daniel Cobrinik, P.C., New York, NY.

For Bank of New York, Defendant: Steven B.
Feigenbaum, Katsky Korins, LLP, New York, NY.

JP Morgan Chase, Defendant, Pro se.

For Societe Generale, Defendant: Mark Hanchet, LEAD
ATTORNEY, Christopher James Houpt, Mayer Brown
LLP (NY), New York, NY.

For Citibank, Defendant: Christopher J. Robinson,
Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright
Tremaine LLP (NYC), New York, NY.

For Angela Yoak, John Becker, The Estate of Anthony
Brown, John R. Cuddeback, Louise Gaddo Blatter,
Kathy Hodges, Defendants: Noel J. Nudelman, LEAD
ATTORNEY, Heideman Nudelman & Kalik, PC,
Washington, DC.

JPMorgan Chase & Co., Defendant, Pro se, New York,
NY.

For JPMorgan Chase Bank, N.A., Defendant: Haley
Ellen Adams, Katsky Korins LLP, New York, NY.

The Bank of New York Mellon, ThirdParty Plaintiff, **[*2]**
Pro se.

JPMorgan Chase Bank, N.A., ThirdParty Plaintiff, Pro
se.

For Societe Generale, ThirdParty Plaintiff: Christopher
James Houpt, Mark Hanchet, LEAD ATTORNEYS,
Mayer Brown LLP (NY), New York, NY.

For Citibank, N.A., ThirdParty Plaintiff: Christopher J.
Robinson, Sharon L. Schneier, LEAD ATTORNEYS,
Davis Wright Tremaine LLP (NYC), New York, NY.

For Commerzbank AG, ThirdParty Defendant: Jeffrey Lance Nagel, Paul Anthony Saso, LEAD ATTORNEY, Gibbons P.C. (NY), New York, NY.

For Sealed Third-Party Defendant, ThirdParty Defendant: Jonathan G. Kortmansky, LEAD ATTORNEY, Sullivan & Worcester LLP, New York, NY; Liviu Vogel, Salon Marrow Dyckman Newman Broudy LLP, New York, NY; Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For The Bank Of Tokyo-Mitsubishi UFJ, Ltd. (New York Branch), ThirdParty Defendant: George F. Hritz, LEAD ATTORNEY, Kaplan Fox & Kilsheimer, LLP, New York, NY; Karl Geercken, Alston & Bird, LLP(NYC), New York, NY.

For The Bank Of Tokyo-Mitsubishi UFJ, Ltd. (London Branch), ThirdParty Defendant: George F. Hritz, LEAD ATTORNEY, Kaplan Fox & Kilsheimer, LLP, New York, NY.

For The Estate of James Silvia and Lynne Michol Spencer, ThirdParty Defendant: [*3]  Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC; June Hee Park, Fleischman Law Firm, New York, NY.

For Joseph A. Barile, Angela E. Barile, Michael Barile, Andrea Ciarla, Ann Marie Moore, Vara Brown, John Brown, Sulba Brown, Rowel Brown, Marvine McBride, LaJuana Smith, Rodney E. Burns, Jeannie Scaggs, Eugene Burns, David Burns, Daniel Cuddeback, Jr., Daniel Cuddeback, Sr., Barbara Cuddeback, Robert Dean, Michael Episcopo, Randy Gaddo, Peter Gaddo, Timothy Gaddo, Gaddo Blatter, The Estate of Willim R. Gaines, Jr., Michael A. Gaines, Carolyn Spears, William R. Gaines, Sr., Evelyn Sue Spears Elliot, Carol Weaver, The Estate of Virgel Hamilton, Gloria Hamilton, Bruce Hastings, Mary Jean Hodges, Maynard Hodges, Lorreta Brown, Cindy Holmes, Shana Saul, Daniel Joy, Sean Kirkpatrick, Daniel Kremer, Joseph T. Kremer, Jacqueline Stahrr, The Estate of Christine Kremer, The Estate of Thomas Kremer, The Estate of David A. Lewis, Betty Lewis, Jerry L. Lewis, Scott M. Lewis, Paul Martinez, Sr., Teresa Gunterh, Esther Martinez Parks, Alphonso Martinez, Daniel Martinez, Michael Martinez,

Paul [*4]  Martinez, Jr., Tomasita L. Martinez, Susanne Yeoman, John Opatovsky, The Estate of Michael Lee Page, Albert Page, Janet Page, Joyce Clifford, David Penosky, Joseph Penosky, Christian R. Rauch, Leonard Paul Tice, The Estate of Burton Wherland, Sarah Wherland, Gregory Wherland, Kimmy Wherland, Charles F. West, Charles H. West, Sharon Davis, Alan C. Anderson, Michael Anderson, Thelma Anderson, Stephen Boyd Bland, Estate of Frank Bland, Ruth Ann Bland, James Bland, Estate of Laura Virginia Copeland, Sidney Decker, Ida Decker, Dudley Decker, Johnnie Decker, Carolyn Mudd, Ronald Duplanity, Estate of Sean F. Ester, Louis Estler, Jr., Mary Ellen Estler, Estate of Benjamin E. Fuller, Ellaine Allen, Ernest C. Fuller, John Gibson, Holy Gibson, Maurice Gibson, Estate of Michael Hastings, Joyce Hastings, Estate of Paul Hein, Christopher Hein, Jo Ann Hein, Karen Hein-Sullivan, Victor J. Hein, Jacqueline M. Kunysz, Estate of John Hendrickson, John Hendrickson, Tyson Hendrickson, Deborah Ryan, Estate of Bruce Hollingshead, Melinda Hollingshead, Renard Manley, Estate of Michael Robert Massman, Nicole Gomez, Angela Massman, Kristopher Massman, Lydia Massman, Patricia Lou Smith, Estate of Louis Melendez, [*5]  Zaida Melendez, Douglas Jason Melendez, Johnny Melendez, Johnny Jr. Melendez, Estate of Michael Mercer, Sarah Mercer, Samuel Palmer, Robin Nicely, Estate of Juan C. Rodriguez, Louisa Punonet, Robert Rucker, Estate of Billy San Pedro, Cesar San Pedro, Sila V. San Pedro, Guillermo San Pedro, Javier San Pedro, Thurnell Shields, Emanuel Simmons, Estate of James Surch, Patty Barnett, Will Surch, Bradley Ulick, Jeanette Doughtry, Marilyn Peterson, Estate of Eric Walker, Tena Walker-Jones, Ronald E. Walker, Galen Weber, Estate of Obrian Weekes, Anson Edmond, Arnold Edmond, Hazel Edmond, Edmond Wendy, Keith Weekes, Faith Weekes, Ianthe Weekes, Meta Weekes, Estate of Dennis Lloyd West, Kathy West, Estate of John Weyl, Kelly Bachlor, Robin Brock, Morgan W. Rowan, Sharon J. Rowan, Nelson Weyl, ThirdParty Defendants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Deborah D. Peterson, personal representative of the Estate of James C. Knipple, et al., ThirdParty Defendant: Liviu Vogel, LEAD ATTORNEY, Salon Marrow Dyckman Newman Broudy LLP, New York, NY.

For The International Bank of Azerbaijan-Moscow LLC, Third Party Defendant, ThirdParty Defendant: John Joseph [*6]  Hay, LEAD ATTORNEY, Salans FMC SNR

Denton Europe LLP, New York, NY.

For Alan D. Hayman, Shirlee Hayman, ThirdParty Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, James Lawrence Bernard, Stroock & Stroock & Lavan LLP, New York, NY.

For Redacted Third-Party Defendant, ThirdParty Defendant: George Michael Chalos, LEAD ATTORNEY, Kerri Marie D'Ambrosio, Chalos & Co., P.C., Oyster Bay, NY; Gina Maria Venezia, LEAD ATTORNEY, Edward John Carlson, Freehill, Hogan & Mahar, LLP, New York, NY.

For Catherine Bonk, Terrance Valore, Cathrine Bonk Hunt, Sr. John Bonk, Kevin Bonk, Thomas Bonk, Lisa DiGiovanni, Marion DiGiovanni, Sherry Lynn Fiedler, Robert Fluegel, Thomas A Fluegel, Marilou Fluegel, Evans Hairston, Felicia Hairston, Julia Bell Hairston, Henry Hukill, Mark Andrew Hukill, Matthew Scott Hukill, Melissa Hukill, Meredith Ann Hukill, Mitchell Charles Hukill, Monte Hukill, Virginia Ellen Hukill, Storm Jones, Penni Joyce, Sr. Carl Kirkwood, Jeff Kirkwood, Shirley Kirkwood, Jr. Carl A. Kirkwood, Patricia Kronenbitter, Kris Laise, Betty Laise, James Macgroglou, Lorraine Macgroglou, Bill Macgroglou, Kathy McDonald, Edward W. McDonough, Sean McDonough, Edward J McDonough, Rose Rotondo Estate [*7]  of, Phyllis Santoserra Estate of, Deborah Rhosto, Robert Simpson, Renee Eileen Simpson, Sr. Larry Simpson, Anna Marie Simpson, Sally Jo Wirick, David A. Battle Estate of, Matilde Hernandez Estate of, James Yarber Estate of, Pedro Alvarado, Jr., Andres Alvarado Tull, Angel Alvarado, Geraldo Alvarado, Marta Alvarado, Minerva Alvarado, Yolanda Alvarado, Zoraida Alvarado, Dennis Jack Anderson, Michael Harris, Rose Harris, Donald R. Pontillo, Deborah True, Douglas Pontillo, John E. Selbe, Eloise F. Selbe, Belinda Skarka, Don Selbe, James Selbe, Willy G. Thompson, Allison Thompson, Ifaline Thompson, Cheryl Bass, Johnny Thompson, Wanda Ford, Orlando Michael Valore, Sr., Orlando M. Valore, Jr., Janice Valore, Marcy Lynn Parson, Timothy Brooks, Edward J. Brooks, Patricia A. Brooks, ThirdParty Defendants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC; Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Robert DiGiovanni, Danielle DiGiovanni, Juanita R.

Goldfarb, Mary V. Hernandez, Robert Muffler, Jr., Jutta Yarber, Ronald L. Tishmack, Celia Walker, Dorothy Wint, Dorothy C Wint, Floyd [*8]  Carpenter, Leonora Pontillo, ThirdParty Defendants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC.

For Luis Rotondo Estate of, John Muffler Estate of, John Jay Tishmack Estate of, Grisselle Alvarado, Luis Alvarado, Luisa Alvarado, Maria Alvarado, ThirdParty Defendants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC; June Hee Park, Fleischman Law Firm, New York, NY.

For Estate of Michael Heiser, ThirdParty Defendant: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY; Dale Kerbin Cathell, DLA Piper US LLP (MD), Baltimore, MD; Richard Marc Kremen, PRO HAC VICE, DLA Piper US LLP (MD), Baltimore, MD.

For Fran Heiser, individually and as personal representative of the Estate of Michael Heiser, Gary Heiser, individually and as personal representative of the Estate of Michael Heiser, ThirdParty Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Estate of Brent Marthaler, Katie Lee Marthaler, individually [*9]  and as personal representative of the Estate of Brent Marthaler, Herman Marthaler, Sharon Marthaler, Matthew Marthaler, Kirk Marthaler, Richard Wood, Kathleen Wood, Shawn Wood, Denise Eichstaedt, Anthony Cartrette, Lewis Cartrette, Estate of Patrick Fennig, Thaddeus C. Fennig, individually and as personal representative of the Estate of Patrick Fennig, Catherine Fennig, individually and as personal representative of the Estate of Patrick Fennig, Paul Fennig, Mark Fennig, Estate of Christopher Adams, Catherine Adams, individually and as personal representative of the Estate of Christopher Adams, Mary Young, Daniel Adams, Elizabeth Wolf, ThirdParty Defendants: Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Patrick Adams, William Adams, Michael Adams, Estate of Thanh "Gus" Nguyen, Christopher Nguyen,

2019 U.S. Dist. LEXIS 22788, *9

individually and as personal representative of the Estate of Thanh "Gus" Nguyen, Sandra M. Wetmore, Bridget Brooks, James Rimkus, Anne Rimkus, Estate of Kendall Kitson, Jr., Kendall Kitson, Sr., individually and as personal representative of the Estate of Kendall Kitson, Jr., Nancy R. Kitson, individually and as personal representative of the Estate of **[*10]** Kendall Kitson, Jr., Steve K. Kitson, Nancy A. Kitson, Lawrence Taylor, Vickie Taylor, Starlina Taylor, Estate of Joshua Woody, Dawn Woody, individually and as personal representative of the Estate of Joshua Woody, Bernadine Beekman, Tracy Smith, Jonica Woody, Timothy Woody, Estate of Leland "Tim" Haun, Ibis "Jenny&quo Haun, individually and as personal representative of the Estate of Leland "Tim" Haun, Senator Haun, Milly Perez-Dallis, Estate of Christopher Lester, Judy Lester, individually and as personal representative of the Estate of Christopher Lester, Cecil Lester, Jr., Jessica Lester, Estate of Kevin Johnson, Sr., Shyrl Johnson, individually and as personal representative of the Estate of Kevin Johnson, Sr., Nicholas Johnson, Estate of Peter Morgera, Michael Morgera, individually and as personal representative of the Estate of Peter Morgera, Thomas Morgera, Estate of Millard "Dee" Campbell, Marie Campbell, individually and as personal representative of the Estate of Millard "Dee" Campbell, Bessie Campbell, Estate of Justin Wood, Estate of Earl Cartrette, Jr., Estate of Brian McVeigh, Estate of Joseph E. Rimkus, Estate of Jeremy Taylor, James Wetmore, George Beekman, Che Colson, **[*11]** Bruce Johnson, ThirdParty Defendants: Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For John Adams, Cecil Lester, Sr., individually and as personal representative of the Estate of Christopher Lester, Kevin Johnson, Jr., Laura Johnson ThirdParty Defendants: Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Pedro Alvarado, Jr., Lynne Michol Spencer, Andres Alvarado Tull, Terance J. Valore, Angel Alvarado, Marta Alvarado, Minerva Alvarado, Yolanda Alvarado, Zoraida Alvarado, Dennis Jack Anderson, Michael Harris, Cheryl Bass, Wanda Ford, Bennie Harris, Rose Harris, Donald P. Pontillo, Douglas Pontillo, Don Selbe, James Selbe, John E. Selbe, Belinda Skarka, Allison Thompson, Ifaline Thompson, Johnny Thompson, Willy G. Thompson, Deborah True, Edward J. Brooks, Patricia A. Brooks, Timothy Brooks, Marcy Lynn Parson, Janice Valore, Orlando Michael Valore, Sr., Orlando M. Valore, Jr., ThirdParty Defendants: Keith Martin Fleischman,

LEAD ATTORNEY, June Hee Park, The Fleischman Law Firm, New York, NY.

For Geraldo Alvarado, Grisselle Alvarado, Luis Alvarado, Luisa Alvarado Luisa Alvarado, ThirdParty Defendants: June Hee Park, The Fleischman Law Firm, New **[*12]** York, NY.

For Alan C. Anderson, Michael Anderson, Johnnie Decker, Sidney Decker, Estate of Laura Virginia Copeland, Keith Estler, Louis Estler, Jr., Mary Ellen Estler, Carolyn Mudd, Estate of Billy San Pedro, Estate of Bruce Hollingshead, Estate of Louis Melendez, Estate of Michael Robert Massman, Holly Gibson, Karen Hein-Sullivan, John Hendrickson, Lydia Massman, Sarah Mercer, Samuel Palmer, Robert Rucker, Patricia Lou Smith, Patty Barnett, Wendy Edmond, Estate of Dennis Lloyd West, Estate of Eric Walker, Cesar San Pedro, Javier San Pedro, Sila V. San Pedro, Ronald E. Walker, Ronald Walker, Jr., Galen Weber, Faith Weekes, Meta Weekes, Kathy West, Robin Brock, Sharon J. Rowan, Nelson Weyl, Joseph A. Barile, Michael Barile, John Becker, John Brown, Rodney E. Burns Andrea Ciarla Robert Dean, Timothy Gaddo, Louise Gaddo Blatter, LaJuana Smith, James S. Spears, Evelyn Sue Spears Elliot, Angela Yoak, Lorreta Brown, Gloria Hamilton, Bruce Hastings, Cindy Holmes, Betty Lewis, Paul Martinez, Sr., The Estate of David A. Lewis, Joyce Clifford, Jean Givens Owen, Alphonso Martinez, Daniel Martinez, Michael Martinez, Steven G. Owen, David Penosky, The Estate of Burton Wherland, The Estate of Michael **[*13]** Lee Page, Charles F. West, Sarah Wherland, ThirdParty Defendants: Noel J. Nudelman, Heideman Nudelman & Kalik, PC, Washington, DC.

For Estate of Binyamin Kahane, Estate of Irma Franklin, ThirdParty Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Nathan Harry Stopper, Patrick Nicholas Petrocelli, Stroock & Stroock & Lavan LLP, New York, NY.

For Estate of Meir Kahane, ThirdParty Defendant: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY.

For Sonia Kahane, ThirdParty Defendant: Curtis Campbell Mechling, Patrick Nicholas Petrocelli, Stroock & Stroock & Lavan LLP, New York, NY.

Matthew Niss

**A-206**

2019 U.S. Dist. LEXIS 22788, *13

For Catherine Bonk, John Bonk, Sr., Kevin Bonk, Thomas Bonk, Catherine Bonk Hunt, Marion DiGiovanni, Sherry Lynn Fiedler, Marilou Fluegel, Robert Fluegel, Thomas A. Fluegel, Evans Hairston, Felicia Hairston, Julia Bell Hairston, Henry Durban Hukill, Mark Andrew Hukill, Meredith Ann Hukill, Mitchell Charles Hukill, Monte Hukill, Virginia Ellen Hukill, Storm Jones, Penni Joyce, Carl Kirkwood, Sr., Patricia Kronenbitter, Kris Laise, Bill Macgroglou, James Macgroglou, Lorraine Macgroglou, Kathy McDonald, Edward W. McDonough, Edward J McDonough, Deborah Rhosto, (Estate) Luis Rotondo, **[*14]** (Estate) Phyllis Santoserra, Anna Marie Simpson, Larry Simpson, Sr., Renee Eileen Simpson, Robert Simpson, Sally Jo Wirick, Estate of Moses Arnold, Jr., Lolita M. Arnold, Estate of David L. Battle, Lisa Ann Beck, Betty J. Bolen, Keith Edwin Bolen, Neale Scott Bolen, Sheldon H. Bolen, Sharla M. Korz, Estate of John Muffler, Estate of Rose Rotondo, Estate of John Jay Tishmack, Estate of Leonard Warren Walker, Estate of Walter Emerson Wint, Jr., Estate of James Yarber, ThirdParty Defendants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Matthew Scott Hukill, Melissa Hukill, ThirdParty Defendants: Keith Martin Fleischman, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For (estate) rose rotondo, ThirdParty Defendant: June Hee Park, Fleischman Law Firm, New York, NY.

For Estate of Judith Greenbaum, ThirdParty Defendant: Curtis Campbell Mechling, LEAD ATTORNEY, Patrick Nicholas Petrocelli, Stroock & Stroock & Lavan LLP, New York, NY.

For Anthony W. Cartrette, Lewis W. Cartrette, Denise M. Eichstaedt, Estate of Brian McVeigh, Estate of Earl F. Cartrette, Jr., Estate **[*15]** of Justin R. Wood, Estate of Leland Timothy Haun, Estate of Millard D. Campbell, Ibis S. Haun, Milagritos Perez-Dalis, Senator Haun, James V. Wetmore, Sandra M. Wetmore, Kathleen M. Wood, Richard W. Wood, Shawn M. Wood, Marie R. Campbell, Bessie A. Campbell, Che G. Colson, Estate of Brent E. Marthaler, Estate of Joseph E. Rimkus, Estate of Kevin J. Johnson, Bruce Johnson, Kevin Johnson, a minor, Laura E. Johnson, Nicholas A. Johnson, a minor, Shyrl L. Johnson, Herman C.

Marthaler, III, Katie L. Marthaler, Sharon Marthaler, Anne M. Rimkus, James R. Rimkus, Catherine Adams, Daniel Adams, John E. Adams, Patrick D. Adams, William Adams, Bernadine R. Beekman, George M. Beekman, Estate of Joshua E. Woody, Estate of Kendall Kitson, Jr., Estate of Peter J. Morgera, Kendall K. Kitson, Steve K. Kitson, Kirk Marthaler, Matthew Marthaler, Christopher R. Nguyen, Tracey M. Smith, Elizabeth Wolf, Dawn Woody, Jonica L. Woody, Timothy Woody, Estate of Jeremy Taylor, Estate of Patrick Fennig, Lawrence Taylor, Starlina D. Taylor, Vicki L Taylor, ThirdParty Defendants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Estate of Michael Heiser, Francis Heiser, Gary Heiser, ThirdParty Defendants: **[*16]** Curtis Campbell Mechling, LEAD ATTORNEY, Patrick Nicholas Petrocelli, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Alan Hayman, ThirdParty Defendant: Curtis Campbell Mechling, Patrick Nicholas Petrocelli, Nathan Harry Stopper, Stroock & Stroock & Lavan LLP, New York, NY.

For Shirlee Hayman, ThirdParty Defendant: Curtis Campbell Mechling, Stroock & Stroock & Lavan LLP, New York, NY.

For Elizabeth Adams, ThirdParty Defendant: Steven Karl Barentzen, LEAD ATTORNEY, The Law Office of Steven Barentzen, Washington, DC.

For Jeremy Levin, Dr. Lucille Levin, ThirdParty Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Suzelle Moss Smith, Howarth & Smith (LA), Los Angeles, CA.

For John Bonk, Jr., ThirdParty Defendant: June Hee Park, Fleischman Law Firm, New York, NY.

For (Estate Of) Maurice Edward Hukill, ThirdParty Defendant: Keith Martin Fleischman, The Fleischman Law Firm, New York, NY.

For James Owens, ThirdParty Defendant: Annie

Matthew Niss

**A-207**

Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC.

For Larry H. Simpson, Jr., Estate of Matilde Hernandez, Jr., ThirdParties Defendants: Keith [*17] Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Dr. Lucille Levin, ThirdParty Defendant: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Suzelle Moss Smith, Howarth & Smith (LA), Los Angeles, CA.

For United Overseas Bank Limited, ThirdParty Defendant: Baruch Weiss Arnold & Porter Kaye Scholer LLP DC), Washington, DC; Drew A Harker, PRO HAC VICE, Arnold & Porter, LLP (DC), Washington, DC.

For Redacted Third-Party Defendant, Redacted Third-Party Defendant, ThirdParty Defendant: Christopher Carlsen, LEAD ATTORNEY, Clyde & Co US LLP, New York, NY.

For redacted third-party, Redacted Third-Party Defendant, ThirdParty Defendant: Chijioke Metu, LEAD ATTORNEY, Placid & Emmanuel, P.C, Jamaica, NY; Nicholas Lawrence Magali, Clyde & Co US LLP (NYC), New York, NY.

For redacted third-party, Redacted Third-Party Defendant, ThirdParty Defendant: Thomas John Luz, LEAD ATTORNEY, Karaahmet Luz & Greenberg, L.L.P., New York, NY; Gina Maria Venezia, Freehill, Hogan & Mahar, LLP, New York, NY; William F. McGovern, Kobre & Kim LLP (NYC), New York, NY.

For Redacted Third-Party Defendant, Redacted [*18] Third-Party Defendant, ThirdParty Defendant: Douglas R. Maag, Clyde & Co US LLP (NYC), New York, NY.

For Redacted third party defendant, ThirdParty Defendant: Chijioke Metu, Placid & Emmanuel, P.C., Jamaica, NY.

For HSBC Bank USA, N.A., ThirdParty Defendant: by Anna Mercado Clark, LEAD ATTORNEY, Phillips Lytle LLP, New York, NY; Paul Kenneth Stecker, LEAD ATTORNEY, Phillips Lytle LLP (Madison Ave.), New York, NY; Sean Charles McPhee, Phillips Lytle LLP (Buffalo, NY), Buffalo, NY.

For CIMB Bank Berhad, ThirdParty Defendant: Jacob S. Pultman, LEAD ATTORNEY, Allen & Overy, LLP, New York, NY.

For Central Bank of Nigeria, ThirdParty Defendant: David H. Fromm, PRO HAC VICE, Brown Gavalas & Fromm LLP, New York, NY.

For Kathy Dianne Bailey, Attorney for Third Party Defendant Turkiye Is Bankasi A.S., Turkiye Is Bankasi A.S., ThirdParty Defendants: by Kathy Dianne Bailey, LEAD ATTORNEY, Bailey Law Group, Washington, DC.

For Engareh (M) SDN. BDH., ThirdParty Defendant: Thomas John Luz, LEAD ATTORNEY, Karaahmet Luz & Greenberg, L.L.P., New York, NY.

For Redacted Third Party Defendant, ThirdParty Defendant: Gina Maria Venezia, Freehill, Hogan & Mahar, LLP, New York, NY.

For Redacted Third-Party Defendant, [*19] ThirdParty Defendant: David H. Fromm, LEAD ATTORNEY, PRO HAC VICE, Brown Gavalas & Fromm LLP, New York, NY.

For Estate of Terrence Rich, Bryan Harris, Elizabeth Murphy, Individually and as Administratrix of the Estate of Terrence Rich, Armando J. Ybarra, ThirdParty Defendants: John W. Karr, LEAD ATTORNEY, Karr & Allison P.C., Washington, DC.

For John E. L'Heureux, ThirdParty Defendant: John W. Karr, LEAD ATTORNEY, Karr & Allison P.C., Washington, DC; Steven Karl Barentzen, The Law Office of Steven Barentzen, Washington, DC.

For Linda Bennett, Indvidually and as Co-Administrator of the Estate of Marla Ann Bennett, Michael Bennett, Individually and as Co-Administrator of the Estate of Marla Ann Bennett, ThirdParty Defendants: Carl E. Person, LEAD ATTORNEY, Carl E. Person - An Individual Practitioner New York, NY; Ferris R. Bond, Bond & Norman PLLC, Washington, DC.

For Lisa Bennett, Estate of Marla Ann Bennett, ThirdParty Defendants: Carl E. Person, LEAD ATTORNEY, Carl E. Person - An Individual Practitioner New York, NY.

For Kerry M. L'Heureux, Mary E. Wells, Bryan Harris, Jane L'Heureux, Mary Wells, Armando J. Ybarra, ThirdParty Defendants: John W. Karr, LEAD ATTORNEY, Karr & Allison P.C., **[*20]** Washington, DC.

For Redacted Third-Party Defendant, ThirdParty Defendant: Andrew Michael Meehan, LEAD ATTORNEY, Akin Gump Strauss Hauer & Feld (1 Battery Pk.), New York, NY.

For Bryan Harris, Jane L'Heureux, John E. L'Heureux, Kerrie L'Heureux, Elizabeth Murphy, Mary Wells, Armando J. Ybarra, Estate of Terrance Rich, John L'Heureux, Kerry L'Heureux, Elizabeth Murphy, ThirdParty Defendants: John W. Karr, LEAD ATTORNEY, Karr & Allison P.C., Washington, DC; Steven Karl Barentzen, LEAD ATTORNEY, The Law Office of Steven Barentzen, Washington, DC.

For Estate of Terrence Rich, ThirdParty Defendant: Steven Karl Barentzen, LEAD ATTORNEY, The Law Office of Steven Barentzen, Washington, DC.

For Estate of Martin Kirschenbaum, David Kirschenbaum, Isabelle Kirschenbaum, Jason Kirschenbaum, Joshua Kirschenbaum, ThirdParty Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY.

For American Life Insurance Company - Lebanon Branch, ThirdParty Defendant: Ilana Haramati, Meister Seelig & Fein LLP, New York, NY; Obiamaka Patricia Madubuko, McDermott, Will & Emery, LLP NY), New York, NY.

For Fiona Havlish, ThirdParty Defendant: Lee Scott Wolosky, LEAD ATTORNEY, Boies **[*21]** Schiller Flexner LLP, New York, NY.

For Babak Bayani, Sheryl Wultz, ThirdParties

Defendant: Lee Scott Wolosky, LEAD ATTORNEY, Boies Schiller Flexner LLP, New York, NY.

For Vestel Elektronik Sanayi Ve Ticaret A.S., Interpleader Defendant: Carolyn B. Lamm, LEAD ATTORNEY, White & Case LLP (DC), Washington, DC.

For Bill Laise, ADR Provider: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC; Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Redacted Third-Party Defendant, ADR Provider: Joseph B. Tompkins, Jr., LEAD ATTORNEY, Sidley Austin LLP (DC), Washington, DC.

For United States Of America, Miscellaneous: David Stuart Jones, U.S. Attorney's Office, SDNY (86 Chambers St.), New York, NY.

The Bank of New York Mellon, ThirdParty Plaintiff, Pro se.

For JPMorgan Chase Bank, N.A., ThirdParty Plaintiff: Christopher James Houpt, Mayer Brown LLP (NY), New York, NY; Steven B. Feigenbaum, Katsky Korins, LLP, New York, NY.

For Societe Generale, ThirdParty Plaintiff: Mark Hanchet, LEAD ATTORNEY, Christopher James Houpt, Mayer Brown LLP (NY), New York, NY.

For Commerzbank AG, ThirdParty Defendant: Paul **[*22]** Anthony Saso, LEAD ATTORNEY, Gibbons P.C. (NY), New York, NY.

For Sealed, Joseph A. Barile, Angela E. Barile, Michael Barile, Andrea Ciarla, Ann Marie Moore, Vara Brown, John Brown, Sulba Brown, Rowel Brown, Marvine McBride, LaJuana Smith, Rodney E. Burns, Jeannie Scaggs, Eugene Burns, David Burns, Daniel Cuddeback, Jr., Daniel Cuddeback, Sr., Barbara Cuddeback, Robert Dean, Michael Episcopo, Randy Gaddo, Peter Gaddo, Timothy Gaddo, Gaddo Blatter, The Estate of Willim R. Gaines, Jr., Michael A. Gaines, Carolyn Spears, William R. Gaines, Sr., Evelyn Sue Spears Elliot, Carol Weaver, The Estate of Virgel

2019 U.S. Dist. LEXIS 22788, *22

Hamilton, Gloria Hamilton, Bruce Hastings, Mary Jean Hodges, Maynard Hodges, Lorreta Brown, Cindy Holmes, Shana Saul, Daniel Joy, Sean Kirkpatrick, Sean Kirkpatrick, Joseph T. Kremer, Jacqueline Stahrr, The Estate of Christine Kremer, The Estate of Thomas Kremer, The Estate of David A. Lewis, Betty Lewis, Jerry L. Lewis, Scott M. Lewis, Paul Martinez, Sr., Teresa Gunterh, Esther Martinez Parks, Alphonso Martinez, Daniel Martinez, Michael Martinez, Paul Martinez, Jr., Tomasita L. Martinez, Susanne Yeoman, John Opatovsky, The Estate of Michael Lee Page, Albert Page, Janet Page, Joyce Clifford, **[\*23]** David Penosky, Joseph Penosky, Christian R. Rauch, Leonard Paul Tice, The Estate of Burton Wherland, Sarah Wherland, Gregory Wherland, Kimmy Wherland, Charles F. West, Charles H. West, Sharon Davis, Alan C. Anderson, Michael Anderson, Thelma Anderson, Stephen Boyd Bland, Estate of Frank Bland, Ruth Ann Bland, James Bland, Estate of Laura Virginia Copeland, Sidney Decker, Ida Decker, Dudley Decker, Johnnie Decker, Carolyn Mudd, Ronald Duplanity, Estate of Sean F. Ester, Louis Estler, Jr., Mary Ellen Estler, Estate of Benjamin E. Fuller, Third-Parties Defendants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Citibank, N.A., ThirdParty Defendant: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For The Estate of James Silvia and Lynne Michol Spencer, ThirdParty Defendant: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC; June Hee Park, Fleischman Law Firm, New York, NY.

For Ellaine Allen, Ernest C. Fuller, John Gibson, Holy Gibson, Maurice Gibson, Estate of Michael Hastings, Joyce Hastings, **[\*24]** Estate of Paul Hein, Christopher Hein, Jo Ann Hein, Karen Hein-Sullivan, Victor J. Hein, Jacqueline M. Kunysz, Estate of John Hendrickson, John Hendrickson, Tyson Hendrickson, Deborah Ryan, Estate of Bruce Hollingshead, Melinda Hollingshead, Renard Manley, Estate of Michael Robert Massman, Nicole Gomez, Angela Massman, Kristopher Massman, Lydia Massman, Patricia Lou Smith, Estate of Louis Melendez, Zaida Melendez, Douglas Jason Melendez, Johnny Melendez, Johnny Jr. Melendez, Estate of Michael Mercer, Sarah Mercer, Samuel Palmer, Robin

Nicely, Estate of Juan C. Rodriguez, Louisa Punonet, Robert Rucker, Estate of Billy San Pedro, Cesar San Pedro, Sila V. San Pedro, Guillermo San Pedro, Javier San Pedro, Thurnell Shields, Emanuel Simmons, Estate of James Surch, Patty Barnett, Will Surch, Bradley Ulick, Jeanette Doughtry, Marilyn Peterson, Estate of Eric Walker, Tena Walker-Jones, Ronald E. Walker, Galen Weber, Estate of Obrian Weekes, Anson Edmond, Arnold Edmond, Hazel Edmond, Edmond Wendy, Keith Weekes, Faith Weekes, Ianthe Weekes, Meta Weekes, Estate of Dennis Lloyd West, Kathy West, Estate of John Weyl, Kelly Bachlor, Robin Brock, Morgan W. Rowan, Sharon J. Rowan, Nelson Weyl, ThirdParty **[\*25]** Defendants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

The Bank of New York Mellon, ThirdParty Plaintiff, Pro se.

JPMorgan Chase Bank, N.A., ThirdParty Plaintiff, Pro se.

For Estate of Michael Heiser, Fran Heiser, individually and as personal representative of the Estate of Michael Heiser, Gary Heiser, individually and as personal representative of the Estate of Michael Heiser, Counter Claimants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Estate of Brent Marthaler, Katie Lee Marthaler, individually and as personal representative of the Estate of Brent Marthaler, Herman Marthaler, Sharon Marthaler, Matthew Marthaler, Kirk Marthaler, Richard Wood, Kathleen Wood, Shawn Wood, Denise Eichstaedt, Anthony Cartrette, Lewis Cartrette, Estate of Patrick Fennig, Thaddeus C. Fennig, individually and as personal representative of the Estate of Patrick Fennig, Catherine Fennig, individually and as personal representative of the Estate of Patrick Fennig, Paul Fennig, Mark Fennig, Estate of Christopher Adams, Catherine Adams, individually and as personal representative **[\*26]** of the Estate of Christopher Adams, Mary Young, Daniel Adams, Elizabeth Wolf, Patrick Adams, John Adams, William Adams, Michael Adams, Estate of Thanh "Gus" Nguyen, Christopher Nguyen, individually and as personal representative of the Estate of Thanh "Gus" Nguyen, Sandra M.

Wetmore, Bridget Brooks, James Rimkus, Anne Rimkus, Estate of Kendall Kitson, Jr., Kendall Kitson, Sr., individually and as personal representative of the Estate of Kendall Kitson, Jr., Nancy R. Kitson, individually and as personal representative of the Estate of Kendall Kitson, Jr., Steve K. Kitson, Nancy A. Kitson, Lawrence Taylor, Vickie Taylor, Starlina Taylor, Estate of Joshua Woody, Dawn Woody, individually and as personal representative of the Estate of Joshua Woody, Bernadine Beekman, Tracy Smith, Jonica Woody, Timothy Woody, Estate of Leland "Tim" Haun, Ibis "Jenny&quo Haun, individually and as personal representative of the Estate of Leland "Tim" Haun, Senator Haun, Milly Perez-Dallis, Estate of Christopher Lester, Cecil Lester, Sr., individually and as personal representative of the Estate of Christopher Lester, Judy Lester, individually and as personal representative of the Estate of Christopher Lester, [*27] Cecil Lester, Jr., Jessica Lester, Estate of Kevin Johnson, Sr., Shyrl Johnson, individually and as personal representative of the Estate of Kevin Johnson, Sr., Kevin Johnson, Jr., Nicholas Johnson, Estate of Peter Morgera, Michael Morgera, individually and as personal representative of the Estate of Peter Morgera, Thomas Morgera, Estate of Millard "Dee" Campbell, Marie Campbell, individually and as personal representative of the Estate of Millard "Dee" Campbell, Bessie Campbell, Estate of Justin Wood, Estate of Earl Cartrette, Jr., Estate of Brian McVeigh, Estate of Joseph E. Rimkus, Estate of Jeremy Taylor, James Wetmore, George Beekman, Che Colson, Laura Johnson, Bruce Johnson, Counter Claimants: Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Societe Generale, Societe Generale, Counter Defendants: Christopher James Houpt, Mark Hanchet, LEAD ATTORNEYS, Mayer Brown LLP (NY), New York, NY.

For Citibank, N.A., Citibank, Counter Defendants: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Jeremy Levin, Dr. Lucille Levin, Cross Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, [*28] New York, NY; Suzelle Moss Smith, LEAD ATTORNEY, Howarth & Smith (LA), Los Angeles, CA.

For Catherine Bonk, Terrance Valore, Cathrine Bonk Hunt, Sr. John Bonk, Kevin Bonk, Thomas Bonk, Marion DiGiovanni, Sherry Lynn Fiedler, Robert Fluegel, Thomas A Fluegel, Marilou Fluegel, Evans Hairston, Felicia Hairston, Julia Bell Hairston, Henry Hukill, Mark Andrew Hukill, Melissa Hukill, Meredith Ann Hukill, Mitchell Charles Hukill, Monte Hukill, Virginia Ellen Hukill, Storm Jones, Penni Joyce, Sr. Carl Kirkwood, Jeff Kirkwood, Shirley Kirkwood, Jr. Carl A. Kirkwood, Patricia Kronenbitter, Kris Laise, Bill Laise, Betty Laise, James Macgroglou, Lorraine Macgroglou, Bill Macgroglou, Kathy McDonald, Edward W. McDonough, Sean McDonough, Edward J McDonough, Rose Rotondo Estate of, Luis Rotondo Estate of, Phyllis Santoserra Estate of, Deborah Rhosto, Robert Simpson, Renee Eileen Simpson, Sr. Larry Simpson, Anna Marie Simpson, Sally Jo Wirick, David A. Battle Estate of, Matilde Hernandez Estate of, Robert Muffler, Jr., Cross Defendants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Matthew Scott Hukill, Cross Defendant: [*29] Keith Martin Fleischman, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For John Muffler Estate of, Cross Defendant: June Hee Park, Fleischman Law Firm, New York, NY.

For James Yarber Estate of, Cross Defendant: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For John Jay Tishmack Estate of, Geraldo Alvarado, Grisselle Alvarado, Luis Alvarado, Luisa Alvarado, Maria Alvarado, Cross Defendants: June Hee Park, Fleischman Law Firm, New York, NY.

For Pedro Alvarado, Jr., Marta Alvarado, Minerva Alvarado, Yolanda Alvarado, Zoraida Alvarado, Dennis Jack Anderson, Michael Harris, Rose Harris, Donald R. Pontillo, Deborah True, Douglas Pontillo, John E. Selbe, Eloise F. Selbe, Belinda Skarka, Don Selbe, James Selbe, Willy G. Thompson, Allison Thompson, Ifaline Thompson, Cheryl Bass, Johnny Thompson, Wanda Ford, Orlando Michael Valore, Sr., Orlando M. Valore, Jr., Janice Valore, Marcy Lynn Parson, Timothy Brooks, Edward J. Brooks, Patricia A. Brooks, The Estate of

**A-211**

Case 4:21-cv-00140   Document 61   Filed on 08/13/21 in TXSD   Page 286 of 686

Page 10 of 31
2019 U.S. Dist. LEXIS 22788, *29

James Silvia and Lynne Michol Spencer, Cross Defendant: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law [*30] Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Estate of Michael Heiser, Fran Heiser, individually and as personal representative of the Estate of Michael Heiser, Gary Heiser, individually and as personal representative of the Estate of Michael Heiser, Cross Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY.

For Citibank, N.A., Cross Defendant: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Deborah D. Peterson, personal representative of the Estate of James C. Knipple, et al., Cross Defendant: Liviu Vogel, LEAD ATTORNEY, Salon Marrow Dyckman Newman Broudy LLP, New York, NY.

For Alan D. Hayman, Shirlee Hayman, Cross Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, James Lawrence Bernard, Stroock & Stroock & Lavan LLP, New York, NY.

For Citibank, N.A., Cross Defendant, ThirdParty Plaintiff: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For The Estate of James Silvia and Lynne Michol Spencer, Cross Defendant: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June [*31] Hee Park, Fleischman Law Firm, New York, NY.

For Alan D. Hayman, Shirlee Hayman, Cross Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY.

For Societe Generale, Counter Defendant: Christopher James Houpt, Mayer Brown LLP (NY), New York, NY.

For Citibank, Citibank, N.A., Counter Defendants:

Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Societe Generale, Societe Generale, Counter Defendants: Christopher James Houpt, Mark Hanchet, LEAD ATTORNEYS, Mayer Brown LLP (NY), New York, NY.

For Jeremy Levin, Dr. Lucille Levin, Jeremy Levin, Counter Claimants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Suzelle Moss Smith, LEAD ATTORNEY, Howarth & Smith (LA), Los Angeles, CA.

For Michael T. Adams, William Adams, ThirdParty Defendants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Elaine Allen, Michael Anderson, ThirdParty Defendants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Angel Alvarado, Minerva Alvarado, Pedro Alvarado, Jr., Yolanda Alvarado, Zoraida Alvarado, Dennis Jack Anderson, Estate [*32] of Moses Arnold, Jr., Lolita M. Arnold, ThirdParty Defendants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Geraldo Alvarado, Marta Alvarado, ThirdParty Defendants: June Hee Park, Fleischman Law Firm, New York, NY.

For Angela E. Barile, Patty Barnett, ThirdParty Defendants: Noel J. Nudelman, Heideman Nudelman & Kalik, PC, Washington, DC.

For Cheryl Bass, Estate of David L. Battle, Lisa Ann Beck, Betty J. Bolen, Keith Edwin Bolen, Neale Scott Bolen, Sheldon H. Bolen, Catherine Bonk, Sr. John Bonk, Kevin Bonk, Thomas Bonk, Catherine Bonk Hunt, Patricia A. Brooks, Timothy Brooks, Marion DiGiovanni, David A. Battle Estate of, Luis Rotondo Estate of, Matilde Hernandez Estate of, ThirdParty Defendants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park,

2019 U.S. Dist. LEXIS 22788, *32

Fleischman Law Firm, New York, NY.

For Bernadine R. Beekman, George M. Beekman, Bridget Brooks, Marie R. Campbell, Anthony W. Cartrette, Lewis W. Cartrette, Che G. Colson, Denise M. Eichstaedt, Estate of Brian McVeigh, Estate of Christopher Adams, Estate of Christopher Lester, Estate of Earl Cartrette, Jr., Estate **[*33]** of Earl F. Cartrette, Jr., Estate of Joseph E. Rimkus, Estate of Joshua E. Woody, Estate of Justin R. Wood, Estate of Kendall Kitson, Jr., Estate of Kevin J. Johnson, Estate of Leland Timothy Haun, Estate of Millard D. Campbell, Estate of Patrick Fennig, Estate of Peter J. Morgera, Estate of Thanh Van Nguyen, ThirdParty Defendants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For James Bland, Stephen Boyd Bland, Vara Brown, Eugene Burns, John R. Cuddeback, Dudley Decker, Johnnie Decker, Ronald Duplanity, Anson Edmond, Hazel Edmond, Wendy Edmond, Estate of Billy San Pedro, Estate of Eric Walker, Estate of Frank Bland, Estate of James Surch, Estate of Laura Virginia Copeland, Estate of Michael Hastings, Estate of Michael Mercer, Estate of Obrian Weekes, Keith Estler, Louis Estler, Jr., ThirdParty Defendants: Noel J. Nudelman, Heideman Nudelman & Kalik, PC, Washington, DC.

For John Bonk, Sr., Edward J. Brooks, ThirdParty Defendants: Keith Martin Fleischman, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For James Yarber Estate of, John Muffler Estate of, John Jay Tishmack Estate of, ThirdParty Defendants: June Hee Park, Fleischman **[*34]** Law Firm, New York, NY.

For Estate of Binyamin Kahane, Estate of Irma Franklin, ThirdParty Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY.

For Estate of Meir Kahane, ThirdParty Defendant: Curtis Campbell Mechling, LEAD ATTORNEY, Nathan Harry Stopper, Patrick Nicholas Petrocelli, Stroock & Stroock & Lavan LLP, New York, NY.

For Estate of Michael Heiser, ThirdParty Defendant: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock

& Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Phyllis Santoserra Estate of, Rose Rotondo Estate of, Sherry Lynn Fiedler, Marilou Fluegel, Thomas A. Fluegel, Wanda Ford, Felicia Hairston, Julia Bell Hairston, Bennie Harris, Michael Harris, Rose Harris, Henry Durban Hukill, Mark Andrew Hukill, Matthew Scott Hukill, Meredith Ann Hukill, Mitchell Charles Hukill, Monte Hukill, Virginia Ellen Hukill, Cathrine Bonk Hunt, Storm Jones, Penni Joyce, Carl Kirkwood, Sr., Jr. Carl A. Kirkwood, Sr. Carl Kirkwood, Jeff Kirkwood, Shirley Kirkwood, Sharla M. Korz, Patricia Kronenbitter, Betty Laise, Kris Laise, ThirdParty Defendants: Keith Martin Fleischman, LEAD ATTORNEY, June Hee **[*35]** Park, The Fleischman Law Firm, New York, NY.

For Catherine Fennig, individually and as personal representative of the Estate of Patrick Fennig, Paul D. Fennig, Thaddeus C. Fennig, individually and as personal representative of the Estate of Patrick Fennig, Ibis S. Haun, Senator Haun, Bruce Johnson, Nicholas A. Johnson, a minor, Shyrl L. Johnson, Nancy R. Kitson, individually and as personal representative of the Estate of Kendall Kitson, Jr., Cecil Lester, Jr., ThirdParty Defendants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Ernest C. Fuller, Peter Gaddo, Holly Gibson, Maurice Gibson, Jean Givens Owen, Nicole Gomez, Joyce Hastings, Christopher Hein, Jo Ann Hein, Karen Hein-Sullivan, John Hendrickson, Tyson Hendrickson, Kathy Hodges, Maynard Hodges, Melinda Hollingshead, Daniel Joy, Daniel Kremer, Jacqueline M. Kunysz, ThirdParty Defendants: Noel J. Nudelman, Heideman Nudelman & Kalik, PC, Washington, DC.

For Alan D. Hayman, Alan Hayman, Fran Heiser, individually and as personal representative of the Estate of Michael Heiser, Sonia Kahane, ThirdParty Defendants: Curtis Campbell Mechling, Stroock & Stroock & Lavan LLP, New York, NY.

For Shirlee Hayman, ThirdParty Defendant: **[*36]** Curtis Campbell Mechling, Nathan Harry Stopper, Patrick Nicholas Petrocelli, Stroock & Stroock & Lavan LLP, New York, NY.

For Francis Heiser, Gary Heiser, Gary Heiser,

2019 U.S. Dist. LEXIS 22788, *36

individually and as personal representative of the Estate of Michael Heiser, ThirdParty Defendants: Curtis Campbell Mechling, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Thomas Adrian Julian, ThirdParty Defendant: Steven Karl Barentzen, The Law Office of Steven Barentzen, Washington, DC.

For Cecil H. Lester, Judy Lester, Herman C. Marthaler, III, Michael Morgera, individually and as personal representative of the Estate of Peter Morgera, Thomas Morgera, Christopher Nguyen, individually and as personal representative of the Estate of Thanh "Gus" Nguyen, Christopher R. Nguyen, Milagritos Perez-Dalis, Anne M. Rimkus, James R. Rimkus, ThirdParty Defendants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Jeremy Levin, Dr. Lucille Levin, ThirdParty Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Suzelle Moss Smith, LEAD ATTORNEY, Howarth & Smith (LA), Los Angeles, CA.

For Scott M. Lewis, James Macgroglou, **[*37]** Lorraine Macgroglou, Alphonso Martinez, Daniel Martinez, Esther Martinez Parks, Angela Massman, Kristopher Massman, Douglas Jason Melendez, Ann Marie Moore, Carolyn Mudd, Robin Nicely, John Opatovsky, Steven G. Owen, Janet Page, Marilyn Peterson, Morgan W. Rowan, Shana Saul, Jeannie Scaggs, Thurnell Shields, ThirdParty Defendants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Bill Macgroglou, Kathy McDonald, Edward J McDonough, Edward W. McDonough, Sean McDonough, Estate of John Muffler, Marcy Lynn Parson, Donald R. Pontillo, Douglas Pontillo, Deborah Rhosto, Estate of Rose Rotondo, (Estate) Luis Rotondo, (Estate) Phyllis Santoserra, James Selbe, Larry H. Simpson, Jr., Larry Simpson, Sr., Renee Eileen Simpson, Robert Simpson, Belinda Skarka, ThirdParty Defendants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For James Owens, ThirdParty Defendant: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC.

For Deborah D. Peterson, personal representative of the Estate of James C. Knipple, et al., ThirdParty Defendant: Liviu Vogel, Salon Marrow Dyckman **[*38]** Newman, New York, NY.

For Anne Rimkus, James Rimkus, ThirdParty Defendants: Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Eloise F. Selbe, John E. Selbe, Anna Marie Simpson, Sr. Larry Simpson, ThirdParty Defendants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC; Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Belinda Skarka, Lynne Michol Spencer, The Estate of James Silvia, Allison Thompson, Ifaline Thompson, Johnny Thompson, Willy G. Thompson, Estate of John Jay Tishmack, Deborah True, Andres Alvarado Tull, Orlando M. Valore, Jr., Orlando Michael Valore, Sr., Terance J. Valore, ThirdParty Defendants: Keith Martin Fleischman, LEAD ATTORNEY, June Hee Park, The Fleischman Law Firm, New York, NY.

For Tracey M. Smith, Lawrence Taylor, Starlina D. Taylor, Vicki L Taylor, Jonica L. Woody, Mary Young, Patrick D. Adams, William Adams, Bernadine R. Beekman, George M. Beekman, Bessie A. Campbell, Marie R. Campbell, Anthony W. Cartrette, Lewis W. Cartrette, Che G. Colson, Denise M. Eichstaedt, Estate of Brent E. Marthaler, Estate of Brian McVeigh, **[*39]** ThirdParty Defendants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Societe Generale, ThirdParty Defendant: Christopher James Houpt, Mark Hanchet, LEAD ATTORNEYS, Mayer Brown LLP (NY), New York, NY.

For Carolyn Spears, Mark Spears, Jacqueline Stahrr, Will Surch, The Estate of Anthony Brown, The Estate of Burton Wherland, The Estate of Christine Kremer, The Estate of Jeffrey Bruce Owen, The Estate of Michael Lee Page, The Estate of Thomas Kremer, The Estate of

2019 U.S. Dist. LEXIS 22788, *39

Virgel Hamilton, Leonard Paul Tice, Bradley Ulick, Tena Walker-Jones, Ronald E. Walker, Carol Weaver, Galen Weber, Faith Weekes, Ianthe Weekes, Keith Weekes, Meta Weekes, Edmond Wendy, Charles H. West, Kathy West, Rick West, James Wetmore, Sandra M. Wetmore, Nelson Weyl, Gregory Wherland, Sarah Wherland, Susanne Yeoman, ThirdParty Defendants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Starlina Taylor, Vickie Taylor, Kathleen Wood, Shawn Wood, Dawn Woody, individually and as personal representative of the Estate of Joshua Woody, Timothy Woody, Mary Young, Catherine Adams, individually and as personal representative of the Estate of Christopher Adams, ThirdParty Defendants: [*40] Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Janice Valore, Terrance Valore, Sally Jo Wirick, ThirdParty Defendants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC; Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Dorothy Wint, Dorothy C Wint, ThirdParty Defendants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC.

For (estate) rose rotondo, ThirdParty Defendant: June Hee Park, Fleischman Law Firm, New York, NY.

For Alan D. Hayman, Alan D. Hayman, Alan D. Hayman, Alan Hayman, Shirlee Hayman, Counter Claimants: Curtis Campbell Mechling, LEAD ATTORNEY, James Lawrence Bernard, Stroock & Stroock & Lavan LLP, New York, NY.

For Alan Hayman, Shirlee Hayman, Sonia Kahane, Sonia Kahane, Alan Hayman, Shirlee Hayman, Counter Claimants: Curtis Campbell Mechling, Stroock & Stroock & Lavan LLP, New York, NY.

For Estate of Christopher Adams, Estate of Christopher Lester, Estate of Jeremy Taylor, Catherine Fennig, individually and as personal representative of the Estate of Patrick Fennig, Mark Fennig, Thaddeus C. Fennig, individually [*41] and as personal representative of the

Estate of Patrick Fennig, Nancy R. Kitson, individually and as personal representative of the Estate of Kendall Kitson, Jr., Jessica Lester, Sharon Marthaler, Timothy Woody, Mary Young, Cecil Lester, Jr., Judy Lester, individually and as personal representative of the Estate of Christopher Lester, Lawrence Taylor, Dawn Woody, individually and as personal representative of the Estate of Joshua Woody, Counter Claimants: Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Estate of Earl F. Cartrette, Jr., Estate of Joseph E. Rimkus, Estate of Joshua E. Woody, Estate of Justin R. Wood, Estate of Kendall Kitson, Jr., Estate of Kevin J. Johnson, Estate of Leland Timonthy Haun, Estate of Millard D. Campbell, Estate of Patrick Fennig, Estate of Peter J. Morgera, Estate of Thanh Van Nguyen, Paul D. Fennig, Ibis S. Haun, Senator Haun, Shyrl L. Johnson, Steve K. Kitson, Cecil Lester, Jr., Cecil H. Lester, Judy Lester, Thomas Morgera, Christopher R. Nguyen, Milagritos Perez-Dalis, Anne M. Rimkus, James R. Rimkus, Tracey M. Smith, Lawrence Taylor, Starlina D. Taylor, Vicki L Taylor, James V. Wetmore, Sandra M. Wetmore, Elizabeth [*42] Wolf, Richard W. Wood, Shawn M. Wood, Dawn Woody, Jonica L. Woody, William Adams, Bernadine R. Beekman, George M. Beekman, Bridget Brooks, Bessie A. Campbell, Marie R. Campbell, Anthony W. Cartrette, Lewis W. Cartrette, Che G. Colson, Denise M. Eichstaedt, Estate of Brent E. Marthaler, Estate of Brian McVeigh, Bruce Johnson, Kendall K. Kitson, Sharon Marthaler, Estate of Earl Cartrette, Jr., Matthew Marthaler, Kathleen M. Wood, Estate of Jeremy Taylor, Counter Claimants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Estate of Michael Heiser, Francis Heiser, Gary Heiser, Counter Claimants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Michael Morgera, individually and as personal representative of the Estate of Peter Morgera, Nicholas A. Johnson, a minor, Counter Claimants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Estate of Michael Heiser, Counter Claimant: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP

(NY), New York, NY; Dale Kerbin Cathell, Richard **[*43]** Marc Kremen, DLA Piper US LLP (MD), Baltimore, MD.

For Gary Heiser, individually and as personal representative of the Estate of Michael Heiser, Counter Claimant: Curtis Campbell Mechling, Stroock & Stroock & Lavan LLP, LEAD ATTORNEY, New York, NY; Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Alan D. Hayman, Counter Claimant: Curtis Campbell Mechling, LEAD ATTORNEY, James Lawrence Bernard, Stroock & Stroock & Lavan LLP, New York, NY.

For Alan Hayman, Shirlee Hayman, Counter Claimant: Curtis Campbell Mechling, Stroock & Stroock & Lavan LLP, New York, NY.

For Citibank, Citibank, N.A., Counter Defendants: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Societe Generale, Counter Defendant: Christopher James Houpt, Mark Hanchet, LEAD ATTORNEYS, Mayer Brown LLP (NY), New York, NY.

For Catherine Fennig, individually and as personal representative of the Estate of Patrick Fennig, Counter Claimant: Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Estate of Leland Timothy Haun, Estate of Millard D. Campbell, Estate of Patrick Fennig, Estate of Peter J. Morgera, Estate of Thanh Van Nguyen, **[*44]** Paul D. Fennig, Ibis S. Haun, Senator Haun, Bruce Johnson, Shyrl L. Johnson, Steve K. Kitson, Herman C. Marthaler, III, Matthew Marthaler, Sharon Marthaler, Michael Morgera, individually and as personal representative of the Estate of Peter Morgera, Thomas Morgera, Christopher R. Nguyen, Milagritos Perez-Dalis, Anne M. Rimkus, James R. Rimkus, Vicki L Taylor, James V. Wetmore, Sandra M. Wetmore, Elizabeth Wolf, Richard W. Wood, Shawn M. Wood, Jonica L. Woody, Counter Claimants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Estate of Michael Heiser, Gary Heiser, Counter Claimants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Catherine Fennig, individually and as personal representative of the Estate of Patrick Fennig, Thaddeus C. Fennig, individually and as personal representative of the Estate of Patrick Fennig, Jessica Lester, Judy Lester, individually and as personal representative of the Estate of Christopher Lester, Tracy Smith, Lawrence Taylor, Kathleen Wood, Timothy Woody, Mary Young, Counter Claimants: Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US **[*45]** LLP (NY), New York, NY.

For Societe Generale, Counter Defendants: Christopher James Houpt, Mayer Brown LLP (NY), New York, NY.

For Angel Alvarado, Minerva Alvarado, Pedro Alvarado, Jr., Yolanda Alvarado, Zoraida Alvarado, Estate of Moses Arnold, Jr., Lolita M. Arnold, Cheryl Bass, Estate of David L. Battle, Lisa Ann Beck, Betty J. Bolen, Keith Edwin Bolen, Neale Scott Bolen, Sheldon H. Bolen, Sr. John Bonk, Kevin Bonk, Thomas Bonk, Catherine Bonk Hunt, Edward J. Brooks, Timothy Brooks, Marion DiGiovanni, Matilde Hernandez Estate of, Phyllis Santoserra Estate of, Rose Rotondo Estate of, Sherry Lynn Fiedler, Marilou Fluegel, Robert Fluegel, Thomas A. Fluegel, Wanda Ford, Evans Hairston, Felicia Hairston, Bennie Harris, Michael Harris, Michael Harris, Rose Harris, Estate of Matilde Hernandez, Jr., Henry Hukill, Henry Durban Hukill, Mark Andrew Hukill, Mitchell Charles Hukill, Monte Hukill, Virginia Ellen Hukill, Storm Jones, Penni Joyce, Sr. Carl Kirkwood, Carl Kirkwood, Sr., Jeff Kirkwood, Shirley Kirkwood, Sharla M. Korz, Betty Laise, Kris Laise, James Macgroglou, Lorraine Macgroglou, Kathy McDonald, Edward J McDonough, Edward W. McDonough, Sean McDonough, Estate of John Muffler, Marcy **[*46]** Lynn Parson, Donald P. Pontillo, Douglas Pontillo, Deborah Rhosto, Estate of Rose Rotondo, (Estate) Luis Rotondo, Don Selbe, James Selbe, John E. Selbe, Anna Marie Simpson, Sr. Larry Simpson, Larry Simpson, Sr., Larry H. Simpson, Jr., Renee Eileen Simpson, Robert Simpson, Belinda Skarka, Lynne Michol Spencer, The Estate of James Silvia, The Estate of James Silvia and, Allison Thompson, Ifaline Thompson, Johnny Thompson, Willy G. Thompson, Deborah True, Andres Alvarado Tull, Janice Valore, Orlando M. Valore, Jr.,

Orlando Michael Valore, Sr., Terance J. Valore, Estate of Leonard Warren Walker, Estate of Walter Emerson Wint, Jr., Sally Jo Wirick, Estate of James Yarber, Counter Claimants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Patricia A. Brooks, Thomas A Fluegel, Julia Bell Hairston, Cathrine Bonk Hunt, Jr. Carl A. Kirkwood, Patricia Kronenbitter, Bill Laise, Bill Macgroglou, Donald R. Pontillo, Eloise F. Selbe, Terrance Valore, Counter Claimants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC; Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, **[*47]** NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Lynne Michol Spencer, Counter Claimant: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC; June Hee Park, Fleischman Law Firm, New York, NY.

For Citibank, N.A., Counter Defendant: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Angel Alvarado, Yolanda Alvarado, Zoraida Alvarado, Estate of Moses Arnold, Jr., Lolita M. Arnold, Cheryl Bass, Estate of David L. Battle, Lisa Ann Beck, Betty J. Bolen, Keith Edwin Bolen, Neale Scott Bolen, Sheldon H. Bolen, Catherine Bonk, Catherine Bonk Hunt, Thomas Bonk, Timothy Brooks, Marion DiGiovanni, Cross Claimants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Dennis Jack Anderson, Kevin Bonk, Edward J. Brooks, Patricia A. Brooks, Cross Claimants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC; Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, **[*48]** NY.

For David A. Battle Estate of, James Yarber Estate of, Luis Rotondo Estate of, Phyllis Santoserra Estate of,

Rose Rotondo Estate of, Sherry Lynn Fiedler, Marilou Fluegel, Robert Fluegel, Thomas A. Fluegel, Wanda Ford, Evans Hairston, Felicia Hairston, Bennie Harris, Michael Harris, Michael Harris, Rose Harris, Estate of Matilde Hernandez, Jr., Henry Hukill, Henry Durban Hukill, Meredith Ann Hukill, Monte Hukill, Virginia Ellen Hukill, Storm Jones, Penni Joyce, Sr. Carl Kirkwood, Carl Kirkwood, Sr., Jeff Kirkwood, Shirley Kirkwood, Sharla M. Korz, Betty Laise, Kris Laise, James Macgroglou, Lorraine Macgroglou, Kathy McDonald, Edward J McDonough, Edward W. McDonough, Sean McDonough, Estate of John Muffler, Marcy Lynn Parson, Douglas Pontillo, Deborah Rhosto, Estate of Rose Rotondo, (Estate) Luis Rotondo, (Estate) Phyllis Santoserra, Don Selbe, James Selbe, John E. Selbe, Anna Marie Simpson, Renee Eileen Simpson, Robert Simpson, Belinda Skarka, Lynne Michol Spencer, The Estate of James Silvia, The Estate of James Silvia and Lynne Michol Spencer, Willy G. Thompson, Estate of John Jay Tishmack, Deborah True, Andres Alvarado Tull, Janice Valore, Orlando M. Valore, Jr., Orlando Michael **[*49]** Valore, Sr., Terance J. Valore, Estate of Leonard Warren Walker, Estate of Walter Emerson Wint, Jr., Sally Jo Wirick, Estate of James Yarber, Cross Claimants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Matilde Hernandez Estate of, Thomas A Fluegel, Julia Bell Hairston, Mitchell Charles Hukill, Cathrine Bonk Hunt, Jr. Carl A. Kirkwood, Patricia Kronenbitter, Bill Laise, Bill Macgroglou, Donald R. Pontillo, Terrance Valore, Cross Claimants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC; Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Allison Thompson, Johnny Thompson, Cross Claimants: Keith Martin Fleischman, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Citibank, N.A., Cross Defendant: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Societe Generale, Christopher James Houpt, Cross Defendants: Mark Hanchet, LEAD ATTORNEYS, Mayer Brown LLP (NY), New York, NY.

2019 U.S. Dist. LEXIS 22788, *49

For Angel Alvarado, Yolanda **[*50]** Alvarado Zoraida Alvarado Estate of Moses Arnold, Jr. Lolita M. Arnold Cheryl Bass Estate of David L. Battle Counter Claimant Lisa Ann Beck Betty J. Bolen Keith Edwin Bolen Neale Scott Bolen Sheldon H. Bolen Catherine Bonk Counter Claimant Catherine Bonk Hunt Thomas Bonk Timothy Brooks Marion DiGiovanni David A. Battle Estate of James Yarber Estate of Luis Rotondo Estate of Phyllis Santoserra Estate of, Rose Rotondo Estate of, Sherry Lynn Fiedler, Marilou Fluegel, Robert Fluegel, Thomas A. Fluegel, Wanda Ford, Evans Hairston, Felicia Hairston, Bennie Harris, Michael Harris, Michael Harris, Rose Harris, Estate of Matilde Hernandez, Jr., Henry Hukill, Henry Durban Hukill, Meredith Ann Hukill, Monte Hukill, Virginia Ellen Hukill, Storm Jones, Penni Joyce, Sr. Carl Kirkwood, Carl Kirkwood, Sr., Jeff Kirkwood, Shirley Kirkwood, Sharla M. Korz, Betty Laise, Kris Laise, James Macgroglou, Lorraine Macgroglou, Kathy McDonald, Edward J McDonough, Edward W. McDonough, Sean McDonough, Counter Claimants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Dennis Jack Anderson, Kevin Bonk, Edward J. Brooks, Patricia **[*51]** A. Brooks, Matilde Hernandez Estate of, Thomas A Fluegel, Julia Bell Hairston, Mitchell Charles Hukill, Cathrine Bonk Hunt, Jr. Carl A. Kirkwood, Patricia Kronenbitter, Bill Laise, Bill Macgroglou, Counter Claimants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC; Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Marcy Lynn Parson, Douglas Pontillo, Deborah Rhosto, Estate of Rose Rotondo, Estate) Luis Rotondo, Estate) Phyllis Santoserra, Don Selbe, James Selbe, John E. Selbe, Anna Marie Simpson, Renee Eileen Simpson, Robert Simpson, Belinda Skarka, Lynne Michol Spencer, The Estate of James Silvia, The Estate of James Silvia and Lynne Michol Spencer, Allison Thompson, Johnny Thompson, Willy G. Thompson, Estate of John Jay Tishmack, Deborah True, Andres Alvarado Tull, Janice Valore, Orlando M. Valore, Jr., Orlando Michael Valore, Sr., Terance J. Valore, Terrance Valore, Estate of Leonard Warren Walker, Estate of Walter Emerson Wint, Jr., Sally Jo Wirick, Estate of James Yarber, Angel Alvarado, Pedro Alvarado, Jr., Yolanda Alvarado, Zoraida Alvarado,

Dennis Jack Anderson, Estate **[*52]** of Moses Arnold, Jr., Lolita M. Arnold, Cheryl Bass, Estate of David L. Battle, Lisa Ann Beck, Betty J. Bolen, Keith Edwin Bolen, Neale Scott Bolen, Sheldon H. Bolen, Kevin Bonk, Thomas Bonk, Catherine Bonk Hunt, Patricia A. Brooks, Timothy Brooks, Marion DiGiovanni, David A. Battle Estate of, Phyllis Santoserra Estate of, Rose Rotondo Estate of, Sherry Lynn Fiedler, Marilou Fluegel, Thomas A. Fluegel, Thomas A Fluegel, Wanda Ford, Evans Hairston, Felicia Hairston, Bennie Harris, Michael Harris, Rose Harris, Estate of Matilde Hernandez, Jr., Henry Hukill, Henry Durban Hukill, Monte Hukill, Virginia Ellen Hukill, Cathrine Bonk Hunt, Storm Jones, Penni Joyce, Sr. Carl Kirkwood, Jr. Carl A. Kirkwood, Jeff Kirkwood, Shirley Kirkwood, Sharla M. Korz, Betty Laise, Bill Laise, Kris Laise, Bill Macgroglou, James Macgroglou, Lorraine Macgroglou, Kathy McDonald, Edward J McDonough, Edward W. McDonough, Sean McDonough, Estate of John Muffler, Marcy Lynn Parson, Douglas Pontillo, Deborah Rhosto, Estate of Rose Rotondo, Estate) Luis Rotondo, Estate) Phyllis Santoserra, Don Selbe, Eloise F. Selbe, James Selbe, John E. Selbe, Anna Marie Simpson, Sr. Larry Simpson, Renee Eileen Simpson, Robert Simpson, **[*53]** Belinda Skarka, Lynne Michol Spencer, The Estate of James Silvia, The Estate of James Silvia and Lynne Michol Spencer, Allison Thompson, Willy G. Thompson, Estate of John Jay Tishmack, Deborah True, Andres Alvarado Tull, Janice Valore, Terance J. Valore, Terrance Valore, Estate of Leonard Warren Walker, Estate of Walter Emerson Wint, Jr., Sally Jo Wirick, Estate of James Yarber, Counter Claimants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Donald R. Pontillo, Julia Bell Hairston, Patricia Kronenbitter, Donald R. Pontillo, Orlando Michael Valore, Sr., Counter Claimants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC. Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Redacted Third-Party Defendant, Redacted Third-Party Defendant, Counter Claimant: Christopher Carlsen, LEAD ATTORNEY, Clyde & Co US LLP, New York, NY.

For Citibank, N.A., Counter Defendant: Christopher J.

2019 U.S. Dist. LEXIS 22788, *53

Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine **[*54]** LLP (NYC), New York, NY.

The Bank of New York Mellon, ThirdParty Plaintiff, Pro se.

For Redacted Third-Party Defendant, Cross Claimant: David H. Fromm, PRO HAC VICE, Brown Gavalas & Fromm LLP, New York, NY.

For Angel Alvarado, Cross Defendant: June Hee Park, Fleischman Law Firm, New York, NY.

For Yolanda Alvarado, Zoraida Alvarado, Estate of Moses Arnold, Jr., Lolita M. Arnold, Cross Defendants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Cheryl Bass, Estate of David L. Battle, Lisa Ann Beck, Betty J. Bolen, Neale Scott Bolen, Sheldon H. Bolen, Catherine Bonk, Catherine Bonk Hunt, Sr. John Bonk, Kevin Bonk, Thomas Bonk, Patricia A. Brooks, Timothy Brooks, Marion DiGiovanni, Sherry Lynn Fiedler, Cross Defendants: Keith Martin Fleischman, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Citibank, Citibank, N.A., Cross Defendants: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For David A. Battle Estate of, James Yarber Estate of, Phyllis Santoserra Estate of, Rose Rotondo **[*55]** Estate of, Cross Defendants: June Hee Park, Fleischman Law Firm, New York, NY.

For Estate of Binyamin Kahane, Estate of Irma Franklin, Estate of Judith Greenbaum, Estate of Meir Kahane, Estate of Michael Heiser, Cross Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY.

For Marilou Fluegel, Robert Fluegel, Thomas A. Fluegel, Thomas A Fluegel, Wanda Ford, Evans Hairston, Felicia

Hairston, Julia Bell Hairston, Bennie Harris, Michael Harris, Michael Harris, Rose Harris, Estate of Matilde Hernandez, Jr., Henry Hukill, Monte Hukill, Virginia Ellen Hukill, Cathrine Bonk Hunt, Storm Jones, Penni Joyce, Sr. Carl Kirkwood, Jr. Carl A. Kirkwood, Carl Kirkwood, Sr., Jeff Kirkwood, Shirley Kirkwood, Sharla M. Korz, Patricia Kronenbitter, Bill Laise, Kris Laise, Bill Macgroglou, James Macgroglou, Lorraine Macgroglou, Cross Defendants: Keith Martin Fleischman, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Alan D. Hayman, Alan Hayman, Shirlee Hayman, Fran Heiser individually and as personal representative of the Estate of Michael Heiser, Francis Heiser, Gary Heiser, Gary Heiser individually and as personal representative **[*56]** of the Estate of Michael Heiser, Sonia Kahane, Cross Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY.

For JP Morgan Chase, JPMorgan Chase Bank, N.A., Cross Defendants: J. Kelley Nevling, Jr, LEAD ATTORNEY, Levi Lubarsky Feigenbaum & Weiss LLP, New York, NY.

For Jeremy Levin, Dr. Lucille Levin, Cross Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Suzelle Moss Smith, Howarth & Smith (LA), Los Angeles, CA.

For Kathy McDonald, Edward J McDonough, Edward W. McDonough, Sean McDonough, Estate of John Muffler, Marcy Lynn Parson, Donald R. Pontillo, Douglas Pontillo, Deborah Rhosto, Estate of Rose Rotondo, (Estate) Luis Rotondo, (Estate) Phyllis Santoserra, Don Selbe, James Selbe, John E. Selbe, Anna Marie Simpson, Renee Eileen Simpson, Robert Simpson, Belinda Skarka, Lynne Michol Spencer, Cross Defendants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For The Estate of James Silvia, Johnny Thompson, Willy G. Thompson, Estate of John Jay Tishmack, Deborah True, Andres Alvarado Tull, Janice Valore, Orlando Michael Valore, **[*57]** Sr., Terance J. Valore, Estate of Leonard Warren Walker, Estate of Walter Emerson Wint, Jr., Sally Jo Wirick, Estate of James Yarber, Cross Defendants: Keith Martin Fleischman,

2019 U.S. Dist. LEXIS 22788, *57

LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For The Estate of James Silvia and Lynne Michol Spencer, Terrance Valore, (estate) rose rotondo, Cross Defendants: June Hee Park, Fleischman Law Firm, New York, NY.

For United Overseas Bank Limited, Cross Defendants: Drew A Harker, PRO HAC VICE, Arnold & Porter, LLP (DC), Washington, DC.

For Jonica L. Woody, Cross Defendant: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Redacted Third-Party Defendant, Counter Claimant: David H. Fromm, LEAD ATTORNEY, PRO HAC VICE, Brown Gavalas & Fromm LLP, New York, NY.

For Michael Bennett, Individually and as Co-Administrator of the Estate of Marla Ann Bennett, ThirdParty Defendant: Ferris R. Bond, Bond & Norman PLLC, Washington, DC.

For Estate of Terrence Rich, Bryan Harris, John E. L'Heureux, Kerry M. L'Heureux, Elizabeth Murphy, Individually and as Administratrix of the Estate of Terrence Rich Armando J. Ybarra, John L'Heureux, ThirdParty Defendants: John W. [*58] Karr, Karr & Allison P.C., LEAD ATTORNEY, Washington, DC.

For Linda Bennett, Indvidually and as Co-Administrator of the Estate of Marla Ann Bennett, Michael Bennett, Individually and as Co-Administrator of the Estate of Marla Ann Bennett, Counter Claimants: Carl E. Person, LEAD ATTORNEY, Carl E. Person - An Individual, New York, NY; Ferris R. Bond, Bond & Norman PLLC, Washington, DC.

For Lisa Bennett, Estate of Marla Ann Bennett, Counter Claimants: Carl E. Person, LEAD ATTORNEY, Carl E. Person - An Individual, New York, NY.

For Estate of Martin Kirschenbaum, David Kirschenbaum, Isabelle Kirschenbaum, Jason Kirschenbaum, Joshua Kirschenbaum, ThirdParty Defendants: Curtis Campbell Mechling, LEAD

ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY.

For Estate of Terrence Rich, Bryan Harris, Jane L'Heureux, Kerry L'Heureux Elizabetth Murphy, Mary Wells, Armando J. Ybarra, ThirdParty Defendant: John W. Karr, Karr & Allison P.C., LEAD ATTORNEY, Washington, DC; Steven Karl Barentzen, LEAD ATTORNEY, The Law Office of Steven Barentzen, Washington, DC.

For Catherine Adams, individually and as personal representative of the Estate of Christopher Adams, Daniel Adams, Mark Fennig, Nancy R. Kitson, [*59] individually and as personal representative of the Estate of Kendall Kitson, Jr., Nancy A. Kitson, Cecil Lester, Jr., Jessica Lester, Judy Lester, individually and as personal representative of the Estate of Christopher Lester, Matthew Marthaler, Counter Claimants: Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For John E. Adams, Michael T. Adams, Patrick D. Adams, William Adams, Bernadine R. Beekman, George M. Beekman, Bridget Brooks, Bessie A. Campbell, Marie R. Campbell, Anthony W. Cartrette, Lewis W. Cartrette, Che G. Colson, Denise M. Eichstaedt, Estate of Christopher Adams, Estate of Christopher Lester, Estate of Earl F. Cartrette, Jr., Estate of Jeremy Taylor, Estate of Joseph E. Rimkus, Estate of Joshua E. Woody, Estate of Justin R. Wood, Estate of Kendall Kitson, Jr., Estate of Kevin J. Johnson, Estate of Leland Timonthy Haun, Estate of Millard D. Campbell, Estate of Patrick Fennig, Estate of Peter J. Morgera, Estate of Thanh Van Nguyen, Estate of Brent E. Marthaler, Estate of Brian McVeigh, Catherine Fennig individually and as personal representative of the Estate of Patrick Fennig, Paul D. Fennig, Thaddeus C. Fennig, individually and as personal [*60] representative of the Estate of Patrick Fennig Ibis S. Haun, Senator Haun, Bruce Johnson, Kevin Johnson, a minor, Laura E. Johnson, Nicholas A. Johnson, a minor, Shyrl L. Johnson, Kendall K. Kitson, Steve K. Kitson, Cecil H. Lester, Herman C. Marthaler, III, Katie L. Marthaler, Kirk Marthaler, Sharon Marthaler, Michael Morgera, individually and as personal representative of the Estate of Peter Morgera, Thomas Morgera, Christopher Nguyen, individually and as personal representative of the Estate of Thanh "Gus" Nguyen, Counter Claimants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Francis Heiser, Gary Heiser, Counter Claimants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Milagritos Perez-Dalis, Anne M. Rimkus, James R. Rimkus, Tracey M. Smith, Starlina D. Taylor, Vicki L Taylor, James V. Wetmore, Sandra M. Wetmore, Elizabeth Wolf, Kathleen M. Wood, Richard W. Wood, Shawn M. Wood, Jonica L. Woody, Mary Young, Daniel Adams, John E. Adams, Michael T. Adams, Patrick D. Adams, William Adams, Bernadine R. Beekman, George M. Beekman, Bridget Brooks, Bessie A. Campbell, Marie **[\*61]** R. Campbell, Anthony W. Cartrette, Lewis W. Cartrette, Che G. Colson, Denise M. Eichstaedt, Estate of Brian McVeigh, Estate of Christopher Adams, Estate of Christopher Lester, Estate of Earl F. Cartrette, Jr., Estate of Joseph E. Rimkus, Estate of Joshua E. Woody, Estate of Justin R. Wood, Estate of Kendall Kitson, Jr., Estate of Kevin J. Johnson, Estate of Leland Timothy Haun, Estate of Millard D. Campbell, Estate of Patrick Fennig, Estate of Peter J. Morgera, Estate of Thanh Van Nguyen, Estate of Brent E. Marthaler, Paul D. Fennig, Ibis S. Haun, Senator Haun, Bruce Johnson, Kevin Johnson, a minor, Laura E. Johnson, Nicholas A. Johnson, a minor, Shyrl L. Johnson, Kendall K. Kitson, Nancy R. Kitson, individually and as personal representative of the Estate of Kendall Kitson, Jr., Cecil Lester, Jr., Cecil H. Lester, Herman C. Marthaler, III, Katie L. Marthaler, Kirk Marthaler, Sharon Marthaler, Michael Morgera, individually and as personal representative of the Estate of Peter Morgera, Thomas Morgera, Christopher R. Nguyen, Milagritos Perez-Dalis, Anne M. Rimkus, James R. Rimkus, Tracey M. Smith, Starlina D. Taylor, Vicki L Taylor, James V. Wetmore, Sandra M. Wetmore, Elizabeth Wolf, **[\*62]** Kathleen M. Wood, Richard W. Wood, Shawn M. Wood, Jonica L. Woody, Counters Claimants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Lawrence Taylor, Dawn Woody, individually and as personal representative of the Estate of Joshua Woody, Timothy Woody, Catherine Adams, individually and as personal representative of the Estate of Christopher Adams, Estate of Jeremy Taylor, Catherine Fennig, individually and as personal representative of the Estate of Patrick Fennig, Mark Fennig, Thaddeus C. Fennig, individually and as personal representative of the Estate of Patrick Fennig, Nancy A. Kitson, Steve K. Kitson,

Jessica Lester, Judy Lester, individually and as personal representative of the Estate of Christopher Lester, Matthew Marthaler, Lawrence Taylor, Dawn Woody, individually and as personal representative of the Estate of Joshua Woody, Timothy Woody, Mary Young, Counters Claimants: Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Citibank, N.A., Counter Defendant: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Estate of Michael Heiser, Counter Claimant: Curtis Campbell Mechling, **[\*63]** LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY; Dale Kerbin Cathell, Richard Marc Kremen, DLA Piper US LLP (MD), Baltimore, MD.

For Francis Heiser, Counter Claimant: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY; Timothy H. Birnbaum, DLA Piper, New York, NY.

For Gary Heiser, individually and as personal representative of the Estate of Michael Heiser, Counter Claimant: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Michael Bennett, Individually and as Co-Administrator of the Estate of Marla Ann Bennett, Counter Claimant: Carl E. Person, LEAD ATTORNEY, Carl E. Person - An Individual Practitioner, New York, NY; Ferris R. Bond, Bond & Norman PLLC, Washington, DC.

For JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Counters Defendants: Christopher James Houpt, Mayer Brown LLP (NY), New York, NY.

For Jeremy Levin, Dr. Lucille Levin, Counters Claimants: Curtis Campbell Mechling, LEAD ATTORNEY, **[\*64]** Stroock & Stroock & Lavan LLP, New York, NY; Don Howarth, Suzelle Moss Smith, Suzelle Moss Smith, LEAD ATTORNEYS, Howarth & Smith (LA), Los Angeles, CA; Kathryn Lee Crawford,

Brownstein Hyatt Farber Schreck LLP (Los Angeles), Los Angeles, CA.

For Timothy Brooks, Donald R. Pontillo, Wanda Ford, Orlando M. Valore, Jr., Minerva Alvarado, Allison Thompson, Angel Alvarado, Edward J McDonough, Willy G. Thompson, Julia Bell Hairston, Lisa Ann Beck, Marcy Lynn Parson, Mark Andrew Hukill, Anna Marie Simpson, Estate) Phyllis Santoserra, Michael Harris, Robert Simpson, Monte Hukill, Terrance Valore, Rose Rotondo Estate of, Kathy McDonald, Janice Valore, Felicia Hairston, Cheryl Bass, Henry Hukill, Shirley Kirkwood, Storm Jones, Evans Hairston, Thomas Bonk, Johnny Thompson, Phyllis Santoserra Estate of, Edward J. Brooks, Patricia Kronenbitter, Estate of Matilde Hernandez, Jr., The Estate of James Silvia and Lynne Michol Spencer, Douglas Pontillo, Luis Rotondo Estate of, Betty Laise, Kevin Bonk, John E. Selbe, David A. Battle Estate of, Virginia Ellen Hukill, Rose Harris, Luisa Alvarado, Meredith Ann Hukill, Belinda Skarka, Deborah True, Betty J. Bolen, John Jay Tishmack Estate of, Cathrine Bonk **[\*65]** Hunt, Sherry Lynn Fiedler, Yolanda Alvarado, Renee Eileen Simpson, Kris Laise, Catherine Bonk, Terance J. Valore, Don Selbe, Don Selbe, Marta Alvarado, Estate of Moses Arnold, Jr., Zoraida Alvarado, Thomas A. Fluegel, Mitchell Charles Hukill, Edward W. McDonough, Sally Jo Wirick, Estate of John Muffler, Bill Macgroglou, James Macgroglou, Carl Kirkwood, Sr., Deborah Rhosto, Pedro Alvarado, Jr., Bill Laise, Patricia A. Brooks, Estate of Leonard Warren Walker, Sr. Larry Simpson, Ifaline Thompson, Marion DiGiovanni, Melissa Hukill, Lolita M. Arnold, Henry Durban Hukill, Jeff Kirkwood, Lorraine Macgroglou, Sharla M. Korz, Thomas A Fluegel, Orlando Michael Valore, Sr., Keith Edwin Bolen, Penni Joyce, Eloise F. Selbe, Andres Alvarado Tull, Neale Scott Bolen, (Estate) Luis Rotondo, Dennis Jack Anderson, John Bonk, Sr., Michael Harris, James Yarber Estate of, Maria Alvarado, John Muffler Estate of, Estate of David L. Battle, James Selbe, Jr. Carl A. Kirkwood, Sr. Carl Kirkwood, Estate of Walter Emerson Wint, Jr., Bennie Harris, Larry Simpson, Sr., Lynne Michol Spencer, Sean McDonough, Sr. John Bonk, Geraldo Alvarado, (estate) rose rotondo, Robert Fluegel, Sheldon H. Bolen, Marilou Fluegel, **[\*66]** The Estate of James Silvia, Estate of Rose Rotondo, Luis Alvarado, Estate of James Yarber, Grisselle Alvarado, Matthew Scott Hukill, Counters Claimants: June Hee Park, Fleischman Law Firm, New York, NY.

For Sidney Decker, Lorreta Brown, Meta Weekes, Nicole Gomez, Karen Hein-Sullivan, Timothy Gaddo,

Samuel Palmer, Counters Claimants: Noel J. Nudelman, Heideman Nudelman & Kalik, PC, Washington, DC.

For The Estate of Thomas Kremer, Ida Decker, Randy Gaddo, Bradley Ulick, Counters Claimants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Kelly Bachlor, Robin Nicely, Kristopher Massman, Rowel Brown, Morgan W. Rowan, Javier San Pedro, Patricia Lou Smith, Estate of Juan C. Rodriguez, Joseph Penosky, Robin Brock, Lydia Massman, Estate of John Hendrickson, Louisa Punonet, Daniel Cuddeback, Jr., Thurnell Shields, Robert Rucker, Estate of Bruce Hollingshead, Dudley Decker, Douglas Jason Melendez, Marvine McBride, Guillermo San Pedro, Estate of Benjamin E. Fuller, Rodney E. Burns, Leonard Paul Tice, Jacqueline Stahrr, The Estate of Willim R. Gaines, Jr., Zaida Melendez, Albert Page, Arnold Edmond, Ronald Duplanity, Jeanette Doughtry, The Estate of Burton Wherland, **[\*67]** Estate of Paul Hein, Emanuel Simmons, Barbara Cuddeback, Daniel Cuddeback, Sr., Paul Martinez, Jr., Kimmy Wherland, Sharon J. Rowan, Estate of Michael Mercer, Johnny Jr. Melendez, Deborah Ryan, Angela Massman, Sean Kirkpatrick, Renard Manley, The Estate of Virgel Hamilton, David Burns, Hazel Edmond, Nelson Weyl, Tomasita L. Martinez, The Estate of Christine Kremer, Carolyn Spears, Jo Ann Hein, Sharon Davis, Paul Martinez, Sr., Jerry L. Lewis, Ruth Ann Bland, The Estate of Anthony Brown, Susanne Yeoman, Christian R. Rauch, Estate of Sean F. Ester, Michael A. Gaines, Teresa Gunterh, Sila V. San Pedro, Gregory Wherland, Carol Weaver, Mary Jean Hodges, Sulba Brown, Michael Episcopo, Ianthe Weekes, Victor J. Hein, Tena Walker-Jones, Keith Weekes, Thelma Anderson, Will Surch, Marilyn Peterson, Estate of Michael Hastings, John Gibson, Counter Claimants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Evelyn Sue Spears Elliot, Janet Page, Louise Gaddo Blatter, Faith Weekes, Mary Ellen Estler, David Penosky, Maurice Gibson, Jeannie Scaggs, Estate of Laura Virginia Copeland, Gloria Hamilton, Scott M. Lewis, Mark Spears, Elaine Allen, Holly Gibson, Tyson Hendrickson, **[\*68]** Andrea Ciarla, Johnnie Decker, Kathy Hodges, Cindy Holmes, Vara Brown, Estate of Michael Robert Massman, Galen Weber, Sarah Wherland, Daniel Martinez, Patty Barnett, Joyce Hastings, Keith Estler, John R. Cuddeback, Stephen

2019 U.S. Dist. LEXIS 22788, *68

Boyd Bland, Angela Yoak, Peter Gaddo, Estate of Dennis Lloyd West, Daniel Kremer, Louis Estler, Jr., Michael Martinez, Alan C. Anderson, The Estate of Jeffrey Bruce Owen, Esther Martinez Parks, Bruce Hastings, Estate of Louis Melendez, Maynard Hodges, Daniel Joy, John Opatovsky, The Estate of David A. Lewis, Michael Barile, Estate of Eric Walker, Anson Edmond, Michael Anderson, Jean Givens Owen, Shana Saul, Estate of Frank Bland, Eugene Burns, Sarah Mercer, Ernest C. Fuller, James Bland, Charles F. West, John Becker, Steven G. Owen, Kathy West, Ronald Walker, Jr., John Hendrickson, Estate of James Surch, Jacqueline M. Kunysz, Joyce Clifford, Cesar San Pedro, Robert Dean, Estate of Billy San Pedro, John Brown, Christopher Hein, Ann Marie Moore, Wendy Edmond, Joseph A. Barile, Melinda Hollingshead, The Estate of Michael Lee Page, Ronald E. Walker, James S. Spears, Rick West, Alphonso Martinez, LaJuana Smith, Carolyn Mudd, Betty Lewis, Angela E. Barile, Counter Claimants: [*69] Noel J. Nudelman, Heideman Nudelman & Kalik, PC, Washington, DC.

For JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., Counter Defendants: Christopher James Houpt, Mayer Brown LLP (NY) 1221 Avenue of the Americas, 14th Floor New York, NY.

For Citibank, N.A., ThirdParty Plaintiff: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Jamie Somoza Raghu, Davis Wright Tremaine LLP (NYC), New York, NY.

For Citibank, Counter Defendant: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Citibank, N.A., Counter Defendant: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Jeremy Levin, Dr. Lucille Levin, Counter Claimants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Don Howarth, Suzelle Moss Smith, LEAD ATTORNEY Howarth & Smith (LA), Los Angeles, CA; Kathryn Lee Crawford, Brownstein Hyatt Farber Schreck LLP (Los Angeles), Los Angeles, CA.

For Fran Heiser, individually and as personal

representative of the Estate of Michael Heiser, ThirdParty Plaintiff, ThirdParty Defendant: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock [*70] & Lavan LLP, New York, NY; Timothy H. Birnbaum, DLA Piper, New York, NY.

For Timothy Brooks, Wanda Ford, Orlando M. Valore, Jr., Minerva Alvarado, Allison Thompson, Angel Alvarado, Edward J McDonough, Willy G. Thompson, Lisa Ann Beck, Marcy Lynn Parson, Mark Andrew Hukill, Anna Marie Simpson, Michael Harris, Robert Simpson, Monte Hukill, Rose Rotondo Estate of, Kathy McDonald, Janice Valore, Cheryl Bass, Shirley Kirkwood, Storm Jones, Evans Hairston, Thomas Bonk, Johnny Thompson, Phyllis Santoserra Estate of, Edward J. Brooks, Estate of Matilde Hernandez, Jr., Douglas Pontillo, Betty Laise, Kevin Bonk, (Estate) Phyllis Santoserra, The Estate of James Silvia and Lynne Michol Spencer, Counter Claimants: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Donald R. Pontillo, Julia Bell Hairston, Terrance Valore, Patricia Kronenbitter, Counter Claimants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Washington, DC; Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Marta Alvarado, Zoraida Alvarado, Don Selbe, Sr. Carl [*71] Kirkwood, Virginia Ellen Hukill, Counter Claimants: June Hee Park, Fleischman Law Firm, New York, NY.

For Felicia Hairston, Henry Hukill, Counter Claimants: Keith Martin Fleischman, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Luis Rotondo Estate of, Counter Claimant: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Washington, DC; June Hee Park, Fleischman Law Firm, New York, NY.

For John E. Selbe, Rose Harris, Belinda Skarka, Deborah True, Betty J. Bolen, Sherry Lynn Fiedler, Yolanda Alvarado, Renee Eileen Simpson, Kris Laise, Catherine Bonk, Terance J. Valore, Estate of Moses

Arnold, Jr., Thomas A. Fluegel, Sally Jo Wirick, Estate of John Muffler, James Macgroglou, Deborah Rhosto, Pedro Alvarado, Jr., Estate of Leonard Warren Walker, Sr. Larry Simpson, Ifaline Thompson, Marion DiGiovanni, Henry Durban Hukill, Jeff Kirkwood, Lorraine Macgroglou, Sharla M. Korz, Orlando Michael Valore, Sr., Keith Bolen Bolen, Penni Joyce, Andres Alvarado Tull, Neale Scott Bolen, Michael Harris, James Selbe, Sheldon H. Bolen, Marilou Fluegel, The Estate of James Silvia, Estate of James Yarber, Counter Claimants: Keith Martin Fleischman, LEAD ATTORNEY, [*72] The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Luis Alvarado, Luisa Alvarado, Catherine Bonk Hunt, John Jay Tishmack Estate of, Robert Fluegel, Estate of John Jay Tishmack, (Estate) Luis Rotondo, Larry Simpson, Sr., John Muffler Estate of, Sr. John Bonk, Maria Alvarado, John Bonk, Jr., (estate) rose rotondo, Matthew Scott Hukill, Grisselle Alvarado, Larry H. Simpson, Jr., Donald P. Pontillo, Counter Claimants: June Hee Park, Fleischman Law Firm, New York, NY.

For Meredith Ann Hukill, Cathrine Bonk Hunt, Matilde Hernandez Estate of, Mitchell Charles Hukill, Bill Macgroglou, Bill Laise, Patricia A. Brooks, Melissa Hukill, Eloise F. Selbe, Dennis Jack Anderson, James Yarber Estate of, Jr. Carl A. Kirkwood, Geraldo Alvarado, Counter Claimants: Annie Pennock Kaplan, LEAD ATTORNEY, Fay Kaplan Law, P.A., Wasshington, DC; Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Edward W. McDonough, Carl Kirkwood, Sr., Lolita M. Arnold, Thomas A Fluegel, John Bonk, Sr., Estate of David L. Battle, Estate of Rose Rotondo, Counter Claimants: Keith Martin Fleischman, The Fleischman [*73] Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Wanda Ford, Counter Defendant: Keith Martin Fleischman, LEAD ATTORNEY, The Fleischman Law Firm, New York, NY; June Hee Park, Fleischman Law Firm, New York, NY.

For Citibank, Citibank, N.A., Counter Defendants: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Patty Barnett, Hazel Edmond, Estate of Laura Virginia Copeland, Kristopher Massman, Paul Martinez, Sr., Estate of Billy San Pedro, Jean Givens Owen, Karen Hein-Sullivan, Carolyn Mudd, Estate of Eric Walker, Daniel Martinez, Robin Nicely, Maurice Gibson, Elaine Allen, Alphonso Martinez, Johnnie Decker, Steven G. Owen, Holly Gibson, Michael Anderson, Wendy Edmond, Galen Weber, Joyce Hastings, Estate of Obrian Weekes, John Hendrickson, Patricia Lou Smith, The Estate of Jeffrey Bruce Owen, Javier San Pedro, Esther Martinez Parks, Estate of Michael Hastings, Nelson Weyl, John Opatovsky, Angela Massman, Louis Estler, Jr., The Estate of Burton Wherland, Sharon J. Rowan, Sila V. San Pedro, Sarah Mercer, Keith Estler, Ronald Duplanity, James Bland, Charles F. West, Jo Ann Hein, Kathy West, Ronald Walker, [*74] Jr., Estate of Bruce Hollingshead, Robin Brock, Marilyn Peterson, Jacqueline M. Kunysz, Cesar San Pedro, Lydia Massman, Robert Rucker, Dudley Decker, Douglas Jason Melendez, Ronald E. Walker, Estate of Michael Mercer, Rick West, Counter Claimants: Noel J. Nudelman, Heideman Nudelman & Kalik, PC, Washington, DC.

For Tyson Hendrickson, Paul Martinez, Jr., Christopher Hein, Anson Edmond, Morgan W. Rowan, Stephen Boyd Bland, Estate of Juan C. Rodriguez, Estate of Benjamin E. Fuller, Thelma Anderson, Joseph Penosky, Tomasita L. Martinez, Charles H. West, Jeanette Doughtry, Estate of John Hendrickson, The Estate of Michael Lee Page, Louisa Punonet, John Gibson, Alan C. Anderson, Estate of James Surch, Leonard Paul Tice, Guillermo San Pedro, Tena Walker-Jones, Albert Page, Arnold Edmond, Susanne Yeoman, Janet Page, Estate of Paul Hein, Emanuel Simmons, Ida Decker, Sarah Wherland, Kimmy Wherland, Johnny Jr. Melendez, Deborah Ryan, Meta Weekes, Thurnell Shields, Renard Manley, Ianthe Weekes, Ernest C. Fuller, Nicole Gomez, David Penosky, Kelly Bachlor, Ruth Ann Bland, Teresa Gunterh, Gregory Wherland, Victor J. Hein, Counter Claimants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, [*75] PC, Washington, DC.

For Deborah D. Peterson, personal representative of the Estate of James C. Knipple, et al., Cross Claimant: Liviu Vogel, LEAD ATTORNEY, Salon Marrow Dyckman Newman Broudy LLP, New York, NY.

2019 U.S. Dist. LEXIS 22788, *75

For Louise Gaddo Blatter, John Becker, The Estate of Anthony Brown, Angela Yoak, Cross Defendants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Societe Generale, Cross Defendant: Mark Hanchet, LEAD ATTORNEY, Christopher James Houpt, Mayer Brown LLP (NY), New York, NY.

For Citibank, Citibank, Cross Defendants: Christopher J. Robinson, Sharon L. Schneier, LEAD ATTORNEYS, Davis Wright Tremaine LLP (NYC), New York, NY.

For Kathy Hodges, John R. Cuddeback, John Becker, Louise Gaddo Blatter, John R. Cuddeback, Kathy Hodges, The Estate of Anthony Brown, Angela Yoak, Cross Defendants, ThirdParty Defendants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Deborah D. Peterson personal representative of the Estate of James C. Knipple, et al., Deborah D. Peterson personal representative of the Estate of James C. Knipple, et al., Deborah D. Peterson personal representative of the Estate of James C. Knipple, et al., Counter [*76] Claimants, ThirdParty Defendants: Liviu Vogel, LEAD ATTORNEY, Salon Marrow Dyckman Newman Broudy LLP, New York, NY.

For Jeremy Levin, Dr. Lucille Levin, Jeremy Levin, Dr. Lucille Levin, Jeremy Levin, Dr. Lucille Levin, Jeremy Levin, Dr. Lucille Levin, Counter Defendants, ThirdParty Defendants, Counter Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Don Howarth, Suzelle Moss Smith, LEAD ATTORNEYS, Howarth & Smith (LA), Los Angeles, CA; Kathryn Lee Crawford, Brownstein Hyatt Farber Schreck LLP (Los Angeles), Los Angeles, CA.

For Societe Generale, Cross Defendant: Mark Hanchet, LEAD ATTORNEY, Christopher James Houpt, Mayer Brown LLP (NY), New York, NY.

JPMorgan Chase Bank, N.A., ThirdParty Plaintiff, Pro se.

For Alan C. Anderson, Angela E. Barile, Joseph A. Barile, James Bland, Ruth Ann Bland, John Brown,

John Brown, Rowel Brown, ThirdParty Defendants: Noel J. Nudelman, LEAD ATTORNEY, Heideman Nudelman & Kalik, PC, Washington, DC.

For Estate of Moses Arnold, Jr., Lolita M. Arnold, Catherine Bonk, John Bonk, Sr., Rose Harris, Lynne Michol Spencer, The Estate of James Silvia, Terance J. Valore, ThirdParty Defendants: Keith Martin Fleischman, [*77] LEAD ATTORNEY, June Hee Park, Fleischman Law Firm, New York, NY.

For Linda Bennett Indvidually and as Co-Administrator of the Estate of Marla Ann Bennett, Lisa Bennett, Michael Bennett Individually and as Co-Administrator of the Estate of Marla Ann Bennett, ThirdParty Defendants: Carl E. Person, LEAD ATTORNEY, Carl E. Person - An Individual, New York, NY; Ferris R. Bond, Bond & Norman PLLC, Washington, DC.

For Bryan Harris, John L'Heureux, Elizabeth Murphy Individually and as Administratrix of the Estate of Terrence Rich, Elizabetth Murphy, ThirdParty Defendants: John W. Karr, LEAD ATTORNEY, Karr & Allison P.C., Washington, DC; Steven Karl Barentzen, LEAD ATTORNEY, The Law Office of Steven Barentzen, Washington, DC.

For Alan D. Hayman, ThirdParty Defendant: Curtis Campbell Mechling, LEAD ATTORNEY, James Lawrence Bernard, Stroock & Stroock & Lavan LLP, New York, NY.

For Shirlee Hayman, ThirdParty Defendant: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY.

For James Owens, ThirdParty Defendant: Annie Pennock Kaplan, Fay Kaplan Law, P.A., Wasshington, DC.

For Catherine Adams individually and as personal representative of the Estate of Christopher Adams, [*78] Counter Defendant: Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Daniel Adams, Estate of Christopher Adams, Estate of Christopher Lester, Catherine Fennig individually and as personal representative of the Estate of Patrick

2019 U.S. Dist. LEXIS 22788, *78

Fennig, Mark Fennig, Thaddeus C. Fennig individually and as personal representative of the Estate of Patrick Fennig, Nancy A. Kitson, Cecil Lester, Jr., Jessica Lester, Judy Lester individually and as personal representative of the Estate of Christopher Lester, Lawrence Taylor, Sandra M. Wetmore, Dawn Woody individually and as personal representative of the Estate of Joshua Woody, Timothy Woody, Mary Young, Counter Defendants: Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For John E. Adams, Michael T. Adams, Patrick D. Adams, William Adams, Bernadine R. Beekman, George M. Beekman, Bridget Brooks, Bessie A. Campbell, Marie R. Campbell, Anthony W. Cartrette, Lewis W. Cartrette, Che G. Colson, Denise M. Eichstaedt, Estate of Brian McVeigh, Estate of Earl F. Cartrette, Jr., Estate of Jeremy Taylor, Estate of Joseph E. Rimkus, Estate of Joshua E. Woody, Estate of Justin R. Wood, Estate of Kendall Kitson, Jr., Estate of **[*79]** Kevin J. Johnson, Estate of Leland Timothy Haun, Estate of Millard D. Campbell, Estate of Patrick Fennig, Estate of Peter J. Morgera, Estate of Thanh Van Nguyen, Estate of Brent E. Marthaler, Paul D. Fennig, Ibis S. Haun, Senator Haun, Bruce Johnson, Bruce Johnson, Kevin Johnson a minor, Laura E. Johnson, Nicholas A. Johnson a minor, Shyrl L. Johnson, Kendall K. Kitson, Nancy R. Kitson individually and as personal, Steve K. Kitson, Cecil H. Lester, Herman C. Marthaler, III, Katie L. Marthaler, Matthew Marthaler, Sharon Marthaler, Michael Morgera individually and as personal representative of the Estate of Peter Morgera, Thomas Morgera, Christopher R. Nguyen, Milagritos Perez-Dalis, Anne M. Rimkus, James R. Rimkus, Tracey M. Smith, Starlina D. Taylor, Vicki L Taylor, James V. Wetmore, Elizabeth Wolf, Kathleen M. Wood, Richard W. Wood, Shawn M. Wood, Jonica L. Woody, Mary Young, Counter Defendants: Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For William Adams, Kirk Marthaler, Counter Defendant: Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY.

For Estate of Michael Heiser, Counter Defendant: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, **[*80]**  New York, NY; Barbara L. Seniawski, Cary Brian Samowitz, DLA Piper US LLP (NY), New York, NY; Dale Kerbin Cathell, Richard Marc Kremen, DLA Piper US LLP (MD), Baltimore, MD.

For Francis Heiser, Gary Heiser, Gary Heiser individually and as personal representative of the Estate of Michael Heiser, Counter Defendants: Curtis Campbell Mechling, LEAD ATTORNEY, Stroock & Stroock & Lavan LLP, New York, NY; Barbara L. Seniawski, DLA Piper US LLP (NY), New York, NY.

For Bank of New York, Counter Claimant: Steven B. Feigenbaum, Katsky Korins, LLP, New York, NY.

For JPMorgan Chase Bank, N.A., ThirdParty Plaintiff: Haley Ellen Adams, Katsky Korins LLP, New York, NY.

For JPMorgan Chase Bank, N.A., ThirdParty Plaintiff, Counter Claimant: Christopher James Houpt, Mayer Brown LLP (NY), New York, NY.

**Judges:** J. PAUL OETKEN, United States District Judge.

**Opinion by:** J. PAUL OETKEN

# Opinion

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs Jeremy Levin and Dr. Lucille Levin ("Plaintiffs") are judgment creditors of the Islamic Republic of Iran ("Iran"). In 2009, they filed this suit seeking turnover of Iranian assets within the United States in an effort to enforce their unsatisfied judgment against Iran. (Dkt. No. 70.) On November **[*81]** 15, 2017, Plaintiffs filed a supplemental complaint seeking turnover of a particular blocked asset, the Tajideen Account, for collection and partial satisfaction of their judgment against Iran. (Dkt. Nos. 1110 & 1110-4.) Plaintiffs now move for summary judgment pursuant to *Federal Rule of Civil Procedure 56*, seeking an order granting turnover of the Tajideen Account. (Dkt. Nos. 1180 & 1181.) Third-Party Defendant American Life Insurance Company — Lebanon Branch ("Alico") has also moved for summary

2019 U.S. Dist. LEXIS 22788, *81

judgment, asserting that it has a property interest in the Tajideen Account and asking the Court to dismiss all judgment creditor claims to the account. (Dkt. Nos. 1197 & 1199.) For the reasons that follow, the motions for summary judgment are denied.

## I. Background

The Court presumes familiarity with the factual and procedural history of this case, as discussed in its three prior Opinions and Orders issued on March 4, 2011, September 23, 2013, and October 27, 2017. *See Levin v. Bank of N.Y. (Levin I), No. 09 Civ. 5900, 2011 U.S. Dist. LEXIS 23779, 2011 WL 812032, at \*1-4 (S.D.N.Y. Mar. 4, 2011) (Patterson, J.); Levin v. Bank of N.Y. Mellon (Levin II), No. 09 Civ. 5900, 2013 U.S. Dist. LEXIS 137399, 2013 WL 5312502, at \*1-2 (S.D.N.Y. Sept. 23, 2013) (Patterson, J.); Levin v. Bank of N.Y. Mellon, No. 09 Civ. 5900, 2017 U.S. Dist. LEXIS 178796, 2017 WL 4863094, at \*1-2 (S.D.N.Y. Oct. 27, 2017)* (*Levin III*), *aff'd sub nom. Levin v. JPMorgan Chase Bank, N.A., No. 17-3854, 751 Fed. Appx. 143, 2018 U.S. App. LEXIS 28403, 2018 WL 4901585 (2d Cir. Oct. 9, 2018)* (summary order).

### A. Procedural History

Plaintiffs hold a final judgment of $28,807,719, plus interest, against Judgment-Debtor Iran, arising out of the 1984 kidnapping **[\*82]** of Jeremy Levin in Beirut, Lebanon. (Dkt. No. 1196 ¶¶ 1-3.) Levin's abductors were terrorists who were trained, supported, aided, funded, and directed by Iran. (Dkt. No. 1196 ¶ 3.)

Plaintiffs filed the original Complaint in this action in 2009, seeking turnover of certain assets within the jurisdiction of the United States in which Iran has a direct or indirect interest. (Dkt. No. 70.) Specifically, the original Complaint alleged that Defendant J.P. Morgan Chase Bank, N.A. ("J.P. Morgan") and other New York banks possessed "assets blocked by the U.S. government due to the fact that Iran has an interest in them either directly or indirectly ('Iranian Blocked Assets')." (Dkt. No. 1196 ¶ 5.)

Although Plaintiffs have obtained turnover of certain Iranian assets, Plaintiffs' judgment has not been fully satisfied. (Dkt. No. 1196 ¶ 4.) On January 12, 2017, J.P. Morgan's responses to interrogatories revealed the existence of additional, previously undisclosed Iranian Blocked Assets, including the Tajideen Account. (Dkt.

No. 1196 ¶ 20.) In the Court's Opinion and Order of October 27, 2017, it permitted Plaintiffs to file a supplemental complaint with respect to the Tajideen Account. *Levin III, 2017 U.S. Dist. LEXIS 178796, 2017 WL 4863094, at \*3.* Plaintiffs **[\*83]** filed their Supplemental Complaint on November 15, 2017, seeking turnover of the Tajideen Account for collection and partial satisfaction of their judgment against Iran pursuant to *§ 201(a)* of the *Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322; §§ 1610(f)(1)(A)* and *(g)(1)* of the Foreign Sovereign Immunities Act ("FSIA"), *28 U.S.C. §§ 1330, 1602-1611*; and *New York Civil Practice Law and Rules § 5225*. (Dkt. No. 1110 ¶¶ 8-9, 55.)

In response to the Supplemental Complaint, J.P. Morgan filed a Third-Party Complaint in interpleader, bringing before the Court all persons and entities with alleged interests in or claims to the Tajideen Account. (Dkt. No. 1136 ¶ 65.) These Third-Party Defendants include Kassim Tajideen, Alico, and judgment creditors of Iran, Hezbollah, and the Revolutionary Armed Forces of Colombia (FARC). (Dkt. No. 1136 ¶¶ 65, 70-89.) Alico filed an answer to the Third-Party Complaint, claiming an interest in the Tajideen account. (Dkt. No. 1172.)[1]

On June 13, 2018, before engaging in any discovery, Plaintiffs moved for summary judgment with respect to turnover of the Tajideen Account. (Dkt. No. 1180.)[2] Alico subsequently filed a cross-motion for summary judgment, asking the Court to hold that the funds in the account are not subject to turnover and to dismiss all judgment creditor **[\*84]** claims against the account.

---

[1] Three judgment creditor groups also filed answers claiming an interest in the Tajideen Account. (Dkt. Nos. 1162, 1167, 1168.) But those groups have since disclaimed any interest in the account. (Dkt. Nos. 1179, 1202, 1206.) Tajideen has also filed a stipulation with J.P. Morgan disclaiming any interest he had in the Tajideen Account. (Dkt. No. 1201 ¶ 30.)

[2] In support of its motion for summary judgment, Plaintiffs ask the Court under *Federal Rule of Evidence 201* to take judicial notice of forty-three "Orders and other pleadings taken from this Court's docket in this matter." (Dkt. No. 1185 at 9.) This motion is unopposed. Under *Rule 201*, a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." *Fed. R. Evid. 201(c)(2)*. It is well established that a court may "take judicial notice of its own orders," and "its own records." *Rosado-Acha v. Red Bull GmbH, No. 15 Civ. 7620, 2016 U.S. Dist. LEXIS 84543, 2016 WL 3636672, at \*7 (S.D.N.Y. June 29, 2016)* (citations omitted). The Court thus grants the motion and takes judicial notice of these documents.

Matthew Niss

**A-227**

(Dkt. No. 1197; *see also* Dkt. No. 1199 at 13-14.)

## B. Factual Background

The following facts are drawn from the Supplemental Complaint and the parties' *Local Rule 56.1* statements and are not subject to genuine dispute unless otherwise noted.

Kassim Tajideen is a Lebanese citizen and businessman. (Dkt. No. 1196 ¶ 34; Dkt. No. 1205 ¶ 52.) On May 27, 2009, Tajideen was labelled a Specially Designated Global Terrorist ("SDGT") by the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC"). (Dkt. No. 1205 ¶ 58.)[3] According to OFAC's press release regarding the designation,

> Kassim Tajideen is an important financial contributor to Hizballah who operates a network of businesses in Lebanon and Africa. He has contributed tens of millions of dollars to Hizballah and has sent funds to Hizballah through his brother, a Hizballah commander in Lebanon. In addition, Kassim Tajideen and his brothers run cover companies for Hizballah in Africa.

(Dkt. No. 1198-2.) However, "Tajideen denies that he has any association, affiliation or relationship with Iran, the FARC or any terrorist organization, and asserts that OFAC's designation of him as an SDGT was improper, without basis, and **[*85]** unlawful." (Dkt. No. 1174 ¶ f.) On the basis of an expert's testimony, Plaintiffs allege that Tajideen provided material support to Hezbollah and Iran. (Dkt. No. 1196 ¶¶ 42-43.)[4] And it is undisputed

by the parties: (1) that Hezbollah is an agency and instrumentality of Iran, to which Iran provides substantial support and over which Iran exercises significant control; and (2) that Iran is a state sponsor of terrorism. (Dkt. No. 1196 ¶¶ 39-41; Dkt. No. 1201 ¶¶ 39-41.)

In 2001, Alico, an insurance company, sold a life insurance policy to Tajideen. (Dkt. No. 1205 ¶¶ 51, 53.) After Tajideen's designation as an SDGT by OFAC, Alico established a deposit account with J.P. Morgan under Tajideen's name—the Tajideen Account—in 2012. (Dkt. No. 1205 ¶ 60; Dkt. No. 1196 ¶ 34; Dkt. No. 1201 ¶ 34; *see* Dkt. No. 1110-4.) Into the account, Alico deposited the "cash surrender value" of Tajideen's life insurance policy.[5] (Dkt. No. 1205 ¶ 61.) As of November 2016, the value of the funds in the account totaled $355,892.25. (Dkt. No. 1205 ¶ 62.)

The ownership of the funds in the Tajideen Account is disputed by the parties. Alico alleges that Tajideen has not surrendered the life insurance policy, and as such **[*86]** the funds do not belong to Tajideen. (Dkt. No. 1205 ¶ 57; Dkt. No. 1201 ¶ 38.) Plaintiffs contend that the funds are owned by Tajideen. (Dkt. No. 1196 ¶¶ 37-38; Dkt. No. 1201 ¶¶ 37-38.) When it disclosed the existence of the blocked asset in November 2016 in response to Plaintiffs' interrogatories, J.P. Morgan identified the account as "contain[ing] . . . blocked property" of Alico's parent company, "which JPMC is holding on their behalf." (Dkt. No. 1110-4; Dkt. No. 1195 at 2 n.1.) In response to Plaintiffs' *Local Rule 56.1* statement, however, J.P. Morgan now clarifies that it "does not know whether that asset is the property of Tajideen or of Alico-Lebanon." (Dkt. No. 1196 ¶ 37.)

## II. Legal Standard

Summary judgment under *Rule 56* is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *See Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009)*.

---

[3] When a person receives an SDGT designation, the person's property is blocked and "may not be transferred, paid, exported, withdrawn or otherwise dealt in." *31 C.F.R. § 594.201(a)*. As a result, U.S. persons are prohibited from engaging in any transaction with persons whose property has been blocked. *Id. § 594.204*.

[4] In response to Plaintiffs' initial **Rule 56.1** statement, J.P. Morgan has taken the position that "[t]he evidence currently in the record [wa]s insufficient to allow a determination on whether Tajideen provided support, material or otherwise, to Hezbollah or Iran." (Dkt. No. 1196 ¶ 42.) Similarly, Alico contends in its opening brief that whether Tajideen is "an agent or instrumentality of Iran" is a "factually disputed issue." (Dkt. No. 1199 at 11-12.) Plaintiffs' expert has filed a supplemental declaration reaffirming his opinion that Tajideen "has provided extensive systematic funding to Hezbollah and acts as an agent of Hezbollah," and attaching supporting sources. (Dkt. No. 1204 ¶ 4.) But in its reply, Alico notes that

the issue "appears to still be disputed." (Dkt. No. 1208 at 7.)

[5] According to Alico, Tajideen has not paid the premiums on the policy since 2011. (Dkt. No. 1205 ¶ 69.)

2019 U.S. Dist. LEXIS 22788, *86

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." **[\*87]** *Cohen Lans LLP v. Naseman, No. 14 Civ. 4045, 2017 U.S. Dist. LEXIS 15547, 2017 WL 477775, at \*3 (S.D.N.Y. Feb. 3, 2017)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*. "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc., No. 12 Civ. 5262, 2014 U.S. Dist. LEXIS 132108, 2014 WL 4652548, at \*3 (S.D.N.Y. Sept. 18, 2014)*. The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995)* (second quoting *Lund's, Inc. v. Chem. Bank, 870 F.2d 840, 844 (2d Cir. 1989))* (internal quotation marks omitted).

## III. Discussion

Section 201(a) of TRIA, which governs the execution of assets blocked under the OFAC regulations, provides:

> Notwithstanding any other provision of law, and except [under circumstances not relevant here], in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

*Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (2002)* (codified as amended at *28 U.S.C. § 1610* note). **[\*88]** In order to be entitled to an execution against a particular asset under TRIA, plaintiffs must demonstrate first that (1) they have obtained a judgment, (2) against a terrorist party, (3) on a claim based upon an act of terrorism. *See Calderon-Cardona v. Bank of N.Y. Mellon, 770 F.3d 993, 999 (2d Cir. 2014)*. Then plaintiffs must establish that they are seeking to subject to execution in aid of that judgment (4) a blocked asset, (5) in which the terrorist party or an agency or instrumentality of the terrorist party holds a property interest. *See Hausler v. JP Morgan Chase Bank, N.A., 770 F.3d 207, 212 (2d Cir. 2014)* (per

curiam) (addressing the property interest prong); *Weininger v. Castro, 462 F. Supp. 2d 457, 479-80 (S.D.N.Y. 2006)* (addressing the requirement that the assets in question be "'blocked assets' within the meaning of TRIA"). Finally, plaintiffs must establish that (6) "no adverse claimant ranks above [them] in priority of interest" to the asset at issue. *Hausler v. JP Morgan Chase Bank, N.A., 127 F. Supp. 3d 17, 47 (S.D.N.Y. 2015)*.

Here, the parties do not dispute that Plaintiffs have obtained a judgment against a terrorist party—Iran—based upon an act of terrorism. *See Levin v. Islamic Republic of Iran, 529 F. Supp. 2d 1 (D.D.C. 2007)*. Nor do they contest whether the Tajideen Account qualifies as a "blocked asset." (Dkt. No. 1110-4; Dkt. No. 1195 at 3.) The Court agrees that Plaintiffs have satisfied those requirements. However, the parties dispute whether the Tajideen Account is the property of an agency or instrumentality **[\*89]** of Iran, and whether Plaintiffs possess priority of claim. The Court will address each requirement in turn.

## A. Whether the Blocked Asset is the Property of an Agency or Instrumentality of the Terrorist Party

Within the requirement that a blocked asset be the property of the terrorist party or an agency or instrumentality of the terrorist party for that asset to qualify for turnover under TRIA, the parties raise two disputed questions: (1) whether Tajideen is properly considered an agent of Iran; and (2) whether the Tajideen Account is the property of Tajideen himself, or the property of Alico. Because Plaintiffs have not demonstrated that they are entitled to judgment as a matter of law on the first question, and because genuine disputes of material fact exist with respect to the second question, Plaintiffs' and Alico's motions for summary judgment must be denied.

## 1. Whether Tajideen is an Agent of Iran

To demonstrate that a party constitutes an agency or instrumentality of a terrorist party under TRIA, plaintiffs must show that the party "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support **[\*90]** of the terrorist party, *or* (3) was owned, controlled, or directed by the terrorist party." *Kirschenbaum v. 650 Fifth Ave. & Related Props., 830 F.3d 107, 135 (2d Cir. 2016)*, *abrogated on other*

2019 U.S. Dist. LEXIS 22788, *90

grounds by _Rubin v. Islamic Republic of Iran, 138 S. Ct. 816, 200 L. Ed. 2d 58 (2018)._

In support of their motion for summary judgment, Plaintiffs argue that Kassim Tajideen "provided material support for Hezbollah," and therefore—because "Hezbollah is an agency and instrumentality of Iran"— is himself "an agency or instrumentality of Iran." (Dkt. No. 1181 at 12.) J.P. Morgan contends that the evidence offered by Plaintiffs to demonstrate Tajideen's provision of financial support to Hezbollah is insufficient to warrant a grant of summary judgment. (Dkt. No. 1195 at 9.) Alico agrees that this issue is "factually disputed," precluding summary judgment. (Dkt. No. 1199 at 12.)

In support of their allegation that Tajideen provided material support to Hezbollah, Plaintiffs offer (1) an indictment of Tajideen from a criminal case in the U.S. District Court for the District of Columbia (Dkt. No. 1204-1),[6] and (2) the declaration and supplemental declaration of Dr. Patrick Clawson, an expert on Iran (Dkt. Nos. 1184 & 1204). In his declarations, Dr. Clawson opines that Hezbollah could not have carried out the kidnapping of Jeremy Levin had it not been "trained, [*91] supported, aided, abetted and funded by the Iranian government," and that "Kassim Tajideen is an important financial contributor to Hezbollah and through Hezbollah acts [as] a financier and an agent of Iran; he has contributed tens of millions of dollars to Hezbollah and he, as agent of Hezbollah and Iran, runs cover companies for Hezbollah based out of Africa." (Dkt. No. 1184 ¶ 3(c), (f); _see also_ Dkt. No. 1204 ¶ 4.) In support of his opinion regarding Tajideen, Dr. Clawson relies on the Federal Register notice designating Tajideen an SDGT,[7] two press releases from the U.S. Department of the Treasury, one press release from the U.S. Department of Justice, the federal indictment of Tajideen, and two articles. (Dkt. No. 1184 ¶¶ 41-45; Dkt. No. 1204 ¶ 10; Dkt. Nos. 1204-1, 1204-3 through 1204-8.)

In its previous Opinions and Orders, this Court has twice accepted Dr. Clawson as an expert on Iran. _Levin I, 2011 U.S. Dist. LEXIS 23779, 2011 WL 812032, at *19_; _Levin II, 2013 U.S. Dist. LEXIS 137399, 2013 WL 5312502, at *9_. The Court does so again here. Furthermore, in _Levin II_, this Court deemed evidence "sufficient" to establish that entities were "agencies and instrumentalities of Iran" for purposes of summary judgment where Plaintiffs presented an "affidavit of their expert, Dr. Clawson, and independently-verifiable [*92] online resources" comprising OFAC's Specially Designated Nationals and Blocked Persons list "as well as a press release from the Treasury Department available online." _Levin II, 2013 U.S. Dist. LEXIS 137399, 2013 WL 5312502, at *10_. Similarly here, the Court determines that Plaintiffs have provided sufficient evidence of Tajideen's financial support to Hezbollah to satisfy the "requisite initial showing" that they are entitled to summary judgment. _Clopay Plastic Prods. Co., 2014 U.S. Dist. LEXIS 132108, 2014 WL 4652548, at *3_.

The burden thus shifts to J.P. Morgan and Alico to "identify specific facts demonstrating a genuine issue for trial." _Id._ J.P. Morgan does not attempt to do so. (_See_ Dkt. No. 1195 at 7-9 (taking the position only that Plaintiffs have not adduced sufficient evidence to warrant summary judgment).) And Alico makes only a passing effort at raising a genuine dispute, pointing exclusively to the express denial of any involvement with Hezbollah contained in Tajideen's disclaimer of interest in the blocked account. (Dkt. No. 1199 at 11-12; Dkt. No. 1174 ¶ f.) However, Tajideen's denial was made in a stipulation with J.P. Morgan, and such "unsworn statements are generally not considered as evidence in opposition to summary judgment." _Waddlington v. City of New York, 971 F. Supp. 2d 286, 292 (E.D.N.Y. 2013)_; _see also Brittany Dying & Printing Corp. v. Griseto, No. 96 Civ. 9218, 2000 U.S. Dist. LEXIS 16699, 2000 WL 1717554, at *3 (S.D.N.Y. Nov. 16, 2000)_ ("Summary judgment cannot be defeated by relying on conclusory [*93] statements . . . . Unsworn statements cannot be considered as evidence in opposition to summary judgment."). The Court concludes that Tajideen's unsworn, conclusory denial does not raise a genuine dispute of material fact here.

That Plaintiffs have established that Tajideen is an agent or instrumentality of _Hezbollah_, however, does not necessarily mean that Tajideen is an agent or instrumentality of _Iran_. Dr. Clawson's declaration assumes that demonstrating the former relationship also proves the latter. (_See_ Dkt. No. 1184 ¶¶ 3(f), 57.) But

---

[6] J.P. Morgan opposes relying on the indictment to support the proposition that Tajideen is an agent of Hezbollah, because a superseding indictment in the same case omitted any reference to Hezbollah. (Dkt. No. 1195 at 9; s_ee_ Dkt. No. 1204-2.) Even absent the indictment, however, the Court concludes that Dr. Clawson's opinion and supporting sources are sufficient to satisfy Plaintiffs' burden.

[7] Alico has also submitted the entry from OFAC's Specially Designated Nationals and Blocked Persons list that identifies Tajideen as an SDGT and subject to OFAC sanctions. (Dkt. No. 1198-3.)

2019 U.S. Dist. LEXIS 22788, *93

none of the evidence establishing Tajideen's relationship with Hezbollah actually links him to Iran. And the Treasury Department's press release regarding Tajideen's SDGT designation, in providing background on Hezbollah, states that "Hizballah is closely allied with Iran and often acts at its behest, but it also can and does act independently." (Dkt. No. 1204-3 at 3.)

The Court has found one case in which the agency relationship between Hezbollah and a terrorist party was imputed to a supporter of Hezbollah for purposes of turning over a blocked asset under TRIA. *See Stansell v. Revolutionary Armed Forces of Colom. (FARC), No. 09 Civ. 2308, 2015 U.S. Dist. LEXIS 189867, 2015 WL 13325432, at *4 (M.D. Fla. Feb. 17, 2015)* (concluding that Tajideen was an agency or instrumentality of FARC). But the Court **[*94]** is unaware of any precedent in this Circuit for imputing such a relationship, and the parties have not provided their positions on this question. At this stage, the Court cannot conclude that Plaintiffs are entitled to judgment as a matter of law on the question of whether Tajideen was an agency or instrumentality of Iran. The parties will have the opportunity to address this question—including whether any objection on this basis should be deemed forfeited by the parties—in the next phase of the case.

## 2. Whether the Blocked Account is the Property of Tajideen

The main dispute between the parties in their motions for summary judgment involves whether the funds in the Tajideen Account are the property of Tajideen and thus subject to turnover under TRIA—as Plaintiffs contend— or the property of Alico and thus not subject to turnover—as Alico contends.

In order to be turned over under TRIA § 201(a), an asset must be the "property of terrorist parties [or] that of their agencies or instrumentalities." *Hausler, 770 F.3d at 211.* Whether an asset is the property of a particular party for purposes of attachment is a question of law. *See Calderon-Cardona, 770 F.3d at 1000.* Courts in this Circuit "look to state law to define the 'rights the judgment debtor has in the **[*95]** property the [creditor] seeks to reach.'" *Hausler, 770 F.3d at 212* (alteration in original) (quoting *Calderon-Cardona, 770 F.3d at 1001*).

Alico claims the funds in the Tajideen Account as its own property. Specifically, Alico alleges that it opened the account in Tajideen's name with J.P. Morgan and deposited the cash surrender value of Tajideen's life

insurance policy into the account in order to comply with OFAC regulations. (Dkt. No. 1200 ¶¶ 60-61; Dkt. No. 1201 ¶¶ 34-36.) However, Alico contends that Tajideen has not yet surrendered the insurance policy, and therefore has no property right in those funds. (Dkt. No. 1199 at 7-9.)[8]

Plaintiffs respond that Tajideen owns the funds in the account because his name is on the account, his right to surrender the policy and obtain those funds is a sufficient property interest for attachment purposes, and the act of blocking the account resulted in a de facto surrender of the policy. (Dkt. No. 1181 at 8-10; Dkt. No. 1203 at 3-4.)[9]

In attempting to ascertain ownership over the funds in the Tajideen Account, a crucial question involves *why* Alico created the account and deposited funds equivalent to the cash surrender value of Tajideen's life insurance policy. According to Alico, it was acting pursuant **[*96]** to OFAC regulations. (Dkt. No. 1201 ¶ 35 (citing *31 C.F.R. §§ 594.101-594.901*).) But neither the regulations, nor published guidance from the office, seem to require this result.

If a policyholder becomes subject to sanctions, guidance from OFAC instructs the insurer to "'block' the policy, report such blocking to OFAC . . . , place any future premiums into a blocked, interest-bearing account at a U.S. financial institution, and seek an OFAC license before making any payments under the policy." U.S. Dep't of the Treasury, *OFAC FAQs: Sanctions Compliance*, FAQ #66, https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_compliance.aspx#insurance (last accessed Jan. 24, 2019). Any newly paid

---

[8] Alico also argues that even if the funds in the account could be considered Tajideen's property, he would not own the full amount under the terms of the insurance policy. (Dkt. No. 1199 at 10.) Because unresolved issues of material fact prevent summary judgment, the Court need not resolve this issue at this time.

[9] J.P. Morgan does not take a position on this question, other than to point out that the motions for summary judgment were made before the parties engaged in any discovery, and to note the lack of evidence in the record. (Dkt. No. 1195 at 5-7.) In a previous action, Tajideen alleged that he alone owned the funds in the account. (Dkt. No. 1195 at 5; Dkt. No. 1136 ¶ 95.) But he has since disclaimed any interest in the funds "due exclusively to the expense and inconvenience of litigation and other factors having nothing to do with the merits of any party's claim." (Dkt. No. 1174 ¶ g.)

2019 U.S. Dist. LEXIS 22788, *96

premiums must go into a blocked account, *id.* at FAQ #66 & #69, and the policy itself becomes "a blocked contract," *id.* at FAQ #63, but nowhere does the guidance require the insurer to create a corresponding blocked account for the surrender value of the policy.

The relevant OFAC regulations may shed more light on Alico's creation of the account. The regulations require blocked "funds, such as currency, bank deposits, or liquidated financial obligations" to be placed "in a blocked interest-bearing account." *31 C.F.R. § 594.203(a)*. Significantly, **[*97]** they do not "create an affirmative obligation for the holder of blocked tangible property . . . or of other blocked property, such as debt or equity securities, to sell or liquidate such property at the time the property becomes" blocked. *Id. § 594.203(e)*. However, with a license from OFAC, blocked property may "be sold or liquidated and the net proceeds placed in a blocked interest-bearing account in the name of the owner of the property." *Id. § 594.206(b)*.

Per these provisions, it is possible that in creating the Tajideen account, Alico was engaging in a discretionary liquidation of the life insurance policy pursuant to a license from OFAC. If so, Tajideen was essentially caused to surrender the life insurance policy by operation of law, and the funds in the account would constitute his property. But it is also possible that Alico was directed by OFAC to create a blocked account containing the equivalent surrender value, in addition to holding the blocked policy. In that event, the question of how Tajideen's property interest in his right to surrender the policy relates to the funds in the account is more complicated. However, without more evidence regarding the insurance policy and creation of the account **[*98]**—in the form of communications between Alico and OFAC, testimony from Alico personnel, communications between Alico and Tajideen, documents from J.P. Morgan, or documents/licenses from OFAC—the Court cannot confidently discern the import of Alico's actions in light of the relevant regulations and guidance.

Given the dearth of evidence in the record, the Court concludes that genuine issues of material fact exist as to the ownership of the funds in the Tajideen Account, and neither moving party has established ownership of the funds as a matter of law. Accordingly, Plaintiffs' motion for summary judgment and Alico's motion for summary judgment are both denied on this ground.

**B. Whether Plaintiffs' Claim Has Priority**

The final disputed issue among the parties is whether Plaintiffs have established the priority of their claim to the blocked account. In response to J.P. Morgan's Third-Party Complaint, five parties or groups of parties initially claimed interests in the Tajideen Account: Plaintiffs, Alico Judgment Creditor Mati Gill, the Greenbaum and Acosta Judgment Creditors, and the Heiser Judgment Creditors. (Dkt. Nos. 1145, 1162, 1167, 1168, 1172.) All remaining third-party defendants **[*99]** either did not respond or have filed an affirmative disclaimer of interest in the account. (Dkt. No. 1183-1.) And the three other judgment creditors or judgment creditor groups that initially claimed an interest in the account—Mati Gill, the Greenbaum and Acosta Judgment Creditors, and the Heiser Judgment Creditors—have all subsequently disclaimed any interest. (Dkt. Nos. 1179, 1202, 1206.)

Plaintiffs and J.P. Morgan contend that that Plaintiffs have priority over all other judgment creditors. (Dkt. No. 1181 at 15-18; Dkt. No. 1195 at 10.) Noting that no other group of judgment creditors is actively seeking turnover of the Tajideen Account in this proceeding, the Court agrees that Plaintiffs have priority over all other groups of judgment creditors.

Regarding Alico's interest in the funds, Alico concedes that it "does not have a priority interest as a judgment-creditor," but asserts that the issue of priority is not dispositive because it is the owner of funds in the account. (Dkt. No. 1199 at 7-11; *see also id.* at 12 (disputing priority as to other judgment creditors only); Dkt. No. 1208 at 6.) Plaintiffs agree that Alico does not have a judgment against Tajideen, and argue that to the extent **[*100]** Alico has a contract-based claim to the funds in the account, the claim of a TRIA judgment creditor takes priority. (Dkt. No. 1203 at 5-6.) J.P. Morgan takes the position that the issue is "intertwined" with the property question: if Alico owns the funds in the account then the issue of priority is moot, whereas if Tajideen owns the funds then Alico would have no interest sufficient to compete with Plaintiff's interest for priority. (Dkt. No. 1195 at 10.)

Here, Plaintiffs are the only TRIA judgment creditors asserting an interest in the Tajideen account. To the extent Alico could claim a contract-based interest in the funds, Plaintiffs' claim would have priority. *See Hausler v. JPMorgan Chase Bank, N.A., 845 F. Supp. 2d 553, 569 (S.D.N.Y. 2012)* ("[A]ny evaluation under the TRIA of the priority of interests in the Blocked Funds must begin with the understanding that 'terrorist victims' holding judgments, as a group, must be first in line."),

*rev'd on other grounds*, 770 F.3d 207 (2d Cir. 2014). Therefore, if Plaintiffs ultimately establish that the funds in the account are the property of Tajideen, Plaintiffs will have priority over all other claims to the account and turnover will be appropriate.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED, **[*101]** and Alico's motion for summary judgment is DENIED. By February 26, 2019, the parties are directed to submit a joint letter regarding their proposed schedule for further proceedings.

The Clerk of Court is directed to close the motions at Docket Numbers 1180, 1185, and 1197.

SO ORDERED.

New York, New York

Dated: February 12, 2019

/s/ J. Paul Oetken

J. PAUL OETKEN

United States District Judge

**End of Document**

# Appendix AF

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| ANTONIO CABALLERO, | CASE NO. 3:20-cv-4485-MGL |
| Plaintiff, | |
| vs. | |
| FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, a/k/a FARC-EP a/k/a REVOLUTIONARY ARMED FORCES OF COLOMBIA; EJERCITO DE LIBERACION NACIONAL a/k/a ELN a/k/a NATIONAL LIBERATION ARMY; and THE NORTE DE VALLE CARTEL, | |
| Defendants. | |

**PETROLEOS DE VENEZUELA, S.A.'S LIMITED MOTION
TO INTERVENE AND MEMORANDUM OF LAW IN SUPPORT**

Pursuant to Federal Rule of Civil Procedure 24(a)(2), Petroleos de Venezuela, S.A. ("PDVSA"), files this limited motion to intervene as a defendant in this matter and its accompanying memorandum of law in support. As set forth below, the Court should grant PDVSA's Motion because it satisfies the requirements of Rule 24(a)(2) and because the Court should not allow the Writ of Garnishment to proceed without providing PDVSA an opportunity to rebut the perfunctory finding that PDVSA is an "agent or instrumentality" of FARC. *See Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, 771 F.3d 713, 727 (11th Cir. 2014).

## INTRODUCTION

Plaintiff obtained default judgments in Florida state court in 2014 and Florida federal court in 2020 against the above-named Defendants in the underlying lawsuit. PDVSA was not named as a defendant in either action and is not alleged to have any connection to the underlying facts giving

rise to the judgments against Defendants. Nevertheless, Plaintiff now seeks to collect on his federal court judgment against PDVSA's blocked U.S. assets.

Plaintiff's attorneys have known since 2019 that Marcos D. Jiménez, P.A. and León Cosgrove, LLP represent PDVSA in connection with Plaintiff's collection efforts; however, Plaintiff never made any attempt to provide notice to PDVSA'S counsel of Plaintiff's enforcement actions. Instead, Plaintiff has hidden behind the Terrorism Risk Insurance Act of 2002 ("TRIA") while he has filed *ex parte* motions and writs of garnishment around the country attempting to seize blocked assets that Plaintiff purports are owned by PDVSA and PDVSA's subsidiaries. Plaintiff has done this without providing PDVSA notice and an opportunity to defend against Plaintiff's false and unproven allegations that PDVSA is an "agency or instrumentality" of the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), one of the defendants and judgment debtors.

PDVSA seeks to intervene in this matter for the limited purposes of (1) moving for dissolution of the writ of garnishment[1] and (2) moving to set aside the State Court's November 23, 2020 Order finding that PDVSA is an agency or instrumentality of the FARC.

## BACKGROUND

1. ### Plaintiff's underlying Florida state and federal court actions against Defendants.

Plaintiff Antonio Caballero ("Plaintiff") initially brought a state court action against the FARC, the Ejercito de Liberacion Nacional ("ELN"), and the Norte del Valle Cartel

---

[1] In seeking limited intervention, PDVSA does not waive and specifically reserves all jurisdictional defenses, and reserves the right, if necessary, to defend against Plaintiff's claims on the merits. *See, e.g., Pescatore v. Palmera Pineda*, No. 08-2245 (RMC), 2019 WL 2173835, at *3-4 (D.D.C. May 20, 2019) (allowing alleged agents or instrumentalities of the FARC to intervene in the TRIA enforcement action to defend against execution while specifically preserving their right to raise defenses of jurisdiction and venue).

**A-235**

("NDVC") in Miami-Dade County, Florida, *Caballero v. Fuerzas Armadas Revolucionarias De Columbia, et al.*, CA. No. 12-48803-CA-02. Plaintiff purported to effectuate service of process on the defendants through individuals imprisoned in the United States. On December 12, 2013, after none of the defendants appeared, the Florida state court issued a default against all the defendants. On November 18, 2014, after a trial on damages during which none of the defendants appeared or presented opposition, Plaintiff obtained a default judgment against the defendants, in the sum of (i) $45,000,000.00, representing non-economic compensatory damages, with interest at 4.75% a year; (ii) $6,244,484.56, representing compensatory economic damages and pre-judgment interest thereon, with interest at 4.75% a year; and (iii) $140,189,001.00, representing punitive damages, with interest at 4.75% a year. *See* ECF No. 1-2.

During the state court damages trial in 2014, Plaintiff relied on an expert, a University of Miami professor, Dr. Bruce Michael Bagley, to identify names of the individuals and entities allegedly acting as agents or instrumentalities of the FARC and/or the NDVC. Notably, PDVSA *was not* on the list of alleged agents and instrumentalities of the FARC and/or NDVC.[2] For years, Plaintiff utilized writs of garnishment to execute on this judgment against these alleged agents or instrumentalities.

On December 19, 2018, Plaintiff filed another action, *Caballero v. Fuerzas Armadas Revolucionarias De Columbia, et al.*, CA. No. 1:18-cv-25337, this time in the United States District Court for the Southern District of Florida against the FARC and the NDVC

---

[2] In June 2020, Dr. Bagley pled guilty to two counts of federal money laundering charges; Dr. Bagley used bank accounts in his name and in the name of a company he created in Florida to launder over $2 million in proceeds of a Venezuelan bribery and corruption scheme into the United States.

A-236

(collectively "Defendants"), under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333. Plaintiff again purported to effectuate service of process on Defendants through individuals imprisoned in the United States. After Defendants failed to appear, on May 20, 2020, the federal district court entered a final default judgment and awarded Plaintiff $45,000,000 in actual compensatory non-economic damages; $1,729,667 in actual compensatory economic damages; and post-judgment interest at 0.15% per annum. *See* 2020 FL Fed. Court Judgment, ECF No. 1-5.

Shortly after receiving the federal court judgment, in July 2020, Plaintiff filed a post-judgment *ex parte* motion in the Southern District of Florida action, which the court granted, for a determination that certain individuals are agents or instrumentalities of the FARC. *See* Ex Parte Mot. for Det. & Writ & Ex.1, *Caballero v. Fuerzas Armadas Revolucionarias De Columbia, et al.*, CA. No. 1:18-cv-25337 (S.D.Fl. July 16, 2020), ECF No. 73, 73-1. Since Plaintiff's previous expert from the state court action, Dr. Bagley, had pled guilty to federal money laundering charges, Plaintiff relied on a new expert, John Robert McBrien, former associate director for global targeting in the Office of Foreign Assets Control ("OFAC") within the United States Department of Treasury. Mr. McBrien's declaration identifying names of the individuals and entities allegedly acting as agents or instrumentalities of the FARC *did not* include PDVSA. Id., ECF 73, & 73-2. This is true even though almost a year prior to Mr. McBrien's July 2020 declaration, Dr. Bagley had identified PDVSA as an agent or instrumentality of FARC, *infra*.

## 2. Plaintiff's collection efforts against purported blocked assets of PDVSA.

In April 2019, after five years of collection efforts to execute Plaintiff's Florida state court judgment against what Plaintiff has alleged to be agents or instrumentalities of the

4

**A-237**

FARC, Plaintiff filed a motion in the Florida state court action, asking the Florida state court to suddenly declare PDVSA "an agency and instrumentality of FARC." Plaintiff's motion relied *exclusively* on a new declaration from his expert at the 2014 damages trial, Dr. Bagley. In this new declaration, unlike in 2014, Dr. Bagley claimed that PDVSA is an agent or instrumentality of the FARC.

Plaintiff never served PDVSA with its Florida state court motion; but PDVSA became aware of Plaintiff's filing, reached out to Plaintiff's counsel, and filed a motion to intervene in the Florida state court action. Plaintiff thereafter discontinued his pursuit of collection efforts in the Florida court, as a result, there was never a hearing on PDVSA's motion to intervene. After that, Plaintiff's expert Dr. Bagley was indicted and pled guilty to money laundering and PDVSA's counsel never heard from Plaintiff's counsel again regarding any attempts by Plaintiff to have PDVSA declared an agency or instrumentality of the FARC.

Unbeknownst to PDVSA, however, Plaintiff continued its underhanded tactics. Without any notice to PDVSA or its counsel, Plaintiff began to file his May 2020 federal court judgment in state and federal courts around the country.[3] PDVSA only recently become aware that Plaintiff has filed numerous *ex parte* motions seeking the same relief that Plaintiff had abandoned in the Florida state court in 2019—to find that PDVSA is an agent or instrumentality of the FARC. Plaintiff's counsel is well aware that PDVSA had

---

[3] In addition to the proceeding in this Court, PDVSA recently became aware of similar proceedings in Western District of New York and Connecticut, and PDVSA is taking appropriate steps in these courts to protect its interests.  The Western District of New York granted PDVSA's motion to intervene in such proceeding.  *See* Order, *Caballero v. Revolutionary Armed Forces of Colombia et al.*, Case No. 1:20-mc-00040-LJV, Feb. 2, 2021 (W.D.N.Y.), Dkt. No. 39.

A-238

counsel representing PDVSA's interests with respect to Plaintiff's collection efforts, yet Plaintiff has utilized TRIA's *ex parte* procedures to purposely hide Plaintiff's efforts from PDVSA.

### 3.  **Plaintiff's collection efforts in this Court, the South Carolina District Court.**

In July 2020, Plaintiff registered his Florida federal court judgment under the Uniform Enforcement of Judgments Act ("UEFJA"), S.C. Code Ann. § 15-35-920, in the Court of Common Pleas for Richland County, South Carolina, captioned as *Antonio Caballero v. Revolutionary Armed Forces of Colombia et al.*, Case No. 2020-CP-40-03495.   Counsel for PDVSA was not served a copy of this notice.  Thereafter, on November 10, 2020, Plaintiff filed a Motion for Agent or Instrumentality Determination and Issuance of Writs of Garnishment seeking the Court declare PDVSA an agent or instrumentality of Defendant FARC and for issuance of writs of garnishment to attach any assets within this Court's jurisdiction in the putative names of, or for the benefit of, or that were blocked due to their association with, PDVSA.  *See* ECF No. 1-7.  Again, Plaintiff did not serve PDVSA with a copy of this Motion.

On November 23, 2020, the Honorable Alison Renee Lee granted Plaintiff's Motion.  The Court found that Plaintiff established PDVSA is an agent or instrumentality of FARC and that its assets are "blocked assets and executable under TRIA towards satisfaction of the ATA Final Judgment."  *See* ECF 1-8, ¶¶ 3-4.   Such findings were necessarily based exclusively on the only support provided by Plaintiff - the declarations of Mr. McBrien.  PDVSA was unable to challenge the reliability of such evidence because it was not provided with notice of the motion or an opportunity to be heard on the matter.

On December 3, 2020, Plaintiff's counsel served Bank of America with the Writ of Garnishment.  *See* ECF No. 1, ¶ 7, ECF No. 1-6.  Once again, Plaintiff's counsel did not serve PDVSA's counsel with the writ.  Instead, PDVSA learned from a third party of Plaintiff's attempt

6

**A-239**

to seize assets absent notice to PDVSA.  Subsequently, on December 29, 2020, counsel for Bank

of American removed the action to this Court.  *See* ECF No. 1.

## ARGUMENT

### 1. Legal standard for intervention.

Federal Rule of Civil Procedure 24(a)(2) provides that, upon the timely filing of a motion,

a court must permit anyone to intervene who:

> claims an interest relating to the property or transaction that is the
> subject of the action, and is so situated that disposing of the action
> may as a practical matter impair or impede the movant's ability to
> protect its interests, unless existing parties adequately represent that
> interest.

In order to intervene as a matter of right under Rule 24(a)(2), the moving party must: (1)

timely file an application, (2) show an interest in the subject matter of the underlying action, (3)

demonstrate that denial of the motion to intervene would impair the movant's ability to protects

its interest, the interest may be impaired by the disposition of the action, (4) show that the interest

is not protected adequately by the parties to the action.  *See Houston Gen. Ins. Co. v. Moore*, 193

F.3d 838, 839 (4th Cir. 1999).  "Liberal intervention is desirable to dispose of as much of a

controversy 'involving as many apparently concerned persons as is compatible with efficiency and

due process.'"  *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (quoting *Nuesse v. Camp*, 385

F.2d 694, 700 (D.C. Cir. 1967)).

### 2. PDVSA meets the requirements to intervene pursuant to Rule 24.

PDVSA satisfies all of Rule 24(a)(2)'s requirements and should be permitted to intervene.[4]

---

[4] Alternatively, the Court can also allow PDVSA to intervene pursuant to Rule 24(b)(2). A court
considers substantially the same factors whether the claim for intervention is "of right" under Rule
24(a)(2), or "permissive" under Rule 24(b)(2). *See R Best Produce, Inc. v. Shulman-Rabin Mktg.
Corp.*, 467 F.3d 238, 240 (2d Cir. 2006) (citing *In re Bank of N. Y.*, 320 F.3d at 300 n. 5).

**A-240**

a. <u>PDVSA's motion is timely</u>.

In determining whether a movant's intervention is timely, a court must consider, "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." *Alt v. U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014) (citing *Gould v. Alleco, Inc.*, 883 F.2d 281, 286 (4th Cir. 1989).

The South Carolina State Court made the determination that PDVSA was an agent and instrumentality of FARC on November 23, 2020.  [ECF No. 1-8]. The Writ of Garnishment to Bank of America was served on Bank of America on December 3, 2020.  [ECF No. 7]. Since service of the Writ, the matter was removed to this Court and Bank of America filed an Answer. *Id.*  No other events have occurred.

Moreover, Plaintiff will not be prejudiced if PDVSA's motion to intervene is granted. The assets at Bank of America that Plaintiff seeks to execute on are currently blocked by OFAC, and therefore, there is no risk that the assets will be dissipated while PDVSA is permitted to intervene.  Plaintiff cannot argue that it will be prejudiced by intervention because intervention does not affect the underlying default judgment against the FARC defendant. In contrast, PDVSA will be severely prejudiced if it is not permitted to intervene in this action.  Intervention will allow for due process and provide PDVSA an opportunity to be heard on its jurisdictional objections and, if necessary, to rebut Plaintiff's assertions of agency and instrumentality.  In this regard, Plaintiff is not "prejudiced" because PDVSA is merely being provided the process that is due.  *See Stansell*, 771 F.3d at 727 (holding that non-party judgment debtor "[was] entitled to the basic constitutional protection of due process…[and] entitled to be heard on their challenge to the agency and instrumentality issue.'")

8

**A-241**

Additionally, requiring Plaintiff to prove his allegations adheres to the Fourth Circuit's strong preference for resolving matters on the merits.  *See, e.g.*, *Choice Hotels Int'l v. Goodwin & Boone*, 11 F.3d 469, 472 (4th Cir. 1993)).  Thus, granting PDVSA's motion affords it an opportunity to contest Plaintiff's alleged proof and fulfills the Court's obligation to ensure that matters are decided on the merits and not based on self-serving untested assertions.

Finally, PDVSA was not named as a defendant in either the Florida state or federal action and is not alleged to have any connection to the underlying facts giving rise to the judgments against Defendants. PDVSA was also not named as a party in Plaintiff's instant action that originated in South Carolina State Court wherein Plaintiff sought and obtained a ruling PDVSA is an agent or instrumentality of FARC and now has served Bank of America with a Writ of Garnishment seeking to attach "all assets in the putative name of, held for the benefit of, or that were blocked due to an association with [PDVSA]." [ECF No. 1-6].  Indeed, despite having known since 2019 that PDVSA's counsel represents PDVSA's interest in Plaintiff's collection efforts, Plaintiff's counsel never provided notice to PDVSA's counsel. Nevertheless, PDVSA recently became aware of Plaintiff's efforts in South Carolina from a third party and has since expeditiously worked to file the instant motion to intervene.

> b.  PDVSA's Motion must be granted to protect PDVSA's interest and to satisfy Due Process requirements.

"While Rule 24(a) does not specify the nature of the interest required for a party to intervene as a matter of right, the Supreme Court has recognized that '[w]hat is obviously meant ... is a significantly protectable interest.'" *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991) (quoting *Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971)).  There can be no dispute that PDVSA has an interest in the present matter, and that denial

9

**A-242**

of PDVSA's motion would deprive PDVSA of the opportunity to challenge Plaintiff's jurisdiction and baseless allegations that PDVSA is an agent or instrumentality of FARC. *See Stansell*, 771 F.3d at 727 ("Without notice and a fair hearing where both sides are permitted to present evidence, the third party never has an opportunity to dispute its classification as an agency or instrumentality.").

Plaintiff's Motion for Writ and this Court's November 23, 2020 Order granting that motion rely *exclusively* on Mr. McBrien's declarations asserting that PDVSA is an agent or instrumentality of the FARC. Having not been provided notice of this motion, PDVSA was unable to challenge the same and present evidence refuting the same. Nor was PDVSA afforded the opportunity to cross Mr. McBrien and point out that his declarations are based riddled with conclusions based on hearsay and speculation and fail to identify any reliable evidence that PDVSA is an "agency or instrumentality" of the FARC.

Plaintiff's failure to notify PDVSA of the Motion, despite counsel's knowledge that PDVSA had counsel with respect to such collection efforts, resulted in the desired outcome. Absent contest to his Motion, Plaintiff obtained an order finding that PDVSA is an agent or instrumentality of FARC and directing the South Carolina Clerk of Court "to issue such writs in aid of garnishment to attach to any assets within this Court's jurisdiction in the putative names of, held for the benefit of, or that were blocked due to their association with [PDVSA]." [ECF 1-8 at 8, ¶ 6]. Plaintiff has already begun its collection efforts based on this finding and seeks "any assets [held] in the putative name of, held for the benefit of, or that were blocked due to an association with [PDVSA]" from Bank of America. [ECF1-6]. Bank of America has answered the writ identifying which assets it holds in which PDVSA may have an interest.

10

**A-243**

In addition to the due process problem clearly present in permitting the execution of the Writ prior to providing PDVSA an opportunity to be heard on the agent or instrumentality issue, Plaintiff is seeking the garnishment of assets from companies that it merely alleges are held for the benefit of PDVSA. This is especially concerning when these companies are not listed as an agent or instrumentality of FARC in the November 23, 2020 Order, and there has been no evidentiary hearing establishing the merit of Plaintiff's claim. Neither these companies, nor PDVSA, have been afforded an opportunity to present evidence on this issue as well. Recognizing such interests, Bank of America highlighted this issue in its Answer. [ECF No. 1-7 at 6]. Moreover, to establish TRIA subject matter jurisdiction, Plaintiff must prove that the assets subject to the Writ of Garnishment are in fact assets owned by PDVSA.

Finally, the consequences of the November 23, 2020 Order are far-reaching. Plaintiff will undoubtedly use this finding to support Plaintiff's attempts to collect against PDVSA assets in other jurisdictions as well. Furthermore, such a finding can be used by any Plaintiff in future actions against FARC seeking enforcement of a judgment under TRIA. Accordingly, this Motion is a critical first step in allowing PDVSA to fully pursue its due process rights and to seek any and all post-judgment and appellate relief that may be available.

c.    PDVSA's interest is not adequately protected by parties to the action.

No current party to the action can adequately protect PDVSA's interests. In determining the question of adequacy of representation, Courts in the Fourth Circuit presume that "'[w]hen the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented,' which can only be rebutted by a showing of 'adversity of interest, collusion, or nonfeasance.'" *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) (quoting *Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir.1976)). In the

A-244

present matter, the only other party to the present action would be Bank of America.  As a non-party garnishee, Bank of America provided its own answer and objections to Plaintiff's writ; however, it does not have standing nor an interest in challenging the writ to protect PDVSA's interests, including to dispute the Court's jurisdiction  and Judge Lee's substantive finding of "agency or instrumentality."  Thus, because PDVSA's "ultimate objective" differs substantially from that of Bank of America, PDVSA's position is not adequately protected by the parties already involved.

## CONCLUSION

Due process requires that PDVSA be provided an opportunity to challenge the Court's November 23, 2020 Order.  Accordingly, because PDVSA satisfies the elements of Rule 24(a)(2), F.R.Civ.P, PDVSA respectfully requests that the Court grant PDVSA's limited motion to intervene.


By:     *s/ James M. Griffin*
        James M. Griffin, Fed ID 1053
        Margaret N. Fox, FED ID 10576
        GRIFFIN | DAVIS
        4408 Forest Drive, Suite 300
        P.O. Box 999 (29202)
        Columbia, S.C. 29206
        jgriffin@griffindavislaw.com
        mfox@griffindavislaw.com


February 5, 2021

**A-245**

# Appendix AG

UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NEW YORK

CASE NO.: 1:20-mc-00040-LJV

ANTONIO CABALLERO,

    Plaintiff,

vs.

FUERZAS ARMADAS
REVOLUCIONARIAS DE COLOMBIA,
a/k/a FARC-EP a/k/a REVOLUTIONARY
ARMED FORCES OF COLOMBIA; EJERCITO
DE LIBERACION NACIONAL a/k/a ELN a/k/a
NATIONAL LIBERATION ARMY; and THE
NORTE DE VALLE CARTEL,

    Defendants.

_____/

**PETROLEOS DE VENEZUELA, S.A.'S LIMITED MOTION
TO INTERVENE AND MEMORANDUM OF LAW IN SUPPORT**

Pursuant to Federal Rule of Civil Procedure 24(a)(2), Petroleos de Venezuela, S.A. ("PDVSA"), files this limited motion to intervene as a defendant in this matter and memorandum of law in support.[1] PDVSA is entitled to due process and requests that the Court (1) stay and set aside the Court's January 29, 2021, Order granting turnover judgment, and (2) dissolve the writ of execution and set aside the Court's December 18, 2020, Order granting Plaintiff's motion for post-judgment execution on the purported blocked assets of PDVSA.

---

[1] In seeking limited intervention, PDVSA does not waive and specifically reserves all jurisdictional defenses. *See, e.g., Pescatore v. Palmera Pineda*, No. 08-2245 (RMC), 2019 WL 2173835, at *3-4 (D.D.C. May 20, 2019) (allowing alleged agents or instrumentalities of the FARC to intervene in the TRIA enforcement action to defend against execution while specifically preserving their right to raise defenses of jurisdiction and venue).

## **INTRODUCTION**

Plaintiff obtained default judgments in Florida state court in 2014 and Florida federal court in 2020 against the named Defendants in the underlying lawsuit. PDVSA was not named as a defendant in either action and is not alleged to have any connection to the underlying facts giving rise to the judgments against Defendants. Nevertheless, Plaintiff now seeks to collect on his federal court judgment against PDVSA's blocked U.S. assets.

Plaintiff's attorneys have known since 2019 that undersigned counsel Marcos Daniel Jiménez, Esq. represents PDVSA in connection with Plaintiff's collection efforts, yet Plaintiff never made any attempt to provide notice to undersigned counsel Marcos Daniel Jiménez, Esq. of Plaintiff's enforcement actions. Instead, Plaintiff has hidden behind the Terrorism Risk Insurance Act of 2002 ("TRIA") while he has filed *ex parte* motions and writs of garnishment around the country attempting to seize blocked assets that Plaintiff purports to be owned by PDVSA and PDVSA's subsidiaries. Plaintiff has done this without providing PDVSA notice and an opportunity to defend against Plaintiff's false and unproven allegations that PDVSA is an "agency or instrumentality" of the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), one of the defendants and judgment debtors.

PDVSA moves to intervene in this matter for the purpose of (1) moving to stay and set aside the Court's January 29, 2021, Order granting turnover judgment, and (2) moving for dissolution of the writ of execution and to set aside the Court's December 18, 2020, Order granting Plaintiff's motion for post-judgment execution on the purported blocked assets of PDVSA and finding that PDVSA is an agency or instrumentality of the FARC, Docket Entry No. 15. PDVSA seeks to intervene, first for the limited purpose of asserting any and all jurisdictional defenses to Plaintiff's claims, and second, if necessary, to defend against Plaintiff's claims on the merits.

2

**A-247**

## BACKGROUND

1. **Plaintiff's underlying Florida state and federal court actions against Defendants.**

Plaintiff Antonio Caballero ("Plaintiff") initially brought a state court action against the FARC, the Ejercito de Liberacion Nacional ("ELN"), and the Norte del Valle Cartel ("NDVC") in Miami-Dade County, Florida. Plaintiff purported to effectuate service of process on the defendants through individuals imprisoned in the United States. On December 12, 2013, after none of the defendants appeared, the Florida state court issued a default against all the defendants. On November 18, 2014, after a trial on damages during which none of the defendants appeared or presented opposition, Plaintiff obtained a default judgment against the defendants, in the sum of (i) $45,000,000.00, representing non-economic compensatory damages, with interest at 4.75% a year; (ii) $6,244,484.56, representing compensatory economic damages and pre-judgment interest thereon, with interest at 4.75% a year; and (iii) $140,189,001.00, representing punitive damages, with interest at 4.75% a year.

During the state court damages trial in 2014, Plaintiff relied on an expert, a University of Miami professor, Dr. Bruce Michael Bagley, to identify names of the individuals and entities allegedly acting as agents or instrumentalities of the FARC and/or the NDVC. Notably, PDVSA *was not* on the list of so-called agents and instrumentalities of the FARC and/or NDVC.[2] For years, Plaintiff utilized writs of garnishment to execute on his judgment against these alleged agents or instrumentalities.

---

[2] In June 2020, Dr. Bagley pled guilty to two counts of federal money laundering charges; Dr. Bagley used bank accounts in his name and in the name of a company he created in Florida to

3

**A-248**

On December 19, 2018, Plaintiff filed another action, this time in the United States District Court for the Southern District of Florida against the FARC and the NDVC (collectively "Defendants"), under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333. Plaintiff again purported to effectuate service of process on Defendants through individuals imprisoned in the United States. After Defendants failed to appear, on May 20, 2020, the federal district court entered a final default judgment and awarded Plaintiff $45,000,000 in actual compensatory non-economic damages; $1,729,667 in actual compensatory economic damages; and post-judgment interest at 0.15% per annum.

Shortly after receiving the federal court judgment, in July 2020, Plaintiff filed a post-judgment *ex parte* motion in the Southern District of Florida action, which the court granted, for a determination that certain individuals are agents or instrumentalities of the FARC. Plaintiff's motion *did not* seek a determination against PDVSA. Since Plaintiff's previous expert from the state court action, Dr. Bagley, had pled guilty to federal money laundering charges, Plaintiff relied on a new expert, John Robert McBrien, former associate director for global targeting in the Office of Foreign Assets Control ("OFAC") within the United States Department of Treasury. Mr. McBrien's declaration identifying names of the individuals and entities allegedly acting as agents or instrumentalities of the FARC *did not* include PDVSA.

### 2. Plaintiff's collection efforts against purported blocked assets of PDVSA.

In April 2019, after five years of collection efforts to execute Plaintiff's 2014 Florida state court judgment against alleged agents or instrumentalities of the FARC, Plaintiff

---

launder over $2 million in proceeds of a Venezuelan bribery and corruption scheme into the United States.

suddenly and for the first time moved the Florida state court to declare PDVSA "an agency and instrumentality of FARC." Plaintiff's motion relied *exclusively* on a new declaration from his expert at the 2014 damages trial, Dr. Bagley. In this new 2019 declaration, unlike in 2014, Dr. Bagley claimed that PDVSA is an agent or instrumentality of the FARC.

Plaintiff never served PDVSA with its Florida state court motion; but PDVSA became aware of Plaintiff's filing, reached out to Plaintiff's counsel, and filed a motion to intervene in the Florida state court action. Plaintiff thereafter discontinued his pursuit of collection efforts against PDVSA in the Florida state court action, and PDVSA's motion to intervene was not heard. After that, Plaintiff's expert Dr. Bagley was indicted and pled guilty to money laundering and undersigned counsel, Marcos Daniel Jiménez, Esq., never heard from Plaintiff's counsel again regarding Plaintiff' efforts to have PDVSA declared an agency or instrumentality of the FARC.

Unbeknownst to PDVSA and undersigned counsel Marcos Daniel Jiménez, Esq., however, Plaintiff continued its *ex parte* efforts. Without any notice to PDVSA or undersigned counsel Marcos Daniel Jiménez, Esq., Plaintiff filed his May 2020 federal court judgment in state and federal courts around the country.[3] PDVSA only recently become aware that Plaintiff has filed numerous *ex parte* motions seeking a determination that PDVSA is an agent or instrumentality of the FARC: the same relief that Plaintiff abandoned in the Florida state court in 2019. Plaintiff's counsel is well aware that PDVSA had counsel representing PDVSA's interests with respect to Plaintiff's collection efforts, yet Plaintiff has utilized TRIA's *ex parte* procedures to hide Plaintiff's efforts from PDVSA.

---

[3] In addition to the proceeding in this Court, PDVSA recently became aware of similar proceedings in South Carolina and Connecticut, and PDVSA is taking appropriate steps in these courts to protect its interests.

5

A-250

**3. Plaintiff's collection efforts in this Court, the Western District of New York.**

In September 2020, Plaintiff registered his Florida federal court judgment in this Court and subsequently filed a series of documents *ex parte* and under seal, including Plaintiff's *ex parte* Motion for Issuance of Court-Ordered Post-Judgment Writ of Execution Pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002, D.E. No. 10 ("Plaintiff's Motion for Writ"). Plaintiff's Motion for Writ requested a writ of execution under TRIA § 201(a) to attach assets held by non-party M&T Bank Corporation ("M&T Bank") allegedly "in the putative name of, or for the benefit of," PDVSA. *Id.* As part of his motion, Plaintiff asked that this Court declare PDVSA[4] an agency or instrumentality of the FARC and that its assets are blocked assets within the meaning of TRIA. Not even the Florida federal court that granted Plaintiff's underlying judgment made this determination.

On December 18, 2020, this Court, in a sealed order, granted Plaintiff's *ex parte* Motion for Writ (the "December 18, 2020 Order"). Despite PDVSA having no notice and no opportunity to be heard, this Court found that Plaintiff established that PDVSA is an agency or instrumentality of the FARC. *See* D.E. No. 15. Plaintiff's Motion for Writ and this Court's Order granting same relied *exclusively* on a new declaration from expert Mr. McBrien that asserts that PDVSA is an agency or instrumentality of the FARC. However, the declaration Mr. McBrien submitted in the underlying Florida federal court action where Plaintiff obtained his judgment did not make this claim. Indeed, Mr. McBrien's current declaration is based entirely on hearsay and

---

[4] Plaintiff originally moved this Court for a determination that PDVSA and six of its purported subsidiaries—PDV Marina S.A.; Aceites Y Solventes Venezolanos S.A.; Petro San Felix SA; Venfleet Asphalt Ltd.; Venfleet Products Ltd.; and Venfleet Ltd.—are agencies or instrumentalities of the FARC and that their assets are blocked assets within the meaning of TRIA. *See* D.E. No. 10. After this Court issued an order to show cause why the Court should make such a determination regarding the subsidiaries, Plaintiff withdrew his request for determinations relating to the subsidiaries. *See* D.E. Nos. 12, 13.

speculation and fails to identify any reliable evidence that PDVSA is an "agency or instrumentality" of the FARC. Even this Court's December 18, 2020 Order recognizes the due process concerns with its determination that PDVSA is an agency or instrumentality of the FARC and found that PDVSA is "entitled to notice and an opportunity to be heard to rebut the allegations that it is an agency or instrumentality of FARC." *See* D.E. 15 at 5 n.3.

On December 21, 2020, this Court issued a writ of execution on M&T Bank for blocked assets purportedly being held in the putative name of, or for the benefit of, PDVSA. On January 13, 2021, Plaintiff filed a motion in this Court for entry of a TRIA Turnover Judgment against the assets identified in the writ to M&T Bank, which this Court granted on January 29, 2021. *See* D.E. Nos. 23, 35. While Plaintiff purported to send PDVSA notice of the writ on December 23, 2020, by sending a copy to an address in Venezuela, Plaintiff failed to provide notice to undersigned counsel Marcos Daniel Jiménez, Esq., despite knowing that undersigned counsel Marcos Daniel Jiménez, Esq. represented PDVSA. Despite Plaintiff's efforts to seize PDVSA's purported assets without notice, undersigned counsel Marcos Daniel Jiménez, Esq. was made aware of Plaintiff's activities by a third party.

Accordingly, PDVSA moves to intervene in this matter for the purpose of (1) moving to stay and set aside the Court's January 29, 2021, Order granting turnover judgment, and (2) moving for dissolution of the writ of execution and to set aside the Court's December 18, 2020, Order granting Plaintiff's motion for post-judgment execution on the purported blocked assets of PDVSA and finding that PDVSA is an agency or instrumentality of the FARC. PDVSA seeks to intervene, first for the limited purpose of asserting any and all jurisdictional defenses to Plaintiff's claims, and second, if necessary, to defend against Plaintiff's claims on the merits.

In seeking limited intervention, PDVSA does not waive and specifically reserves all jurisdictional defenses. In particular, this Court lacked jurisdiction to adjudicate Plaintiff's motion for a determination that PDVSA is an agency or instrumentality of the FARC. Accordingly, in moving to dissolve the writ and set aside the Court's December 18, 2020, Order, PDVSA seeks to assert all jurisdictional defenses. In addition, if necessary, PDVSA seeks to defend against and set aside the Court's finding on the merits that PDVSA is an agency or instrumentality of the FARC.

## ARGUMENT

### 1. **Legal standard for intervention.**

Federal Rule of Civil Procedure 24(a)(2) provides that, upon the timely filing of a motion, a court must permit anyone to intervene who:

> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interests, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).

In order to intervene as a matter of right under Rule 24(a)(2), the moving party must: "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 300 (2d Cir.2003).

8

**A-253**

2. **PDVSA meets the requirements to intervene pursuant to Rule 24.**

PDVSA satisfies all of Rule 24(a)(2)'s requirements and should be permitted to intervene.[5]

a.   PDVSA's motion is timely.

PDVSA's motion to intervene is timely. In determining whether a movant's intervention is timely, a court must consider:

> (a) the length of time the applicant knew or should have known of its interest before making the motion; (b) prejudice to the existing parties resulting from the applicant's delay; (c) prejudice to the applicant if the motion is denied; and (d) the presence of unusual circumstances mitigating for or against a finding of timeliness.

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir. 2006).

PDVSA was not named as a defendant in either the Florida state or federal actions and is not alleged to have any connection to the underlying facts giving rise to the judgments against Defendants. PDVSA was also not named as a party in Plaintiff's instant action in this Court where Plaintiff has nonetheless sought to execute on PDVSA's purported assets. Plaintiff conducted his efforts on an *ex parte* basis with filings under seal. This Court entered a sealed order on December 18, 2020, granted Plaintiff's *ex parte* Motion for Writ and found that PDVSA is an agency or instrumentality of the FARC (without PDVSA having an opportunity to rebut these allegations). The writ of execution to M&T Bank was then issued on December 21, 2020, and the Court unsealed the *ex parte* documents on December 22, 2020. While Plaintiff purported to send PDVSA notice of the Court's writ of execution December 23, 2020, by sending a copy to an address in Venezuela, Plaintiff did not provide notice to undersigned counsel Marcos

---

[5] Alternatively, the Court can also allow PDVSA to intervene pursuant to Rule 24(b)(2). A court considers substantially the same factors whether the claim for intervention is "of right" under Rule 24(a)(2), or "permissive" under Rule 24(b)(2). *See In re Bank of N. Y.*, 320 F.3d at 300 n. 5; *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006).

Daniel Jiménez, Esq. despite having known since 2019 that undersigned counsel Marcos Daniel Jiménez, Esq. represents PDVSA's interest in Plaintiff's collection efforts.

Moreover, Plaintiff will not be prejudiced if PDVSA's motion to intervene is granted. The assets which Plaintiff seeks are currently blocked by OFAC, and therefore there is no risk that the assets will be dissipated while PDVSA is permitted to intervene. Plaintiff cannot argue that it will be prejudiced by intervention because intervention does not affect the underlying default judgment against the FARC defendant.

In contrast, PDVSA will be severely prejudiced if it is not permitted to intervene in this action. This Court entered an *ex parte* order that PDVSA is an agency or instrumentality of the FARC. Based on this Court's order, Plaintiff now seeks a turnover order from a third party for what Plaintiff alleges to be PDVSA's assets. Intervention will first provide PDVSA an opportunity to be heard on its jurisdictional objections and, if necessary, to rebut Plaintiff's assertions that PDVSA is an agency or instrumentality of the FARC. This Court itself acknowledged the due process concerns in determining that PDVSA is an agency or instrumentality of the FARC and found that, pursuant to *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713 (11th Cir. 2014), PDVSA is "entitled to notice and an opportunity to be heard to rebut the allegations that it is an agency or instrumentality of FARC." *See* D.E. 15 at 5 n.3; *Stansell*, 771 F.3d at 727 (holding that due process entitled alleged agents or instrumentalities under TRIA "to actual notice of the post-judgment proceedings against them. . . [and] to be heard on their challenge to the agency or instrumentality issue").

    b.  <u>PDVSA's motion must be granted to protect PDVSA's interest and to satisfy due process requirements.</u>

There can be no dispute that PDVSA has an interest in this action that may be impaired if it is not permitted to intervene. Intervention requires "direct, substantial, and legally protectable" interest in the litigation. *Pers. v. New York State Bd of Elections*, 467 F.3d 141, 144 (2d Cir. 2006) (citing *United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411, 415 (2d Cir.2001)). Plaintiff seeks to deprive PDVSA of what Plaintiff alleges to be PDVSA's assets, and Plaintiff obtained an *ex parte* declaration from this Court that PDVSA is an agent or instrumentality of the FARC.

PDVSA is first entitled to assert all jurisdictional defenses to Plaintiff's TRIA enforcement action against PDVSA and PDVSA's purported assets. *See, e.g., Pescatore*, 2019 WL 2173835, at *3-4. If necessary, PDVSA also seeks to challenge the merits of Plaintiff's claims and this Court's determination that PDVSA is an agency or instrumentality of the FARC. To recover a TRIA judgment, a plaintiff must show "(1) that the Defendants are a 'terrorist party' or an 'agency or instrumentality of that terrorist party,' and (2) that the Defendants' properties are 'blocked assets.'" *Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 131 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

The question of "agency or instrumentality" is particularly complex and requires a detailed analysis. "To demonstrate that [judgment debtors] are 'agencies or instrumentalities' of a terrorist party under the TRIA … Plaintiffs must show that each Defendant (1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by a terrorist party." *Id. at 135*. Furthermore, in *Kirschenbaum*, the Second Circuit left open the question of whether a TRIA judgment creditor must "show that the [party subject to execution] knew, or

A-256

reasonably should have known, that they were functioning for, providing material services on behalf of, or being owned, controlled, or directed by the terrorist party." *Id.* at 136.

Due process requires that PDVSA be provided an opportunity to challenge the Court's December 18, 2020, Order that PDVSA is an agency or instrumentality of FARC. *See Stansell*, 771 F.3d at 727. Without such notice, plaintiff's motion for writ of execution must be denied. *See Doe v. Ejercito de Liberacion Nacional*, 92 F. Supp. 3d 1, 2 (D.P.R. 2015) ("Because Plaintiff has failed to notify [the judgment debtor] of these proceedings, I must deny Plaintiff's garnishment motion."). "Without notice and a fair hearing where both sides are permitted to present evidence, the third party never has an opportunity to dispute its classification as an agency or instrumentality." *Stansell*, 771 F.3d at 727.

Indeed, here, Plaintiff's Motion for Writ and this Court's December 18, 2020, Order granting that motion relies *exclusively* on Mr. McBrien's declaration asserting that PDVSA is an agent or instrumentality of the FARC. Mr. McBrien's declaration, however, is based entirely on hearsay and speculation and fails to identify any reliable evidence that PDVSA is an "agency or instrumentality" of the FARC. Having not been provided notice of Plaintiff's action, PDVSA was unable to challenge Plaintiff's allegations or cross Mr. McBrien on his declaration.

Furthermore, the consequences of the Court's December 18, 2020, Order are far-reaching. Plaintiff will undoubtedly use the Court's Order to support Plaintiff's attempts to collect against PDVSA assets in other jurisdictions as well. Accordingly, this motion is a critical first step in allowing PDVSA to fully pursue its due process rights and to seek any and all post-judgment and appellate relief that may be available.

c. **PDVSA's interest is not adequately protected by parties to the action.**

No current party to the action can adequately protect PDVSA's interests. The burden to demonstrate inadequacy of representation is minimal. *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179–80 (2d Cir. 2001) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972)). In this circuit, "[w]hether or not representation of an intervenor's interest by existing parties is to be considered inadequate hinges upon whether there has been a showing of (1) collusion; (2) adversity of interest; (3) possible nonfeasance; or (4) incompetence." *F.T.C. v. First Capital Consumer Membership Servs., Inc.*, 206 F.R.D. 358, 364 (W.D.N.Y. 2001) (internal citation omitted).

Here, the named parties to Plaintiff's enforcement action certainly have an adversity of interest to that of PDVSA. Plaintiff seeks to collect on its judgment against purported PDVSA assets, and he obtained an order from this Court that PDVSA is an agency or instrumentality of the FARC. Furthermore, while the holder of the assets at issue here, M&T Bank, may raise its own objections to the writ of execution and Plaintiff's motion for entry of a turnover judgment, M&T Bank has no standing or interest in challenging Plaintiff's enforcement action to protect PDVSA's interests, including to dispute the Court's jurisdiction and substantive finding that PDVSA is an agency or instrumentality of the FARC. PDVSA must be provided its own opportunity to challenge Plaintiff's action.

## CONCLUSION

PDVSA respectfully requests that the Court grant PDVSA's limited motion to intervene and permit PDVSA to intervene as a Defendant to raise jurisdictional and all other defenses to Plaintiff's TRIA enforcement action, and for any and all relief that the Court deems just and proper. PDVSA is entitled to due process and requests that this Court (1) enter a stay of the turnover

13

judgment and set it aside, and (2) dissolve the writ of execution and set aside the Court's Order

granting Plaintiff's motion for post-judgment execution on the purported blocked assets of

PDVSA.

Dated:  February 2, 2021                              Respectfully submitted,

                                                      *s/ Terrance Patrick Flynn*
                                                      Terrance Patrick Flynn
                                                        New York Bar No. 2232056
                                                      Harris Beach, PLLC
                                                      726 Exchange Street, Suite 1000
                                                      Buffalo, NY 14210
                                                      Tel: 716-200-5120
                                                      Email: tflynn@harrisbeach.com

                                                              -and-

                                                      *s/Marcos D. Jiménez*
                                                      Marcos Daniel Jiménez
                                                        New York Bar No. 4881736
                                                      *Motion for Pro Hac Vice Admission*
                                                          *To Be Submitted*
                                                      **Marcos D. Jiménez, P.A.**
                                                      255 Alhambra Circle, 8th Floor
                                                      Miami, Florida 33134
                                                      Telephone: 305-772-6026
                                                      Email:  mdj@mdjlegal.com


                                                      *Attorneys for Intervenor,*
                                                        *Petroleos de Venezuela, S.A. ("PDVSA")*

14

**A-259**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 2, 2021, a true and correct copy of the foregoing

was electronically served upon filing to all counsel of record via the CM/ECF filing system.

_s/ Terrance Patrick Flynn_
Terrance Patrick Flynn

**A-260**

# Appendix AH

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION
CASE NO.: 12-48803-CA-02

ANTONIO CABALLERO,

      Plaintiff,

vs.

FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA, a/k/a FARC-EP a/k/a
REVOLUTIONARY ARMED FORCES OF
COLOMBIA; EJERCITO DE LIBERACION
NACIONAL a/k/a ELN a/k/a NATIONAL
LIBERATION ARMY; and THE NORTE DE
VALLE CARTEL;

      Defendants.

_____/

## MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S MOTION AND INCORPORATED MEMORANDUM OF LAW FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY ON ALL COUNTS

      THIS CAUSE came before the Court upon Plaintiff's Motion and Incorporated Memorandum of Law for Partial Summary Judgment as to Liability on all Counts.

      THE COURT has considered the Motion, and the pertinent portions of the record, held a hearing on April 4, 2014 at which counsel for Plaintiff were present, and being otherwise fully advised in the premises, it is

      ORDERED AND ADJUDGED that the said Motion is hereby GRANTED in accordance with the following memorandum opinion, findings of fact, and conclusions of law.

**A-261**

## BACKGROUND

This is a lawsuit brought by Plaintiff against three organizations in Colombia that have been identified by U.S. and International agencies as being involved in narco-trafficking and terrorist activities by which they profit from trafficking drugs (primarily cocaine cultivated and processed in Colombia, into the United States, primarily through Florida), kidnapping, and extortion, among other things.   The Defendants are Fuerzas Armadas Revolucionarias De Colombia, FARC-EP a/k/a Revolutionary Armed Forces Of Colombia (the "FARC"); the Ejercito De Liberacion Nacional a/k/a ELN a/k/a National Liberation Army (the "ELN"); and the Norte De Valle Cartel ("NDVC").   The first two Defendants have been engaged in a decades' long civil war against the government of Colombia, while the NDVC is primarily engaged in trafficking narcotics.   The "Corrected Second Amended Complaint" (hereafter, "Complaint") alleges that these organizations, acting in concert and in conspiracy with one another, established a criminal enterprise, the purpose and operation of which was to traffic illegal narcotic drugs from places of production in southern Colombia though central Colombia (where Plaintiff and his father, Ambassador Carlos Caballero (hereafter referred to as "the Ambassador"), operated farming properties), and into the United States, primarily through Florida, for ultimate sale to Americans.   As part of this criminal enterprise to traffic drugs in the United States, the Defendants, acting in concert and in conspiracy, committed heinous crimes against the Plaintiff and his father in order to remove them as obstacles to their operations to traffic illegal drug into the United States, primarily through Florida.   The Complaint avers counts against the Defendants under the Alien Tort Statute, 28 U.S.C. § 1350, violations of Federal and Florida Civil RICO, and for wrongful death under Colombian law.

None of the Defendants have responded to the Complaint, filed any paper herein, or otherwise made any attempt to defend this action. The Court entered a Default against all three defendants on December 12, 2013, for their failure to file a responsive pleading.

Based upon the findings of fact and conclusions of law set forth in this memorandum opinion below, the Court finds that it has personal jurisdiction over the defendants, subject matter jurisdiction over the claims set forth in the Complaint, and that undisputed facts establish that partial summary judgment in favor of Plaintiff and against each and every Defendant for liability under the causes of actions averred is warranted as a matter of law.

## FINDING OF FACT

The following findings of fact are based upon the well pled allegations of the Complaint, which are deemed admitted by virtue of the Default entered against all Defendants. *Pro-Art Dental Lab, Inc. v. V-Strategic Group, LLC*, 986 So. 2d 1244, 1256 n.10 503 (Fla. 2008). They are also based upon the affidavits of Dr. Bruce M. Bagley, Beatriz Elena Sevillano Correa, Foreign Legal Consultant, and the Plaintiff, submitted by Plaintiff in his Finding of Fact filed in support of his Motion for Partial Summary Judgment and Incorporated Memorandum of Law.

Specifically, Plaintiff submitted the affidavit of Dr. Bagley, as supplemented, to assist the Court in understanding the evidence and in determining a fact in issue concerning the Defendants' background, organizational structure, activities and behaviors in the relevant time frame regarding the acts alleged in the Complaint. The Court has reviewed Dr. Bagley's extensive Curriculum Vitae, and finds that Dr. Bagley's extensive education, knowledge, and study of these Colombian organizations more than adequately demonstrates his knowledge, skill, experience, training, or education in the relevant areas, and that he is qualified to testify as an expert on the subject matters covered in his verified expert report. The Court notes that Dr. Bagley's curriculum vitae reflects that he has previously been qualified as an expert witness in

**A-263**

various Federal and Florida court cases. The Court finds that Dr. Bagley's affidavit testimony is based upon sufficient facts and data, is the product of reliable principles and methods, and that Dr. Bagley has applied the principles and methods reliably to the facts of this case, and that his scientific, technical, or other specialized knowledge assists the Court in understanding the evidence or in determining facts in issue. Consequently, the Court recognizes Dr. Bagley as an expert in this case on the subject of Defendants' organizational structure, background, behavior and operations, as set forth in his affidavit, pursuant to Fla. R. Evd. § 90.702.

Plaintiff also submitted the affidavit of Beatriz Elena Sevillano Correa, also known as Beatriz Avila, to assist the Court in matters of Colombian law. The Court has reviewed the curriculum vitae of Ms. Avila, and notes that she holds an attorney at law degree from the University of Medellin, is licensed to practice in Colombia, and holds a Florida Bar certification as a Foreign Legal Consultant in Colombia Law since 2009 pursuant to Chapter 16 of the Rules Regulating the Florida Bar. The Court finds that Ms. Avila's affidavit testimony is based upon sufficient facts and data, is the product of reliable principles and methods, and that she has applied the principles and methods reliably to the facts of this case, and that her scientific, technical, or other specialized knowledge assists the Court in its understanding the evidence or in determining facts in issue. Consequently, the Court recognizes Ms. Avila as an expert in this case on the subject of Colombian law, as set forth in her affidavit, pursuant to Fla. R. Evd. § 90.702. *See Baloco et al. v. Drummond Company, Inc., et al.*, 640 F. 3d 1338, 1349-1350 (11th Cir. 2011) (court accepting opinion as to Colombian law where affidavit of Colombian law expert was not disputed or challenged).

## FACTS

1.     Plaintiff is a resident of Miami-Dade County, Florida.   Affidavit of Antonio Caballero, **Exhibit A to Plaintiff's Finding of Fact, ¶ 1.**[1]

2.     Plaintiff was born in Colombia, and a resident of Colombia until fleeing Colombia for sanctuary in the United States for fear from the threats to his life.  Caballero Aff., Ex. A, ¶¶ 4, 50, 56.   At the time of the filing of the Complaint, Plaintiff was a citizen of Colombia and resident alien of the United States residing in Florida seeking US citizenship.  Caballero Aff., Ex. A, ¶ 2.

### Defendant FARC

3.     Defendant Fuerzas Armadas Revolucionarias de Colombia ("FARC") is a narco-terrorist organizations and active participants in the ongoing war against the Colombian government, funded by narco-terrorist activities which traffic illicit narcotic drugs from Colombia into foreign markets, principally the United States.  Affidavit of Bruce Bagley, Exhibit B, ¶¶ 20, 21, 19, 22.

4.     The FARC is a complex organization - association or partnership - with a well defined organizational structure and line of command.  It is an association of persons that among other things carries on as co-owners a business for profit from the illicit narco-trafficking trade. Bagley Aff. Ex. B, ¶ 24.  FARC is also a "terrorist organization" within the definition of Fla. Stat. § 874.03.

5.     Defendant, FARC is a "terrorist party" within the meaning of section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA") because it has been designated as a terrorist

---

[1] Hereafter, all reference to exhibits in the finding of fact refer to the corresponding exhibit filed with Plaintiff's Finding of Fact in support of Plaintiff's motion for Partial Summary Judgment.

organization by the Secretary of State (as published in the Federal Register), See Federal Register, Exhibit C.

6.  FARC is also a "terrorist party" within the meaning of section 201 of TRIA because FARC has planned, prepared, solicited funds, and committed and conspired to commit terrorist activities. Bagley Aff. Ex. B, ¶ 20.

7.  In 1997, FARC was designated by the United States as a Foreign Terrorist Organization pursuant to the Immigration and Nationality Act.  8 U.S.C. § 1189.  See Federal Register, Ex. C.

8.  As a Foreign Terrorist Organization pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1189, the United States government has specifically designated FARC's activities as those that "threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States."[2]

9.  In 2001, FARC was designated by the United States as a Specially Designated Global Terrorist pursuant to Executive Order 13224, "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism." See Executive Order 13224, Exhibit D.

10.  In 2003, FARC was designated by the President of the United States as a Specially Designated Narcotics Trafficker Kingpin pursuant to the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908, 8 U.S.C. § 1182.  See Foreign Narcotics Kingpin Designation Act, Exhibit E.

11.  As part of its ongoing campaign of terror, FARC strategically targets high profile Colombian citizens, such as politicians and businessmen, using tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of

[2] See Immigration and Nationality Act, 8 U.S.C. § 1189.

Page 6

A-266

Colombia while silencing those adverse to FARC's violent agenda.  Bagley Aff. Ex. B, ¶¶ 20, 19, 22.

12.    In addition to its attacks on Colombian military, political and economic targets, the FARC's various fronts are deeply involved in narcotics trafficking, kidnapping for ransom, extortion, murder and other criminal activities. Bagley Aff. Ex. B, ¶¶ 17, 20, 21, 19.

13.    FARC engages in narcotics manufacturing and trafficking as a primary means of funding its terrorist activities against the citizens of Colombia.  Bagley Aff. Ex. B, ¶ 19, 22.

14.    Juvenal Ovidio Ricardo Palmera Pineda a/k/a Simon Trinidad is a high-ranking member, principal, partner, and agent of FARC.  Bagley Aff. Ex. B, ¶¶ 26, 27.  He is currently incarcerated at the Federal Penitentiary in Florence, Colorado.

**Defendant ELN**

15.    Defendant Ejercito de Liberacion Nacional ("ELN") is a narcoterrorist organization and active participant in an ongoing war against the Colombian government.  Bagley Aff. Ex. B, ¶ 28.

16.    The ELN operates as an association or partnership of persons that among other things carried on as co-owners a business for profit from the illicit narco-trafficking trade and other criminal activities.  Bagley Aff. Ex. B, ¶ 31.

17.    ELN is a terrorist organization and narcotics trafficker that has participated in the trafficking of illegal drugs to the United States.  Bagley Aff. Ex. B, ¶ 28.  ELN is also a "terrorist organization" within the definition of Fla. Stat. § 874.03.

18.    ELN is a "terrorist party" within the meaning of section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA") because it has been designated as a terrorist organization by the Secretary of State as published in the Federal Register. See Federal Register, Exhibit F.

19.    In 1997, ELN was designated by the United States as a Foreign Terrorist Organization pursuant to the Immigration and Nationality Act, 8 U.S.C. §1189.  Ex. C.

20.    As a Foreign Terrorist Organization pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1189, the United States government has specifically designated ELN's activities as those that "threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States." Ex. F.

21.    The European Union has designated and sanctioned the ELN (as well as the FARC) as a terrorist organization for its breaches of international humanitarian law. See "Council Implementing Regulation Number (EU) No. 1285/2009 Copy attached as Exhibit G.

22.    As part of its campaign of terror, ELN strategically targets high profile Colombian citizens, such as politicians and businessmen, using tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia while also silencing those adverse to ELN's violent agenda.  The ELN has actively, widely, and systematically targeted civilians during its ongoing military conflicts with the Colombian government.  Bagley Aff., Ex. B, ¶ 28, 29, 30, 35.

23.    In order to finance its terrorist objectives, ELN engages in narcotics manufacturing and trafficking as the primary means of funding its terrorist activities. Bagley Aff., Ex. B, ¶ 35.

24.    Jose Luis Mejia Ramirez is a Colombian citizen and a terrorist member, agent, partner, and principal of ELN and co-conspirator with FARC and NDVC. Bagley Aff., Ex. B, ¶ 36.  He is currently incarcerated at the Colombian penitentiary in Itagüí, Colombia.

**Defendant NDVC**

25.    Defendant El Norte del Valle Cartel ("NDVC") was, at all relevant times to the Complaint, a highly evolved illegal drug organization and a narcotics trafficking organization

that engaged in terrorist activities.[3]   Bagley Aff., Ex. B, ¶ 37.   NDVC is also a "terrorist organization" within the definition of Fla. Stat. § 874.03.

26.   The NDVC emerged as a partnership to traffic cocaine into the United States out of the breakup of the infamous Cali Cartel in 1995-97.   It was an association or partnership of persons that among other things carried on as co-owners a business for profit from the illicit narco-trafficking trade.   Bagley Aff., Ex. B, ¶ 37.

27.   NDVC is a "terrorist organization" within the meaning of Section 201(d)(4) of the Terrorism Risk Insurance Act of 2002 ("TRIA"), because it is a group of two or more individuals in association or partnership which engages in, or has subgroups engaging in:

        a.      Terrorist activities under circumstances indicating an intention to and causing death and serious bodily injury;

        b.      The preparation and planning of terrorist activities,

        c.      Soliciting funds for terrorist activities;

        d.      Knowingly provides material support for the commission of terrorist activities to individuals known to have committed terrorist activities.

Bagley Aff., Ex. B ¶¶39, 49, 51, 52.

28.   NDVC controlled and operated its base from the southwestern sections of the rural parts of Colombia.   In these areas, the NDVC cultivated coca, and operated processing factories by which raw coca and other products were processed into cocaine for export, primarily into US markets.   Bagley Aff., Ex. B, ¶ 38.

---

[3] *See also* United States Department of Treasury website; 2007 Impact Report on Economic Sanctions Against Colombian Drug Cartels available at http://www.treasury.gov/resource-center/sanctions/Documents/narco_impact_report_05042007.pdf; United States Department of Treasury Norte Del Valle Cartel organizational charts, available at http://www.treasury.gov/resource-center/sanctions/Programs/Pages/narco.aspx.

29.   NDVC also directly engaged in terrorist activities. NDVC, through its members, kidnapped, tortured and assassinated individuals in order to eliminate perceived threats and to intimidate and prevent other persons from cooperating with law enforcement authorities.[4] Exhibit H, Bagley Aff., Ex. B, 39

30.   NDVC acted through principals and members, who were agencies or instrumentalities of the NDVC, including Carlos Alberto Renteria Mantilla, a Colombian citizen and a terrorist leader, principal and agent of NDVC and co-conspirator with ELN and FARC. Bagley Aff., Ex. B, ¶ 42.

31.   Diego Montoya Sanchez, at all relevant times was a Colombian citizen and a terrorist member, principal, partner, agent and instrumentality of NDVC, and co-conspirator with ELN and FARC.  Bagley Aff., Ex. B, ¶43.

**Defendants' Narco-Trafficking Conspiracy.**

32.   In the late 1990s NDVC forged an alliance with the FARC and the ELN to smuggle cocaine along a new route north through the Magdalena River Valley.  Bagley Aff., Ex. B, ¶ 44.

33.   In association with the FARC, in the late 1990s, a faction of the NDVC led by Diego Montoya sought to establish drug transportation routes from its base in the northern Valle region north through the Magdalena River Valley to the northern Caribbean coast of Colombia and then on through the Caribbean to the eastern United States.  Bagley Aff., Ex. B, ¶ 45.

34.   Both the FARC and the ELN were crucial to this criminal association because they exercised territorial control in key areas of the middle and lower Magdalena River Valley needed

---

[4] *See* "Government's Factual Basis in Support of Entry of Guilty Plea" of Diego Montoya Sanchez, case number 99-804-Cr.-Altonaga (S.D. Fla. August 4, 2009) setting forth facts describing how Montoya and members of his organization, which were part of the North Valle Cartel, kidnapped, tortured, and beat Garcia Giraldo to death with baseball bats until he died.  The document also describes how his organization used violence and murder to extract information from, threaten, and punish individuals suspected of providing information to or cooperating with authorities or otherwise posing a threat to the organization, and to prevent others from doing so.  Montoya is a Specially Designated Narcotics Trafficker by OFAC.

by the NDVC to exploit the Magdalena route to the Caribbean coast.   Bagley Aff., Ex. B, ¶¶ 46, 47.

35.   The NDVC could not diversify its trafficking operations and take advantage of the Magdalena River Valley route to smuggle cocaine into the eastern U.S. markets across the Caribbean without the active cooperation and involvement of their FARC and ELN partners. Bagley Aff., Ex. B, ¶ 48.

36.   Thus, in 1998-99, the NDVC forged such an association and criminal enterprise and conspiracy with the FARC and with the ELN, which can be referred to as "Colombian Narco-Terrorist Association."   This enterprise, in association with other narco-traffickers and terrorists who were not their members, but their agents, established a new, jointly controlled, and potentially highly profitable cocaine smuggling route from the interior Department of Valle, north through the Magdalena River Valley, to Colombia's northern coast where the illicit drugs would then be regularly trafficked in the United States, primarily through Florida but other points as well.  Bagley Aff., Ex. B, ¶ 49.

37.   This conspiracy and association, in effect, constituted a narco-terrorist enterprise and conspiracy to traffic cocaine along a new route through the Magdalena River Valley.  This alternative route allowed both the FARC and the NDVC to diversify their cocaine smuggling operations away from the more traditional, heavily government-monitored, NDVC smuggling route from the Department of Valle across the Eastern range (cordillera) of the Andes mountains to Colombia's Pacific coast.  Bagley Aff., Ex. B, ¶50.

38.   One crucial dimension of this association or narco-terrorist enterprise was to bring key chemical inputs (such as cement) for processing coca leaf into cocaine into the FARC-controlled "zona despeje" from Venezuela across Colombia's Llanos Orientales with the help of criminal bands and drug traffickers allied with the NDVC (such as Daniel – "el loco" – Barrera,

subsequent leader of the NDVC offshoot known as "los Rastrojos). This illegal smuggling of chemical inputs from Venezuela was essential because Colombian government efforts to reduce the availability of more traditional chemical agents used in manufacturing cocaine (such as acetone and sulphuric acid) had greatly restricted the FARC's and the NDVC's ability to obtain key chemical inputs in Colombia. The cooperative relationship between the FARC and the NDVC was crucial to guarantee a secure flow from Venezuela of these chemical prerequisites for processing coca leaf into cocaine. Bagley Aff., Ex. B, ¶52.

39.    This narco-terrorist enterprise involved the collaboration between FARC and NDVC with the ELN guerrillas, who operated in the middle and lower Magdalena River Valley and controlled a strategic area in the southern region of the Department of Bolivar, which was crucial to the smuggling of cocaine through the Magdalena River Valley to Colombia's northern coast and then on to the United States. Bagley Aff., Ex. B, ¶¶ 46-49, 50, 52.

40.    NDVC provided FARC and ELN with funds which it knew would support, and indeed supported, FARC and ELN's terrorist activities in exchange for FARC and ELN transporting and safeguarding the drugs, and for supplying NDVC with materials needed for producing cocaine. Bagley Aff., Ex. B, 49.

41.    The NDVC knew FARC and ELN engaged in criminal and terrorist activities, such as targeting high profile Colombian citizens including politicians and businessmen, and that they used tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia, and supported these activities to facilitate its drug trafficking operations. Bagley Aff., Ex. B, 49.

42.    The Colombian Narco-Terrorist Association repeatedly engaged in murder, kidnapping, extortion, trafficking in persons, and money laundering to facilitate the manufacture, receiving, concealment, buying, selling and trafficking in cocaine and related product, which

were destined for export to and sale in the United States.  The criminal enterprise engaged in this continued criminal activities to generate profits on behalf of the members.   Bagley Aff., Ex. B, ¶ 51.

43.   The Defendants, through the Colombian Narco-Terrorist Association, received monies from their activities of murder, kidnapping, extortion, felonious manufacture, importation, receiving, concealment, buying, selling and trafficking in cocaine and heroin, trafficking in persons, and money laundering. Bagley Aff., Ex. B, ¶ 51.

**Defendants' Terrorist Activities Against Plaintiff's Father and Family.**

44.   Plaintiff's father, Ambassador Carlos Caballero, was a resident and citizen of Colombia and was the father of ten children and the grandfather of eighteen grandchildren. Caballero Aff., Ex. A, ¶ 24.

45.   The Ambassador was a politically active and well-known resident of Magdalena Colombia.   He was a member and former President of the Partido Liberal Colombiano (Colombian Liberal Party).   The Ambassador was also active in the government of Colombia and was a Senator of Colombia from 1958-1962, 1962-1966, 1970-1974, 1974-1976, and 1986-1990. Caballero Aff., Ex. A, ¶ 25.

46.   In addition to local politics, Carlos Caballero also served as a Colombian Ambassador to the United Nations on or about 1973.  Caballero Aff., Ex. A, ¶ 26; Complaint ¶ 62.

47.   The Ambassador was politically active in speaking out against Colombian narcotics traffickers, including both FARC and ELN.  Caballero Aff., Ex. A, ¶ 27.

48.   Several members of the Ambassador's immediate and extended family, including Plaintiff, were also actively involved with the Colombian Liberal Party in Colombia:  Caballero Aff., Ex. A, ¶ 28.

a. The Ambassador's brother and the Plaintiff's uncle, Jose "Pepe" Caballero, was the governor of Magdalena from 1980-1982;

b. The Plaintiff's uncle, Humberto Caballero Cormane, was the Mayor of Pivijay from approx. 1992 to 1993;

c. The Plaintiff's sister, Maria V. Caballero Whitman was the Counselor (Consejal) of Pivijay from approx. 1986-1990;

d. The Plaintiff's brother, Jaime Caballero Wightman, was the Governor Aise (Aseso de Gobernacion) for the Republic Judges;

e. The Plaintiff's cousin, Cesar Caballero, has been the Deputy for the Assembly of Magdalena since 1997; and,

f. The Plaintiff's cousin, Moises Caballero, has been the Counselor (Consejal) of Pivijay from approx. 1986-1990.

49. Some of the Ambassador's properties, included the contiguous ranch properties known as the "Ecuador" and "Ginebra," which were located in the Magdalena region of Colombia. Caballero Aff., Ex. A, ¶ 29.

50. In the early 1990s, Plaintiff ceased going to work at the farms and ranch properties in the Pivijay and the Magdalena region because of fear from threats he received from FARC and ELN. Caballero Aff., Ex. A, ¶ 30

51. In the late 1990s Plaintiff began receiving reports from the workers at the property that groups of people were frequently transporting illegal drugs through the property in military style trucks. He also learned from other people in the region and published reports that the FARC and ELN were involved in moving drugs through these areas. Caballero Aff., Ex. A, ¶32.

52. The Ecuador and Ginebra properties were located in strategic positions for the movement of illicit drugs in the area. This is because of small roads, usually dirt, that traversed

Page 14

A-274

the properties, where the drugs could be transported while avoiding more developed roads that were more frequently travelled by law enforcement or military vehicles. Caballero Aff., Ex. A, ¶ 33; Bagley Aff., Ex. B, ¶ 55.

53.   Furthermore, there were airstrips commonly reported to be used by drug traffickers, located near the properties.   Airstrips were located to the east and west of the properties. Caballero Aff., Ex. A, ¶ 34.

54.   The properties were also located within a few miles of the Magdalena River, where it was reported drug traffickers would frequently transship drugs to the Colombia coast or other offloading points. Caballero Aff., Ex. A, ¶ 35; Bagley Aff., Ex. B, ¶ 55.

55.   Because the Ecuador and Ginebra properties were located on higher ground than properties to the east of these properties, they were more favorable for the use of transporting drugs.   Areas to the east of these properties would flood in heavy rains, particularly during the rainy season, making them impassable for periods of time. Caballero Aff., Ex. A, ¶ 36.

56.   As a result of these strategic factors, it was reported to Plaintiff by workers and his foreman that drug traffickers were moving drugs through the Ecuador and Ginebra properties, with increasing frequency.   Caballero Aff., Ex. A, ¶ 37.

57.   Thus, the Ambassador's properties contained roads and paths through which processed drugs manufactured by the NDVC with product and chemicals supplied by FARC and ELN were transported through and that were used to facilitate drug trafficking logistics and transportation from production and cultivation centers in the southern areas of Colombia to ports on the Caribbean coast of Colombia and on to the United States.   Bagley Aff., Ex. B, ¶ 55; Caballero Aff., Ex. A, ¶ 32, 33, 36.

58.   The location of the properties in a strategically important conjunction of dirt paths ("caminos") through which drugs could be moved through the region, avoiding more heavily

patrolled roads, and on to nearby airfields and the Magdalena River. From there, the drugs would be transported up through the central corridor of Colombia and to ports on the Colombian Caribbean coasts where they would then be transported to their ultimate destination in the United States. Bagley Aff., Ex. B, ¶ 55; Caballero Aff., Ex. A, ¶ 33, 34.

59. In keeping with their established past practices, ELN and FARC's interest in the Ambassador's property would have derived from its strategic location along the smuggling routes leading to Colombia's northern Caribbean coast, a major embarcation point for illegal drugs being smuggled in to the United States. Bagley Aff., Ex. B, ¶ 56.

60. By controlling the Ambassador's ranch and other nearby properties, the conspirators could obtain easier access via infrequently used secondary roads to the Magdalena River itself, which was in 1999 (and still is) often employed to transport the drugs by boat to the coast. Bagley Aff., Ex. B, ¶ 57.

61. They could also avail themselves of back roads crossing the property to transport drugs essentially unobserved by governmental authorities, and, thereby, reach the private airstrips located near Mr. Caballero's property undetected. Bagley Aff., Ex. B, ¶ 58.

62. Both the river and air routes to the northern coast were crucial smuggling pathways to Colombia's Caribbean coast and, from there, across the Caribbean Sea into Florida and the United States. Bagley Aff., Ex. B, ¶ 59.

63. On or about November of 1998, FARC, specifically the 19th Front Jose Prudencio Padilla Caribbean Block of FARC–EP, issued and circulated a politically charged and threatening written bulletin entitled "What is Happening in Pivijay?" ("FARC Bulletin 1") Caballero Aff., Ex. A, ¶ 38.

64. In FARC Bulletin 1, FARC specifically describes the Caballero family as "alimañas" (which is Spanish for "scoundrels") and accuses the Caballero family of financing

the paramilitaries, the FARC's mortal enemy.  The FARC Bulletin 1, announces the beginning of

an armed conflict against FARC's enemies and for the people of Pivijay, Magdalena. Caballero

Aff., Ex. A, ¶ 39.

65.    On or about February of 1999, FARC issued and circulated the second part of the

bulletin entitled "What is Happening in Pivijay?" Caballero Aff., Ex. A, ¶ 40.

66.    In FARC Bulletin 2, FARC refers to the mayor of Pivijay at the time, Jose Alfonso

Romero Romo, as the "Judas" of treason and cruelty, and a member of the clan of ranchers

whom the FARC claim are the enemies of the people.  In addition, the FARC specifically

accuses the Caballero family, along with the Mayor and other ranchers as being murderers and

financiers of the paramilitary organizations.    FARC further illustrates the importance of the

aforementioned accusation by purposefully enlarging these words and strategically placing it in

the middle of the bulletin.  FARC further threatens the Caballero family by accusing Jaime

Caballero of organizing assassinations in the Ranch "Granada."   In concluding the bulletin,

FARC threatens the Caballero families and others, and warns them that they will soon suffer in

the war via firearm and via a conspiracy carefully formulated against them. Caballero Aff., Ex.

A, ¶ 41.

67.    While traveling to Pivijay, Magdalena, the Ambassador was abducted by ELN

forces. At the time of his abduction, the Ambassador was 76 years old and suffered from

hypertension and pre-diabetes, among other things.   Caballero Aff., Ex. A, ¶ 43.

68.    The Ambassador remained in the custody of FARC and/or ELN forces who were

working in conjunction to conspire and profit from kidnapping the Ambassador.  Caballero Aff.,

Ex. A, ¶ 44.

69.    At the time of the Ambassador's kidnapping, Plaintiff, the Ambassador's son, was

living in Barranquilla, Colombia.  Caballero Aff., Ex. A ¶ 45.

70.   Plaintiff was the owner of a successful rice and husbandry business, "La Espiga," for over 9 years.   He also oversaw operations of the Ambassador's properties and farms, including Hacienda El Ecuador, Hacienda Ginebra, and Finca Telegrafia.  Caballero Aff., Ex. A, ¶ 55.

71.   In 1999, the Ambassador was unlawfully seized, kidnapped, detained, and held captive for 184 days, over 6 months.  Caballero Aff., Ex. A, ¶ 44, 51.

72.   Throughout the 184 days of the Ambassador's captivity, FARC and ELN forces tortured the Ambassador daily by, among other horrific acts:

   a.   Forcing the Ambassador to walk through the woods and jungle for hours;

   b.   Depriving the Ambassador of food and water to the point where the Ambassador became severely malnourished and emaciated;

   c.   Depriving the Ambassador of necessary medication that his family had delivered to the FARC and/or ELN, including hypertension medication, and pre-diabetes medication;

   d.   Forcing the Ambassador to spend his entire six-month captivity in caves — with minimal clothing - exposed to the cold, wet, and humid conditions of the Sierra Nevada jungle; and,

   e.   Subjecting the Ambassador to near-constant emotional and verbal abuse, including death threats.

Caballero Aff., Ex. A, ¶ 46.

73.   Throughout his captivity, the Plaintiff's family was contacted regularly by FARC and ELN in an ongoing effort to compel them to pay a ransom for the Ambassador's safety and freedom. FARC and ELN forces demanded six million dollars ($6 Million) to secure the Ambassador's safety and release.  Caballero Aff., Ex. A, ¶¶ 40, 47.

74.    The Colombian government froze the assets of the Plaintiff's family upon hearing of the Ambassador's kidnapping.  Caballero Aff., Ex. A, ¶ 49.

75.    Shortly before Defendants assassinated the Ambassador, Plaintiff was urgently warned by the Police Commander of the Anti-Sequestering Task Force that he should flee the country as they would be unable to protect him from Defendants.  Caballero Aff., Ex. A, ¶ 50.

76.    Fearing for his life from the threat from Defendants, and upon the urging of the Police Commander of the Anti-Sequestering Task Force, Plaintiff was forced to flee Colombia and, in so doing, deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.  Caballero Aff., Ex. A, ¶ 56.

77.    Plaintiff fled Colombia for the United States, where he sought and received political asylum.  Caballero Aff., Ex. A, ¶ 56.

78.    Tragically, after six months of captivity and torture, Defendants assassinated the Ambassador by shooting him multiple times.  Caballero Aff., Ex. A, ¶ 51.

79.    On August 15, 1999, the Ambassador's emaciated body was found discarded on a dirt road between the provinces of Magdalena and Cesar and brought to Valledupar, Cesar, where his body was eventually identified and confirmed as the Ambassador.  Caballero Aff., Ex. A, ¶ 51.

80.    The Ambassador was targeted, seized and detained by FARC and ELN in conspiracy with and aided and abetted by the NDVC in order to compel Plaintiff and Plaintiff's family to, among other reasons, provide ransom and finance the Defendants' terrorist activities and criminal enterprises, including the Defendants' extensive narco-trafficking operations.  Caballero Aff., Ex. A, ¶ 53; Bagley Aff., Ex. B, ¶¶ 62-64.

81.    The Defendants, aiding and abetting one another and acting in conspiracy and through the Colombia Narco-Terrorist Association, exported its illicit product through ports

along the Colombian coasts, including the ports of Barranquilla and Santa Marta on the Caribbean coast of Colombia. To move their illicit product from their processing areas to these Caribbean ports and on to the United States, the product was moved along routes through storage areas and clandestine airstrips up through the central regions areas of Colombia, including through the Magdalena District, where the Plaintiff and the Ambassador owned and operated farms and other properties. Bagley Aff., Ex. B, ¶¶ 44, 45-49, 55, 57. Thus, the Ambassador was also targeted, seized, detained and eventually assassinated as a necessary component part of the Defendants' overall criminal activity and scheme to traffic illicit drugs into Florida and the United States for their profit and gain. Bagley Aff., Ex. B, ¶ 64.

82.   The Ambassador was also targeted, seized, detained and eventually assassinated because of his political affiliations, official anti-narcotics positions, to facilitate use of the Ambassador's properties by the Enterprise, and to send a message to other uncooperative landowners in the region that resistance to (or failure to comply with) such demands would not be tolerated and could result in them being targeted for kidnapping for ransom and/or assassination. Caballero Aff., Ex. A, ¶ 53; Bagley Aff., Ex. B, ¶ 63.

83.   Defendants and others, acted directly and in concert through aiding and abetting and a conspiracy, to effect the kidnapping, unlawful detention, hostage-taking, trafficking, torture, and killing of the Ambassador. ¶ Bagley Aff., Ex. B, ¶¶ 62-64.

84.   The NDVC aided and abetted and conspired with FARC and ELN by specifically directing and commissioning FARC and ELN to transport and safeguard their illicit product from areas of production in southern Colombia and specifically through routes that passed through Plaintiff's and Ambassador's properties, to ports on Colombia's Caribbean coast (and then on to the United States), and to facilitate and expand its drug distribution and logistical operations,

which included removal of political and social opposition such as that presented by the Ambassador and his family, including Plaintiff. Bagley Aff., Ex. B ¶¶ 49, 62, 64.

85.    The NDVC knew that FARC and ELN engaged in terrorist activities, such as targeting high profile Colombian citizens including politicians and businessmen, and that they used tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia, and NDVC had knowledge of, approved of, and acquiesced in FARC and ELN engaging in such activities in effecting its directives, including against the Ambassador and Plaintiff.   Bagley Aff., Ex. B, ¶¶ 49, 63, 64.

86.    Although a citizen of Colombia, the Defendants' actions outlined below forced Plaintiff to flee his native country and obtain political asylum in the United States, and suffer numerous damages. Cabllero Aff., Ex. A, ¶¶ 50, 56.


## CONCLUSIONS OF LAW

### I.    Personal Jurisdiction Over All Defendants.

This Court finds it has personal jurisdiction over all Defendants.   Personal jurisdiction over a defendant requires that the defendant has engaged in acts that satisfy Florida's long-arm statute, Fla. Stat. § 48.193 ("Acts subjecting person to jurisdiction of courts of state"). "Specific jurisdiction" under Fla. Stat. §48.193(1)(a) is shown by the defendant doing of any of the acts enumerated in the statute, which confers personal jurisdiction for causes of action arising from the doing of those acts enumerated in the statute. In addition to specific jurisdiction, the Florida long-arm statute also confers "general jurisdiction" over a nonresident defendant who "is engaged in substantial and not isolated activity within this state…whether or not the claim arises from that activity." Fla. Stat. § 48.193(2).  Florida courts have held this to require "continuous

and systematic contacts" with the state, such that the defendant can properly be considered to be present in the state. *American Overseas Marine Corp. v. Patterson*, 632 So. 2d 1124, 1127 (Fla. 1st DCA 1994); *Mother Doe I v. Maktoum*, 632 F. Supp. 2d 1130, 1135 (S.D. Fla. 2007).

The Court has specific jurisdiction over Defendants pursuant to Fla. Stat. 48.193(1)(a)(1) and 48.193(1)(a)(6).[5]   FARC, ELN and NDVC have individually and in concert engaged in narcotics manufacturing and trafficking of cocaine destined for Florida and the United States, shipped from Caribbean ports in Colombia into the United States primary through Florida.[6] At all times relevant to the Complaint, FARC, ELN and NDVC have been involved in narcotics production and trafficking.[7]  Defendants' acts against Plaintiff and his father set forth in the Finding of Fact were a component part of Defendants' trafficking of illegal drugs into Florida and the United States.  Florida is a primary point of entry and target market for Colombia's cocaine trafficking, including narcotics produced and trafficked by Defendants.[8]  Consequently, Defendants were operating, conducting, engaging in, or carrying the business of narco-trafficking for distribution in Florida within the definition of Fla. Stat. §48.193(1)(a)(1).  In addition, Defendants have also caused injury to Florida persons arising out of the cocaine manufactured and narco-trafficked by Defendants which is being consumed within Florida.[9]

---

[5] Fla. Stat. § 48.193(1)(a) and (f) confers personal jurisdiction for causes of action arising from the doing of the following acts:
> "(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state. ..(f)  Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
> > 1.  The defendant was engaged in solicitation or service activities within this state; or
> > 2.  Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use."

[6] ¶¶ 36-37, Finding of Fact.

[7] ¶¶ 32-43, Finding of Fact.

[8] ¶ 36, Finding of Fact.

[9] Controlled Substances Act, 21 USC § 801(2): "The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people."

Thus, personal jurisdiction over the defendants is also established pursuant to Fla. Stat. § 48.193(1)(a)(6).

Moreover, Defendants' narco-trafficking of illegal drugs into the United States were substantial, ongoing, and systematic and thus provide a basis for general jurisdiction under Fla. Stat. § 48.193(2). Because of Defendants' continuous narco-trafficking activities in furtherance of the movement of illegal drugs into Florida and the harm  that has caused to citizens of this State and Nation, this Court has both "specific" and "general" jurisdiction over Defendants.[10]

## II.   Defendants Have Capacity to be Sued Under Florida Law Because they are Partnership Organizations Within the Meaning of F.S. 620.8202(1).

### a.   Defendants are Partnership Organizations Within the Meaning of F.S. § 620.8202(1).

Partnerships can be sued in their own name. F.S. §620.8307. Section 620.8202(1) of the Florida Statutes states that "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intends to form a partnership." Formation of a partnership does not require a showing that the parties subjectively intended to create a partnership, only that they intended to do the things that constitute a partnership. Florida law provides that a partnership results from either an express or implied agreement to share profits and to carry on the business as co-owners. *Rafael J. Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams*, 856 So. 2d 1, 5 (Fla. 4th DCA 2003).

The Court finds that at all times relevant to this lawsuit, FARC[11], ELN,[12] and the

---

[10]  A plaintiff need only allege "sufficient material facts" to support the exercise of personal jurisdiction, at which point the burden shifts to the defendant to challenge the plaintiff's allegations. *Mother Doe I*, 632 F. Supp. at 1135.

[11] ¶ 4, Finding of Fact.

[12] ¶ 16, Finding of Fact.

NDVC[13] were associations or an organization of persons who carried on as co-owners in businesses for profit from narco-trafficking operations as partnerships. Consequently, these organizations are partnerships that have the requisite capacity to be sued in their own names pursuant to F.S. §620.8202.

**b.   Defendants are Criminal Gangs within the Definition of the Florida Statutes.**

FARC, ELN, and NDVC organizations also fall within the definition of a "terrorist organization" as defined in the Florida Statutes. Fla. Stat. § 874.03(7). Section 874.06 of the Florida Statutes gives a civil cause of actions for gang related and terrorist organization activities. Fla. Stat. § 874.02 specifies the Legislature's findings and intent:

> (1) The Legislature finds, however, that the state is facing a mounting crisis caused by criminal gangs whose members threaten and terrorize peaceful citizens and commit a multitude of crimes. These criminal gang activities, both individually and collectively, present a clear and present danger. Street gangs, **terrorist organizations**, and hate groups have evolved into increasingly sophisticated and complex organized crime groups in their criminal tactics, schemes, and brutality. The state has a compelling interest in preventing criminal gang activity and halting the real and present danger posed by the proliferation of criminal gangs and the graduation from more primitive forms of criminal gangs to highly sophisticated criminal gangs. ... (3) It is the intent of the Legislature to outlaw certain conduct associated with the existence and proliferation of criminal gangs, provide enhanced criminal penalties, and eliminate the patterns, profits, proceeds, instrumentalities, and property facilitating criminal gang activity, including criminal gang recruitment.

Section 874.03 of the Florida Statutes defines "criminal gang" as "a formal or informal ongoing organization, association or group that has as one of its primary activities the commission of criminal or delinquent acts, and that consists of three or more persons who have a common name or common identifying signs, colors, or symbols, including, but not limited to, terrorist organizations and hate groups."   Section 874.03(7) further defines "terrorist

---

[13] ¶ 26, Finding of Fact.

organization" as "any organized group engaged in or organized for the purpose of engaging in terrorism as defined in Section 775.30[14] of the Florida Statutes." A civil cause of action is created under Fla. Stat. § 874.06 in favor of "A person … establishing, by clear and convincing evidence, coercion, intimidation, threats, or other harm to that person or organization in violation of this chapter …"

Chapter 874, Florida Statutes, codifies the Legislature's intent to allow causes of actions for the activities of criminal gangs.[15] The facts set forth above show that ELN, FARC, and the NDVC were criminal gangs and terrorist organizations whose primary activities are the commission of criminal acts, and thus are within the definition of criminal gangs and terrorist organizations in Fla. Stat. § 874.03, and therefore have capacity to be sued in Florida.

### c. The Defendants have Capacity to be Sued Under Federal Law

Alternatively, Defendants have the capacity to be sued under Federal Law.

Rule 17(b)(3)(A) of the Federal Rules of Civil Procedure provides for capacity to sue an unincorporated organization or partnership that does not otherwise have capacity in the law of the state, in order to "enforce a substantive right existing under the United States constitution or

---

[14] Terrorism; defined.—As used in the Florida Criminal Code, the term "terrorism" means an activity that:
    (1)(a)   Involves a violent act or an act dangerous to human life which is a violation of the criminal laws of this state or of the United States; or
        (b)   Involves a violation of s. 815.06; and
    (2)   Is intended to:
        (a)   Intimidate, injure, or coerce a civilian population;
        (b)   Influence the policy of a government by intimidation or coercion; or
        (c)   Affect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy.

[15] Florida Statutes, § 874.05, provides:
Causing, encouraging, soliciting, or recruiting criminal gang membership.—
    (1)   Except as provided in subsection (2), a person who intentionally causes, encourages, solicits, or recruits another person   where a condition of membership or continued membership is the commission of any crime commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
    (2)   A person who commits a second or subsequent violation commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

laws."[16]  Rule 17(b) provides for the capacity to sue an unincorporated organization in claims asserting a federal question.  *See Sisso v. Islamic Republic of Iran, et al.*, 448 F. Supp. 2d 76 (D.D.C. 2006)( where the federal claims asserted in federal court against the Defendant, a foreign militia and unincorporated organization, fell within the 17(b) exception).  Federal law is properly referenced when a federal cause of action is brought in State Court.  *C.f. Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) (where federal claim under §1983 was brought in state court, the federal law was analyzed to determine whether Plaintiff could bring a claim against a state official in his official capacity).  "An unincorporated association is defined as a body of persons acting together and using certain methods for prosecuting a special purpose or common enterprise."  *Motta v. Samuel Weiser, Inc.* 768 F. 2d 481, 485 (1ˢᵗ Cir. 1985).  Defendants fit within this description.

Notably, these Defendants also have capacity to be sued under the Federal causes of action brought in this case (the ATS and Federal RICO claims).  These federal causes of action permit lawsuits against the Defendants to enforce substantive rights under circumstances in which the universe of appropriate defendants is even more broad than was the case in *Will*.  Thus, as was the case in *Will*, this Court may analyze federal law, including that ATS and Federal RICO statutes, to determine the capacity of the Defendants to be sued.  The ATS and Federal RICO statues do not contain limitations as to the capacity of the Defendants to be sued that would exclude a claim against them.  The Defendant terrorist organizations are clearly within the realm of defendants against whom Congress intended to provide a cause.

Thus, the Federal claims brought by Plaintiff permit lawsuit against the Defendants to enforce substantive rights.  The court finds that capacity of the Defendants to be sued for the

---

[16] Fed. R. Civ. P. 17(b)(3)(A) states in part: "a partnership or other unincorporated association may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws."

federal claims averred, including the ATS and Federal RICO claims which are federal causes of action, alternatively exists under Federal law.

### III.   Service of Process was Duly Made on Defendants in Accordance with Florida Law

As partnership organizations within the meaning of F.S. § 620.8202(1), service is made pursuant to Section 48.061(1) of the Florida Statutes which provides that "[p]rocess against a partnership shall be served on any partner and is as valid as if served on each individual partner." In the instant case, service was completed for each Defendant by service on a partner and principal of each.   At the time of service, the partner served of each Defendant was residing outside of Florida.   Section 48.194 of the Florida Statutes states that "service of process on persons outside of this state shall be made in the same manner as service within this state by an officer authorized to serve process in the state where the person is served."

As shown by the verified return of service filed with Plaintiff's Motion for Default, Defendant FARC was duly served on August 2, 2013, by personal service of process, the Complaint and the Corrected Second Amended Complaint (and Spanish translations thereof), upon Juvenal Ovidio Ricardo Palmera Pineda a/k/a Simon Bolivar ("Palmera").   Palmera is a high-ranking officer, member, partner and principal of FARC.[17]   Palmera is currently, and was at the time of service, a prisoner at the USP Florence Admax, U.S. Penitentiary located in Florence, Colorado.   Florida law provides that service of process on prisoners is made by service on the prisoner himself.   Fla. Stat. § 48.051 (2013).

On May 27, 2013, Defendant ELN was duly served with process, the Complaint and the Corrected Second Amended Complaint (and Spanish translations thereof) by personal service upon Jose Luis Mejia Ramirez a/k/a Bayron ("Mejia").   Mejia was, at all relevant times to the

---

[17] Finding of Fact, ¶14.

Complaint, a terrorist member, principal, partner, and agent of ELN.[18]  In addition, at all relevant times to the Compliant, Mejia was the ELN leader in charge of the faction conducting the terrorist attacks, kidnappings and narco-trafficking alleged in the Complaint.[19]   Mejia is currently, and was at the time of service, a prisoner at the Prison in Itagüí, Colombia.

On June 10, 2013, Defendant NDVC was duly served with process, the Complaint and the Corrected Second Amended Complaint (and Spanish translations thereof) by personal service upon Diego Leon Montoya a/k/a Don Diego ("Montoya").  Montoya is the surviving leader and principal, member, agent, and a partner of the NDVC.[20]  At the time of service, Montoya was a prisoner at the USP Tucson, U.S. Penitentiary.

Personal service upon these individuals as members, principals, partners and agents of the respective Defendants is authorized by Fla. Stat. §§ 48.194(1), and 46.061(1), and 48.051.  The Court finds that each Defendant was properly served under Florida Law.

## IV.     Plaintiff's Causes of Action Pursuant to the Alien Tort Statute, Counts I - V.

### a.    Plaintiff Has Standing to Sue Defendants Under the ATS Pursuant to the Laws of Colombia.

To ascertain whether a plaintiff has standing to bring forth a claim under the ATS, the Court may look to the law of the jurisdiction where the case was filed, or employ a choice of law analysis.  *Doe v. Alvaro Rafael Saravia,* 348 F. Supp. 2d 1112, 1145 (E.D. Cal. 2004); *see Sosa v. Alvarez Machain*, 331 F. 3d 604, 632-33 (9th Cir. 2003).

Using the choice of law analysis, courts have previously found survivors of victims have standing to bring ATS claims if they had standing under the applicable foreign jurisdiction.  *See Baloco v. Drummond Company, Inc.*, 640 F.3d 1338, 1349 (11th Cir. 2011) (Colombian children

---

[18] Finding of Fact, ¶24.

[19] *Id.*

[20] Finding of Fact, ¶ 31.

A-288

had standing to bring wrongful death claim for their father's death under Colombian law); *Estate of Cabello v. Fernandez-Larios,* 157 F. Supp. 2d 1345, 1357-58 (S.D. Fla. 2001) (finding that even though Florida law would deny standing to some plaintiffs, they had standing to bring ATS claims because they had standing under Chilean law); *see also Xuncax v. Gramajo.* 886 F. Supp. 162, 178 (D. Mass. 1995) (finding standing under the ATS based on laws of Guatemala, which allowed siblings to sue for wrongful death).

For tort cases, Florida applies the "significant relationship" choice of law test of the Restatement (Second) of Conflict of Laws. *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).[21]   The test involves consideration of several factors to determine which state has the most contacts with the action or the greatest interest in the outcome:

    (1) consideration of which state that has the most significant relationship to the occurrence and the parties under the principles stated in § 6; and,

    (2) consideration of the contacts that the state has including:  (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

*Nelson v. Freightliner, LLC,* 154 Fed. Appx. 98 (11th Cir. 2005).

A court applying the "significant relationship" test next determines which jurisdiction has the most significant relationship to the occurrence and the parties by applying the following factors:

    (a) the needs of the interstate and international systems,

    (b) the relevant policies of the forum,

    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

    (d) the protection of justified expectations,

---

[21] Restatement (Second) of Torts § 145, specifically adopted as the law of Florida in *Bishop*, provides that a choice of law analysis is to be made with respect to the particular issue.  Comment d. to the Restatement recognizes that "The courts have long recognized that they are not bound to decide all issues under the local law of a single state."  The choice of law discussion in this section pertains to the issue of Plaintiff's standing to bring claims asserted herein.

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.*   The Plaintiff and his father were citizens of Colombia at all relevant times to the Complaint.[22]  Defendants' actions against the Ambassador and Plaintiff were inextricably tied to, and part of, the trafficking of illegal drugs into and throughout Florida and the United States. Most of the Defendants' activity harming Plaintiff occurred in Colombia -- threatening Plaintiff's family, kidnapping, torturing and eventually murdering the Ambassador – and were components of the Defendants' concerted efforts to traffic illicit drugs into and throughout Florida and the United States.[23]   Under Florida's choice of law test, Colombia law would therefore be an appropriate choice to ascertain Plaintiff's standing.  *See Nelson v. Freightliner, LLC*, 154 Fed. Appx. 98 (11th Cir. 2005); *see also, Doe v. Alvaro Rafael Saravia,* 348 F. Supp. 2d 1112, 1145 (E.D. Cal. 2004).

Plaintiff is a surviving child and legal beneficiary of Ambassador Caballero.[24]  The Court finds, based upon the affidavit of Beatriz Elena Sevillano Correa, that under Colombian law, violations of Colombian Criminal Code entitle any legal beneficiary of a victim to receive "moral and material" damages for violations of the law committed against the father.[25]  Plaintiff, who fled Colombia in fear of his life from the Defendants,[26] has no practical forum in Colombia for redress of the wrongs committed against him and his family by the Defendants.  As one of

---

[22] ¶¶ 2, 44, Finding of Fact.

[23] See Finding of Fact, ¶¶ 81, 84.

[24] ¶ 44, Finding of Fact.

[25] Under Colombian law, Plaintiff is entitled to "moral and material" and other damages as provided by various provisions of the Colombian Civil and Criminal Codes.  See Affidavit of Beatriz Elena Sevillano Correa, filed in support of Plaintiff's Motion for Partial Summary Judgment.

[26] ¶ 76, Finding of Fact.

the Ambassador Antonio Caballero's legal beneficiaries and pursuant to the laws of Colombia, Plaintiff has standing to bring forth ATS claims on behalf of the Ambassador. *See Baloco v. Drummond Company, Inc.,* 640 F.3d 1338, 1349 (11th Cir. 2011).

### b.  <u>Subject Matter Jurisdiction Pursuant to the Alien Tort Statute.</u>

Under the ATS, "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or treaty of the United States." 28 U.S.C. § 1350.  While the Alien Tort Statute grants federal district courts original jurisdiction, it does not specify that federal courts have exclusive jurisdiction. "The general principle of state-court jurisdiction over cases arising under federal laws is straightforward: state courts may assume subject-matter jurisdiction over a federal cause of action absent provision by Congress to the contrary or disabling incompatibility between the federal claim and state-court adjudication." *Gulf Offshore Co., Div. of Pool Co. v. Mobil Oil Corp.,* 453 U.S. 473, 477-478 (U.S. 1981)

The ATS provides for subject matter jurisdiction for various violations international law. *Aldana v. Del Monte Fresh Produce, Inc,* 416 F.3d 1242 (11th Cir. 2005).  Subject matter jurisdiction is established where the plaintiff is (1) an alien (2) suing for a tort (3) committed in violation of the law of nations. *Kadic v. Karadizic,* 70 F.3d 232, 238 (2d Cir. 1995).  In the instant case, the Plaintiff Antonio Caballero was an alien at all relevant times alleged in the Complaint, thus satisfying the first element.[27]

The second and third elements require that the cause of action be a tort in violation of the "laws of nations."  The Supreme Court has recognized that the violations actionable under the ATS include acts that violate a "norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18[th]-century paradigms." Several

---

[27] See ¶2, Finding of Fact.

specific characteristics may suggest that a norm falls within the jurisdiction of the ATS. With regards to the contours of the phrase "law of nations," the Eleventh Circuit has stated that "law of nations" means customary international law. *United States v. Bellaizac-Hurtado, Nos.*, 700 F.3d 1245 (11th Cir. 2012). Notably, "the existence of a treaty reflecting an overwhelming international consensus on certain norms may be evidence of the specificity and international scope of concern required by the ATS." *Estate of Ahuva Emergi, et al. v. Palestinian Authority*, 611 F.3d 1350 (11th Cir. 2010). The Supreme Court standard for a cause of action under the ATS, as enunciated by the Eleventh Circuit, is that "the offense must be based on present day, very widely accepted interpretations of international law." *See Mamani*, 654 F.3d at 1152 (11th Cir. 2011) (*citing Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004)). The Eleventh Circuit has acknowledged that non-state actors may be liable for some violation of the law of the nations, such as war crimes, regardless of whether they acted under color of law of a foreign nation. *Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, 1263 (11th Cir. 2009); *Romero v. Drummond Co., Inc*, 552 F.3s 1303, 1316 (11th Cir. 2008). In the instant case, Plaintiff has sued Defendant terrorist organizations FARC, ELN, and NDVC for the commission of and/or for the aiding and abetting of torts that are well-recognized to be violations of the laws of nations, committed during the course of the ongoing civil war by FARC and ELN against the government of Colombia.[28] As is discussed in more detail below, the acts of (1) hostage-taking, (2) trafficking in persons, (3) torture, (4) extrajudicial killing, and (5) crimes against humanity, as alleged in Counts I through V of the Corrected Second Amended Complaint, constitute violations against the laws of the nations. As the undisputed facts demonstrate that Defendants' committed these offenses, the Court finds that it has subject matter jurisdiction over Plaintiff's ATS claims.

---

[28] Complaint, ¶¶ 38, 49, 128, 131, 135; Finding of Fact ¶¶ 3, 15, 66.

In the recent U.S. Supreme Court decision *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659 (2013), the Supreme Court held that the *presumption* against extraterritoriality applies to claims brought pursuant to the ATS where claims are based on activities that occurred *solely* outside the United States.  The presumption against extraterritoriality has been overcome where a U.S. interest exists that would rebut same.  *See Ahmed v. Magan*, 2013 U.S. Dist. LEXIS 117963 (S.D. Ohio 2013).

As the facts demonstrate, this case involves violations of law that were part of, and inextricably tied to, a scheme to establish and expand routes to traffic illegal drugs into the United States, primarily through Florida, for sale to consumers in the United States.[29]  The Defendants' vicious and vile acts against the Plaintiff and his family were a necessary component part of the Defendants' criminal activity and operations to traffic illicit drugs in Florida and the United States for their profit and gain.[30]  Thus, the United States was directly affected by the Defendants' actions as alleged in the Complaint, as the ultimate result of its operations were the trafficking of illegal narcotics in the United States.

The Defendants' crimes against Plaintiff and the Ambassador for the acts alleged in the Complaint were a necessary component of the activities that ravaged Florida communities and the greater United States.  Put another way, the injurious activities to Florida and our nation were effectuated through the murder of the Defendants' principal opponent and the use of his properties to move illegal drugs here.  Thus, because the murder of the Ambassador and other heinous acts were essential components of the scheme to traffic drugs into and throughout Florida and the United States, these wrongs cannot be fairly described as extra territorial or occurring solely outside the United States.

---

[29] Finding of Fact ¶¶ 32-41.

[30] Finding of Fact ¶ 81.

The direct exportation of illegal drugs into Florida and the United States, which was the ultimate effect of the Defendants' actions against Mr. Caballero and the Ambassador, rebuts the presumption against extraterritoriality, because the ultimate activity of trafficking drugs in Florida and the United States occurs in the United States, and invokes a strong national interest in preventing the illegal entry, trade, and trafficking of illegal narcotics. *See Ahmed v. Magan,* 2013 U.S. Dist. LEXIS 117963 (S.D. Ohio 2013). Therefore, this Court has subject matter jurisdiction over counts I through V of the Complaint pursuant to the ATS.

### c.  NDVC Liability for ATS Violations.

The Court finds that undisputed facts establish that Defendant NDVC, acting in concert and conspiracy with FARC and ELN, is liable for the actions of co-defendants FARC and ELN under the secondary liability principles. Secondary liability for ATS claims can exist under the following recognized doctrines: (a) aiding and abetting; (b) conspiracy; and, (c) joint criminal enterprise. *In re Chiquita Brandsm int'l, Inc.,* 792 F. Supp. 2d 1301, 1339 (S.D. Fla. 2011); *Yousef v. Samantar*, 2012 (U.S. Dist. LEXIS 122403 (E.D. Va. 2012).

### i.  Aiding and Abetting.

Aiding and abetting liability is well established under the ATS. *Aziz, et al. v. Alcolal, Incorporated, et al.*, 658 F.3d 388 (4th Cir. 2011); *Presbyterian Church of Sudan v. Talisman,* 582 F.3d 244 (2d Cir. 2009). A defendant may be held liable under international law for aiding and abetting the violation of a law by another. *Presbytarian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009); *see also Sexual Minorities Uganda v. Scott Lively,* 2013 U.S. Dist. LEXIS 114754 (D. Ma. 2013) (holding that aiding and abetting a crime against humanity is a well-established offense under customary law).

To prove aiding and abetting, a plaintiff must show that: (1) the principal committed an international law violation; (2) the defendant acted with the purpose or intent to assist in the

Page **34**

commission of that violation; and, (3) the defendant's assistance substantially contributed to the principal's commission of the violation. *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1343 (S.D. Fla. 2011). Notably the "purpose or intent" standard "requires more than mere knowledge of the principal's unlawful goals." *Id.*

### ii. **Conspiracy.**

Conspiracy liability is applicable to all of the ATS claims alleged in the Complaint. *See In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1341 (S.D. Fla. 2011); *see also, Cabello v. Fernandez-Larios,* 402 F. 3d 1148, 1151-57 (holding that a conspiracy theory of indirect liability is applicable to claims for extrajudicial killing, torture, and crimes against humanity). In order to show conspiracy, a plaintiff must show that: (1) the defendant and the principal agreed to commit the international law violation; (2) the defendant joined the agreement with the purpose or intent to facilitate the commission of the violation, and (3) the principal committed the violation. *See In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1351 (S.D. Fla. 2011). A conspiracy claim under the ATS requires the same *mens rea* of "purpose or intent" as aiding and abetting claims. *Id.* NDVC intended for such violations to be acted upon the Ambassador because of their interest in the furtherance of their narco-trafficking scheme.[31]

### iii. **Application.**

Defendants FARC and ELN directly committed acts violating international law as discussed below. The undisputed evidence shows that NDVC acted with the purpose or intent to assist FARC and ELN in the commission of such crimes, and conspired with them to do so.[32] It shows that the Ambassador was targeted, kidnapped, and detained for over six months by FARC and ELN with the knowledge, agreement, and assistance of the NDVC, in accordance to their

---

[31] ¶ 84, Finding of Fact.

[32] ¶¶ 36, 80, 81, 83, Finding of Fact.

common plan to profit from the expansion of drug trafficking capabilities through central Colombia.[33]  NDVC's assistance substantially contributed to FARC and ELN's commission of the violation.  NDVC used the Ambassador's properties for the transportation and safeguarding of their illicit product to transship it to ports and airstrips in Colombia's coast, and from there to its ultimate destination in Florida and the United States.[34]  The assassination of the Ambassador facilitated the Defendants' use of the Ambassador's properties and ability to expand their drug distribution network.   By removing the opposition posed by Ambassador Caballero and controlling his ranch and other nearby properties, the conspirators could obtain access via infrequently used secondary roads to the Magdalena River itself, which was in 1999 (and still is) often employed to transport the drugs by boat to the coast.[35]   Defendants could also avail themselves of back roads crossing the property to transport drugs essentially unobserved by governmental authorities, and, thereby, reach one of the two private airstrips located near Mr. Caballero's property undetected.[36]   Both the river and air routes to the northern coast were crucial smuggling pathways to Colombia's Caribbean coast and, from there, across the Caribbean Sea into the United States, primarily through Florida.[37]   The assassination of the Ambassador was done in accordance with the Defendants common criminal scheme, and with the knowledge, support, approval and agreement of defendant NDVC.[38]  The undisputed facts show that NDVC had the intent and agreed to the kidnapping, torture and the assassination of the Ambassador in violation of international laws against (a) hostage-taking (b) trafficking in-

---

[33] ¶¶ 78, 80, 81-85, Finding of Fact.

[34] ¶ 36-37, Finding of Fact.

[35] ¶ 60, Finding of Fact.

[36] ¶ 61, Finding of Fact.

[37] ¶¶ 36, 62, Finding of Fact.

[38] ¶¶ 40, 41, 80-85, Finding of Fact.

persons (c) torture (d) extra judicial killing and (e) crimes against humanity.[39] Therefore the Court concludes that NDVC is, as a matter of law, jointly liable for international crimes committed by its co-defendants set forth in Counts I-V.

### d.   Count I - Hostage Taking and False Imprisonment.

Acts of hostage taking and false imprisonment are violations of international customary law.  Hostage-taking is a well-recognized violation of international law and is of international mutual concern among nations. Norms against hostage-taking are universal, obligatory, and specific. *Xuncax v. Gramajo*, 866 F. Supp. 162, 184 (D. Mass. 1995) (holding that plaintiffs' claims for arbitrary detention "constitute fully recognized violations of international law."); *Forti v. Suarez-Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987) (holding that there is "sufficient consensus to evince a customary international human rights norm against arbitrary detention").

Moreover, hostage-taking was codified as a well-recognized violation of international law by the International Convention Against the Taking of Hostages, G.A. Res. 146 (XXXIV) GAOR, 34th Sess., Supp. No. 46, at 245, U.N. Doc. A/34/36 (1979), entered into force June 3, 1983.[40]  The preamble to this convention confirms:

> [t]he taking of hostages is an offence of grave concern to the international community and that, in accordance with the provisions of this Convention, any person committing an act of hostage taking shall either be prosecuted or extradited.

The International Convention Against the Taking of Hostages recognizes that the offense of hostage-taking is of international character and of grave mutual concern whether the perpetrators or victims are individuals or states. *See id.*  Specifically, it provides:

---

[39] ¶¶ 80-85, Finding of Fact.

[40] International Convention Against the Taking of Hostages, G.A. Res. 146 (XXXIV) GAOR, 34th Sess., Supp. No. 46, at 245, U.N. Doc. A/34/36 (1979), available at,   http://www1.umn.edu/humanrts/instree/taking hostages. html (last visited Dec. 7, 2012).

**A-297**

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention.

"[T]he existence of a treaty reflecting an overwhelming international consensus on certain norms may be evidence of the specificity and international scope of concern required by the ATS." *Estate of Ahuva Emergi,* 611 F.3d at 1357.

The evidence shows that the Ambassador was abducted by ELN forces, and remained in the custody of FARC and/or ELN forces who were working in conjunction with NDVC to conspire and profit from kidnapping the Ambassador.[41]  The Ambassador, then 76 years of age, was unlawfully seized, detained, and held captive for 184 days, over 6 months before he was murdered.[42]  Thus, Defendants' acts of kidnapping, unlawful detaining, and holding and threatening to kill the Ambassador hostage violated the widely-accepted, present-day international laws against the taking of hostages and false imprisonment, committed in the context of these Defendants' ongoing civil war.  Consequently, this Court has jurisdiction over Count I of the Complaint, and as there are no genuine issue of material fact that Defendants violated this offense, partial summary judgment as to liability as to Count I is appropriate as a matter of law.

### e.  Count II - Trafficking in Persons.

The acts of trafficking in persons described in the Complaint constitute a violation of the law of nations as reflected, expressed, defined, and codified in multilateral treaties and other

---

[41] ¶¶36, 67-68, Finding of Fact.

[42] ¶71, Finding of Fact.

international instruments, international and domestic judicial decisions, and other authorities including, among others, the United Nations' Protocol to Prevent, Suppress and Punish Trafficking in Persons. The United States District Court for the Southern District of Florida has recognized that trafficking in persons is a well-established violation of international law. *See Rodriguez Licea v. Curacao Drydock Co.*, 584 F. Supp. 2d 1355, 1358 (S.D. Fla. 2008) (holding that the "international human trafficking alleged and proved in this matter clearly constitute violations of universal and obligatory norms of international law, thereby constituting actionable claims falling well within the jurisdictional grant of the ATS").

Moreover, the acts of 'trafficking in persons' was codified as a well-recognized violation of international law by the United Nations' "Protocol to Prevent, Suppress and Punish Trafficking in Persons." Article 3, paragraph (a) of the United Nations' "Protocol to Prevent, Suppress and Punish Trafficking in Persons" defines 'Trafficking in Persons' as:

> the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation.[43]

The facts forth above establish that Defendants committed this offense in the course of their ongoing civil war. The Ambassador was abducted by ELN and/or FARC, acting in concert with and in conspiracy with NDVC, and held captive against his will for more than 6 months.[44] During his captivity, the Ambassador was forced to walk through the woods and jungle for hours.[45] Defendants FARC and ELN contacted the family in an effort to compel them to make a

---

[43] Sept. 20, 2012, http://www.unodc.org/unodc/en/treaties/CTOC/index.html.

[44] ¶¶ 36, 71, Finding of Fact.

[45] ¶ 72, Finding of Fact.

payment for his release.[46] Their actions were done in a conspiracy and with the knowledge, aid, and abetment of Defendant NDVC.   Thus, Defendants committed the acts of recruiting, transporting, abducting the Ambassador for the purpose of exploitation, in violation of laws against trafficking in persons.[47]

The facts establishing that the Defendants committed this offense against the Plaintiff and his father, partial summary judgment against the defendants "trafficking in persons" set forth in Count II of the Complaint is warranted as a matter of law.

### f.  Count III - Torture of the Ambassador.

The prohibition against torture is *jus cogens* and has long been a part of customary international law as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, including, among others, the United Nations' Universal Declaration of Human Rights.   e.g. *United States v. Emmanuel*, 2007 U.S. Dist. LEXIS 48510, 1-4 (S.D. Fla. July 5, 2007); *Nuru v. Gonzales*, 404 F.3d 1207, 1222-23 (9th Cir. 2005).   Thus, torture is a well-recognized violation of international law and is of international mutual concern among nations.   *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 249-250 (2d Cir. N.Y. 2003); *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 283 (E.D.N.Y. 2007).   Norms against torture are universal, obligatory, and specific. *Emmanuel*, 2007 U.S. Dist. LEXIS 48510, 1-4; *Nuru v. Gonzales*, 404 F.3d 1207, 1222-23 (9th Cir. 2005) ("torture is illegal under the law of virtually every country in the world and under the international law of human rights"); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1157 (E.D. Cal. 2004).

---

[46] ¶ 73, Finding of Fact.

[47] ¶¶ 36, 67, 68, 71-73, 80, Finding of Fact.

**A-300**

The United States Court of Appeals for the Eleventh Circuit has recognized that "torture, crimes against humanity, and cruel, inhumane, or degrading punishment have ["long"] been a part of the United States and international law." *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154 (11th Cir. 2005).

For the purposes of the ATS, the United States Court of Appeals for the Eleventh Circuit has

> ... adopted the definition of torture set forth by the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N. GAOR, U.N. Doc. A/39/51 (1984). This convention defines torture as the intentional infliction of severe pain or suffering, whether physical or mental, on a person for the purposes of obtaining information or a confession, punishment, intimidation or coercion, or discrimination.

*In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1324 (S.D. Fla. 2011) (*citing Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1252 (11th Cir. 2005)).

The principle that torture is a violation of international law, has not only risen to the level of customary international, but is now considered a principle of *jus cogens*. In *Aldana v. Del Monte Fresh Produce, N.A.*, Inc., the Eleventh Circuit held "that the multiple death threats, committed with the mayor as an armed aggressor, constituted state-sponsored torture, and could support a claim under the ATS." *Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242 (11th Cir. 2005).

In the instant case the facts establish Defendants, terrorist organizations, committed acts of torture against the Ambassador during the course of war crimes.[48] FARC and ELN's acts of torture were inflicted deliberately and intentionally for purposes that included, among others, punishing the Ambassador and Plaintiff, humiliating the Ambassador, causing the Ambassador and Plaintiff physical, psychological, emotional, and economic harm, and intimidating both the

---

[48] Complaint, ¶¶ 38, 49, 128, 131, 135; Finding of Fact ¶¶ 3, 15, 66.

local Colombian residents and Plaintiff's family, from whom the Defendants sought to coerce ransom money, and use of their properties to facilitate Defendants' narco-terrorist activities.[49] The facts establish that Defendants FARC and ELN's actions of torturing the Ambassador were in violation of the laws of the nations, and NDVC is jointly liable for this violation. Therefore, partial summary judgment against Defendants FARC, ELN, and NDVC for the torture of the Ambassador as alleged in Count III of the Complaint is warranted as a matter of law.

### g.  Count IV - Extrajudicial Killing of the Ambassador.

Extrajudicial killing is a well-recognized violation of international law and is of international mutual concern among nations. Norms against extrajudicial killing are universal, obligatory, and specific. *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1153-1154 (E.D. Cal. 2004). The act of extrajudicial killing described herein constitutes a violation of the law of nations as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, including, among others, the United Nations' International Covenant on Civil and Political Rights, the Geneva Convention, and the Hague Convention. *See Sinaltrainal*, 578 F.3d at 1263 (*citing Kadic*, 70 F.3d at 243) ("[s]ome acts, such as torture and murder committed in the course of war crimes, violate the law of nations regardless of whether the perpetrator acted under color of law of a foreign nation or only as a private individual.").

After being in captivity for over six months, the Ambassador's cadaver was found dead on the side of the road with multiple gunshot wounds. The local Colombian news reported that the Ambassador's death was caused by ELN.[50] ELN conspired with the FARC and the NDVC to

---

[49] See ¶¶ 73, 82, Finding of Fact, and affidavit of Bruce Bagley, detailing the ongoing civil war in Colombia.

[50] ¶ 61 Finding of Fact.

assassinate the Ambassador because of his political affiliations, anti-narcotics positions, to facilitate the use of the Ambassador's properties by the Narco-Terrorist Association described below, and to send a message to other uncooperative landowners in the region that resistance to such demands would result in their assassination.[51]   The evidence shows that the Defendants, directly, indirectly, and acting in concert, assassinated the Ambassador.[52]

Defendants' actions of assassinating the Ambassador in the Colombian ongoing civil war as alleged in the Corrected Second Amended Complaint constitute an actionable extrajudicial killing in violation of the laws of the nations.[53]   The facts establish that Defendants' assassination of the Ambassador constitutes an extrajudicial killing in violation of the laws of the nations. Therefore, partial summary judgment against Defendants for liability for extrajudicial killing alleged in Count IV of the Complaint is warranted as a matter of law.

### h.  Count V - Crimes Against Humanity.

Crimes against humanity are well-recognized violations of international law and are of international mutual concern among nations. The Eleventh Circuit has confirmed, in numerous cases, that "torture, crimes against humanity, and cruel, inhumane, or degrading punishment have ["long"] been a part of the United States and international law." *Cabello,* 402 F.3d 1148 at 1154.  Other courts have also confirmed that "crimes against humanity" reflect violations of the law of nations. *See Doe v. Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004); *Sarei v. Rio Tinto, Plc.*, 487 F.3d 1193, 1202 (9th Cir. 2007).   According to the International Criminal Court, murder, torture, imprisonment, and political persecution during a widespread and systematic

---

[51]  ¶ 82-85, Finding of Fact.

[52]  ¶¶ 36, 64-66, 70-86, Finding of Fact.

[53]  Complaint, ¶¶ 38, 49, 128, 131, 135; Finding of Fact, ¶¶ 3, 15, 66.

attack on a civilian population all constitute crimes against humanity in violation of international law.[54]

Defendants kidnapping, torture and murder of the Ambassador took place in the context of a widespread and systematic attack on a civilian population, evidenced by the ongoing civil war and campaign of kidnapping, torture, extortion and murder committed by the Defendant terrorist organizations.[55]  It is further evident by the FARC Bulletin #2, which refers to the mayor of Pivijay at the time, Jose Alfonso Romero Romo, as the "Judas" of treason and cruelty, and a member of the clan of ranchers whom the FARC claim are the enemies of the people.   In addition, the FARC specifically accuses the Caballero family, along with the Mayor and other ranchers as being murderers and financiers of the paramilitary organizations.[56]

Defendants' acts against the Ambassador, including his kidnapping, unlawful detention, hostage-taking, trafficking, torture, political targeting, and murder as set out in Counts I through IV of the Complaint therefore constitute the offense of crimes against humanity.   The facts establish Defendants' crimes against humanity which constitutes a violation of the law of nations, and therefore, partial summary judgment on Count V is warranted as a matter of law.

## V.     RICO  Claims, Counts VI through IX.

### a.   Subject Matter Jurisdiction.

Because the ATS provides this Court subject matter jurisdiction in at least one count in this action, this Court has subject matter jurisdiction over the federal RICO claims.  *Rodriguez Licea v. Curacao Drydock Co.,* 584 F. Supp. 2d 1355, 1359 (S.D. Fla. 2008).   However, this

---

[54]Article 7, Rome Statute of the International Criminal Court, available at, http://www.icc-cpi.int/NR/rdonlyres/ADD16852-AEE9-4757-ABE7-9CDC7CF02886/283503/RomeStatutEng1.pdf  (last  visited Dec. 7, 2012).

[55] ¶¶ 11, 12, 22, 29, 41, 42, Finding of Fact.

[56] ¶ 66, Finding of Fact.

court independently has jurisdiction over the federal RICO claims because, as discussed above, the Defendants' actions to traffic narcotic drugs in the United States through Florida had substantial ties with the United States. *See Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 U.S. Dist. Lexis 72231, at 55 (D.D.C. Sept. 21, 2006) (RICO claims may be given extraterritorial reach whenever a predominantly foreign transaction has substantial effects within the United States.") (*quoting Consol. Gold Fields PLC v. Minorco*, S.A., 871 F.2d 252, 261-62 (2d Cir. 1989)); *see also Doe I v. Unocal Corp.,* 395 F.3d 932, 961-62 (9th Cir. 2002) (*agreeing* with the Second Circuit that RICO applies extraterritorially when the claim meets either the "effect" or the "conduct" test).

Moreover, state courts have concurrent jurisdiction with federal courts to hear civil claims arising under federal RICO. *Tafflin v. Levitt,* 493 U.S. 455 (1990). Therefore the Court has subject matter jurisdiction over the Federal RICO claims against Defendants.

### b. **RICO Elements.**

18 U.S.C. 1964(c) states that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue thereof in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys fee." In order to establish a Federal civil RICO violation, the plaintiff must show (1) the violation of section 1962 (2) injury to business and property; and that the (3) violation caused the injury. *Avirgan, et al v. Hull, et al.,* 932 F.2d 1572 (11th Cir. 1991); see also *Diaz v. Gates, et al.*, 420 F.3d 897 (9th Cir. 2005).

With regards to the injury, Plaintiff must show that the violation "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). Whether a particular interest amounts to property is

a question of state law. *Doe v. Roe*, 928 F.2d 763 (7th Cir. 1992); *Diaz v. Gates*, et al., 420 F. 3d 897 (9th Cir. 2005).

For a violation of Section 1962, a plaintiff must show the (a) conduct of an enterprise (b) through a pattern of racketeering. *Smart Sci. Labs, Inc. v. Promotional Mktg. Servs.*, 2008 U.S. Dist. LEXIS 118270 (M.D. Fla. 2008); *Jones v. Childers*, 18 F.3d 899, 910 (11th Cir. 1994). With regard to the first two elements, a plaintiff must establish conduct of an enterprise and that the enterprise had a common goal. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282, 1283 (11th Cir. 2006).

### i.  RICO Enterprise.

An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  As stated in *United States v. Goldin Industries, Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000), "the existence of an enterprise is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." (Emphasis added).

The facts demonstrate that in 1998-99, the Defendants forged an alliance, association and criminal enterprise, which is referred to herein as the "Colombian Narco-Terrorist Association." This enterprise (in association with other narco-traffickers and terrorists who were not their members but their agents), was formed to establish a jointly controlled, and potentially highly profitable cocaine smuggling route from the interior Department of Valle, north through the Magdalena River Valley, to Colombia's northern coast where the illicit drugs would then be regularly trafficked in the United States, primarily through Florida but other points as well.[57]

---

[57] ¶ 36, Finding of Fact .

Furthermore, "the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." *Williams v. Mohawk Indus.*, 465 F.3d 1277, 1284 (11th Cir. 2006)(emphasis added). The Eleventh Circuit, however, has never required that the "common purpose" of the enterprise be the sole purpose of each and every member of the enterprise. *See Williams v. Mohawk Indus.*, 465 F.3d 1277, 1285-1286 (11th Cir. Ga. 2006). In fact, it may often be the case that different members of a RICO enterprise will enjoy different benefits from the commission of predicate acts. *Id.* Thus, all that is required is that the enterprise have a common purpose. *Id.* The Colombian Narco-Terrorist Association, constituted an enterprise within the meaning of 18 U.S.C. §1961(4), and had the common purpose of generating profit by trafficking illicit drugs through the central valley region of Colombia and into Florida and the United States. It had the common goal to specifically traffic cocaine along routes through the Magdalena River Valley, where the Ambassador's properties were located,[58] on to Colombian Caribbean ports and into Florida and the US, which allowed the FARC, ELN and the NDVC to diversify their cocaine smuggling operations away from the more traditional, heavily government-monitored, NDVC smuggling route.[59]

### ii. **Pattern of Racketeering**.

"An act of racketeering is commonly referred to as a predicate act. A pattern of racketeering activity is shown when a racketeer commits at least two distinct but related predicate acts." *Maiz v. Virani*, 253 F.3d 641, 671 (11th Cir. 2001); *see also Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1397 (11th Cir. 1994) (concluding that a pattern of racketeering

---

[58] ¶¶ 52-62, Finding of Fact.

[59] *Id*; ¶37, Finding of Fact.

activity, for purposes of the RICO Act, requires at least two acts of racketeering activity),

modified on other grounds by 30 F.3d 1347 (11th Cir. 1994).

For the purposes of a RICO claim, racketeering activity includes the following predicate

acts: "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery,

extortion...which is chargeable under State law and punishable by imprisonment for more than

one year." 18 U.S.C. §1961(1)(A).  In the instant case, the racketeering activity consisted of,

among other things, Defendants' distinct acts of: (a) kidnapping, trafficking in persons and

murder of the Ambassador;[60] (b) extortion and threats to Plaintiff and his family;[61] and (c)

Defendants activities of manufacturing, importing, exporting, buying, selling, concealing, and

trafficking illegal drugs throughout Colombia and to South Florida.[62]  The facts also established

that the Defendants, individually and in concert, systematically committed acts of murder,

extortion, kidnapping, and drug trafficking.[63]  The facts establish the Defendants, both

individually and in concert through the Colombian Narco-Terrorist Association, engaged in a

pattern of racketeering activity.

As discussed below, the undisputed evidence shows that Plaintiff has satisfied the

elements of proof showing Defendants' violation of sections 18 U.S.C. 1962(a)-(d).  Defendants

FARC, ELN and NDVC received monies derived from the pattern of racketeering and invested

such funds in the Colombian Narco-Terrorist Association which purposes was to continue

expanding drug trafficking activities and terrorist activities.  Defendants are therefore liable for

damages to Plaintiff pursuant to 18 U.S.C. 1964(c).

---

[60] ¶¶ 36-39, 67-69, 71-73, 78-79, Finding of Fact.

[61] ¶¶ 65, 66, 73, 75, Finding of Fact.

[62] ¶¶ 32-43, Finding of Fact.

[63] ¶¶ 11, 12, 22, 29, 41, 42, Finding of Fact.

A-308

### c. Count VI - Violation 18 U.S.C. §1962(a).

18 U.S.C. § 1962(a) provides that

"[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … *to use or invest, directly or indirectly, any part of such income, or the proceeds of such income*, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

18 U.S.C. § 1962(a) makes it unlawful to invest income derived from a pattern of racketeering in an enterprise. In the instant case, the facts establish that Defendants continuously invested income derived from the unlawful acts of extortion and drug trafficking, among others into the Colombian Narco-Terrorist Association for the purpose of financing their criminal drug trafficking and terrorist enterprise. The Defendants, through the Colombian Narco-Terrorist Association, received money from their activities of murder, kidnapping, extortion, felonious manufacture, importation, receiving, concealment, buying, selling and trafficking in cocaine and heroin, trafficking in persons, and money laundering.[64] Defendants ELN and FARC invested the income derived from the pattern of racketeering into the Colombian Narco-Terrorist Association in order to continuously finance its terrorist activities.[65] The enterprise also engaged in a pattern of racketeering including such acts as trafficking of drugs, kidnapping, torture, extortion, bribing, and assassination of individuals. NDVC invested such funds received from the pattern of racketeering into the Narco-Terrorist Association to facilitate and continue its drug trafficking operations in violation of 18 U.S.C. § 1962(a).[66] As a direct and proximate cause of Defendants' control and maintenance of the Colombian Narco-Terrorist Association, in violation of 18 U.S.C. § 1962(a), Plaintiff suffered and has continued to suffer economic damages to his business and

---

[64] ¶ 43, Finding of Fact.

[65] ¶¶ 12, 13, 22, 23, Finding of Fact.

[66] *See* ¶¶ 40, 41, Finding of Fact.

property, and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

There is no genuine issue of fact as to Defendants' actions violating 18 U.S.C. §1962(a) of the federal RICO statute, and partial summary judgment on Count VI against Defendants is warranted as a matter of law.

### d.  Count VII - Violation of 18 U.S.C. §1962(b).

18 U.S.C. § 1962(b) provides that:

> [i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt *to acquire or maintain, directly or indirectly, any interest in or control of any enterprise* which is engaged in, or the activities of which affect, interstate or foreign commerce.

The Defendants, through a pattern of racketeering activity, have acquired and maintained an interest in, and control of, the Colombian Narco-Terrorist Association, which is engaged in, and affects, interstate and foreign commerce.[67] The Defendants' pattern of racketeering activity was used to acquire and maintain an interest and control of the Colombian Narco-Terrorist Association including operations that, directly and acting in concert through aiding and abetting and a conspiracy, among other things, removed the Ambassador and Plaintiff and their opposition to the Colombian Narco-Terrorist Association's narcotics and terrorist activities, by which the Colombian Narco-Terrorist Association expanded and facilitated its logistical operations, distribution, and trafficking of illicit drugs into and through Florida and the United States.[68]

---

[67] ¶¶ 36-39, Finding of Fact.

[68] *Id;* ¶¶40, 52-62, 81 Finding of Fact.

As a direct and proximate cause of Defendants' control and maintenance of the Colombian Narco-Terrorist Association, in violation of 18 U.S.C. § 1962(b), Plaintiff suffered and has continued to suffer economic damages to his business and property, and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

There is no genuine issue of material fact that Defendants violated this statute. Partial summary judgment as to liability on Count VII is therefore warranted as a matter of law.

**e.  Count VIII – Violation of 18 U.S.C. §1962(c).**

18 U.S.C. § 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to *conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs* through a pattern of racketeering activity or collection of unlawful debt.

The Colombian Narco-Terrorist Association was a criminal enterprise established to facilitate the exportation of illegal drugs into the United States that regularly engaged in the commission of murder, kidnapping, extortion, trafficking in persons, the manufacture, importation, receiving, concealment, buying, selling, and trafficking in cocaine and heroin, and money laundering. Defendants conducted and participated in the affairs of the Colombian Narco-Terrorist Association through a pattern of racketeering activity, consisting of, among other things, engaging in murder, kidnapping, trafficking in persons, extortion, threats, the manufacture, importation, receiving, concealment, buying, selling, and trafficking in cocaine and heroin, and money laundering, all of which are related to the purpose of expanding drug trafficking activities and profits.[69]  This was done to facilitate the Colombian Narco-Terrorist

---

[69] ¶¶ 32-43, Finding of Fact.

Association's drug trafficking activities by expanding the logistics and transportation network through the Ambassador's properties, as well as by removing the opposition of Plaintiff and the Ambassador to FARC, ELN, NDVC, and the Colombian Narco-Terrorist Association's trafficking and terrorist activities.[70]   The Defendants, acting in concert through the Colombian Narco-Terrorist Association, engaged in a pattern of racketeering when they kidnapped, trafficked, tortured, and murdered the Ambassador, and when they threatened Plaintiff's life and livelihood in order to expand and facilitate their narcotics logistical and distribution networks.

As a direct and proximate cause of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiff suffered and has continued to suffer economic damages to his business and property, and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.   The facts establish Defendants' violation of this law, and partial summary judgment as to liability for Count VIII is warranted as a matter of law.

**f.   Count IX – Violation of 18 U.S.C. §1962(d).**

18 U.S.C. § 1962(d) provides that:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

The facts show Defendants conspired to violate 18 U.S.C. § 1962(a) by agreeing to receive income derived from a pattern of racketeering activity and using such income or the proceeds thereof in the establishment and operation of the Colombian Narco-Terrorist Association.[71]   Defendants conspired to violate 18 U.S.C. § 1962(b) by agreeing to conduct and conducting a pattern of racketeering activity to acquire or maintain interest in or control of the

---

[70] ¶¶ 40, 52-62, Finding of Fact.

[71] ¶ 42-43, Finding of Fact.

Colombian Narco-Terrorist Association.  The facts establish that Defendants FARC, ELN, and NDVC conspired to violate 18 U.S.C. § 1962(c) by agreeing to associate with the Colombian Narco-Terrorist Association and by engaging together to conduct or participate in the conduct of the Colombian Narco-Terrorist Association's affairs through a pattern of racketeering, including among other things, (1) engaging in murder, kidnapping, extortion, felonious manufacture, importation, receiving, concealment, buying, selling, and (2) trafficking in cocaine and heroin, (3) trafficking in persons, and (4) money laundering, and (5) the kidnapping, trafficking, torture and murder of the Ambassador, and (6) threatening Plaintiff's life and livelihood.[72]

As a direct and proximate cause of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiff suffered and has continued to suffer economic damages to his business and property, and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.  The facts establish Defendants' violation of 18 U.S.C. § 1962(d), and partial summary judgment as to liability for Count IX is warranted as a matter of law.

## VI.  Counts X – XIII:  Violation of the Florida Racketeering and Corrupt Practices Act RICO.

The Florida RICO Act is modeled after the federal RICO act.  While there are some differences in the statutes, including the remedies provided, the elements of the Florida RICO offenses set forth in Counts X – XIII are substantially similar to the comparable sections of the federal RICO statute set forth above.  Furthermore, because of the similarities, "Florida courts should look to federal courts for guidance in interpreting and applying the state act and should accord great weight to federal decisions."  *Ruth, et al. v. State of Florida*, 661 So. 2d 901, 904 (Fla. 2d DCA 1995).  The minor differences are highlighted below and are immaterial in that the

---

[72] ¶¶ 32-43, 51-75, Finding of Fact.

established facts in this case which demonstrate Plaintiff is entitled to partial summary judgment as a matter of law on the federal RICO.

      a.  **RICO enterprise**.

In order to prove an enterprise under Florida law, the Plaintiff only needs to establish: (1) an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct, which (2) functions as a continuing unit. *Gross v. State of Florida*, 765 So. 2d 39 (Fla. 2000). Similar to federal RICO, set forth in Section V.b.i above, where an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). As stated in *United States v. Goldin Industries, Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000), "the existence of an enterprise is proved by evidence of an ongoing organization, <u>formal or informal</u>, and by evidence that the various associates function as a <u>continuing unit</u>."

The same facts proving the establishment of the Colombian Narco-Terrorist Organization discussed under the federal RICO sections above also meet the test for enterprise under Florida's RICO statutes.

      b.  <u>**Count X – Violation of Fla. Stat. § 772.103(1).**</u>

Florida Statutes section § 772.103(1) provides that it is unlawful for any person:

> Who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of criminal activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

This language is substantially similar to the language of 18 U.S.C. § 1962(a), Count VI, discussed above in section V.c. 18 U.S.C. § 1962(a) provides that

"[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

The Florida statute adds the requirement that the offender act with "criminal intent," speaks of "proceeds derived" as opposed to "income derived" and a "pattern of criminal activity" versus a "pattern of racketeering" activity.  Notwithstanding theses minor differences in language, the facts demonstrate that the Defendants' conduct violated the elements of the Florida statute as they have violated the federal statute as shown above, in section V.c.  The facts clearly show that the Defendants acted with criminal intent.

Because the facts establish Defendants' violation of Fla. Stat. § 772.103(1), partial summary judgment against Defendants as to liability is warranted as a matter of law.

### c.  Count XI – Violation of Fla. Stat. § 772.103(2).

Florida Statutes Section 772.103(2) provides that it is unlawful for any person "through a pattern of criminal activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property."  The language is in relevant aspects broader than the language of 18 U.S.C. § 1962(b) (Count VII) which provides that: "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt *to acquire or maintain, directly or indirectly, any interest in or control of any enterprise* which is engaged in, or the activities of which affect, interstate or foreign commerce."

In addition to acquiring and maintaining an interest and control in the Colombian Narco-Terrorist Association, as discussed in section V.d above, the Defendants also violated this section of Florida RICO by obtaining control of the Plaintiff's father's property, which they used

to expand and facilitate their narco-trafficking activities through central Colombia and ultimately into Florida and the United States.  Thus, the facts demonstrate that Defendants violated Fla. Stat. § 772.103(2), and that partial summary judgment as to liability is warranted as a matter of law.

        **d.**  **Count XII – Violation of Fla. Stat. § 772.103(3).**

Florida Statutes section 772.103(3) provides that is unlawful for any person, "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt."  This statute is not materially different in relevant terms to its federal counterpart, 18 U.S.C. § 1962(c) which provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  The differences are immaterial as to the facts of this case, which establish a violation by the Defendants of the federal statute as demonstrated above in section V.e, as well as a violation of this Florida Statute.  Plaintiff is entitled to partial summary judgment on Count XII as a matter of law.

        **e.**  **Count XIII – Violation of Fla. Stat. § 772.103(4).**

Florida Statutes section 772.103(4) provides that it is unlawful for any person "[t]o conspire or endeavor to violate any of the provisions of subsection (l), subsection (2), or subsection (3)."  This language is not materially different from the language of the federal counterpart, 18 U.S.C. § 1962(d), which provides that:  "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

A-316

For the same reasons Defendants' conduct violated 18 U.S.C. § 1962(d), demonstrated above in section V.f., it violated Fla. Stat. § 772.103(4), and partial summary judgment as to liability is warranted for the same reasons as well.

**VII.**     <u>**Count XIV – Violation of Colombian Wrongful Death Law**</u>.

Colombia recognizes cause of action for the acts committed by Defendant against Plaintiff and the Ambassador. *See Baloco v. Drummond Co.*, 640 F.3d 1338, (11th Cir. 2011) (children of deceased alleged they were legal beneficiaries under Colombian law with standing to sue for their personal damages; Court deciding that "after thorough consideration, we conclude that the Children have properly alleged their entitlement to proceed as wrongful death claimants under Colombian law"); Affidavit of Beatriz Elena Sevillano Correa, filed herein, ¶¶ 6, 19, and 20.

As established above, the facts establish that Defendants, acting in concert and in a conspiracy, wrongfully caused the death of the Ambassador when they kidnapped, tortured, and executed him. Defendants' actions violated numerous provisions of the Colombian Penal Code and are liable for damages as established by the undisputed allegations in the Complaint as has been set forth in the affidavit of Ms. Sevillano Correa filed herein. *Id.*

As an heir of the Ambassador and as the legal beneficiary under Colombian law, Plaintiff has standing and a substantial right to bring a wrongful death claim against the Ambassador's murderers. *See Baloco,* 640 F.3d 1349. The facts establish that Defendants caused the wrongful death of the Ambassador, plaintiff's father. Thus, partial summary judgment as to liability for wrongful death under Colombian is appropriate. Affidavit of Ms. Sevillano Correa, ¶¶ 14-18.

## CONCLUSION

For the reasons set forth in this memorandum opinion, the undisputed facts demonstrate that (1) this Court has jurisdiction over the Defendants and the subject matter of the claims brought; (2) the Defendants have capacity to be sued; (3) Plaintiff has standing to sue the Defendants; and (4) the Defendants committed the offenses and violated the statutes and laws set forth in Counts I-XIV of the Complaint.  Therefore, the Court grants Plaintiff's motion for partial summary judgment on the issue of liability as to each Defendant for each count.

DONE AND ORDERED in Chambers at Miami, Florida, this ___ day of May, 2014.

_____
Circuit Court Judge

SPENCER EIG
CIRCUIT COURT JUDGE

Copies Provided:

Joseph I. Zumpano, Esq., Bryan R. Cleveland, Esq., Zumpano Patricios & Winker, P.A., 312 Minorca Avenue, Coral Gables, FL  33134

A-318

# Appendix AI

United Nations

$S$/2017/272

 **Security Council**

Distr.: General
21 April 2017

Original: English

---

### Letter dated 29 March 2017 from the Secretary-General addressed to the President of the Security Council

In accordance with the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace, signed on 24 November 2016, between the Government of Colombia and the Revolutionary Armed Forces of Colombia-People's Army (FARC-EP), on 24 March 2017, I received a signed original of the Final Agreement from the Permanent Representative of Colombia to the United Nations, María Emma Mejía Vélez, along with a letter from the President of the Republic of Colombia, Juan Manuel Santos Calderón.

I welcome this historic achievement, and have the honour to transmit herewith the letter (see annex I) and the Final Agreement (see annex II). I should be grateful if you could circulate both documents to the members of the Security Council.

(*Signed*) António **Guterres**

Please recycle

A-319

## Annex I

I would like to reiterate my best wishes to you in your new post as Secretary-General of the United Nations. The United Nations is playing a decisive role in the consolidation of peace in Colombia, and our permanent dialogue and exchange of views will be very important in this process.

I would also like to officially express the Colombian Government's good faith through a unilateral State declaration, and herewith submit the full text of the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace in Colombia, which was signed by the national Government and by the Revolutionary Armed Forces — People's Army (FARC-EP) on 24 November 2016 in Bogotá. This replaces the Final Agreement signed in Cartagena, which I delivered to your predecessor and to the President of the Security Council in September 2016. The new Agreement in force was ratified by the Colombian Senate on 29 November 2016 and by the House of Representatives on 30 November 2016.

Pursuant to the commitment made by the national Government and FARC-EP, which is set out in the Agreement signed on 7 November 2016, paragraph IV, included in the Final Agreement of 24 November 2016, I request that the Secretary-General accept the new Agreement and transmit it to the Security Council pursuant to resolutions 2261 (2016) and 2307 (2016), approved unanimously by the Security Council, for the purpose of creating an official document containing the full text of the Final Agreement as an annex to resolution 2261 (2016).

(*Signed*) Juan Manuel **Santos**
President of the Republic of Colombia

**Annex II**

[Original: Spanish]

### FINAL AGREEMENT FOR ENDING THE
### CONFLICT AND BUILDING A STABLE AND LASTING PEACE

### PREAMBLE

*Recalling* that the Havana dialogues between men and women delegates of the national Government, led by President Juan Manuel Santos, and those of the Revolutionary Armed Forces of Colombia — People's Army (FARC-EP), based on their joint decision to put an end to the national armed conflict, occurred as the result of the Exploratory Meeting held in the capital of the Republic of Cuba from 23 February to 26 August 2012;

*Bearing in mind* that said exploratory dialogues resulted in a General Agreement for Ending the Armed Conflict and Building a Stable and Lasting Peace, which was signed on 26 August 2012 in the presence of national witnesses and before delegates from the Republic of Cuba and the Kingdom of Norway, who also served as witnesses and have since helped to consolidate the process as guarantor countries;

*Noting* that the Bolivarian Republic of Venezuela and the Republic of Chile have, at all times, been ready to provide their good offices as observer countries;

*Recalling* that in pursuing the agenda approved in the aforementioned Agreement, negotiations were launched on 18 October 2012 in the city of Oslo, capital of the Kingdom of Norway, and have since continued in the Cuban capital without interruption until the signing of the new Final Agreement;

*Considering* that, as a consequence of the above, on 24 August 2016, the parties signed a Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace; that said Agreement was put to public consultation in the form of a referendum as agreed to by the parties at the time, on a date appointed for that purpose (2 October 2016), and based on a ruling handed down by the Constitutional Court informing the country of the terms and conditions of the path chosen;

*Recognizing* that the referendum returned a majority NO vote, although this did not imply a rejection of the right to peace or to fundamental rights;

*Emphasizing* that the aforementioned Constitutional Court ruling set forth the guidelines to be followed in the event of a majority NO vote in the referendum; that this Court ruling indicates that the powers of the President of the Republic to maintain public order, "including through negotiation with illegal armed groups for the purpose of achieving other peace accords, remain intact";

*Asserting* the decision of the parties to continue the search for peace by listening to those who expressed reservations over the contents of the Final Agreement as initially signed, with the desire to reach a new agreement that commands broader consensus; that what was achieved thereby was to have been able to enhance and amend the previous Agreement, taking into account the concerns and proposals, clarifications and specific definitions expressed by the widest range of social groups and organizations, sectors of opinion and political movements and parties; that after scrupulously examining everything put to the consideration of the negotiating parties by the stakeholders, many significant changes and substantial amendments were made to the old texts, turning the previous Peace Agreement into a new Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace;

*Emphasizing* that the new Final Agreement then signed represents the free expression of the will of the Government and of FARC-EP — having considered various initiatives of different sectors of the Colombian people — acting in good faith, and with the firm intention of complying with the Agreement;

*Bearing in mind* that article 22 of the Political Constitution of the Republic of Colombia imposes peace as a right and a duty of mandatory compliance; that Article 95 states that the exercise of the rights and freedoms recognized in the Constitution implies responsibilities, which include promoting and maintaining peace;

*Emphasizing* that peace has been universally classified as a superior human right, and a prerequisite for the exercise of all other rights and duties of individuals and citizens;

*Mindful* that the new Final Agreement encompasses each and every one of the accords reached in fulfilment of the agenda of the General Agreement signed in Havana in August 2012; and, to achieve this, the parties have at all times adhered to the spirit and scope of the provisions of the national Constitution, the principles of international law, international human rights law, international humanitarian law (conventions and protocols), the mandate of the Rome Statute (international criminal law), the rulings handed down by the Inter-American Court of Human Rights on conflicts and how to end them, and other universally recognized jurisdictional judgments and authoritative pronouncements relating to the issues agreed upon;

*Considering* that the rights and duties enshrined in the Charter are interpreted in accordance with the international treaties on human rights ratified by Colombia, without limitation on their enjoyment or exercise;

*Recalling* that Article 94 states that "the enunciation of the rights and guarantees contained in the Constitution and international conventions currently in force, should not be understood as a negation of others which, being inherent to humanity, are not expressly mentioned therein;

*Considering* that the set of accords that form the new Final Agreement contribute to the satisfaction of fundamental rights, such as political, social, economic and cultural rights; the rights of victims of conflict to obtain truth, justice and reparation; the rights of children and adolescents; the right to freedom of worship and free practice of religious faith; the fundamental right to individual and/or collective legal security and to physical security; and the fundamental right of each individual and society not to suffer a repetition of the tragedy of the domestic armed conflict that this Agreement aims definitively to overcome;

*Emphasizing* that the new Final Agreement pays special attention to the fundamental rights of women, vulnerable social groups such as indigenous peoples, children and adolescents, communities of African descent and other ethnically distinct groups; the fundamental rights of men and women campesinos and the essential rights of persons with disabilities and those displaced as a result of the conflict; and the fundamental rights of older adults and of the lesbian, gay, bisexual, transgender and intersex (LGBTI) population;

*Considering* that, in implementing the foregoing, the State, pursuant to article 13 of the Political Constitution of Colombia, must guarantee the right to equality and non-discrimination in its different dimensions; which should aim to ensure that conditions are in place to enable effective protection of persons in situations of manifest weakness and the punishment of abuses committed against them;

*Emphasizing* that Colombia has signed international treaties and declarations that enshrine equality, non-discrimination and tolerance as universal forms of

A-322

conduct, not only as principles, but as values that must be applied and defended as a condition for achieving peace and furthering the economic and social progress of all peoples, and keeping in mind that tolerance consists in "harmony in difference";

*Noting* that, in the opinion of the national Government, the changes to be made in implementing this Agreement should help reverse the effects of the conflict and alter the conditions that have facilitated the persistence of violence in the country; and that, in the opinion of FARC-EP, such transformations must contribute to solving the historical causes of the conflict, such as the unresolved issue of land ownership, particularly its concentration, the exclusion of campesino populations and the lack of development in rural communities, which affects women and children in particular;

*Appreciating and extolling* the fact that the central pillar of peace is the promotion of the presence and the effective operation of the State throughout the country, especially in the many regions that are today afflicted by abandonment, by the lack of effective public services and by the effects of the internal armed conflict itself; that it is an essential goal of national reconciliation to construct a new territory-based welfare and development paradigm to the benefit of broad sectors of the population that have hitherto been the victims of exclusion and helplessness;

*Recognizing* the rights of society to comprehensive human security with the participation of the civilian authorities;

*Exalting and enshrining* prospective justice insofar as it recognizes fundamental rights that are essential for the new and future generations, such as the right to conserved land, the right to the preservation of the human species, the right to know one's origins and identity, the right to know the truth about events occurring before one's birth, the right to exemption from responsibility for actions committed by previous generations, the right to preserve freedom of choice, and other rights, without prejudice to the rights of victims of any age or generation to obtain truth, justice and reparation;

*Vigilant* to ensure that the new vision of a peaceful Colombia will lead to a sustainable society, united in diversity, founded not only on the cult of human rights but on mutual tolerance, on the protection of the environment, on respect for nature, its renewable and non-renewable resources and its biodiversity;

*Recalling* that, on 23 June 2016, the delegations of the Government and FARC-EP signed, in the Cuban capital, the accords on the Bilateral and Definitive Ceasefire and Cessation of Hostilities, and the Laying-down of Arms and Security Guarantees, in the presence of the President of the Councils of State and Ministers of the Republic of Cuba, the Secretary-General of the United Nations, the President of the United Nations General Assembly, the President of the United Nations Security Council, the Minister of Foreign Relations of the Kingdom of Norway, the Heads of State of the observer countries, Heads of Government of the region, the Special Envoy of the United States of America and the Special Representative of the European Union; that such cessation of hostilities has been reiterated since the referendum held on 2 October;

*Accepting* that the norms of customary international law will continue to govern fundamental rights issues not mentioned in the new Final Agreement, including the binding mandate that "in cases not provided for by existing law, the human person is safeguarded by the principles of humanity and the demands of the public conscience";

*Acknowledging* that the new Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace must be endorsed pursuant to section 6 of the agenda contained in the General Agreement; that such endorsement can be obtained

through citizen participation systems such as a referendum, legislation, consultation, open meeting and others, or by public entities elected by popular vote, whose members hold representative mandates, such as the Congress of the Republic, departmental assemblies and municipal councils; that such endorsement is decided on by the parties and will be given under the relevant rules or judgments; and

*Recognizing* all of the above and, in particular, the non-delegable constitutional mandate, which makes the President of the Republic, as Head of State, Head of Government and Supreme Administrative Authority, responsible for agreeing and endorsing peace accords;

We, the Government of the Republic of Colombia and the Revolutionary Armed Forces of Colombia — People's Army, have agreed as follows:

To sign this Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace, with the substantive amendments that make it a new Agreement, the implementation of which will put a definitive end to an armed conflict that has lasted more than fifty years, as detailed below.

This Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace is signed by the national Government and the Revolutionary Armed Forces of Colombia — People's Army (FARC-EP) as a Special Agreement pursuant to common article 3 of the 1949 Geneva Conventions, thereby affording it international legitimacy.

The national Government and the Revolutionary Armed Forces of Colombia — People's Army (FARC-EP) hereby sign this Agreement, including the annexes thereto, in seven original copies, one for each of the parties, one for each of the guarantor countries and one for each of the observer countries. The seventh original copy will be deposited, immediately after signature, with the Swiss Federal Council in Berne, or with such body as may replace it as repository of the Geneva Conventions at a future date.

## INTRODUCTION

After a confrontation lasting more than half a century, we, the Government and FARC-EP, have agreed to put a definitive end to the domestic armed conflict.

The conclusion of hostilities will first and foremost represent the end of the enormous suffering that the conflict has caused. Millions of Colombians, men and women alike, have been victims of forced displacement; the dead number in their hundreds of thousands and tens of thousands of people from all walks of life have disappeared. Vast numbers of communities have been affected in one way or another throughout the length and breadth of the country, including women, boys, girls and adolescents; campesino communities and indigenous peoples; the Afro-Colombian, Black, Palenquero, Raizal and Roma communities; political parties, social and trade-union movements; and economic associations, inter alia. There must be no more victims in Colombia.

Secondly, the end of the conflict will herald a new chapter in our history. It will be an opportunity to initiate a phase of transition that will contribute to greater territorial integration, greater social inclusion — especially of those who have existed on the fringes of development and have suffered from the conflict — and to the strengthening of our democracy, bringing it to all corners of the country and ensuring that social conflicts can be resolved through institutional channels, with full guarantees for those taking part in politics.

We must build a stable and lasting peace, with the involvement of all Colombian citizens. With this objective — putting an end, once and for all, to the

17-06469

**A-324**

historical cycles of violence, and laying the foundations for peace — we hereby approve the sections contained in the Agenda of the General Agreement of August 2012, which underpins this Agreement.

The Agreement is composed of a series of accords that nonetheless constitute an indissoluble whole, in that they are suffused by a consistent rights-based approach whereby the measures agreed upon here can contribute to upholding the constitutional rights of all Colombian people. The Final Agreement recognizes, without any discrimination, the primacy of the inalienable rights of the person as a basis for coexistence in the public and private spheres, and the family as the fundamental nucleus of society and the rights of its members. Implementation of the Agreement will be governed by the recognition of equality and protection of the pluralism of Colombian society, without any discrimination. Implementation will ensure the conditions for real and effective equality; and affirmative action will be taken in favour of discriminated or marginalized groups, under a territorial, differential and gender-sensitive approach.

The Agreement's territorial focus entails recognition and consideration of the economic, cultural and social needs, characteristics and specific features of the territories and communities of Colombia, thereby guaranteeing socioenvironmental sustainability. It also seeks to implement the various measures comprehensively and in a coordinated way, with the active participation of all citizens. All of the country's regions and territories will contribute to the implementation of the Agreement, with the participation of the territorial authorities and the various sectors of society.

Citizen involvement is the basis of all of the accords constituting the Final Agreement, meaning, in general, participation by society in the peacebuilding process and, in particular, participation in the planning, implementation and monitoring of plans and programmes around the country, which is also a guarantee of transparency.

In addition, the participation of, and dialogue between, the various sectors of society will contribute to building a climate of trust and promoting a culture of tolerance, respect and harmonious relations in general, which is an objective of all the accords. Decades of conflict have led to deep mistrust within society, especially in the territories most affected by the conflict. To break down these barriers, opportunities must be provided for the broadest possible citizen involvement and mechanisms must be established to allow recognition of victims, acknowledgement and establishment of accountability and, in general, acceptance by society at large of all that has happened and of the need to make the most of this opportunity for peace.

Based on the foregoing, and with a view to further consolidating the foundations of peacebuilding and national reconciliation, the Government of Colombia and FARC-EP will, once the endorsement procedure has been completed, convene a meeting of all parties, political and social movements, and all of the country's living forces, with the aim of reaching an overarching national political accord designed to set out the institutional modifications and reforms that are needed to meet the challenges inherent to the peace, thereby implementing a new framework for political and social coexistence.

\*

The Final Agreement contains the following sections, with their corresponding accords, which aim to contribute to the changes needed to lay the foundations for a stable and lasting peace.

Item 1 contains the accord on comprehensive rural reform, which will foster structural change in rural areas, overcoming the disparities that exist between town and country, and creating conditions for quality of life and well-being among the rural population. Comprehensive rural reform must integrate the country's regions, contribute to the eradication of poverty, promote equality and ensure full enjoyment of citizenship rights.

Item 2 contains the accord entitled "Political participation: A democratic opportunity for peacebuilding". In the end-of-conflict scenario, building and consolidating peace requires expanding democracy to allow new political forces to emerge, to enrich debate and deliberation on the major issues facing the nation and thus consolidate pluralism and, concomitantly, the representation of society's diverse points of view and interests, with due guarantees for political participation and inclusion.

In particular, implementation of the Final Agreement will contribute to a broadening and deepening of democracy inasmuch as it will involve the laying down of arms and the prohibition of violence as a means of political action for each and every Colombian citizen, with a view to making the transition to a situation where democracy prevails, with comprehensive guarantees for those taking part in politics, and thereby opening up new spaces for participation.

Item 3 contains the accord "Bilateral and definitive ceasefire and cessation of hostilities and laying down of arms". This aims at the definitive cessation of offensive actions between the Colombian armed forces and FARC-EP and, in general, an end to hostilities and any action governed by the rules of the ceasefire, including those affecting civilians. This will create conditions to start the implementation of the Final Agreement and the laying down of arms, and to prepare the institutional framework and the country as a whole for the reintegration of FARC-EP into civilian life.

Item 3 also contains the accord "Reintegration of FARC-EP into civilian life — in economic, social and political matters — in accordance with their interests". The process of laying the foundations for a stable and lasting peace requires the effective reintegration of FARC-EP into the country's social, economic and political life. Reintegration constitutes ratification of FARC-EP's commitment to close the chapter of internal conflict, to become a valid player within the democratic system and to make a resolute contribution to consolidating peaceful coexistence, guarantees of non-repetition of the conflict and the dismantling of the conditions that have facilitated the persistence of violence in Colombia.

Item 3 also includes the accord "Security guarantees and the fight against criminal organizations responsible for homicides and massacres or attacks against human rights activists and social or political movements, including criminal organizations that have been labelled as successors of paramilitarism and their support networks, and the prosecution of criminal acts that threaten the implementation of the agreements and peacebuilding". To achieve this goal, the accord includes measures such as the National Political Covenant; the National Commission on Security Guarantees; the Special Investigation Unit; the Elite Corps of the National Police; the Comprehensive Security System for Political Activity; the Comprehensive Security and Protection Programme for Communities and Organizations across the country; and measures to prevent and combat corruption.

Item 4 contains the accord "Solution to the problem of illicit drugs". Peacebuilding requires a definitive solution to the illicit drugs problem, which includes crops grown for illegal use and the production and sale of illicit drugs. To that end, a new approach will address the phenomenon of drug use, the problem of crops grown for illegal use, and organized crime associated with drug trafficking,

deploying a general human rights and public health, differentiated and gender-sensitive approach.

Item 5 contains the "Victims" accord. Since the 2012 Exploratory Meeting, we have agreed that victim compensation should be at the heart of any agreement. The accord creates the comprehensive system for truth, justice, reparation and non-repetition, which will help combat impunity using a combination of judicial mechanisms that allow for the investigation and sanctioning of serious human rights violations and serious infringements of international humanitarian law, together with supplementary extrajudicial mechanisms that help to clarify the truth of what happened, search for loved ones who have disappeared and ensure reparation for the harm and injury caused to individuals, groups and entire territories.

The comprehensive system is composed of the Commission on Truth, Coexistence and Non-repetition; the Special Unit for the Search for Persons deemed as missing in the context of and due to the armed conflict; the special jurisdiction for peace; comprehensive reparation measures for peacebuilding purposes; and guarantees of non-repetition.

Item 6 contains the accord "Implementation and verification mechanisms", which creates the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement, composed of representatives from the national Government and FARC-EP. This aims, inter alia, to monitor the components of the Agreement and verify compliance therewith, while also serving as a forum for dispute resolution and the promotion and monitoring of law enforcement.

Additionally, an observer mechanism is created to enable the international community in different ways to help guarantee the implementation of the Final Agreement. In the verification area, a model is being implemented that has an international component comprising those countries that throughout the process have acted as guarantors and observers, plus two international spokespersons. The technical aspects are being supported by a project at the Kroc Institute for International Peace Studies at the University of Notre Dame in the United States.

*

We, the delegations of the national Government and FARC-EP, reiterate our profound gratitude to all victims, social and human rights organizations, communities, including ethnic groups, women's organizations, men and women campesinos, young people, academia, businesspeople, churches and faith communities, and, in general, all the citizens who played an active part and who, through their proposals, contributed to the Final Agreement. With their participation, we will succeed in building a stable and lasting peace.

The delegates of the Government of the Republic of Colombia (the national Government) and the Revolutionary Armed Forces of Colombia (FARC-EP) state the following with regard to:

1. **Towards a new Colombian countryside: comprehensive rural reform**

Whereas:

Within the context of this Agreement for ending the conflict, comprehensive rural reform lays the foundations for the structural transformation of rural areas, creates conditions for well-being among the rural population — both men and women — and thus contributes to the building of a stable and lasting peace.

In the opinion of the Government, this transformation must help to reverse the effects of the conflict and to change the conditions that have facilitated the

persistence of violence in Colombia. In the opinion of FARC-EP, this transformation must help to resolve the historical causes of the conflict, such as the unresolved issue of land ownership and, in particular, the concentration thereof, the exclusion of the campesino population and the underdevelopment of rural communities, which especially affects women, girls and boys.

Comprehensive Rural Reform views the rural areas of Colombia as a socio-historical setting of social and cultural diversity in which communities — both men and women — play a leading role in bringing about improvements in their living conditions and in defining the country's development as part of an urban/rural integration vision.

Comprehensive rural development is a decisive factor in driving forward the country's regional integration and equitable social and economic development. Comprehensive rural reform must bring about the great transformation of the rural situation in Colombia by promoting greater inclusion at the regional level, poverty eradication and equality, and it must guarantee the full enjoyment of citizens' rights and, therefore, the eradication of violence and non-repetition of the conflict.

A genuine structural transformation of rural areas requires the adoption of measures to promote appropriate use of the land in accordance with its aptitudes and to encourage its registration, restitution and equitable distribution, by guaranteeing progressive access to rural property for those who live in the countryside and, in particular, for rural women[1] and the most vulnerable communities, and by legalizing and democratizing property and promoting broader ownership of land, so that it fulfils its social function.

This structural transformation also requires greater gender equality through the adoption of specific measures to guarantee that men and women participate in, and benefit from, the implementation of this Agreement on an equal footing.

Although the aforementioned access to land is a prerequisite for the transformation of rural areas, on its own it is insufficient; national plans financed and promoted by the State must be set up with a view to achieving the comprehensive rural development that will provide public goods and services, such as education, health, recreation, infrastructure, technical assistance, food and nutrition, which promote well-being and quality of life for the rural population — girls, boys, men and women.

In its vision, comprehensive rural reform acknowledges the fundamental role of the campesino, family and community-based economy in the development of rural areas, the eradication of hunger, the generation of employment and income, decent and formal jobs, food production and national development generally, all in conjunction with and complementary to other forms of agrarian production. The reform recognizes the productive and reproductive role of women and thus their fundamental contribution to rural development and the rural economy; and it will make every endeavour on their behalf and on that of the most vulnerable in society to guarantee conditions of well-being and quality of life and to consolidate their modes of organization and production.

In the area of food and nutrition, comprehensive rural reform aims to ensure that the entire rural and urban population in Colombia has sufficient access to and

---

[1] Pursuant to Act No. 731 of 2002 establishing regulations in favour of rural women, a rural woman is any woman who, without distinction of any kind and irrespective of where she may live, takes part in a productive activity directly relating to the countryside, even where said activity is not recognized by the State's information and measurement systems, or is unremunerated. This definition includes all women from campesino, indigenous and Afrodescendent communities who have insufficient or no land.

availability of the foodstuffs they need for proper nutrition, in terms of timeliness, quantity, quality and price, especially in the case of boys and girls, pregnant or breast-feeding women and older adults, with priority given to food production and income generation.

The effectiveness, transparency and proper development of comprehensive rural reform are largely dependent on the promotion of broad participation on the part of communities through the generation of participatory and democratic institutional spaces where said communities have the capacity for change and to affect the planning, implementation and monitoring of the various plans and programmes agreed upon. Participation is also a guarantee of the greater inclusion of rural communities — both women and men — in the political, economic, social and cultural life of their regions and thus of the nation.

Men and women in the campesino, indigenous, black, Afrodescendent, *raizal* and *palenquero* communities, and other ethnic communities across the territories of Colombia, are contributing to the structural transformation of rural areas and in particular to the closing of the agricultural frontier, in favour of a sustainable socio-environmental planning. To that end, it is necessary to recognize and to support campesino reserve zones and other forms of solidarity-based partnership.

Comprehensive rural reform applies universally, and its implementation prioritizes the territories most affected by the conflict, poverty and neglect through territory-based development programmes, as vehicles of reconciliation in which all involved work towards the supreme goal of peace as both a right and a mandatory duty.

The plans and programmes agreed upon as part of comprehensive rural reform must have a territory-, ethnic- and gender-based perspective that will require the recognition and consideration of the economic, cultural and social needs, characteristics and peculiarities of the territories, women throughout their life cycle, rural communities and vulnerable groups, and they must guarantee socio-environmental sustainability.

Comprehensive rural development will be advanced in a context of globalization and State policies to allow Colombia to be integrated into the global economy, with special attention being paid to national agriculture and, in particular, to campesino, family and community-based production.

## Principles

The following principles will guide implementation of what has been agreed to under the heading "Towards a new Colombian countryside: comprehensive rural reform":

• **Structural change**: transformation of the reality of rural life on the basis of fairness, equality and democracy.

• **Comprehensive rural development**: the comprehensive development of rural areas depends on an appropriate balance being struck between the different forms of production that exist — family farming, agribusiness, tourism, commercial-scale agriculture; competitiveness and the need to promote and encourage investment in rural areas with a business vision for productive purposes as a condition for development; and the promotion and nurturing, under equity conditions, of linkages between small-scale rural production and other production models, which may be vertical or horizontal and on a different scale. In any event, the campesino, family and community-based economy will be supported and protected to further its development.

• **Equality and gender mainstreaming**: acknowledgement of women as independent citizens with rights, who, irrespective of their marital status or relationship to their family or community, have access, on an equal footing with men, to ownership of land and production projects, financing options, infrastructure, technical services and training, inter alia. Attention will be given to the social and institutional conditions that have prevented women from gaining access to productive assets and to public and social benefits. Such recognition requires the adoption of specific measures for the planning, implementation and monitoring of the plans and programmes covered in this Agreement so that these can be implemented whilst taking account of women's specific needs and distinct conditions, in accordance with their life cycle, aspirations and needs.

• **Well-being and quality of life**: the ultimate goal is the eradication of poverty and the full satisfaction of the needs of citizens in rural areas, so that, in the shortest possible time, campesinos and communities, including those of African descent and indigenous peoples, can fully exercise their rights and there can be a convergence between the quality of urban and rural life, while respecting the territorial and gender perspective, and the ethnic and cultural diversity of the communities.

• **Prioritization**: the comprehensive agrarian development policy is universal and its implementation prioritizes the most needy and vulnerable populations and territories, and the communities most affected by poverty, neglect and conflict, and it focuses on small and medium-sized producers, men and women alike. The rights of the victims of the conflict, boys and girls, women and older adults, deserve special attention.

• **A comprehensive approach**: this guarantees productivity through programmes for effective access to land, supported by innovation, science and technology, technical assistance, credit, irrigation and marketing, and other means of production that add value. It is also a guarantee that there will be opportunities for a better quality of life deriving from access to public goods such as health, housing, education, infrastructure and connectivity, and measures to ensure that the entire population has access to healthy, adequate and sustainable nutrition.

• **Reinstatement**: the reinstatement of the rights of victims of displacement and dispossession, and the reversal of the effects of the conflict and neglect on communities and territories.

• **Land titling**: combating the unlawful possession and ownership of land and guaranteeing the rights of men and women who are the legitimate holders and owners, so that violence is never again used as a means of solving land-related disputes. Nothing in the Agreement should impair the constitutional right to private ownership.

• **The right to food**: the comprehensive agrarian development policy must focus on gradually guaranteeing that all individuals have access to healthy and adequate nutrition and that foodstuffs are produced under sustainable systems.

• **Participation**: the planning, implementation and monitoring of plans and programmes will move forward with the active participation of communities, both men and women, which is also a guarantee of transparency and accountability, citizen oversight and special supervision by the competent agencies.

• **Benefit, impact and measurement**: taking prioritization into account, comprehensive rural reform must be of benefit to and have a positive impact

on the largest number of citizens, both male and female, to the greatest extent and in the shortest time possible, with its effects on each project and region being measured.

- **Sustainable development**: development that is environmentally and socially sustainable, requiring protection and promotion of access to water, as part of an ordered concept of territory.

- **State presence**: in order to build a stable and lasting peace, the presence of the State in rural areas will be broad and effective, and it will be reflected in the democratic fulfilment of the rights of all citizens, men and women alike.

- **Democratization of land access and appropriate use**: mechanisms and guarantees which enable the largest possible number of men and women living in rural areas, and who are landless or have insufficient land, to gain access to it, and which encourage appropriate land use under criteria of environmental sustainability, aptitude, territorial management and community participation. With this in mind and in accordance with the provisions of section 1.1.1 on the land bank for comprehensive rural reform (3 million hectares) and section 1.1.5 on large-scale land titling (7 million hectares), the next 12 years will see an extension under comprehensive rural reform of 10 million hectares. In any case, the titling target will be met within the first 10 years and titling under the territory-based development programmes will be met within the next seven years.

## 1.1.   Access and Use. Unproductive land. Land titling. Agricultural frontier and protection of reserve areas.

### 1.1.1.   Land bank for comprehensive rural reform

With a view to democratizing land access, for the benefit of campesino communities and especially rural women with insufficient or no land and the rural communities most affected by poverty, neglect and the conflict; legalizing property ownership rights; and, as a result, reversing concentration and promoting a fair distribution of land, the national Government will create a permanent land bank as a vehicle for free distribution. The land bank will have 3 million hectares of land available during its first 12 years of existence, obtained from the following sources:

- Land obtained from legal cancellation of ownership in favour of the nation: the Government will speed up the reforms needed to streamline the legal cancellation process with a view to reversing the unlawful concentration of land ownership.

- Land recovered in favour of the nation: uncultivated public land unlawfully appropriated or occupied, which is recovered by means of agrarian processes, notwithstanding the fact that members of campesino communities may be beneficiaries of the registration programme. (This source should be consolidated through the creation and updating of a land registry, to be promoted under this Agreement).

- Land obtained from the updating, demarcation and strengthening of the forest reserve, intended for the beneficiaries of the land bank: the appropriation of land using this mechanism will be conditional upon the drawing up of plans to guarantee social and environmental sustainability, with community participation.

- Unexploited land: land recovered through the application of the current administrative ownership cancellation procedure, due to failure to fulfil the property's social and ecological functions.

- Land acquired or expropriated for reasons of social interest or public utility, to promote access to rural property, with the corresponding compensation being paid.

- Donated land: the Government will adopt measures to facilitate procedures for donating land to the land bank, within the context of ending the conflict and peacebuilding.

Administrative expropriation for reasons of social interest and public utility and the administrative cancellation of ownership owing to non-use (cancellation of ownership of uncultivated land) will be applied pursuant to the Constitution and following the criteria established in the laws in force.

### 1.1.2.   Other mechanisms for promoting access to land

In addition to the aforementioned mechanisms, the Government commits to the following:

- Full purchase subsidy: the Government will grant a full subsidy for the purchase of land by beneficiaries (see 1.1.3) in priority areas, as an alternative tool that will help solve individual access problems, and will include specific measures to facilitate women's access to the subsidy.

- Special purchase credit: the Government will arrange for the launch of a new long-term, subsidized, special credit line for land purchase by the beneficiary population, with special measures for rural women (see 1.1.3).

- Without prejudice to section 1.1.1 on the land bank, the Government will legislate to promote other forms of access to State land, such as the assignment of use rights, particularly for small and medium-sized producers operating as individuals or in partnership.

### 1.1.3   Beneficiary persons

The beneficiaries of the free land distribution plan, the full subsidy and the special credit, will be men and women farm workers who have insufficient or no land, with priority being given to rural victims of the conflict, including their associations, rural women, female heads of household and displaced persons. Additional beneficiaries may include associations of male and female farm workers with insufficient or no land, and also people and communities taking part in settlement and resettlement programmes, with the aim, inter alia, of protecting the environment, replacing illicit crops and strengthening food production.

The beneficiaries of the free distribution plan and the full subsidy will be chosen by the competent administrative authority, with the participation of the local communities — both men and women — to guarantee transparency and effectiveness, through a legally defined procedure that includes objective requirements and criteria and observes the aforementioned prioritization. The Government and communities will take steps to prevent land speculation within these programmes.

The competent administrative authority will produce a single register of potential beneficiaries of the free distribution plan and the full subsidy, for use as an input when implementing these mechanisms.

### 1.1.4   Comprehensive access

When implementing the principles of well-being and quality of life, integration and access to land, the national Government will provide support programmes to men and women benefitting from the land bank in the areas of

housing, technical assistance, training, land adaptation and soil recovery where necessary, productive projects, marketing and access to value-adding means of production, inter alia, and will scale up the provision of public goods as part of its territory-based development programmes.

In addition to the measures mentioned under this section and those referred to under section 1.1.1 on access to land, the national Government will establish, within the context of the programmes to stimulate agricultural production set out under section 1.3.3, measures to support income generation, poverty eradication and promotion of the solidarity-based and cooperative economy in the case of campesinos occupying land classified as a smallholding or microholding (mini- or microfundio).

### 1.1.5   Large-scale registration of small and medium plots

With a view to legalizing and protecting rights pertaining to small and medium-sized rural properties, in other words, guaranteeing the rights of the legitimate owners and holders of the land, so that violence is never again used as a method of resolving land disputes and as a safeguard against dispossession of any type, the Government will gradually register all land occupied or held by the campesino population in Colombia, subject to constitutional and legal provisions. The Government will thus register 7 million hectares of small and medium plots, giving priority to areas such as those covered by territory-based development programmes, campesino reserve zones (ZRC) and other mechanisms to be defined by the Government. In implementing this proposal, the Government will:

- Draw up a broad-based titling plan and promote the relevant regulatory and operational reforms to guarantee participation by the communities and their organizations. The plan will include specific measures for overcoming the obstacles facing rural women when titling property.

- Guarantee that there will be no charge for the registration of small plots, and provide assistance both in the processes of allocating uncultivated land and formalizing ownership of existing property.

- Within the context of the agrarian legal system being established, the Government will provide a flexible, rapid remedy for protecting property rights.

- Where the registered plot is smaller than one family agricultural unit (Unidad Agrícola Familiar — UAF),[2] the registered smallholder may also benefit from the land bank access plan and alternative mechanisms, such as credit and subsidies for land purchase, with a view to helping to curb the proliferation of unproductive smallholdings.

Transitioning to a society that has clear rules for reaching agreements on land and for accessing land ownership requires an adequate definition and protection of property rights. As there are currently various situations that impair legal certainty over land tenure or ownership in Colombia, and a solution needs to be found that takes account of realities in the country, without prejudice to the rules on land access, the Government will form a group of three experts on land issues, who will be given up to three months to make recommendations for regulatory and public policy reforms that make it possible, within a short time frame and as soon as possible, to:

- regularize the property rights of bona fide owners, occupants and tenants, provided there is no dispossession or bad faith

---

[2] The term "family agricultural unit" is used as defined in article 38 of Act No. 160 of 1994.

• guarantee the property's social and ecological function

• facilitate access for men and women workers with insufficient or no land

• promote productive land use

Proposals for regulatory amendments to land laws and public policy should be discussed with the sectors concerned, with a view to obtaining the broadest possible consensus, prior to discussion in the Congress of the Republic.

**1.1.6   Inalienable and unattachable land**

With a view to guaranteeing the well-being and quality of life of the beneficiaries and avoiding the concentration of land distributed by means of free allocation, full purchase subsidy or registered vacant land, such land will be inalienable and unattachable for a period of seven years. Distributed land and land acquired through the full purchase subsidy which, during this period, despite the full purchase subsidy, ceases to be exploited by the beneficiaries (except in cases of force majeure or fortuitous circumstance), or is used unlawfully, will revert to the land bank. The social function of rural property and, in particular, family farming, will be promoted and protected at all times.

**1.1.7   Restitution**

The Government and FARC-EP both wish to reverse the effects of the conflict and ensure that the land rights of the victims of dispossession and forced displacement, and the communities are restored, and they will encourage the voluntary return of displaced men and women. To that end, the measures agreed in item 5 on victims will be implemented.

**1.1.8   Mechanisms to resolve conflicts concerning land possession and use and to strengthen food production**

With a view to contributing to the legalization and protection of property rights, promoting appropriate land use, improving land planning and management, preventing and mitigating disputes over use and possession, and, in particular, resolving conflicts that jeopardize or limit food production, the Government will:

• Set up flexible, efficacious mechanisms for conciliation and dispute resolution concerning land use and possession, aimed at guaranteeing the effective protection of rural property rights; resolving disputes over land possession and use rights; and, in general, promoting the legalization of rural property, including traditional mechanisms and participatory intervention by communities in dispute resolution. Furthermore, the national Government will, to the same end, establish a new agrarian legal system that will enjoy appropriate coverage and capacity across Colombia, with emphasis on prioritized areas, and in conjunction with mechanisms that guarantee the rural poor expeditious and timely access to justice, with legal advice and special training for women regarding their rights and access to justice, together with specific measures for overcoming barriers to the recognition and protection of women's rights over land. Participation by women and women's organizations in the various mechanisms created for conciliation and resolution of disputes over land use and possession will be promoted.

• Create a high-level body within national Government jurisdiction, which will be responsible for drawing up general guidelines for indicative land use planning in order to coordinate, develop and harmonize sectoral policies, taking into account land suitability, the common good and the territorial rural development visions built within the framework of the participation bodies

that will have equal representation of men and women and the territorial authorities. The design of the guidelines will take the following into account: (1) socioenvironmental sustainability and the conservation of water resources and biodiversity; (2) compatibility between the suitability of rural land and its actual use; (3) the priority of food production for the country's development, allowing this to coexist with other economic activities and fostering increasing self-sufficiency; (4) the specific social, cultural and economic features of the territories. The foregoing is without prejudice to local authorities' powers to plan and guide the development of the territory in their jurisdiction and to regulate the use, transformation and occupation of space in coordination with the national authorities, within the framework of the formulation and approval of territorial planning schemes and plans.

• Promote the effective use of participatory and decision-making spaces in the planning of rural land use and territory management.

• Set up mechanisms for consensus-building and social dialogue between the national, regional and local authorities, campesino, indigenous, black, Afrodescendent, Raizal and Palenquero communities, in addition to other communities where different ethnic and cultural groups coexist, and private-sector enterprises doing business in rural areas, with a view to creating formal spaces for discussion between actors with diverse interests, which enable a common development agenda to be promoted, focusing on socioenvironmental sustainability, the well-being of rural populations and economic growth with equity.

**1.1.9    Creation and updating of the rural land register and rural property tax**

With the aim of promoting appropriate, productive and sustainable use of the land; creating an information system that can be used to promote comprehensive rural development; enhancing effective collection of taxes by local authorities and also social investment; promoting deconcentration of unproductive rural property; and, in general, transparently legalizing land ownership, the national Government will establish:

• A comprehensive and multi-purpose general land information system, which, within a maximum of seven years, leads to the creation and updating of the rural land register, including the registration of rural properties, and is implemented within the framework of municipal autonomy. In fulfilment of the principles of prioritization, well-being and quality of life, the land register must provide early results in the prioritized zones, within the scope of the agreements reached between the national Government and FARC-EP. The system will include data disaggregated by sex and ethnicity, and will provide information, inter alia, on the size and characteristics of the properties and forms of title certification. The land valuation will be carried out by the competent authority in accordance with the law.

• Technical, administrative and financial support for local authorities to enable them to create, update and maintain the rural land register, as necessary.

• Guarantee of broad and effective citizen participation to ensure information transparency. In any event, land registration matters pertaining to rural communities will be resolved with the involvement of its members. At no time will the agreements herein affect the rights acquired by indigenous and Afrodescendent populations or other rural communities.

• A system so that local authorities have autonomy to effectively assess, charge and collect the property tax, based on the up-to-date land register.

• An appropriate regulatory framework to enable local authorities to set property tax rates in accordance with the principles of progressiveness (an individual who has more, pays more), fairness and social justice.

• Local authority incentives, which will include, where necessary, transfers to municipal funds to enable said authorities to exempt the beneficiaries of land access programmes and small-scale producers from property tax.

The creation and comprehensive updating of the land register, and the registration of rural property, will not only lead to a long-lasting improvement of land registry information and processes, but will also aim to provide legal and social certainty, especially for small and medium-sized rural property, and to benefit food production and environmental harmony.

### 1.1.10   Closure of the agricultural frontier and protection of reserve areas

To demarcate the agricultural frontier, protect areas of special environmental interest and generate, for the neighbouring or occupying communities, livelihood alternatives that maintain a balance between that which is good for the environment and that which contributes to well-being and quality of life, under the principles of rural community participation and sustainable development, the national Government will:

• Within two years, implement an environmental zoning plan to define the agricultural frontier and make it possible to update and, where necessary, expand the inventory, and specify the use of areas requiring special environmental management, such as: forest reserve areas, zones of high biodiversity, fragile and strategic ecosystems, watersheds, moorland and wetlands, and other water sources and resources, with a view to safeguarding biodiversity and the population's progressive right to water, and the promotion of its rational use.

• In implementing the plan, the Government will take account of coexistence and development projects and participation by rural organizations and communities — both men and women — as a guarantee of the fulfilment of the aims under this section, without prejudice to the community and socioenvironmental interests and the common good.

• Provide support to rural communities currently living alongside or within areas requiring the special environmental management described above, working with them to structure plans for their development, including resettlement programmes or programmes for community rehabilitation of forests and the environment, which are compatible with and contribute to the objectives of closing the agricultural frontier and preserving the environment, such as: the provision of environmental services, with special acknowledgement and appreciation of intangible cultural and spiritual assets, and protecting the social interest; sustainable food production and silvo-pastoral systems; reforestation; campesino reserve zones (ZRC) and, in general, other sustainable forms of organization of the rural population and campesino economy.

• In order to promote appropriate land use, as well as the new land registry system and progressive property taxes (1.1.9), the Government will adopt measures and create incentives as necessary to prevent, and promote solutions for, conflicts between appropriate land use and actual use, taking into account the environmental zoning plan referred to herein and the principle of well-being and quality of life. Land appropriated from the forest reserve areas mentioned in this Agreement will be allocated on a priority basis to

campesinos with insufficient or no land, via various forms of organization or association, including the campesino reserve zones, which will contribute to the closure of the agricultural frontier and the strengthening of the rural economy and family farming.

• Campesino reserve zones are agricultural initiatives that contribute to peacebuilding by guaranteeing the political, economic, social and cultural rights of campesino communities, development based on socio-environmental and food sustainability, and reconciliation between Colombian citizens. The national Government, in agreement with the various communities and taking into account the principles of well-being and quality of life and participation in the comprehensive rural reform, will promote access to land and the planning of its use in the campesino reserve zones. This will involve providing support for the plans for the development of both existing zones and those to be set up, in response to initiatives of rural communities and organizations deemed to be representative, in such a manner as to comply with the aims of fostering the campesino economy, contributing to the closure of the agricultural frontier, boosting food production and protecting forest reserve areas. Active participation in the implementation of these development plans by communities — both men and women — living in the campesino reserve zones will be encouraged.

• In the context of the procedures for establishing campesino reserve zones, which will be established by the competent authority in accordance with the legislation in force, the Government will work with the communities concerned to define the areas for each zone, taking into account the needs of the campesinos who have started or wish to start procedures for setting up such zones. The zones will be established alongside property titling procedures.

## 1.2   Territory-based development programmes

### 1.2.1   Objective

The objective of the territory-based development programmes is to achieve structural change in the countryside and the rural environment and to promote an equitable relationship between rural and urban areas, with a view to guaranteeing:

• Well-being and quality of life for people living in rural areas — boys and girls, men and women — by enabling them to exercise their political, economic, social and cultural rights and by reversing the effects of poverty and conflict;

• The protection of the pluri-ethnic and multicultural richness of Colombia in order that it might contribute to knowledge, the organization of life, the economy, production and the relationship with nature;

• The development of the rural and family economy (based on cooperative, mutual, communal, microbusiness and solidarity association systems) and of the particular production methods of the indigenous, black, Afrodescendent, Raizal and Palenquero communities, through comprehensive access to land and to productive and social goods and services. The programmes will, with equal emphasis, play a part in inter-ethnic and intercultural spaces, with a view to making effective progress towards development and harmonious coexistence;

• The development and integration of regions abandoned and laid to waste by the conflict, providing progressive public investment agreed upon with the various communities and aimed at achieving a convergence between the

quality of rural and urban life, and strengthening links between cities and the countryside;

• The recognition and promotion of community organizations, including rural women's organizations, enabling them to become protagonists in the structural transformation of rural areas;

• Making the Colombian countryside a showcase of reconciliation where all men and women work towards a common goal, namely peace, which is a mandatory right and duty.

**1.2.2   Prioritization criteria**

The process of structurally transforming the countryside must cover all the country's rural areas. Priority will be given to the zones most urgently in need under a territory-based development programme, which will enable the national plans set up within the context of this Agreement to be implemented more quickly and with greater resources. The prioritization criteria for the zones will be as follows:

• Poverty levels, in particular extreme poverty and unsatisfied needs;

• The degree to which the zone has been affected by the conflict;

• The weakness of administrative institutions and of management capacity;

• The presence of crops for illicit use and other unlawful economic activities.

**1.2.3   Action plans for regional transformation**

In order to fulfil the objectives of the territory-based development programmes, an action plan for regional transformation will be prepared for each prioritized zone, which will include all levels of territorial planning and will be prepared in collaboration with the local authorities and communities. The plans will address the following:

• The territory-based approach to rural communities that takes into account the socio-historical, cultural, environmental and productive characteristics of the territories and their inhabitants, as well as their unique needs, which will vary owing to their membership of vulnerable groups and depending on the suitability of the land, so that sufficient public investment resources can be deployed in harmony with the nation's tangible and intangible assets.

• An objective diagnostic assessment, carried out with the participation of the various communities — both men and women — which, using the aforementioned territory-based approach, will take account of the needs in a territory and the steps necessary to coordinate the various aspects, with clear, precise targets that will allow for the structural transformation of living and production conditions.

The National Development Plan will encompass the priorities and goals of the territory-based development programmes.

**1.2.4   Participation mechanisms**

Active participation by the communities — both men and women — in conjunction with the territorial authorities, is the basis of the territory-based development programmes. For that purpose, mechanisms will be set up at the different territorial levels, to guarantee citizen participation in the competent authorities' decision-making process, so as to implement what was agreed in the comprehensive rural reform. These mechanisms will have community

representation, including the participation of rural women and their organizations, and support from supervisory bodies to:

- Define priorities for the implementation of national plans (roads, irrigation, infrastructure, services, etc.) in the territory, in accordance with the population's needs;

- Guarantee community involvement in the execution of the works and their upkeep;

- Establish project follow-up and oversight mechanisms.

The participation mechanisms created for the development of the territory-based development plans seek to strengthen citizen participation in decisions affecting them under the Constitution, promote solidarity associations and invigorate local democracy. In no way are they intended to limit the executive powers of elected officials or the powers of collegiate bodies (Congress, councils and assemblies). In the context of the territory-based development programmes, the general characteristics and timeframes will be explicitly defined to ensure the proper functioning of these participation mechanisms.

**1.2.5   Means**

The territory-based development programmes will be the implementation mechanism in the prioritized zones for the various national plans arising from the Agreement.

The national Government will provide the resources needed for the design and implementation of the action plans for structural transformation, in conjunction with territorial bodies.

**1.2.6   Follow-up and evaluation**

The action programmes and plans for regional transformation in each prioritized zone will include local, regional and national follow-up and evaluation mechanisms as part of the general verification and follow-up mechanisms referred to under item 6, to ensure that what is agreed on is implemented and delivered.

**1.3   National plans for comprehensive rural reform**

The central objective of the national plans for comprehensive rural reform is, on the one hand, the eradication of poverty and inequality to foster well-being among the rural population, and on the other hand, integration and closure of the gap between the countryside and the city. In accordance with this Agreement, the competent authorities will draw up and implement the national plans in the territory.

Poverty is not overcome by simply improving family incomes, but by ensuring that boys, girls, men and women have adequate access to public goods and services. This is the basis of a decent life. Thus, overcoming poverty in rural areas depends, first and foremost, on the joint action of the national plans for comprehensive rural reform, which over a 15-year transition phase will eradicate extreme poverty, reduce rural poverty in all its dimensions by 50 per cent, reduce inequality and create a trend towards convergence, at a higher level, of the quality of life in towns and cities and in rural areas. The framework plan must guarantee maximum efforts in fulfilment of the national plans over the next five years. To overcome poverty, specific and differentiated measures will be implemented to meet the specific needs of rural women and to achieve effective equality of opportunities between men and women.

### 1.3.1   Infrastructure and land improvement

#### 1.3.1.1   Road infrastructure:

With the aim of achieving regional integration and access to social services and markets, favourably influencing food prices to guarantee the right to food and raising the income level of campesino communities, the national Government will draw up and implement a national tertiary road plan, based on the following criteria:

- Active community participation, by both men and women, in the prioritization, implementation and monitoring of the works.

- Technical assistance and the promotion of the organizational capabilities of communities, to guarantee the upkeep and sustainability of the works.

- Stimulation of the local economy, giving priority to the hiring of male and female workers and the acquisition of local materials.

- Promotion and application of diverse technological solutions.

- The importance of guaranteeing the sustainability of socioenvironmental conditions.

#### 1.3.1.2   Irrigation infrastructure

With the aim of promoting family farm production and the campesino economy in general, by guaranteeing democratic and environmentally sustainable access to water, the national Government will draw up and implement a national irrigation and drainage plan for the campesino, family and community-based economy. Implementation of the plan will be based on the following criteria:

- Promotion and application of appropriate technological irrigation and drainage solutions for the campesino, family and community-based economy, in accordance with the particular features of the various zones, their rural productive project and the communities themselves.

- Rehabilitation of the irrigation infrastructure for the campesino, family and community-based economy.

- Assisting user associations in the design and creation of irrigation and drainage projects.

- Technical assistance and promotion of the organizational capabilities of communities to guarantee the upkeep, administration and economic and environmental sustainability of the irrigation and drainage projects.

- Promotion of appropriate practices for the use of water in irrigation.

- Preparatory measures to mitigate climate change risks.

#### 1.3.1.3   Electricity and connectivity infrastructure

With the aims of ensuring the conditions for a decent quality of life and of improving connectivity, the national Government will design and implement a national rural electrification plan and a national rural connectivity plan, based on the following criteria:

- Expansion of electrical coverage.

- Promotion and application of appropriate technological solutions for electric power generation, in accordance with the particular features of the rural environment and the various communities.

- Technical assistance and promotion of the organizational capabilities of communities to guarantee the upkeep and sustainability of the works.

- Training in the appropriate use of energy to guarantee its sustainability.

- Installation of the infrastructure needed to guarantee high-speed internet access in municipal capitals.

- Provision of community Internet access solutions for population centres.

**1.3.2   Social development: health, education, housing, poverty eradication**

**1.3.2.1   Health**

To bring the supply of health services closer to the communities, especially for vulnerable groups and individuals, strengthen the infrastructure and quality of the public network in rural areas and improve the timeliness and relevance of service provision, the national rural health plan will be created and implemented, under the following criteria:

- Construction of and improvements to infrastructure on the basis of a broad, participatory assessment, making it possible to reach the greatest number of users in each region, provision of equipment, including the adoption of new technologies to provide higher levels of care (e.g. telemedicine), and the availability and long-term presence of qualified staff.

- Adoption of a differential and gender-sensitive approach that takes account of the health requirements of women, over their life cycle, including measures to address sexual and reproductive health, psycho-social care and special measures for pregnant women and children in the areas of prevention, health promotion and treatment.

- Creation of a special public health model for dispersed rural areas, with the emphasis on prevention, which will provide a service in the home or in the workplace.

- A system of ongoing follow-up and evaluation to guarantee the quality and suitability of the service.

**1.3.2.2   Rural education**

To provide a comprehensive service for early childhood, guarantee the coverage, quality and relevance of education, eradicate illiteracy in rural areas, help the younger generation to remain part of the production sector in rural areas and encourage regional academic institutions to become involved in rural development, the national Government will draw up and implement a special rural education plan. Implementation of the plan will be based on the following criteria:

- Universal coverage with comprehensive early childhood care.

- Flexible preschool, primary and secondary education models adapted to the needs of communities and of the rural environment, with a differential approach.

- The construction, reconstruction, improvement and adaptation of the rural educational infrastructure, to include the provision and ongoing presence of qualified teaching staff and access to information technologies.

- Guarantee of free education at the preschool, primary and secondary levels.

- Improvement of the conditions of access of boys, girls and adolescents to the education system and assistance in enabling them to continue their education through the free provision of materials, textbooks, school meals and transport.

- Provision of recreation, culture and sports programmes and infrastructure.

- Incorporation of technical agricultural training into secondary school education (grades ten and eleven).

- Provision of scholarships and grants for the poorest rural men and women to gain access to technical, technological and university training, to include subsistence funds, where relevant.

- Promotion of vocational training for women in disciplines that are not a traditional female preserve.

- Implementation of a special programme for eradicating illiteracy in rural areas.

- Strengthening and promotion of research, innovation and scientific and technological development for the agricultural sector in areas such as agro-ecology, biotechnology and soil science.

- Gradual increase in technical, technological and university places in rural zones, with fair access for both men and women, including persons with disabilities. Special measures will be implemented to provide incentives for rural women to access and continue in education.

- Promotion of greater supply of technical, technological and university training in subject areas related to rural development.

**1.3.2.3   Housing and drinking water**

With the aim of guaranteeing decent living conditions for rural inhabitants, the national Government will draw up and implement a national plan for building and improving rural public housing. Implementation of the plan will be based on the following criteria:

- Application of appropriate housing solutions adapted to the particular features of the rural environment and of the communities. Men and women will have equal access to these solutions.

- Promotion and application of appropriate technological solutions (local pipelines and individual solutions) to guarantee access to drinking water and wastewater management.

- Granting of subsidies for construction and improvement of housing, prioritizing those in extreme poverty, victims, beneficiaries of the land distribution plan and women heads of household. The amounts of the non-repayable subsidy, which may cover the full cost of the housing solution, will be established according to construction costs and requirements in each region, with a view to guaranteeing decent housing conditions.

- Active participation of the communities — both men and women — in defining housing solutions and in project implementation.

- Technical assistance and enhancement of the organizational capabilities of the communities to ensure the upkeep, operation and sustainability of solutions providing water access and wastewater management.

- Promotion of appropriate practices for the use of drinking water.

### 1.3.3 Measures to stimulate agricultural production and the cooperative and solidarity-based economy. Technical assistance. Subsidies. Credit. Income generation. Marketing. Formalization of employment.

#### 1.3.3.1 Measures to stimulate the cooperative and solidarity-based economy

With the aim of promoting different associative forms of work for, or between, small and medium-sized producers, based on solidarity and cooperation, which promote economic independence and organizational capacity, especially among rural women, and which strengthen the ability of small producers to access goods and services, market their goods, and, in general, improve their living, working and production conditions, the national Government will draw up and implement a national plan to promote the rural cooperative and solidarity-based economy. Implementation of the plan will be based on the following criteria:

• Mentoring and technical and financial support for rural communities — both men and women — in the creation and strengthening of cooperatives, solidarity-based and community associations and organizations, especially those connected with food production and supply and, in particular, organic and agro-ecological production, and women's organizations.

• Strengthening of productive capacities and the conditions providing access to rural development instruments (means of production, technical assistance, training and qualifications, credit and marketing, inter alia).

• Measures to stimulate the solidarity-based and cooperative economy as a means of channelling resources and services to the rural population.

• Support and adapted measures to assist community organizations and associations in managing infrastructure and equipment projects (roads, housing, health, education, water and basic sanitation, irrigation and drainage).

#### 1.3.3.2 Technical assistance

With the aim of strengthening production capacities in the rural, family and community-based economy to develop productive projects and promote technological innovation, the national Government will design and implement a national plan for comprehensive technical and technological assistance and research incentives. Implementation of the plan will be based on the following criteria:

• Guaranteed provision of comprehensive technical and technological assistance (advances in terms of technical-productive, organizational, social, management, administration, information technology, finance, marketing and training aspects) for production in the rural, family and community-based economy in a decentralized manner. Comprehensive technical and technological assistance is a free-of-charge public service for men and women who benefit from the land bank and for small-scale producers, with priority being given to women heads of family, and will include a progressive subsidy for medium-scale producers.

• Regulation and supervision of the quality of the technical and technological assistance service, including a system of participatory and community-based monitoring and evaluation that will involve female participation.

• Linkage of technical and technological assistance with the results of agricultural research and innovation processes, including the use of information and communication technologies.

• Promotion and protection of native seeds and seed banks, without restricting or imposing other types of seeds such as enhanced, hybrids and others, so that

A-343

communities (both men and women) can access optimal planting materials and, on a participatory basis, contribute to their improvement by incorporating their own knowledge, as well as the strict socioenvironmental and health regulation of genetically modified crops to promote the common good. These measures will be implemented in the context of the Government's unwavering duty to adopt measures and use the necessary tools to safeguard genetic heritage and biodiversity as part of the nation's sovereign resources.

### 1.3.3.3   Subsidies, income generation and credit

In addition to the subsidies that the national Government will grant to the rural, family and community-based economy through the plans and programmes on land distribution, technical assistance, housing, infrastructure and, in general, all the social goods and services falling under the heading of comprehensive access, the Government will design and implement a plan for supporting and consolidating income generation in the rural, family and community-based economy and among low-income medium-scale producers. The plan will also be designed to enable women to overcome barriers preventing them from gaining access to finance. The plan will be implemented on the basis of the following criteria:

- Provision of non-repayable seed funding that will enable the successful start-up of production projects for the beneficiaries of land distribution.

- Promotion of revolving agricultural funds for associations of small and medium-scale low-income producers.

- Adoption of a system of guarantees to facilitate access to agricultural credit by the rural family and community-based economy.

- In light of the agreements set out in 1.1.6 on inalienable and non-attachable land, the provision of soft, flexible, rapid and subsidized credit lines for the rural, family and community-based economy, and complementary activities, with progressive subsidies for medium-scale low-income producers, aimed at supporting the right to nutrition, the restructuring of production and the creation of added value. Subsidized credit lines for land purchase will be granted exclusively to small-scale producers.

- Promotion of subsidized harvest insurance for the agricultural produce of the rural, family and community-based economy in all its forms.

- Fostering of an all-risk management culture.

- Alongside subsidized credit manuals, comprehensive information and mentoring will be provided as a priority to small-scale rural producers in the use of portfolio normalization mechanisms, enabling them to resume production on their landholdings in the campesino, family and community-based economy, with a view to safeguarding their livelihood.

### 1.3.3.4   Marketing

With the aim of guaranteeing suitable conditions for marketing goods arising from the production of the campesino, family and community-based economy and improving their availability as a guarantee of the right to nutrition, the national Government will draw up and implement a national plan for the marketing of products of the campesino, family and community-based economy, which will include affirmative actions to promote the economic empowerment of rural women. Implementation of the plan will be based on the following criteria:

- Promotion of solidarity-based associations, including those of rural women, for marketing purposes, which will provide information and logistics,

administer storage centres and promote the produce of the countryside, with special attention being given to prioritized areas, in order to gradually minimize middlemen, reduce the final price charged to the consumer, encourage direct relationships between producers and consumers, and create conditions for guaranteeing higher incomes for producers.

• Financing or co-financing of storage centres for the food produced in the campesino, family and community-based economy, which address the particular features and needs of the region and encourage organized communities to run the storage centres.

• In towns and cities, promotion of markets for the produce of the campesino, family and community-based economy.

• Promotion of links between small-scale rural production and other production models, which may be vertical or horizontal, and on different scales, depending on country/town integration, for the benefit of the various communities — both men and women — and to add value to production.

• The design and gradual implementation of a public procurement mechanism to meet the demand from institutional entities and programmes which, in a decentralized fashion, will foster local production in order to support the sales and market absorption of the produce of the campesino, family and community-based economy.

• Implementation for producers of a regional price information system based on information and communications technologies.

**1.3.3.5  Formalization of rural employment and social protection**

The Government will do its utmost to strengthen the social security and protection system for the rural population, with a differentiated approach that takes into account the situation of women in particular. On the basis of the International Labour Organization regulations, to which Colombia is party, and with a view to safeguarding decent employment and the rights of men and women workers in rural areas, and their social protection (covering old age and maternity benefits, and occupational risks), the Government will draw up and implement the progressive plan for social protection and safeguarding of the rights of rural workers.

The aim of the plan will be to provide decent rural working conditions through the full application, by means of workplace inspections, of the regulations governing employment contracts, length of the working day, remuneration and contract regulation, taking account of case-law developments in favour of workers and the applicable international standards of the International Labour Organization concerning labour in general and rural labour in particular, to effectively safeguard the fundamental right to work for both men and women on an equal basis. Implementation of the plan will be based on the following criteria:

• Campaigns to eradicate child labour and immediate measures to eradicate its worst forms.

• Guaranteed social protection through a regular economic benefit for workers in rural areas of retirement age, and an occupational risk subsidy proportionate to individual savings, which will include a State subsidy.

• Measures to promote worker organization in rural areas through solidarity- and cooperation-based associations, to facilitate access to State services targeting worker well-being.

• Promotion of the recruitment of persons with disabilities.

- Promotion of the recruitment of women in non-traditional areas of production.

- Training for agricultural men and women workers and businesses in the area of employment rights and obligations, and promotion of the culture of job formalization.

- Strengthening of the fixed labour inspection system and creation of a mobile system in rural areas to enable workers to demand their employment rights and to adequately handle employment disputes.

- The environmentally and socially sustainable plans and programmes to be implemented in rural areas will be developed in collaboration with the workforce in communities in the zone — both men and women. Employment conditions under these programmes will be compliant with international and national regulations and will be governed by the principles of dignity and fairness.

- Extension of programmes for effective protection from the economic risk of old age to the elderly rural population in extreme poverty which is not covered by the social security system, taking account of the special needs of older women.

- Promotion of schemes for protection during pregnancy, childbirth and breastfeeding, as well as newborn health services, by gradually extending the coverage and enhancing the quality of the family health and subsidy systems, with special emphasis on rural working women.

### 1.3.3.6   Associations

The Government will encourage and promote associations, productive chains and partnerships between small, medium and large-scale producers, and also with processors, traders and exporters, to guarantee large-scale, competitive production that forms part of value-added chains that help improve the living conditions of rural inhabitants in general and small producers in particular. To that end, the Government will provide technical, legal and economic assistance (credit or financing) to small producers to underpin balanced and sustainable projects in the family and associative economy.

### 1.3.4   System for gradually guaranteeing the right to food

In fulfilment of the obligation to progressively guarantee the human right to healthy, nutritious and culturally appropriate food, with the aim of eradicating hunger and enhancing the availability of, access to and consumption of nutritious food in sufficient qualities, the Government will establish a special system to gradually guarantee the right to food for the rural population.

Food and nutrition policy in rural zones is based on the gradual increase in food production, income generation and, in general, the creation of conditions of well-being based on national plans for access to land, infrastructure, irrigation, housing and drinking water, technical assistance and training, marketing, credit, the promotion of partnerships based on solidarity and cooperation, and other plans set out in this Agreement. This policy acknowledges the fundamental role played by rural women in helping to guarantee the right to food.

All national plans must be cross-cutting and in line with the proposed food and nutrition policy objectives, and must be implemented in the territories on the basis of a system that takes account of the following criteria:

- The development of departmental and local plans concerning culturally appropriate food and nutrition, with active participation by the communities,

society, the national Government and departmental and municipal governments, with a view to implementing the measures and establishing targets in the field.

• The establishment of departmental and municipal food and nutrition councils, with representatives from the Government and broad representation of society and communities — both men and women — with the aim of proposing and participating in the definition of guidelines for designing and implementing food and nutrition policies through departmental and local plans, mobilizing resources in the region, monitoring risk and monitoring the fulfilment of targets.

• The creation of a National Food and Nutrition Council composed of national, departmental and municipal authorities and representatives (both male and female) selected from the departmental and municipal councils, which will propose and participate in defining food policy guidelines, coordinate departmental and local plans, report on and monitor risk and monitor goals on a national level.

• The development of programmes to combat hunger and malnutrition, with national coverage, especially for the destitute rural population, pregnant and breastfeeding women, girls and boys and older adults. These programmes will include emergency plans for the most vulnerable rural population and those living in extreme poverty.

• The adoption of support systems to strengthen, develop and underpin production and the domestic market, which include technical and scientific assistance and are designed to enhance the environmentally and socially sustainable skill level of the campesino, family and community-based economy, thereby contributing to self-sufficiency and self-supply.

• The promotion of local and regional markets close to those who produce and consume, which improve conditions of access to and availability of food in rural areas of the country.

• The implementation of campaigns designed to promote the production and consumption of highly nutritious food products, the correct handling of food and the adoption of good eating habits, which take specific territorial features into account and promote the production and consumption of Colombian foods.

• In addition, the provision of conditions and incentives to promote production and marketing, including, where necessary, direct support to strengthen production with the aim of avoiding or minimizing the negative impacts of economic globalization and trade liberalization in the campesino, family and community-based economy.

## 2.  Political participation: a democratic opportunity for peacebuilding

The Government and FARC-EP consider that:

In the context of the end of the conflict, peacebuilding and consolidation requires an expansion of democracy to allow new political forces to emerge, to enrich debate and discussion on the major problems confronting the nation, thereby strengthening pluralism and thus the representation of different visions and interests in society, with due safeguards for participation and political inclusion. It is important to expand and to qualify democracy as a prerequisite for achieving solid foundations for forging the peace.

Peacebuilding is a task for society as a whole and requires the involvement of everyone without distinction. As a result, it is necessary to encourage participation and decision-making by all sectors of Colombian society. Peacebuilding is a right and also a mandatory duty, forming the basis for setting Colombia on the road to peace with social justice and reconciliation, heeding its people's clamour for peace. This includes strengthening social organizations and movements and providing more robust spaces for involvement to enable citizens to participate in a positive and effective way, and thus invigorate and enhance democracy.

Considering that women face greater social and institutional barriers to political participation, as a result of deep-rooted discrimination and inequality, structural conditions of exclusion and subordination, there will be significant challenges in guaranteeing their right to participation. Addressing and transforming these historical conditions will involve developing firm measures that will guarantee women's participation in the various areas of political and social representation. To that end, the situation and condition of women in their specific contexts need to be recognized.

The signing and implementation of the Final Agreement will help to extend and deepen democracy by resulting in the laying down of arms and the outlawing of violence as a method of political action for each and every Colombian citizen, in order to make the transition to a country where democracy rules, with full guarantees for those taking part in politics and thereby opening up new opportunities for participation.

Consolidating peace entails guaranteeing pluralism by facilitating the establishment of new political parties and movements that will contribute to debate and to the democratic process and will involve sufficient guarantees for the exercise of political opposition and genuine power alternatives. In the end-of-conflict scenario, democracy needs stronger safeguards for political participation.

Peace consolidation also requires the promotion of coexistence, tolerance and non-stigmatization, ensuring conditions of respect for democratic values and hence greater respect for those exercising political opposition.

Those guarantees will be based on a fairer distribution of public resources allocated to political parties and movements and a more transparent electoral process. There will have to be a series of immediate measures, especially in the regions where risks and threats persist, and also a comprehensive review of the electoral system and the composition and functions of the electoral authorities. In addition, there will have to be greater guarantees for the exercise of political opposition.

The review and modernization of the electoral system must provide for greater citizen participation in the electoral process. This, in turn, requires inclusive measures to facilitate exercise of that right, especially in remote areas or in areas affected by the conflict and neglect, taking account of the specific difficulties faced by women in such areas to exercise this right.

Peacebuilding further requires citizen mobilization and participation in public affairs and, in particular, in the implementation of this Agreement. This involves, first, the strengthening of guarantees and capacities, so that male and female citizens alike, brought together in different social and political movements and organizations, can carry on their activities and thereby contribute to the expression of the interests of a pluralistic, multicultural society through different means, including social protest.

To strengthen the participation of women as citizens, their social agendas have to be appreciated and their contribution to public life as political subjects has to be recognized, especially in terms of promoting and defending their rights.

Moreover, citizen participation in the discussion of development plans, public policies and, in general, matters affecting the community will have a direct impact on the decision-making of the relevant public authorities and corporations. Thus, citizen participation will become a genuine complementary force and, at the same time, a mechanism of control of the political representation and public administration system.

The promotion of both political pluralism and social organizations and movements, particularly those involving women, young people and other sectors excluded from political activity, and of democratic debate in general, requires new modes of dissemination to give parties, organizations and communities involved in peacebuilding access to broadcasting media at the national, regional and local levels.

In addition, in a transition phase, peacebuilding requires the territories most affected by the conflict and neglect to have greater representation in the Congress of the Republic to ensure the political inclusion of those territories and their people and also the representation of their interests.

Similarly, measures are needed to create the conditions and to provide guarantees for the organizations that took up arms to be converted into political movements or parties, and to play an active part in the shaping, exercising and control of political power so that their proposals and projects can constitute a power alternative.

To fulfil all the foregoing, the necessary institutional adjustments and reviews will be made, leading to full political and citizen participation by all political and social sectors, thereby tackling the challenges of peacebuilding.

## 2.1. Rights and full guarantees for the exercise of political opposition in general and, in particular, for the new movements that emerge following the signing of the Final Agreement. Access to the media.

### 2.1.1 Rights and guarantees for the exercise of political opposition in general

Political activity is not limited exclusively to participation in the political and electoral system, and for that reason the creation of spaces for democracy and pluralism in Colombia requires acknowledgement not only of the opposition role of political parties and movements but also of the forms of action open to social and popular organizations and movements that may, in the future, act in opposition to the policies of the national Government and departmental and municipal authorities.

In that regard, defining the guarantees concerning opposition requires a distinction to be made between political opposition exercised within the political and representative system and activities of social and popular movements or organizations that could act in opposition to the policies of the national Government and departmental and municipal authorities.

In the case of political parties and movements that declare themselves to be in opposition, safeguards will be enshrined in a statute, whilst in the case of the aforementioned social and popular organizations or movements it is necessary not only to guarantee the full exercise of rights and freedoms, including that of opposition, but also to promote and facilitate spaces in which demands can be addressed.

#### 2.1.1.1   Statute of guarantees for the exercise of political opposition

The exercise of political opposition is a cornerstone of the process of building a broad-based democracy, peace with social justice and national reconciliation, particularly in the wake of the signing of a Final Agreement that will provide the space for new political parties and movements requiring full guarantees for their political activity.

To move towards fulfilling the constitutional obligation (article 112) to fully regulate the rights of political parties and movements that declare themselves in opposition to the Government, political parties and movements with legal status will be convened in a commission to define the guidelines of the statute of guarantees for political parties and movements that declare themselves in opposition. In addition, the following political groups representing the opposition will be convened to the commission: Marcha Patriótica and Congress of the Peoples, along with two experts designated by FARC-EP. The commission will create spaces or mechanisms to receive inputs and proposals from other political groupings wishing to participate in the discussion. Care will be taken to ensure that the parties, movements and other groups called to the commission include female representation. The Commission will hold an event to facilitate involvement by spokespersons from the most representative social organizations and movements, experts and academics, and others. On the basis of these guidelines, the national Government will draft a bill, with the assistance of delegates from the Commission of political parties and movements, which will be presented for debate within Congress no later than three months after the Commission submits its recommendations.

#### 2.1.2   Security guarantees for political activity

As part of a modern, qualitatively new concept of security that, in the context of the end of the conflict , is based on respect for human dignity, the promotion of and respect for human rights, and the defence of democratic values, particularly the protection of the rights and freedoms of those engaging in political activity, and especially those who, after the armed conflict has ended, become members of the political opposition and thus have to be recognized and treated as such, the national Government will set up a new comprehensive security system for political activity.

In an end-of-conflict scenario, the maximum possible guarantees for political activity have to be established, thereby using democracy as a vehicle for the settlement of disputes and conflicts, contributing decisively to the creation of a climate of coexistence and reconciliation.

The comprehensive security system is conceived within the context of guarantees of rights and freedoms, and it seeks to ensure the promotion and protection of individuals, and respect for life and freedom of thought and opinion, thereby strengthening and consolidating democracy.

This new comprehensive security system for political activity must help to create and to guarantee a culture of coexistence, tolerance and solidarity that dignifies political activity and offers guarantees to prevent any form of stigmatization or persecution of leaders by reason of their political activities, free opinion or opposition. Measures will be adopted to prevent the promotion of concepts of security which, under any pretext, conflict with the objectives of the system — namely protection of the life of persons engaging in political activity and their non-stigmatization for their political ideas and activities. The new system will include special measures for women, including a higher valuation of their involvement in public life.

The new system will, within State institutions, political parties and movements, social organizations and movements and communities in general, promote a culture of respect for difference and an interest in the prevention of violence against politically active persons.

The system will include a robust internal control mechanism that will guarantee the suitability of officials and make it possible to prevent and, if necessary, penalize any conduct in conflict with the rights of the individuals that it is called upon to protect.

The system will be structured in keeping with a concept of security that focuses on the individual, is based on the principles of sovereignty, non-intervention and free determination of peoples, and that allows security measures to be established in conjunction with measures aimed at the development and well-being of individuals and groups covered by this Agreement. It will also adopt a differential and gender-sensitive approach.

Furthermore, the Government will strengthen, concentrate and implement its full institutional capacity and deploy a multi-dimensional approach to prevent, dismantle and neutralize any possible source of violence against persons engaging in political activity. It will also take all necessary steps to ensure that there is no resurgence of paramilitary groups (see 3.4).

### 2.1.2.1  Comprehensive security system for political activity

Under the precepts set forth above, the national Government will establish a comprehensive security system for political activity, understanding security as a democratic value and adopting a humanistic approach that must inspire Government actions. The system must effectively guarantee the rights and freedoms of persons engaging in political activity within the framework of democratic rules.

The system will include the following elements:

(a)   Appropriate regulations and institutions:

• Creation of a high-level unit, which will:

– Establish a security system for political activity and guarantee its implementation, functioning and supervision.

– Be accountable to the Office of the President of the Republic and establish mechanisms for ongoing dialogue with political parties and movements, especially those in opposition and the new movement arising from the transition of FARC-EP to legal political activity. The mechanisms will include, inter alia, a system of planning, information and monitoring, as well as a follow-up and evaluation commission (see paragraph (d). The unit will promote effective dialogue with women.

– Oversee the functioning of the system and serve as the primary link with other State institutions, such as the Office of the Ombudsperson, the Public Prosecution Department (Fiscalía) and the Attorney-General's Office (Procuraduría)

• A review of the regulatory framework to increase the penalties for crimes against persons engaging in political activity.

• Strengthening of investigative and judicial capabilities for prosecuting anyone who commits an offence against persons engaging in political activity. A specialization process will be carried out in the investigation and indictment stage to increase institutional capacity for combating impunity.

(b)   Prevention:

• Early warning system:

    – The system will have a territorial, differential and gender-sensitive approach.

    – The Government will have sufficient funding for the proper and comprehensive functioning of this early warning system.

• Preventive security deployment:

    – The concept of comprehensive territorial control that includes engaging men and women citizens in the regions to assist in the protection of those involved in political activity, within the context of the peacebuilding process.

• An inclusive and auditable coordination system.

(c)   Protection:

• A specialized protection programme for members of the new political movement arising from the transition of FARC-EP to legal political activity, to be agreed upon between FARC-EP and the Government.

• Specialized protection, based on a risk assessment, for persons elected by popular vote, those who declare themselves in political opposition, and the men and women leaders of political parties and movements. For the purposes of their participation in politics, the assessment will take into consideration the specific risks that these people face.

• The risk assessment will be defined promptly and will be the responsibility of a unit within the system that will provide input to enable the Government to take pertinent measures. The unit will have regional and local capabilities and will include representation from the new political movement arising from the transition of FARC-EP to legal political activity, with which decisions and actions will be coordinated.

• The Government will have the resources needed to protect the integrity of leaders, men and women who take part in political activity, with particular attention to their specific needs.

(d)   Evaluation and follow-up:

• An inter-agency planning, information and monitoring system, with representation from the political parties and movements, will be set up to evaluate performance and results and to adapt strategy and procedures in order to guarantee conditions of security in political activity. The system will include specific information on risks and threats concerning political participation and the political, social and community representation of women. The system will be permanently monitored by international humanitarian organizations in agreement with the new parties or movements arising in the wake of the signing of the Final Agreement and all other political parties and movements wishing to take part.

• Accountability in the form of public reports prepared by the high-level unit.

• A commission will be set up to monitor and evaluate the performance of the comprehensive system for protection and progress in the dismantling of criminal organizations and of all those that threaten political activity. The commission will include representation from political parties and movements.

• A committee will be set up to facilitate investigations into crimes committed against persons engaging in political activity, especially offences against the opposition.

**2.1.2.2   Security guarantees for leaders of social organizations and movements and human rights activists**

(a)   Appropriate regulations and institutions:

• A review of the regulatory framework for increasing the penalties for crimes against leaders of social organizations and movements and human rights activists.

• Strengthening of investigative and judicial capabilities for prosecuting anyone who commits an offence against the leaders of social organizations and movements and human rights activists.

• Guarantees for demonstrations and social protests, including the review of the regulatory framework.

(b)   Prevention:

• An early warning system.

• Preventive security deployment.

• A coordination system.

• Raising the profile of the work performed by the leaders of social organizations and movements and human rights activists.

(c)   Protection:

• Strengthening the programme of individual and group protection for the leaders of social organizations and movements and human rights activists who find themselves at risk. The individual and group protection programme will adopt a differential and gender-sensitive approach.

(d)   Evaluation and follow-up:

• An inter-agency information and monitoring system to evaluate performance and results, adapting strategy and procedures to guarantee conditions of security for the leaders of social organizations and movements and human rights activists. The system will include data disaggregated by sex.

• Accountability in the form of public reports, a follow-up commission and a special audit.

• A committee to facilitate investigations into crimes against leaders of social organizations and movements and human rights activists.

**2.2   Democratic mechanisms for citizen participation, including direct participation, at various levels and in various subject areas**

**2.2.1   Guarantees for social organizations and movements**

Given the right of all people to establish social organizations of the most varied types, to be a member of such organizations and to publicize their agendas; to freedom of expression and dissent; to pluralism and tolerance; to social or political action through protest and mobilization; and, taking account of the need for a political culture conducive to peaceful dispute resolution and of the State's obligation to guarantee deliberative and public dialogue, measures will be adopted

to guarantee the recognition, strengthening and empowerment of all social organizations and movements in accordance with their social action agendas.

The Government will guarantee the political rights of all citizens who, as political players, are organized in social organizations and movements.

Citizen participation in matters of public interest, through the establishment and strengthening of different organizations and movements, is a fundamental pillar of peacebuilding and development of a full-fledged democracy.

A democratic, organized society is a prerequisite for building a stable and lasting peace, in particular within the context of the implementation of this Agreement. To achieve that, measures must be adopted to strengthen social organizations and movements, in particular, to provide guarantees for their involvement and dialogue with the authorities. In addition, in the conviction that a society in which women participate actively is a more democratic society, it is important to strengthen women's organizations and enhance their role within social organizations and movements.

All social organizations and movements, including those arising in the wake of the signing of this Agreement, are called upon to exercise the rights and fulfil the duties of citizen participation covered therein.

With these aims, the Government will draft a bill to guarantee and promote citizen participation and other activities that social organizations and movements may engage in, in accordance with the following guidelines which will be discussed at the national level and will include the participation of men and women spokespersons from the most representative social organizations and movements:

- Guarantee of the right to timely, free access to official information pursuant to the Constitution and the law, with such legal adaptations as may be necessary for the implementation of the accords.

- Regulation of the right to reply and the right to rectification, for the most representative social organizations and movements, in response to false or offensive statements made by the Government.

- Joint work with social organizations and movements to classify and register formal and non-formal social organizations, and ensure that such information is updated regularly in order to identify, without detriment to their nature or autonomy, their capacities and needs and the existence of networks and partnerships as a basis for the development of or adjustments to public policy.

- Legal and technical assistance to support the creation and strengthening of social organizations and movements. Without prejudice to the principle of equality, special measures will be adopted to support women's and youth organizations and those representing groups that have been historically discriminated against.

- At the request of social organizations and movements, facilitate the systematic exchange of experiences in successfully strengthening such organizations and movements, and provide training and capacity-building to help them to achieve their objectives, with support from other similar organizations and movements, as appropriate.

- Strengthen mechanisms for financing initiatives and projects specific to social organizations, through public, transparent tenders subject to citizen oversight.

- Promote the creation of networks of social organizations and movements, especially those that have been politically excluded, to make their leaderships

visible and ensure that they are able to engage in full dialogue with the public authorities.

• Access to broadcasting media to highlight the work and the views of social organizations and movements, including airtime on public service channels and broadcasters.

• Take measures to increase and guarantee the representation of social organizations and movements in citizen participation mechanisms, with equal participation of men and women, citizen oversight and dialogue with the local, municipal, departmental and national authorities.

• Design methodologies that contribute to the effectiveness and influence of participation and dialogue mechanisms, including those that are established according to their inherent nature (formal or informal) and specific features. The methodologies will ensure mechanisms for monitoring and accountability of agreements arising the participation of social organizations and movements.

• Implement mechanisms for monitoring and verifying the authorities' fulfilment of obligations, commitments and guarantees relating to the establishment, operation and effectiveness of citizen participation spaces and, in particular, those that allow for dialogue with social organizations and movements.

• Create a tool to enhance, make visible and encourage work by public authorities to encourage the participation of organizations and social movements.

• Guarantee the exchange of successful experiences of citizen participation between social organizations and local and regional authorities, in accordance with the specific features of the various territories.

• Promote the establishment of local, municipal, departmental and national work programmes, as appropriate, to allow prompt action to be taken in response to requests and proposals from the various sectors made through social organizations and movements.

• The local authorities must provide a timely response to such requests and proposals and must forward them to the relevant departments to ensure that they are addressed promptly and efficiently.

The Government will consider and evaluate the feasibility of proposals for additional guarantees that are made in the context of the national participatory mechanism, through discussion within a dialogue commission that includes spokespersons from the most representative social organizations and movements, who will be chosen using a mechanism defined by the organizers. The mechanism must be participatory and guarantee pluralistic and balanced representation on the commission.

We, the Government and FARC-EP, have agreed to request that the National Participation Council, with support from the organizations Foro por Colombia, Viva la Ciudadanía and the Centre for Research and Popular Education (CINEP), establish the national participatory mechanism mentioned in item 2.2.1.

Following the signing of the Final Agreement, and within the context of the Follow-Up Commission mentioned in section 6, the Government and FARC-EP will agree criteria and guidelines for the establishment of the national participatory mechanism, with a view to guaranteeing pluralistic, balanced representation on the basis of the recommendations made by Foro por Colombia, Viva la Ciudadanía and the Centre for Research and Population Education.

The national mechanism will be convened and will meet within 60 days of the signing of the Final Agreement. Further to the provisions of section 2.2.1, within 60 days of the Dialogue Commission concluding its work, the Government will draw on the conclusions arising from the national mechanism to draft a bill on safeguarding and promoting citizen participation and other activities that social organizations and movements could engage in. This undertaking will be included in the accord defining the road map or timeline.

### 2.2.2   Guarantees for peaceful protests and demonstrations

Peaceful protests and demonstrations as forms of political action are legitimate expressions of the right to freedom of movement, freedom of assembly, freedom of expression, freedom of conscience and opposition within a democracy. Exercising those rights strengthens political inclusion and encourages citizens to be critical and prepared to engage in social dialogue and collective nation-building. Furthermore, in the context of the end of the conflict, different channels must be found for citizens' demands, including full guarantees for demonstrations, protests and peaceful coexistence. Alongside peaceful protests and demonstrations, the rights of those involved and of other citizens must be guaranteed.

Political and social democratization processes, supported by greater social and popular participation, will contribute to the structural transformation of political culture and promote renewed respect for politics.

With the aim of guaranteeing that such rights can be fully exercised, the Government will define the necessary regulatory measures and amendments, in accordance with the criteria set out below, as well as any other measures and amendments that are agreed within the context of a special commission that will have similar functions to the commission mentioned in 2.2.1 and will involve the participation of spokespersons from the Dialogue Commission and representatives from other interested sectors. The special commission will discuss input from the national participatory mechanism mentioned in the previous section, as well as input from other sectors:

- Full guarantees for peaceful protests and demonstrations as part of the constitutional right to freedom of expression, assembly and opposition, favouring dialogue and civility in the treatment of this type of activity, without prejudice to the exercise of the Government's legitimate authority in accordance with international standards for protecting the right to protest.

- Guarantees of the rights of demonstrators and other citizens.

- The guarantees needed to exercise the right to freedom of information during demonstrations and protests.

- Review of and, where necessary, amendments to the regulations on social protests and demonstrations.

- Guarantees for the application of, and respect, for human rights in general. Demonstrations and protests, including riots, will be treated with full respect for human rights by the legitimate State authority, while ensuring the rights of other citizens, in a balanced and proportionate manner.

- Strengthened oversight and control of the actions and means employed by the authorities in dealing with this type of activity.

- Guaranteed dialogue as a Government response to demonstrations and protests, through the establishment of dialogue mechanisms and participation spaces and, where necessary, mechanisms whereby agreements may be sought, with demonstrations and protests being addressed democratically; furthermore,

there must be mechanisms to monitor compliance with the agreements. Decisions made must always be for the common good.

• Involvement of the Public Prosecution Service (Ministerio Público) in demonstrations and protests to guarantee respect for democratic freedoms, where relevant or at the request of the protesters or those affected.

As part of public policy concerning the strengthening, promotion and guarantee of participation by social organizations and movements, the Government will improve and expand citizen participation mechanisms for dialogue and for the preparation of local, municipal, departmental and national work programmes, as appropriate, which will enable a prompt response to the requests and proposals of the various social organizations and sectors.

### 2.2.3   Citizen participation through community, institutional and regional media

Community, institutional and regional media must contribute to citizen participation and, in particular, promote civic values, acknowledgement of different ethnic and cultural identities, gender equality, political and social inclusion, [3] national integration and, in general, the consolidation of democracy. Citizen participation in community media will also help to build a democratic culture based on the principles of freedom, dignity and affiliation, and will strengthen good neighbourliness and mutual collaboration among communities.

In addition, in an end-of-conflict scenario, community, institutional and regional media will play a part in developing and promoting a culture of participation, equality and non-discrimination, peaceful coexistence, peace with social justice and reconciliation, and media content will incorporate non-sexist values and respect for the rights of women to a life free from violence.

In working towards these goals, the Government undertakes to:

• Hold new tenders for the award of community radio concessions, subject to the objective criteria established by law and with emphasis on the areas most affected by the conflict, and thus promote the democratization of information and use of the available electromagnetic spectrum, ensuring pluralistic allocation. The participation of community organizations including those of victims will be promoted in these tenders.

• Promote technical training for community media workers, along with professional development and training for community spokespersons and media operators, through processes that seek to dignify free expression and opinion.

• Provide access to institutional and regional broadcasting channels with the intention of publicizing the work done by social organizations and movements, including those involving women, and by communities in general, and disseminating content relating to the rights of vulnerable populations, peace with social justice and reconciliation, and implementation of the plans and programmes agreed upon in this Agreement.

• Fund the production and dissemination of content designed to encourage a culture of peace with social justice and reconciliation on the part of the public service and community media. Funds will be allocated by means of transparent, open competition subject to citizen oversight.

---

[3] Political inclusion is understood to mean the greatest possible involvement by all citizens in public affairs in the context of the consolidation of democracy, not political proselytism or propaganda.

### 2.2.4   Guarantees for reconciliation, coexistence, tolerance and non-stigmatization, especially on grounds of political and social action, within a context of mutual respect

In an end-of-conflict scenario, all citizens, including the parties to this Agreement, must help establish a culture of reconciliation, coexistence, tolerance and non-stigmatization by using respectful, dignified language and behavior in political activity and social mobilization. They must also work to create conditions conducive to building recognition and the defence of the rights enshrined in the Constitution.

With this aim, the Government will establish a national council for reconciliation and coexistence composed of representatives from the Government, the public prosecution service, representatives appointed by political parties and movements, including such movement as may arise from the transition of FARC-EP to legal political activity, social organizations and movements, particularly those involving women, campesinos, trade associations, ethnic minorities, churches, religious and faith-based organizations, the education sector, and others. The council will have the function of advising and supporting the Government in implementing mechanisms and actions, including the following:

• Design and implementation of a programme of reconciliation, coexistence and anti-stigmatization, with the involvement of territorial entities.

• Promotion of respect for difference, criticism and political opposition.

• Promotion of respect for the peacebuilding and reconciliation work done by different political and social organizations and movements.

• Promotion of respect for the work of social and human rights organizations, particularly those monitoring Government actions and those opposing Government policy.

• Promotion of non-stigmatization of vulnerable groups or persons subject to discrimination, such as women, ethnic groups and communities, the LGBTI community, young persons, children and older adults, people with disabilities and political and religious minorities.

• Training for public officials and the leaders of social organizations and movements with a view to guaranteeing non-stigmatization.

• Provision of teaching and education services concerning the Final Agreement: the promotion of training and communication programmes aimed at fostering ownership of this Agreement, especially concerning agreed designs for political and social participation. A special dissemination programme will be created and implemented through the public and private education system at all levels. The Agreement will be publicized at all levels of Government.

• Design and implementation of mass awareness-raising campaigns to build a culture of peace, reconciliation, pluralism and free debate of ideas in support of democracy.

• Promotion of reconciliation, coexistence and tolerance, especially in those populations most affected by the conflict, taking account of the disproportionate impact of the conflict on women.

Provision of training to social organizations and movements, and also to public officials in leadership posts at the national, departmental and municipal levels, to help them address and resolve conflicts.

• Creation of a university professorship in the area of political culture for reconciliation and peace.

Reconciliation and coexistence councils will be established in the territories with the aim of advising and supporting local authorities in implementing agreements in a way that takes account of territorial specifics.

**2.2.5    Citizen control and oversight**

Participation and control by citizens are essential for ensuring the transparency of public management and the appropriate use of resources, and for furthering measures to combat corruption and the penetration of criminal structures into public institutions.

Citizen control is all the more necessary in an end-of-conflict and peacebuilding scenario where huge investments will be needed to accomplish the objectives of this Agreement throughout Colombia and especially in the prioritized zones. With the aim of promoting and consolidating citizen control and democratization with more transparent public administration, the Government will:

• Put a plan in place to support the creation and promotion of citizen oversight and transparency watchdog organizations, with special emphasis on citizen control of the implementation of this Agreement. The plan will be launched in collaboration with specialist organizations and higher education institutions, inter alia, which will provide support and technical assistance services.

• Guarantee support for the national plan to train citizen monitors designated by the communities.

• Create easy-access information mechanisms at the local, regional and national levels, with the aim of guaranteeing the publicizing and transparency of implementation of this Agreement, as part of a system of accountability under the Agreement.

• In the context of a special programme for eliminating and preventing corruption in the implementation of this Agreement, create a special mechanism for addressing, processing and following up reports and warnings lodged by citizens and movements and organizations concerning possible incidents of corruption in general, with emphasis on matters relating to the implementation of this Agreement.

• Promote a widespread institutional campaign of publicizing citizens' rights and the obligations and duties of the authorities in the area of citizen participation and oversight of the public authorities, and also the administrative and judicial mechanisms aimed at ensuring effective compliance therewith.

• This campaign will also include dissemination of all citizen oversight and participation mechanisms, the way in which citizens can be involved in them and their significance in terms of a genuine democratic life.

• Strengthen the mechanisms for accountability of all popularly elected public servants at the national, departmental and municipal levels, and other public entities and firms providing public services. In particular, dialogue mechanisms will be promoted within the relevant participatory spaces.

• Through professional practices and community intervention projects engage public universities in awareness-raising campaigns to promote citizen participation and control by citizens.

• The citizen control and oversight mechanisms envisaged will include effective participation by women.

### 2.2.6    Policy for strengthening democratic and participatory planning

The promotion of good practices in planning participation is crucial for deepening democracy in Colombia, especially in the context of implementing this Agreement in the regions, which will require active, effective citizen mobilization and involvement. With the aim of strengthening participation in the preparation, discussion, implementation monitoring and evaluation of the planning and budgeting processes and in promoting the impact thereof on administrative decisions, the Government will carry out the following actions:

(a)    A review of the functions and composition of the territorial planning councils, in order to:

• Expand citizen participation in the formulation of development plans and monitoring of their implementation and evaluation. Adopt measures aimed at encouraging territorial planning councils to guarantee broad, pluralistic representation among their membership based, inter alia, on existing economic, social, cultural, environmental, educational and community organizations, partnerships and networks. It will be these bodies that will appoint their representatives in the units.

• Guarantee the involvement of the councils in the preparation, discussion, implementation monitoring and evaluation of the plans. Mechanisms will be set up for dialogue between them and the approval units.

• Strengthen involvement by local administration boards in the preparation of development plans.

• Foster connections between the various formal and informal participatory planning units.

• Make any necessary regulatory amendments so that the concepts, pronouncements and monitoring reports emanating from the participatory planning units are addressed by the public authorities in dialogue and exchange mechanisms.

• Ensure that the basic issues of the territorial planning councils are addressed by the public authorities as a matter of priority.

• Strengthen spaces for exchange and accountability between the participatory planning units and the organizations or sectors they represent in order, inter alia, to guarantee that citizen initiatives in planning matters are addressed.

• Strengthen the technical capacities of the participatory planning units.

• Promote female participation on the territorial councils.

(b)    The provision of technical assistance to the municipal and departmental authorities that need it, for the purpose of participatory formulation of various planning tools.

(c)    A comprehensive, participatory review of the participation system in planning processes and, in particular, concerning:

• Connections between territorial and national planning units.

• The composition and functioning of the National Planning Council, with a view to guaranteeing broad and pluralistic representation.

• The effectiveness of the system.

The Government will make the necessary adjustments as these emerge from the review process at all levels of the system of participation in planning processes.

(d)   Strengthen institutional designs and methodology with the aim of facilitating citizen participation and ensuring its effectiveness in the formulation of public social policies in areas such as health, education, combating poverty and inequality, the environment and culture. To that end, the Government, in collaboration with the relevant sectors, will review the sector-based participatory processes and units and will issue instructions to the respective institutions for the latter to adapt their regulations, organization and method of operation. The Government will adopt measures to facilitate effective participation by women in this work, including measures to overcome obstacles concerning women's care-giving and reproductive roles.

(e)   Strengthen and promote the preparation of participatory budgets that take account of gender and women's rights at local level, with the following aims:

• Promote involvement by men and women in prioritizing a portion of the investment budget so as to reflect the conclusions arising from the participatory planning exercises.

• Provide incentives for the formulation and implementation of participatory budgets.

• Promote monitoring and accountability mechanisms in connection with the participatory budget exercises.

## 2.3   Effective measures to promote greater participation in national, regional and local politics in all sectors, including the most vulnerable population groups, under conditions of equality and with security guarantees.

### 2.3.1   Promotion of political pluralism

With the aim of promoting political pluralism and the representative nature of the party system, by broadening the right of association for political purposes and strengthening guarantees of equal conditions for participation by political parties and movements and thereby expanding and deepening democracy, the Government will adopt the following:

### 2.3.1.1   Measures to promote access to the political system

In the end-of-conflict situation and with the aim of consolidating peace, obstacles will be removed and institutional changes implemented to enable political parties and movements to acquire and retain legal status and, in particular, to facilitate the transition of social organizations and movements with a political role towards their establishment as political parties or movements. The following measures will be taken to that end:

• Waiver of the requirement for political parties and movements to achieve a minimum threshold in congressional elections in order to acquire and keep legal status, thereby redefining the requirements for their establishment. With the aim of avoiding the indiscriminate proliferation of political parties and movements, recognition of their legal status will depend on having a certain number of members.

• Design of a system for the gradual acquisition of rights by political parties and movements, in accordance with their electoral performance at the municipal, departmental and national levels. The new regime will retain the requirements relating to votes in elections to the Senate and/or House of Representatives by the existing ordinary electoral districts, to acquire full financing rights, media

access and registration of candidates for popularly elected posts and corporations

• The system will include an eight-year transition arrangement, including funding and dissemination of programmes, to promote and support new national political parties and movements that emerge to the political scene for the first time, along with others that used to have representation in Congress but have since lost it.

### 2.3.1.2   Measures to promote equal conditions in politics

To establish a fairer distribution of funding, steps will be taken to:

• Increase the percentage that is equally distributed among the political movements or parties represented in Congress, and increase the level of funding for political parties and movements.

• Expand forums for publicizing the political programme of political movements or parties represented in Congress.

### 2.3.2   Promotion of electoral participation

With a view to fostering greater electoral participation, the Government, together with the competent authorities, will promote the following measures:

• Implementation of information, training, teaching and dissemination campaigns to encourage electoral participation at the national and regional levels, with special emphasis on the promotion of greater involvement by women, vulnerable populations and territories especially affected by the conflict and neglect.

• Implementation of a nationwide ID-issuance campaign, prioritizing marginalized zones in urban and rural areas, particularly those most affected by the conflict and neglect, and providing measures to facilitate access to the campaign by rural women.

• Support for the arrangements offered by the electoral organization to encourage and facilitate electoral participation by the most vulnerable and most isolated populations (rural, marginalized, displaced persons and victims), and in particular:

– Conduct a wide-ranging participatory diagnostic exercise with a gender perspective concerning the obstacles that such populations face in exercising the right to vote, and adopt the corresponding measures.

– Adopt mechanisms to facilitate access to voting stations by communities living in isolated and remote areas.

### 2.3.3   Promotion of transparency

### 2.3.3.1.   Measures to promote transparency in electoral processes

With a view to promoting greater electoral transparency, the Government will work with the competent authorities to implement the following measures:

• Campaigns to prevent behavior that undermines transparency in electoral processes.

• Mechanisms for facilitating citizen reporting and creation of a system to monitor it.

S/2017/272

- A technical audit of the electoral census, which will have effective citizen monitoring and involvement, by men and women alike, and by representatives from political parties and movements.

- Establishment of a national electoral guarantees tribunal and special sectional courts in electoral districts at the greatest risk of electoral fraud. The districts in question will be defined on the basis of reports and warnings received by the electoral organization from the authorities, citizens, non-governmental organizations specialized in the oversight of electoral processes, and political parties and movements, inter alia.

- Strengthening of capacity to investigate and punish crimes, electoral misdemeanours and criminal infiltration into political activity.

- Support for measures to increase transparency in the funding of election campaigns.

- Support for the implementation of electronic methods in electoral processes, with transparency guarantees.

- Encouragement of the involvement of social organizations and movements, or of any other citizens' organizations, in the monitoring and control of electoral processes.

- Promotion of political communication, education and training processes in public affairs.

**2.3.3.2   Measures to ensure transparency in the allocation of the official publicity subsidy**

To ensure transparent allocation of official publicity funding (*pauta oficial*) and prevent it from being used for electoral, partisan, personal promotion, or political project purposes, especially during electoral periods, the Government will amend the regulations to make sure the official publicity subsidy at the national, departmental and municipal levels is allocated under transparent, objective and fair criteria, taking into account local and community media and communications mechanisms.

In addition, the regulations must ensure that such expenditure is put in the public domain in the form of detailed reports.

**2.3.4   Reform of the electoral regime and organization**

To ensure greater autonomy and independence of electoral bodies, including the National Electoral Council, or any institution that may replace it, and to modernize the electoral system and make it more transparent in order to provide greater guarantees for political participation under equal conditions and to improve the quality of democracy, a special electoral mission will be set up after the Final Agreement has been signed. The mission will consist of seven high-level experts, the majority of whom will be Colombian nationals, as follows: one representative from the Electoral Observation Mission and six experts to be selected from organizations including the Carter Centre, the Department of Political Science of the National University of Colombia, the Department of Political Science of the University of the Andes, and the Netherlands Institute for Multiparty Democracy. The Mission will begin work immediately after the Final Agreement has been signed.

Within a period of four months, the Mission will submit its recommendations based, inter alia, on good national and international practices, the inputs received from political parties and movements and from the electoral authorities, and taking account of the specific problems faced by women vis-à-vis the electoral system. The

Mission will advance a broad and effective process of participation with all parties, movements and political groupings to obtain the widest possible consensus in the production of the final report. The Government will use these recommendations to make regulatory and institutional changes as necessary.

### 2.3.5  Promotion of a democratic and participatory political culture

The strengthening of political and social participation goes hand in hand with a necessary change in political culture in Colombia. To expand democracy and make it more robust, thereby consolidating peace, a participatory political culture must be fostered, founded on respect for democratic values and principles, the acceptance of contradictions and conflicts inherent in a pluralistic democracy and acknowledgement and respect for one's political opponent.

A democratic, participatory political culture must contribute to equality between citizens (men and women alike), a humanistic approach, solidarity and social cooperation, and must provide transparent management of public affairs, outlawing cronyism and corruption. It should also promote the handling of disputes through political mechanisms, and rule out violence as a method of political action.

Advancing towards a democratic, participatory political culture implies the promotion and safeguarding of the value and the significance of politics as a means whereby political, economic, social, environmental and cultural rights can be upheld. A democratic, participatory political culture should contribute to the greater integration of the most vulnerable sectors of society.

To promote a democratic, participatory culture, the Government will implement the following measures:

• Promotion of democratic values, political participation and political mechanisms, to guarantee and enhance knowledge of them and their effective use, thereby consolidating the exercise of constitutional rights, doing so through media campaigns and training workshops. Special emphasis will be placed on the most vulnerable populations such as campesino communities, women, indigenous and Afrodescendent populations and LGBTI groups. The contents of these campaigns will include values that address discrimination in its multiple forms.

• Strengthening of education programmes on democracy at different levels of education.

• Promotion of political and social leadership programmes for members of social organizations and parties.

• A programme to promote women's political participation and leadership.

### 2.3.6  Promotion of the political representation of populations and areas particularly affected by the conflict and neglect

In the end-of-conflict scenario and with the aim of achieving better integration of areas particularly affected by the conflict, neglect and institutional weakness, and to ensure greater political representation and inclusion for these populations and their political, economic, social, cultural and environmental rights, and as a further reparation measure in the peacebuilding process, the Government will create 16 special temporary electoral districts for peace in those areas. The electoral districts will in turn elect a total of 16 representatives to the House of Representatives, on a temporary basis and for two electoral periods.

The electoral districts will be governed by special rules concerning the registration and selection of men and women candidates, and the campaigns will

benefit from special funding and access to regional media. Special monitoring mechanisms will be set up to ensure the transparency of the electoral process and the electorate's freedom to vote.

In any case, candidates must be people who regularly live in those territories or have been displaced from them and are in the process of returning. Candidates may be registered by substantial groups of citizens or organizations in a given electoral district, such as rural organizations, victims' organizations (including displaced people), and organizations of women and social sectors working to construct the peace and to improve social conditions in a region. The Government will launch processes to strengthen social organizations in these territories, especially victims' organizations, with a view to their participation in the electoral district.

Candidates will be chosen by the citizens of those territories, without prejudice to their right to participate in the election of men and women candidates to the House of Representatives in the ordinary elections in their departments. Parties that have representation in the Congress of the Republic or those with legal status, including the party or political movement that arises from the transition of FARC-EP to legal political activity, will not be able to register candidates for these electoral districts.

The electoral organization will closely supervise the electoral census and the registration of candidates and campaign financing, guaranteeing compliance with the established rules. Additional monitoring and oversight mechanisms will be implemented by specialized organizations such as electoral observation missions and political parties and movements.

### 2.3.7  Promotion of women's political participation and citizenship under this Agreement

The Government and FARC-EP acknowledge the important role played by women in the prevention and resolution of conflicts and in consolidating peace, and also the need to promote and strengthen women's political and citizen participation, particularly in the end-of-conflict situation. Women's leadership and participation on an equal footing are essential in public decision-making processes and in the formulation, implementation, evaluation and monitoring of Government policies aimed at achieving a stable and lasting peace.

The Government and FARC-EP reject any form of discrimination against women and reaffirm that the contribution of women as political subjects in public life is vital for strengthening democracy and for maintaining and nurturing the peace. In implementing everything agreed to in item 2 of this Agreement, the gender perspective will be guaranteed and the necessary affirmative measures will be designed and adopted to strengthen women's participation and leadership and, in general, to fulfil the aforementioned aims.

The strengthening of women's political participation and citizenship on an equal footing includes the adoption of measures to ensure balanced representation of men and women in shaping all the bodies referred to in this Agreement. Likewise, balanced participation and leadership by women must be promoted within social organizations and movements and political parties. To raise awareness of women's rights and promote new leadership roles for them, training programmes will be implemented concerning women's political rights and forms of political participation and citizenship.

The foregoing has no bearing on the duty to strengthen compliance with international commitments and laws and with national regulations in this area.

### 2.3.8   Creation of a new vehicle of media access for political parties and movements

To supplement what is agreed upon in items 2.2 and 2.3 concerning media access for social organizations and movements and political parties and movements, respectively, the Government undertakes to establish a dedicated institutional TV channel for legally established political parties and movements, to enable them to disseminate their political platforms in a context of respect for ideas and difference. The channel will also serve as a means to provide information on the work of victims' organizations and social organizations and movements, promote a democratic culture of peace and reconciliation and the values of non-discrimination and respect for the right of women to a life free of violence, and also to publicize progress made in terms of implementing the plans and programmes contained in this Agreement.

A commission will be set up with representatives from the most widely supported political parties and movements and social organizations and movements to advise on programming for the channel.

### 3.   End of the Conflict

### 3.1   Agreement between the Government and FARC-EP on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and the Laying down of Arms ("the Ceasefire Agreement")

In implementing sub-sections 1 — Bilateral and Definitive Ceasefire and Cessation of Hostilities — and 2 — Laying down of Arms — of item 3 — End of the Conflict — of the General Agreement for Ending the Armed Conflict and Building a Stable and Lasting Peace, signed in Havana, Cuba, on 26 August 2012, the Government of the Republic of Colombia ("the Government") and the Revolutionary Armed Forces of Colombia — People's Army ("FARC-EP") hereby enter into the following agreements:

In fulfilment of, and pursuant to, the provisions of item 2 — Political participation: a democratic opportunity for peacebuilding — the Government reaffirms its commitment to the implementation of measures conducive to full political and citizen participation by all political and social sectors, including measures to guarantee citizen participation and mobilization in matters of public interest and also measures to facilitate the formation of new political parties and movements, with due guarantees for participation under secure conditions.

Furthermore, the Government reaffirms its commitment to the provisions of 3.4. and 3.6. of item 3 — End of the Conflict — which includes the creation of a new comprehensive security system for political activity, as agreed in item 2 — Political participation. This will form part of a modern, qualitatively new concept of security which, in the end-of-conflict situation, is based on respect for human dignity, the promotion of and respect for human rights and the defence of democratic values, in particular protection of the rights and freedoms of politically active persons, especially those who, after the end of the armed conflict, make the transition into a political movement and must therefore be acknowledged and treated as such.

In addition, the Government and FARC-EP confirm their commitment to foster the emergence of a new culture that outlaws the use of arms in political activity and to work together to achieve a national consensus involving all political, economic and social sectors, make a commitment to political activity where the values of democracy, freedom of ideas and civilized debate are paramount and wherein tolerance and political persecution are outlawed. This commitment forms part of the

17-06469

**A-366**

guarantees concerning non-repetition of the acts that contributed to the armed confrontation between Colombians for political reasons.

Lastly, the Government and FARC-EP reaffirm their commitment to uphold the agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement"), to which end a road map will be prepared that will contain the mutual undertakings whereby, within 180 days of the signature of the Final Agreement, the process of the laying down of arms will have been completed.

### 3.1.1   Introduction

#### 3.1.1.1   Definitions

**Bilateral and definitive ceasefire and cessation of hostilities:**

The definitive end of offensive actions between the Colombian armed forces and FARC-EP, all hostilities and any conduct prohibited under the annex to the rules governing this process. The bilateral and definitive ceasefire and cessation of hostilities will commence on Day D at hour H.

**Laying down of arms**:

This is a technical, traceable and verifiable procedure whereby the United Nations receives all FARC-EP weaponry, which will be used to construct monuments.

#### 3.1.1.2   Purpose

The purpose of this Agreement is the definitive cessation of offensive actions between the Colombian armed forces and FARC-EP and, in general, all hostilities and any action mentioned under the rules governing the process of implementing the ceasefire and cessation of hostilities, including any conduct having an adverse effect on the general population, thereby creating the conditions for the commencement of implementation of the Final Agreement and the laying down of arms and preparing the institutional framework, and the country as a whole, for the reintegration of FARC-EP into civilian life.

#### 3.1.1.3   Provision of information

The Government and FARC-EP are supplying information gradually, at the appropriate level of detail, and at the agreed upon times, to facilitate the planning and implementation of: 1. The work of the monitoring and verification mechanism; 2. Budget and logistics; 3. Security and deployment of units in the field; 4. Fulfillment of the tasks inherent to the process of implementing the ceasefire and cessation of hostilities; 5. The laying down of arms; and 6. The reintegration of FARC-EP into civilian life.

#### 3.1.1.4   Announcement and commencement of the Ceasefire Agreement

The Government and FARC-EP will announce, both nationally and internationally, their agreement for the definitive end of offensive actions between the Colombian armed forces and FARC-EP, all hostilities and any conduct prohibited under the annex to the rules governing the process in this Agreement. The process of implementing the Ceasefire Agreement will commence on Day D at Hour H.

Once this announcement has been made, a reasonable period will be established for implementation of the monitoring and verification mechanism and

for the appropriate field deployment of units of the Colombian armed forces and FARC-EP.

**3.1.1.5   Dissemination and communication**

Following signature of the Ceasefire Agreement, precise instructions will be given to the Colombian armed forces and to FARC-EP units for them to take the actions needed for the process to begin.

**3.1.1.6   Timeline**

The Government and FARC-EP have agreed to establish a logical sequence for the implementation of activities under the Ceasefire Agreement. To that end, they will adhere to the annexed timeline, which refers to events in terms of dates before or after Day D and Hour H.

The procedures for, and the terms of, implementation of this Agreement are described in the following annexes and protocols:

(a)   The Ceasefire Agreement — Introduction

• Provision of Information

• Dissemination and communication

• Timeline

(b)   Rules governing the Ceasefire Agreement

(c)   Monitoring and verification

• Deployment of the monitoring and verification mechanism

• Monitoring and verification mechanism information flow

• Strategic communications

• Monitoring and verification mechanism observation and registration

• Monitoring and verification mechanism coordination

• Code of conduct for members of the monitoring and verification mechanism

• Dispute settlement

• Mandate of the monitoring and verification mechanism

• Supervision of weapons, ammunition and explosives

(d)   Deployments on the ground

• Deployments of units on the ground and in the zones

• Movement routes, coordination of movements on the ground

(e)   Security

• Security for members of the monitoring and verification mechanism

• Security for the delegates and civil servants of the Ceasefire Agreement

• Security for FARC-EP members

• Security for the civilian population during the process of implementing the Ceasefire Agreement in the transitional local zones for normalization (ZVTN) and transitional local points for normalization (PTN)

- Security for the movement of FARC-EP to the transitional local zones for normalization and transitional local points for normalization

- Security for the ZVTN and PTN during the process of implementing the Ceasefire Agreement

- Security for the handling, storage, transport and control of weapons during the process of implementing the Ceasefire Agreement

  (f)   Logistics

- Logistics

  (g)   Laying down of arms

- Identification

- Registration

- Collection

- Storage

- Final disposal of weapons

This list of protocols may be changed as agreed upon between the Government and FARC-EP.

**3.1.2.   Rules governing the process of implementing the Ceasefire Agreement**

The rules governing the process of implementing the Ceasefire Agreement are all those arising from this Agreement that seek to prevent the Ceasefire Agreement from being violated, either by the civilian population or by the opponents in the conflict.

The rules governing its implementation aim to identify actions leading to a violation of the ceasefire; and the monitoring of such actions is at the very core of the mandate of the monitoring and verification mechanism.

The relevant annex, which forms an integral part of this Agreement, clearly identifies the actions that the Colombian armed forces and FARC-EP undertake not to commit.

**3.1.3.   Monitoring and verification**

For the purposes of implementing this Agreement, a monitoring and verification mechanism will be set up to verify compliance with the Agreement and to manage the various factors that may jeopardize the implementation process, and, in particular, to verify compliance with the rules governing the ceasefire and laying down of arms. The functions, procedures and scope of the mechanism are established in the mandate of the mechanism.

This is a flexible, efficient and rapid mechanism that will enhance the transparency and credibility of and confidence in the implementation process.

The international component of the monitoring and verification mechanism will verify the laying down of arms under the terms of the protocols to the Agreement, and with the due guarantees established therein.

The mechanism comprises three types of bodies: one at the national level; eight regional verification units; and local monitoring units set up in specific areas.

The monitoring and verification mechanism will be a tripartite technical mechanism composed of representatives from the Government (the armed forces),

FARC-EP and an international component comprising a political mission with unarmed United Nations observers mainly drawn from the member States of the Community of Latin American and Caribbean States (CELAC).

In all units, the international component leads the monitoring and verification mechanism and is responsible for settling disputes, submitting recommendations and generating reports, in accordance with the guidelines given to it in order to guarantee and support the Ceasefire Agreement's impartiality and transparency.

The number of monitoring teams will depend on the following criteria: areas, number of people and weaponry to be monitored, and topography and risk factors in each zone identified for the purpose.

The monitoring and verification mechanism has links with social and political organizations and communities, and also with Government institutions at the local, regional and national levels, and these may contribute to its work by providing information, by assisting in the dissemination of its reports to the public at large, and by submitting proposals and suggestions.

### 3.1.3.1 Settlement of disputes relating to the Ceasefire Agreement

The regional units and the national verification unit are responsible for confirming and verifying incidents involving, or violations, of this Agreement in accordance with information documented by the monitoring teams and also submitting recommendations to the Government and FARC-EP, with a view to preventing or correcting actions or facts detrimental to the process of implementing the Ceasefire Agreement.

### 3.1.4 Deployment of units in the field and zones

To fulfil the Ceasefire Agreement and to further preparation for the economic, political and social reintegration of FARC-EP members into civilian life, in accordance with their interests, as stated in sub-section 2 of item 3 of the General Agreement for Ending the Armed Conflict and Building a Stable and Lasting Peace, the Government and FARC-EP agree to set up 23 transitional local zones for normalization (ZVTN) and seven transitional local points for normalization (PTN).

On day D+1, the Colombian armed forces will start to redeploy their troops to facilitate the movement of FARC-EP units to those zones and to comply with the Ceasefire Agreement.

On day D+5, the various missions, commissions and tactical combat units on FARC-EP fronts will begin moving towards the previously agreed ZVTN and PTN, following the routes agreed upon between the Government and FARC-EP.

The foregoing will be monitored and verified by the monitoring and verification mechanism pursuant to the mandate of said mechanism, the text of this Agreement and the protocols agreed upon by the Government and FARC-EP.

### 3.1.4.1 Transitional local zones for normalization (ZVTN).

These zones aim to guarantee the process of implementing the Ceasefire Agreement and to begin the preparations for the economic, political and social reintegration of FARC-EP units into civilian life in accordance with their interests, as established in item 3, sub-section 2, of the General Agreement, and their transition to legal status.

These zones are transitional, temporary and territory-based, and are defined, demarcated and pre-approved by the Government and FARC-EP, with monitoring

and verification by the monitoring and verification mechanism, which will have local monitoring teams for each zone.

The transitional zones are in locations selected by mutual agreement and are accessible via road or river. Their boundaries correspond to those of the settlement in which they are located, and they may be extended or reduced by mutual agreement, depending on the size of the settlement in question. They are of a reasonable size to allow monitoring and verification by the monitoring and verification mechanism and compliance with the objectives of the ZVTN, having geographical features or characteristics of the terrain as references.

In implementation of the Ceasefire Agreement, both the Colombian armed forces and FARC-EP must comply with the rules governing the process of implementing the ceasefire and laying down of arms, as well as with the other chapters of, and protocols, to the Ceasefire Agreement. The monitoring and verification mechanism has unfettered access to the ZVTN, as stipulated in annex X1 of this Agreement and to units of the Colombian armed forces seconded for the arrangements stipulated in annex Y to this Agreement.

To ensure fulfilment of this Agreement, permanent communication channels will be set up between the monitoring and verification mechanism and the delegates appointed by the Government and FARC-EP.

Whilst the ZVTN are operational, FARC-EP will be answerable for its combatants inside those zones. FARC-EP combatants will leave the camps unarmed and in civilian clothing.

Once FARC-EP members are in the ZVTN, the Government will suspend orders to capture all members of FARC-EP found inside the said ZVTN, after FARC-EP has submitted a list of its members present in each zone.

Members of FARC-EP who, under the amnesty law, have been released from prison will, if they so desire, be integrated in said zones in order to continue the process of reintegration into civilian life. To this end, accommodation outside of the camps is being organized inside the ZVTN.

During the lifetime of the Ceasefire, FARC-EP will designate a group of 60 of its members (men and women) who can, at the national level, be assigned to tasks in connection with the peace accords. Similarly, for each ZVTN, FARC-EP will designate a group of 10 of its members who, at the municipal and departmental levels, can be mobilized to fulfil tasks in connection with the peace accords. For the purposes of these movements, FARC-EP members will benefit from the security measures agreed upon with the Government, for which purpose each zone will have two protection teams to cover such movements. FARC-EP commanders will be jointly responsible for any departures from the zones.

FARC-EP members assigned to the tasks mentioned in the foregoing paragraph must previously have stored weapons in containers subject verification by the international component of the monitoring and verification mechanism. Any FARC-EP member wishing to leave a ZVTN to receive emergency medical care or specialist medical treatment that is unavailable within a ZVTN must also store any weapons in caches.

The Government and FARC-EP undertake to ensure that implementation of this Agreement does not hinder the normal functioning of the unarmed civilian authorities, of economic, political and social activity in the regions, or of life in the communities, including the exercise of their rights and those of the communal, social and political organizations that are present in the country's territories.

Full effectiveness of the rule of law within the ZVTN will be guaranteed, for which purpose the functioning of the civilian authorities will be maintained without restriction. The (unarmed) civilian authorities present in the zones will remain and will continue to carry on their functions therein, notwithstanding points agreed upon in the Ceasefire Agreement. The ZVTN may not be used for political demonstrations.

The unarmed civilian authorities may enter the ZVTN on a permanent basis without restriction, except for the area of the camps where FARC-EP units are located. Each ZVTN has a reception area for attending to anyone arriving there.

No member of the civilian population may be present in or enter said camps at any time.

For the duration of the ZVTN, permission for the civilian population to carry and possess weapons within them is suspended.

The monitoring and verification mechanism is tasked with monitoring and verifying compliance with the protocols agreed upon between the Government and FARC-EP for the ZVTN and units of the Colombian armed forces assigned to the arrangements stipulated in Annex Y to this Agreement.

Should any act be committed or circumstance arise within a ZVTN that requires the presence of the national police, or any other armed authority of the State, the monitoring and verification mechanism will be informed to enable it to coordinate entry pursuant to the protocols agreed upon by the Government and FARC-EP.

The number of camps within each ZVTN agreed upon by the Government and FARC-EP will depend on the conditions of the terrain and the number of combatants within them. In any event, camps will be located to enable the monitoring and verification mechanism to fulfil its function of monitoring and verifying the Ceasefire Agreement.

In implementing the preparatory process for the reintegration of its combatants into civilian life, FARC-EP may, in coordination with the Government, provide FARC-EP members inside the ZVTN with training of any kind in productive tasks and with instruction to raise their basic primary, secondary or technical level of education, according to their own interests.

Moreover, inside the ZVTN, the Government, in agreement with FARC-EP, will implement measures and activities in preparation for reintegration, along with other activities as necessary to facilitate the transition of FARC-EP to legal status and to guarantee well-being in the ZVTN. These may include health services, ID-issuance days and other activities in preparation for reintegration.

The monitoring and verification mechanism will set up a local base for each ZVTN in a location that enables it to fulfil its functions efficiently and effectively.

### 3.1.4.2 Security zone

A security zone will be established around each ZVTN, in which no units of the Colombian armed forces or FARC-EP operatives may be present, with the exception of the monitoring and verification teams accompanied by police security when circumstances so require. Any police intervention required in a security zone, other than in connection with the monitoring and verification mechanism, must be coordinated in advance with the monitoring and verification mechanism and must observe the protocols agreed upon between the Government and FARC-EP. The security zone around each ZVTN will be one kilometre wide.

### 3.1.4.3   Establishment of camp zones and relocation routes

The ZVTN are listed in annex X1 to this Agreement.

The units of the Colombian armed forces subject to monitoring and verification by the monitoring and verification mechanism are listed in annex Y to this Agreement.

### 3.1.4.4   Commencement of relocation

On day D+1, a delegate from the Government and a delegate from FARC-EP will notify the international component of the monitoring and verification mechanism of the coordinates of the location of units of the Colombian armed forces and of FARC-EP, so that the necessary measures can be adopted to allow FARC-EP structures to relocate to the ZVTN in a safe and secure manner under monitoring and verification by the monitoring and verification mechanism.

Such movements may be accompanied by the monitoring and verification mechanism if the Government and FARC-EP so request.

### 3.1.4.5   Airspace

As from day D, airspace may be used as follows:

Over the ZVTN and security zones, military flights will be restricted to an altitude of 5,000 feet. In the event of an accident, public catastrophe or medical emergency, civilian aircraft may fly in these areas subject to prior coordination between the monitoring and verification mechanism, the Government and FARC-EP.

### 3.1.5   Security

As security is considered an overarching responsibility for the process of implementing the Ceasefire Agreement, founded on the principles of respect for life and human dignity, the Government and FARC-EP have jointly defined security protocols that comprehensively minimize potential threats that might affect or harm persons and assets committed under the Ceasefire Agreement.

The security conditions implemented as from the entry into force of the Ceasefire Agreement guarantee protection for members of the monitoring and verification team, members of FARC-EP, delegates from the Government, the Colombian armed forces and other parties involved in the process. Movements and deployments in the field will be coordinated.

Security in respect of FARC-EP weaponry, munitions and explosives during the process of implementing the Ceasefire Agreement forms part of the implementation of security protocols covering their transportation, handling, storage and control.

Security measures relating to the Ceasefire Agreement require of the State the capacity needed to guarantee security and effective implementation of the activities involved in this process and to prevent, dismantle and eliminate any circumstance that might jeopardize it.

The security measures also require FARC-EP to fulfil its respective obligations.

Similarly, the Government will use the Colombian armed forces to continue guaranteeing conditions for coexistence and security of the civilian population during this process.

The security protocols agreed upon are based on a concept of security in which people and communities are its central focus and rely on comprehensive and in-context prevention of threats whereby any risks that might affect the activities under the Ceasefire Agreement can be mitigated.

To ensure fulfilment of the Ceasefire Agreement security measures, the following protocols have been jointly drawn up to create a climate of security and trust amongst those participating in this process:

• Security for personnel from the monitoring and verification mechanism.

• Security for the delegates and public servants of the Ceasefire Agreement.

• Security for members of FARC-EP.

• Security for the civilian population in the ZVTN and PTN during the process of implementing the Ceasefire Agreement

• Security for the relocation of FARC-EP into the ZVTN and PTN.

• Security for the ZVTN and PTN during the process of implementing the Ceasefire Agreement.

• Security for the handling, storage, transport and control of weapons during the process of implementing the Ceasefire Agreement.

### 3.1.6 Logistics

This covers all elements designed to meet the specific needs identified by the Government and FARC-EP in terms of fulfilment of all aspects relating to the Ceasefire Agreement.

The local unit of the monitoring and verification mechanism has a logistics section coordinated by a member of the international component. This tripartite section of the local unit is responsible for defining aspects concerning the logistics necessary for the functioning of the ZVTN; it is also responsible for guaranteeing the appropriate and timely arrival of supplies to such zones.

The protocols under this chapter specify in detail the criteria identified and commitments made concerning each step in the logistical supply process.

### 3.1.7 Laying down of arms

This is a technical, traceable and verifiable procedure whereby the United Nations will receive all FARC-EP weaponry and use it in the construction of three monuments, approved by the Government and FARC-EP.

The laying down of arms by FARC-EP is an organized, traceable and verifiable process that will take place in two stages — control of weaponry, and laying down of arms — which involve the following technical procedures: registration, identification, monitoring and verification of possession, collection, storage, removal and final disposal.

• **Registration**: the technical procedure of recording the quantity and type of weapons received from FARC-EP by the international component of the monitoring and verification mechanism.

• **Identification**: the technical procedure for classifying FARC-EP's arms by the international component. This procedure involves only the personal weapons carried by FARC-EP members inside the camps.

• **Monitoring and verification of possession**: each FARC-EP member remaining in the zones carries an individual weapon within the camp. The

international component monitors and verifies possession of such weapons on the basis of registration and identification by the international component. There are representatives of the international component inside the camps on a permanent basis.

- **Collection**: the technical procedure whereby the international component receives all FARC-EP arms in accordance with the procedures detailed herein.

- **Storage of weaponry**: in each zone, inside one of the camps, there is an area for storing the weapons received by the international component, which are stored in dedicated containers. This location may be accessed only by the international component, which performs ongoing monitoring and verification.

- **Removal of weaponry**: this technical procedure, under United Nations auspices, consists in the physical removal of weaponry from the zones. The location of this weaponry will be determined between the Government and FARC-EP, in conjunction with the United Nations, and will be used in the construction of three monuments.

- **Final disposal of weaponry**: the technical procedure whereby FARC-EP arms are used to construct three monuments: one at United Nations headquarters, another in the Republic of Cuba, and another in Colombia at a location to be decided on by the political organization that emerges from the transformation of FARC-EP, in agreement with the Government.

### 3.1.7.1   Procedure

The signing of the Final Agreement will initiate the process of the laying down of arms by FARC-EP, as follows:

For the purposes of planning and preparing the logistical aspects of the laying down of arms, from day D+5, FARC-EP will provide the international component of the monitoring and verification mechanism with such information as the latter deems necessary for the transport, registration, identification, monitoring and verification of possession, collection, storage, removal and final disposal.

FARC-EP will contribute in various ways, including the supply of information, with the clearing and decontamination of areas where there are anti-personnel mines (APM), improvised explosive devices (IED), and unexploded ordnance (UXO), or explosive remnants of war (ERW) in general, taking into account the provisions agreed upon in items 4 and 5 and the section relating to reintegration into civilian life in connection with FARC-EP involvement in mine clearance.

Day D+5 sees the start of the relocation of FARC-EP units to the ZVTN and the transport of individual weaponry. The monitoring and verification mechanism will monitor and verify this procedure.

The period D+7 to D+30 will be for transporting heavy weaponry, militia weaponry, grenades and munitions by FARC-EP members to the ZVTN, in accordance with the security protocol for the transport of weaponry. The monitoring and verification mechanism will monitor and verify this procedure.

On arrival of FARC-EP members at the zones, the international component will start the procedure for: registration and storage in dedicated containers of personal weapons from FARC-EP members who are leaving to fulfil peacebuilding tasks and FARC-EP members seconded to the monitoring and verification mechanism.

Likewise, the international component will begin the monitoring and control of possession of personal weapons by FARC-EP members remaining inside the camps, on the basis of registration and identification of such weapons.

Heavy weaponry, grenades and munitions entering the camps, including militia weapons, will remain in temporary weapon stores under FARC-EP responsibility until day D+60 when they will be stored in special containers. This procedure will be monitored and verified by the international component.

To ensure effective control of weaponry in each zone, there will be a single storage point within one of the camps where the containers under ongoing monitoring and verification by the international component are located, in accordance with the protocols agreed upon between the Government and FARC-EP.

The period from D+10 to D+60 will see the destruction of unstable weaponry kept in caches previously located by georeferencing, in fulfilment of the security protocols defined for this purpose. The international component will confirm the implementation of this procedure.

Individual weapons still in the possession of FARC-EP members inside the camps in the zones will be collected and stored in containers sequentially and in three phases, as follows: Phase 1 - D+90, 30%; Phase 2 - D+120, 30%; and Phase 3 - D+150, the remaining 40%. This will be in accordance with the road map (timeline of events) agreed upon by the Government and FARC-EP, which will guide the process of ending the conflict once the Final Agreement has been signed.

When the weaponry has been deposited (D+150), the United Nations will complete the process of removing the weapons no later than D+180, in accordance with the agreed-upon procedures; and it will certify fulfilment of this process through an announcement to the Government and to the general public.

D+180 will mark the end of the period of operation of these zones and the bilateral and definitive ceasefire and cessation of hostilities.

The monitoring and verification mechanism will confirm and announce each of the phases of the procedure described above for the laying down of arms.

## 3.2   Reintegration of FARC-EP members into civilian life — in economic, social and political matters — in accordance with their interests

The delegates of the Government of the Republic of Colombia (the Government) and the Revolutionary Armed Forces of Colombia — People's Army (FARC-EP) consider that:

Laying the foundations for building a stable and lasting peace requires the effective reintegration of FARC-EP into the country's social, economic and political life. The reintegration process confirms the commitment of FARC-EP to contribute to the ending of the armed conflict, become a legal political entity and contribute decisively to the consolidation of national reconciliation, coexistence and guarantees of non-repetition, and to transform the conditions that allowed violence across the country to break out and persist. For FARC-EP, this is a sign of trust in Colombian society and particularly in the State, since it is expected that all of the accords forming the Final Agreement will be effectively implemented under the established terms.

Reintegration into civilian life will be a comprehensive, sustainable process of an exceptional and transitory nature, which takes into account the interests of the FARC-EP community in the process of reintegration, along with its members and their families, aimed at strengthening the social fabric across the country as well as coexistence and reconciliation among its inhabitants. It is also aimed at developing

and deploying socially productive activities and local democracy. The reintegration of FARC-EP is based on the recognition of individual freedoms and free exercise of individual rights for all current FARC-EP members. The reintegration provided for in this Agreement will be complementary to any previous accords. Every component of the reintegration process will have a differential perspective, with a special emphasis on women's rights.

In accordance with the Agreement on the special jurisdiction for peace, with respect to persons who belong to rebel organizations that have signed a peace agreement with the Government, for the purposes of reintegration, the sentences resulting from crimes in the jurisdiction of the Tribunal for Peace imposed by ordinary or disciplinary courts will remain with suspensive effect, until these sentences have been jurisdictionally reviewed by the special jurisdiction for peace.

### 3.2.1   Political reintegration

The transition of FARC-EP from an armed organization into a new legal political party or movement, which has rights and fulfils the obligations and duties inherent to constitutional order, is an essential condition for ending the armed conflict, building a stable and lasting peace and, in general, for strengthening democracy in Colombia. To that end, the necessary guarantees and conditions will be adopted to facilitate the creation and functioning of the new political party or movement that emerges from the transition of FARC-EP to legal political activity, after the signing of the Final Agreement and the laying down of arms.

In view of the foregoing and to further the political component of the reintegration of FARC-EP into civilian life, in accordance with its interests, as provided for in the General Agreement, the following special rules are agreed:

### 3.2.1.1   Guarantees for the new political party or movement

#### • Legal status

Upon signature of the Final Agreement, the National Electoral Council will process the registration application submitted by the current citizens' political grouping, which aims to promote the creation of the future political party or movement that emerges from the transition of FARC-EP to legal political life.

When the process of laying down of arms has been completed, the plenipotentiaries of FARC-EP at the Negotiation Table will formally declare and register at the National Electoral Council its decision to become a political party or movement, the act of constitution, its statutes, ethics code, ideological platform and the appointment of its officers. By virtue of this formal act, the political party or movement, under whatever name it adopts, will be recognized for all purposes and under equal conditions, as a political party or movement with legal status; and the Government will process any legislative reforms that may be required in advance.

The political party or movement thus recognized must comply with the requirements for preservation of legal status and will be subject to the grounds for loss thereof as applicable to other political parties and movements under the Constitution and other laws, except for the accreditation of a certain number of members, participation in elections and the attainment of a minimum vote threshold, during the period between its date of registration and 19 July 2026.

#### • Funding and technical assistance

#### • Operation

As a measure to facilitate the transition of FARC-EP to legal political activity, the political party or movement that it forms will receive an annual allowance,

between its date of registration and 19 July 2026, in an amount equivalent to the average received by political parties or movements with legal status to participate in the elections prior to the signing of the Final Agreement. These funds will be used in accordance with the rules applicable to all political parties and movements.

Moreover, to contribute to the funding of the Centre for Political Thought and Education (3.2.2.2), and the disclosure and dissemination of its ideological and programmatic platform, it will be assigned an annual allowance of 7 per cent of the budget allocation for the activities of political parties and movements between its date of registration and 19 July 2022.

The aforementioned sums will not affect the amount to be distributed by the Fund to the other legally established political parties and movements.

The Government will take steps to ensure that international cooperation is used to support, with the required transparency guarantees, the development of the infrastructure necessary for the establishment and initial functioning of the new political party or movement that emerges from the transition of FARC-EP to legal political activity and for the training of its leaders. Cooperation funds may not be used for electoral campaigns.

- **Electoral campaigns**

The campaigns of candidates for the Presidency and the Senate of the Republic registered by the political party or movement that emerges from the transition of FARC-EP to legal political activity, to participate in the 2018 and 2022 elections, will be funded predominantly by the State under the following rules: (i) in the case of presidential campaigns, the appropriate State funding will be granted to candidates that meet the legal requirements, pursuant to the provisions applicable to said campaigns; (ii) in the case of Senate campaigns, candidates will receive advance State funding equivalent to 10 per cent of the expense limit set by the electoral authority; (iii) the prior State funding will be non-repayable, provided that the funds allocated have been used for the purposes established by law.

- **Media access**

The political party or movement that emerges from the transition of FARC-EP to legal political activity will have access to the communications media under the same conditions as other political parties and movements with legal status, in accordance with the regulations currently in force.

- **Security**

The new political movement and its leaders and militants will have special security guarantees within the framework of the comprehensive security system for political activity, as agreed under 2.1.2.1., as well as the guarantees specified in 3.4.

### 3.2.1.2    Political representation

**(a)    Congress of the Republic**

After the signing of the Final Agreement and the laying down of arms by FARC-EP, and in order to facilitate the latter's transition to legal political activity and ensure conditions for it to promote its ideological platform, the Government will implement the constitutional and legal reforms needed to ensure the temporary political representation of the new political party or movement in the Congress of the Republic, during two constitutional periods starting on 20 July 2018:

- It may register single lists of its own candidates or in coalition with other political parties and/or movements with legal status, for the ordinary electoral

district for the Senate of the Republic and for each of the ordinary electoral districts from which the Chamber of Representatives is elected.

- These lists will compete under equal conditions in accordance with the ordinary rules for all of the seats elected in each electoral district. In both the Senate and the House of Representatives, a minimum of five seats will be guaranteed, including those obtained under the ordinary rules. For this purpose, in the House of Representatives, a seat will be assigned to each of the five lists that obtain the most votes without having gained a seat.

Once the Final Agreement enters into force, the political grouping formed with the aim of promoting the creation of the future political party or movement that emerges from the transition of FARC-EP to legal political life will appoint three spokespersons in each of the chambers (Senate and House of Representatives), who must be citizens in full exercise of their rights, exclusively so that they can participate in debates on the legal or constitutional reform bills dealt with through the special legislative process for peace under Legislative Act 01 of 2016. These spokespersons must be convened to all sessions in which the corresponding draft legislative acts or laws are discussed and may intervene with the same powers as the Congressmen and congresswomen during the legislative procedure, apart from voting. The requirements for carrying out their work will be defined in conjunction with the Ministry of the Interior.

**(b)   Participation in the National Electoral Council**

The political party or movement that emerges from the transition of FARC-EP to legal political activity may appoint a temporary delegate to the National Electoral Council, who will have a voice but not a vote and may participate in the deliberations of that body.

**(c)   Reforms for the democratic opportunity for peacebuilding**

The implementation of the reforms decided in item 2 — Political participation: A democratic opportunity for peacebuilding — constitutes an essential condition for ensuring a sustainable process of reintegration of FARC-EP into civilian life in political matters. The process established in Legislative Act 01 of 2016 will prioritize the presentation and approval of the Statute of Opposition and the reform of the electoral system.

### 3.2.2   Economic and social reintegration

### 3.2.2.1   Organization for collective economic and social reintegration

To promote a process of collective economic reintegration, FARC-EP will set up a joint social and solidarity-based economic organization called Economías Sociales del Común — ECOMÚN. This entity will cover the entire country and may have territorial branches. Current members of FARC-EP may join this entity on a voluntary basis. The Government will facilitate the legalization of ECOMÚN by providing funding for legal and technical advice and designing an expeditious and special procedure for its establishment. Within the framework of the National Reintegration Council, guidelines will be established to ensure that the work of ECOMUN is coordinated with the different competent bodies.

### 3.2.2.2   Centre for Political Thought and Education

Political groupings of citizens in full exercise of their rights, which aim to promote the creation of the future political party or movement that emerges from the transition of FARC-EP to legal political activity, will set up a centre for political

thought and education, as a non-profit institution, for the purpose of advancing social studies and research, and designing and advancing political education programmes. To that end, agreements may be entered into with public and private entities and international partners.

### 3.2.2.3   Institutional organization — National Reintegration Council

The National Reintegration Council will be created, comprising two members of the Government and two members of FARC-EP, tasked with defining the activities, establishing the timeline and monitoring the reintegration process, pursuant to the terms agreed upon with the Government. In addition, joint territorial reintegration councils will be created under terms and conditions and with functions to be defined by the National Reintegration Council. These councils will be set up when the Final Agreement is signed. The National Reintegration Council may call upon institutions, social organizations or international bodies to assist it in fulfilling its functions.

### 3.2.2.4   Accreditation and transition to legal status

Following their arrival in the ZVTN and PTN, FARC-EP will submit to the Government a list of all of FARC-EP members, via a delegate expressly designated for that purpose. This list will be received and accepted by the Government in good faith, in accordance with the principle of legitimate trust, notwithstanding the need for the corresponding verifications. In drawing up this list, FARC-EP will be responsible for the veracity and accuracy of the information contained therein. The Government will provide the facilities needed to draw up the lists in the prisons and will provide the information at its disposal in the various State institutions.

For accreditation purposes, once FARC-EP has submitted the list of all members of its organization, including the militias, the Government will start the process of reviewing and corroborating the information contained therein. It will present its observations to FARC-EP and if they are not accepted a joint discrepancy resolution mechanism will be established to review these cases in the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement. The foregoing is without prejudice to the acceptance of other people included on the list for whom no observations are presented.

An expeditious procedure will be established for the accreditation and transit of the non-armed members of FARC-EP. The persons who are accredited will have their legal situation resolved by granting a pardon through the legal instruments that would exist if the law of amnesty were not in force. They will be released at the disposal of the special jurisdiction for peace if they had been indicted for crimes not subject to amnesty under the Amnesty Law incorporated into the Final Agreement. The provisions of the Agreement of August 20, 2016 to facilitate execution of the schedule for the laying down of arms specified in the Agreement of June 23, 2016 shall be applied to them wherever in their favour.

Pursuant to the FARC-EP commitment to end the conflict, lay down arms, not return to using arms, comply with the agreements and make the transition to civilian life, once its members have laid down their arms and confirmed the organization's commitment, they will receive their respective accreditation from the Government based on the list submitted by FARC-EP.

Accreditation will be granted on the basis of the road map agreed to by the Government and FARC-EP for the transition of the members of FARC-EP to legal status.

The Government will receive and accept the definitive list, through a formal administrative act, no later than day D+180, notwithstanding any earlier accreditations made in compliance with the road map agreed for the purpose, for subsequent accreditations as agreed in the special jurisdiction for peace framework. Under exceptional circumstances and with prior justification, FARC-EP may add or remove persons to or from the list. The names included will be subject to verification by the Government.

The final list will include all of FARC-EP members whether or not they are under detention.

This accreditation will be necessary for accessing the measures agreed on for FARC-EP in the Final Agreement, notwithstanding that which was established in the agreement creating the special jurisdiction for peace. Nonetheless, access to the reintegration measures requires a commitment of responsibility towards the accords and their goals. Rights and duties in the framework of the reintegration process will be specified in detail by the National Reintegration Council

### 3.2.2.5   Reintegration for minors who have left FARC-EP camps

Any children who have left the FARC-EP camps since the start of the peace talks, and those who leave during the process of the laying down of arms, will be placed under special care and protection measures, which will be discussed within the Follow-up Commission and which will include the guiding principles applicable to minors and guidelines for drawing up the special programme as established in Joint Communiqué No. 70 of 15 May 2016, to ensure restitution of their rights under a differential approach, prioritizing their access to health care and education. These minors will be granted all the rights, benefits and provisions established for the victims of the conflict, as well as those arising from their process of reintegration under the terms contemplated in this Final Agreement, and prioritizing their family reunification whenever possible, as well as their definitive return to their communities of origin or others of similar characteristics, always taking the best interest of the child into account. These programmes will be monitored by the National Reintegration Council in conjunction with the competent State entities and with support from social or specialized organizations in charge of overseeing the terms of Joint Communiqué No. 70. The Special Reintegration Programme for minors will be prepared by the National Reintegration Council within 15 days from the signing of the Final Agreement, based on the proposal presented by the technical panel created by Joint Communiqué No. 70. Once the programme has been approved, the Government will process the necessary regulatory amendments to ensure its implementation, always taking into account the best interests of the child and international humanitarian law.

The programme must guarantee the full reintegration of the children concerned and their psycho-social support, supervised by social or specialized organizations pursuant to Joint Communiqué No. 70, as well as their placement in temporary reception units in municipalities close to the ZVTN, guaranteeing the right to information for all participants, especially children and adolescents.

### 3.2.2.6   Identification of needs for the economic and social reintegration process

#### (a)   Socioeconomic census:

Within 60 days following the implementation of the ZVTN, a socioeconomic census will be conducted to provide the information needed to facilitate the comprehensive reintegration of FARC-EP into civilian life, both as a community and as individuals. The National Reintegration Council will define the content of the census, how it is to be conducted and the safekeeping and proper use of the

information. The National University of Colombia will be responsible for conducting the census.

**(b)  Identification of sustainable productive projects and programmes**

On the basis of the results obtained from the census, potential productive projects and programmes will be identified, for the purpose of bringing together the largest possible number of men and women who are currently members of FARC-EP. Participation in programmes and projects for environmental protection and humanitarian mine clearance will warrant special attention.

**(c)  Development and implementation of sustainable productive projects and programmes**

Every member of FARC-EP in the process of reintegration will have the right to one-time economic support to start an individual or collective productive project, in the amount of 8 million pesos (Col$ 8 million).

**• Programmes and projects with ECOMÚN**

A fund will be set up, on a once-only basis, for the establishment of productive and service projects in the process of economic and social reintegration through ECOMÚN, the viability of which will be verified in advance by the National Reintegration Council. The resources corresponding to persons who decide to participate in collective projects (see 3.2.2.6 (c)), through ECOMÚN, having been identified and shown to be viable, will be transferred by the Government to ECOMUN, no later than 30 days after each project has gained viability status. The value of the fund will depend on the total number of allowances for current FARC-EP members who have chosen this option. Nonetheless, ECOMÚN will file periodic reports with the National Reintegration Council on the receipt of resources obtained from the State.

**• Individual projects**

Members of FARC-EP in the process of reintegration who wish to start production or housing projects on an individual basis, the viability of which has been checked by the National Reintegration Council, will be allocated the one-off sum indicated above by the Government.

**3.2.2.7  Guarantees for sustainable social and economic reintegration**

**• Basic income**

Every man or woman who is currently a member of FARC-EP will receive a basic monthly income equivalent to 90 per cent of the current legal minimum monthly wage, from the end of the ZVTN and for 24 months thereafter, provided they do not have a contractual relationship that already generates income for them.

Once this period has expired, a monthly allowance will be paid pursuant to the regulations issued for this purpose, and which will not be less than the amount currently in force, provided that the beneficiary confirms that he/she has continued his/her education in line with the reintegration aims. For the foregoing, the Government will set up a trustee commission. ECOMÚN will provide its members with advice and assistance in the process of selecting educational institutions.

**• One-time normalization allowance**

When the ZVTN cease to operate, every man or woman who is currently a member of FARC-EP will receive a one-time normalization allowance equivalent to Col$ 2 million.

• Social security

The amounts of social security payments for health care and pensions, under the current regulations for people who are not engaged in remunerated activities will be guaranteed by the Government. The latter will set up a trustee commission to make the payments for 24 months. ECOMÚN, for its part, will assist members in choosing the social security institutions that provide these services. Exceptionally, for serious illnesses of high cost and for rehabilitation from injuries sustained during the conflict, the Government will create a special system with national and international cooperation, within the context of the National Reintegration Council, to provide care over a period of 36 months.

• Social programmes or plans

The results of the socioeconomic census will be used to identify the plans or programmes needed to safeguard the fundamental and comprehensive rights of the population covered by the present Agreement, such as formal education (primary and secondary, technical and technological, university) and education for work and human development, as well as the validation and standardization of knowledge and know-how; housing; culture, recreation and sport; environmental protection and recovery; psycho-social support; reunification of family units and extended families and older adults, including measures for the protection and care of children of members of FARC-EP undergoing reintegration.

The actions and measures that can initiate implementation of each of these programmes will be defined at the start of the laying down of arms process in the ZVTN.

Such programmes will be guaranteed by the Government under the terms and duration defined by the National Reintegration Council. The foregoing, without prejudice to Government programmes aimed at comprehensive reparation for the victims of the conflict. To ensure their effective implementation and deployment in the territory, these programmes will be implemented on the basis of the institutional resources available to the competent national Government and Colombian State entities, without prejudice to the use of other legal remedies.

The identification of projects and mechanisms enabling access to housing, including self-build projects, will merit priority treatment and will receive special attention and support from the Government.

• Education for peace

FARC-EP will appoint three spokespersons for each ZVTN and PTN from the ten members of FARC-EP who are authorized to mobilize at the municipal level, in order to promote peace education work in the councils of the municipality in question. In the case of the departmental assemblies, that work will follow discussions between the National Reintegration Council and the respective assemblies and governors.

**3.2.2.8   Other resources for economic reintegration projects**

The economic resources provided by international cooperation, the private sector, foundations and multilateral bodies for projects aimed at the economic reintegration of current FARC-EP members into civilian life, as well as the technical cooperation resources associated with such projects, will not reduce the amounts mentioned in the paragraphs above; in other words, they will increase the economic resources provided by the Government for the implementation of the reintegration agreement.

### 3.3. Obligations of the former guerrilla commanders/members of the governing bodies of the new political force arising from the transition of FARC-EP to legality to ensure the proper implementation and stability of the Final Agreement

The former guerilla commanders/members of the governing bodies of the new political force that arises from the transition of FARC-EP to legality will be obliged to ensure the success of the process of comprehensive reintegration of FARC-EP into civilian life. To that end, among other obligations arising from the Final Agreement, they will be tasked with explaining said Agreement and resolving conflicts that might arise over compliance therewith in any of the country's municipalities, between the former members of FARC-EP or among the members of the new political movement.

### 3.4. Agreement on security guarantees and the fight against criminal organizations and conducts responsible for homicides and massacres perpetrated against human rights activists, social or political movements, or which threaten those who participate in the implementation of the agreements and peacebuilding, including criminal organizations that have been labeled as the successors of paramilitaries and their support networks

The content of this Agreement also includes section 3.6 — Security Guarantees — of the General Agreement for Ending the Conflict. This Agreement contains measures to clarify the phenomenon of paramilitarism referred to in section 3.7 of the General Agreement for Ending the Conflict, in addition to what has already been agreed in item 5 — Victims. In particular, with the Commission on Truth, Coexistence and Non-repetition, the measures discussed in the present Agreement will need to be adopted to comprehensively achieve this aim.

Based on the provisions of item 2 — Political participation — which defines security as: "a modern, qualitatively new concept of security that, in the end-of-conflict situation, is based on respect for human dignity, the promotion of and respect for human rights, and the defence of democratic values, particularly the protection of the rights and freedoms of those engaging in political activity, and especially those who, in the wake of the ending of the armed conflict, become members of the political opposition and thus have to be recognized and treated as such, the Government will set up a new comprehensive security system for political activity."

Item 2 of the Agreement also establishes that "The comprehensive security system for political activity will be structured in line with a person-centred security concept, based on the principles of sovereignty, non-intervention and free determination of peoples, and which makes it possible to coordinate security measures with the collective and individual welfare and development measures discussed in this Agreement", and provides that a differential and gender-sensitive approach will be adopted.

Lastly, item 2 of the Agreement establishes that the security guarantees are a necessary condition for consolidating peacebuilding and coexistence, and in particular for implementing the plans and programmes agreed herein, ensuring the protection of communities and community leaders and human rights advocates (both men and women), political and social movements and parties, and especially of the new political party or movement that emerges from the transition of FARC-EP to legal political activity, as well as the members thereof who are in the process of reintegration into civilian life.

To achieve these aims, the Government and FARC-EP make the following commitments:

• The Government will implement the measures needed to effectively and comprehensively intensify actions taken against the criminal organizations and conducts responsible for homicides and massacres, or acts perpetrated against human rights activists, social or political movements, or which attack or threaten persons involved in the implementation of agreements and peacebuilding, including the criminal organizations that have been designated as successors to paramilitarism and their support networks. It will also safeguard the protection of communities across the country, breaking any type of link between politics and the use of arms and respecting the principles that govern any democratic society.

• The Colombian State will apply the rules of criminal prosecution against the criminal organizations and conducts covered by this Agreement, while respecting human rights in its actions.

• It will observe the rules of international human rights law in order to protect the population.

• The State holds a monopoly on the legitimate use of arms with the aim of ensuring that all Colombian men and women can fully exercise all of their human rights.

• FARC-EP also makes a commitment to contribute effectively to the building and consolidation of peace, within the limits of its capacities, to promote the content of the agreements and to respect fundamental rights.

### 3.4.1   Guiding principles

The Government and FARC-EP agree upon the following guiding principles:

• Respect for, and guarantee, protection and promotion of, human rights: the State is the guarantor of free and full exercise of the rights and freedoms of individuals and communities in all of the country's territories.

• Safeguard the State's legitimate monopoly of force and the use of arms throughout the country: within the framework of ending the conflict and building a stable and lasting peace, the measures adopted must safeguard the State's legitimate monopoly of force and use of arms, to ensure respect and fundamental rights for all citizens. Legitimacy derives from fulfilment of the obligation to ensure that all Colombians can exercise their fundamental rights to the full, under the principles of legality, necessity and proportionality.

• Strengthening of justice administration: in the context of ending the conflict and building a stable and lasting peace, the measures adopted must help ensure citizens' equal access to independent, timely, effective and transparent justice, whilst respecting and promoting alternative mechanisms for resolving conflicts in the country's territories, such that fundamental rights and impartiality are guaranteed, preventing the application of any form of private justice and confronting the conduct and organizations covered by this Agreement. These measures must also help ensure effective justice administration in cases of gender-based violence, free from stereotypes regarding members of the LGBTI community, with sanctions proportional to the seriousness of the act in question.

• Tax Authority monopoly of taxation: action will be taken against forms of illegal economic activity and criminal income linked to organized crime, including people trafficking, drugs trafficking, illegal coercion or extortion,

S/2017/272

contraband, money laundering, tax charges other than those levied by the State monopoly and illegal mining. Traditional artisanal mining is not considered illegal.

• Differential and territorial approach: in the context of ending the conflict and building a stable and lasting peace, the security measures adopted must have a differential and territorial approach that takes into account the different threats and the characteristics and experiences of people in their diversity, and communities and territories, in order to implement the plans and programmes for building peace and provide guarantees to the population, including the new political movement that emerges from the transition of FARC-EP to legal political activity and its members in the process of reintegration into civilian life, to thus contribute to enhanced governance, legitimacy and effective exercise of citizens' rights and freedoms.

• Gender mainstreaming: special emphasis will be placed on protecting women, children and adolescents who have been affected by the criminal organizations covered by this Agreement. This approach will take account of the specific risks that women face against their life, freedom, integrity and safety; and it will be appropriate to those risks.

• Institutional coordination and co-responsibility: in the context of ending the conflict and building a stable and lasting peace, coordination and joint responsibility between all State institutions is necessary to ensure the effectiveness of the security measures adopted, on which national, departmental and municipal institutions will need to work together.

• Citizen participation: the measures will involve the active participation of civil society, including the new political movement that emerges from the transition of FARC-EP to legal political activity and its members in the process of reintegration into civilian life.

• Accountability: all measures adopted must include a permanent system for holding the institutions to account for the achievements and progress made as a result of the actions taken, including actions in response to information provided by the communities.

• Guarantees of non-repetition: the Government will adopt measures to more clearly identify the paramilitary phenomenon, prevent its repetition and dismantle the criminal organizations responsible for homicides and massacres and systematic gender-based violence, or those that attack human rights activists, social or political movements, or which threaten or attack those who participate in the implementation of the agreements and peacebuilding.

In view of the foregoing, the Government and FARC-EP agree as follows:

**3.4.2   National Political Covenant**

The country's desire to achieve a stable and lasting peace is based on recognition of the need to overcome the armed conflict. The Government and the new political movement that emerges from the transition of FARC-EP to legal political activity, undertake to promote a National Political Covenant to be developed from the regions, with the aid of political parties and movements, trade associations, the living forces of the country, organized society and communities across the country, labour unions, the National Council of Trade Associations and various economic associations, owners and directors of communications media, churches, religious groups, faith-based organizations and other organizations of the religious sector, academia and educational institutions, women's and LGBTI

17-06469

organizations, persons with disabilities, youth, ethnic peoples and communities, victims' organizations and human rights activists and other social organizations.

This National Political Covenant to be promoted from the regions and, in particular, in those regions most affected by violence, seeks to make a reality of the commitment of all Colombians that arms will never again be used in politics, and never again will violent organizations such as paramilitarism be promoted, which disrupt the life of Colombians by violating their human rights, poisoning peaceful coexistence and undermining the security conditions required by society. In this regard, the Government will legislate as necessary to incorporate, in the Constitution, a prohibition on the promotion, organization, funding or official and/or private use of paramilitary units or practices; and it will develop the regulations required for the application thereof, which will include a criminal prosecution policy, administrative sanctions and disciplinary actions. In addition, measures for bringing perpetrators to justice will be discussed. This Covenant will seek to achieve national reconciliation and harmonious relations among all Colombian people.

### 3.4.3   National Commission on security guarantees for the dismantling of criminal organizations and conducts responsible for homicides and massacres or which attack human rights activists, social or political movements, or threaten or attack people involved in the implementation of the agreements and peacebuilding, including criminal organizations that have been designated as successors of paramilitarism and their support networks, hereinafter referred to as the National Commission on Security Guarantees.

In fulfilment of what has been agreed under 2.1.2.1(d) on the comprehensive security system for political activity, which relates to the implementation of the Commission for monitoring and evaluation of the performance of the comprehensive system for protection and progress in the dismantling of criminal organizations and all those that threaten political activity, the Government and FARC-EP agree that the Government will create and implement the National Commission on Security Guarantees, which will have the aim of planning and monitoring public and criminal policies on the dismantling any organization or conduct covered by this Agreement that threatens the implementation of the accords and peacebuilding. The Commission will also harmonize those policies in order to ensure their implementation. The performance of the comprehensive system for protection will be monitored and evaluated by the high-level unit referred to in section 3.4.7.1.1 of this Agreement.

The National Commission on Security Guarantees will be chaired by the President of the Republic and will comprise the Minister of the Interior, the Minister of Defence, the Minister of Justice, the Public Prosecution Department, the Ombudsperson, the Director of the Special Investigation Unit (see section 74 on the special jurisdiction for peace), the Commander General of the Military Forces, the General Director of the National Police, three recognized experts on the subject chosen by the Monitoring Committee and two delegates of the human rights platforms. The Commission should also hold meetings every month. It may invite representatives of political parties and movements, the Office of the High Commissioner for Human Rights and other specialized national and international organizations with a presence in the territories; and it may make use of experts on the subject when it deems it appropriate. The Commission will be set up before the Final Agreement comes into effect. The Commission will promote the effective participation of women.

The work of the Commission will focus on the following:

(a)   The National Commission on Security Guarantees will be the unit for the design, monitoring, intersectoral coordination and the promotion of coordination at departmental and municipal levels, with regard to compliance with the action plan promoted by the Government to tackle and dismantle the organizations and to prosecute conducts that are punishable under this Agreement;

(b)   It will draw up and assess the permanent action plan to combat and dismantle the organizations and conducts covered by this Agreement;

(c)   It will evaluate the institutional response and the impact of dismantling the organizations and conducts covered by this Agreement;

(d)   It will coordinate, with the departmental and municipal authorities, on the creation of technical committees for monitoring criminal activities within its remit, including the receipt of reports and complaints, complementing Government endeavours;

(e)   It will recommend reforms that contribute to eliminating any possibility that the State, its institutions or its agents may establish, support or maintain relationships with the organizations covered by this Agreement;

(f)   It will ask the authorities to submit reports on any subject relating to the organizations and conducts covered by this Agreement and will follow up the contents of said reports;

(g)   It will plan and draw up strategies, within its competence, to identify the funding sources and patterns of criminal activity of the organizations and conducts covered by this Agreement; among those patterns, special account will be taken of those that affect, in particular, women, children, adolescents and the LGBTI community.

(h)   It will recommend the repeal or amendment of regulations in order to identify those provisions which, directly or indirectly, facilitate and/or promote the creation of the organizations and conducts covered by this Agreement;

(i)   It will propose mechanisms to carry out background checks on public servants in all Government institutions in order to check for any involvement that they may have had with paramilitary groups and/or activities or human rights violations;

(j)   It will periodically report to the branches of public authority, public opinion and international bodies in relation to the progress and obstacles in the fight against the organizations and conducts covered by this Agreement;

(k)   It will ensure the provision of information by the entities or institutions that participate in the National Commission on Security Guarantees, to the Commission on Truth, Coexistence and Non-repetition and to the Unit for Investigation and Dismantling of criminal organizations and successors of paramilitarism (see section 74 of the Agreement on the special jurisdiction for peace);

(l)   It will make recommendations to the branches of public authority to amend and prioritize actions and strategies relating to the Government's intelligence policy and legislation in the fight against the organizations and conducts covered by this Agreement;

(m)   It will monitor the system of controls on surveillance services and private security services and will make proposals for updating the regulations governing such services, with the aim of ensuring that their services are in line with the

purpose for which they were created, and under no circumstances directly or indirectly facilitate the action of the criminal organizations and conduct covered by this Agreement.

(n)  It will formulate policies for bringing to justice the criminal organizations and their support networks covered by this Agreement, defining specific procedures for the members of said organizations and networks, promoting and providing incentives for a rapid and definitive dismantling of said organizations and networks. Such measures will never mean political recognition.

(o)  It will ensure the application of territorial, differential and gender-sensitive approaches in the design, implementation and monitoring of the policies and strategies covered by this Commission.

### 3.4.4  Special Investigation Unit for the dismantling of the criminal organizations and conducts responsible for homicides and massacres or which attack human rights advocates, social or political movements, or which threaten or attack those who participate in the implementation of the agreements and peacebuilding, including the criminal organizations that have been labelled as the successors of paramilitarism and their support networks.

In the context of ending the conflict and with the aim of effectively combating criminal organizations and their support networks, including those which have been labelled as successors of paramilitarism, which pose the greatest threat to the implementation of the accords and to peacebuilding, the Government will adopt the measures necessary for the creation and start-up, within ordinary jurisdiction, of a Special Investigation Unit for the dismantling of criminal organizations and their support networks, including the criminal organizations that have been labelled as successors of paramilitarism, pursuant to what has been established in section 74 of item 5.1.2 of the Agreement on the comprehensive system for truth, justice, reparation and non-repetition. The Unit will remain operational for the time needed for it to conclude its mandate.

The Unit's mandate will involve the investigation, prosecution and indictment of the criminal organizations and conducts responsible for killings, massacres and systematic violence against women in particular, or that threaten or attack people involved in the implementation of the accords and peacebuilding, including the criminal organizations that have been labelled as successors of paramilitarism and their support networks.

In performance of its functions within the ordinary jurisdiction, the Special Unit will contribute to the goals of the Justice and Peace Act and the special jurisdiction for peace. Insofar as it will help to strengthen justice and contribute to dismantling the organizations that have been labelled as successors of paramilitarism, it will in turn guarantee non-repetition of the paramilitary phenomenon, prevent the perpetration of new human rights violations and thereby help to build a stable and lasting peace.

The Special Investigation Unit will have the following features:

• It will be created outside of the special jurisdiction for peace and will form part of the ordinary jurisdiction and the National Public Prosecution Department. The Unit will decide what is necessary for it to function and on the formation of its working and investigation groups, and in these areas will promote the effective participation of women. It will also have the autonomy to decide on its lines of investigation, carry these out and undertake actions before any jurisdiction.

- The Director of the Unit will be responsible for making decisions relating to any functions or competencies of the Unit and may delegate those responsibilities, in full or in part, to other civil servants attached to the Unit.

- The Unit will investigate, group together cases where this is within its competency and, if appropriate, will file charges and indictments before the ordinary jurisdiction or before the jurisdiction for justice and peace, provided that the statutory time limit for applications has not expired. The Unit may request before the competent body the accumulation, at the court of higher instance, of judicial competences for all the offences committed by the criminal organization, within the respective jurisdiction.

- The Unit will fulfil its duties without replacing the ordinary duties of the national Public Prosecution Department before the jurisdiction for Justice and Peace or before the ordinary courts.

- The Unit's Director must be a lawyer, meet transparency and technical suitability criteria and have experience in the field of criminal investigations and have demonstrated results in the fight against organized crime. He/she will be appointed for a four-year term. The Director of the Unit will be subject to the disqualification and incompatibility rules for civil servants of the country's Public Prosecution Department. Under no circumstances may the Director of the Unit be removed from office due to shortcomings that are not deemed extremely serious under the current disciplinary rules. Any disciplinary procedures which are brought against the Director of the Unit will be heard at sole instance by the National Disciplinary Commission.

- The Unit will deploy its investigation capacity with a territorial, differential and gender-sensitive approach, in order to tackle the threat with an emphasis on areas where there is a convergence of variables that endanger the communities and peacebuilding, prioritizing the investigation of structures of organized crime which are within its jurisdiction.

- It will have a special unit of the judicial police composed of specialist officers from the Public Prosecution Department and the Judicial Police Unit of the national police force, experts in a range of subjects, who must have knowledge of the development and establishment of organized criminal organizations, including knowledge of the paramilitary phenomenon and the criminal organizations that have been labelled as successors of paramilitarism. Said officers should have knowledge of gender-based violence and justice. The Director will have operational command for the officers of the Technical Investigation Unit assigned to his/her Unit and operational command for the other officers of the Judicial Police assigned thereto.

- The civil servants staffing the Unit will be selected by the Director, applying the special mechanisms for selection, incorporation and monitoring of the performance of the staff, prioritizing high standards of transparency and effectiveness in public service.

- As an operating basis, this Unit will adopt a multidimensional investigative approach which covers the entire criminal chain of the organizations and conducts within its mandate, including criminal conduct affecting women, children and adolescents.

- To ensure it performs its duties with high standards of efficiency, the Unit will have at its disposal sufficient resources and budget for its operations. The funding for the operation of the Unit will come from the national general budget and international cooperation. The allocation provided by the Government for this purpose will be included on a mandatory basis in the

annual budget of the Public Prosecution Department which will be subject to the approval of Congress and specifically earmarked for the Unit. The resources will be used according to the plan drawn up by the Director, without prejudice to the legally established controls. The Unit may request extraordinary funds from the State or international aid and in the latter case may negotiate and receive international funds for its operations. The Unit may enter into any international cooperation agreement to assist in the achievement of its mandate.

• The Investigation Unit will periodically submit reports to the National Commission on Security Guarantees in relation to its progress and results.

• Upon request by the Unit, the national Public Prosecution Department, in coordination with the Government, may ask the European Union to send a temporary support mission to strengthen the Unit's capabilities in the fight against organized crime and ensure the adoption of international best practices, without prejudice to the additional international cooperation that the Unit may request via the country's Public Prosecution Department.

• It will have access to all available judicial information that it requires for its investigations, including the information that resides in or has been transferred to other units of the Public Prosecution Department, especially the Unit for Justice and Peace. It may make use of the mechanisms for access to documents and sources of information provided for the special jurisdiction for peace (section 69 of the Agreement on the special jurisdiction for peace).

• The Unit will ensure legal discretion in the performance of its functions and will adopt the measures needed to protect witnesses and victims so requiring.

• The Director of the Unit will be chosen by the Attorney General of the Nation, from a shortlist of three candidates proposed by the mechanism for the selection and appointment of judges and other judicial officials of the special jurisdiction for peace, set forth in section 68 of the Agreement on the special jurisdiction for peace and developed in section 5.3 of the Final Agreement for Ending the Conflict, entitled "Supplementary Agreement on the Comprehensive System of Truth, Justice, Reparation and Non-repetition." Once the mandate of the first Director of the Special Investigation Unit for the dismantling of criminal organizations and conduct responsible for killings and [...], established in section 74 of the Agreement establishing the special jurisdiction for peace and developed in section 3.4.4 of the Final Agreement, the successive directors of the Unit will be chosen by the Attorney General of the Nation from a list proposed by the judges that make up the peace court of the special jurisdiction for peace.

**Competency**

The Special Unit will:

• Judicially prosecute the conducts and organizations covered by its mandate. It will investigate the individual criminal responsibilities of the members of these organizations and submit the information obtained on perpetrators, instigators, organizers and financiers of these structures to the competent authority for the purpose of starting a trial or investigation by another competent body.

• Undertake investigations in cases where certified copies have been made in the ordinary jurisdiction or in the jurisdiction for justice and peace in order to investigate the criminal responsibility of those who were members of support

networks for criminal organizations included in this Agreement, including criminal organizations that have been labelled as successors of paramilitarism.

• Implement methodological plans for specialized investigation in relation to the most serious acts of victimization perpetrated against women, children, adolescents and the LGBTI community by the organizations and conducts covered by this Agreement.

• Conduct investigations into the relationships between criminal organizations included within its mandate, including criminal organizations that have been labelled as successors of paramilitarism, and Government officials.

• Upon finding evidence of the responsibility of public officials, it will continue by conducting the criminal investigation and, in addition, will refer the case to the national Public Prosecution Department or to the Office of the Comptroller General of the Republic, in order to initiate the corresponding disciplinary and prosecutorial investigations.

• If it finds evidence of the responsibility of public officials, the Unit will seek the imposition of additional sanctions before the competent judicial authorities, such as disqualification from holding public office.

• Check that there are no regulations which, directly or indirectly, permit or promote the existence of paramilitary structures or their successors, and inform the National Commission on Security Guarantees of any such regulations so that the relevant measures can be adopted.

• Be able to periodically provide information to the national and international public on progress and obstacles in the performance of its mission.

• Coordinate the exchange of information in relation to matters within its competency with the Commission on Truth, Coexistence and Non-repetition and the special jurisdiction for peace.

### 3.4.5   Formation of the elite corps

To ensure immediate State action against the organizations and conducts covered by this Agreement and the dismantling thereof, an elite corps will be set up in the national police with a multidimensional approach. The members of the elite corps will be selected on the basis of a special model that attests to their high standards of suitability, transparency and effectiveness.

### 3.4.6   Basic guarantees for the professional performance of prosecutors, judges and other public servants

Public servants with responsibilities for activities relating to investigation, analysis and prosecution in connection with the organizations and conducts covered by this Agreement will be provided with the conditions necessary for carrying out their activities so as to avoid any disruption or threat to their role, and providing the corresponding security guarantees.

### 3.4.7   Comprehensive security system for political activity

The comprehensive system will develop a new model of guarantees for citizens' rights and protection for political parties and movements, including the movement that emerges from the transition of FARC-EP to legal political activity, rural communities and social organizations, women's organizations and human rights advocates, in accordance with the provisions of the Agreement on political participation.

**3.4.7.1    Individual and collective security and protection measures**

In view of the fact that a comprehensive security system for political activity was included in the Agreement on political participation, the content of which must be supplemented and defined in respect of the guarantees in terms of security and protection of the people targeted by this system, and with the aim of providing security guarantees for the new political movement that emerges from the transition of FARC-EP to legal political activity and for its members in the process of reintegration into civilian life, and of ensuring application of the model for prevention, security and protection across the country and the intangible protection measures defined in the context of the Agreement on political participation: a democratic opportunity for peacebuilding, the Government and FARC-EP agree the following:

**3.4.7.2    High-level Unit of the comprehensive security system for political activity**

Pursuant to the provisions of 2.1.2.1 (a), of the Agreement on political participation, the High-level Unit will be tasked with implementing the security system for political activity, and ensuring its functioning, coordination and supervision. The Unit will also serve as the space for discussion and monitoring relating to the security and protection of the members of social and political parties and movements, in particular those forming the opposition, and the new movement that emerges from the transition of FARC-EP to legal political activity and its members in the process of reintegration into civilian life.

The High-level Unit of the comprehensive security system for political activity (see the Agreement on political participation, section 2.1.2.1) will develop and implement the following components of the security system:

• Specialized protection, based on an assessment of the level of risk and in coordination with the relevant State entities, for the following persons: those who have been popularly elected, those who stand in political opposition and leaders of political parties and movements, with a differential approach and with national and regional presence, as well as its risk assessment body at the regional and local levels, as referred to in 2.1.2.1(c) of the Agreement on political participation. Both the risk-level studies and the specialized protection measures will apply protocols that take account of each person's specific conditions.

• Inter-agency planning, monitoring and evaluation system, as set out in 2.1.2.1(d) of the Agreement on political participation: a democratic opportunity for peacebuilding.

• Committee to investigate crimes committed against people engaged in political activity, taking into account women and the LBGTI community, as set out in 2.1.2.1(d) of the Agreement on political participation: a democratic opportunity for peacebuilding.

The Unit will be composed of:

• The President of the Republic.

• The Minister of the Interior.

• The Minister of Defence.

• The Human Rights Advisor to the Office of the President of the Republic.

• The Commander of the Military Forces.

• The Director of the National Police.

• The Director of the National Protection Unit.

• The High-level Unit will ensure the permanent participation of the new political movement that emerges from the transition of FARC-EP to legal political activity.

The Government will ensure the participation of political parties and movements in the High-level Unit, in particular those whose security has been affected, victims' organizations, human rights organizations and social movements, including women's organizations. A delegate from international human rights organizations with a presence in Colombia and other delegates from Government entities and supervisory bodies may be invited to join the Unit if this is deemed relevant.

### 3.4.7.3  Presidential delegate

The President of the Republic will appoint a delegate attached to the Administrative Department of the Presidency to take charge of the technical secretariat of the High-level Unit and be responsible for the planning, information and monitoring system (see Agreement, section 2.1.2.1(a)) and for coordinating and monitoring the protection and security measures adopted in this respect. He/she will hold ongoing discussions with members of the social and political movements and human rights activists, and also with the political party that emerges from the transition of FARC-EP to legal political activity and its members in the process of reintegration into civilian life.

### 3.4.7.4  Comprehensive protection programme for members of the new political movement or party that emerges from the transition of FARC-EP to legal activity, along with its activities and offices, as well as the former members of FARC-EP who are being reintegrated into civilian life and the families of all the aforementioned, according to the respective risk level.

The Government will implement a comprehensive protection programme in accordance with the provisions of item 2 on political participation, section 2.1.2.1(c), which will have the aim of protecting the members of the new political party or movement that emerges from the transition of FARC-EP to legal activity, and its offices and activities, as well as the former FARC-EP members who are being reintegrated into civilian life and the families of all the aforementioned, according to the respective risk level.

The programme, which will come under the Administrative Department of the Office of the President of the Republic and be subject to the supervision of the Presidential delegate in the High-level Unit of the comprehensive security system for political activity, will have administrative and financial autonomy and will coordinate with the relevant State institutions on a permanent and operational basis.

The measures specified in this paragraph will apply to the representatives of FARC-EP who are in the process of reintegration into civilian life and are assigned tasks in the peace process, who are appointed by the FARC-EP peace delegation, pursuant to the provisions of the Final Agreement and as from the signing thereof.

### 3.4.7.4.1  Specialized security and protection cell of the National Protection Unit

The Government will create a cell within the National Protection Unit that specializes in security and protection, for the members of the new political party or movement that emerges from the transition of FARC-EP to legal activity, and its activities and offices, as well as the former members of FARC-EP who are being

A-394

reintegrated into civilian life and the families of all the aforementioned, according to the respective risk level.

The specialized cell on security and protection will involve the active and permanent participation of at least two representatives of the new political party or movement that emerges from the transition of FARC-EP to legal political activity; and its entire structure and functions will be defined by the Government and FARC-EP. The cell will be responsible for the administration, functioning and operation of the technical committee on security and protection and the security and protection corps created under the present Agreement:

### 3.4.7.4.2    Technical committee on security and protection

The Government will set up a technical committee on security and protection, hereinafter referred to as the technical committee, with participation from the Government and FARC-EP. The technical committee will begin its work immediately after the signing of this Agreement, in order to develop, coordinate, monitor and make suggestions for the implementation of a strategic plan on security and protection, which will include tangible and intangible anti-stigmatization measures for the members of the new political party or movement that emerges from the transition of FARC-EP to legal activity, and its offices and activities, as well as the former members of FARC-EP who are being reintegrated into civilian life and the families of all the aforementioned, according to the respective risk level.

The technical committee will have the following functions:

• To put in place the structure of the specialized cell on security and protection, in accordance with the agreements reached by the Government and FARC-EP.

• To identify requirements in terms of human, physical and budgetary resources for implementation of the strategic plan on security and protection, so as to safeguard the rights to life and personal safety, freedom, mobility and security of the members of the new political party or movement that emerges from the transition of FARC-EP to legal political activity and the members of FARC-EP in the process of reintegration into civilian life, in view of the risks they face from the exercise of their political, public, social or humanitarian functions or activities, and the rights of their families, according to the respective risk level.

The technical committee will be permanent and will carry out periodic monitoring and assessments in coordination with the State institutions with competence in this respect. The planning and monitoring of protection actions will take place on both an individual and a collective basis for the members of the new political party or movement that emerges from the transition of FARC-EP to legal activity, and its offices and activities, as well as the former members of FARC-EP who are being reintegrated into civilian life and the families of all the aforementioned, according to the respective risk level.

At the initiative of the technical committee and in coordination with the Presidential delegate, the Government will implement the legislative amendments and reforms — decrees and developments — governing all aspects relating to the protection and security of members of the new political party or movement that emerges from the transition of FARC-EP to legal political activity and of their families, according to the respective risk level. Such regulations and procedures will be prepared by the technical committee and presented to the Government for approval before the Final Agreement is signed.

The technical committee will be composed of delegates from the Government, headed by the Presidential delegate, the Director of the National Protection Unit and

the Director of the new specialized cell, created under the present agreement, who will serve as secretary, as well as other entities deemed relevant, including, as a permanent invited member, the representative from the Office of the United Nations High Commissioner for Human Rights in Colombia. The representatives that FARC-EP deems relevant will be involved before the Final Agreement is signed. Once the Agreement has been signed, the delegates appointed by FARC-EP will continue to participate on the technical committee. When the political movement has been created, the representatives that it appoints will be incorporated into the technical committee.

- **Guidelines and criteria for the strategic plan on security and protection for the new political party or movement that emerges from the transition of FARC-EP to legal activity, on the basis of its risk situation.**

The strategic plan on security and protection will consist of all the comprehensive measures contained in this Agreement, including intangible, collective or political measures aimed at prevention and creation of a climate of trust, and tangible measures which will be defined in the security and protection protocols, as well as all those measures that the technical committee deploys to implement the plan.

The security and protection protocol will consist of the following components: prevention, security and protection schemes and programmes; personnel from the security and protection corps — selection and training; logistics and recruitment for the security and protection corps — funding and financial resources, together with risk analysis programmes and programmes for coordination among the elements of the security system.

The measures applied to the population targeted by this Agreement will be implemented in accordance with the content of paragraph 3.4.7.4 of this Agreement and the development protocols, which must be executed in a timely and efficient manner.

The protection protocol will include the means of transport that may be required for the protected persons.

Pursuant to the decisions taken by the technical committee, support will be provided for temporary relocation, communications media, psycho-social care and any other support necessary to ensure the effective protection of the population targeted by this Agreement.

Bearing in mind the definitions of the technical committee, the Government will ensure that all the necessary protection measures are taken with regard to the comprehensive security of the offices and facilities of the new political party or movement that FARC-EP becomes, and of the homes of the persons subject to protection under this Agreement, according to the respective risk level.

The technical committee will define the prevention, security and protection schemes relating to recruitment, logistics, administration, mobility, staff employment rights and other requirements for its optimal functioning and sustainability, bearing in mind the criteria of reliability and compliance provided, in this area, by the operators to the new political party or movement that FARC-EP becomes.

The security and protection protocol will be drawn up by the technical committee and approved by the Negotiation Table before the Final Agreement is signed.

### 3.4.7.3.3   Security and protection corps

The Government will create a security and protection corps, pursuant to the provisions of this Agreement, with a mixed composition, consisting of trusted personnel from the new political party or movement that emerges from the transition of FARC-EP to legal activity, which will coordinate and have direct contact with the national police, which will in turn appoint contacts for each security and protection scheme at the national, departmental and municipal levels according to the operating scheme that is established.

The trusted personnel of the new party or political movement that arises from the transition of FARC-EP to legal activity, who form part of the security and protection corps, must be properly trained and fulfill the psychological suitability requirements that are demanded of other members of protective bodies. The National Protection Unit's specialized cell on security and protection will verify compliance with these requirements.

The security and protection schemes will have all the logistics needed for their operations, equipment and administration as required for protection of the persons in question. The Government will ensure that the protection schemes are provided with the most suitable and relevant weapons to ensure the safety of the population covered by this Agreement, based on the levels of risk established by the technical committee.

The security and protection will be provided for the members of the new political party or movement that emerges from the transition of FARC-EP to legal activities and its offices and activities, as well as for the former FARC-EP members who are being reintegrated into civilian life and the families of all the aforementioned, according to the respective risk level.

In order to work towards the construction of a professional and technical model for the security and protection corps, the technical committee will make proposals to the Government, including a system of education and training, employment and social security, which will be followed up and managed by the Presidential delegate. The system will include training programmes on issues relating to the protection of women and the specific risks that they face.

The security and protection protocol will determine the operating system and composition of the protection schemes — which will have a gender-mainstreaming approach — including the contacts with the new political party or movement that emerges from the transition of FARC-EP to legal activity and the contacts with the national police. It will contain the criteria and guidelines of the strategic plan on security and protection.

The Government will make the necessary budget allocations for comprehensive implementation of the system, and these will be guaranteed for an initial minimum period of five years.

In the case of members of the national police who are part of the security and protection corps, a rigorous model for checking criminal and disciplinary records will be applied and security checks will be carried out, including credibility and reliability tests.

The members of the security and protection corps will report to the specialized cell on security and protection. The employment arrangements may involve a direct employment contract as public servants, or temporary agreements for the provision of services, or the incorporation of personnel via duly authorized security operators, which provide greater guarantees of reliability for the protected persons. The

Government will make any adjustments needed to increase staffing of the National Protection Unit.

The security and protection corps will be supported by duly accredited security training programmes for the training and specialization of all its members. Consultancy and training agreements may be established with national or international institutions or bodies that are experts in this area.

The technical committee will establish the criteria for the content of the training. The members of the security and protection corps will be selected, trained and qualified at national or international institutions or academies, for which purpose the Government will provide all the necessary guarantees and conditions.

Constitutional and legal presumption of risk: The members of the new political movement that emerges from the transition of FARC-EP to legal political activity will be presumed to be at exceptional risk on the basis of reasonable criteria presented by its representatives to the technical committee. The new political movement will be presumed to be at exceptional risk. The Government will promote the regulatory measures needed for that presumption to become enshrined in law.

Psycho-social care measures: All steps will be taken to provide tools for psycho-social care, of either an individual or a collective nature and with a gender perspective, to recipients of the protection programme who have been affected as a result of any attack on their life and physical safety.

### 3.4.7.4.4   Implementation of the programme on reconciliation, coexistence and prevention of stigmatization

Pursuant to the Agreement on political participation (see section 2.2.4), once the Final Agreement has been signed, the National Council for Reconciliation and Coexistence will be set up to plan and implement the programme on reconciliation, coexistence and prevention of stigmatization, with the involvement of territory-based entities. The foregoing is without prejudice to the immediate measures to be adopted.

### 3.4.7.4.5   Self-protection measures

A self-protection training process will be launched for the security of the members of FARC-EP in the process of reintegration into civilian life and of the new political movement that emerges from the transition of FARC-EP to legal political activity, for which purpose the Government will provide the new political movement with sufficient tools and resources to achieve this aim effectively.

### 3.4.8   Comprehensive security and protection programme for the communities and organizations across the country

A comprehensive security and protection programme will be created for the communities and organizations in the country's territories, at the request of the Ministry of the Interior. This will define and adopt measures for the comprehensive protection of organizations, groups and communities across the country, such that it contributes to ensuring, under an effective model, the implementation of the measures for prevention and protection of the communities and their territories. The preparation and implementation of this programme will involve active and effective participation by social organizations, including women's organizations, and the communities across the country. The following measures, among others, will be promoted:

• **Implementation of comprehensive security and protection measures**: in implementing the provisions established in section 2.2.4 of the Agreement on

political participation, the prevention and protection plan prepared as part of the comprehensive security and protection programme will include anti-stigmatization measures, including in respect of gender and sexual orientation, widespread dissemination mechanisms, campaigns for the legitimization and recognition of human rights advocates, in both rural and urban areas, and the creation and dissemination of community and public-interest communications media for promoting human rights and coexistence.

- **Community promotors of peace and coexistence**: this will be a programme led by the Ministry of the Interior in coordination with the Ministry of Justice. The community promoters of peace and coexistence will be unarmed volunteers. The programme will encourage alternative mechanisms for resolving disputes in the different territories and promote the defence of human rights, encouraging harmonious relations within communities in the areas previously defined for that purpose. The programme will be allocated the resources needed for its implementation.

- **Rural territories protection protocol**: the Ministry of the Interior will create a special protocol for the protection of rural communities that were affected by the conflict, which will be agreed upon with the communities and organizations in each territory, including women's organizations, and in line with the comprehensive security and protection system. Within this protocol, rural communities and their organizations will draw up their own plans for the assessment and definition of risks, taking account of the specific situations faced by women.

- **Support for the reporting activity of human rights organizations across the country**: the Ministry of the Interior will draw up a programme for strengthening the reporting capability of human rights organizations in rural areas, which will promote prevention measures with an emphasis on written and audiovisual communication, together with instruments to document possible human rights violations. Under this programme, human rights organizations will be provided with offices and facilities, together with funding and equipment, to support the activities of human rights advocates and their organizations across the country and to promote the achievement of their aims. The offices and facilities will be collectively managed by the human rights organizations in question.

### 3.4.9 Instrument for prevention and monitoring of the criminal organizations covered by this Agreement

Pursuant to paragraph 2.1.2.1(b) of the Agreement on political participation, a new prevention and warning system for rapid response to the presence, operations and/or activities of the criminal organizations and conducts covered by this Agreement will be set up in the Ombudsperson's Office, in coordination with the Government and the Special Investigation Unit, and the National Committee on Security Guarantees will be involved in the planning of that system. The system must combine ongoing monitoring and early warning activities for the deployment of a rapid response on the ground. It will act in coordination with human rights organizations and communities. This system will issue early warnings autonomously without having to consult with or submit its decisions to any other institution.

This early warning system must have a territorial-, differential and gender-sensitive approach, and a preventive security deployment, without detriment to national deployment and response capability. The Colombian State will guarantee appropriate funding in accordance with the requirements of the system and its comprehensive functioning.

Threat monitoring activities will be combined with early warning capability and recommendations for rapid response and deployment on the ground. The system will incorporate Government capacities and at the same time will be able to deal with and respond to situations on the ground. It will have the following functions:

• Monitoring and mapping of the threat posed by the presence and/or activities of the criminal organizations and conducts covered by this Agreement, including the organizations that have been labelled as successors of paramilitarism, particularly in regions and territories where FARC-EP is carrying out its process of reintegration into civilian life.

• The Government institutions, the Colombian armed forces, the communities, social groups and specialist organizations on the ground will contribute on a continuous and ongoing basis to maintaining the system, such that verification and response mechanisms will be created for complaints and reports submitted from the country's territories and at the central level.

• Prompt identification of the presence, movement, incursions and activities across the country of the criminal organizations covered by this Agreement, as well as the potential risks to the civilian population.

• The Government will organize and coordinate preventive and rapid response measures in relation to these incursions and actions of the criminal organizations covered by this Agreement, in order to protect the civilian population.

• Priority will initially be given to areas of critical intervention based on the accumulated compilation of public reports and complaints.

• Activation of communication channels with municipal officials for the purpose of collecting and processing information that makes it possible to identify potential risk situations that may lead to acts of violence affecting the civilian population, including human rights organizations, former members of FARC-EP and members of the political party or movement that emerges from the transition of FARC-EP to legal political activity.

In the prioritized territories, integrated mechanisms for inter-agency coordination will be implemented to coordinate efforts with regard to security warnings on threats across the country, to ensure a rapid response.

The prevention and warning system for rapid response will include territorial committees for warning and immediate response across the defined territories and regions, which coordinate their functions at local level with the competent authorities.

The preventive measures in relation to the action of the criminal organizations covered by this Agreement must focus on the areas most affected by the organizations in question.

### 3.4.10   Implementation of a national mechanism for territorial supervision and inspection of private surveillance and security services

The Government will strengthen the national mechanism for territorial supervision and inspection of private surveillance and security services at the request of the Superintendency of Private Surveillance and Security, in order to ensure that the use of those services is in line with the purposes for which they were created, placing an emphasis on the prohibition of the privatization of military, police or intelligence functions. Priority will also be given to reviewing legislation on private surveillance and security. Furthermore, the Government will ensure that the services do not perform military, police or State security functions, and will

update the regulations relating to private surveillance and security services. It will also review the regulations on permitted weapons, which are used exclusively by the armed forces to perform the function of private security and surveillance.

The following measures will be adopted:

• Monitoring to ensure that the public register contains adequate information on the owners of this kind of business, their employees, the weapons available and the service provision agreements currently in force.

• The Superintendency for Private Surveillance and Security will be empowered to cancel or refuse to grant operating licences to security companies involved with criminal organizations covered by this Agreement or which violate the regulations that they are obliged to comply with.

• The necessary legislative initiatives will be promoted and the relevant administrative measures will be adopted to regulate private security services, with the aim of ensuring that employees, shareholders, owners and directors in this type of service are not involved with the criminal organizations targeted by this Agreement.

**3.4.11   Measures to prevent and combat corruption**

To implement the provisions of section 3.4 of the General Agreement on the intensification of measures to combat conduct that, by action or omission, lead to instances of corruption, the Government will promote State action to foster a culture of transparency across the country, as part of its efforts to ensure effective compliance with the accords, guarantees of security in the territories and democratic participation.

**3.4.11.1   Institutional oversight and verification instruments**

Based on the legal framework in force for combating corruption, the Government will adopt measures to certify the transparency and effectiveness of the action for dismantling the organizations and conducts covered by this Agreement. The Government will promote the following measures, among others:

• Verification of the suitability of civil servants to ensure that they have the skills needed to fully exercise their public office.

• Certification of the integrity and performance of civil servants, to guarantee transparency and commitment to the application of the law by means of evaluation and verification of their résumés and criminal and disciplinary records.

• Guarantees to maintain oversight and monitoring of the financial assets of public servants and checks on their income, to ensure that this is consistent with their legal activities and salary. Evaluation and monitoring of their performance in the fight against the organizations covered by this Agreement and the building of trust with the communities.

**3.4.11.2   Measures for action to contain the penetration into political activity of the criminal organizations and conducts covered by this Agreement**

A multidimensional approach to the fight against the organizations and conduct covered by this Agreement, enabling progress to be made in the creation and maintenance of security guarantees, requires the adoption of a series of measures to tackle the penetration into political activity of criminal organizations, including those that have been labelled as successors of paramilitarism and their support networks.

Political penetration by the criminal organizations and conducts covered by this Agreement — which has led to expressions such as "parapolitics" — in a democratic system, distorts the political fabric by influencing local democratic leaders, undermines participation processes, increases the risk of mafia penetration into institutions, distorts public tendering, constrains democratic debate and results in resources being diverted to fund violence.

Measures need to be adopted that relate not only to people involved in these conducts — who must be subjected to criminal, disciplinary and financial sanctions — but also to the parties and communities whose leaders or elected officials engage in such practices.

Consequently, pursuant to the provisions of section 2.3.4 of item 2 — Agreement on political participation: a democratic opportunity for peacebuilding, the Government will ensure that the special electoral mission to be created discusses proposals to tackle this problem put forward by the new political movement that emerges from the transition of FARC-EP to legal political activity.

The Government will introduce the legislative reforms needed to sanction political movements or parties whose candidates or members elected to public institutions or offices from a single candidate list have been convicted of having links to criminal organizations, including organizations that have been labelled as successors of paramilitarism and their support networks, for acts occurring during their term of office. Said sanctions may be imposed even when the persons in question have been convicted after expiry of the terms of offices for which they were endorsed or elected.

Moreover, and in the same situations as above, the Government will introduce the legislative reforms needed to impose penalties on individuals who endorsed the criminally sanctioned candidates or elected persons.

The legislative amendments will involve disciplinary and fiscal oversight of contracting and the management of public funds in departmental and municipal administrations, particularly in the areas where there are criminal organizations covered by this Agreement.

### 3.4.12   Other guarantee provisions

The Government will prioritize the actions and strategies needed for intelligence purposes within the plans and programmes being developed by the State to dismantle and prosecute the organizations and conducts described in this Agreement.

The Government will take steps to remove names and information from the security and intelligence agencies' databases, referring to members of human rights organizations, members of the opposition and members of the new political movement that emerges from the transition of FARC-EP to legal political activity, and their families where relevant, where that data was being stored solely by virtue of the affiliations concerned.

### 3.4.13   Bringing the abovementioned organizations to justice

In the context of ordinary justice and with a view to contributing to the fight against the criminal organizations mentioned above, strengthening security guarantees in the territories and facilitating the creation of conditions conducive to peacebuilding, the Government, in coordination with the judicial branch, will submit a bill to promote the bringing to justice of the abovementioned organizations by means of the special legislative procedure for peace.

### 4.  Solution to the problem of illicit drugs

The domestic conflict in Colombia has a long history spanning several decades, which predates and has causes other than the appearance of crops used for illicit purposes on a large scale, and the production and sale of illegal drugs across the country.

The persistence of the crops is in part linked to the existence of conditions of poverty and marginalization, the weak presence of institutions and the existence of criminal organizations involved in drug trafficking.

To help lay the foundations for a stable and lasting peace it is necessary, inter alia, to find a definitive solution to the problem of illicit drugs, including crops used for unlawful purposes and the production and sale of such drugs.

We aspire to be a country that is at peace and without the problem of illicit drugs, and we are aware that achieving this aim also depends on global agreements and decisions adopted by all States, in particular by those which have been directly or indirectly affected by this transnational problem.

Accordingly, the Government and FARC-EP consider that:

Many regions and communities across the country, especially those in conditions of poverty and neglect, have been directly affected by the cultivation, production and sale of illicit drugs, which has increased marginalization, inequalities and gender-based violence and hindered development.

The production and sale of illicit drugs and criminal economies have had serious effects on the Colombian people, in both rural and urban areas, impairing enjoyment and exercise of their rights and liberties; and women and young people have been particularly affected by these criminal economies.

These phenomena have a severe influence on specific forms of violence that particularly affect women, victims of human trafficking, sexual exploitation and violence resulting from the use of illicit drugs, inter alia, which requires women to receive training in the planning and monitoring of action to combat this kind of violence.

The cultivation, production and commercialization of illicit drugs have penetrated, fuelled and financed the internal conflict.

Institutions at both the national and local levels have been damaged, in terms of both integrity and performance, by the corruption associated with drug trafficking.

Various sectors of society have been directly or indirectly engaged in the production and sale of illicit drugs.

All the foregoing has contributed to undermining values and harmonious relations and has hindered progress towards social inclusion, gender-based equity and the expansion of democracy.

In that situation, the end of the conflict has to represent an opportunity to construct a collective and comprehensive solution to the illicit drugs problem.

As a result of the foregoing, a new vision is needed to address the causes and consequences of this phenomenon, especially by presenting alternatives that lead to improving the well-being and quality of life of communities — both men and women alike — in the territories of the country that have been affected by crops used for illicit purposes. The new vision also needs to tackle drug use from a public health perspective and must include strengthened measures to combat criminal

organizations involved in drug trafficking, including activities related to illicit finances, money laundering, trafficking of precursors and the fight against corruption, dismantling the entire drug trafficking value chain.

This new vision involves seeking evidence-based alternatives and providing a fresh and differentiated approach to the issue of drug use, the problem of crops used for illicit purposes and organized crime associated with drug trafficking, which unduly exploits young people. In that respect, new policies are required that reflect this new vision and differentiated treatment.

Policy must be governed by the exercise of the principles of sovereign equality and non-intervention in the internal affairs of other States and must ensure coordinated action within the framework of international cooperation, insofar as solving the problem of illicit drugs is the collective responsibility of all States.

The new policy will have a general human-rights and public-health focus, as well as an equity-based and gender-sensitive approach. They must also be adjusted over time in response to evidence, lessons learned with regard to best practice and the recommendations of national and international specialist organizations and experts.

The elements of the public policy on tackling the drugs problem must have the flexibility to incorporate new knowledge that renders them more effective, and it must identify undesired costs and damage.

The new policy will especially target the weakest links in the drug trafficking chain, namely the people who cultivate and use illicit drugs, and will promote increased efforts to dismantle criminal organizations.

In order to construct sustainable solutions, safeguard the rights of citizens and ensure the non-recurrence of the problem, the policy must have a territorial focus, based on citizen participation and institutional presence, particularly institutions providing social care and community security and protection services. Those services must be strengthened in terms of effectiveness, efficiency and transparency.

The policy must continue to recognize the ancestral and traditional uses of the coca leaf, as part of the indigenous community's cultural identity, and also the possibility of using illicit crops for medical or scientific purposes and other established legitimate uses.

One aspect of the solution to the illicit drugs problem entails definitively solving the problem of illicit crops. This will require a new programme which, as part of the structural transformation of rural areas under the comprehensive rural reform, will help to improve the well-being and quality of life of the populations affected by these crops.

New alternatives need to be found based on the replacement of illicit crops and the implementation of comprehensive plans for the substitution of crops and alternative development which will form part of a new national comprehensive programme for the substitution of crops used for illicit purposes, which will have a new institutional structure.

A definitive solution is possible if constructed collectively by the communities — both men and women alike — and the authorities, through participatory planning processes, based on the Government's commitment to implement the comprehensive rural reform and the comprehensive plans for crop substitution and alternative development and the communities' commitment to promote voluntary substitution processes. The communities' commitment to voluntary substitution is crucial for achieving the objectives.

17-06469

**A-404**

The solution to the problem of crops used for illicit purposes through structural transformation across the country and the creation of conditions of well-being requires institutions and citizens to apply and observe the principles and standards of the rule of law.

Solving the illicit drugs problem also requires measures to tackle drug use on the basis of a shared commitment and joint work between the authorities, communities and families to implement policies promoting health, prevention, reduction of harm, comprehensive care and social inclusion of users, which must have an equity-based and gender-sensitive approach.

The definitive solution to the illicit drugs problem requires an intensification of the fight against the criminal organizations involved in drug trafficking and money laundering, which will also help to create the conditions needed for the implementation of the Agreement across the country and the construction of a stable and lasting peace.

Without prejudice to the constraints faced by the country in providing a definitive solution to a transnational problem, every effort will be made to transform the conditions of the communities across the country, and to ensure that Colombia is a country without crops used for illicit purposes and free from drug trafficking.

Nonetheless, the definitive solution to the illicit drugs problem is a dynamic process that must reflect consensus among society and the international community. Thus, mechanisms are needed for reflection and discussion to capture the feelings of the people affected, including the communities.

All the foregoing is only possible with the genuine commitment of the Government and the contribution of the communities and society at large, including a commitment by FARC-EP to contribute in different ways to definitively solving the illicit drugs problem, which is an aim of all sectors of Colombian society.

This is only possible if everyone is genuinely committed:

• The commitment of the Government to implement policies and programmes in this respect, to intensify and decisively wage the war on corruption in institutions caused by the illicit drugs problem, and to lead an efficient national process to definitively break any kind of relationship between this scourge and the various spheres of public life.

• The commitment of FARC-EP to contribute effectively, with the greatest determination and in different forms and by means of practical actions, to the definitive solution to the illicit drugs problem and, in the end-of-conflict scenario, to terminate any relationship that it has developed with this phenomenon as a result of the rebellion.

• Anyone who has been associated with any link in the chain of illicit crops and their derivatives, within the context of the conflict, and who appears before the special jurisdiction for peace, will have an obligation to provide the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct with any and all information they may have of acts committed and the circumstances involved, as well as any information that would be necessary and sufficient to assign responsibilities. All this should contribute to upholding the rights of victims to reparation and non-repetition.

• The Government and FARC-EP declare their firm commitment to definitively solving the illicit drugs problem.

• The commitment of all of society as a whole, including all its different forms of political or social organizations, to reject any relationship with the illicit drugs problem and the money originating therefrom.

• Lastly, building a stable and lasting peace involves a willingness by everyone to help clarify the relationship between the conflict and the cultivation, production and sale of illicit drugs and the money laundering resulting from this phenomenon, so that drug trafficking never again threatens the future of Colombia.

### 4.1 Programmes for the substitution of crops used for illicit purposes. Comprehensive development plans with communities — both men and women — participating in the design, implementation and evaluation of substitution programmes and environmental recovery of the areas affected by those crops.

As part of its efforts to end the conflict and forge peace; to generate the material and intangible conditions for well-being and a higher standard of living for the population affected by crops used for illicit purposes, particularly rural communities living in poverty whose livelihood depends on them; and in this way to find a sustainable and definitive solution to the problem of crops used for illicit purposes and all the issues associated with them in Colombia, the Government will establish and implement a new national comprehensive programme for the substitution of crops used for illicit purposes.

The new substitution programme will be the competent national authority and will be headed by the Office of the President of the Republic in coordination with departmental and municipal authorities. It will be a civilian programme, without prejudice to its coordination with any State authorities needed to ensure full implementation, including those responsible for the security and protection of communities in accordance with the concept of security envisaged in the Final Agreement.

The substitution programme will set in motion a participatory planning process to guarantee the active and effective participation of communities — both men and women — in the decision-making process and in the joint crafting of solutions. Following the signing of the Final Agreement and subject to the terms agreed to in items 3 and 6 of the Agenda of the General Agreement, FARC-EP will participate in the programme and contribute to solving the problems associated with crops used for illicit purposes.

The substitution programme will contribute to the structural transformation of rural society that will result from implementation of the comprehensive rural reform, of which it is a part, and to the activation of the citizen participation mechanisms agreed to.

The sections embodied in this Agreement shall be implemented without prejudice to due compliance with any commitments undertaken by the Government and the authorities in direct dialogue with the communities and their organizations.

### 4.1.1. Principles

To the extent that the national substitution programme forms part of the comprehensive rural reform, the programme shall be governed by both the principles agreed upon in the reform and the following:

• **Integration into the comprehensive rural reform**: The national substitution programme is one component of the comprehensive rural reform. It addresses the needs of populations and territories with specific characteristics that therefore require additional and particular measures compared with other rural

**A-406**

communities. The territories in which crops used for illicit purposes are grown may coincide with prioritized zones in which territory-based development programmes are being implemented, in which case the substitution programme's actions and activities need to be undertaken within the framework of the plan of action for regional transformation of the territory concerned. In cases in which the territories do not coincide with territory-based development programmes, either comprehensive development plans will be implemented by agreement with the communities, within the agricultural frontier, or else the plans and programmes referred to in the third section of item 1.1.10 will be implemented, with a view to helping close the agricultural frontier.

Integration also involves interrelationship, engagement and coordination between the local, regional and national spheres. That being so, the national substitution programme will be integrated into development plans at all territorial management levels.

- **Participatory and negotiated construction of a solution**: The transformation of the territories and alternatives for the communities living in areas affected by crops used for illicit purposes, whether or not they are directly engaged in cultivating them, will be based on joint and participatory efforts between them and national, departmental and municipal authorities to forge a solution to the problem of crops used for illicit purposes and overcome poverty. That joint quest for a solution will start from the decision by the communities — both men and women — to abandon those crops and shift, via substitution, to other economic activities. Consensus-building with the communities is paramount for planning and establishing the guidelines for implementing and monitoring the programme in the territory.

- **Approach tailored to the specific conditions in each territory**: The national substitution programme to be implemented must have a territory-oriented and gender-based approach as defined in the comprehensive rural reform (item 1), that is to say, it must recognize and take into account the economic, cultural and social needs, characteristics and particularities of the territories and rural communities, especially indigenous and Afrodescendent communities, and of the women in those communities and territories, and it must guarantee social and environmental sustainability. The participatory nature of the national substitution programme will make it possible to design approaches in keeping with specific circumstances and the particular socioeconomic nature of the problem in each different region of Colombia.

- **Observance and application of the principles and norms of a social State governed by the rule of law and harmonious relations among citizens**: Achieving the structural transformations of the territories that guarantee the well-being and a decent standard of living for the communities affected by the presence of crops used for illicit purposes and the transition toward legal economic activities requires that institutions and citizens apply and observe the principles and norms of the social State governed by the rule of law. It also requires strengthening democratic values, harmonious relations among citizens and the observance of human rights.

- **Voluntary substitution**: Once farmers have decided and committed to give up crops used for illicit purposes, voluntary substitution is a core principle of the programme for generating trust among the communities and establishing the conditions needed to help solve the problem of crops used for illicit purposes without impairing the economic, social and environmental sustainability of the communities and territories concerned. That requires actions to promote

voluntary substitution and defining, with the communities, substitution alternatives that are economically and socio-environmentally sustainable and capable of boosting family livelihoods, while guaranteeing decent living conditions, all of which presupposes Government support for the process and sustainability of substitution under terms agreed upon with the communities. (See the item on "Agreement with the communities" and "Participatory development and implementation of comprehensive municipal and community plans for substitution and alternative development".)

### 4.1.2.  Objectives

The National Comprehensive Programme for the Substitution of Crops Used for Illicit Purposes will be implemented within the framework, and as part of, the comprehensive rural reform and needs to comply with the following objectives:

• Overcoming poverty in rural communities, especially the households affected by crops used for illicit purposes, by creating conditions conducive to well-being and a decent standard of living in the territories; and contributing to the structural transformations of rural society that result from implementing the comprehensive rural reform and from implementing the components of item 2 on political participation.

• Promoting voluntary substitution of crops used for illicit purposes by fostering comprehensive municipal and community substitution and alternative development plans, crafted through consensus-building and with the direct participation of the communities involved.

• Generating policies and productive opportunities for farmers by promoting associative enterprises and cooperatives; and generating policies and job opportunities in connection with the comprehensive rural reform for illicit crop pickers and sharecroppers[4] [*recolectores y amedieros*], giving them the possibility of opting to become beneficiaries as envisaged in item 1.1.3 of the reform.

• Contributing to the closing of the agricultural frontier, recovery of ecosystems and sustainable development on the terms agreed to in item 1.1.10 of the comprehensive rural reform. To that end, the national substitution programme will support development plans for already constituted or future campesino reserve zones as well as other forms of organization or association in areas affected by crops used for illicit purposes. As established under item 1, campesino reserve zones are agrarian initiatives that help to forge peace; guarantees for the political, economic, social and cultural rights of small farmers; the development of social, environmental and food security sustainability; and reconciliation among Colombians. Consequently, priority will be given to the provisions of item 1.1.10 of the comprehensive rural reform and, especially, matters relating to campesino reserve zones (ZRC).

• Strengthening the participation and capacities of campesino organizations, including rural women's organizations, in (technical, financial, human and other) support of their projects.

• Incorporating women as protagonists in the consensus-building processes needed for voluntary substitution, recognizing the active part they play in rural development.

---

[4] "*Amediero*" means a farmworker who partly (*a medias*) cultivates the land in the sense that he shares the produce with the landowner.

• Strengthening relations of trust, solidarity, harmony and reconciliation within communities.

• Contributing to achievement of the goals of the system for progressively strengthening guarantees of the right to food, on the terms established in item 1.3.4 of the comprehensive rural reform.

• Achieving a national territory free from crops used for illicit purposes, while observing human rights and safeguarding the environment and quality of life.

• Strengthening the institutional presence of the State in the territories affected by crops used for illicit purposes, while promoting comprehensive development and the exercise of rights for all citizens; guaranteeing security, harmonious relations and the observance and protection of human rights; and providing, inter alia, infrastructure, utilities, education and access to education, in such a way as to ensure respect for and application of the principles and norms of a social State governed by the rule of law. Security in the territories affected by crops used for illicit purposes will be guaranteed with due respect for the fundamental principles and guarantees built into the Final Agreement and in compliance with the principles and obligations that underpin a social State governed by the rule of law.

• Strengthening the management capacities of the communities and their organizations by enabling them to participate directly in the design, implementation, monitoring, evaluation, supervision and citizen oversight of the national substitution programme, pursuant to the principle of joint, participatory and constructive action based on consensus between the communities and the authorities.

• Ensuring the sustainability of the national substitution programme in the territories as a guarantee for a definitive solution to the problem of crops used for illicit purposes through continuous and persistent intervention by the State geared to establishing conditions conducive to well-being and quality of life for the communities, and through the participation and commitment of all parties, including FARC-EP, following the signing of the Final Agreement, within the framework of their economic and social reintegration.

• Fostering and strengthening research projects reflecting on and analysing the circumstances of women in connection with crops used for illicit purposes, so as to address the problem from their distinct perspective.

### 4.1.3.  Description and components of the National Comprehensive Programme for the Substitution of Crops Used for Illicit Purposes

The National Comprehensive Programme for the Substitution of Crops Used for Illicit Purposes will be a special chapter of the comprehensive rural reform established under this Agreement and will address the particular needs of the territories affected by crops used for illicit purposes.

Within that framework and in accordance with the principles and objectives of the comprehensive rural reform, the national substitution programme will help to establish conditions that will enable the communities living in areas affected by crops used for illicit purposes to enjoy well-being and quality of life, while providing persons directly involved with crops used for illicit purposes opportunities to dissociate themselves definitively from those activities.

To that end, the national substitution programme is supplemented by, and integrated with, the plans and programmes agreed to in connection with the comprehensive rural reform discussed in item 1 in respect of access and title to

property, land reclamation, housing, technical assistance, incentives to develop a solidarity-based, cooperative economy, subsidies, income and credit generation, marketing and trade, Government procurement programmes and the provision of public goods and services.

The national substitution programme will promote voluntary substitution of crops used for illicit purposes by providing incentives, within the framework of the comprehensive rural reform, for comprehensive municipal and community substitution and alternative development plans negotiated with the communities — both men and women — involved and with their direct participation.

Guarantees will be provided to ensure women's participation in the planning, implementation, monitoring and evaluation of the comprehensive substitution and alternative development plans, as well as training geared to preventing the gender violence associated with drugs.

To strengthen the national substitution programme and contribute to its effectiveness in establishing conditions conducive to well-being and quality of life for the population affected by crops used for illicit purposes, and to ensure a definitive solution to the crops used for illicit purposes problem, the national substitution programme will be able to harness the abilities of community leaders.

The ways in which FARC-EP will participate and contribute will be defined in the discussion regarding items 3 and 6 of the Agenda of the General Agreement.

The principal components of the National Comprehensive Programme for the Substitution of Crops Used for Illicit Purposes will be:

### 4.1.3.1. Security for the communities and territories affected by crops used for illicit purposes

In addition to the generation of the conditions needed to satisfy the economic and social rights of the population and achieve comprehensive development, the sustainability of the national substitution programme and the fulfilment of its objectives also require that guarantees and conditions be provided for the security of the territories affected by crops used for illicit purposes. They can be generated by strengthening the institutional presence of the State and its ability to protect communities, particularly from any kind of coercion or threat, as well as its ability to interdict and prosecute local drug trafficking networks in accordance with the notion of security envisaged in the Final Agreement.

Protecting communities and safeguarding the rural population's right to life and well-being also entail demining. Thus, following the signing of the Final Agreement and as part of its implementation, the Government will activate a demining and clearing programme in parts of the country affected by antipersonnel mines and unexploded ordnance.

This is an undertaking in which the Government and FARC-EP will pool efforts in a variety of ways, including the provision of information, in areas and on the terms set forth in the Final Agreement and as part of the mutual commitment to end the conflict and build a stable and lasting peace, without prejudice to any agreements reached on the reparation of victims' rights.

This commitment is particularly relevant in territories in which the national substitution programme is implemented.

### 4.1.3.2. Agreements with the communities

A core ingredient of the definitive solution to the problem of crops used for illicit purposes is the fact that it is voluntary and consensual, reflected in the

manifest desire of communities — both men and women — to pursue alternatives to crops used for illicit purposes and in the Government's commitment to generate and guarantee living and working conditions conducive to well-being and quality of life. To formalize that commitment and the decision to substitute crops used for illicit purposes, agreements will be signed between the communities, the Government and regional entities, before the Programme is launched in a particular territory.

The agreement includes official confirmation of both the communities' commitment to voluntary and consensual substitution, to abstaining from replanting or growing, or taking part in work associated with, crops used for illicit purposes or in the illegal marketing of the raw materials derived from them, and the Government's commitment to immediate implementation of its response plan and the joint, participatory and negotiated development of comprehensive municipal and community substitution and alternative development plans.

The agreements with the communities will set timelines for compliance by the Government and the communities with their commitments in respect of the substitution process. The idea is to reach agreements that will ensure territories free from crops used for illicit purposes. Being a beneficiary of a substitution programme shall preclude any ties to economies relating to crops used for illicit purposes.

In cases in which, in connection with the signing of agreements with the communities under the national substitution programme, there are farmers who are unwilling to declare their decision to substitute crops used for illicit purposes or who, despite the absence of unforeseeable circumstances or force majeure, fail to honour commitments undertaken even though the programme and the communities have tried to dissuade them, the Government will proceed, after informing and sharing the problem with the communities, to eradicate those crops manually.

In cases in which no agreement is reached with the communities, the Government will proceed to eradicate the crops used for illicit purposes, preferably manually, taking care to protect human rights, the environment, health and well-being. Should substitution not be possible, the Government does not rule out using instruments it deems more effective such as spraying the crops used for illicit purposes [with chemicals] to ensure their eradication. FARC-EP considers that eradication should be manual in all cases.

### 4.1.3.3.   Prioritization of territories:

The national substitution programme is to be implemented nationwide, starting with territories that have been prioritized on the basis of the following criteria:

- zones prioritized in connection with territory-based development programmes based on the principle that they need to be integrated with the comprehensive rural reform;

- Density of population and of crops used for illicit purposes;

- National natural parks;

- Cases in which communities not included in the foregoing categories have chosen the "special criminal treatment" option. In such cases, special assistance measures will be adopted in coordination with regional and local authorities that include access to Government welfare programmes, without prejudice to the possibility of access to the national plans agreed on in connection with the comprehensive rural reform as beneficiaries on the terms described in item 1.1.5 of the comprehensive rural reform.

In places in which substitution plans do not coincide with territory-based development programmes, the communities will benefit from comprehensive rural reform national plans and from special programmes run by departmental and municipal authorities in coordination with the national substitution programme.

### 4.1.3.4   Special criminal treatment

In connection with the end of the conflict and given its contribution to the construction of peace and more effective use of judicial resources against the criminal organizations linked to drug trafficking, the Government has adopted a comprehensive approach to finding a definitive solution to the problem of crops used for illicit purposes, which has multiple (including social) causes, and thereby facilitating implementation of the national substitution programme. From that perspective, the Government undertakes to bring about the regulatory adjustments needed to temporarily waive criminal proceedings or proceed to abolish criminal sanctions against small farmers who are or have been linked to crops used for illicit purposes, provided that within one year from the entry into force of the new rules they formally declare to the competent authorities their decision to give up growing or maintaining crops used for illicit purposes. During that one-year period, the Government will guarantee deployment of the national substitution programme in all the areas in which crops used for illicit purposes are grown, so that agreements can be reached with the communities and effective implementation of the programme can begin. The regulatory adjustment must establish the criteria for identifying the small-scale farmers cultivating crops used for illicit purposes.

The voluntary declaration that farmers will give up growing crops used for illicit purposes and no longer take part in that activity may either be made by each individual farmer or in the framework of substitution agreements with the communities.

This treatment may be revoked in the event of any backsliding, in the sense that a farmer reverts to participation in any of the links of the chain of production of crops used for illicit purposes or the products derived from them.

### 4.1.3.5   Participatory construction and implementation of comprehensive community and municipal crop substitution and alternative development plans (PISDA)

Given the political, economic, social, environmental and cultural nature of the problem to be addressed and the effects of the lack of development in rural areas, the illegal economy and the violence associated with crops used for illicit purposes, ample community participation — by both men and women — including the communities directly involved in growing the crops used for illicit purposes is vital for formulating, implementing and monitoring the PISDA and thereby meeting the goals of the national substitution programme. To that end and to strengthen grassroots democracy, the municipality and its authorities need to play a leading role alongside the communities.

This process of participatory planning by communities together with the Government and local authorities must lead to the formulation and implementation of comprehensive substitution plans and, thereby, to structural transformation of the territory and a definitive solution to the crops used for illicit purposes problem.

• **Community assemblies**

With a view to triggering this process of participatory planning from the bottom up, an effort will be made to support and strengthen community assemblies, with the active participation of the men and women in the community. Special

municipal and community assembly bodies will be formed to keep track of the process.

Community assemblies are key to participatory planning, starting with the formulation of a proposal containing a comprehensive vision of the territory and a clear idea of needs, opportunities and priorities within and in line with the national substitution programme framework. The community assemblies will encompass all the communities in the affected area, including illicit crop farmers, and they will guarantee the effective participation of women. In each municipality, depending on the specific features of each territory and its population, the necessary assemblies will be constituted together with the communities, establishing the territorial scope of each assembly.

Participatory construction of a comprehensive vision of the territory requires, first, drawing up a proposal based on a collective diagnostic assessment of the territory's main social, economic and environmental features and of what it needs in terms of physical, social and institutional infrastructure. Priorities must then be established with respect to the projects corresponding to those needs. Productive potential in the territory has to be discerned and the areas planted with crops used for illicit purposes need to be identified and mapped.

As the competent national authority, in this case, the national substitution programme will define and implement a participatory planning methodology, based on the methodology used to construct territory-based development programmes and reflecting the contributions made by the assemblies. The national substitution programme will provide technical support to the communities constructing the comprehensive vision and the proposal by identifying projects and priorities in coordination with the municipalities.

- **Comprehensive municipal and community crop substitution and alternative development plans**

The various proposals put forward by the community assemblies will form the basis for constructing the comprehensive municipal crop substitution and alternative development plan for areas affected by crops used for illicit purposes that will be drawn up and implemented with the active participation of the communities, including the social organizations in the territory. Within the municipal plan framework and taking into account the proposals put forward by the various assemblies, community plans will be drawn up and form an integral part of that municipal plan. Both municipal and community plans will be put together jointly by the communities and national, departmental and municipal authorities and by the national substitution programme, as the competent national authority.

To ensure that the various proposals by the assemblies are incorporated, prioritized, validated and articulated in a municipal crop substitution and alternative development plan, the national substitution programme will organize municipal participatory planning commissions with the municipal, departmental and national authorities involved in implementing the national substitution programme and with delegates elected by the community assemblies.

The municipal plan containing the communities' proposals and comprised of the communities' plans will form the basis for implementation of the national substitution programme.

The principal participatory planning bodies at the local level are the community assemblies and the municipal participatory planning commissions, of which the assembly delegates are a structural part. In terms of their content and structure, the plans are forged from the bottom up, starting at the community assembly level and using the national substitution programme methodology, along

with any necessary technical support (which should take local experts into account and others whom the communities may suggest). The methodology used in constructing the municipal plan should ensure maximum participation and inclusion, adhere as closely as possible to the proposals put forward by the assemblies, and seek the greatest possible levels of consensus as well as optimal and equitable use of resources. The national substitution programme will engage directly with communities as it defines and implements its guidelines.

The municipal plan that emerges from the participatory planning exercise carried out in connection with the municipal commissions will be amply disseminated in the community assemblies so as to ensure that it is well understood and embraced by the community.

The community assemblies will elect their delegates and, should they deem it necessary, may constitute boards, committees, councils or other organizational units they may elect, to take part in the municipal participatory planning commissions and in the councils monitoring and evaluating crop substitution and alternative development plans and to facilitate coordination between the assemblies and national substitution programme authorities. Delegates will be required to account for their actions and activities to the community assemblies they represent.

In hiring organizations to implement crop substitution plans, preference will be given to community organizations and to employment generation in the areas in which the national substitution programme is implemented. To that end, social and community organizations and cooperatives, including rural women's organizations, will be strengthened. Efforts will also be made to foster solidarity-based associations and provide technical training.

The crop substitution plans will be integrated with municipal, departmental and national development plans.

 • **Integration with territory-based development programmes**

In cases in which the national substitution programme coincides with zones prioritized by the territory-based development programmes (see item 1), the necessary integration of the substitution plans with the regional transformation action plan will be carried out using the participatory methodology agreed upon under item 1 for constructing regional transformation action plans. The methodology will guarantee effective participation by community assembly delegates and the decision-making process will be based on consensus.

 • **Monitoring and evaluation**

Monitoring and evaluation of the implementation and fulfilment of community plans will be conducted jointly with the authorities within the community assembly framework and will serve as a basis for monitoring and evaluation at the municipal level with the participation of the community assembly delegates.

Monitoring and evaluation of the implementation and fulfilment of municipal plans will be conducted periodically by municipal councils responsible for monitoring and evaluating crop substitution and alternative development plans. Those councils will be made up of community assembly delegates and the national, departmental and municipal authorities involved in implementing the national substitution programme. The Council may invite other social and economic sectors within the municipality, such as rural and small-farmer organizations, businessmen and businesswomen, churches, academics and non-governmental organizations.

The councils and community assemblies will also hear the reports rendered by the national substitution programme, authorities and communities on the projects they are implementing.

#### 4.1.3.6    Components of the comprehensive substitution plans

Given the particular circumstances of the communities most affected by crops used for illicit purposes, the comprehensive substitution plans for those communities will, where applicable, include the following components (in addition to projects needed to implement the national plans agreed upon in item 1 (land reclamation, road infrastructure and communications, social development, technical assistance, credit and financing, marketing, Government procurement, and so on):

**(a)    Immediate response plan and development of productive projects**

Once the commitment to substitute crops used for illicit purposes and not to grow them anymore has been made, the following steps will be taken to facilitate the transition of farmers, crop pickers and sharecroppers to licit economic activities by providing them immediately with the support they need to safeguard their livelihoods and food security for households, and to ensure income, well-being and quality of life for farmers, crop pickers, sharecroppers and communities in general by putting together long-term sustainable productive projects:

• For illicit crop farmers' households, the provision of:

   – Immediate food aid consisting of direct delivery of market produce or the equivalent in vouchers or any other system tailored to the particularities of the territory, for up to one year, in accordance with the size of each household, the specific characteristics and needs of each population and region and progress with income-generating projects. Priority will be given to local providers in supplying markets and solidarity-based associations will be encouraged so that they can enter into market supply contracts with the Government.

   – The establishment of kitchen gardens and the provision of minor animal species, along with appropriate technical counselling, and the provision of the animal fodder and inputs that households request.

   – Projects that can quickly generate income, such as short rotation crops, fish farming, poultry farming and others, along with appropriate technical counselling, aimed at meeting households' immediate needs and promptly and adequately replacing the income previously derived from crops used for illicit purposes, taking each household's preferences into account, as well as the conditions and potential of each zone.

At the same time, working with the farmers and small-scale producers in the territory, long-term productive projects will be developed within the framework of the comprehensive rural reform process with a view to providing families with higher incomes and decent living conditions. Priority will be given to food production and the generation of value-added, first and foremost to satisfy the demand of the communities themselves, but also to exploit national or international market niches. In addition to farming and livestock activities, an effort will be made to promote crafts and industrial and services activities, especially those that add value to goods and services produced by the community and activities of interest to the community that exploit the potential of the territory and provide income and decent work opportunities for the campesino communities — both men and women — particularly affected by crops used for illicit purposes. Special steps will be taken to promote cooperatives and a solidarity-based economy. Such activities should be governed by the principles espoused in the comprehensive rural reform, especially those to do with environmental sustainability, well-being and quality of life and, wherever possible, they should contribute to closing the agricultural frontier and to environmental rehabilitation. The same immediate aid package will be provided to

sharecroppers and tenant farmers who have settled in the territory and opt to remain in the region.

• For crop pickers, the actions envisaged include:

– Food aid for pickers living in the territories in which the national substitution programme is implemented, in the form of direct delivery of market produce or the equivalent in vouchers or any other system tailored to the particularities of the territory, for up to one year, for each household,[5] in accordance with the specific characteristics of each population and region.

– Temporary job options for pickers, whether or not they have settled in the region: the identification of community works and other sources of employment that arise in connection with implementation of the comprehensive rural reform and give preference to members of crop pickers' families, without that precluding their opting to be beneficiaries under the terms of item 1.1.3 of the comprehensive rural reform.

Pickers (settled or not) and settled sharecroppers living in the region — both men and women — will be those recognized in a participatory fashion by the community assembly census and the national substitution programme.

• For the community in general:

– Early childhood: A rural day-care nurseries program will be implemented in villages affected by crops used for illicit purposes with a view to facilitating access to employment opportunities for women heads of household and contributing to early childhood food security.

– School population: In order to improve the food security of children of school age and reduce drop-out rates, a programme to build and equip school canteens and provide food will be developed to ensure that every child attending school in the territories used for illicit purposes receives breakfast, without prejudice to sections agreed on under item 1 in connection with the Special Plan for Rural Education, in particular the emergency plans referred to in item 1.3.4, "System for the progressive realization of the right to food."

– Generating job opportunities: mechanisms will be put in place to facilitate access to job opportunities arising in connection with the implementation of the comprehensive rural reform and, in particular, the comprehensive crop substitution and alternative development plans, which will enable the community living in territories affected by crops used for illicit purposes to identify and access the available job market. Those mechanisms will include special measures for rural women.

– Older adults: implementation of programmes to eradicate hunger among the elderly as per item 1.3.4 of the comprehensive rural reform, "System for the progressive realisation of the right to food."

– Poverty alleviation and income generation programmes will be implemented.

– The formation of basic health-care brigades will be encouraged, without prejudice to the provisions of item 1.3.2.1. "National rural health plan".

---

[5] There can only be one member of the household receiving direct food aid for the family. The household may comprise a single person.

     – The viability and sustainability of the productive projects for the substitution of crops used for illicit purposes depend on the Government implementing the plans referred to in item 1.3.3 of the comprehensive rural reform regarding stimulating the cooperative and solidarity-based economy, technical assistance, subsidies, income and credit generation, and marketing.

Support measures under the national substitution programme will be conditional upon compliance with the schedule of commitments made by farmers in the agreements to substitute crops used for illicit purposes and not to replant them, it being understood that the process of substitution and the sustainability thereof require Government support under the terms agreed upon with the communities. The voluntary decision to give up growing crops used for illicit purposes and no longer take part in that activity may either be expressed by each individual farmer or in the framework of voluntary substitution agreements with the communities. In any case, there must be a full commitment to abstain from growing or being involved in work associated with growing, or participating in the illegal marketing of raw materials derived from crops used for illicit purposes.

**(b)**   **Fast-track social infrastructure works**

     In order to respond rapidly to the needs of communities, the plans will establish fast-track social infrastructure works to be prioritised by the communities; these will include rural roads, improvements to schools, health centres and communal buildings, without prejudice to the implementation of other infrastructure plans and programmes under the comprehensive rural reform.

**(c)**   **Sustainability and environmental recovery component**

     To contribute to closing of the agricultural frontier and promote environmental recovery, especially in the municipalities bordering areas of special environmental interest, the plans will have a component relating to sustainability and environmental protection that will include:

     • Land reclamation and adaptation actions for growing legal crops;

     • Actions to mitigate environmental damage in areas of special environmental interest, fragile ecosystems and vulnerable hydrography and to promote the recovery of forests;

     • Environmentally sustainable productive projects and environmental protection projects in areas of special environmental interest, such as silvopasture projects and other programmes referred to in item 1.1.10.

**(d)**   **Land titling plan**

     In order to promote access to land for men and women and to encourage the substitution of crops used for illicit purposes in areas where the commitments made by farmers under the national substitution programme are fulfilled, registration processes will be expedited under the terms set out in the large-scale titling plan discussed in Item 1.1.5 of the comprehensive rural reform. The Government will adapt the regulations to allow titles to be awarded to such beneficiaries, conditional upon prior compliance with the commitments guaranteeing that the property is free of crops used for illicit purposes and that they will not be replanted.

**(e)**   **Plans for remote areas with low population density**

     In areas with low population density that are difficult to access owing to location and distance and therefore difficult to supply with the goods and services

needed to ensure the well-being and quality of life for the people and their territorial integration, special measures will be developed for the substitution of crops used for illicit purposes, recovery of ecosystems, generation of new employment opportunities related to river transport, environmental recovery programmes, protection of forests and wildlife, and so on, without prejudice to alternatives for relocating communities settled there, where possible and necessary, in consultation with communities, to improve their living conditions.

(f)   **Timelines, targets and indicators**

Both the comprehensive crop substitution and alternative development plans and the accords must include timelines for implementation with targets and indicators, including the commitments made by the community, so as to be able to measure the impact of projects on the well-being of communities — both children and adults — and monitor the plan.

**4.1.4   Implementation of the National Comprehensive Programme for the Substitution of Crops Used for Illicit Purposes in National Natural Parks**

To solve the problem posed by the presence of crops used for illicit purposes in national natural parks, and to ensure the well-being and quality of life of communities and the preservation and conservation of the parks, mechanisms for direct dialogue with communities will be established to forge agreements for the eradication of these crops that will ensure the control, restoration and effective protection of these areas.

To that end, the sections agreed to under item 1.1.10 of the comprehensive rural reform, in particular those in the third section thereof, shall be used as a basis.

**4.1.5   Communications strategy**

A communications campaign will be launched to promote substitution agreements, motivate communities and build confidence regarding participation in the processes of joint construction of comprehensive municipal and community crop substitution plans, which should help improve living conditions and quality of life and provide a definitive solution to the problem of crops used for illicit purposes; and to highlight the commitment of the Government and FARC-EP to contribute to and support this goal. Information on the national substitution programme and mechanisms for community participation in the various phases will be disseminated directly through community meetings and indirectly through the media, particularly local and community media.

**4.1.6   Financing**

National substitution programme resources will be allocated pursuant to the immediate response plans and the comprehensive municipal and community crop substitution and alternative development plans with a view to ensuring efficient, effective and timely implementation.

**4.2.   Public health and drug use prevention programmes**

Illicit drug use stems from multiple causes triggered by economic, social, family and cultural conditions in the society or environment in which the drug user lives and should be treated as a public health issue. It can be dealt with only through the commitment and collaboration of authorities, the community and the family to

pursue a policy of health promotion, prevention, comprehensive care [6] and social inclusion, with particular emphasis on children and adolescents.

Actions undertaken in this field need to be devised democratically with the involvement of society in general and, in particular, social workers specialising in this field.

The policy for addressing illicit drug use must be a priority espoused by the State that requires, inter alia, national and subnational capacity building, as part of the system of social protection, and the corresponding provision of resources.

### 4.2.1 Comprehensive National Programme to Address Illicit Drug Use

The Government will establish the Comprehensive National Programme to Address Illicit Drug Use to ensure high-level coordination among the institutions with authority in this area and to oversee a participatory process for the review, adjustment and implementation of the policy to address drug use.

### 4.2.1.1 Principles:

The national policy to address illicit drug use will be guided by the following principles:

- **Human rights-based approach**: actions aimed at preventing and addressing drug use, as well as reducing risks and harm, must be guided by respect for and effective enjoyment of human rights. That precludes, inter alia, stigmatisation of and discrimination against users, as well as prosecution for drug use.

- **Public health approach**: actions to address illicit drug use must be comprehensive, effective and sustainable over time, and include the promotion of a healthy lifestyle and healthy living conditions, prevention of drug use, treatment and rehabilitation, based on identification of the health needs of the population.

- **Equity and gender-based approach**: within a framework of respect for human rights, to ensure that actions to address drug use are tailored to the real circumstances of users and are effective and sustainable, it is necessary to discern vulnerability factors associated with age, gender, disability status, socioeconomic status and geographical location, membership of the LGBTI community, and so on. Such actions should pay particular attention to the needs of adolescents in rural and urban areas.

  This approach should take into account the relationship between illicit drug use and violence against women, especially domestic violence and sexual violence. Measures will be adopted for women, girls, young people and adolescents.

  In any case, actions taken must respect the ancestral use of the coca leaf by indigenous communities.

- Community participation and harmonious relations: to maximize the effectiveness of actions to address illicit drug use, the community must be involved in the construction and implementation of solutions to create strong ties between people and their community.

---

[6] Comprehensive care includes treatment, rehabilitation and harm reduction.

• Evidence-based approach: the actions implemented to address illicit drug use must be based on evidence, and founded on evaluated and validated knowledge.

### 4.2.1.2   National response and care system for illicit drug users

With the aim of improving the care provided to drug users who require progressive treatment and rehabilitation, the Government will draw up and implement a national response and care system for illicit drug users that includes additional actions for rehabilitation and social integration with a gender perspective.

### 4.2.1.3   Participatory review and adjustment of public policy to address illicit drug use

The Programme will coordinate participatory reformulation of the policy to address illicit drug use with a focus on the promotion of health, the prevention and tackling of drug use and the reduction of risks and harm, based on evaluation and review of the actions implemented so far and taking into account specific characteristics and the need to target particular groups based on age, gender, socioeconomic status and geographic location.

To ensure participatory review and adjustment of the policy to address illicit drug use based on the abovementioned principles, the Government will set up a national body with representatives of the competent authorities, scientific institutions, specialised centres, educational institutions, parents' associations, religious communities and drug users.

To fulfil its function, this body shall take into account:

• The review and evaluation of policies and strategies that have been developed at national and local level in the area of prevention and tackling of drug use and the reduction of risks and harm, with the participation of communities and experts in the field.

• Territory-based analyses of illicit drug use, in collaboration with departmental and municipal authorities, to identify the problems, risks, vulnerabilities, trends, consequences and new dynamics of illicit drug use within a particular context.

• Experience gained both internationally and nationally and recommendations issued by international organizations.

### 4.2.1.4   Participatory action plans with a territorial and population-based approach

Based on the policy and the territory-based analyses of illicit drug use, the Programme will foster capacity-building within local authorities and support them in the participatory design and implementation of departmental and municipal action plans to address drug use, according to the specific characteristics of territories and different population groups.

These plans shall contain at least:

• Evidence-based actions aimed at the promotion of health and prevention of drug use, that respond to the specific characteristics and levels of risk of each territory and help strengthen safeguards (psychosocial support, self-esteem, conflict resolution, management of free time, strengthening of the family unit, commitment to education, healthy lifestyles, development of cultural and sporting skills and recreational activities) against the risks identified. Special attention will be given to prevention in children and adolescents.

- Actions to strengthen and empower communities — both men and women — in order to contribute to the promotion of health and the prevention of drug use.

- Actions to support and strengthen youth leadership processes so as to make a positive difference in a number of environments (schools, clubs, neighbourhoods, etc.).

- Special prevention programmes in educational institutions at different levels, to be extended to urban centres and rural areas, by involving head teachers, teachers, parents and students, through comprehensive training initiatives.

- Evidence-based actions to reduce harm, aimed at minimising the negative impact of drug use on the user him/herself, on the family and on the community, giving priority to more vulnerable groups such as the homeless, women and the prison population. In the case of female users, actions should take into account the relationship between illicit drug use and violence against women, especially domestic violence and sexual violence. For the female prison population, special measures will be taken in terms of health, protection and prevention, including measures to prevent HIV-AIDS.

- Actions to raise awareness and guide the community and institutions to prevent stigmatisation of drug users, taking into account in particular the difference in impact by gender and in respect of LGBTI persons.

- Actions to expand and improve access to and the range of care and assistance provided by qualified persons to drug users, including treatment and rehabilitation, pursuing, inter alia, affirmative action measures for women and LGBTI persons. That care and assistance with rehabilitating drug users and reintegrating them into society will take into account targeted initiatives by qualified and experienced civil society organizations, including religious bodies and organizations and organizations in various different communities.

- Actions by the Government, families, communities and schools to protect children and adolescents from illicit drug use.

### 4.2.1.5   Evaluation and monitoring of the actions implemented to address drug use

For the purposes of ongoing monitoring of the actions undertaken to address drug use and to assess their impact and identify new requirements, the Programme will devise and implement a monitoring and evaluation system.

This system will involve participatory bodies for monitoring and evaluation at municipal and departmental level, comprising, inter alia, the authorities, scientific institutions, specialised centres, educational institutions, parents' associations, religious communities, social organizations, experts and drug users themselves.

### 4.2.1.6   Creation of a pool of knowledge on illicit drug use

To ensure the availability of sufficient, up-to-date information on health promotion, prevention and comprehensive care in the area of illicit drug use, to contribute to decision-making and serve as input for the design, implementation, monitoring, evaluation and adjustment of the evidence-based policy, the following measures will be implemented:

- Specialised research and studies on the subject of illicit drug use, including an equity-based, age-based and gender-based approach.

- Tracking indicators of use and the impact of actions taken.

• In coordination with departmental and municipal authorities, regular territory-based analyses of the use of illicit drugs, both synthetic and natural, so as to identify and place in context the problems, risks, vulnerabilities, trends, consequences and new dynamics in illicit drug use.

• Establishment of mechanisms for disseminating information on illicit drug use, tailored to particular groups.

### 4.3    Addressing the production and selling of narcotics

The illicit drugs problem is transnational. Resolving it therefore requires simultaneous action both within the country and in coordination with and with the commitment of the international community.

With the end of the conflict in sight, both to facilitate the implementation of the agreements and in general to address the challenge of organised crime associated with drug trafficking and money laundering, it is necessary to implement policies and programmes to disable the factors and mechanisms that give rise to and maintain the production and sale of illicit drugs and profiting therefrom. The primary aim is to disrupt the criminal organizations with a vested interest in this scourge, including networks dedicated to money laundering.

We yearn for a country free from drug trafficking, a common goal that all should strive for and that requires changes at the political and institutional level, and in society in general, in order to consolidate a culture based on values opposed to drug trafficking and money laundering that will allow us to eradicate and negate the impact of this phenomenon, including the stereotypes associated with drug trafficking that lead to gender-based violence.

Lastly, building a stable and lasting peace will require clarification of the relationship between production and selling of illicit drugs and conflict, including the relationship between paramilitaries and drug trafficking, and the willingness of everyone to contribute to this clarification.

### 4.3.1    Effective prosecution

As part of the commitment to stepping up the fight against organised crime and its support networks (item 3.4 of the General Agreement), as the conflict draws to an end, and in order to safeguard both communities and proper execution of the national substitution programme and implementation of the agreements in the territories from the threat of organised crime, and generally to disrupt the networks of these organizations, the Government will launch a criminal policy strategy. Parallel with the implementation of a comprehensive strategy to fight corruption, this criminal policy strategy will strengthen and enhance the presence and effectiveness of institutions and concentrate their capabilities in the investigation, prosecution and punishment of crimes associated with any organization or criminal group involved in the production and selling of illicit drugs, always mindful of the different treatment that should be given to the small-scale farmers and rural inhabitants caught up in the exploitation of crops used for illegal purposes.

Moreover, so as to ensure effective prosecution of members of organised crime, especially those at the top, the Government will promote the improvement and strengthening of judicial capacities, by devising and implementing a national strategy that includes regional strategies for strengthening and coordinating agencies and mechanisms for investigating and prosecuting criminal networks linked to drug trafficking, including the following measures:

• Creation of inter-agency groups to conduct structural investigations with mechanisms to recognise and understand local, regional, national and

transnational dynamics of crime in all its dimensions and prevent the emergence of new groups dedicated to organised crime, in close coordination with other State agencies and incorporating contributions from specialised centres, academia and the general public, and the different organizational forms thereof, as part of a comprehensive strategy.

• Reinforcement and extension of regional and international cooperation to identify networks, marketing systems and routes used by criminal organizations involved in drug trafficking.

### 4.3.2 Strategy to deal with the assets involved in drug trafficking and money laundering

In order to fully eradicate the production and sale of illicit drugs and eliminate the factors that stimulate illegal economies, facilitate the financing of organised crime networks, yield illegal profits, induce corruption and disrupt harmonious relations among citizens, and also in order to contribute to the forging of peace, the Government will implement a strategy to resolutely go after the property and assets involved in drug trafficking and prevent and control money laundering. This strategy will include the following measures:

• **Identification of the drug trafficking value chain**: the Government will carry out a process of mapping crime, at all levels including regional, to identify systems for financing organised crime, how those resources are used, the people who manage this money, national and international money laundering strategies, types and channels, property acquired with these funds and networks of front organizations for criminal structures, and the level of penetration thereof in the State and its institutions. To this end, a group of national and international experts, including delegates from international and regional organizations specialising in this field, will be established to make recommendations and draw up a public report on illicit financing networks, how they operate and their impact on life in Colombia.

• **Regulatory amendments and the enhancement and strengthening of institutional capacities for the detection, monitoring and reporting of illegal financial transactions**: The Government will set up a committee of experts, including academics and researchers, both national and international, as well as discussion Panels across the country's territories, with the aim of developing a new Statute for the prevention and combatting of illegal financing, so as to, inter alia, adapt where necessary, or define and coordinate the regulations on this subject, with an emphasis on going after the strong links in the drug trafficking chain, such as the organizations engaged in production, selling and money laundering. The regulations will be extended to all sectors that are at risk of being used for money laundering. The committee will take into consideration the results of the crime mapping exercise.

• **Investigative bodies**: the Government will also promote the improvement and strengthening and, where necessary, the redesign or establishment of bodies tasked with investigating and monitoring finances and money laundering so as to identify the financial systems of organised crime networks involved in drug trafficking, the dynamics thereof according to the value chain at the national and local levels, and their international ties. The people who head up these investigative bodies shall publish regular reports accounting for their activities.

• **Anti-money laundering culture**: the Government will launch a new national campaign to promote values, raise awareness of new forms of money laundering and foster citizen participation and capability, in line with item 2 of

A-423

the General Agreement, to exercise control and perform audits to address the corruption associated with money laundering and irregular or suspicious transactions, in order to prevent people and institutions from being used for money laundering.

- **Strategy for the effective implementation of the asset recovery process**: the Government will put a new strategy in place to ensure effective implementation of the asset recovery process, including the resources and regulatory and institutional modifications needed to improve and strengthen the capacities of State agencies responsible for identification of assets, investigation and prosecution, which will be accompanied by the implementation of a comprehensive strategy to combat corruption.

In addition, by making the necessary regulatory and institutional modifications, the Government will ensure transparent and efficient management of property in the process of recovery and will do all it can to ensure the assets and funds recovered are channelled into the plans and programmes covered by the Final Agreement.

### 4.3.3   Control of inputs

The Government will review and establish strict state controls on the production, import and selling of inputs and precursor chemicals required for the production of illicit drugs, as well as increasing monitoring and control by the State. It will put in place rules and mechanisms to require companies that produce, import and sell such inputs to adopt measures of transparency and controls on the end use of inputs. So as not to affect legal production activities, special protocols will be drawn up to identify the uses, frequencies and locations where there is demand for inputs.

### 4.3.4   Strategy to combat corruption

As part of the comprehensive strategy to combat corruption (item 3.4 of the Agenda of the General Agreement), a specific strategy will be drawn up to combat corruption associated with drug trafficking, taking into account the results and recommendations of the group of experts called upon to perform the mapping of the drug trafficking value chain.

Parallel to the fight against corruption, institutional capacities will be enhanced and strengthened.

The strategy must include the establishment of specialised inter-agency groups in order to address the various manifestations of corruption and those responsible for it and help improve institutional performance.

### 4.3.5   International Conference and forums for regional dialogue

In connection with the end of the conflict and to help eliminate the illicit drugs problem, once and for all, the Government will promote an international conference under the auspices of the United Nations to discuss and perform an objective assessment of the policy to combat drugs and to make progress in reaching agreement on changes that need to be made, taking into account the debate and new international developments on this subject as well as the perspective of countries where drugs are used and the countries producing them, particularly the experiences and lessons learned in Colombia, and identifying sound practices based on evidence.

At that forum, the Government will promote a discussion on commitments and responsibilities and, in general, the shared responsibility between producer and user countries when addressing the problem.

Efforts will be made to promote the participation at this conference of academic and research institutions, producers of coca leaf, poppy and marijuana, and organised users.

In parallel, the Government will promote opportunities for dialogue within the framework of regional organizations, OAS, UNASUR and CELAC, so as to make progress in forging consensus on the policy to combat drugs.

For the purposes of promotion, preparation and holding of the international conference and regional venues, the Government shall convene forums for dialogue and discussion at the national and local levels.

**4.3.6**  **Under item 5.1.1.1.2 on the mandate of the Truth, Coexistence and Non-repetition Commission, the Commission's mandate will be to clarify and promote recognition of the relationship between production and selling of illicit drugs and conflict, including the relationship between paramilitaries and drug trafficking (aspect of item 3.7 of the Agenda of the General Agreement).**

**5.**  **Agreement on the victims of the conflict:**

**"Comprehensive system for truth, justice, reparation and non-repetition", including the special jurisdiction for peace; and commitment on human rights**

Compensation for victims is at the core of the Agreement between the Government and FARC-EP. In this regard, at the Negotiation Table in Havana we discussed and reached agreement on item 5 of the Agenda, "Victims", including sub-items 1. Victims' human rights and 2. Truth, with the aim of drafting content that will satisfy the claims of those who have been affected by the long conflict. Now, in the pursuit of a political accord, through these new accords and important de-escalation measures and agreements, we have taken a major step forward towards building a stable and lasting peace and bringing an end to a war that has torn the country apart for more than half a century.

We, the Government and FARC-EP, given the need for comprehensiveness when developing the points included under the item "Victims", will begin our analysis of this section by taking on board the "Declaration of Principles" of 7 June 2014. These principles governed all the work that went into drafting this item 5 — Victims, and must also underpin its implementation:

• **Recognition of the victims**: All the victims of the conflict must be recognised, not only in their capacity as victims, but also and primarily in their capacity as citizens with rights.

• **Acknowledgement of responsibility**: Any discussion of this section must be based on acknowledgement of responsibility vis-à-vis the victims of the conflict. We will not negotiate on impunity.

• **Realisation of victims' rights**: The rights of the victims of the conflict are non-negotiable; the issue is to agree on how they should be effectively addressed in the best possible manner within the context of the end of the conflict.

• **Victim participation**: The discussion on the realisation of the rights of the victims of serious human rights violations and breaches of international humanitarian law during the conflict necessarily involves the participation of the victims, through different means and at different times.

• **Clarification of the truth**: Uncovering the truth about what happened throughout the conflict, including the multiple causes, origins and effects thereof, is fundamental to the realisation of the rights of victims and of society

in general. Trust can only be regained through full elucidation and recognition of the truth.

- **Reparation for the victims**: Victims have the right to be compensated for the injury and loss suffered because of the conflict. Restoring victims' rights and changing their lives for the better, within the framework of the end of the conflict, is a fundamental aspect of building a stable and long-lasting peace.

- **Guarantees of protection and security**: Protecting the lives and the personal integrity of the victims is the first step towards realisation of their other rights.

- **Guarantees of non-repetition**: The end of the conflict and the implementation of the reforms ensuing from the Final Agreement constitute the main guarantee of non-repetition and the way to ensure that there will be no further generations of victims. The measures adopted both in item 5 and in the other sections of the Agenda should be aimed at guaranteeing non-repetition in order to ensure that no Colombian will ever become a victim or face the risk of becoming one again.

- **Principle of reconciliation**: One of the goals of realising victims' rights is the reconciliation of all Colombian citizens to enable them to move towards a future of civility and peaceful coexistence.

- **Rights-based approach**: All the agreements we reach on the sections of the Agenda, and in particular on item 5 — "Victims", should contribute to protecting and guaranteeing the effective enjoyment of rights by all. Human rights are equally inherent to all human beings, meaning that the latter are entitled to these rights by virtue of their status as humans, and consequently the recognition of human rights is not a concession; they are universal, indivisible and interdependent and they must be considered globally and in a fair and equitable manner. Consequently, the State has the duty to promote and protect all rights and fundamental freedoms, and all citizens have the duty not to violate the human rights of their fellow citizens. Acknowledging the principles of universality, equality and progressivity and for the purposes of compensation, account will be taken of violations of economic, social and cultural rights as a result of the conflict.

On the basis of these principles we have reached core agreements regarding: 1. Comprehensive system for truth, justice, reparation and non-repetition and 2. Commitment to the promotion, observance and guaranteeing of human rights.

These commitments include transcendental agreements such as the establishment of the Truth, Coexistence and Non-repetition Commission; the Special Unit for the Search for Persons deemed as Missing in the context of and due to the conflict; the special jurisdiction for peace and the specific reparation measures. All these components have been combined within a comprehensive system for truth, justice, reparation and non-repetition, which also includes non-repetition measures; with regard to the latter, it is worth noting that, besides the coordinated implementation of all of the above measures and mechanisms, as well as of all the sections of the Final Agreement in general, additional measures will be implemented, which will be agreed upon under item 3 — "End of the Conflict" of the Agenda of the General Agreement.

In the course of the discussions on item 5 "Victims", the Historical Commission on the Conflict and its Victims was set in motion and came up with important conclusions covering many different aspects and points of view as regards the origins and multiple causes of the conflict, the main factors and conditions that facilitated the conflict or contributed to its lasting so long, and the most notorious effects and impacts of the conflict on the population, all of which have been

considered as essential input for the work of the Truth, Coexistence and Non-repetition Commission.

Other principal steps taken within the framework of the discussions on item 5 "Victims" were: the signing of measures and protocols to implement programmes for the decontamination and removal from the country's territories of anti-personnel mines (APMs), improvised explosive devices (IEDs), unexploded ordnance (UXO) or explosive remnants of war (ERWs); immediate humanitarian measures for the search, location, identification and dignified delivery of the remains of persons deemed as missing in the context of and due to the conflict.

*** 

The armed conflict, which has multiple causes, has inflicted suffering and loss on the people to a degree unparalleled in our history. Millions of Colombians have been victims of forced displacement, the dead number in their hundreds of thousands, tens of thousands of people of all kinds have disappeared, and vast numbers of families, communities and segments of the population have been affected throughout the length and breadth of the country, including rural communities, indigenous peoples, the Afro-Colombian, black, *palenquero*, *raizal* and Roma communities, individuals victimised because of their political beliefs, political parties, social and trade-union movements, LGBTI persons and economic associations. There have also been other, less visible but no less painful forms of victimisation, such as sexual violence, psychological damage or simply living in fear.

In recognition of this national tragedy, starting with the Exploratory Meeting of 2012, we agreed that compensating the victims had to be at the core of any agreement; and that the agenda for ending the conflict should include a section on the victims, as set forth in the General Agreement dated 26 August 2012.

For that same reason, before addressing this section of the Agenda we agreed on the abovementioned "Declaration of Principles", which reflects this commitment to the victims and which has served as the compass for discussions in order to ensure that the comprehensive realisation of their rights to the truth, justice, reparation and non-repetition remains at the core of the agreement.

At the same time, we broadened the mechanisms for participation. More than 3,000 victims took part in four forums held in Colombia, organised by the United Nations and the National University, and sixty victims travelled to Havana to deliver their testimonies directly to the Negotiation Table and offer their recommendations, with the support of the Episcopal Conference, the United Nations and the Colombian National University. In addition, more than 17,000 proposals were submitted by the victims and other citizens, by various means, to the Negotiation Table. All the proposals that we received from the victims were fundamental for achieving the agreements.

Lastly, we want to thank the victims for their resolute participation, their noble testimonies and their proposals, without which it would not have been possible to construct this Agreement, and we encourage them to actively participate in its implementation and in the building of peace.

We hope that with the implementation of this and all of the Agreements, the dignity of victims will be restored, justice will be done, and the foundations will be laid to bring an end, once and for all, to the violence of the conflict in the country, and to ensure that nobody in Colombia ever becomes a victim again.

### 5.1   Comprehensive system for truth, justice, reparation and non-repetition

In compliance with our commitment to place the victims at the core of the Agreement, and in response to victims' testimonies, proposals and expectations, which we heard directly from them, the Government and FARC-EP have agreed to establish the comprehensive system for truth, justice, reparation and non-repetition, and for this very reason we have adopted the measures described above.

The underlying principles on which the comprehensive system is founded are the recognition of the victims as citizens with rights; the acknowledgement that the full truth about what happened must be uncovered; the acceptance of responsibility by all those who took part, directly or indirectly, in the conflict and were involved in one way or another in severe human rights violations and serious infringements of international humanitarian law; the realisation of victims' rights to the truth, justice, reparation and non-repetition, based on the premise of non-negotiation on impunity, additionally taking into account the basic principles of the special jurisdiction for peace, one of which is that "damage caused shall be repaired and made good whenever possible".

The end of the conflict must contribute to ensuring an end to violations and infringements, while also being an opportunity to guarantee the realisation of victims' rights. The definitive end of hostilities creates conditions in which victims can express themselves without fear and receive the recognition they are entitled to; an opportunity for all of those who bear responsibility for human rights violations or infringements of international humanitarian law to acknowledge that responsibility accordingly; and consequently, an opportunity for more effective implementation of measures aimed at ensuring truth, justice, reparation and non-repetition.

International experience shows that such measures are more effective if they are applied in a coordinated, complementary manner. To this end, the system is intended to be comprehensive, in order for the measures to achieve maximum justice and accountability for the human rights violations and the infringements of international humanitarian law that have occurred throughout the conflict. The comprehensive nature of the system also contributes to the elucidation of the truth about the conflict and to construction of the historical memory.

We understand that a broad, genuine response to the rights of victims — alongside the implementation of all the other agreements, which also guarantee rights — forms the basis for justice.

In order to fulfil this purpose and to move forward in the fight against impunity, the comprehensive system combines judicial mechanisms for the investigation and punishment of serious human rights violations and serious infringements of international humanitarian law, under the terms set forth by the special jurisdiction for peace, with complementary extrajudicial mechanisms that may contribute to the elucidation of the truth about what happened, the search for missing loved ones, and the reparation of the harm done to people, communities and entire territories.

Furthermore, judicial mechanisms will be established outside of the special jurisdiction for peace, such as a unit for investigating and dismantling criminal organizations, including criminal organizations deemed to be the successors to paramilitaries, and their support networks, referred to in item 3.4 of the Agenda of the General Agreement.

The comprehensive system adopts an equity-based and gender-based approach, which is tailored to the particular characteristics of the victimisation in each territory and each population, and in particular to the needs of women and children.

The comprehensive system places special emphasis on restorative and reparative measures, and seeks to achieve justice not only through retributive sanctions.

The system must also concurrently guarantee the legal security of all of those who have recourse to justice measures, as an essential element of the transition to peace.

The success of the comprehensive system is also dependent on achieving the broadest acceptance across society.

Lastly, the comprehensive nature of the system contributes to laying the foundations for regaining trust, for coexistence in a peacebuilding scenario, and for real reconciliation among all Colombians.

(a)   **Goals:**

In summary, the various measures and mechanisms of the comprehensive system must contribute to achievement of the following goals:

- **Realisation of victims' rights**, through the combination of judicial and extrajudicial mechanisms.

- **Accountability**, through the establishment of responsibilities, whereby everyone involved in the conflict, directly or indirectly, as combatants or non-combatants, shall assume their share of responsibility for the serious violations and infringements committed in the context of and due to the armed conflict.

- **Non-repetition**, through the application of all the measures of the system — as well others to be agreed on in item 3 of the Agenda — to prevent revictimisation and repetition, to encourage society's rejection of war and its effects, to secure the termination of the conflict, and to prevent the emergence of new forms of violence.

- **Territory-based, equity-based and gender-based approach**, through the differentiated treatment of territories and populations, in particular of women and children victims, and of the most deprived and most vulnerable populations and communities, and therefore those most affected by the conflict.

- **Legal certainty**, through the fulfilment of the conditions of the comprehensive system, and in particular the special jurisdiction for peace, with the guarantees needed to ensure due process.

- **Coexistence and reconciliation**, by building mutual trust starting from the positive changes triggered within society by the peace agreements, in particular through the recognition of the victims, the acknowledgement and the establishment of responsibilities and, in general, the acknowledgement by society as a whole of the need to take advantage of this opportunity to build a future based on social justice, respect and tolerance.

- **Legitimacy**, responding to the expectations of the victims, and society in general, and to the national and international obligations of the Colombian state, including compliance with the covenants set forth in the Final Agreement.

(b)   **Components:**

The comprehensive system will comprise the following five mechanisms and measures:

- **Commission on Truth, Coexistence and Non-repetition**: This will be a temporary, extrajudicial body seeking to uncover the truth about what happened and contribute to the elucidation of violations and infringements, and to offer a broad explanation to society as a whole about the complexity of the conflict; to promote the recognition of the victims and of the responsibilities of those who directly and indirectly took part in the armed conflict; and to promote peaceful coexistence across the country's territories in order to guarantee non-repetition.

- **Special Unit for the Search for Persons deemed as Missing in the context of and due to the conflict**: This will be a high-level special unit of a humanitarian and extrajudicial nature, whose goal is to direct, coordinate and contribute to the implementation of humanitarian actions for searching for and identifying all the people deemed as missing due to the conflict who are still alive, and in the cases of those deceased, whenever possible, for the location and dignified delivery of their remains. The Unit's activities may not substitute or prevent judicial investigations to be carried out in fulfilment of the State's obligations.

- **Special jurisdiction for peace**: A number of judicial Panels for justice, including a Judicial Panel for Amnesty and Pardon and a Tribunal for Peace, to administer justice and investigate, clarify, prosecute and punish serious human rights violations and serious infringements of international humanitarian law. The special jurisdiction for peace forms part of the comprehensive system for truth, justice, reparation and non-repetition and, since it is exclusively and temporarily devoted to conduct directly and indirectly related to the armed conflict, does not replace ordinary jurisdiction.

- **Comprehensive reparation measures for building peace**: These measures seek to ensure the comprehensive reparation of the victims, including the rights to restitution, indemnification, rehabilitation, realisation and non-repetition; and the collective reparation of the territories, populations and communities most affected by the conflict and those that are most vulnerable, alongside the implementation of the other agreements. For this purpose, existing mechanisms will be strengthened, new measures will be adopted and efforts will be made to promote universal commitment to reparation of the harm done.

- **Guarantees of non-repetition**: The guarantees of non-repetition are the result, on the one hand, of the coordinated implementation of all of the abovementioned measures and mechanisms, as well as, in general, all the items of the Final Agreement; and on the other hand, of the implementation of any non-repetition measures agreed upon within the framework of item 3 — "End of the Conflict".

The various mechanisms and measures for truth, justice, reparation and non-repetition, inasmuch as they are part of a system that seeks a comprehensive answer for the victims, cannot be construed in isolation. They will be interconnected through relationships of conditionality and incentives to gain access to and maintain any special treatment based on justice and constant recognition of the truth and of responsibilities. Compliance with these conditionalities will be verified by the special jurisdiction for peace.

No one mechanism of the system shall prevail over another. Each mechanism shall fulfil its main function in the most expeditious manner possible, and without duplicating the functions of other mechanisms; for this purpose, the necessary collaboration protocols will be established.

17-06469

**A-430**

### 5.1.1 Truth: Commission on Truth, Coexistence and Non-repetition and Special Unit for the Search for Persons deemed as Missing in the context of and due to the conflict

#### 5.1.1.1 Commission on Truth, Coexistence and Non-repetition

The end of the conflict is a unique opportunity to satisfy one of the greatest desires of Colombian society and of the victims in particular: to uncover and learn the truth about what happened during the conflict. Colombia needs to know what happened and what must never happen again so as to be able to forge a future in which the well-being and dignity of everyone is guaranteed, thus helping to break, once and for all, the cycles of violence that have scarred Colombian history.

By starting over again we can contribute to the construction and preservation of historical memory and gain a broad understanding of the multiple facets of the truth about the conflict, including the historical dimension, so as not only to realise the right to the truth but also to contribute to laying the foundations for coexistence, reconciliation and non-repetition.

With this aim in mind, we, the Government and FARC-EP, have reached an agreement to set in motion, once the Final Agreement has been signed, the Commission on Truth, Coexistence and Non-repetition (hereinafter the Commission), which will be an independent, impartial extra-judicial mechanism.

The Commission forms part of the comprehensive system for truth, justice, reparation and non-repetition that has been established to realise victims' rights, put an end to the conflict and achieve peace. Therefore, the Commission cannot be construed as an entity separate from the comprehensive system, which includes judicial and extrajudicial mechanisms to guarantee victims' right to the truth, justice and reparation, as well as to help ensure that the Colombian people never have to experience such a conflict again. This Commission addresses the ethical, political and historical need to contribute, along with other initiatives, to creating the conditions, commitments and guarantees of non-repetition.

The Commission will fulfil three fundamental purposes, which together will help to ensure that the conflict will not recur:

First, the Commission will help uncover the truth about what has happened, in accordance with the aspects of the mandate described below, and offer an extensive explanation of the complexity of the conflict, so as to promote a shared understanding in society, in particular as regards the least known aspects of the conflict, such as the impact of the conflict on children and adolescents and gender-based violence.

Second, the Commission will promote and contribute to recognition. This means the recognition of victims as citizens whose rights were violated and as political actors vital for the transformation of the country; the voluntary recognition of individual and collective responsibilities by all those who directly or indirectly took part in the conflict, as a contribution towards truth, justice, reparation and non-repetition; and, in general, the recognition by society as a whole of this legacy of violations and infringements as something that must be rejected by all and that can never and must never be repeated.

And third, the Commission shall promote harmonious relations across the country's territories, on the understanding that harmonious relations does not mean simply sharing the same social and political space but the establishment of an environment conducive to change to facilitate peaceful resolution of conflicts and the forging of a pervasive culture of respect and tolerance in democracy. To that end, it will foster dialogue and establish forums for restoring the dignity of the

victims, for individual and collective acknowledgment of responsibility, and, in general, for strengthening people's respect for and trust in each other, cooperation and solidarity, social justice, gender equity, and a culture of democracy that fosters tolerance, promotes well-being and rids us of indifference to the problems of others. The Commission must lay the foundations for peace based on truth and the revelation and recognition of a blood-stained past that must be acknowledged before it can be put behind us.

Throughout its work, the Commission will adopt an approach designed to show the different ways in which the conflict affected women, children, adolescents, young people and the elderly, persons with disabilities, indigenous peoples, rural communities, persons espousing particular religions, opinions or beliefs, the Afro-Colombian, black, *palenquero*, *raizal* and Roma communities, LGBTI persons, displaced and exiled persons, human rights defenders, trade unionists, journalists, farmers, ranchers, traders and businessmen and women, inter alia. This should also help to raise awareness in Colombian society of the specific ways in which the conflict reproduced historical mechanisms of discrimination and gender stereotypes: a fundamental first step towards a more just and inclusive society.

All of this should help to create structural conditions for peaceful coexistence among Colombians and lay the foundations for non-repetition, reconciliation and building a stable and lasting peace. For these reasons, uncovering the truth also needs to be understood as an essential part of building peace.

Lastly, the success of the Commission will depend on the acknowledgement of responsibilities by those who directly or indirectly took part in the conflict and on the commitment of all sectors of society to the process of construction of truth as an expression, inter alia, of their rejection of indolence.

Therefore, the Government and FARC-EP, as part of their moral and political commitment to contributing to the realisation of victims' rights, undertake to make a real contribution to the process of clarifying the truth and to acknowledge their respective responsibilities to the Commission, and invite all sectors of society to participate in this effort.

#### 5.1.1.1.1    Guiding criteria

- **Focus on victims**: The Commission's efforts shall be focused on guaranteeing the participation of the victims of the conflict, ensuring the restoration of their dignity and contributing to the realisation of their right to the truth in particular, and in general of their rights to justice, comprehensive reparation and guarantees of non-repetition, always taking pluralism and equity into consideration. All of the foregoing should also help enhance their living conditions.

- **Impartiality and independence**: The Commission will be an impartial and independent mechanism with full autonomy to carry out its mandate and fulfil its functions.

- **Temporary nature**: The Commission will be a special body that will operate for a limited period of time in such a way that its conclusions and recommendations can effectively contribute towards building a stable and long-lasting peace.

- **Participation**: The Commission will set in motion a broad, pluralist and balanced process where different voices and views will be heard; in the first place, those of the individual or collective victims of the conflict for whatever reason related to it, and also those of persons who directly and indirectly took part in the conflict, as well other relevant actors.

• **Territory-based approach**: The Commission will be a national body but will adopt a territory-based approach in order to achieve a better understanding of the regional dynamics of the conflict and the diversity and particularities of the territories affected, and in order to promote the truth-building process and help to ensure non-repetition in the various territories. The territory-based approach will also take into consideration the people and populations that were forcibly displaced from their territories.

• **Differential and gender-based approach**: In carrying out its mandate and functions, the Commission will take into account the different experiences, different impacts and specific conditions of persons, populations or sectors that are discriminated against, or are at risk or are particularly affected by the conflict. Special heed will be paid to the victimisation of women.

• **Coordination with other peacebuilding measures**: The Commission will work in coordination with the mechanisms adopted for the implementation of the Final Agreement. In particular, where pertinent, it will work in coordination with the peacebuilding plans and programmes set in motion across the country's territories as a result of the implementation of the Final Agreement.

• **Guarantees for the commissioners**: With regard to their work for the Commission, commissioners will not be compelled to make statements in judicial processes, they will be exempt from the duty to report offences, and their opinions and conclusions may not be judicially challenged.

• **Safety conditions**: The Commission will assess the security conditions needed for the performance of its work and will coordinate, with State authorities, the adoption of the security measures necessary both for commissioners and for those who take part in the Commission's work.

• **Peaceful coexistence and reconciliation**: In order to contribute to the goal of non-repetition and reconciliation, the Commission's work in the performance of its mandate will be geared to promoting peaceful coexistence among Colombians, particularly in the territories most affected by the conflict and violence. For that purpose, the Commission will seek to ensure that the forums or hearings it holds help to strengthen respect and tolerance and citizens' trust in one another and in the regulations that ensure the effective exercise of and respect for human rights. In this manner, the Commission will also help to lay solid foundations for building peace.

• **Procedural rules**: The Commission will first establish procedures aimed at ensuring proper guarantees and fair, honourable and non-discriminatory treatment for those who take part in it.

• **Methodology**: The Commission will take all necessary measures to ensure as much objectivity and impartiality as possible in carrying out its work, for which purpose it will adopt procedures to compare and verify the quality of the information it collects, including the reliability thereof, and to identify any false information that may be provided to the Commission in bad faith. The Commission will publicly disclose its methodology.

• **Extrajudicial mechanism**: The Commission will be an extrajudicial mechanism. In this regard, its work will not be of a judicial nature and may not lead to criminal charges against those who appear before it. The information received or produced by the Commission may not be forwarded by it to the judicial authorities for the purposes of attributing liability in judicial proceedings and it shall be of no probative value; likewise, the judicial authorities may not demand that it do so.

The Commission may request the information required for the fulfilment of its mandate before magistrates, judges and investigative bodies, in accordance with the protocols established for that purpose, while always observing guarantees of due process.

Documents received by the Commission which may constitute documentary evidence and are not verbal or written versions or testimonies that a person gives to the Commission, will not lose their probative value and the use thereof by the Commission will not interfere with judicial proceedings underway.

**5.1.1.1.2   Mandate**

The Commission's mandate will be to elucidate and promote the acknowledgement of:

- Practices and deeds constituting serious human rights violations and serious infringements of international humanitarian law, in particular those that reflect recurrent patterns or were committed on a massive scale in the course of the conflict, as well as the complexity of the territorial contexts and dynamics where these happened.

- The collective responsibilities of the State, including those of the Government and the other public authorities, of FARC-EP, of the paramilitaries, as well as those of any other group, organization or institution, domestic or international, that took part in the conflict in any way, for the practices and deeds referred to in the preceding paragraph.

- The human and social impact of the conflict on society, including its impact on economic, social, cultural and environmental rights, and the different ways in which the conflict affected women, children, adolescents, youths and the elderly, persons of a particular religion or espousing particular opinions or beliefs, persons with disabilities, indigenous peoples, rural communities, the Afro-Colombian, black, *palenquero*, *raizal* and Roma communities, the LGBTI community, displaced and exiled persons, human rights defenders, trade unionists, journalists, farmers, ranchers, traders and businessmen and businesswomen, inter alia.

- The impact of the conflict on political activity and the practice of democracy as a whole, including the impact on political and social parties and movements, particularly those in opposition.

- The impact of the conflict on those who directly took part in it as combatants, and on their families and surroundings.

- The historical context, the origins and multiple causes of the conflict, taking into account as input, inter alia, the reports of the Historical Commission on the Conflict and its Victims.

- The factors and conditions that facilitated the conflict or contributed to its lasting so long, taking into account as input, inter alia, the reports of the Historical Commission on the Conflict and its Victims.

- The course taken by the conflict, particularly the actions of the State, guerrillas, paramilitary groups, and the involvement of various different sectors of society.

- The paramilitary phenomenon, including its causes, origins and manifestations; the way it was organized and the various forms of cooperation with paramilitaries, including funding; and the impact of paramilitary actions on the conflict.

• Displacement and dispossession of land during the conflict and the consequences thereof.

• The relationship between conflict and crops used for illicit purposes, the production and selling of illicit drugs and money laundering associated with drug trafficking.

• Processes for strengthening the social fabric in communities and individual or collective experiences of resilience.

• Positive changes in organizations and institutions over the course of the conflict.

**5.1.1.1.3    Time period studied by the Commission**

In order to address the various aspects of its mandate, the Commission will study the entire period of the conflict. Since this is a lengthy period of time, it will be necessary for the Commission to establish investigative priorities within this period. However, in order to fulfil its purpose of fully elucidating the origins and multiple causes of the conflict, the Commission may explore historical events prior thereto, taking into account as basic input, inter alia, the reports of the Historical Commission on the Conflict and its Victims.

**5.1.1.1.4    Duties:**

In order to fulfil its mandate, the Commission's main functions will be to:

• Investigate all aspects of the mandate using the methodologies and forms of information-gathering and analysis needed for that purpose, including those generally accepted by the social sciences, and taking into account previous efforts to establish the truth, including as basic input, inter alia, the reports of the Historical Commission on the Conflict and its Victims.

• Establish national, regional and territorial-level forums, particularly thematic, territory-based and institutional public hearings and hearings sponsored by organizations in relation to landmark situations and cases, inter alia, in order to listen to the different voices, primarily those of the victims, both individual and collective, and to promote the participation of the various sectors of society in a joint discussion of what happened and the causes and effects of the serious violence experienced by Colombia.

• These forums may include venues for public discussion and reflection or cultural ceremonies, enabling those who directly or indirectly took part in the conflict to engage in acts of acknowledgement of responsibility and ask for forgiveness, in its various dimensions, both for the harm and suffering caused to the people, and for the political and social impact of their actions; and consequently, to offer explanations for the actions carried out, contribute to reparation, and commit to guarantees of non-repetition and peacebuilding, inter alia. This should help uncover the truth and promote peaceful coexistence across the country's territories.

• Prepare a final report that takes account of the different contexts, reflects on the investigations conducted into all the aspects covered by the mandate, and contains the conclusions and recommendations resulting from the Commission's work. The report shall be officially submitted by public act to the public authorities and to Colombian society as a whole.

• Offer guidance to the victims and victimised communities taking part in the Commission regarding the help available to them from institutions and others for the realisation of their rights and the mechanisms to achieve this.

• Relationships between the Commission and the victims and their organizations: Devise and set in motion a strategy for active liaison with the victims and their organizations.

• Implement a strategy for dissemination, information and active liaison with the media to report, in the course of its work, progress and developments in the fulfilment of all the Commission's duties, and to ensure as much participation as possible. The Government will adopt all necessary measures for the Commission to have broad access to public media. The final report, in particular, will be disseminated as widely and affordably as possible, including through cultural and educational initiatives, such as the promotion of exhibitions and recommendations that it be included in the academic curriculum. In any case, the Commission's conclusions will be taken on board by the National Memory Museum.

• Adopt measures to archive the information collected in the course of its work and, on termination of its mandate, take the necessary measures to ensure its preservation. The Commission will decide which entity shall be the depositary for these archives and act as their custodian. The Commission will set out guidelines for the adoption by the depositary of appropriate mechanisms to allow victims and society in general access to the archives.

• Ensure that the gender perspective is mainstreamed in every facet of the Commission's work, by creating a gender-oriented task force to help with specific technical tasks, investigation, the preparation of hearings, and so on. This task force will not be the only one addressing this topic, but it will take responsibility for reviewing methodologies to ensure that all the Commission's instruments include a gender perspective, and for liaising with women's and LGBTI organizations. This will be achieved without prejudice to the necessary autonomy of the Commission in determining its structure and working methodology.

• Publish regular reports, accounting to society at least biannually for the activities and operations carried out in the fulfilment of all its duties.

• Establish its own rules of procedure and programme.

**5.1.1.1.5  Selection process**

The Commission will have 11 commissioners. Their selection will be based on a nomination and selection procedure offering guarantees of legitimacy, impartiality and independence for Colombian society as a whole, and victims in particular. The candidate nomination process will be wide-ranging and pluralistic, ensuring that all sectors of society, including victims' organizations, among others, may nominate candidates.

The "Mechanism for the selection of the magistrates of the special jurisdiction for peace" agreed upon by the parties on 12 August 2016 for selecting the magistrates, prosecutors and other members of the special jurisdiction for peace will be tasked with selecting and appointing the 11 commissioners of the Truth, Coexistence and Non-repetition Commission, including the Chair.

All members of the selection committee should inspire trust among the people.

The selection will be based solely on nominations and the election will take into account individual selection criteria such as ethical suitability, impartiality, independence, commitment to human rights and justice, absence of conflicts of interest, and knowledge about the armed conflict, international humanitarian law and human rights, and a recognised background in any of these fields. The selection

**A-436**

of the commissioners shall also take collective criteria into account, such as equitable participation by women and men, pluralism, interdisciplinary requirements and regional representation.

The selection committee may select foreign commissioners, but no more than three.

The selection committee will have up to three months to select the commissioners, as of the closing of the nomination phase.

The selection of commissioners will require a vote in favour of two-thirds of the members of the selection committee.

**5.1.1.1.6   Chair of the Commission**

The Chair of the Commission will be Colombian, and will be elected by mutual agreement between the Government and FARC-EP by means of an agreed mechanism. The Chair of the Commission will be its primary public spokesperson, who will coordinate the work of the commissioners, facilitate the internal workings of the Commission, and direct its tasks, preferably seeking consensus in the internal decision-making process. The role of the Chair of the Commission is important because he/she will be both a national and international figurehead.

**5.1.1.1.7   Term**

The Commission will have a three-year term, including the preparation of the final report. The Commission will have six months to prepare everything necessary for its operation. The final report will be published within one month following the conclusion of the Commission's work.

**5.1.1.1.8   Commitments to contribute towards historical clarification**

The Government, as the executive power, and FARC-EP, undertake to make a genuine contribution to the process of clarifying the truth and to acknowledge their respective responsibilities before the Commission.

The Government will adopt all necessary measures to guarantee the contribution of other State entities and will foster third-party participation in the Commission, so as to contribute towards elucidation and the acknowledgement of responsibilities, as part of the necessary guarantees of non-repetition.

Pursuant to the applicable laws, the Government undertakes to facilitate consultation of the information required by the Commission for the fulfilment of its duties, and the Commission, in turn, will afford such information the corresponding legal treatment.

**5.1.1.1.9   Financing**

The Government undertakes to guarantee the timely financing of all the Commission's operations so that it is able to fully accomplish its mandate and tasks in an autonomous and uninterrupted manner, including the publication and widespread dissemination of the final report. The Commission will need to take the necessary measures to ensure the transparent use of its resources and austerity in its expenditure. Citizen oversight of resource implementation will be encouraged, with the necessary guarantees being provided to that end.

#### 5.1.1.1.10   Committee to monitor and follow up on implementation of the Commission's recommendations

Following the publication of the final report, a committee will be created to monitor and follow up on implementation of the Commission's recommendations. To enable the committee to fulfil its mission, facilities will be provided for discussions with victims' and human rights bodies and organizations, among others. This committee will comprise representatives of different sectors of society, including victims' and human rights organizations. The Commission will establish the period of time for which the committee will operate. The committee will submit regular reports on follow-up to the recommendations. These reports will need to take a territory-, equity- and gender-based approach. The committee will take the necessary steps to disseminate its reports widely in the national and regional media. The Government will guarantee financing of the committee such that it is able to fulfil its tasks.

#### 5.1.1.2.   Special Unit for the Search for Persons deemed as Missing in the context of and due to the armed conflict

The Government and FARC-EP agree that, with the aim of determining the fate of people deemed to be missing as a result of actions of State agents, members of FARC-EP or any other organization involved in the conflict, and thus contributing to realising the victims' rights to truth and reparation, the Government will establish, in the context of the end of the conflict and following the signing of the Final Agreement, an exceptional and transitory high-level special unit, with ample participation of the victims, to search for persons missing in the context of and due to the armed conflict. This missing persons unit serves a humanitarian purpose and will form part of the comprehensive system for truth, justice, reparation and non-repetition. It will enjoy the necessary independence and financial and administrative autonomy to ensure continuity of its work over time.

The Unit will direct, coordinate and contribute to the implementation of humanitarian actions in the context of the comprehensive system for truth, justice, reparation and non-repetition, aimed at searching for and finding persons deemed to be missing in the context of and due to the armed conflict and who may still be alive or, in the case of those who are deceased, wherever possible identifying them and providing for the dignified return of their remains.

The missing persons unit will, in all cases, provide relatives with an official report containing the information that was obtained on the fate of the person or persons deemed to be missing.

The Unit and the processes and procedures it implements will be of a humanitarian and extrajudicial nature. Victims' and human rights organizations will be involved in its design, implementation and operations, and it will enjoy the support of specialist institutions aimed at incorporating international best practice and the experiences of the National Commission to Search for the Disappeared.

The Unit will have the following functions:

- To gather all information necessary to establish the universe of people deemed to be missing in the context of and due to the armed conflict.

- To strengthen and expedite the processes for identifying remains, in coordination with the National Institute for Legal Medicine and Forensic Science.

- To coordinate and conduct processes to search for, identify, locate and provide for the dignified return of remains, for which it will need to:

- Actively search for, compare and analyse all information available from different sources, including confidential and voluntary interviews with those who, having participated directly or indirectly in the hostilities, may have information on the fate of people deemed to be missing due to the conflict, as well as information on the location of graves, cemeteries and sites where the remains of people deemed as missing may be found.

- Design and put in place a national plan to establish priorities for the implementation of its work, along with the corresponding regional plans, for which it will be provided with the necessary staff and equipment and will coordinate and work with the relevant bodies. The involvement of victims' and human rights organizations will be guaranteed in the design and launch of the plans.

• The Unit will have the necessary powers and capacity to fulfil these functions, in coordination with the state institutions, the Commission on Truth, Coexistence and Non-repetition, and with the active involvement of victims' and human rights organizations.

• The Unit will have access to official databases and will be able to sign agreements with victims' and human rights organizations in order to obtain access to the information they hold. In accordance with the laws current at the time the Agreement is implemented, the Government undertakes to facilitate the Unit's consultation of the information it requires to fulfil its functions, and the Unit, for its part, will handle this information in the appropriate legal manner.

• To promote inter-agency coordination for the guidance and psychosocial care of the relatives of those deemed to be missing in the context of and due to the armed conflict.

• To promote partnerships with specialist national and international organizations in order to facilitate the fulfilment of its functions.

• Whenever possible, to provide for the dignified return to their relatives of the remains of people deemed as missing in the context of and due to the armed conflict, always ensuring that this is done in accordance with their different ethnic and cultural traditions.

• To guarantee the participation of the relatives of people deemed as missing in the context of and due to the armed conflict in processes to search for, identify, locate and provide for the dignified return of remains.

• To provide families with an official report containing the information obtained on the fate of the person deemed as missing, on completion of the corresponding search plan. Remains that are unidentified or unclaimed by their relatives will be preserved and will be made available to the competent authorities in order to realise the victims' rights.

• To submit a copy of the report described in the above paragraph to the Commission on Truth, Coexistence and Non-repetition.

• To regularly and publicly report, at least every six months, on the implementation of activities for the search, identification, location and dignified return of remains, always respecting the victims' right to privacy.

• To plan, coordinate and direct the implementation, together with the corresponding entities and with the participation of the victims' and human rights organizations, of a national plan and regional plans for tracking, searching and identification.

- To produce and implement a national registry of graves, illegal cemeteries and burial grounds.

- In order to fulfil its functions, the Unit will adopt procedures to compare and verify the quality of the information gathered, including its reliability, and to identify false information.

The Unit's humanitarian work of searching for, locating, identifying and providing for the dignified return of remains will be implemented within the context of the comprehensive system for truth, justice, reparation and non-repetition, as a complement to its work and without taking on the tasks of the system's other components. The Unit's activities may, in particular, neither replace nor hinder investigations of a judicial nature that may take place in fulfilment of the State's obligations.

The Unit's search for remains will not disqualify the special jurisdiction for peace or other competent bodies from undertaking the investigations they consider necessary in order to clarify the circumstances and victimization responsibilities of the case taken up by the Unit.

In any case, both the technical forensic reports and the material elements associated with the body that may be found at the place of the exhumations may be required by the special jurisdiction for peace and other competent bodies. In order to ensure the effectiveness of the Unit's humanitarian work and realise the victims' maximum possible rights to truth and reparation and, above all, to alleviate their suffering, information received or produced by the Unit may not be used for the purposes of attributing responsibilities in judicial proceedings or for its evidentiary value, with the exception of technical forensic reports and material elements associated with the body.

Information provided to the Unit may be taken into consideration in order to receive special treatment with regard to justice.

The Unit's officials will not be obliged to testify in court cases and will be exempt from the duty to report on the work they are doing in the Unit. If required to do so by the special jurisdiction for peace, other competent authorities or the Commission on Truth, Coexistence and Non-repetition, those producing the technical reports will need to ratify and explain matters relating to these reports and the material elements associated with the body.

During the period of operations of the Commission on Truth, Coexistence and Non-repetition, the Unit will be attentive to the Commission's requirements and guidance. The Unit and the Commission will establish a protocol for cooperation and exchange of information that will contribute to achieving the objectives of both bodies. It will coordinate its actions with the Commission on Truth, Coexistence and Non-repetition, notifying it of its actions and outcomes and providing it with any information it requires.

In the context of the end of the conflict, the Government and FARC-EP undertake to provide the Unit with all information at their disposal in order to establish the fate of persons deemed as missing in the context of and due to the conflict.

In order to design and launch this Unit, the recommendations of the National Commission to Search for the Disappeared will be taken into consideration, as a result of the work done to develop the agreement on "Measures that contribute to the search, location, identification and dignified return of those deemed as missing in the context of and due to the conflict".

• **Establishment of the Unit**

The Unit will form part of, and will implement its tasks within the context of, the comprehensive system for truth, justice, reparation and non-repetition.

The Unit will have a director who will need to be Colombian and who will be chosen by the "Mechanism for selecting justices of the special jurisdiction for peace" agreed upon by the parties on 12 August 2016 for the selection of justices, prosecutors and other members of the special jurisdiction for peace, on the basis of criteria of suitability and excellence drawn up bearing in mind the suggestions of the International Committee of the Red Cross and the International Commission on Missing Persons.

In terms of how the Unit is structured, the director will receive recommendations and suggestions from the National Commission to Search for the Disappeared, victims' organizations, the International Committee of the Red Cross and the International Commission on Missing Persons.

In pursuing immediate measures to build trust regarding the search for, location, identification and dignified return of the remains of persons deemed as disappeared in the context of and due to the armed conflict, and pending initiation of the work of the Unit for the Search for Persons deemed as Missing (the Unit), we have agreed to set in motion a special, strictly humanitarian process for contributing and gathering information. The participants in this process will be the Government, FARC-EP, victims' organizations, including, among others, Mesa de Desaparición Forzada de la Coordinación Colombia Europa Estados Unidos, FEVCOL, PAÍS LIBRE, ASFADDES, ECIAF, Fundación Víctimas Visibles, MOVICE, Fundación Nydia Erika Bautista and, as the standing coordinator, the International Committee of the Red Cross. The aim will be to continue, with added momentum, the search for and gathering of information about persons deemed as missing in the context of and due to the armed conflict, whose whereabouts remain unknown. In pursuit of those ends, immediate steps will be taken to allow the National Institute of Forensic Medicine to contribute by performing the necessary procedures. The Government and FARC-EP reiterate their commitment to continue providing the International Committee of the Red Cross with the information at their disposal and to facilitating the implementation of these humanitarian measures.

### 5.1.2   Justice

With regard to justice, it has been agreed to establish a special jurisdiction for peace.

### Special jurisdiction for peace

### I.   Basic principles of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition

1.    "States have a legal obligation to address the rights of the victims and, with the same intensity, the obligation to prevent further acts of violence and to achieve peace in an armed conflict by the means at their disposal. Peace as a product of a negotiation is offered as a morally and politically superior alternative to peace as a result of the annihilation of the opponent. Therefore, international human rights law should consider that peace is a right and that the State must achieve it."[7]

2.    The judicial component of the comprehensive system for truth, justice, reparation and non-repetition is called the special jurisdiction for peace. Its

---

[7] Concurring Opinion, Inter-American Court of Human Rights, Case of the Massacres of El Mozote and nearby places v. El Salvador (Judgment of 25 October 2012, para. 37)

objectives are to realise the victims' right to justice, offer truth to Colombian society, protect victims' rights, contribute to achieving a stable and lasting peace, and take decisions that offer full legal certainty to those who participated directly or indirectly in the internal armed conflict with regard to actions committed in the context of and during said conflict and which represent serious breaches of international humanitarian law and serious violations of human rights.

3.     A guiding paradigm of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition is the idea that the political community is not simply a union of contemporary peers but also a link between generations over time. Justice is forward-looking inasmuch as it considers that one period in time inevitably influences subsequent ones. Forward-looking justice is respectful of the values of the present and, at the same time, concerned to put an end to conflicts that must not be perpetuated, for the sake of the rights of future generations.

4.     The State has autonomy to establish special jurisdictions or legal systems, based on the provisions of the Charter of the United Nations on the sovereignty and self-determination of nations, and on principles of international law, including international humanitarian law, international law on human rights and international criminal law.

5.     In exercising this autonomy, accepted and recognised by international human rights law, the State is able to assess and evaluate the complexity, duration and severity of the internal armed conflict with the aim of designing and adopting justice mechanisms to achieve peace, respecting the parameters established by international law, in particular the guaranteeing of human rights.

6.     Redressing victims' rights is at the centre of the General Agreement to End the Armed Conflict and Build a Stable and Lasting Peace signed in Havana on 26 August 2012. The rights of the victims and the severity of the suffering inflicted by serious breaches of international humanitarian law and serious violations of human rights occurring during the conflict will be taken into account as core concerns in all actions of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition. Such violations cause serious and long-term harm to the victims' life projects. Harm caused will need to be repaired and rights restored wherever possible.

In light of the above, one of the paradigms guiding the judicial component of the comprehensive system for truth, justice, reparation and non-repetition will be the application of restorative justice, the primary goal of which is to repair the harm done and make reparation to the victims of the conflict, especially in order to put an end to the social exclusion triggered by their victimization. Restorative justice addresses, first and foremost, the needs and dignity of the victims and it comes with a comprehensive approach guaranteeing justice, truth, and a commitment to ensuring that what happened will never be repeated.

7.     In addition, the consequences of such violations are most serious when they are committed against women or when victims pertain to the most vulnerable groups eligible for special protection and reparation, including indigenous peoples, Afro-Colombian communities and other ethnically distinct groups, religious communities, campesinos, the poorest, the disabled, the displaced and refugees, girls, boys and adolescents, the LGBTI population and older persons.

8.     The judicial component will function in a way that emphasises the needs of women and child victims, who suffer the disproportionate and differentiated effects of serious breaches and violations committed because of and during the conflict. Reparation must be in line with the United Nations' call for all peace agreements to

adopt a gender perspective, recognising reparative and restorative measures, the special suffering of women, and the importance of their active and fair participation in the judicial component of the comprehensive system for truth, justice, reparation and non-repetition.

9.     The judicial component of the comprehensive system for truth, justice, reparation and non-repetition, known as the special jurisdiction for peace is a special jurisdiction that, autonomously and as a matter or priority, performs judicial functions in respect of issues within its sphere of competence, particularly with regard to actions considered serious breaches of international humanitarian law or serious violations of human rights. It will enter into force on the terms established in the Final Agreement. It will apply only to actions committed prior to its entry into force.

In the event of any dispute concerning spheres of competence between a jurisdiction and the special jurisdiction for peace, the dispute will be settled by an ad hoc division comprising three justices of the Higher Judicial Council elected by that Council and three justices of the divisions or sections of the special jurisdiction for peace that are not affected by that jurisdictional dispute, elected by the plenary of the special jurisdiction for peace. The decision of the ad hoc division will be taken by a simple majority of the votes cast. Should no majority be reached, in deference to the preferential status of the special jurisdiction for peace, its president will have the casting vote.

Crimes committed due to, during or in direct or indirect connection with the armed conflict are those punishable acts in which the existence of the armed conflict caused them to be committed, or played a substantial part in the ability of the perpetrator to commit the punishable act, in the perpetrator's decision to commit it, in the manner it was committed, or in the perpetrator's motive.

The time allowed for the special jurisdiction for peace to conclude its tasks, namely the filing of indictments by the Investigation and Indictment Unit, either ex officio or as a result of the reports referred to in paragraph 48(b) and (c) will be 10 years from the date on which all divisions and sections of the special jurisdiction for peace are up and running, plus an additional period of five years to conclude its jurisdictional activity, that, if need be, may be extended. The Stability and Effectiveness of Resolutions and Judgments Section envisaged in the last paragraph of paragraph 52 may be constituted at any time, as needed, with no time restrictions.

With respect to members of organizations entering into peace agreements with the Government, special judicial treatment will also apply to conduct closely related to the laying down of arms from the time the Final Agreement entered into force until the laying down of arms process concludes.

10.   On termination of the hostilities, the amnesty for rebels will be conditional solely upon the end of the rebellion of their respective armed organizations and fulfilment of the provisions of the Final Agreement, without prejudice to the provisions of items 23 and 27. The end to the rebellion, for the purposes of obtaining an amnesty or pardon, will be set out in the Final Agreement.

11.   In other cases not eligible for an amnesty or pardon, in order to establish the legal situation or to receive and implement the sanctions established in the comprehensive system for truth, justice, reparation and non-repetition, it will be necessary to fulfil the conditions on truth, reparation and non-repetition established therein, once all components of the comprehensive system are up and running.

12.   The responsibility of those to whom the comprehensive system is directed does not relieve the State of its duty to respect and ensure full enjoyment of human

rights or its obligations, in accordance with international humanitarian law and international human rights law.

13.    In order to access the special treatment set out in the judicial component of the comprehensive system for truth, justice, reparation and non-repetition, it will be necessary to provide the full truth, reparation for the victims and guarantees of non-repetition. Providing the full truth means, where it is available, giving an exhaustive and detailed account of actions and the circumstances in which they were committed, as well as necessary and sufficient information to be able to assign responsibilities, and thus ensure that the victims' rights to reparation and guarantees of non-repetition are realised. The duty to furnish the truth does not entail an obligation to accept responsibility. Special treatment means the special and alternative sanctions set out in paragraph 60.

14.    Pursuant to the rules applicable to the special jurisdiction for peace, all actions within the judicial component will respect fundamental rights of due process, defence, the presence of an attorney, presumption of innocence, and the independence and impartiality of the justices sitting on the judicial Panels and in the chambers, as well as the members of the Investigation and Prosecution Unit. The special jurisdiction for peace will apply the most-favourable-law principle in all its undertakings, especially in respect of the treatment of persons subject to this jurisdiction. All judicial decisions on the liabilities and punishment of people will be duly substantiated and based on reliable evidence that is admissible in court. When a witness testifies against somebody in respect of conduct within the sphere of competence of the special jurisdiction for peace in exchange for procedural or punishment-related benefits of any kind, the probative value of his or her testimony shall be dependent upon its being corroborated by other evidence. The judgments and rulings of the judicial Panels and chambers may be subject to appeals for annulment or other forms of appeal at the request of the affected parties.

15.    The functioning of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition is indivisible and will be applied simultaneously and comprehensively to all those who participated directly or indirectly in the armed conflict; its decisions will offer guarantees of legal certainty to all of the above. Its scope of application is set out in paragraphs 9 and 32.

Should laws or rules be approved following the signing of the agreement on the special jurisdiction for peace that grant differentiated treatment to state agents or others for actions directly or indirectly related to the armed conflict, whether they be combatants or non-combatants, that will result in the above being removed from the competence of the special jurisdiction for peace, or in the non-application of this jurisdiction or the non-application of the conditions referring to sanctions as set out in this text regarding these people, the Special Tribunal for Peace will exercise its preferential jurisdiction in the areas within its competence in line with the provisions of this document.

16.    The State will guarantee the administrative autonomy and sufficiency and budgetary autonomy of the comprehensive system for truth, justice, reparation and non-repetition and particularly the judicial component. An Executive Secretariat will be established to be responsible for the administration, management and execution of the resources of the special jurisdiction for peace, under the guidance of its presidency. The secretariat will begin functioning sufficiently in advance to ensure that the infrastructure of the special jurisdiction for peace is available from its start-up. The State will establish economic and financial mechanisms for the timely and effective implementation of resources, which may come from different national and international sources. The appointment of the members of the Executive Secretariat will take place through the mechanism that the parties

determine during the talks process, which will involve calling upon individuals with wide experience of administration and of high moral standing.

II.   **Content, scope and limits of the amnesties and pardons to be granted, along with other special treatment**

17.   The comprehensive system for truth, justice, reparation and non-repetition will have the overriding aims of consolidating peace and realising the rights of victims.

18.   The final outcome of the application of the comprehensive system for truth, justice, reparation and non-repetition must be to guarantee legal certainty in order to promote stable and lasting peace.

19.   For the purposes of the comprehensive system for truth, justice, reparation and non-repetition, the legal frameworks to be applied are primarily international human rights law and international humanitarian law. When adopting their judgments or rulings, the chambers of the Tribunal for Peace, the Panels and the Investigation and Indictment Unit will make the system's own legal characterization of the actions in question, based on the Colombian Penal Code and/or the provisions of international human rights law, international humanitarian law or international criminal law, with mandatory application of the most-favourable-law principle.

That characterization may differ from that made by the judicial, disciplinary or administrative authorities in respect of those actions, given that it is understood that international law is applicable as a legal framework.

20.   Victims enjoy rights to truth, justice, reparation and guarantees of non-repetition. In order to guarantee these rights, they will participate in the comprehensive system for truth, justice, reparation and non-repetition in accordance with the implementing regulations of the judicial component and, among other things, must be consulted regarding any prioritisation and selection of cases. The regulations will need to respect the victims' right to prompt, full and efficient justice.

21.   The Colombian State also has a duty to ensure, by any reasonable means within its power, truth, justice, reparation and measures to ensure non-repetition with respect to serious breaches of international humanitarian law or serious human rights violations.

22.   With regard to justice, in accordance with international human rights law, the Colombian State has a duty to investigate, clarify, prosecute and punish serious violations of international human rights law or serious breaches of international humanitarian law.

23.   On termination of the hostilities, in accordance with international humanitarian law, the Colombian State will be able to grant "the broadest possible" amnesty. The broadest possible amnesty will be granted to rebels belonging to organizations that have signed a final peace agreement, as established in paragraph 10, along with those accused or convicted of political or related crimes by means of decisions passed by the justice system, in line with the provisions established in this document in this regard, in accordance with paragraph 38.

24.   The Constitution allows amnesties or pardons to be granted for the crime of rebellion and other political and related crimes.

25.   Some crimes will be ineligible for an amnesty or a pardon, pursuant to paragraphs 40 and 41 of this document. Neither crimes against humanity nor other crimes set out in the Rome Statute are eligible for an amnesty.

26.   For the purposes of legal certainty, it will be necessary to clearly determine which crimes are eligible for an amnesty or pardon and which are not. To that end, the amnesty rules to be adopted will follow the principles set out in this document creating the special jurisdiction for peace. When determining whether an action is eligible for an amnesty or pardon, the most-favourable-law principle will be applied to the benefit of the of the recipient of the amnesty or pardon, unless amnesty or pardon are prohibited under international law in relation to the conduct of which the rebels or other persons stand accused. The most-favourable-law principle will be applied to all those for whom the special jurisdiction for peace is applicable.

27.   The granting of amnesties or pardons or access to any special treatment does not relieve people of the duty to contribute, individually or collectively, to clarification of the truth as established in this document.

28.   The treatment to be received in the judicial component will be proportionate to the degree of voluntary contribution of each person or group to the truth.

29.   The scope of every crime that is or is not eligible for an amnesty will be clearly determined for the purposes of legal certainty.

30.   Crimes that are ineligible for an amnesty or pardon must be subject to the judicial component of the comprehensive system for truth, justice, reparation and non-repetition agreed by the parties.

31.   Sanctions will be established in the judicial component for those with responsibility in cases that are ruled as ineligible for an amnesty or pardon.

32.   The judicial component of the comprehensive system for truth, justice, reparation and non-repetition will apply to all those who participated directly or indirectly in the armed conflict. It will apply to those investigated or convicted of the crime of rebellion or other crimes related to the conflict, whether they belong to the armed organizations in rebellion or not.

With regard to combatants in illegal armed groups, the judicial component of the system will only apply to those signing a final peace agreement with the Government.

The special jurisdiction for peace will also have competence over actions of financing or collaborating with paramilitary groups, or with any actor in the conflict, when they were not the result of coercion. This refers to people who actively or decisively participated in committing crimes falling within the sphere of competence of this jurisdiction, as established in paragraph 40, unless they were previously convicted by the justice system for those same actions. The organs of the special jurisdiction for peace will decide on the appropriate procedure, according to the case. In accordance with paragraph 48 (t) and 58 (e), people who may have had a decisive involvement in one of the actions listed in paragraph 40 and who have not previously appeared before the Judicial Panel for Truth and Recognition will be summoned by the Review Chamber of the Tribunal to appear before the special jurisdiction for peace.

The judicial component will also apply to State agents who may have committed crimes related to or during the armed conflict; this application will be in a differentiated manner, providing fair, balanced, simultaneous and symmetrical treatment. This treatment will need to take into account the State's role as guarantor of rights.

In the case of State agents, application of the special jurisdiction for peace is based on the recognition that an essential purpose of the State is to protect and guarantee the rights of all citizens and that is has an obligation to contribute to the strengthening of institutions. For that reason, its agents, in particular the member of

the security forces, exercise the legitimate use of force and their actions are presumed to be legal.

For the purposes of the special jurisdiction for peace, a State agent is understood to be any person who at the time the alleged criminal act was committed was working as a member of a public corporation, as a Government employee or worker, or of its decentralized entities, territorially or through services, who may have taken part in planning or executing criminal acts because of, during, or directly or indirectly in connection with the armed conflict. For such conduct to be considered eligible for examination by the special jurisdiction for peace, it must have consisted of actions or omissions committed within the framework of, or during, the internal armed conflict, without an illicit personal enrichment motive, or if such motive did exist, without it being the determinant of the criminal conduct.

The creation and functioning of the special jurisdiction for peace will have no effect on the current rules applicable to those who have held the office of President of the Republic, in accordance with the provisions of article 174 of the Political Constitution of Colombia at the time of approving this document. Should the special jurisdiction for peace be apprised of information that compromises a person having held the office of President of the Republic, said information will be referred to the Chamber of Representatives of Congress for issues within their competence. That referral will take place whenever considered appropriate by the special jurisdiction for peace, once it has undertaken appropriate verification.

33. In accordance with the provisions of the Final Agreement, the judicial component of the comprehensive system for truth, justice, reparation and non-repetition will take precedence over criminal, disciplinary or administrative proceedings for conduct committed during, because of, or directly or indirectly related to, the armed conflict given that it will have exclusive jurisdiction over such actions.

With regard to disciplinary or administrative sanctions or investigations, including financial sanctions imposed on private individuals in any jurisdiction, the competence of the special jurisdiction for peace will be limited either to reversing or extinguishing the liability or disciplinary or administrative sanction imposed for conduct related directly or indirectly to the armed conflict, or to reviewing said sanction, all at the request of the person sanctioned or investigated. In no case may the request result in the reopening of a criminal investigation for the same deeds. Should a review of the sanction imposed be requested or the extinction of the sanction or liability, the Review Chamber of the Tribunal for Peace will be competent. With regard to the persons investigated, the Judicial Panel for Determination of Legal Situations will be competent.

34. Judicial treatment of members of FARC-EP, for State agents and for other actors that have participated in the conflict, either as combatants or as non-combatants, when they have committed crimes, may be different but balanced and fair.

35. Peaceful protest, defence of human rights and leadership of civil society groups cannot in themselves be characterized as criminal offences or sanctioned. If there have been cases of such sanctioning, special treatment mechanisms will be granted that may extend as far as extinguishing liability. The Judicial Panel for Amnesty and Pardon and the Review Chamber of the Tribunal for Peace will be competent to decide whether the sanctions, investigations or sentences imposed in the previous situations should be extinguished, revised or annulled.

36. The imposition of any sanction in the comprehensive system for truth, reparation and non-repetition will not disqualify a person from political

participation or limit the exercise of any right, active or passive, to political participation. To ensure that, the parties will agree on pertinent constitutional amendments.

37.   Article 6.5 of Protocol II Additional to the Geneva Conventions, to which Colombia is a State Party, will apply. It states the following: "At the end of hostilities, the authorities in power shall endeavour to grant the broadest possible amnesty to persons who have participated in the armed conflict, or those deprived of their liberty for reasons related to the armed conflict, whether they are interned or detained."

38.   Pursuant to that provision, political and related crimes committed in the course of the rebellion by persons forming part of the rebel groups with which a peace agreement is signed will be granted amnesties and pardons. In line with the provisions of the Final Agreement and this document, the amnesty rules will clearly and precisely determine the crimes eligible for amnesties and pardons and the criteria for determining related actions. Membership of said group will be determined by the provision of a list by each rebel group, with the parties determining how verification should proceed. Political and related crimes will, for example, include rebellion, sedition and attempted coup, as well as the illegal bearing of firearms, killings in combat as defined under international humanitarian law, criminal conspiracy for the purposes of rebellion and other related crimes. To decide whether there is any connection of criminal activities relating to the planting of crops used for illicit purposes to political crimes, consideration will be given to the criteria applied in Colombian case law and to the requirement to apply the most-favourable-law principle. The same amnesty or pardon criteria will apply to persons investigated or sanctioned for crimes of rebellion or similar offences, without them being obliged to recognise themselves as rebels.

Before the entry into force of the Final Agreement, it will be necessary to establish how the laying down of arms and reincorporation of FARC-EP into civilian life, the entry into force of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition and effective access to the amnesty will be coordinated.

In the case of FARC-EP, participation in the comprehensive system for truth, justice, reparation and non-repetition will be subject to the laying down of arms agreed in item 3.2 of the General Agreement to End the Armed Conflict and Build a Stable and Lasting Peace of 26 August 2012.

39.   There will be two criteria for determining actions related to a political crime, one inclusive and the other restrictive. The first criterion will consist of including as related crimes: 1. — those crimes specifically linked to the course of the rebellion committed in connection with the armed conflict, such as for example apprehending combatants during military operations; 2. — crimes in which the victim (*sujeto pasivo*) of the action is the State and its current constitutional system; and 3. — conduct aimed at facilitating, supporting, financing or concealing the course of the rebellion, for which the content of each of the previous types of action will need to be defined. Conduct aimed at financing the rebellion shall be construed as all illicit conduct that did not lead to personal enrichment of the rebels and is not considered a crime against humanity, a serious war crime or genocide.

The Judicial Panel for Amnesty and Pardon will determine whether there is any connection to political crime on a case by case basis.

The second criterion, of a restrictive nature, will exclude international crimes, as indicated in items 40 and 41 below, as established in international law pursuant to the Rome Statute. With regard to applying the criteria for determining related

actions to anything that has not been defined precisely in the amnesty law, the doctrine adopted when the Judicial Panel for Amnesty and Pardon and the Review Chamber of the Tribunal for Peace interpreted that Law will be borne in mind.

40.   Crimes against humanity, genocide, serious war crimes — that is to say, all systematic violations of international humanitarian law — hostage taking or other serious deprivations of freedom, torture, extrajudicial executions, forced disappearances, rape and other forms of sexual violence, child abduction, forced displacement and the recruitment of minors will all be ineligible for an amnesty or pardon or equivalent benefits, as established in the Rome Statute.

The amnesty law will determine the actions characterized in national legislation as ineligible for an amnesty, provided they correspond to the above list.

The rules will specify the scope and reach of these actions in accordance with the provisions of the Rome Statute, international human rights law and international humanitarian law.

41.   Common crimes unrelated to the rebellion shall also be ineligible for an amnesty or pardon through the comprehensive system for truth, justice, reparation and non-repetition, in accordance with the amnesty law.

42.   Investigations underway and disciplinary and/or administrative sanctions will also be extinguished when they have been imposed for conduct or actions related to the armed conflict or rebellion. In application of this, consideration will be given to actions that could be eligible for an amnesty or pardon according to the amnesty law.

43.   The granting of amnesties or pardons does not extinguish the victims' right to receive reparation.

44.   In accordance with the above, special, simultaneous, balanced and fair treatment will be established for State agents, based on international humanitarian law. This differentiated treatment will take into account the provisions of the operating rules governing the Colombian armed forces in relation to international humanitarian law. In no case may command responsibility be based exclusively on rank, hierarchy or scope of jurisdiction. The liability of members of the Colombian armed forces for the actions of their subordinates will need to be based on effective control of the respective action, knowledge based on information available to them before, during and after the action was committed, as well as the means within their power to prevent it or, once it had taken place, to promote the appropriate investigations.

## III.   Procedure, bodies and sanctions of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition

45.   Two procedures will be applied in the judicial component:

    1.   Procedure in the case of acknowledgement of the truth and responsibility.

    2.   Procedure in the case of a lack of acknowledgement of the truth and responsibility.

46.   In order to realise the victims' right to justice, the judicial component will comprise the following bodies:

    (a)   Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct,

    (b)   Tribunal for Peace,

    (c)   Judicial Panel for Amnesty and Pardon,

(d)    Judicial Panel for Determination of Legal Situations, for cases other than those above or in other unforeseen situations and,

(e)    Investigation and Indictment Unit, which must realise the victims' right to justice when there is no collective or individual acknowledgement of responsibility

Judgments and rulings will need to be duly substantiated and based on law. They may be brief in the part corresponding to verification of the requirements of the comprehensive system for truth, justice, reparation and non-repetition.

Everybody has the right to exercise their right of defence through any of the bodies of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition, as they prefer, individually or collectively, for instance as former members of an organization or by means of the organization to which they belonged. Any lawyer accredited as such by the corresponding bodies of his or her country of residence may act as defence lawyer before the comprehensive system for truth, justice, reparation and non-repetition. The State will offer an autonomous system of advice and defence — free of charge if the applicant lacks resources — comprising duly qualified defence lawyers selected via a mechanism to be agreed on by the parties before the judicial component of the comprehensive system for truth, justice, reparation and non-repetition starts operating. If interested parties so wish, they may use the judicial defence systems already existing in Colombia.

The justices of the chambers and Panels of the special jurisdiction for peace will, in exercise of their autonomy, adopt the operating and organizational regulations of the special jurisdiction for peace, in line with principles of impartiality, independence and guarantees of due process, avoiding any revictimisation and providing due support to victims in accordance with the provisions of relevant international standards. These regulations will also establish the grounds and procedures for challenging and disqualifying justices. These individuals may be assigned flexibly to different chambers and Panels depending on the workload of each one, and in accordance with the criteria set out in the regulations.

The justices of the chambers and Panels of the special jurisdiction for peace will prepare rules of procedure observing, at a minimum, the following principles: the system will be adversarial and observe due process and the principle of impartiality; it will ensure due transparency in its proceedings and allow all sides a say in the assessment of evidence and defence, as well as the right of appeal. It will also abide by the principles set forth in paragraph 14. The aforementioned procedural standards should be built into Colombian domestic law.

The Tribunal for Peace will be the body responsible for eventually ending the special jurisdiction for peace created within the comprehensive system for truth, justice, reparation and non-repetition.

47.    Acknowledgement of truth and responsibility for actions may be individual or collective, oral or by means of a letter sent to the special jurisdiction for peace's Judicial Panel for Acknowledgement of Truth and Responsibility once the reports mentioned in paragraph 48 have been received and the panel has been established. The deadline for receipt of the reports provided for in paragraph 48 will be set at two years, a period that may be extended, publicly and for well substantiated reasons, for successive periods of three months up to a maximum of three years from the date all chambers and Panels of the special jurisdiction for peace were constituted. Exceptionally, for well substantiated reasons, this term may be extended, for a moderate period of time, by the Judicial Panel for Acknowledgement

of Truth and Responsibility. In the case of collective acknowledgement, subsequent individual attribution of responsibility will be incumbent upon the members of the organization that issued the acknowledgement. Persons who are attributed individual responsibility will be able to accept that responsibility or state their disagreement with it. If there is no indication of acceptance of, or disagreement with, the attribution of responsibility, the content of the statement in which the aforementioned persons are mentioned will, in observance of due process, need to be communicated to them. Persons who have remained silent who, once located, accept responsibility, will be entitled to the sanctions already imposed, provided they meet the system's conditions. If they do not accept responsibility or remain silent, they will be referred to the Investigation and Indictment Unit.

The Judicial Panel may agree that acknowledgement of the truth and responsibility should take place in a public hearing, in the presence of the victims' organizations that it has invited, on the date it has indicated, without prejudice to the fact that this recognition may be in writing.

48.   The Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct will have the following functions:

(a)   To decide whether the events and conduct attributed to different people fall within the system's competence, that is, were committed directly or indirectly in relation to or during the internal armed conflict.

(b)   To receive reports submitted to it by the State Prosecutor General's Office, the relevant bodies of the military criminal justice system, the Indictment Commission of the House of Representatives or anybody replacing it, the Office of the Attorney-General, the Office of the Comptroller General of the Republic or any other jurisdiction operating in Colombia with regard to all investigations underway in relation to conduct committed during or because of the armed conflict, including any which may have already been brought to trial or concluded by the Office of the Attorney General or Comptroller General or by any other jurisdiction. The reports will classify the actions of the alleged perpetrators and group together similar conduct into a single category, without legal characterization. A report on the relevant rulings handed down by the justice system will also be sent to the Judicial Panel by the Administrative Body of the Judicial Branch or by those convicted. The competent bodies of the military criminal justice system will also send the decisions handed down. Any administrative body that has passed sanctions for conduct related to the conflict will also send the resolutions in which these are appear. In all the above cases, copies of the rulings or resolutions will be attached.

Along with the reports submitted by the State Prosecutor General's Office, this institution will include the certifications of copies that have been sent by the Justice and Peace Jurisdiction created by Law 975 of 2005, so that the special jurisdiction for peace can determine whether the related actions fall within its competence or not, in accordance with the provisions of the third paragraph of paragraph 32.

(c)   To receive reports from Colombian victims' and human rights organizations with regard to acts committed during the armed conflict, as well as from judicial or administrative sources. The special jurisdiction for peace will handle these reports in the manner established in sub-paragraph (h) of this paragraph.

(d)   The reports will group together the actions by perpetrators or alleged perpetrators and will group together similar conduct into a single category, without legal characterization. The reports will need to be rigorous. The Judicial Panel may order the reports to be organised by most representative acts.

(e)   When a person has been compromised in a report or a statement of acknowledgement, the panel will notify that person so that he or she has the opportunity to voluntarily provide his or her version of the events. When doing so, the person will be able to acknowledge truth and responsibility or to deny the conduct or submit that it was unrelated to the conflict. A person convicted in a judgment handed down in ordinary legal proceedings of conduct that the system is competent to hear may appear voluntarily to acknowledge the complete, detailed, and exhaustive truth of what happened should that account not have to be submitted to the Amnesty Panel or Chamber to Determine Legal Situations.

(f)   To set the dates and deadlines for receiving reports and for making these available to the persons or organizations noted in them, bearing in mind the deadlines established in paragraph 47.

(g)   Once the reports have been received, a reasonable and sufficient time frame will be established for the statements, oral or written, acknowledging truth and responsibility.

(h)   Once all reports established in paragraphs (b) and (c) describing the conduct have been received they will be compared and, once the version noted in sub-paragraph (e) has been taken into account, should it be deemed that there are sufficient grounds to believe that the conduct took place, that the person mentioned participated in it and that the conduct involved criminal offences ineligible for an amnesty or pardon, they should be made available to those allegedly responsible so that they can decide whether or not to come forward to acknowledge truth and responsibility or whether to come forward to defend themselves from the charges made.

The Chamber may make certified copies of the reports referred to in sections (b) and (c) of this paragraph when there are indications that they contain apparently deliberately false accusations, descriptions of conduct or denunciations, or when it senses a desire to make fraudulent use of legal procedure. The certified copies will be remitted to the competent judicial bodies in the ordinary Colombian legal system, which will act in accordance with their sphere of competence to enforce domestic criminal law after considering the aforementioned reports of denunciations submitted to the ordinary justice system. The competent judicial organs shall report back every six months to the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct on the status of legal proceedings in relation to each set of certified copies.

(i)   To receive the statements of acknowledgement of truth and responsibility, both individual and collective. For the imposition of sanctions, the highest-ranking officials, through command responsibility, will need to be individually identified.

(j)   The Office of the Attorney General or the investigating body of any other jurisdiction operating in Colombia will continue the investigations until the Panel publicly announces that it has concluded the previously established steps - with the exception of the receipt of acknowledgements of truth and responsibility, which will always need to be subsequent to the panel's receipt of all the investigations carried out with regard to the conduct in question - and will present its resolution of conclusions to the Tribunal for Peace in three months' time. At that point, the Office of the Public Prosecutor or the investigating body in question will need to send the panel all the investigations it has on said events and conduct. The Office of the Public Prosecutor or the corresponding investigating body investigations will then cease to be competent for continuing to investigate facts or conducts within the sphere of competence of the special jurisdiction for peace.

If the State Prosecutor General's Office or the relevant investigating body identifies a case that should have been a matter addressed in the report noted in subparagraph (b) of this paragraph, it will need to send it to the Judicial Panel for Acknowledgement immediately. Nonetheless, the State Prosecutor General's Office or the relevant investigating body will continue to investigate conduct or actions that do not fall within the competence of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition and will provide support to its bodies when they request it.

(k)   Once the report from the State Prosecutor General's Office, from victims' and human rights organizations, or from the relevant investigating body has been received, the Panel may ask them or other competent State bodies to report on actions for which there is insufficient information.

(l)   As promptly as possible and at any moment considered appropriate, to send the Judicial Panel for Amnesty and Pardon a list of the people benefiting from these measures, based on the list drawn up by FARC-EP, crosschecked by the Judicial Panel for Acknowledgment of Truth and Responsibility.

(m)   To present a resolution of conclusions to the Tribunal in accordance with the list of sanctions corresponding to the respective acknowledged conduct. In addition, to present in a single resolution and as promptly as possible the findings that the panel has at its disposal regarding actions known to have been committed by one and the same person.

(n)   As promptly as possible and at any moment considered appropriate, to decide whether conduct that has not been acknowledged will be referred to the Investigation and Indictment Unit so that, if appropriate and there is value in doing so, trial proceedings may be initiated before the Tribunal. It may also decide to refer conduct to the Judicial Panel for Determination of Legal Situations.

(o)   For the purposes of issuing its resolutions, it will need to focus initially on the most serious cases and the most representative conduct or practices.

(p)   To remit two lists of persons to the Judicial Panel for Determination of Legal Situations: the first consisting of those persons or actions that are ineligible for amnesty or pardon and will not be included in the resolution on conclusions, and a second list consisting of those who will not need to be held to account before the Tribunal, for whatever reason.

(q)   When the acknowledgement of truth and responsibility is considered incomplete, to summon the declarants so that they can complete it, indicating the conduct which, should full truth not be provided, would be referred to the Investigation and Indictment Unit to decide if it merits being referred for trial. The summons sent to declarants should indicate the concrete aspects that need completing.

(r)   Should a person individually attributed responsibility in a collective statement make known his or her disagreement with that attribution of individual responsibility, to send the case to the Investigation and Indictment Unit to decide if it merits being referred to the First Instance Chamber of the Tribunal for Peace for cases in which there is no acknowledgement of truth and responsibility.

(s)   In order to ensure the efficient, effective and prompt functioning of the judicial component, this Judicial Panel will have ample powers to organise its work, form working committees, set priorities, combine similar cases and establish the sequence in which it will address them, as well as to adopt selection and decongestion criteria. When exercising these powers, it will take into account the

need to avoid impunity for serious and representative actions while also preventing the Tribunal from becoming overloaded.

(t)   If, three months prior to submitting the resolution of conclusions, the Panel considers that a person for whom there is clear and sufficient grounds to presume that his or her decisive involvement in one of the actions listed in paragraph 40 should be included in the resolution of conclusions or referred to the Investigation and Indictment Unit but said person has refused to come forward, the Panel will need to ask the Review Chamber of the Tribunal to require said person to appear before the special jurisdiction for peace.

49.   The Judicial Panel for Amnesty and Pardon will apply this special legal treatment to crimes eligible for amnesty or pardon, bearing in mind the recommendations of the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct. Notwithstanding the above, the Judicial Panel will first grant an amnesty or pardon to persons convicted of or investigated for crimes eligible for amnesty or pardon, automatically or upon request, and always in accordance with the provisions of the Amnesty Law. Should the request for pardon or amnesty relate to actions that are ineligible for pardon or amnesty, the Judicial Panel for Amnesty and Pardon will refer the case to the Judicial Panel for Acknowledgement of Truth and Responsibility.

For the purposes of granting an amnesty, it will assess the extent to which the action is linked to the rebellion and other political crimes.

50.   The Judicial Panel for Determination of Legal Situations will have the following functions:

(a)   To define the legal situation of all those accessing the judicial component of the comprehensive system for truth, justice, reparation and non-repetition, in relation to two scenarios: persons who will be ineligible for amnesty or pardon and who will not be included in the resolution of conclusions, and persons who do not need to be held to account before the Tribunal, because they merit amnesty or a pardon and will therefore be referred to the Judicial Panel for Amnesty and Pardon.

(b)   To define the treatment to be given to judgments previously handed down by the justice system with regard to persons covered by the judicial component, pursuant to the requirements of the comprehensive system for truth, justice, reparation and non-repetition — item 3.3 of the General Agreement — including the extinction of responsibilities where the sanction has been completed. A person convicted in the ordinary justice system may appear voluntarily to acknowledge the complete, detailed, and exhaustive truth of what happened should that account not have to be submitted to the Amnesty Panel or remain in the Judicial Panel for Acknowledgement of Truth and Responsibility.

(c)   With the aim of administering prompt and full justice, to determine the possible procedural mechanisms for selecting and prioritising those cases where an acknowledgement of the truth and responsibility is absent. When adopting its determinations, this Judicial Panel will assess the decisions taken by the Judicial Panel for Acknowledgement with regard to focusing its work on the most representative cases, as established in paragraphs l) and p) of paragraph 48 of this document.

(d)   In the exercise of its functions, to assess the extent to which the conduct is related to the armed conflict.

(e)   To adopt other resolutions needed to define the legal situation of those not granted an amnesty or pardon, and who have not been included in the resolution of conclusions.

(f)    At the request of the person under investigation, to define the legal situation of those who, without belonging to a rebel organization, may be under investigation for conduct that falls within the competence of the special jurisdiction for peace. The Panel will decide whether it is appropriate to refer this to the Judicial Panel for Amnesty and Pardon or to the Judicial Panel for Acknowledgement and Responsibility or, in order to define the legal situation, whether it is appropriate to waive exercise of criminal or disciplinary action (in this last also with respect to civilian non-combatants) or apply any other legal mechanism depending on the case. It will also establish the legal status of third parties who appear voluntarily before the jurisdiction in its first three years of operation and who have proceedings against them or convictions for crimes that fall within the sphere of competence of the special jurisdiction for peace, when they did not play a decisive part in the most serious and representative crimes. Once their legal status has been verified, the Panel will adopt the necessary resolutions, including waiving criminal action or other form of early termination of the proceedings, provided that such decisions make an effective contribution to the comprehensive system for truth, justice, reparation and non-repetition measures, particularly with regard to shedding light on the truth within the framework of that system. The resolution defining the legal situation will become *res judicata*.

(g)    In order to ensure the efficient, effective and prompt functioning of the judicial component, the Judicial Panel will have ample powers to organise its work, form working committees, set priorities, combine similar cases and establish the sequence in which they will be addressed, as well as to adopt selection and decongestion criteria. When exercising these powers, it will take into account the need to avoid impunity for serious and representative actions while also preventing the Tribunal from becoming overloaded.

51.    The Investigation and Indictment Unit will be responsible for realising the victims' right to justice when there is no collective or individual acknowledgement of responsibility. It will have the following functions:

(a)    To investigate and, where warranted, indict before the Tribunal for Peace those persons whose cases have been referred by the Judicial Panel for Acknowledgement and Responsibility, the Judicial Panel for Determination of Legal Situations or the Review Chamber of the Tribunal for Peace.

(b)    To decide on the protection measures applicable to victims, witnesses and other involved parties.

(c)    In cases of an absence of acknowledgement of truth and responsibility, to request that the First Instance Chamber of the Tribunal for Peace adopt remand and precautionary measures to guarantee that the process achieves its goals.

(d)    To organise its tasks, form working committees, set priorities, join similar cases and establish the sequence in which they will be handled, as well as to set criteria for selection and decongestion. When exercising these powers, it will take into account the need to avoid impunity for serious and representative actions while also preventing the Tribunal from becoming overloaded.

(e)    When, by virtue of the decisions it has adopted, it considers that it is not necessary to investigate or prosecute a case, it may refer it to the Judicial Panel for Determination of Legal Situations or the Judicial Panel for Amnesty and Pardon.

The Unit will have an investigative support team chosen by the Unit Director; this team will work independently and with integrity, under the direction of the Director.

52.    The Tribunal for Peace will have different chambers. Specifically, it will have a First Instance Chamber in Cases of Acknowledgement of Responsibility, which

will hand down rulings. It will have another First Instance Chamber in Cases of Absence of Acknowledgement of Truth and Responsibility, where cases will be heard and judgments handed down, either acquitting or convicting the person. In this case, the corresponding ordinary or alternative sanctions will be imposed.

It will have a Review Chamber, charged with reviewing judgments handed down by the justice system, in accordance with the provisions of paragraph 58. At the request of the person sanctioned, it will receive cases already heard by jurisdictional bodies or sanctioned by the Offices of the Attorney General or Comptroller General, provided they are not going to form the object of an amnesty or pardon. It will exercise any other function expressly established in this document.

It will also have an Appeals Chamber to decide on objections to verdicts handed down by either of the first instance chambers. It will not be possible to increase the sentence at the second instance when the sole appellant is the person sanctioned.

The resolutions of the Panels and chambers of the judicial component may be internally appealed before the Panel that passed them or appealed before the Appeals Chamber of the Tribunal, solely at the request of the person in respect of whom the resolution or judgment was handed down.

Should the sentences of the chambers violate the fundamental rights of a victim with a direct and legitimate interest, that victim may submit a request for protection to the Appeals Chamber, which will need to be resolved within 10 days.

Once the Tribunal for Peace has concluded its tasks, a mechanism will be established to incorporate one of its chambers, the main task of which will then be to ensure the stability and efficacy of the resolutions and rulings passed by the judicial component of the comprehensive system for truth, justice, reparation and non-repetition, as well as their enforcement.

Once the Tribunal for Peace has concluded its work, should judicial, administrative or disciplinary resolutions or rulings be passed that involve accusations of conduct falling within the competence of this special jurisdiction for peace, the mechanism provided for in the above paragraph will be re-established (should it have ceased to exist) and, once the relevance and merit of the stated accusations have been assessed by this body, the Unit for Investigation and Indictment and/or the chambers or Panels which in its opinion may be required to process the alleged case in accordance with the provisions of the governing regulations of the special jurisdiction for peace will, if necessary, be re-established. Once the assessment has been made, if it considers it unnecessary to re-establish the Investigation and Indictment Unit and/or the chambers and Panels, it will pass a resolution defining the legal situation in question. The Chamber referred to in the previous paragraph will assess whether the accused meets the requirements established in the system for accessing special treatment, given that the accused did not attempt to evade its jurisdiction. Otherwise the accused will not have the option of acknowledging truth and responsibility before the Panel.

**Note**: An action for protection of constitutional rights (*acción de tutela*) shall proceed against acts or omissions of the organs of the special jurisdiction for peace that may have violated, or violate, or pose a threat to fundamental rights.

An action for protection of constitutional rights against judicial rulings by the special jurisdiction for peace shall proceed only in the event of blatantly unlawful conduct or when the infringement of the fundamental right is a direct consequence inferred by the operative part of the ruling and all internal remedies within the special jurisdiction for peace have been exhausted and there is no suitable mechanism available for calling for protection of the violated or threatened right. In

the case of violations related to impairment of due process, an action for protection should be filed after having exhausted the appropriate remedy before the organs of the special jurisdiction for peace.

The petition in respect of the action for protection of constitutional rights must be filed with the Tribunal for Peace, the only body competent to review such petitions. The first instance will be decided by the Review Panel; the second by the Appeals Panel. The verdict on the action for protection of constitutional rights may be reviewed by the Constitutional Court pursuant to the following rules:

The decision regarding selection of the verdict to be reviewed will be taken by a chamber comprising two justices of the Constitutional Court chosen by lot and two justices of the special jurisdiction for peace. The verdict will be selected for review if all four justices vote in favour.

The review judgments will be handed down by the Plenary of the Constitutional Court. If it finds that the right invoked was violated, it shall state as much specifying what the violation consists of, without annulling, invalidating or setting aside the decision of the organ in the special jurisdiction for peace. Nor shall it rule out the facts and conduct analysed in the action for protection within the sphere of competence of the special jurisdiction for peace. The judgment shall be remitted to Tribunal for Peace for the latter to take the appropriate decision regarding the protected right. The ruling, resolution, or act of the special jurisdiction for peace organ issued to comply with the judgment of the Constitutional Court may not be the subject of another action for protection of a constitutional right.

53. The First Instance Chamber of the Tribunal for Peace in cases of acknowledgement of truth and responsibility will have the following functions:

(a) To evaluate the links between the acknowledged conduct, those responsible for it and the sanctions on the basis of the resolution passed by the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct. It will verify whether the resolution corresponds to the legal descriptions of acknowledged actions that are ineligible for amnesty or pardon. Should it decide that there is no such correspondence, it will communicate this decision to those who made the acknowledgement so that they can be heard, once the Judicial Panel for Acknowledgement of Truth and Responsibility has been heard. Once the above have been heard, its ruling will be handed down.

(b) If it is decided that there is such a correspondence, to impose the respective sanction from the list of sanctions, bearing in mind the proposed sanction included in the resolution of the Judicial Panel for Acknowledgement of Truth and Responsibility.

(c) To set the conditions and methods for implementing the sanction as established in the list of sanctions, bearing in mind the proposed sanction included in the resolution of the Judicial Panel for Acknowledgment of Truth and Responsibility.

(d) To supervise and certify effective fulfilment of its ruling, with the support of the monitoring and verification bodies and mechanisms of the comprehensive system designed for this purpose, which will need to submit regular compliance reports.

54. The First Instance Chamber of the Tribunal for Peace in cases of absence of acknowledgement of truth and responsibility will have the following functions:

(a) To prosecute persons in adversarial proceedings and, where appropriate, convict or acquit them. The Chamber may agree to the adversarial proceedings being conducted in a public hearing in the presence of victims' organizations.

(b)   To impose ordinary sanctions on those who do not acknowledge truth and responsibility, if they are convicted.

(c)   If a trial commences without acknowledgement of truth and responsibility, and during that trial, before sentence is passed, the defendant acknowledges truth and responsibility, the alternative sanctions given in the list of sanctions will be imposed. These will be harsher than those imposed on persons who acknowledged truth and responsibility in front of the Judicial Panel of Acknowledgement.

(d)   When adopting decisions, the Tribunal will endeavour to place the conduct in the context of the armed conflict. Without prejudice to the powers of the Council of State with regard to financial reparation, it may establish symbolic reparatory obligations on the State or organizations, respecting due process and provided the organization or the State did not take effective steps to prevent the punishable conduct. It may also establish guarantees of non-repetition, as has been the case in both national and international law, and always in accordance with the provisions of the Final Agreement.

(e)   To hear the accusations submitted by the Investigation and Indictment Unit.

(f)   At the request of the Investigation and Indictment Unit, to adopt remand and protective measures to ensure that the process achieves its goals.

(g)   When adopting decisions, the Tribunal may state that the conduct analysed meets the requirements for an amnesty or pardon, in which case it will refer the case to the Judicial Panel for Amnesty and Pardon; or consider that the definition of the legal situation should be something other than an acquittal or conviction, in which case it will refer it to the Judicial Panel for Determination of Legal Situations.

55.   The final rulings passed by the Tribunal for Peace will be immediately passed to the Commission on Truth, Coexistence and Non-repetition.

56.   All rulings of the Tribunal for Peace, as well as the resolutions of the Panels of the judicial component that define legal situations and grant amnesties or pardons will become *res judicata* when they are final and their immutability will be ensured. These rulings may only be invalidated or struck down by the Tribunal itself on restrictive grounds expressly set out in the regulations.

57.   Any decision adopted by a jurisdictional body or other authority that is aimed at striking down the amnesty, pardon or other measure adopted in the system will need to be submitted to the Tribunal for Peace so that this body can verify whether or not the decision is in violation of the principles of the comprehensive system for truth, justice, reparation and non-repetition.

58.   The Review Chamber of the Tribunal for Peace will have the following functions:

(a)   At the request of the Judicial Panel for Determination of Legal Situations, the convictions imposed by the justice system will be referred to the Review Chamber of the Tribunal for Peace so that, if the conditions are met, it can decide on the corresponding sanction, in accordance with the list of sanctions, and establish whether it has already been effectively enforced, without prejudice to the realisation of the rights of victims to reparation and non-repetition. This ruling may never increase the sanction previously imposed by the justice system.

(b)   At the request of the convicted person, to review judgments handed down by the justice system due to a change in the legal characterization of the

offense pursuant to paragraph 19; due to the emergence of new facts that could not be taken into account before; or due to the emergence of new evidence that was unknown at the time of the conviction, all in relation to actions committed during or because of the conflict, or the social protest, provided that the System's conditions are met.

The review by the special jurisdiction for peace of the judgments handed down by the justice system shall never result in a demand for liability of any kind on the part of the judges handing them down because of the content of those judgments.

The Supreme Court of Justice shall be the competent organ to review the judgments it hands down. Only in the case of persons whose convictions took into account the definition under international humanitarian law of who counts as a non-combatant may a request be filed for a review of previous judgments by the review Panel of the special jurisdiction for peace.

(c)   With regard to conduct and actions that are covered by the judicial component's procedures and regulations, at the request of any Chamber or Panel and when there are doubts, to determine whether conduct related to financing was connected with the rebellion or not, in accordance with the criteria established in the Amnesty Law.

(d)   Exceptionally, to review resolutions or rulings imposed by the judicial component when there is value in doing so due to the reasons established in the implementing regulations of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition, and provided that such a review does not entail adversely affecting the situation of the person sanctioned.

(e)   To rule on requests made by the Judicial Panel for Acknowledgement of the Truth and Responsibility asking that a person be ordered to appear before the special jurisdiction for peace, and deciding the particular body before which that person will need to appear.

(f)   To resolve conflicts of competence between Panels, and between Panels and the Investigation and Prosecution Unit, or any other conflict or clash arising in the special jurisdiction for peace. This Chamber may only resolve said conflict or clash once the Presidents of the Panels or the Director of the Unit in question have met to seek an agreed solution to the conflict or clash arising and have not managed to reach one.

(g)   To examine and decide on any decision adopted by a jurisdictional body or other authority aimed at striking down an amnesty, pardon or other measure adopted in the system, verifying inter alia whether or not the decision is in violation of the principles of the comprehensive system for truth, justice, reparation and non-repetition.

59.   When considering the responsibility of members of FARC-EP, the legal frames of reference to be used will be international humanitarian law, international human rights law and international criminal law. The judicial component of the comprehensive system for truth, justice, reparation and non-repetition will, where relevant, bear in mind the relevance of decisions taken by said organization when analysing responsibilities. The responsibility of FARC-EP officers for the actions of their subordinates will need to be based on effective control of the respective conduct, knowledge of it based on information available to them in advance of, during and after the action was committed, as well as the means within their power to prevent it and, it having taken place, to take the corresponding decisions. Command responsibility cannot be based exclusively on rank or hierarchy.

Effective control of the respective conduct shall be construed to mean a real possibility for the officer to have exercised appropriate control over his subordinates in relation to commission of the criminal acts, in the sense established in international law.

60.     The sanctions will have the overall aim of realising the rights of victims and consolidating peace. They will need to have the greatest restorative and reparative function in relation to the harm caused, and will always correspond to the degree of acknowledgement of truth and responsibility demonstrated before the judicial component of the comprehensive system for truth, justice, reparation and non-repetition through individual or collective statements.

With regard to certain very serious offences, the special jurisdiction for peace's sanctions to be imposed on those who acknowledge truth and responsibility before the Panel for Acknowledgement will be of a minimum duration of five years and a maximum of eight in respect of the reparatory and restorative functions of the sanction. The maximum duration for all system sanctions imposed, taken together, including those for compound offences, shall be eight years. Where necessary for their implementation, they will include effective restrictions on freedoms and rights, such as freedom of residency and movement, and they will also need to include guarantees of non-repetition.

Effective restriction requires suitable monitoring and supervision mechanisms in order to ensure good faith compliance with the restrictions ordered by the Tribunal, so that the latter is in a position to provide timely supervision of compliance, and to certify that compliance. The special jurisdiction for peace will establish the conditions for any effective restriction of freedom that may be necessary to ensure fulfilment of the sanction, conditions which in no case shall be understood as jail or prison, nor the adoption of equivalent forms of detention.

The justices shall apply the following criteria:

(a)     They shall specify the areas in which persons sanctioned shall be located during the hours established for implementation and fulfilment of the sanctions imposed by the system. The size of that area shall not exceed that of the Local Transitory Normalization zones.

(b)     They shall establish the times for fulfilling the restorative sanctions.

(c)     During the times established for execution of the sanction, any movements of the sanctioned person for purposes unrelated to compliance with the sanction must be authorized by the First Instance Chamber of the Tribunal for Peace.

(d)     The judgment shall determine the place of residence of the person who will implement the sanction, while it is being carried out.

(e)     If, during implementation of the sanction, other projects have to be executed, the Tribunal will in each establish where the person sanctioned will live.

(f)     Fulfilment of these sanctions will be compatible with the compliance by the sanctioned persons with other tasks or obligations derived from the Final Agreement.

(g)     They shall notify the organ responsible for verifying implementation of the sanctions of the periodicity of the reports it should file regarding execution of the sanction.

In cases of acknowledgement of truth and responsibility before the Judicial Panel, the restrictions on the above rights and freedoms will be less than in cases of

acknowledgement of truth and responsibility before the Tribunal or cases where there is an absence of acknowledgement.

The alternative sanctions for very serious offences to be imposed on those who acknowledge truth and responsibility before the First Instance Chamber, prior to the ruling, will be of an essentially retributive nature involving deprivation of liberty for between five and eight years. The maximum time served under these alternative sanctions, for all sanctions taken together, including those for compound offences, will be eight years.

In the above situations, the implementing regulations will determine the precise level of the sanction and the cases in which sanctions of fewer than five years will apply to those who did not play a decisive role in the most serious and representative conduct, despite being involved in it. In this case, for all sanctions imposed taken together, including those for compound offenses, the minimum sanction will be two years and the maximum five.

The ordinary sanctions to be imposed when there is no acknowledgement of truth and responsibility will perform the functions provided for in criminal legislation, without prejudice to the fact that reductions in the deprivation of liberty may be obtained, provided the person convicted undertakes to contribute to their social rehabilitation through work, training or study during the time they are deprived of their liberty. In any case, the actual deprivation of liberty will be no less than 15 years and no more than 20 in the case of very serious conduct. The maximum period of fulfilment of ordinary sanctions, for all sanctions imposed taken together, including those for compound offenses, will be 20 years.

The so-called alternative and ordinary sanctions will include effective deprivation of liberty such as jail or prison and/or any other form of detention.

In terms of implementing the sanctions, in the case of agents of the State, a prison jurisdiction will be applied that corresponds to their status as civilians or as members of the security forces, subject to monitoring by the system itself. The sanctions specific to the system applicable to state agents will be decided by the State, respecting everything already established in the special jurisdiction for peace with regard to its own alternative and ordinary sanctions.

With respect to members of an organization that signs a peace agreement with the Government, the time spent in transitional local zones for normalization (ZVTN) will be considered, where applicable, as time served in fulfilment of the sanction, provided that during that stay work, construction work or reparation activities were performed. Once the stay in the transitional zones has concluded, the work, construction work or reparation activities performed by persons at the disposal of the special jurisdiction for peace will also be considered time served in fulfilment of a sanction that may be imposed on them, provided that the work, construction work or reparation activities are carried out in a perfectly circumscribed and verifiable area. Verification of the provisions of this paragraph will be conducted by the Executive Secretary of the special jurisdiction for peace, who may request the collaboration of the Office of the United Nations High Commissioner for Human Rights in Colombia, and once the special jurisdiction for peace has been constituted, by the Tribunal for Peace.

61. The resolutions and rulings imposed in accordance with the special regulations of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition will clearly state the content of the sanction, the place of implementation of the sanction, and the conditions and effects of sanctions for crimes ineligible for an amnesty.

62. The international mechanism, provided for in paragraph 53 (d), that may support the Tribunal for Peace in the task of verifying fulfilment of the sanctions may be a specific component of the United Nations Political Mission tasked with verification that will start operating once the United Nations Mission charged with verifying the bilateral and definitive cease fire has concluded its work, in coordination with the Office of the United Nations High Commissioner for Human Rights in Colombia.

The places in which the sanctions will be implemented are subject to the system's own monitoring, as well as that of a system of security and vigilance that will guarantee the life and physical integrity of those sanctioned.

Physical transfers in order to undertake activities that are in compliance with the sanction will be monitored by the aforementioned mechanism, which shall also issue authorizations for transfers that are not related to fulfilment of the sanction, when such movements are not expressly authorized in the judgment, without prejudice to the powers of the First Instance Chamber of the Tribunal for Peace.

63. Persons who, without forming part of the organizations or armed groups, have contributed directly or indirectly to crimes committed in the context of the conflict will be able to use the mechanisms of the justice system, without prejudice to the provisions of paragraphs 32, 48 (t) and 58 (e) of this document, and to receive whatever special treatment the regulations may determine, provided they meet the conditions established on contributing to truth, reparation and non-repetition.

64. The Judicial Panel for Determination of Legal Situations will be able to apply mechanisms to terminate proceedings, with a view to extinguishing responsibility, when this relates to contexts linked to exercising the right of protest or internal disturbance. The State authorities, social organizations, unions, human rights organizations and processes that form part of the Rural, Ethnic and Popular Summit will present information to the Panel when it relates to the following crimes: conspiracy, obstruction of the public highway, release of hazardous substances, violence against public servants, disruption of the public transport system, damage to third-party property, personal injury and other crimes committed in the context of the Law on Public Security.

65. The Tribunal for Peace will comprise Colombian justices in five-person chambers. Exceptionally, at the request of persons subject to its jurisdiction, or ex officio, the chamber that is going to hear the case will ask for the intervention, in an *amicus curiae* capacity, of up to two highly regarded foreign jurists. Twenty Colombian justices will need to be elected to sit in the chambers, along with four foreign jurists. The latter's only function will be to contribute a concept or friend-of-the-court opinion on the case at hand, with a view to establishing criteria or information relevant to the case. When foreign jurists are asked to intervene, they will take part in the debates in the chamber in which their participation was requested on the same terms as the justices, but without the right to vote.

All these individuals will need to be highly qualified and they must include experts in different branches of law, with a focus on knowledge of international humanitarian law, human rights or conflict resolution. The composition of the Tribunal will need to observe criteria of gender equity and respect for ethnic and cultural diversity, and members will be elected through a selection process that Colombian society and its different sectors trust.

To be elected as a Justice of the Tribunal for Peace, a person will need to meet the same requirements as a Justice of the Constitutional Court, the Supreme Court or the State Council of Colombia. Under no circumstances shall a career structure be applied.

Up to three alternate justices per chamber may be appointed, who will be at the Tribunal's disposal should they be needed to stand in for the regular justices or be needed, in the opinion of the governing bodies of the special jurisdiction for peace, to reinforce the work of the chambers.

Justices of the special jurisdiction for peace will be subject to the same grounds for disqualification as those set forth in article 56 of Law 906 of 2004 or a future provision that replaces it.

66.   Each Panel will comprise a minimum of six highly qualified justices and will need to include experts from different branches of law, with a focus on knowledge of international humanitarian law, human rights or conflict resolution. The composition of each Panel will need to observe criteria of gender equity and respect for ethnic and cultural diversity, and members will be elected through a selection process that Colombian society and its different sectors trust.

Exceptionally, at the request of persons subject to its jurisdiction, or ex officio, the Panel that is going to hear the case will ask for the intervention, in an *amicus curiae* capacity, of up to two highly regarded foreign jurists to contribute a concept or friend-of-the-court opinion on the case at hand, with a view to establishing criteria or information relevant to the case. When foreign jurists are asked to intervene, they will take part in the debates in the Panel in which their participation was requested on the same terms as the justices, but without the right to vote.

Up to three alternate justices per Panel may be appointed, who will be at the Tribunal's disposal should they be needed to stand in for the regular justices or be needed, in the opinion of the governing bodies of the special jurisdiction for peace, to reinforce the work of the Panels.

To be elected a justice on a Judicial Panel, individuals will need to meet the same requirements as justices of the higher district courts. Under no circumstances shall a career structure be applied.

Panel justices and those of the Tribunal for Peace will be subject to the same disciplinary rules as those provided for judges and justices under Colombian law. The adoption of disciplinary measures, their enforcement and verification, will be carried out by a commission comprised of one justice per Panel and one Justice for each chamber of the Tribunal for Peace, elected in accordance with the operational and organizational regulations of the Jurisdiction, in all cases without the participation of the Justice in respect of whom the disciplinary measure was requested.

Panel justices and those of the Tribunal for Peace will be subject to the special penal regime provided for under Colombian law for justices of the Supreme Court of Justice, except in respect of their rulings.

67.   The Investigation and Indictment Unit will comprise a sufficient number of legal professionals who are highly qualified in investigation and indictment and will need to include experts from different branches of law, with a focus on knowledge of international humanitarian law and human rights. It will need to have a technical forensic investigation team that will be able to draw on international support, particularly in the area of exhumations and identifying the remains of missing persons. The composition of the Unit will need to observe criteria of gender equity and respect for ethnic and cultural diversity, and members will be elected through a selection process that Colombian society and its different sectors trust.

The Unit will have a special investigation team for cases of sexual violence. Special provisions on handling evidence will be established for acts of sexual violence, as per the Rome Statute.

The Unit may call on other competent state bodies or human rights and victims' organizations to provide information with regard to events for which it has insufficient information. Within its sphere of competence and in connection with its functions, the Unit may request such collaboration as it deems necessary from the State Prosecutor General's Office and enter into cooperation agreements with it.

68.    The parties will establish, by mutual agreement and prior to the signing of the Final Agreement, the criteria and mechanisms for selecting and appointing the justices of the Panels and Chambers, the foreign jurists who will act as friends of the court, and the members of the Investigation and Indictment Unit and the Executive Secretariat; whereby the above may not be elected by the parties to the Negotiation Table. The selection mechanism established will appoint an initial President of the special jurisdiction for peace, a Director of the Investigation and Indictment Unit and an Executive Secretary, whereby the regulations of this jurisdiction should take into account the terms for the above posts and the procedure for electing successive Presidents, Directors and Secretaries.

69.    The justices of the Judicial Panels and of the Special Tribunal for Peace and the prosecutors of the Investigation and Indictment Unit will be able to access documents and investigative sources as established in Colombian laws which, at all times, regulate access to documents and investigative sources for justices, judges and prosecutors of the Republic. The Executive Secretary of the special jurisdiction for peace may adopt precautionary measures before all the Panels and Chambers of this Jurisdiction begin operating, in order to preserve documents relating to the conflict kept in public or private archives, pursuant to Colombian laws.

70.    The State will need to set the judicial component of the comprehensive system for truth, justice, reparation and non-repetition in motion as soon as possible after the signing of the Final Agreement. The Panels and the Investigation and Indictment Unit will need to begin functioning no later than three months after the entry into force of the Final Agreement, unless this latter establishes an earlier date. No more than one month may pass between the commencement of the judicial Panels and the commencement of the chambers.

71.    The comprehensive system for truth, justice, reparation and non-repetition will envisage the necessary guarantees for non-repetition. The State must, in all cases, guarantee the non-repetition of crimes committed with regard to *Unión Patriótica*.

72.    Extradition may not be granted nor detention measures taken with the aim of extradition with regard to events or conduct covered by this system, caused by or occurring during the internal armed conflict or because of it up until its termination, whether they relate to crimes that are eligible or ineligible for amnesty, and particularly not for political crimes, the crime of rebellion or a related crime, whether committed inside or outside Colombia.

This non-extradition guarantee covers all members of FARC-EP and persons accused of forming part of said organization, in relation to any conduct taking place before the signing of the Final Agreement, for those people who agree to abide by the rules of the comprehensive system for truth, justice, reparation and non-repetition.

When it is alleged, with regard to a member of FARC-EP or a person accused of being a member of that organization, that the conduct stated in the request for extradition occurred after the signing of the Final Agreement, then the Review Chamber of the Tribunal for Peace will evaluate the conduct stated in order to determine the precise date on which it took place and decide the appropriate procedure. In the event that the conduct occurred prior to the signing of the Final Agreement, it will be referred to the Panel for Acknowledgement in respect of

matters within its sphere its competence, in this case always excluding extradition. If it occurred after the signing of the Final Agreement, it will be referred to the competent judicial authority for investigation and prosecution in Colombia, without excluding the possibility of extradition.

For conduct committed prior to the signing of the Final Agreement only, when there is an extradition request involving relatives, up to the second degree of consanguinity or first degree by marriage, of members of FARC-EP or a person accused of or singled out in an extradition request as being a member of that organization, this situation may be submitted to the Review Chamber of the Tribunal for Peace to decide whether the request involves events or conduct related to said membership, or alleged membership, of FARC-EP of the relative of the person whose extradition is being called for. Should this be the case, because it relates to an accusation or indictment of conduct that has never before been the object of an extradition request and does not meet the conditions required for it, the Chamber may refuse the extradition and, in that case, decide whether the action or conduct is within the sphere of competence of the comprehensive system for truth, justice, reparation and non-repetition or whether it needs to be investigated or tied through Colombia's ordinary criminal jurisdiction. The above situation will need to be submitted to the Review Chamber for any of the former members of FARC-EP that have signed the Final Agreement.

The special jurisdiction for peace will need to resolve issues raised with regard to extradition within a period of no more than 120 days, except in warranted cases that depend on the cooperation of other institutions.

The Final Agreement will establish additional measures to guarantee and provide for the above, as well as to prevent others who are offering truth to the comprehensive system for truth, justice, reparation and non-repetition from being extradited before they have finished doing so.

73.   The State will need to consult with the indigenous peoples regarding the form and appropriate time frame with which the decisions adopted or to be adopted by their respective jurisdictions regarding conduct covered by this judicial component can be transferred to this latter's competence. This will be the case unless there is prior and express acceptance of the competence of the judicial component of the comprehensive system for truth, justice, reparation and non-repetition.

74.   In its operations, the comprehensive system for truth, justice, reparation and non-repetition will need to emphasise an end to impunity through its work. Outside the special jurisdiction for peace, judicial mechanisms will be created as determined by the parties, including for example a unit to investigate and dismantle criminal organizations, including criminal organizations considered successors to paramilitary organization, and their support networks referred to in item 3.4 of the General Agreement of 26 August 2012. These will be created as promptly as possible and, in all cases, prior to the signing of the Final Agreement.

In addition, the Government will initiate effective strategies and instruments to shed light on the paramilitary phenomenon , as follows: in the context of the agreement on the Truth, Coexistence and Non-repetition Commission, it will promote measures to guarantee the participation of former members of paramilitary groups in the Commission, as a contribution to shedding light on the paramilitary phenomenon; in turn, the Government will take measures to improve clarification of the phenomenon in the Justice and Peace processes and Law 1424 of 2010. The Government will also put in place other instruments with the aim of clarifying this phenomenon.

In any case, the special jurisdiction for peace will be able to autonomously establish cooperation mechanisms and protocols for accessing information that exists in the justice administration bodies of the Justice and Peace processes and Law 1424 of 2010.

75.    All operators in the judicial component of the comprehensive system for truth, justice, reparation and non-repetition will need to interpret the relevant rules and take their decisions in line with the guiding principle that peace, as a right that is the basis of all other rights, is a necessary condition for the exercise and enjoyment of all other rights.

**List of sanctions**

This list describes the sanctions the Tribunal for Peace may impose.

Pursuant to the document on the special jurisdiction for peace, particularly paragraphs 60 to 63 thereof, this list of sanctions has been drawn up based on:

1.    The degree of truth expressed by the person concerned;

2.    The gravity of the sanctioned act;

3.    The level of participation and responsibility and attenuating or aggravating circumstances with respect to punishability; and

4.    Commitments to making reparation to victims and guarantees of non-repetition.

Activities, work or construction works carried out from the moment of adoption of the agreement on "Unexploded ordnance, explosive remnants of war and anti-personnel mine clearance and decontamination" on a personal and direct basis by any individual falling within the sphere of competence of the special jurisdiction for peace shall, at the request of the interested party, be considered by the Judicial Panel for Acknowledgement of Truth and Responsibility and the Tribunal for Peace when sanctions are imposed upon the applicant, provided the following requirements are met:

1.    The activity carried out has provided reparation or redress to victims or has had a restorative impact;

2.    Its implementation has been recognised by the verification mechanisms agreed by the parties for each activity, work or construction works or by the verification mechanisms agreed to by the parties in Item 6.1 of the General Agreement of 26 August 2012 regarding compliance with the conditions of the comprehensive system for truth, justice, reparation and non-repetition;

3.    It is compatible with the list of sanctions.

There are three types of sanction:

I.    **Sanctions applicable to persons who acknowledge detailed and complete truth before the Judicial Panel for Acknowledgement of Truth and Responsibility:**

The special sanctions of the system, as set out in item 60, will focus on redress and reparation, as well as restrictions on freedoms and rights, such as freedom of residence and movement, which are required for its implementation. The persons penalised shall provide guarantees of non-repetition.

This list sets out the special sanctions concerning compliance with the agreements reached, inter alia, in item 1, Comprehensive rural reform, 2, Political participation and 4, Solution to the illicit drugs problem of the talks agenda.

**A-466**

Sanctions relating to harm or injury caused to minors, women and other affected parties are also included, bearing in mind the need for the fullest possible reparation and redress to victims of the armed conflict.

Sanctions may be applied during a pre-established period or while awaiting results, such as completion of the construction of particular infrastructure, without prejudice to the duration of the sanction imposed by the Tribunal where applicable.

Persons appearing before the Judicial Panel for Acknowledgement of Truth and Responsibility may submit a detailed individual or collective project for works, schemes or activities providing reparation and redress. Such projects will set out the obligations, objectives, phases, timetables, places of implementation and the persons who are to carry them out and their place of residence. Sanctions imposed by the Tribunal will pre-establish where the persons who will carry the projects out are to live. Such places will have dignified and appropriate living conditions.

Projects must establish a mechanism for discussion with representatives of victims who live in the area of implementation in order to hear their opinion and to ensure that they are not opposed to the project. The discussion mechanism must be approved by the Judicial Panel and shall be carried out under its supervision. If the victims consider it appropriate, they may make the Tribunal aware of their opinion on the proposed programme. The Tribunal shall be completely independent in taking decisions concerning such projects.

Projects must have been approved in advance by the Judicial Panel for Acknowledgement of Truth and Responsibility and must have been drawn up by the Judicial Panel if the persons appearing do not present them.

In the event of collective acknowledgement, the organizations or bodies to which the persons appearing belong will be responsible for ensuring proper execution and fulfilment of the sanction, without prejudice to the function to be attributed to a national or international monitoring mechanism agreed by the parties.

The First Instance Chamber in Cases of Acknowledgment of Responsibility shall determine the effective execution of the sanction.

With respect to FARC-EP, sanctions will be executed in accordance with agreements on the laying down of arms and reincorporation of FARC-EP into civilian life.

The project may include, inter alia, the works, schemes or activities set out below, which must not be incompatible with relevant state public policies, provided they are consistent with the ethnic and cultural traditions and customs of the communities:

**A.   In rural areas**

1.   Participation in/implementation of effective reparation programmes for displaced rural people.

2.   Participation in/implementation of environmental protection programmes for enterprise zones.

3.   Participation in/implementation of infrastructure building and repair programmes in rural areas: schools, roads, health centres, housing, community centres, municipal infrastructure, etc.

4.   Participation in/implementation of rural development programmes.

5.   Participation in/implementation of waste disposal programmes where necessary.

6.    Participation in/implementation of programmes to improve electrification and connectivity in communications in agricultural areas.

7.    Participation in/implementation of programmes to substitute crops used for illicit purposes.

8.    Participation in/implementation of environmental recovery programmes for areas affected by crops used for illicit purposes.

9.    Participation in/implementation of programmes to build and improve the road infrastructure required to market agricultural products from illicit crop substitution areas.

**B.    In urban areas**

1.    Participation in/implementation of programmes to build and repair infrastructure in urban areas: schools, public roads, health centres, housing, community centres, municipal infrastructure, and so on.

2.    Participation in/implementation of urban development programmes.

3.    Participation in/implementation of drinking water access programmes and construction of waste-water treatment networks and systems.

**C.    Clearance and disposal of explosive remnants of war, unexploded ordnance and antipersonnel mines from areas of national territory affected by such devices.**

1.    Participation in/implementation of programmes to clear and dispose of explosive remnants of war and unexploded ordnance.

2.    Participation in/implementation of programmes to clear and dispose of anti-personnel mines and improvised explosive devices.

**II.    Sanctions applicable to persons who acknowledge truth and responsibility for the first time in adversarial proceedings before the First Instance Chamber of the Tribunal for Peace prior to delivery of judgment.**

Alternative sanctions for very serious acts imposed upon persons who acknowledge truth and responsibility before the prosecuting chamber prior to delivery of judgment shall pursue essentially retributive purposes and consist of five to eight years' imprisonment.

1.    If the person has appeared after the charge was filed with the Investigation and Indictment Unit when the acknowledgement of truth and responsibility has been exhaustive, complete and detailed, the Tribunal shall assess the reasons why the person concerned did not present themselves to the Judicial Panel for Acknowledgement of Truth and Responsibility at an earlier opportunity. The sanction to be imposed may be adjusted if such an omission is deemed to be fully justified.

2.    Where the Tribunal for Peace considers that the acknowledgement of truth and responsibility set out before it has not been exhaustive, complete and/or detailed, it shall apply for alternative sanctions in accordance with the procedure set out below.

The competent Chamber of the Tribunal for Peace shall establish the appropriate sanction for the crimes, conduct or offences committed in accordance with the rules of the Colombian Criminal Code.

The competent Chamber of the Tribunal for Peace will then impose an alternative penalty of a minimum of five (5) and a maximum of eight (8) years' imprisonment,

in accordance with the gravity of the crimes and the degree of acknowledgement of truth and responsibility and effective cooperation in shedding light on the respective facts.

To be eligible for the alternative penalty, the person concerned must undertake to contribute to his or her reincorporation into society by means of work, training or study during that person's term of imprisonment, and shall where appropriate engage in activities ensuring non-repetition.

When the alternative sanction and conditions imposed in the judgment have been completed, the person concerned will be released.

In no event shall substitute penalties, additional benefits or supplementary reductions to the alternative sanction be applied.

III.  **Sanctions applicable to persons who do not acknowledge truth and responsibility in adversarial proceedings before the First Instance Chamber of the Tribunal for Peace who are found guilty by the latter.**

The ordinary sanctions to be imposed when there is no acknowledgement of truth and responsibility shall fulfil the functions provided for in the Colombian Criminal Code, without prejudice to the obtaining of remission, provided the convicted person undertakes to contribute to their reincorporation into society by means of work, training or study during his or her term of imprisonment. The effective imprisonment shall in no event be less than 15 years, or more than 20 years in cases of serious offences or violations.

Convicted persons may be given substitute penalties or additional benefits provided they undertake to contribute to their reincorporation into society by means of work, training or study during their term of imprisonment and to engage in activities ensuring non-repetition of the harm or injury caused once they are released.

When the sanction imposed in the judgment has been served, they will be released on probation if they have undertaken to engage in activities ensuring non-repetition of the harm or injury caused upon their release and this was a reason for granting a reduction in the duration of the penalty imposed. The period of release on probation will expire and the sentence will be deemed to have been served when it is verified that activities ensuring non-repetition of the harm or injury caused have been carried out and in any event on completion of the term of imprisonment imposed by the Tribunal for Peace.

**Agreement to implement paragraph 23 of the Agreement to create a special jurisdiction for peace**

On their entry into force, the amnesty rules shall cover the release from prison of all persons referred to in the first paragraph of paragraph 23 of the Agreement to create a special jurisdiction for peace of 15 December 2015 — rebels who are members of organizations which have signed a final peace agreement and persons who have been accused or convicted of political or related crimes through decisions delivered by the courts — and shall define the authority that will determine their release. The former detainees shall declare that they will submit to the authority and remain at the disposal of the special jurisdiction for peace on conditional release (parole) decided by the special jurisdiction for peace and in accordance with the conditions laid down in the comprehensive system for truth, justice, reparation and non-repetition and verified by the special jurisdiction for peace when it begins operations.

Should the person have been accused of or sentenced for crimes which are not subject to amnesty, the preceding paragraph shall be applied in relation to their release from prison and submission to the special jurisdiction for peace to appear before the Judicial Panel for Acknowledgement of Truth and Responsibility, the Judicial Panel for Amnesty and Pardon or the Review Chamber, or until the special jurisdiction for peace imposes the corresponding sanctions, where applicable, and they shall remain at the disposal of the special jurisdiction for peace under the following conditions:

(a)   If the special jurisdiction for peace has begun to operate, and from the time it becomes operational in respect of the circumstances envisaged in the following (lettered) subparagraph, the decision to release, the transfer and supervision of the special the special jurisdiction for peace oversight and guarantee measure established by it with regard to former detainees will be determined by the Review Chamber of the Tribunal for Peace and enforced in the same places where reincorporation into civilian life occurs, as agreed for other members of FARC-EP, or in other places of residence that may be proposed by former detainees.

(b)   If the special jurisdiction for peace has not begun to operate, the authority determining the amnesty law will decide on the release from prison and on the special jurisdiction for peace oversight and guarantee measures and will provide for the special jurisdiction for peace verification mechanism agreed by the parties under item 6 of the General Agreement of August 2012 to ensure that such persons are at the disposal of the special jurisdiction for peace in the same places where reincorporation into civilian life occurs, as agreed for the other members of FARC-EP, or in other places that may be proposed by former detainees once the authority has given its approval. The foregoing as a whole will be confirmed by the same special jurisdiction for peace verification mechanism agreed by the parties under the aforesaid item 6 of the General Agreement of August 2012. The authority or mechanism established in the amnesty law will be responsible for the transfer of former detainees to the places in which they will remain at the disposal of the special jurisdiction for peace. At their own choice and once the competent authority has given its approval, former detainees will go to their place of residence, to the places where reincorporation into civilian life of members of FARC-EP is to occur or to any other place proposed to the mechanism or authority competent to decide thereupon. Both members of FARC-EP and persons who do not acknowledge that they are members of that organization shall remain under the supervision of the abovementioned verification mechanism determined by the parties until the special jurisdiction for peace starts operating.

Persons accused of or sentenced for crimes which are not subject to amnesty, members of FARC-EP who are released or persons who are released who do not acknowledge that they are members of FARC-EP shall remain on release at the disposal of the special jurisdiction for peace.

When the special jurisdiction for peace has begun to operate, all persons who have been released or former detainees will appear before that body to allow the Judicial Panel for Amnesty and Pardon, the Judicial Panel for Acknowledgement of Truth and Responsibility, the Judicial Panel for Determination of Legal Situations, the Review Chamber of the Tribunal for Peace or any other competent chamber to resolve their situation. Their liberation or release from prison will not mean that they are discharged from their responsibilities until the special jurisdiction for peace resolves the individual situation of each person in each case.

The following persons shall also be released: those convicted or investigated for attempting a coup, blocking public roads, throwing dangerous substances, using violence against public officials, disrupting the public transport service, damaging

property, causing personal injuries or committing other crimes within the framework of the Public Order Act (*Ley de Seguridad Ciudadana*), in cases relating to the exercise of the right to protest or internal disturbances, who express their willingness to submit to the authority of the special jurisdiction for peace and to appear before the Judicial Panel for Determination of Legal Situations to call for the application of mechanisms to stay proceedings with a view to discharging their responsibility, all as laid down in item 64 of the Agreement to create the special jurisdiction for peace. In that event they shall also remain under the supervision of the special jurisdiction for peace when it has begun operating or of the verification mechanism determined by the parties as set out above when the special jurisdiction for peace has not yet begun to operate. The special jurisdiction for peace shall define the terms of release on parole, the rules governing it and the supervision of such situations by the special jurisdiction for peace until the situation is resolved by the Judicial Panel for Determination of Legal Situations or the appropriate Judicial Panel or Chamber of the special jurisdiction for peace.

In all the above cases and in accordance with the most-favourable-law principle governing the special jurisdiction for peace, the various authorities required to take the abovementioned decisions shall take into account periods of imprisonment served by former detainees under the sanctions that may be imposed by the special jurisdiction for peace.

**5.1.3    Reparation: comprehensive reparation measures for building peace**

**5.1.3.1    Early acts of recognition of collective responsibility**

To contribute to realising victims' rights, signal a symbolic new beginning and create a favourable environment for building peace in the context of the end of the conflict, the Government and FARC-EP have agreed that in developing this Agreement following the signature of the Final Agreement, the Government will as soon as possible support acts of acknowledgement and contrition in which the Government, FARC-EP and different sectors of society that may have borne some responsibility in the conflict acknowledge their collective responsibility for the harm or injury caused and apologise, each party assuming their responsibility as an expression of their willingness to contribute towards a definitive Never Again. Such action will not preclude voluntary acts of acknowledgement of individual responsibility that may take place in this initial period.

Collective acts will be formal, public and official and will be carried out at both national and regional level. The *Conferencia Nacional Episcopal* (National Episcopal Conference) will be asked to coordinate these acts with the support of the *Diálogo Intereclesial por la Paz* (DIPAZ) (Inter-church Dialogue for Peace) and other churches, in discussion with victims' and human rights organizations, among others. The coordinators must ensure that the acts meet the expectations both of victims and of communities, avoid re-victimisation, empower victims and help to lay the foundations underpinning coexistence and non-repetition to be developed by the Commission on Truth, Coexistence and Non-repetition.

In addition to acknowledgement of responsibility and a public apology, these acts may also include undertakings to take specific action to contribute towards ensuring full reparation to victims, coexistence and guarantees of non-repetition, and to contribute in general to the peacebuilding process.

The foregoing will not preclude the possibility of acts of acknowledgement of collective responsibility which the Government, FARC-EP or any other sector of society decide to take prior to signature of the Final Agreement.

### 5.1.3.2    Concrete contributions to reparation

In the context of the end of the conflict, the Government and FARC-EP have agreed that the Government will promote and put into operation the measures necessary to ensure that any persons who caused harm or injury during the conflict and who express their willingness and commitment to contribute directly to satisfying victims and communities may do so by taking part in specific reparation actions. This will result from early acknowledgement of responsibility, where applicable, in coordination with collective territory-based reparation programmes where necessary.

Under the comprehensive system for truth, justice, reparation and non-repetition, all persons who have caused harm or injury during the conflict shall help to make the respective reparation. Such contributions will be taken into account if any special judicial treatment is to be granted.

Under the comprehensive system, the Government will take the necessary actions to promote the participation in various reparation measures of state agents and others who played a direct role in the conflict who may have caused harm or injury as a consequence of serious breaches of international humanitarian law or serious and gross human rights violations, and of anyone who may have borne some responsibility because of their indirect participation in the conflict.

The Government will also adopt measures to promote and, where applicable, to ensure that collective reparation measures are taken by the various state bodies that may have been responsible for harm or injury caused during the conflict.

FARC-EP is committed to reincorporation into civilian life and to taking action as part of that process to help to redress the harm or injury caused. Such action may include, inter alia, participating in infrastructure rebuilding work in the areas most affected by the conflict and in programmes to clear such areas of anti-personnel mines (APM), improvised explosive devices (IED), unexploded ordnance (UXO) or explosive remnants of war (ERW), participating in programmes to substitute crops grown for illicit purposes, contributing to the search for, location, identification and dignified return of remains of deceased persons or persons considered to be missing in the context of and due to the armed conflict, and participating in programmes to repair environmental damage, e.g. reforestation.

The Government and FARC-EP invite anyone who may have taken part directly or indirectly in the conflict and who may have caused harm or injury at the time to take part in specific actions to ensure reparation under the comprehensive system.

### 5.1.3.3    Collective reparation at the end of the conflict

In the context of the end of the conflict, the Government and FARC-EP, have agreed that the Government will strengthen collective reparation processes and ensure that comprehensive rural reform plans and programmes will be reparation-based where applicable.

#### 5.1.3.3.1    Reparation-oriented approach of territory-based development programmes

The aim of a focus on the level of victimisation and its impact as a criterion for defining areas where the territory-based development programmes will be put into effect is to provide redress. Their implementation will accordingly seek to provide redress for victims and communities.

**5.1.3.3.2   Collective reparation plans with a territory-based focus**

In order to acknowledge the harm or injury caused to communities by the conflict and to help transform their living conditions so that they can rebuild their plans in the context of the end of the conflict, the Government will strengthen collective reparation processes with a territory-based focus in accordance with this Agreement.

To that end, all territory-based development programmes will include collective reparation plans, while in areas where these plans are not put into effect, plans for communities which have been particularly victimised will be strengthened, prioritising community initiatives.

In both cases such collective reparation plans with a territorial-based focus must incorporate the following aspects:

- **Material and symbolic measures to address harm**: Measures aimed at direct individual and collective victims, such as actions to dignify, commemorate and pay homage to them, commemorations, infrastructure building and commemorative architecture.

- **Coexistence and reconciliation measures**: Measures to address the damage done to the social fabric and to promote coexistence within communities, including victims, former members of paramilitary organizations, members of FARC-EP in the process of reincorporation into society and third parties who may have participated in the conflict in some way, as well as measures to build and strengthen confidence between the public authorities and communities.

- **Coordination**: Collective reparation plans must be coordinated, where applicable, with the territory-based development programmes, the various plans and programmes agreed and the different efforts to achieve truth and justice.

- **Action plans**: A collective reparation action plan will be drawn up by means of participation. These plans shall include: (i) a diagnosis of the collective harm or injury; (ii) identification of the material and symbolic measures to be prioritised; and (iii) the timetable for implementation.

- **Participation mechanisms**: The active participation of victims and their organizations with the regional authorities will form the basis for the collective reparation plans with a territorial-based focus. Spaces for participation will be created to that end to define priorities in implementing the collective reparation measures, ensuring community participation in their implementation and establishing project follow-up and oversight mechanisms. The participation of women in this approach will be ensured.

- **Measures to contribute to reparation**: Where applicable, collective action plans shall involve the participation of anyone who may have caused harm or injury during the conflict in developing specific actions contributing to the reparation referred to in this Agreement.

**5.1.3.3.3   National collective reparation plans**

In the context of the end of the conflict, the Government will strengthen national collective reparation plans as it implements this Agreement. These plans will be gender-based and will be aimed at communities consisting, inter alia, of groups and organizations such as women's and trade organizations and political and social parties and movements, particularly those of the opposition, with a view to acknowledging the special nature of their victimisation, rediscovering their identity

and their organizational potential and rebuilding their ability to have an impact on the development of local and national policies within a legal framework. These plans must also contribute to coexistence, guarantees of non-repetition and reconciliation.

In the context of these plans, stress will be laid on acknowledging the responsibility of the state, FARC-EP, paramilitaries and any other group, organization or institution that caused harm or injury during the conflict.

The Colombian Government and FARC-EP agree that the Government, together with the *Unión Patriótica* (Colombian Patriotic Union) will seek an amicable outcome to the litigation currently pending in the Inter-American Commission on Human Rights concerning the *Unión Patriótica* political party.

Accordingly, the Colombian Government undertakes to develop a special reparation plan and to make the adjustments and carry out the reforms necessary to ensure the participation of victims, considered individually and collectively, and non-repetition.

### 5.1.3.4  Psychosocial rehabilitation

#### 5.1.3.4.1  Emotional recovery measures at the individual level

In order to address and help to alleviate the suffering of victims in the context of the end of the conflict, the Government and FARC-EP have agreed that in implementing this Agreement the Government will undertake to broaden the public coverage and regional scope and improve the quality of psychosocial care to ensure the emotional recovery of victims in accordance with the specific harm or injury they have suffered, including the particular impact of sexual violence. To do this the number of local centres providing care for victims will be increased and mobile strategies to reach the most isolated places will be promoted.

In fulfilling the agreements reached the Government will also improve access to mental health services for victims who require them.

#### 5.1.3.4.2  Psychosocial rehabilitation plan for coexistence and non-repetition

Within the framework of the collective reparation plans and bearing local reconciliation initiatives in mind, in implementing this Agreement the Government undertakes to increase the coverage and raise the quality of community rehabilitation strategies to rebuild the social fabric. These strategies will be developed through medium and long-term community processes whose key aims are to generate future projects for living together, build confidence among citizens and institutions and achieve peaceful coexistence within communities, including victims, former members of paramilitary organizations and former members of FARC-EP who are in the process of reincorporation into society, as well as third parties who may have participated in the conflict in some way. The strategies will be equity- and gender-based and will involve the following components:

- Creation of spaces for community dialogue and collective mourning allowing expressions of individual and collective suffering.

- Rediscovery and generation of social, cultural, artistic, recreational and sporting activities associated to exchanges between citizens and coexistence in communities.

- Boosting of local initiatives focusing on reconciliation, dignity and acknowledgement.

- Reflection on collective attitudes regarding future life projects allowing reparation to be transformative and peaceful coexistence to be fostered.

- Creation of learning environments to strengthen the social rejection of violations and infringements that took place in the past, leading to changes in the attitudes which allowed them or justified them.

- Rediscovery of social practices abandoned as a result of the conflict.

- Promotion of agreements for peaceful coexistence within communities, which include victims and persons who may have participated directly or indirectly in the conflict, and confidence-building between the public authorities and communities.

- Strategies for reconstructing family ties impacted by the conflict that, while respecting religious, ethnic and cultural differences and the principle of non-discrimination, strive to ensure that victims recover their environment and their ties of affection, solidarity, mutual respect and assistance.

Psychosocial rehabilitation strategies for coexistence will be coordinated with and supported by the work of the Commission on Truth, Coexistence and Non-repetition while it is in operation.

### 5.1.3.5   Collective processes of return of displaced persons and reparation of victims abroad

In implementing this Agreement and in the context of the end of the conflict, the Government will introduce specific collective territory and gender-based programmes to return and relocate displaced persons on the one hand, and accompanied and assisted return plans for victims living abroad on the other. The coordination of such plans will be strengthened at territorial level by other aspects of the victim reparation policy, particularly collective reparation and land return programmes, and by implementation of the agreement entitled "Towards a New Colombian Countryside: Comprehensive Rural Reform", where applicable.

Measures will be taken accordingly to guarantee collective or individual returns and relocations in conditions of safety and dignity according to a voluntary approach involving the following elements:

- **Identification of territories**: return and relocation plans will prioritise areas in which the territory-based development programmes are implemented and other territories in which collective reparation plans are developed and will be coordinated with land restitution processes.

- **Inter-agency coordination**: return and relocation plans will be coordinated, where applicable, with the various plans and programmes agreed, particularly the territory-based development programmes, rural housing and water plans, measures to provide access to land, income generation, boosting of the rural economy and programmes to clear and decontaminate areas of anti-personnel mines (APMs), improvised explosive devices (IEDs) and unexploded ordnance (UXO) or explosive remnants of war (ERW), and with land return processes.

- **Security in territories for return**: in areas in which return and relocation plans are to be prioritised, the Government will set up the security measures necessary to guarantee life and personal integrity in communities, which will always participate in this process.

- **Strengthening of community advocates**: The Government will take the necessary measures to strengthen the community advocates programme, and in particular their functions of protection and promotion of human rights, so that

S/2017/272

they can effectively monitor the processes of land restitution, return and relocation of displaced persons and victims abroad, including refugees and exiles, which form part of these processes, and can support and assist the victims in order to guarantee access to the institutional services offered with regard to realisation of their rights.

The implementation of these processes of returns and relocations will require the cooperation of specialised and interdisciplinary teams, capable of ensuring the participatory process and use of local resources.

With regard to the large number of victims who had to leave the country as a consequence of different human rights violations and breaches of international humanitarian law during the conflict, the Government, in fulfilment of this Agreement, will strengthen the programme of recognition and reparation of victims abroad, including refugees and exiles victimised during the conflict, by means of the implementation of "supported and assisted return" plans. The assisted return will consist of promoting conditions to facilitate their return to the country and the construction of their life project, including decent reception conditions through the coordination of these plans with the specific institutional services offered, to progressively guarantee access to basic rights, decent employment, housing, health and education at all levels according to each person's individual needs. Priority will be given to their relocation to the places they had to leave, respecting the wishes of the victim. The Government will adopt the necessary measures to coordinate these plans, where appropriate, with the different plans and programmes agreed, in particular the territory-based development programmes.

All this is without prejudice to the different measures that, in an end-of-conflict scenario, have to be adopted to drive forward and promote the return of exiles and other Colombians who left the country because of the conflict.

### 5.1.3.6   Land restitution measures

In order to strengthen and invigorate the processes of land restitution in an end-of-conflict scenario, as well as guaranteeing coordination between the processes of land restitution and the processes of collective reparation, the development programmes with a territory-based approach as well as the other plans and programmes arising from the implementation of the Final Agreement, we have agreed that:

In an end-of-conflict scenario, in order to strengthen and invigorate the processes of land restitution, we have agreed that the coordination of these and the processes of collective reparation, the development programmes with a territory-based approach and the plans and programmes arising from the implementation of the Final Agreement, will be guaranteed, and also that:

• The political application of land restitution will, inter alia, meet the technical criteria of historical density of the dispossession and the conditions for the return, taking into account the recommendations, including those concerning territorial focus, made by the victims' organizations and experts on the subject. The territory-based entities must participate actively in the implementation of the land restitution policy and contribute from the time of drawing up their territorial development plans to the comprehensive care for the population benefiting from the processes of restitution, including investment in infrastructure works and public services.

• The population benefiting from the processes of restitution will receive technical and financial support for the reconstruction of their life projects and strategies for income generation, strategies for substitution of crops used for

illicit purposes, strategies for recovery and reconstruction of the social fabric; strengthening of organizational processes and construction of the historical memory for reconciliation.

• The information resulting from the entries in the register of despoiled and forcibly abandoned land and the subsequent rulings ordering land restitution will be included in the Single Register of Victims for purposes of harmonisation of the records and access to the different reparation measures.

**5.1.3.7   Participatory adaptation and strengthening of the Policy of caring for and making comprehensive reparation to victims, in the context of the end of the conflict and contribution to material reparation for the victims**

The Government and FARC-EP agree that, in the context of the end of the conflict, it is necessary to strengthen the policy of caring for and comprehensive reparation of victims, to adapt it to the needs and opportunities of this new context, and to ensure that it contributes effectively to coexistence, guarantees of non-repetition and reconciliation.

For this, the Government will set in motion an effective process with the broadest possible participation of victims and their organizations, promoting opportunities for the discussion of their proposals with the competent authorities. This process will be carried out in the framework of the existing forums for victim participation, which will be expanded upon and strengthened for this purpose, so that victims' organizations and victims not involved in these forums can participate in this process.

In order to implement this, an event with broad-based participation will be announced and held with victims' organizations and victims including those that are not involved in these forums for participation. Invitations will be issued to academic experts, specialised organizations and organizations of human rights advocates.

As a consequence of this process of participation and discussion of the proposals of the victims and their organizations, the Government will set in motion the necessary adjustments and reforms of regulations and policy in order to: adapt the policy to that agreed in the sub-section on reparation; guarantee coordination with the implementation of the plans and programmes at local and inter-agency level resulting from the signing of the Final Agreement; overcome the difficulties and take advantage of the opportunities afforded by the end of the conflict; and make the adjustments to the priorities of delivery of resources, to the plans for achievement of goals, and to the criteria of population- and territorial-based prioritisation for their execution.

The process of strengthening and adaptation of the policy of caring for and comprehensive reparation of victims will seek to guarantee greater levels of territory-based cover in its implementation.

The process for the adaptation and participatory strengthening of the policy of caring for and comprehensive reparation of victims will be overseen by the existing forums for participation of victims, at local and national level. For this purpose these forums will be expanded and strengthened by means of the participation of other victims and victims' organizations and human rights organizations.

In addition, in the context of the end of the conflict, the Government undertakes to implement the following agreed measures:

• To construct an individual and collective victimisation map, which will serve as a source of information and an instrument for acknowledgement and memory of acts committed during the conflict that are not within the realm of

victims registered in the Programme of Comprehensive Reparation for Victims, in coordination with the Commission on Truth, Coexistence and Non-repetition and the Unit for the Search for Persons deemed as Missing in the context of and due to the conflict and with the special jurisdiction for peace.

• To recognise the direct and indirect victims of serious human rights violations or breaches of international humanitarian law who have also been combatants. The reparation measures for members of FARC-EP who have been victims will be discussed in the section of the Agenda relating to the process of reincorporation. In parallel, the Government will strengthen the measures of caring for and reparation of the members of the Colombian armed forces who were victims of serious violations of human rights or breaches of international humanitarian law.

• To take all the necessary measures for the full and effective financing of the Policy of caring for and comprehensive reparation of victims, including the strengthening of the Reparation Fund for the Victims of Violence, the expansion of its sources of funding and of the fund-raising mechanisms, as well as the promotion of the mechanisms of participation and oversight to ensure victims' control over the Fund. The State will contribute, in the form of subsidies, to the reparation of victims when the individuals who caused the injury, loss or damage in the context of the conflict do not have sufficient resources to provide reparation for them.

For its part, within the context of the end of the conflict and within the parameters of the Comprehensive System for Truth, Justice, Reparation and Non-Repetition, FARC-EP, as an insurgent organization that acted in the context of the rebellion, undertakes to contribute to the material reparation of the victims and in general to their comprehensive reparation, on the basis of the facts identified by the special jurisdiction for peace.

For as long as FARC-EP stays in the transitional local zones for normalization during the laying down of arms process, authorized representatives of that organization will agree with representatives of the Government on procedures and protocols for drawing up an inventory of all kinds of goods and assets included in what is being called "resources for war" and provide information regarding them, as established in sub-section 3.1.1.3 "Provision of Information" of the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities, and the Laying Down of Weapons.

As established in this Agreement, FARC-EP will proceed to make material reparation to the victims, with the aforementioned goods and assets, within the framework of the comprehensive reparation measures, abiding by the criteria established in the jurisprudence of the Constitutional Court with respect to the resources of war.

Goods and assets that have not been inventoried by the end of the laying down of arms process will be treated in accordance with ordinary law.

The terms and procedures applicable to this material reparation will be specified in the framework of the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement.

In any case, the approval and implementation of the foregoing measures cannot involve limitation, annulment or restriction of the victims' currently acquired rights.

### 5.1.4   Guarantees of non-repetition

The primary objective of the different mechanisms and measures of the Comprehensive System for Truth, Justice, Reparation and Non-Repetition agreed by the Government and FARC-EP is to contribute to the prevention and guarantee of non-repetition of the violations and of the conflict itself, in different ways.

The Comprehensive System for Truth, Justice, Reparation and Non-Repetition contributes to guaranteeing non-repetition, in the first place, by means of the recognition of the victims as citizens who whose rights were violated. The measures for reparation and the measures in respect of truth and justice, in particular the attribution of responsibilities and the imposition of sanctions by the Tribunal for Peace of the special jurisdiction for peace, must contribute to this purpose.

Secondly, by means of the recognition of what occurred in the context of the conflict and of the clarification and rejection of the serious violations of human rights and serious breaches of international humanitarian law, including those that have been historically less visible such as those committed against women, children and adolescents, as well as the rejection of the violence against groups, social and trade union movements, and political parties, especially the opposition parties that were severely victimised, in order for it to be a shared aim of society that this will never happen again.

The Government will take all the measures, including those stipulated in this Agreement and any others that are necessary, to ensure that no party or political movement in Colombia is ever victimised again and that what happened with the Patriotic Union (*Unión Patriótica*) party will never happen again.

The following sections must all contribute to the goal of recognising, clarifying and encouraging rejection of what occurred: the final report and the recommendations of the Commission on Truth, Coexistence and Non-repetition; the results of the Unit for the Search for Persons deemed as Missing in the context and due to the conflict; the acknowledgements of responsibility; the judicial truth and the decisions made by the special jurisdiction for peace; and also the measures for reparation, including the measures for collective reparation.

Thirdly, by means of the fight against impunity, an area in which both the special jurisdiction for peace and the measures of clarification of the truth and reparation have a special part to play. Accountability for what happened, based on the implementation of these measures, must contribute to the prevention of and dissuasion from committing new violations, and it is a fundamental guarantee of the non-repetition of the violations and breaches and of the definitive termination of the violence that the country has suffered because of the conflict.

In order to fulfil this purpose, judicial mechanisms will also be created, outside the special jurisdiction for peace, such as a unit for investigation and dismantling of criminal organizations, including the criminal organizations that have been described as successors to the paramilitary forces, and their support networks, referred to in item 3.4 of the Agenda for the General Agreement.

And fourthly, by means of the promotion of coexistence on the basis of the acknowledgements of responsibility made in the framework of the Commission on Truth, Coexistence and Non-repetition, of the special jurisdiction for peace and of the measures for reparation. Insofar as these acknowledgements are also acknowledgement of the rules and rights breached and constitute commitments to non-repetition, they contribute to the strengthening of trust between citizens and confidence in the rules that guarantee the validity of and respect for those rights.

Thus the bases are established for coexistence, which in turn is the foundation for reconciliation and the building of a stable and long-lasting peace.

Furthermore, the primary objective of the comprehensive system, and of everything agreed in respect of victims, to contribute to non-repetition, essentially requires fulfilment and implementation of what is agreed to in connection with item 3 of the Agenda of the General Agreement "End of the Conflict", which must guarantee the definitive end to the armed conflict, as well as the implementation of everything agreed in respect of human rights, with a vision of territory-based development and implementation.

The guarantees of non-repetition of the conflict also require the implementation of all the agreements reached here, which in the opinion of the Government contribute to reversing the effects of the conflict and to changing the conditions that have facilitated the persistence of violence in the country; and which in the opinion of FARC-EP contribute to resolving the historical causes of the conflict. To that extent they are a fundamental guarantee of non-repetition.

The guaranteeing of rights, including economic, social, cultural and environmental rights, of the rural population by means of the implementation of the comprehensive rural reform which contributes to their well-being and quality of life; the strengthening of the exercise of political rights, the promotion of a democratic culture and of human rights and guarantees for reconciliation, coexistence, tolerance and non-stigmatisation, and the guarantees for mobilisation and social protest, by means of the implementation of a democratic opportunity to build peace; the measures to protect and guarantee the rights of the population living in territories affected by the growing of crops used for illicit purposes and to contribute to overcoming the conditions of poverty, marginalisation and weak institutional presence by means of the implementation of the programmes and measures agreed for the solution to the illicit drugs problem and the effective judicial control of the criminal organizations and networks associated with national and regional drug trafficking; and the measures agreed to in item 5 "Victims" and in item 3 "End of Conflict", all pursue a rationale of non-repetition of the conflict and of guarantees of human rights for all. The Government reiterates its commitment to the implementation of these agreements.

In conclusion, the guarantees of non-repetition will be the result, on the one hand, of the coordinated implementation of all the foregoing measures and mechanisms, as well as in general of all the sections included in the Final Agreement; and, on the other hand, of the implementation of the additional measures of non-repetition that are agreed to in the framework of Item 3 "End of Conflict" of the Agenda of the General Agreement.

## 5.2  Commitment to the promotion, observance and guarantee of human rights

In the General Agreement to End the Armed Conflict and Build a Stable and Lasting Peace, signed by the Government and FARC-EP on 26 August 2012, it is specifically stipulated that "respect for human rights in all corners of the national territory is an aim of the State that must be promoted."

The Government, representing the Colombian state, reiterates its commitment to the protection of human rights and of those who are working for this cause. It is the duty of the Colombian State to promote, protect, respect and guarantee human rights, including economic, social, cultural and environmental rights, with a differential and gender-based approach, following the principles of equality and progressivity, and to guarantee the right to peace, especially in the territories most affected by the conflict.

For its part, FARC-EP reiterates its unrestricted commitment to human rights and undertakes to ensure that both its members and the organization that emerges from its transition to legal political life will promote and respect the individual freedoms and the human rights of all, as well as peaceful coexistence across the country.

The Agreement as a whole must contribute to building a shared vision of the need for respect of all human rights. The State will work to guarantee full realisation of these in terms of their universality, comprehensiveness, indivisibility and interdependence, as a basis for justice and materialisation of the recognition of human dignity.

In the new scenario of peacebuilding and democratic opportunity, citizen participation and the exercise of rights will not just be sections on a list, but will contribute to the realisation of everybody's rights.

Another aim is to ensure that all Colombians are aware of the rights of all other Colombians, and that we are committed to respecting them and to the promotion of relations of social harmony and coexistence, on the basis of tolerance and respect for differences, especially differences in the ways we think and critical thinking, so as to lay the foundations for reconciliation, non-repetition, and peace-building.

The commitment to respect and promote human rights in the process of reconciliation pursued as part of the achievement of peace, presupposes recognition of the need to move forward with public policies for promoting a political, democratic and participatory culture of respect for human rights. Such commitment also implies respect for cultural and ethnic diversity.

The end of the conflict constitutes the best opportunity to realise the rights of the victims to truth, justice, reparation and non-repetition, and in general to ensure the full realisation of the human rights of all, including those of women, children, adolescents, youths and the elderly, persons with disabilities, indigenous peoples, rural communities, members of churches, religious denominations, faith-based organizations, and religious sector organizations, the Afro-Colombian, black, *palenquero* and *raizal* communities, the LGBTI community, human rights advocates, trade unionists, journalists, farmers, ranchers, traders and businessmen and businesswomen; which also implies the adoption of measures of affirmative action, to guarantee fully the rights of those individuals who have been hardest-hit by the conflict. Peace as a fundamental right of all citizens is a necessary condition for the exercise and enjoyment of all other rights.

The end-of-conflict scenario will make it possible to guarantee the culture of legality, free debate of ideas, the effective participation of citizens and their organizations in the taking of decisions, respect for people who think differently and for the exercise of opposition, the deepening of the culture of human rights, protection of cultural diversity and autonomy, the promotion of peaceful conflict resolution, the strengthening of access to justice in conditions of equality, social inclusion, the well-being and quality of life of the population, social justice, the overcoming of poverty, protection of the environment and a territory-based approach in the implementation of public policies.

In the context of the respect and promotion of human rights, the commitment is reiterated to realise the rights in this area contained in the Political Constitution of 1991, the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights, and the other international treaties on human rights ratified by Colombia.

In particular, the Government will set in motion the following measures:

### 5.2.1   Strengthening of the mechanisms for promotion of human rights:

- Promotion of respect for human rights and of a culture of human rights for the building of peace and reconciliation.

- Strengthening of the system of information on the human rights situation, taking into account the progress of the National System of Human Rights.

- Strengthening of the system of monitoring of the human rights situation at national and regional level, taking into account the early warning system.

- Strengthening of the process of implementation of the National Plan for Human Rights Education by means, inter alia, of:

  – The inclusion of the Final Agreement and of the Final Report of the Commission on Truth, Coexistence and Non-repetition in the National Plan for Human Rights Education.

  – Coordination with the programmes for promotion of a democratic and participatory political culture of item 2 "Political Participation: A democratic opportunity to build peace", in particular for overcoming the stigmatisation associated with the conflict.

  – The strengthening of the measures of non-formal education through the launching of public campaigns for recognition of human rights and prevention of violation of such rights.

### 5.2.2.   Strengthening of the mechanisms for protection of the work performed by human rights advocates and their organizations

Furthermore, the Government, recognising the work of human rights advocates, undertakes to contribute to the strengthening of human rights defence organizations, in particular those that work in rural contexts, in the framework of what was already agreed to in item 2 in relation to the guarantees for social organizations and movements, guarantees of security, recognition and non-stigmatisation; and to maintain with them an ongoing dialogue to respond to their reports, diagnoses and recommendations. For this, and in the framework of what was agreed to in item 2 "Political participation", a protocol for comprehensive protection will be drawn up in collaboration with human rights advocates' organizations, including those that carry out their work in rural environments.

The Government will strengthen the coordination with the Office of the Public Prosecutor, for driving forward and following up, case-by-case, accusations and investigations of violations of the rights of human rights advocates. Public progress reports will be issued every three months.

### 5.2.3.   Prevention and protection of human rights

- Design, drawing up and execution of a national plan for human rights with the effective participation of human rights advocates' organizations and social organizations and movements which, taking into account the different existing policy efforts, will make it possible to adjust them to the needs of a peace-building scenario.

- In accordance with that approved in the item on political participation, the necessary regulatory measures and adjustments will be adopted to give full guarantees for social mobilisation and protest, as part of the constitutional

right to freedom of expression, to assembly and to opposition, favouring dialogue and civility in the treatment of this type of activities.

• Creation of an advisory committee convened by the Office of the Ombudsman to advise and make recommendations to the Government, to State institutions and to human rights organizations, with regard to human rights and peace. The Office of the Ombudsman and representatives of human rights organizations will agree on its composition and modus operandi.

### 5.3. Additional agreement on the comprehensive system for truth, justice, reparation and non-repetition

In the Tribunal for Peace, justice will be administered by a minimum of 20 Colombian justices. Four foreign jurists will also be chosen to act as *amicus curiae*.

In the judicial panels of the special jurisdiction for peace, justice will be administered by 18 Colombian justices and 6 foreign jurists to act as *amicus curiae*.

The justices will not have to be career justices and no age limit will be applied.

The selection mechanism established in paragraph 68 of the Agreement establishing the special jurisdiction for peace will choose the aforementioned justices and foreign jurists — a total of 38 justices and 10 foreign jurists and up to a further one-third, i.e., 13 justices who must be available as deputy or substitute justices and four foreign jurists to be available as *amicus curiae*. The President will formalise the appointment and swear in the justices of the special jurisdiction for peace and the Director of the Investigation and Indictment Unit. If need be, the plenary of justices of the special jurisdiction for peace will make the necessary appointments from the list of deputy or substitute justices chosen by the selection mechanism.

The Investigation and Indictment Unit of the special jurisdiction for peace will comprise a minimum of sixteen (16) Colombian prosecutors.

The prosecutors will not have to be career prosecutors and no age limit will be applied.

The foregoing prosecutors — 16 in total — and up to a further one-third — 5 prosecutors to be available as deputy or substitute prosecutors, will be appointed and sworn in by the Director of the Investigation and Indictment Unit, who will have full autonomy to select and appoint any other professionals he may require to form part of the Unit.

### 6. Implementation, verification and public endorsement

The Government and FARC-EP adopt the following agreement on the creation of the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement (the "Follow-up Commission"), thereby complying with the provisions of the General Agreement of 26 August 2012.

### General principles governing implementation

Without prejudice to the specific principles established for the implementation of the various agreements, we, the Government and FARC-EP, have agreed on the following guiding principles for implementation of the Final Agreement:

• **Rights-based approach**. Implementation of all the agreements reached must contribute to protection of, and guarantees for, the effective exercise of the rights of all. Human rights are equally intrinsic to all human beings, which

means that they are entitled to them because they are human beings; consequently, the recognition of those rights is not a concession, since they are universal, imperative, indivisible and interdependent and must be considered as a whole, in a just and equitable manner. The State therefore has a duty to promote and protect all rights and fundamental freedoms, without any discrimination, observing the *pro homine* principle, and all citizens have a duty not to violate the human rights of their fellow citizens and to espouse the principles of universality, equality and progressiveness.

• **Respect for equality and non-discrimination**. In implementing this Agreement the parties will respect equality in its various dimensions as well as equal opportunity for all to access the various plans and programmes contemplated herein, without any discrimination. No content in the Final Agreement shall be understood and interpreted as the denial, restriction or impairment of the rights of persons regardless of their gender, age, religious beliefs, opinions, ethnic identity, their membership of the LGBTI community, or for any other reason; nor as curtailing the right to free development of personality or the right to freedom of conscience.

• **Gender perspective**. In the present Agreement, the gender-based approach means recognizing the equal rights of men and women and the special circumstances of each sex, especially of women regardless of their marital status, life cycle, and family and community relations, as persons with rights who merit special protection under the Constitution. It implies, in particular, the need to ensure affirmative measures to promote that equality, the active participation of women and their organizations in building peace and recognition of the victimization of women due to the conflict.

To guarantee effective equality, affirmative actions are needed to address the disproportionate adverse impact of the armed conflict on women, especially sexual violence. As regards victims' rights, protecting them includes differentiated treatment that recognizes the causes and disproportionate impacts that the armed conflict has had for women in particular. Moreover, actions tailored to their special circumstances are needed so that women can accede to the plans and programmes envisaged in this Agreement on an equal footing. Guarantees will be provided to ensure the equal participation of women and their organizations and their equitable representation in the various spheres of participation. The gender perspective needs to be understood and mainstreamed in the implementation of every aspect of this Agreement.

• **Respect for freedom of worship**. This means recognizing and respecting the practice of any form of religiosity, worship, beliefs, or denomination, without any discrimination or stigma. In implementing the Final Agreement, an effort will be made to elicit the active participation of churches, religious denominations, faith-based organizations, and religious sector organizations in forging peace. The parties will, in addition, strive to do what is needed to restore, on an equal footing, the rights of persons and groups that were victimized for their religious beliefs during and due to the armed conflict.

• **Territorial integration and social inclusion**. The measures taken during implementation must foster greater integration of territories within regions and integration of the regions with the rest of the country, as well as the inclusion of the various population groups and communities, especially those hardest hit by the conflict and those that have endured poverty and exclusion.

• **Institution-building and coordination**. To build a stable and lasting peace and, in general, to guarantee protection of the rights of all citizens in democracy, a strong institutional presence of the State is needed countrywide.

The public policies adopted need to promote institution-building and ensure that the State response to needs nationwide is ample and effective and accompanied by the active participation of regional and local authorities in decision-making and in the follow-up to implementation of the Final Agreement in their territories.

The parties reaffirm the constitutional principle that the Colombian State is administratively decentralized and its territorial entities are autonomous and guided by the principles of concurrence, coordination, and subsidiarity, so that implementation of the Agreement will be carried out in coordination with and with the help of local authorities. Implementation of the Agreement must be accomplished with full respect for the spheres of competence of local authorities, without detriment to the agreements reached.

In particular, the measures adopted need to promote the strengthening of the managerial capacity of departments, municipalities and other territorial divisions, so that they can take the lead in coordinating the plans and programmes needed for peacebuilding. Those measures also need to promote coordination among national, departmental and municipal authorities so as to ensure that their actions in all the country's territorial divisions are comprehensive, coordinated, interwoven and orderly.

- **Enhancing democracy and "building on what is already there."** Implementation of the plans and programmes agreed to must take development initiatives and processes into account and recognize the effort being made by society, in forging peace nationwide, to "build on what is already there" and enhance democracy, eradicating corruption, lack of transparency, cronyism, and all other acts that run counter to the principles espoused in the Agreement. Implementation of the Agreement will be spearheaded and executed by making the most of existing institutional structures and recognizing the spheres of competence of the different levels of government. Every effort will be made to ensure that the bodies and mechanisms established in the different sections of the Final Agreement to ensure inter-agency coordination help strengthen those institutional structures and thereby strengthen democracy.

- **Effectiveness, efficiency and suitability**. Optimal use will be made of the time and resources available for implementation through special mechanisms and efficient public management, the elimination of unnecessary red tape and the simplification of agencies, processes and instruments. The parties will make sure that the civil servants responsible for implementing the plans and programmes are well-suited to the task and have all the technical and competitive Qualifications needed.

- **Prioritization**. Implementation of the agreements is an ongoing and urgent process beginning with a determination as to the most pressing plans and programmes and the establishment of an implementation timetable that takes into account the social priorities defined in the Agreement, institutional capabilities and the resources available. The territory-based development programmes need to be prioritized in connection with the implementation of the Final Agreement as they are programmes for coordinating the implementation of the plans and programmes agreed upon.

- **Transparency, social oversight and efforts to combat corruption**. This will require clear, accessible and timely information on decisions taken from allocation of resources through to final execution of the projects they finance (traceability). Monitoring needs to be simple and accompanied by accountability mechanisms, dissemination of information, oversight by citizens and supervisory bodies, and efforts to combat corruption; the idea being to ensure that all public resources allocated to implementation are

properly executed and strictly in accordance with the terms of the Final Agreement.

- **Democratic principles**. The interpretation and implementation of this Agreement and of the provisions that incorporate it in the legal system will respect the unitary nature of the social State governed by the rule of law, political pluralism, individual liberties, the separation of powers, the separate spheres of competence of the branches of Government, territorial integrity, economic freedom, the right of all citizens to possess private property and the primacy of the inalienable rights of the person, as well as the different organizational efforts and processes in society, especially rural, indigenous, Afro-Colombian, black, *palanquera* and *raizal* communities.

## 6.1 Implementation and verification mechanisms

(a) The day after the signing of the Final Agreement, the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement will be established, comprised of three representatives of the Government and three representatives of FARC-EP or the political party that emerges from its transition to legal life. The duration of the Committee may be for up to 10 years, with an initial period of operation agreed upon up to January 2019, after which the members of the Commission will decide on its extension.

Its members will be high-level representatives of the Government designated by the President and plenipotentiaries of FARC-EP at the Negotiation Table in Havana.

(b) Objectives of the Commission. Dispute resolution; follow-up of the components of the Agreement and verifying their fulfilment; promotion and follow-up of the legislative implementation of the agreements; follow-up reports on implementation; reception of input from agencies in charge of implementation.

(c) The implementation of the agreements reached in the peace process must be effected in good faith, pursuing reciprocity in the fulfilment of the obligations accepted by the parties, promoting the integration of populations, communities, territories and regions of the country, in particular of those most affected by the conflict and those that have lived in conditions of poverty and marginalisation.

(d) With a view to contributing to monitoring of the approach and guarantees of women's rights in the implementation of the Final Agreement, a special body will be formed comprising representatives of the six national and territory-based Colombian women's organizations that will be in constant communication with the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement. Its composition and modus operandi will be defined within the framework of that Commission and in consultation with women's organizations.

Implementation will include measures and mechanisms that enable citizen participation to have an effective influence on the decisions of the corresponding public authorities and promote dialogue between the different sectors of society, the building of trust and social inclusion.

It will enjoy technical support, information and methodologies to ensure effective participation in the definition of priorities and in the formulation of projects.

It will be the result of work that involves the cooperation and commitment of everybody: the different State institutions, the territorial authorities, the social agents, organizations and movements, the communities, the political parties including the political movement that emerges from the transition of FARC-EP to

legal political activity, the ex-combatants of FARC-EP and the citizens in general. Notwithstanding the foregoing, the Government will be responsible for the correct implementation of the agreements reached in the peace talks process, to which end it undertakes to ensure the necessary financing from various sources. The implementation and realization of the agreements will abide by the rules governing budgetary matters, guaranteeing fiscal sustainability

### 6.1.1    Framework plan for implementation of the Agreements

After the signing of the Final Agreement and in order to guarantee the implementation of everything agreed upon — policies, regulations, plans, programmes — and to facilitate follow-up and verification, the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement will discuss and approve, within four (4) months of its establishment, a framework plan for the implementation of the Agreements on the basis of the draft to be submitted by the national Government.

The Framework Plan will contain the set of aims and objectives, goals and priorities and indicators, the policy recommendations and the measures needed for the implementation of all the agreements, as well as their prioritisation and sequence — timeline — and responsible institutions. The framework plan will include the various sources of funding and name the institutions responsible for implementation.

The Framework Plan will include as a priority the practical and strategic needs of women, identifying the multiple discriminations that must be addressed for the execution of the agreements. Furthermore, in respect of the implementation of the agreements, it will foster public policies, programmes and reforms that take into account the particular circumstances of women and of ethnic peoples, including impact indicators that make it possible to identify the progress of implementation in that regard.

The Framework Plan will remain in force for ten (10) years and will have a first phase of priority implementation which will run until 20 May 2019; it will be reviewed annually by the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement in order to make any adjustments needed.

As soon as possible, and in order to allow the start of the implementation, an CONPES Document on the Framework Plan for Implementation will be drawn up and approved in the National Social and Economic Policy Council (CONPES), in the terms approved by the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement, which will also contain an indication of the resources necessary for its financing, as well as the sources of such funding.

Based on the Framework Plan, from now on and for the following two presidential terms after the end of the current one, as part of the preparation of the national development plan a chapter must be included corresponding to the four-year plan for the implementation of the Agreements.

For this, through the special legislative procedure for peace provided for in Legislative Act 01 of 2016, the necessary constitutional or legal reforms will be processed for the multi-year investment plan to be incorporated in the national development plan for the respective period. In the same vein, the necessary adjustments will be made to the current National Development Plan.

In order to guarantee the implementation of the first measures as from the entry into force of the Final Agreement, the Government will draw up a list of early

implementation measures (D+1 to D+180) which it will submit to the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement, within 15 days following the signing of the Final Agreement.

**6.1.2.   Measures to incorporate implementation of the agreements with territory-based resources**

In order to contribute towards guaranteeing the implementation of the agreements and to coordinate efforts between the different levels of Government:

- The necessary reforms will be processed in order to ensure that the departmental and municipal development plans incorporate measures to guarantee the implementation of the agreements, including in the prioritised territories the action plans for the regional transformation of the territory-based development programmes.

- Mechanisms and measures will be promoted to ensure that with resources of the General Transfer System (*Sistema General de Participaciones*) and of the General Royalties System (*Sistema General de Regalías*) a contribution is made toward the funding of the implementation of the agreements, including the territories prioritized for the action plans designed to bring about regional transformation of the territory-based development programmes.

- The departmental and municipal development plans will be inputs for the formulation of the four-year plans and multi-year plans that form part of the framework plan for implementation. In the same way, measures will be adopted to encourage the incorporation in the territorial development plans of those elements that ensure consistency with the framework plan for implementation. In those cases in which the territorial-based strategies involve two or more departments, as is the case of the territory-based development programmes, the respective plans will have to be adjusted to ensure that efforts and resources come together in the prioritized zones.

**6.1.3   Other measures to contribute to guaranteeing implementation of the agreements**

- Participation of the business sector in the implementation of the agreements will be promoted, to contribute to guaranteeing productivity, access to markets and in general the sustainability of the projects contemplated, inter alia, in the comprehensive rural reform, the national comprehensive programme for the substitution of crops and in the plans for reincorporation into civilian life.

- The Government and the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement will encourage the receipt of funds from international cooperation.

- The economic resources for the implementation contributed by international cooperation, multilateral bodies and the private sector will be added to the funds provided by the Government for these purposes.

- Within the discussions on the measures for reincorporation, the measures for contribution to the material reparation of victims will be determined, including the contribution of FARC-EP.

- In the implementation of everything agreed upon, the best interests of children and adolescents will be guaranteed, as well as their rights and their precedence over the rights of everyone else.

**6.1.4.    Promotion of the participation of social and community organizations in the implementation of projects**

Recognising the very different capacities of the regions and in order to promote the participation of the communities in the execution of projects within the framework of the implementation of the Agreements, the Government will set in motion the necessary reforms in order to make possible to enter into contracts with social and community organizations, with appropriate technical support, especially in the areas that have been prioritised for launching the territory-based development programmes.

**6.1.5    Integrated information system and measures for transparency in the implementation of the Agreement**

In order to contribute to transparency, to facilitate the follow-up and verification of the framework plan for implementation and of the resources invested, in particular the follow-up on the part of the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement, as well as making the corresponding adjustments for achievement of the goals, the Government undertakes to create an integrated information system and to guarantee transparency in the implementation of the Final Agreement, preventing any form of corruption and giving guarantees to citizens on the delivery of the resources.

The Government will set in motion the following measures:

- **Interactive follow-up maps**: a web portal will be set up which contains follow-up maps with all the information on the implementation of the projects: their costs, their state of progress, their geographical location, inter alia, so that any citizen can see the use made of the resources and provide feedback to the system in the event that the information does not match the state of implementation of the projects.

- **Periodic accountability mechanisms**: different accountability mechanisms will be set in motion including public hearings, at the different levels and on the part of entities at national and territorial level. In particular, the mass communication of information will be promoted via the local media, including community radio stations, the distribution of newsletters and the display of results in public places.

- **Citizen oversight boards and public transparency observatories**. Pursuant to the provisions of item 2.2.5, a plan will be established to support the creation and promotion of oversight boards and transparency observatories, especially in the areas where the territory-based development programmes are implemented.

- **New information technology tools**. These tools, such as mobile phones, for instance, would be connected to the integrated information system, to ensure that any citizen can access public information, and to allow and promote mechanisms for collaboration and reporting.

- **Corruption risk matrices**, as well as strategies to mitigate the risk of corruption, raise awareness and prevent malpractice, cronyism and corruption.

- **Special mechanism for citizens' complaints**. Pursuant to item 2.2.5, a special mechanism will be created for receiving, processing and following up on reports and warnings made by citizens and by organizations and movements about possible acts of corruption related to the implementation of this Agreement.

- **Strengthening of internal control mechanisms**: technical assistance will be offered to the territory-based authorities to strengthen e internal control mechanisms to ensure implementation of the Agreement

- **Special support for oversight bodies**: Special support will be requested for the bodies overseeing delivery of the resources needed for country-wide implementation of the plans and projects provided for in the agreements.

### 6.1.6. Functions of the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement

The Follow-up Commission will have the following functions:

- To resolve any dispute or unforeseen situation that may arise in the interpretation of the agreements that cannot be resolved by the mechanisms agreed in the corresponding section, if any. The guarantor countries may help facilitate the solution of the disputes when so required.

- To serve as a space to handle of any situation or dispute that may arise after the signing of the Final Agreement, which does not involve the United Nations monitoring and verification mechanism.

- To follow up on all the components of the Final Agreement and verify their fulfilment, respecting what was agreed to with regard to international observation and without prejudice to the functions of the monitoring and verification mechanism. In particular, the Follow-up Commission must:

  – Follow up and verify the fulfilment of the commitments established in the timeline of the Final Agreement. That does not affect the spheres of competence of the different branches of Government or of State bodies.

  – Ensure that the content of all the draft decrees, laws or legislative acts that are necessary to implement the Final Agreement correspond to the Agreement, before they are issued by the President of the Republic or presented to Congress, as the case may be. For these purposes, account will be taken of the indicative and non-exhaustive list of projects included as an annex to this Agreement. All of the above shall be without prejudice to the powers of Congress. The Follow-up Commission will interact with donor agencies, States and organizations contributing financially to implementation of the agreements and/or participating in the international observation of that implementation. The Follow-up Commission may request monitoring and implementation reports on the various programmes and projects that they receive as a result of international cooperation in connection with implementation of the peace agreements.

  – Propose draft rules that must be agreed upon for implementation of the Final Agreement, without prejudice to the normal powers of the National Congress.

  – Organise a system of thematic and territory-based commissions in order to perform its functions that allows for citizen participation.

  – Produce periodic reports showing a breakdown of progress with implementation. Occasionally, it may generate thematic, specialized or territory-based reports related to the components of the agreements.

- The Follow-up Commission may receive input from the different agencies in charge of the implementation of the agreements as well as from organizations, universities, research centres and national and subnational monitoring bodies.

17-06469

**A-490**

• Any mandate or function which, for its ordinary or priority fulfilment, is delegated to the Follow-up Commission in the Final Agreement.

### 6.1.7   Composition

The Follow-up Commission will be made up of three delegates from the Government and three delegates from FARC-EP in the process of reincorporation into civilian life. It will be joined during the bilateral and definitive ceasefire and cessation of hostilities and the laying down of arms (D+180) by one delegate from each of the guarantor countries, Cuba and Norway, and one delegate from each of the observer countries, Chile and Venezuela.

The Follow-up Commission will have a technical secretariat, the composition of which will be determined by common agreement between the Government and FARC-EP, to produce the periodic reports and perform any other task that may be required.

The spokespersons of FARC-EP in the Congress may be invited to the meetings of the Follow-up Commission.

### 6.1.7.1.   Expanded Follow-up Commission

In order to ensure the participation of civil society in the follow-up and verification of the agreements, the Follow-up Commission will hold periodic expanded sessions to which it may invite the National Council for Reconciliation and Coexistence and any agreed representation of civil society. The Commission will notify the Council and other representatives of civil society of progress made with implementation and will receive all the information that they wish to contribute.

### 6.1.7.2.   Location and timescale

The Follow-up Commission may meet initially in Havana. It will be based in Bogotá.

The Commission will meet regularly with the present format until the end of the Bilateral and Definitive Ceasefire and Cessation of Hostilities (D+180). Afterwards, it will continue operating for the period established in this agreement.

### 6.1.8.   Start of the implementation of the Final Agreement

As established in the Agreement of 7 November 2016, the Final Agreement will be signed as a Special Agreement under Common Article 3 of the Geneva Conventions and deposited, after its signature, with the Swiss Federal Council in Berne. Then, the President of the Republic will make a unilateral declaration of the State to the United Nations announcing this Final Agreement and requesting its incorporation in a document of the United Nations Security Council in the terms established in the Agreement dated 7 November 2016.

### 6.1.9.   Priorities for regulatory implementation

Pursuant to the provisions of the Final Agreement, the Government will guarantee the following schedule for legislative implementation:

The Final Agreement will be adopted in accordance with the provisions of the Constitution.

As a priority, the following draft legislation will be processed urgently in accordance with the procedure established in Legislative Act 1 of 2016 or other Legislative Act should the former procedure no longer be in effect:

(a)   Amnesty Law and Legislative Act of incorporation of the special jurisdiction for peace in the Political Constitution, pursuant to the agreement of 7 November 2016.

(b)   Legislative Act for the incorporation of a transitional article in the Political Constitution, pursuant to the agreement of 9 November 2016.

(c)   Law or Legislative Act establishing the Unit for the investigation and dismantling of criminal organizations, including the successors of the paramilitary forces, established in paragraph 74 of the Agreement establishing the special jurisdiction for peace. Incorporation in the constitution of the prohibition to promote, organize, fund or make official and/or private use of paramilitary structures or practices.

(d)   The provisions contained in the foregoing subparagraphs will be processed simultaneously.

(e)   Laws needed to adopt the procedural provisions to govern the procedures of the special jurisdiction for peace pursuant to paragraph 46 of the Agreement establishing that jurisdiction. Those provisions must espouse at least the following principles: the system will be adversarial and will respect due process and the principle of impartiality; it will provide for appropriate openness and guarantee adversarial procedures in the evaluation of evidence and defence, together with the right of appeal, and it will abide by the principles referred to in paragraph 14.

(f)   Legislative Act and organizational rules in respect of the Unit for the Search for Persons deemed as missing in the context of and due to the armed conflict and in respect of the Commission on Truth, Coexistence and Non-Repetition

(g)   Law of differentiated treatment under criminal law for crimes related to crops used for illicit purposes, when those convicted or tried are rural persons not belonging to criminal organizations; this law will include differentiated treatment under criminal law for women in a situation of poverty, with family responsibilities, convicted of drug-related crimes unrelated to violent crimes and who do not form part of the leadership structures of criminal organizations, in accordance with the recommendations made by the Organization of American States.

(h)   Suspension of orders to capture members of FARC-EP or persons accused of being members or of collaborating with that organization and suspension of the procedures of extradition of such persons until the entry into force of the amnesty law and of the constitutional rule on the prohibition of extradition established in paragraph 72 of the special jurisdiction for peace. Adoption of measures on the civil and legal status of all the members of FARC-EP which will enable the strict application of paragraph 72 of the special jurisdiction for peace.

(i)   Constitutional and legal reform on guarantees and participation for the new political party or movement that arises from the transition of FARC-EP to legal political life, including the modification of the second sentence of transitional article 67 of the Political Constitution in order to guarantee political participation.

(j)   Rules and measures necessary for the implementation and verification of the agreements, including financing provisions.

(k)   Constitutional or legal rules or reforms needed for the four-year implementation plan, with its corresponding multi-year investment plan, to be incorporated in the National Development Plan for the respective period.

17-06469

**A-492**

**6.1.10    Regulatory implementation schedule during the first 12 months after the signing of the Final Agreement, as established in Legislative Act 1 of 2016**

(a)    Laws and/or rules for the implementation of agreements reached in the framework of the comprehensive rural reform and the substitution of crops used for illicit purposes.

(b)    Law and/or implementing rules on political participation: creation of special transitory electoral districts for peace, expansion of spaces for outreach of political parties and movements including communication and dissemination media.

(c)    Law and/or rules of the system for the financing of parties including the increase in their funding, and especially, of the political organization or movement that emerges from the peace agreements.

(d)    Law and/or implementing rules for reform of the judicial extinction of ownership (seizure of assets).

(e)    Reform of the early warning system.

(f)    Law and/or implementing rules for the reform of the early warning system.

(g)    Law and/or implementing rules on the comprehensive system of security guarantees for the political organization that emerges from the peace agreements.

(h)    Amendments to Law 1448 of 2011, on Victims and Land Restitution, on the basis of item 5.1.3.7 of the "Victims" agreement, taking into account the principle of universality and in accordance with international standards, widening the recognition of all the victims of breaches of international humanitarian law or of serious and flagrant violations of international human rights standards that occurred during the internal armed conflict.

(i)    Laws and/or implementing rules on economic and social reincorporation.

(j)    Laws and/or implementing rules on guarantees and promotion of the participation of citizens and society, especially of the communities in the special electoral districts for peace.

(k)    Law and/or rules for the adoption of measures to combat corruption.

(l)    Organization of the Commission on Truth, Coexistence and Non-repetition.

(m)    Rules for the creation, promotion and strengthening of the mechanisms of citizen control and oversight and of transparency observatories.

(n)    Constitutional and legal reforms relating to the electoral system and organization of elections, paying particular attention to recommendations made by the Electoral Mission.

**6.1.11    Priority implementation**

For implementation of the commitments entered into in the Final Agreement, priority will be given in the Commission for the Follow-up, Promotion and Verification of Implementation of the Final Agreement, to the following themes:

(a)    In respect of the areas prioritised by the territory-based development programmes and immediate action plans:

To define in accordance with the established criteria the areas in which the 16 rural development programmes with a territory-based focus will initially be implemented.

As progress is made in the implementation of the territory-based development programmes in the prioritised areas, the Government will, subject to the availability of resources, be able to launch other territory-based development programmes in areas that meet the criteria established in the Agreement. All the foregoing will be without prejudice to the commitment to implement the national plans throughout the national territory.

In those municipalities not yet prioritised for the implementation of the territory-based development programmes where transitional local zones for normalization and transitional local points for normalization are established, an immediate action plan will be implemented to coordinate and execute actions and projects to reactivate these territories socially and economically. In coordination with the local authorities, a series of measures will be adopted, including humanitarian actions and the identification and execution of projects to improve the living conditions of the rural populations in these municipalities who are deemed to be extremely vulnerable. Exceptionally, and subject to the availability of resources, in the framework of the Follow-up Commission, other municipalities or communities with a vulnerable population, which meet the criteria of the agreement for the implementation of these immediate action plans, may be proposed.

(b)   Definition of institutional structures in non-prioritised areas.

(c)   Demarcation of the special electoral districts for peace and criteria for the adoption of the special rules agreed upon.

(d)   Schedules for implementation actions for the first 12 months after the signing of the Final Agreement.

(e)   Creation of the mechanism for national or international monitoring of the sanctions imposed by the special jurisdiction for peace.

(f)   Creation of the autonomous system for free legal counselling and defence provided for in the special jurisdiction for peace agreement and in the Amnesty Law.

(g)   Convening of an international conference to reflect on the policy for the fight against drugs.

(h)   Establishment of the Technical Committee on Security and Protection and Implementation of the Security and Protection Protocol and of the rules regulating the protection of members of the new movement or political party that emerges from the transition of FARC-EP to legal political life and of their families in accordance with the level of risk. This Committee will start operating 15 days after the signing of the Final Agreement.

(i)   Drawing up of the Security Protocol for the Implementation of the Joint Effort for Voluntary Substitution of Crops used for Illicit Purposes.

### 6.2.   Ethnic perspectives

### 6.2.1   Considerations

Whereas the Government and FARC-EP recognize that ethnic peoples have contributed to the building of a sustainable and lasting peace, to progress, and to the country's economic and social development, and historically have endured conditions of injustice, resulting from colonialism, slavery, exclusion and despoilment of their lands, territories and resources; and have, in addition, been seriously affected by the internal armed conflict, so that the strongest guarantees need to be provided so that their human and collective rights can be fully exercised in accordance with their own aspirations, interests and world-views.

Whereas ethnic peoples need to have control over events that affect them and their lands, territories and resources and over maintaining their own institutions, cultures and traditions, it is essential to incorporate the ethnic and cultural perspective in interpreting and implementing the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace in Colombia.

## 6.2.2   Principles

In interpreting and implementing all components of the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace in Colombia with an ethnic-based approach, account is taken of the principles enshrined in legislation at the international and constitutional levels, case law and legal regulations, and, in particular, the principle of non-derogation recognized in the International Covenant on Economic, Social and Cultural Rights as well as the principles and rights recognized in the Convention on the Elimination of All Forms of Discrimination against Women (CEDAW, ratified by Colombia on 19 January 1982), the International Convention on the Elimination of all Forms of Racial Discrimination, the Durban Declaration and Programme of Action, the United Nations Declaration on the Rights of Indigenous Peoples, and the Indigenous and Tribal Peoples Convention, 1989 (No. 169) adopted by the International Labour Organization.

In interpreting and implementing the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace in Colombia, with an ethnic-based approach, account will be taken, inter alia, of the following principles: self-determination, autonomy and self-government, participation, consultation and free and informed prior consent; social, economic and cultural identity and integrity, rights over land, territories and resources, involving the recognition of ethnic peoples' ancestral territorial practices, the right to restitution and strengthening of territoriality, and existing mechanisms for the legal protection and security of land and territories traditionally and/or ancestrally occupied or owned.

## 6.2.3   Safeguards and guarantees

### Substantial safeguards for the interpretation and implementation of the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace in Colombia

The fundamental and non-subsidiary nature of free and informed prior consultation and the right to cultural objection as a guarantee of non-repetition will be respected, whenever appropriate. Consequently, the phase of implementation of the accords, as far as ethnic peoples are concerned, should be carried out guaranteeing the right to free and informed prior consultation respecting constitutional and international standards.

A cross-cutting approach will be taken, encompassing ethnicity, gender, women, family and generation.

In no case will implementation of the accords be detrimental to the rights of ethnic peoples.

### (a)   In relation to comprehensive rural reform

The implementation of item 1 on comprehensive rural reform will guarantee the application of an ethnic and cultural perspective, the current legal conditions of collective ownership, and the mechanisms for the legal protection and security of land and territories ancestrally and/or traditionally occupied or owned. The holistic nature of territoriality and its cultural and spiritual dimensions, and heightened

protection for peoples at risk of extinction and their safeguard plans, will also be observed.

**Access to land, including the land bank**. Ethnic peoples will be included as beneficiaries of the various measures agreed to for access to land without impairment of acquired rights. The allocation of plots of land and registration procedures will be carried out with a view to the establishment, creation, cleaning up, expansion, titling, demarcation, restitution of land use and tenure and resolution of disputes in that regard. It shall be understood, in the case of ethnic peoples, that the ecological function of ownership and their own ancestral forms of relationship with the territory take precedence over the notion of non-exploitation. The ethnic peoples and communities will participate, with their representative organizations, in creating mechanisms to resolve disputes over land use and tenure and over strengthening of food production, when such disputes compromise their rights.

- Comprehensive territory-based development programmes, which are planned for implementation in the territories of indigenous and Afro-Colombian communities, must include a special consultative mechanism for their implementation in order to incorporate the ethnic and cultural perspective in the territory-based approach, aimed at implementing ethnic peoples' life plans, ethno-development plans, environmental management and land-use plans or the equivalent.

**(b)   In relation to participation**

The full and effective participation of representatives of the ethnic authorities and their representative organizations will be guaranteed in the different forums created in the context of the implementation of the Final Agreement, in particular those enshrined in item 2 and the participatory planning forums.

Measures will be taken to guarantee the inclusion of candidates from the ethnic peoples in the lists of the special territorial electoral districts for peace, when their electoral districts coincide with their territories.

**(c)   In relation to the security guarantees of section 3.4**

The ethnic and cultural perspective will be incorporated into the design and implementation of the security and protection programme for communities and organizations throughout the country. Care will be taken to strengthen ethnic peoples' own security systems, recognized at the national and international levels, such as the Indigenous Guard (Guardia Indígena) and the Maroon Community Guard (Guardia Cimarrona).

**(d)   In relation to a solution to the illicit drugs problem**

- The effective participation and consultation of the ethnic peoples' communities and representative organizations will be guaranteed in the design of the national comprehensive programme for the substitution of crops used for illicit purposes, including plans for immediate attention to the ethnic peoples' territories. In any case, the national substitution programme will respect and protect the cultural use and consumption of traditional plants classed as used for illicit purposes. In no event will policies on the use of territory and its natural resources be imposed unilaterally.

- In the prioritization of territories, the realities of the ethnic peoples' territories will be addressed, and account will be taken of the territories of ethnic peoples at risk of physical and cultural extermination or at risk of extinction, or in a situation of confinement or displacement, that are affected by the growing of crops for illicit purposes.

- The programme for demining and clearance of parts of the national territory will be developed through dialogue with the ethnic peoples and their representative organizations. Priority will be given to the cases of the Emberá people located in the municipalities of Puerto Libertador in Córdoba and Ituango in Antioquia; the Jiw people located in the municipality of San José del Guaviare in Guaviare; the Nukak people in the department of Guaviare, in the municipalities of Mapiripán and Puerto Concordia in Meta, as well as in the municipality of Tumaco Río Chagüí; and the Awá People in the department of Nariño. To these will be added the cases of the community councils of Alto Mira y Frontera and Río Chagüí and the municipality of Buenos Aires, Vereda La Alsacia, in the department of Cauca.

- As a gesture of goodwill for peace, reparation and humanity, the Government, FARC-EP and the ethnic peoples' representative organizations undertake to develop a programme of settlement, return, restoration and restitution of the territories of the Nukak indigenous people, the Emberá Katío people of the Cañaveral Reserve in Alto San Jorge, as well as the territory of the community council of Alto Mira y Frontera and Curvaradó and Jiguamiandó.

**(e)  In relation to victims of the conflict: comprehensive system for truth, justice, reparation and non-repetition**

- The design and implementation of the comprehensive system for truth, justice, reparation and non-repetition will respect the exercise of the judicial functions of the traditional authorities within their territorial remit in accordance with the current national and international standards.

- The ethnic and cultural perspective will be incorporated into the design of the various judicial and non-judicial mechanisms agreed to in respect of the ethnic peoples. The right to participation and consultation in the definition of these mechanisms will be respected and guaranteed, when appropriate.

- In the framework of the implementation of the special jurisdiction for peace, mechanisms will be created for liaison and coordination with the special indigenous jurisdiction as mandated by article 246 of the Constitution and, when appropriate, with the Afro-Colombian ancestral authorities.

- A special harmonization programme will be drawn up in collaboration with the ethnic peoples' representative organizations for the reintegration of demobilized individuals belonging to those peoples who opt to return to their communities, to guarantee restoration of territorial harmony. An educational and communications strategy will be developed for the dissemination of the principles of no racial or ethnic discrimination against women, young people and girls demobilized from the conflict.

**(f)  In relation to implementation and verification**

- A special high-level agency will be created, by agreement between the Government and FARC-EP and the ethnic peoples' representative organizations, to monitor implementation of the accords. The agency's functions will include acting as a primary consultative, representative and liaison body of the Commission for the Follow-up, Promotion and Verification of the Implementation of the Final Agreement.

- This is without prejudice to the functions and duties of existing Government and participatory agencies.

- The sources of funding for implementation of the accords will not involve those accords on budgetary matters already reached between the Government

and the indigenous and Afro-Colombian peoples, set out in the current national development plan and other policies on which there has been consultation and agreement.

### 6.3. International verification component of the Commission for the Follow-up, Promotion and Verification of the Implementation of the Final Agreement

Item 6 of the General Agreement for the Termination of the Conflict and the Construction of a Stable and Lasting Peace, concerning implementation, verification and public endorsement, provides that, upon the signing of the Final Agreement, the implementation of all the agreed points shall commence.

On that basis, the Government and FARC-EP have agreed to establish a verification mechanism for the accords which will have an international component, which will in turn be part of the accords' implementation mechanism and shall be designed to ascertain the status and progress of their implementation, to identify delays or shortcomings, to provide opportunities for continuous improvement, and to contribute to strengthening their implementation.

Within this mechanism, verification shall consist in an analysis of the information gathered during the monitoring process, for the purpose of establishing the fulfilment or non-fulfilment of the accords. It will establish the progress made during the implementation, the subject areas that are under development and the points of discussion and controversy, so that on the basis of that characterization and the evidence, supported by findings of data and facts, it will be possible to assess the fulfilment of what has been agreed to and the measures for solution that have as their final objective the due implementation of such agreements.

### 6.3.1 Guideline criteria for the verification mechanism

The Government and FARC-EP agree to the following criteria to govern the verification procedures:

- **Verification**: Shall be rigorous in determining implementation status and the points of discussion and dispute.

- **Objectivity**: Every report or pronouncement the verification mechanism produces shall be rigorously supported by data and facts.

- **Correspondence**: The verification effort undertaken by the mechanism shall correspond precisely to the elements and contents incorporated in the Final Agreement, as agreed to during negotiations panel discussions, taking into consideration criteria of a bilateral nature.

- **Equity- and gender-based approach**: The effectiveness of the equity- and gender-based approach shall be determined in each of the accords.

- **Comprehensive and intersectoral approach**: The verification process shall be supported by information issued by the international observation component, the technical component and that provided by the Government and the FARC-EP representatives and the spokespersons for corporate organizations.

- **Access to information**: For the carrying out of the verification work, the verification mechanism shall have access to the information required in respect of the implementation of the accords that is held by agencies, State entities and technical information gathering mechanisms. Information of a confidential nature shall be handled in accordance with the regulations in force.

- **Transparency**: The international component shall, for the purposes of the verification process, ask the Government and the agencies undertaking the international observation for progress reports on the implementation of the accords having regard to the designated use and investment of public resources for such implementation. In the same way, for the purpose of fulfilling its verification tasks, the international component may also coordinate with the State's monitoring bodies.

- **Territorial aspect**: The verification and monitoring mechanisms shall have special emphasis placed on the regional, departmental and municipal application of the accords.

### 6.3.2    Composition of the verification mechanism and functions

The verification mechanism shall comprise the following bodies:

- **Notable persons**: There shall be two (2) persons with international representative powers, one selected by the Government and the other by FARC-EP, who shall lead the verification mechanism and shall have the following responsibilities:

(a)    To make pronouncements and issue public reports on the progress made in implementing all of the accords, without prejudice to those subject to verification by the United Nations Special Political Mission, and on points of discussion and dispute, all in coordination with the Commission for the Follow-up, Promotion and Verification of the Implementation of the Final Agreement.

(b)    In relation to the points of discussion and dispute that draw attention to difficulty in the implementation of the accords, the notable persons shall, in coordination with the above Follow-up Commission, submit recommendations for their solution, for which purpose they may consult with a delegated United Nations member of the verification mechanism. The guarantor countries may also work to settle disputes at the request of the above Follow-up Commission.

(c)    Their compliance observations will be submitted to the above Follow-up Commission over the first 18 months, after which they will be submitted every six months based on the reports of the Kroc Institute for International Peace Studies at the University of Notre Dame, United States of America, and such additional information as they shall receive.

- Technical secretariat: The notable persons will be supported by a technical secretariat having the following functions:

(a)    To collect, analyse and prepare the requisite information for the notable persons to make their public pronouncements, in which it will be supported by the Kroc Institute for International Peace Studies at the University of Notre Dame, United States of America, based on the function and scope criteria assigned to it by the Follow-up Commission. It may also request information on the progress of implementation from any of the organizations making up the international support component.

(b)    To coordinate its activities with the other components of the international verification process.

(c)    It may consult institutions with competence in the area or other civil society institutions and organizations that can contribute to verification of the implementation of the accords.

The technical secretariat will follow the protocols established by the Follow-up Commission for verification of the implementation of the accords. The Follow-up Commission will select a technical secretary.

The technical secretariat will coordinate all its functions with the Follow-up Commission. Any additional functions will be established by the Follow-up Commission.

The Government will ensure that international community resources are properly managed to implement the verification process.

• **Technical support**: The Kroc Institute, subject to the criteria and lines of action defined by the Follow-up Commission, shall undertake, amongst others, the following activities:

(a)  It shall design the methodology for identifying the progress of the accords.

(b)  It shall contribute best practices and experiences to effectively follow up the implementation of the accords.

(c)  It shall provide technical support for the follow-up, verification and monitoring of the implementation of the accords.

(d)  It shall draw up with methodological strictness an evaluation and follow-up model that will enable fulfilment of the accords to be measured with sufficient accuracy and will allow decisions to be taken and adjustments made, in real time, all within the framework of a logic of continuous improvement of peacebuilding performance capabilities.

(e)  Its technical work effort may be supplemented by the best practices and experiences of such other institutions and institutes as are agreed to by the international verification component and approved by the Follow-up Commission.

(f)  The reports, matrices and products generated by the Kroc Institute shall be intended for the international verification component and the Follow-up Commission, in compliance with the confidentiality criteria established there.

(g)  The international observation activities and the reports of the subject area components shall be taken into consideration as an input to ensure objective follow-up of the fulfilment of the implementation of the accords.

**6.3.3**   **United Nations political verification mission**

The Government and FARC-EP will request from the United Nations, through the General Assembly, a political mission with the mandate to verify the reintegration of FARC-EP personnel and the implementation of personal and collective security and protection measures. The mission will begin operations upon completion of the mandate of the mission for verification of the bilateral and definitive ceasefire and cessation of hostilities. Recognizing the importance of having an international verification mechanism in place to ensure implementation of what has been agreed in respect of reintegration and security guarantees, the Government and FARC-EP consider that the verification system to be implemented must remain in operation for a period of three (3) years, renewable if necessary.

The Government will send a communication to the Secretary-General of the United Nations requesting the support required for the purposes of this Agreement.

The contents of the texts of the accords to be verified are as follows:

Agreement 3.2. Reintegration of FARC-EP personnel into civilian life — economic, social and political — in accordance with their interests. The contents of the Agreement that must, in particular, be verified are as follows:

(a)   Political reintegration.

(b)   Guarantees for the new party or political movement resulting from the transition of FARC-EP into political life.

(c)   Economic and social reintegration.

Agreement 3.4. Guarantees of security and the fight against the criminal organizations and behaviours responsible for murders and massacres or which attack human rights defenders, social movements or political movements or threaten or attack those participating in implementation of the accords and peacebuilding, including the criminal organizations that have been named as the successors of paramilitarism and their support networks. The contents of the Agreement that must, in particular, be verified are as follows:

(a)   Protection measures, personal and collective security.

(b)   Comprehensive security system for the exercise of politics, especially for FARC-EP personnel and their families.

(c)   Comprehensive security and protection programmes for communities and organizations in the territories.

(d)   The Mission must be of a political nature and must be composed of unarmed personnel with experience in human rights.

### 6.3.4   Qualities of the verifier

The verifier, understood for the purposes of this Agreement to be any participant in the mechanism, must undertake to maintain the confidentiality of the entire process of implementation of the accords, must remain outside public dispute and opinion concerning the criteria and guidelines determined by the mechanism for the communication process and, in all cases, shall seek to find solutions that can contribute to continuous improvement of the implementation of the peacebuilding accords.

The Government of the Republic of Colombia shall renew the current mandate of the United Nations High Commissioner for Human Rights (OHCHR) for a period of three years, which shall be renewable. It will also request that a special chapter be included in the report that his Office annually produces on Colombia, concerning the implementation of the human rights accords.

### 6.3.5   Duration of the international verification component

Following an evaluation of the component's suitability and verification requirements, the Follow-up Commission will recommend to the President of the Republic the termination of its operation.

### 6.4   International observation component

The international observation included in item 6 of the General Agreement for the Termination of the Conflict, concerning implementation, verification and public endorsement, shall be understood to mean direct or indirect support by organizations, countries and agencies designated therefor, through material and/or human resources, for the design, implementation and monitoring of implementation of this Agreement.

International observation seeks to contribute to strengthening the guarantees for the fulfilment of the accords. It must respect the constitutional and legal order of Colombia and have respect for its internal sovereignty and the duty to guarantee citizens' human rights. Its role is to support and endorse the joint efforts toward successful implementation of the accords.

International observation, as defined in this Agreement, shall maintain a dialogue with the Commission for the Follow-up, Promotion and Verification of the Implementation of the Final Agreement, and shall support the technical secretariat of the verification mechanism by providing the information requested.

The Government and FARC-EP agree to the following criteria for implementation of international observation.

**6.4.1   General criteria**

On the basis of the international principles of sovereign equality, peaceful resolution of disputes, peacekeeping, respect for the internal jurisdiction of States and respect for international human rights law, international observation shall be conducted according to the following general criteria:

• **Sovereignty**: International observation shall be understood to constitute support for the efforts of Colombia to successfully achieve implementation of the accords and peacebuilding, in all cases respecting and taking into consideration the principle of sovereignty in relation to its decisions regarding implementation of the accords. International observation will also help ensure that the duties and responsibilities of the State, as defined in the Final Agreement, guarantee citizens' rights.

• **Impartiality**: Shall be based on respect for and confidence in the institutions, the content of the accords and democratic values, as a guarantee that the implementation of the accords will contribute to peacebuilding.

• **Provision of experience, technical capacity and resources**: Support for international observation is rooted in the readiness to share best practices and exchange knowledge, experience and resources so as to ensure success in the implementation of the accords and in peacebuilding.

**6.4.2   International support**

FARC-EP and the Government have agreed that the international support of the following countries and international organizations shall be sought for the implementation of the accords, in each of the sections of the Final Agreement for Ending the Conflict:

| Agreement | Agency providing international observation |
|---|---|
| 1.   Towards a new Colombian countryside: comprehensive rural reform | – European Union |
| | – FAO |
| | – International Peasant Movement (Via Campesina) |
| | – UNDP |
| 2.   Political participation: a democratic peacebuilding opportunity | – The Union of South American Nations (USAN) |
| | – Switzerland |

| Agreement | Agency providing international observation |
|---|---|
| | – The Netherlands Institute for Multiparty Democracy (NIMD) |
| | – The Carter Center |
| 3.2 Reintegration | – European Union |
| | – UNESCO |
| | – UNDP |
| | – Continental Organization of Latin American and Caribbean Students (OCLAE) |
| | – Organization of Ibero-American States |
| The Government shall review the situation of persons deprived of their liberty, held for trial or sentenced because of membership of or collaboration with FARC-EP. | – Office of the United Nations High Commissioner for Human Rights |
| 3.4 Combating and dismantling criminal organizations | – United Nations Office on Drugs and Crime (UNODC) |
| | – United States |
| 3.4 Special Investigation Unit | – United States |
| | – European Union |
| 3.2 Personnel and security guarantees | – United States |
| | – Office of the United Nations High Commissioner for Human Rights |
| 4. Solution to the problem of illicit drugs | – United Nations Office on Drugs and Crime (UNODC) |
| | – Global Commission on Drug Policy |
| 5. Victims  Victims' human rights | – Office of the United Nations High Commissioner for Human Rights |
| | – International Committee of the Red Cross (ICRC) |
| | – International Centre for Transitional Justice (ICTJ) |
| | – Office of the United Nations High Commissioner for Refugees (UNHCR) |
| | – Sweden |
| Missing Persons Unit | – Sweden |
| | – International Committee of the Red Cross (ICRC) |
| | – International Commission on Missing Persons (ICMP) |

| Agreement | Agency providing international observation |
|---|---|
| Gender mainstreaming | – UN-Women |
| | – Special Representative of the Secretary-General on Sexual Violence in Conflict |
| | – Women's International Democratic Federation |
| | – Sweden |

In order to guarantee the greatest possible effectiveness of the international observation component for the implementation of the accords, the following lines of action are prescribed:

- International observation activities shall meet the criteria and requirements laid down by the Follow-up Commission.

- In order to carry out the specific observational activities, thematic specialization and full cooperation of the observing countries and organizations shall be ensured through the establishment of an integration body meeting the Follow-up Commission's criteria.

- Each thematic component shall draw up periodic reports that will be shared with the Follow-up Commission, all without prejudice to the reports that the various organizations or institutions may send to their respective bodies.

The reports produced by the thematic observation components shall be systematically supplied to the Kroc Institute for International Peace Studies at the University of Notre Dame, United States of America, which the Government and FARC-EP have agreed will be one of the components providing technical support to develop the Follow-up Commission's assessment and monitoring model.

This Agreement invites the countries, institutions and organizations that are part of the international observation component to contribute to the financing of those aspects related to the implementation of the accords. As regards reintegration, the Organization of Ibero-American States for Education, Science and Culture will be asked to support the process of reintegration into civilian life. The German Government will also be asked to be among the observer countries for the subjects referred to in item 5, having regard to the subjects of victims and the special jurisdiction for peace.

**6.5    Dissemination and communications tools**

For purposes of public education on the contents of the Final Agreement, and to publicize the progress made towards its implementation, we have agreed on the following communication and dissemination tools:

- **Broadcasts for coexistence and reconciliation**: Twenty class "C" public-service FM radio stations will be established in the areas most affected by the conflict, at locations and with wattages to be determined by the Commission for the Follow-up, Promotion and Verification of the Implementation of the Final Agreement according to the optimal signal range and assigned by National Radio and Television of Colombia (RTVC), for purposes of public education on the contents of the Final Agreement, and to publicize the progress made towards its implementation. For two years, the Joint Communications Committee, made up of delegates from the Government and FARC-EP in transition to civilian life, will define, by mutual agreement, the

educational content and its production. The stations will be able to operate 24 hours a day.

No later than twelve months after the broadcast locations are set, all stations will be up and running.

After their first two years of operation, National Radio and Television of Colombia (RTVC) will take over management of the stations for another four years, during which time programming will be set according to the guiding principles of public-service radio, as follows: one third for victims' organizations in the territories concerned, one third for the joint social and economic organization ECOMÚN, and one third for community organizations in those territories, in order to promote coexistence, reconciliation and peacebuilding. The allocation of time slots to the three groups will be done in an equitable manner.

During the first two years, National Radio and Television of Colombia (RTVC) will provide a technical training pathway for up to 60 people from the three groups, in an equitable manner, with 20 persons per group, as radio operators and producers for the stations, so that they can spread knowledge.

After the end of the stations' six years of operation, the Ministry of Information Technologies and Communications may, on the recommendation of the Commission for the Follow-up, Promotion and Verification of the Implementation of the Final Agreement, extend the class "C" public-service licences for four more years on the same terms as then current.

- **Social networks**: Based on the experience of the Negotiation Table website, the Joint Communications Committee will design a strategy using new social network tools to disseminate information on the implementation of the accords.

- **Public television time slots**: To promote coexistence, reconciliation and peacebuilding, the Joint Communications Committee, made up of delegates from the Government and FARC-EP in transition to civilian life, in coordination with RTVC and the National Television Authority (ANTV), will for two years have a weekly time slot of one and a half hours, rebroadcast in full once that same week, to educate citizens on the accords and report on the progress of their implementation. The Government shall guarantee that the broadcast schedule is the one best suited to the audience and the purpose of the information to be conveyed. Pending completion of the process of laying down of arms, FARC-EP personnel in transition to civilian life will designate two representatives to sit on the editorial boards to be chaired by the Government in the framework of the Committee. The programme will be broadcast provided that ANTV guarantees to finance a percentage of its production and broadcast costs in accordance with the provisions of the regulations in force issued by ANTV for regular public-service programming on public television. The programme's two-year run will be reckoned from the date of first broadcast.

All of the foregoing notwithstanding any other activities that each party may carry out separately for that purpose. The work of the Joint Communications Committee shall be financed by the Government.

## 6.6   Accord on public endorsement

The new Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace shall be subject to public endorsement in accordance with item 6 of the Agenda of the General Agreement. That public endorsement may be given through citizen participation systems such as plebiscites, legislative initiatives,

consultation, open cabildo and other means, or through directly elected public bodies whose members have a mandate to represent the citizenry, such as the Congress, departmental assemblies and municipal councils. The Government and FARC-EP shall agree on the public endorsement mechanism, which will operate as dictated by the relevant standards or rulings.

**Protocols and annexes to the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms between the Government and FARC-EP**

**Protocol and Annex to the Chapter entitled "Introduction" of the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms**

This Protocol of the chapter entitled "Introduction" to the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement") consists of the planning and implementation phases, which covers: the deployment of the monitoring and verification mechanism at the national, regional and local levels so that it may carry out its work; adjustments to the numbers of personnel deployed in the field; the operation of the 20 transitional local zones for normalization and seven transitional local points for normalization, which have been defined by mutual consent; and the technical procedure for the laying down of arms in accordance with the above Agreement.

1. **Planning**

Planning is understood to mean all activities prior to the signing of the Final Agreement, which marks the start of the Ceasefire Agreement on day D at time T.

1.1 **Provision of information for planning purposes**

During this phase, the members appointed by the Government and FARC-EP to form the monitoring and verification mechanism must be trained and certified, and they must have time to settle into their roles before deployment. To that end, the Government and FARC-EP shall provide the mechanism's international component with the names of those of their members to be trained by day D–35.

The information needed for the movement and participation of FARC-EP members in training, adaptation and subsequent deployment of the monitoring and verification mechanism shall be provided to the mechanism's international component, which shall coordinate with the Government as required.

Day D-30 marks the start of the deployment of any regional bodies of the monitoring and verification mechanism.

Day D-25 marks the start of the training of the monitoring and verification mechanism staff.

On Day D-20, the Government and FARC-EP shall provide the international component of the monitoring and verification mechanism with details of the units and structures involved in adjusting the field deployment, the ZVTN and PTN.

On Day D-15:

(a)   The Government and FARC-EP shall provide the monitoring and verification mechanism with the information on the coordinates of the ZVTN and PTN.

(b)   The Government, FARC-EP and the mechanism's international component shall pair up the mechanism's local teams.

(c)   The Government shall pair the protection teams with the monitoring and verification mechanism.

On D-12 the Government and FARC-EP shall provide the monitoring and verification mechanism with a status report on the ZVTN and PTN.

Day D-8 marks the deployment of the mechanism's local units to set up the various local headquarters.

On day D-7, the local base of the monitoring and verification mechanism shall be set up.

On day D-6, the national monitoring and verification mechanism unit shall be deployed.

On day D-5, the deployment of the monitoring and verification mechanism shall be verified, ensuring that all administrative, technical, logistical and infrastructure conditions are optimal.

The Government guarantees that the information it gathers will be used solely for purposes related to the process of implementing the Ceasefire Agreement.

2.   **Implementation**

Implementation is understood to mean all activities to be carried out by the Government, FARC-EP and the monitoring and verification mechanism after the signing of the Final Agreement, which marks the start of the ceasefire and laying down of arms on day D at time T.

2.1   **Announcement and start**

On day D, the Government and FARC-EP, making use of all media, shall announce the start of the ceasefire laying down of arms to the country, which involves:

(a)   The definitive end of offensive actions between the Colombian armed forces and FARC-EP, hostilities and any conduct that must not be carried out, in accordance with the annex to the rules governing the ceasefire and laying down of arms under this Agreement.

(b)   The entry into force of the rules governing the ceasefire and laying down of arms.

(c)   The end of the preparatory phase, which sets in motion the tripartite monitoring and verification mechanism, which comprises the Government, FARC-EP and an international component made up of an unarmed United Nations political mission.

(d)   The beginning of the restriction on military flights at an altitude of 5,000 feet over the ZVTN, the PTN and the security zones (ZS).

(e)   The obligation for both the Colombian armed forces and FARC-EP to temporarily adjust their numbers of personnel deployed in the field to enable the start-up of 20 ZVTN and 7 PTN and the verification of the Ceasefire Agreement.

(f)   The start of the process of laying down arms as provided for in the Ceasefire Agreement, whereby the United Nations shall receive all FARC-EP weapons, which are to be used to build monuments.

2.2   **Provision of information on the implementation of the Ceasefire Agreement**

On Day D–1:

(a)   One delegate of the Government and one from FARC-EP shall provide the international component of the monitoring and verification mechanism with the coordinates of the location of the Colombian armed forces and FARC-EP units, so that the necessary steps may be taken to allow the safe movement of the FARC-EP

structures to the ZVTN and PTN, under the monitoring and verification of the monitoring and verification mechanism.

(b)   The Colombian armed forces shall reorganize their troop deployment to facilitate the movement of the FARC-EP structures to the said zones and points for the implementation of the Ceasefire Agreement.

On Day D–5:

(a)   The Government and FARC-EP shall supply such information as is required by the international component of the monitoring and verification mechanism to monitor and verify the process of movement of the various missions, committees and tactical combat units, including the militias of the FARC-EP fronts, to the previously agreed ZVTN and PTN, following the routes established by mutual agreement between the Government and FARC-EP.

(b)   The movement of the FARC-EP units to the ZVTN and PTN and the transport of personal weapons begins. This process ends no later than day D+30 and shall be monitored and verified by the monitoring and verification mechanism.

(c)   FARC-EP shall supply the international component of the monitoring and verification mechanism with such information as the component may consider necessary for the transport, registration, identification, monitoring and verification of weapons held, collected, stored, removed and finally disposed of.

(d)   FARC-EP shall provide the local unit of the monitoring and verification mechanism with a list of the specific amounts and needs required for the logistics of each ZVTN and PTN, with the aim of speeding up the purchase and supply process in a timely manner.

(e)   Once FARC-EP personnel have proceeded to the ZVTN and PTN, the international component of the monitoring and verification mechanism shall specify where the containers for protecting the weapons are to be installed.

On Day D+7, monitored and verified by the monitoring and verification mechanism, the transport of heavy weapons, militias' weapons, grenades and ammunition by members of FARC-EP to the ZVTN and PTN will begin, subject to adherence to the weapons transport security protocol. The process ends on day D+30.

All heavy weapons, grenades and ammunition entering the camps, including weapons from militias, will remain in temporary arsenals under the responsibility of FARC-EP until day D+60, at which time they will be stored in the containers provided for this purpose.

On day D+8, FARC-EP will provide the international component of the monitoring and verification mechanism with information on its strength.

On day D+10 FARC-EP will provide the international component of the monitoring and verification mechanism with the coordinates of any depots (caches) of unstable weapons, defined as weapons showing external damage: cracks, dents, indentations and rusting, weapons oozing explosive material or any other indication that their transport may prove dangerous, as well as home-made weapons and explosives and components for their manufacture, so that the process of destroying such weapons may be undertaken through the coordinated efforts of the international component of the monitoring and verification mechanism and FARC-EP, subject to adherence to the safety protocols defined for that purpose, which shall be coordinated with the Government. The international component of the monitoring and verification mechanism shall verify that this process has been carried out.

Collection and storage in containers of the personal weapons remaining in the possession of FARC-EP members at the camps in the ZVTN and PTN will be done in sequence, in three phases, as follows: phase 1: D+90, 30 per cent; phase 2: D+120, 30 per cent; phase 3: D+150, the remaining 40 per cent, in accordance with the road map (events timeline) agreed to by the Government and FARC-EP, which guides the end-of-conflict process subsequent to the signing of the Final Agreement.

Once all weapons have been received, by day D+150, the process of weapons removal by the United Nations will end not later than day D+180 in accordance with the procedures agreed to therefor and the United Nations certifies the completion of the process, informing the Government and the general public thereof.

On day D+180, the operation of these zones and the bilateral and definitive ceasefire and cessation of hostilities will come to a close.

The monitoring and verification mechanism will certify and announce each of the phases of the laying down of arms process described above.

All information referred to in this Protocol shall be provided in writing to the monitoring and verification mechanism or to its international component as applicable, and, where a response is necessary, the relevant body shall respond in writing. .

**2.3    Dissemination and communication**

With the Final Agreement reached, the Government and FARC-EP, respectively, shall ensure that all units of the Colombian armed forces involved in the ceasefire and laying down of arms, and also all FARC-EP structures, are informed that this process has begun and is continuing. To that end, all necessary means shall be used to effectively communicate the information.

The monitoring and verification mechanism shall verify that the process has been carried out.

**3.    Timeline**

In accordance with Annex F entitled "Timeline for the bilateral and definitive ceasefire and cessation of hostilities and laying down of arms".

17-06469

A-510

**Protocol for the chapter on rules governing the bilateral and definitive ceasefire and cessation of hostilities and laying down of arms**

**Rules governing the bilateral and definitive ceasefire and cessation of hostilities and laying down of arms**

- The acts described below are the main focus of the activities of the monitoring and verification mechanism.

- The rules seek to avoid situations that could jeopardize the fulfilment of the Ceasefire Agreement.

- Such acts must NOT be carried out, and the rules seek to ensure that the rights of the civilian population are not affected.

**Under this Agreement the Government and FARC-EP undertake NOT to engage in the following actions:**

1.   Enter into armed contact.

2.   Hinder or obstruct the work of the monitoring and verification mechanism.

3.   Conceal information that may be material to the operation of the monitoring and verification mechanism and the implementation of the Ceasefire Agreement.

4.   Deploy armed units or unauthorized personnel in the transitional local zones for normalization, transitional local points for normalization and security zones under the conditions set out in the Ceasefire Agreement.

5.   Take any actions to prevent humanitarian protection or assistance.

6.   Use defamatory language, by whatever medium.

7.   Carry out acts of violence or make any threats that could endanger the lives and physical integrity of the civilian population, especially acts that are gender-based.

8.   Carry out acts that undermine the physical or moral integrity of their opposite numbers.

9.   Carry out acts against the physical integrity and safety of staff of the monitoring and verification mechanism.

10.   Interfere in the work of the international component of the monitoring and verification mechanism concerning technical procedures for the registration, identification, monitoring and verification of the possession, collection, storage, removal and final disposal of FARC-EP weaponry.

11.   Use the movement routes, the adjustment of field deployments, the ZVTN, the PTN or security zones for any purpose other than those agreed to under the CFHBD and DA.

12.   Violate the accords and protocols concerning entry to and exit from the ZVTN and PTN.

13.   Remain temporarily or permanently in the security zones previously defined by mutual agreement.

14.   Violate the commitments made in the Ceasefire Agreement.

15.   Infringe the rights and freedoms of the civilian population.

16.   The Colombian armed forces will comply with the law, particularly judgment T-455 of 2014 handed down by the Constitutional Court, regarding new recruits; for

its part, FARC-EP will not recruit any more men or women into its ranks (guerrillas and militias).

**Under this Agreement the Government undertakes NOT to engage in the following actions:**

1.   Practise discrimination in its treatment of the people to whom this Agreement refers.

2.   Design, plan or carry out military flights below 5,000 feet altitude.

3.   Design, plan or carry out offensive action operations against the members of FARC-EP (guerillas — militias) who are complying with the Ceasefire Agreement.

4.   Control the supply of food and medicinal drugs destined for the areas defined in the ZVTN and PTN.

5.   Affect or damage facilities in the ZVTN and PTN.

6.   Enter the ZVTN, PTN and security zones without notifying or liaising with the monitoring and verification mechanism.

7.   Disseminate hostile propaganda against FARC-EP.

8.   Obstruct the movement of FARC-EP members into the ZVTN and PTN.

9.   Obstruct medical care for FARC-EP members.

**Under this Agreement FARC-EP undertakes NOT to engage in the following actions:**

1.   Appear armed and in uniform anywhere outside the camps.

2.   Leave the ZVTN or PTN without complying with the agreed security procedures for movements.

3.   Acquire, manufacture, carry or transport weapons, ammunition and explosives not authorized under the Ceasefire Agreement.

4.   Interfere with the normal performance of the duties of civil, military and police authorities.

5.   Commit acts of destruction of or material damage to the works and facilities, infrastructure and installations of the Government or Colombian armed forces.

6.   Engage in unlawful activities to finance the organization.

7.   Increase its fighting capability.

8.   Sell or prepare clandestine arms and supply caches.

9.   Without justification, alter the number and lists of individuals and weapons authorized to stay in the camps.

10.   Violate the agreed technical procedure for the registration and storage of the weapons of the FARC-EP members who go out on peace process tasks and the FARC-EP members assigned to the monitoring and verification mechanism.

**Protocol for the chapter on the deployment of the monitoring and verification mechanism of the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Recruitment and deployment of the monitoring and verification mechanism of the Ceasefire Agreement**

The Government and FARC-EP have agreed to this protocol, which sets out the timeline for the recruitment and deployment of the Ceasefire Agreement monitoring and verification mechanism. It covers the setting up of facilities, staff training, the pairing of teams at the three levels of authority and the deployment of the monitoring and verification mechanism.

The following timeline identifies the main activities that must be carried out in order to deploy the monitoring and verification mechanism in the relevant areas and bases, so that they carry out the functions laid down in the mandate.

**Timeline**

| Day | Sequence of activities |
|---|---|
| D–56 | Definition of regional and national bases. |
| D–35 | List supplied of national Government and FARC-EP personnel to be trained. |
| D–30 | Commence deployment of some of the mechanism's regional authorities (United Nations). |
| D–25 | Training of staff of the monitoring and verification mechanism begins. |
| D–20 | The Government and FARC-EP to provide the international component of the monitoring and verification mechanism with details of the units and structures allocated to the adjustment of field deployments, the ZVTN and PTN. |
| D–15 | Information — coordinates of the ZVTN and PTN as verified during the visits and supplied by the negotiations panel — to be supplied to the monitoring and verification mechanism. |
| D–12 | Status report on the ZVTN and PTN prepared by the Government and FARC-EP delivered to the monitoring and verification mechanism. |
| D–9 | Completion of monitoring and verification course. |
| D–8 | Deployment of local authorities of the monitoring and verification mechanism to set up their headquarters. |
| D–7 | Installation of local and regional headquarters of the monitoring and verification mechanism. |
| D–7 | Pairing of local and regional teams begins. |
| D–6 | Installation of national headquarters. |
| D | Final Agreement signed and the monitoring and verification mechanism begins operations. |
| D+3 | Community outreach for education on verification and monitoring begins. |

| Day | Sequence of activities |
|-----|------------------------|
| D+5 | Second batch of information to be supplied to the monitoring and verification mechanism. |

**Operation of field teams**

- The local body consists of 35 persons, comprising 15 from the international component, 10 from the Government and 10 from FARC-EP. These groups are located in each of the transitional local zones for normalization (ZVTN) and transitional local points for normalization (PTN).

- These 35 persons are divided into teams to perform the monitoring functions described in the various protocols of the Ceasefire Agreement. At each headquarters there is a team in charge of coordinating the local monitoring activities.

- The 20 ZVTN and the 7 PTN are located in 27 municipalities and 15 departments as follows: Fonseca (Guajira), La Paz (Cesar), Tibú (Norte Santander), Remedios (Antioquia), Ituango (Antioquia), Dabeiba (Antioquia), Vigía del Fuerte (Antioquia), Río Sucio (Chocó), Tierra Alta (Córdoba), Planadas (Tolima), Villa Rica (Tolima), Buenos Aires (Cauca), Caldono (Cauca), Corinto (Cauca), Policarpa (Nariño), Tumaco (Nariño), Puerto Asís (Putumayo), Cartagena del Chairá (Caquetá), La Montañita (Caquetá), San Vicente del Caguán (Caquetá), Arauquita (Arauca), Tame (Arauca), Mesetas (Meta), Vista Hermosa (Meta), La Macarena (Meta), Mapiripán (Meta), Cumaribo (Vichada), San José del Guaviare 1 (Guaviare), San José del Guaviare 2, Calamar and El Retorno (Guaviare).

- At the regional level there are two verification teams at each of the following bases: Valledupar, Bucaramanga, Medellín, Quibdó, Popayán, Florencia, Villavicencio and San José del Guaviare.

- At the national level there is just one team operating, the headquarters of which are in Bogotá.

The dates, timing and number of teams and people included in this protocol are for planning purposes and may undergo changes by mutual agreement between the Government, FARC-EP and the United Nations.

**Protocol for the chapter on monitoring and verification: flow of information from the monitoring and verification mechanism of the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Flow of information from the monitoring and verification mechanism**

The Government and FARC-EP have agreed on the procedures for how information flows within the mechanism, and how internal and public reports are generated and disseminated.

**Internal reports**

Internal reports are drawn up by people at the local, regional and national authority levels and are presented by the international component that is in charge of the respective authorities. These reports set out the incidents that arise in the field and are handled by the monitoring and verification mechanism. They include a description of the incident, the information gathered about it, an analysis, gender-disaggregated information, and a recommendation as to how the incident should be handled. Internal reports are issued to the authority at the next higher level.

Internal reports reflect the points of view of the different components of each authority.

**Public reports**

Public reports are issued by the national authority and are prepared by the staff of the international component in liaison with the Government and FARC-EP delegates. They give details of the progress of the monitoring and verification process. The inputs for these public reports are the monthly statements of events documented at each of the local and regional authorities, as well as the main developments observed by the monitoring and verification mechanism, and they provide an analysis of the information gathered.

**Flow of information and generation of internal reports at local-authority level**

At local-authority level internal reports are addressed to the regional verification authority. The information is gathered by the monitors, and assessed and analysed by all three components of the monitoring and verification mechanism at the local-authority level. The international component consolidates the information and generates the internal report. The local authority analyses the event and determines whether it falls within its remit, or whether it should be referred up for regional-level verification. In any case, the local monitoring and verification mechanism authority reports all information gathered to the regional authority.

**Flow of information and generation of internal reports at the level of the regional verification authority**

At regional-authority level internal reports are addressed to the national verification authority. Once a local entity's internal report reaches the regional verification authority, the latter analyses it. If the information contained in the report is insufficient, the regional verification authority asks the local authority for clarification; or, if required, sends a task force into the field to gather further elements that will provide the necessary information.

Once the members of the regional authority have completed their analysis and assessment of the information, the international component consolidates the internal report and sends it to the national authority.

**Flow of information and generation of internal and public reports at the level of the national verification authority**

The national verification authority prepares two types of documents: internal and public reports.

(a)   The internal reports are sent to the representatives of the Government and FARC-EP.

When a regional verification authority's internal report reaches the national authority, the latter analyses and assesses it. If the internal report does not contain sufficient information, the authority may request inputs from competent bodies, further details from the regional-level authority or, if required, it may send a task force into the field to obtain the relevant information. Once there is clarity about an incident and the internal report has been analysed by the members of the national authority, the international component in charge of the authority consolidates the internal report and issues the appropriate recommendations to the Government, FARC-EP, the United Nations, and the other entities engaged in the process of implementing the Ceasefire Agreement.

(b)   The public reports are published nationally and internationally through the channels established by the Government and FARC-EP. Public reports are issued every 30 days, or sooner, as considered appropriate by the national authority. Only the national authority makes public statements.

The national, regional and local authorities maintain fluid and ongoing communications and guarantee a timely flow of internal information between them, for which purpose they have sufficient technical, administrative and operational resources.

**Protocol for the chapter on monitoring and verification: strategic communications of the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Strategic communications, monitoring and verification mechanism**

This protocol sets out a standard procedure on how to optimize communication actions and products arising from the activities of the monitoring and verification mechanism. The document focuses efforts towards the main audiences of interest: the national and international civilian population and the members of the Government and FARC-EP.

## Objective

To publicize the activities of the monitoring and verification mechanism and any contingencies that may arise in implementing the Ceasefire Agreement, with the aim of keeping national and international public opinion as fully and transparently informed as possible.

**Bodies and officers in charge of strategic communications**

**National authority**: the monitoring and verification mechanism has a team for handling strategic communications and appoints a spokesperson from the international component as the person authorized to make official public statements on behalf of the mechanism. This can be a rotating appointment.

**All authorities (national, regional and local)**: All levels play a role in disseminating and raising awareness of educational resources and in engaging in dialogue with the various audiences. They are the visible face of the monitoring and verification mechanism in dealing with the communities and are in constant contact with the strategic communications and press officers of the various State entities and FARC-EP, and with the social organizations that have a connection to the monitoring and verification mechanism.

**Communications products**

- The monitoring and verification mechanism is responsible for three types of communications products: the first is the appropriate dissemination of the monthly (30-day) public reports issued by the national authority. It is up to the spokesperson to disseminate these public reports to all units of the mechanism and the general public.

- The second product is educational and its purpose is to facilitate understanding of the objectives of the monitoring and verification mechanism, its functions and work methodology. It is designed by the mechanism's national authority and disseminated at its behest by all three authorities.

- The third product is the result of handling contingencies and events or situations that warrant comment by the monitoring and verification mechanism, and it is up to the national authority spokesperson to disseminate the information to the general public.

- These products must have an appropriate gender-sensitive approach, both in the information they contain and in their dissemination.

**Dissemination, frequency and duration of the strategic communications work**

To facilitate the dissemination of messages, the monitoring and verification mechanism national authority defines the channels it deems most appropriate.

- The monthly reports (every 30 days) are disseminated at all authority levels as of their date of publication and during the following fortnight.

- The educational products will be continuously circulated for as long as the monitoring and verification mechanism remains in operation.

- Public statements resulting from contingencies concerning the operations of the monitoring and verification mechanism are made as deemed appropriate by the national authority.

Strategic communications efforts will continue for as long as the monitoring and verification mechanism remains in operation.

It is the national authority, through its spokesperson, that makes official public statements on behalf of the monitoring and verification mechanism, whose staff at local and regional authority level may make public statements only with the authorization of the national authority.

17-06469

**Protocol for the chapter on monitoring and verification: observation and recording by the monitoring and verification mechanism of the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Observation and recording by the monitoring and verification mechanism**

**Monitoring objectives**

Information plays a decisive role in the monitoring and verification mechanism: how it is obtained, gathered and processed is crucial for the mechanism to perform well. Information that is wrongly obtained, biased or unreliable does not meet the standard required for an effective validation process.

The main monitoring tasks are to observe, seek, gather and systematize information relating to events that constitute a violation of the Ceasefire Agreement or represent a threat to its proper implementation. Monitors document events on their own initiative or in response to a request or complaint of an event that is presumed to be a violation of or threat to the Ceasefire Agreement.

**Monitoring sources**

Sources can be:

• Direct or primary sources: These may be direct conversation or official reports from the armed forces, police, FARC-EP, a local authority, Government official or ombudsman, churches, social leaders, civilian population, social and women's organizations, local human rights committees, non-governmental organizations or community action groups.

• Secondary sources: Documents of public and private entities, complaints or reports published by social organizations and non-governmental organizations, media, surveys, academic analyses, press reports, documentaries or news bulletins.

The following considerations apply to information received from direct sources:

• Enquiries involving members of the public, authorities and public servants are voluntary; the interviewee's appearance before the monitors must not be considered an administrative or judicial formality. At no time may a monitor require the presence of citizens or local authorities.

• Cases in which members of the Colombian armed forces or FARC-EP do not wish to give the monitors information should be reported.

• In all cases the identity of the source is confidential and may be revealed only with the explicit consent of the person concerned, following the procedure laid down for this purpose by the national authority.

**Ongoing tasks of monitors**

Observation is an ongoing task for monitors. When faced with an action that is suspected to be a violation of the Ceasefire Agreement, the procedure for recording, analysing and preparing reports is initiated.

The monitors prepare a daily field log containing:

• A record of the dates, key details, number and status of enquiries with direct and secondary sources.

- Field observations for subsequent verification, in accordance with the various protocols on the monitoring and verification mechanism, including: the rules governing the ceasefire and laying down of arms, security measures, numbers of personnel deployed in the field and logistical issues.

- Difficulties of cultural or regional adaptation.

- The monitor's view of the day's observations.

The local authority carries out the following administrative and operational support tasks:

- It provides technical, logistical and technological resources with which to perform the monitoring tasks.

- It supervises the completion of the monitors' record slips.

- It coordinates the daily meetings for planning and assessing the monitors' work.

- It compiles and issues early warnings.

- It has specially trained monitors on its staff for receiving and analysing information concerning violence against women or LGBTI people, especially cases of sexual violence.

**Tasks of monitors when faced with actions they suspect are in violation of the Ceasefire Agreement**

When reviewing an event that suggests a violation of the Ceasefire Agreement, it is assumed that there may be different sources and versions of information, and therefore the aspects about which the details agree and differ are collated.

In response to a suspected incident or violation of the Agreement, local monitoring authorities will:

- Record the events in accordance with the procedures defined by the national monitoring and verification mechanism authority.

- Make the necessary enquiries and investigations in the field.

- Compare sources and versions.

- Analyse the information gathered about the events.

As part of their duties, the monitors complete an information record form (see record form, below).

Record form

| Form descriptive details | | | | |
|---|---|---|---|---|
| Form code | | | | |
| **Local headquarters** | | | | |
| **Monitor's name** | | | | |
| | **Source 1** | **Source 2** | **Source 3** | **Assessment of information** |
| **Source code** | | | | |
| **Type of source** | | | | |
| **Sex** | | | | |
| **Witness** | | | | |
| **Description and circumstances of events** | | | | |
| **parties allegedly involved** | | | | |
| **Approximate date of event** | | | | |
| **Approximate time of event** | | | | |
| **Preliminary characterization of events** | | | | |
| **Information handling** | | | | |
| **Monitor's view of event:** | | | | |

**Record form definitions**

**Rows**

- **Form descriptive details**: Form code (unique identifier); local headquarters (geographical location of headquarters); monitors' names.

- **Source**: unique identification number of source; type of source (direct or secondary sources); sex; witness (whether or not the source was an eyewitness).

- **Description and circumstances of events**: as faithful an account as possible of the events, exactly as described by the source, without any interpretation by the monitor, Care should be taken to include the basic information questions:

who? what did they do, or what happened? to whom? (persons allegedly affected); with what? when? and how? It is highly unlikely that the question as to why can be answered (something that has to do with the perpetrator's internal intentions and motivations). However, if it is possible to identify this aspect in the source's account, it should be noted. The following details are extracted from this information for better tabulation: parties allegedly involved, date and time of the event.

• **Preliminary characterization of events**: This is the monitor's assessment as to whether the act or action observed constitutes an alleged incident or violation of the Agreement. It is tabulated with options such as: information that predominantly suggests that there has been a violation of the rules governing the Ceasefire Agreement; information that provides evidence of a violation but does not confirm it; information that requires further review and cross-checking; basic information without any major significance; information that suggests that the act does not constitute a violation of the Ceasefire Agreement but requires a second assessment; information that clearly indicates that the act is not a violation of the Ceasefire Agreement.

• **Information handling**: the decision taken or treatment of the source: discounted; included in the internal report; to be checked against another source.

• **Monitor's view**: this is an elaboration on the information recorded about the event under analysis.

**Columns:**

• As many columns are included as are required for the number of sources consulted.

• Assessment box: This is the assessment of the quality of the information including how complete and reliable it is. It can be tabulated as: full and reliable information; incomplete but reliable information; unreliable information; information that has not been cross-checked, new source (the first time contact has been made with them); anonymous source (it is not known who supplied the information).

**Steps to be followed and instructions:**

• Enquiries should preferably be carried out in the presence of all three components of the monitoring and verification mechanism. However, people being interviewed by the mechanism can ask to speak with any one of its components separately.

• An effort should be made to have at least two sources of information. Once the information has been entered in the record form, the local monitoring and verification mechanism authority makes an initial assessment of the event.

• If this initial assessment is inconclusive, or the team members are not all in agreement, the international component of the local authority shall request a new, alternative source that can provide more tools for analysis.

• The monitors take notes while interviewing a direct source and endeavour to remain as faithful as possible to the response and interpretation given by the interviewee. No recordings of the conversation may be made. The monitors must avoid including their own views, interpretations and theories.

• In cases where there is only one source (e.g. an eyewitness), the local authority carries out a more thorough inspection in the field and looks for additional

sources of information. If no additional sources are found, the event is recorded as "information that has not been cross-checked" in the source assessment column.

• At the end of the interview the information gathered is transferred to the record form.

• The record forms must be completed in full. The information contained therein must be as precise and clear as possible, and a summary must be given of the most significant information gathered

**Information analysis**

Once the information has been gathered the key details supplied are cross-checked. It must be remembered that the information is generally incomplete and imperfect, as not all sources of information give the same account of a given event. This results in differences in how a given event is perceived and interpreted, so the analysis of the information recorded must be meticulous.

The tasks of the monitors in analysing the information are:

• To analyse the data collected through fieldwork, taking as a reference the rules governing the ceasefire and laying down of arms and the other protocols of the Ceasefire Agreement.

• To ensure that the information is as complete as possible by having appropriate communication skills and obtaining multiple sources of information.

• To ensure that the information is relevant, that the versions of the events are as close to the experience of each person as possible, and to avoid asking biased, leading or tendentious questions.

Data analysis involves: reducing raw data to key information; arranging and processing data so that they are comparable and systematizable; reaching and reviewing conclusions.

Once this process has been completed and it has been determined whether the event under analysis is an incident or a violation of the Ceasefire Agreement, the internal report is drawn up informing the regional verification authority of the events analysed and conclusions reached by the local authority (see flow of information protocol).

**Protocol for the chapter on monitoring and verification: coordination by the monitoring and verification mechanism of the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Coordination of the monitoring and verification mechanism by the international component**

Joint Communiqué No. 65 of 19 January 2016 states that the international component of the monitoring and verification mechanism "will chair and coordinate the mechanism in all its aspects, settle disputes, make recommendations and present reports". Likewise, Security Council resolution 2261 (2016) of 25 January 2016 establishes the United Nations Mission "as the international component and coordinator of the tripartite mechanism".

The international component provides this coordination through a system in which each of the three components of the monitoring and verification mechanism has its own chain of command. The governmental component reports to the Government; the FARC-EP component reports to its own secretariat; and the international component reports to the United Nations Secretary-General through the Head of the United Nations Mission in Colombia and ultimately to the Security Council.

The National steering group of the monitoring and verification mechanism comprises a Head and an Assistant Head for each component. The steering group is responsible for joint management of the mechanism, under the coordination of the international component. The functions of settling disputes, making recommendations and international verification of compliance with commitments under the Ceasefire Agreement are the responsibility of the International component.

In this context, the coordinating powers and duties of the international component at the local, regional and national levels include the following:

**Meetings and decision-making**

At the request of the national components (national Government and FARC-EP), or on its own initiative, the international component shall convene tripartite meetings.

To ensure that meetings are productive, the coordinator shall prepare the agenda in consultation with the other components and submit it to them for approval.

The coordinator shall moderate the discussions.

The international component coordinator shall draft the conclusions and decisions reached in the meeting, submit them to the (tripartite) steering group for formal approval, and subsequently communicate the approved conclusions to the parties concerned.

The international component coordinator shall be responsible for drafting the minutes of the meetings and shall submit them to the steering group for approval. Copies of the minutes shall be distributed to each component.

**Preparation of reports**

The international component coordinator shall prepare draft reports on the activities of the monitoring and verification mechanism at the local, regional and national levels; shall incorporate comments and observations from members of the

local, regional and national teams, respectively; shall submit the reports for approval by the components in the steering groups of the corresponding authority; and shall forward them to the corresponding recipients. Any unresolved discrepancies between components shall be referred to the next higher level in order to find a solution.

**Operational planning**

The international component coordinator shall draft proposals for the operational planning of the deployment of the monitoring and verification mechanism teams and submit them for the consideration of the other components of the mechanism in the steering group. He or she shall then conduct the appropriate consultations in order to make any necessary adjustments, and present the proposed plan of action to the other components of the steering group for approval; following approval he or she shall communicate the plan to all those concerned so that it may be implemented.

The international component of each authority shall coordinate and verify compliance with the security procedure established for FARC-EP members exiting the camps as part of the peace process, at both national and regional levels, in relation to the Ceasefire Agreement.

The international component shall have all the resources it requires so that it may effectively fulfil its role as coordinator of the monitoring and verification mechanism.

**Protocol for the chapter on monitoring and verification: code of conduct for members of the monitoring and verification mechanism with respect to the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Code of conduct for members of the monitoring and verification mechanism during the bilateral and definitive ceasefire and cessation of hostilities and laying down of arms**

The monitoring and verification mechanism comprises representatives of the Government, FARC-EP and the United Nations, including international observers, in particular from the Community of Latin American and Caribbean States (CELAC).

For the Government, for FARC-EP and for the people of Colombia, the monitoring and verification mechanism serves as a guarantee of compliance with the commitments made under the Ceasefire Agreement.

Its tripartite structure facilitates the resolution of disputes and incidents that may arise in the implementation of the Ceasefire Agreement; cooperation and effective communications between the members of the mechanism will strengthen trust between the United Nations, the Government and FARC-EP to consolidate the peace process.

With these responsibilities in mind, the codes of conduct to be applied to its members by each component of the monitoring and verification mechanism must meet the expectations held by the Colombian people and the international community as regards our actions and our behaviour.

The following code of conduct for members of all three components of the monitoring and verification mechanism has been established by mutual agreement:

We shall at all times:

• Behave in a professional and disciplined manner;

• Strive to understand and fulfil the mandate of the monitoring and verification mechanism and its protocols;

• Act with objectivity, integrity and tact;

• Respect other members of the monitoring and verification mechanism regardless of their status, rank, ethnicity or nationality, gender or creed;

• Support and promote relationships of trust between our colleagues;

• Take care of our personal appearance and ensure we are well turned out;

• Properly manage the property and budget assigned to us as members of the monitoring and verification mechanism;

• Respect the laws, customs and traditions, culture and religion of the people living in the areas in which we work;

• Interact with the population, and in particular with victims and persons affected by the conflict, with the utmost respect, courtesy and consideration;

• Respect gender equality, both within and outside the monitoring and verification mechanism;

• Condemn all acts or threats of sexual exploitation, violence or abuse;

• In the performance of our duties, take care to avoid harming the environment;

- Be supportive of other working task force members and sympathetic to the civilian population.

**We shall under no circumstances**:

- Harm the reputation of the monitoring and verification mechanism through unacceptable personal acts, dereliction of duty or abuse of our position as members of the tripartite mechanism;

- Consume alcoholic beverages in excess, or take drugs;

- Cause intentional damage to or misuse property or equipment provided for the performance of our work;

- Enter into communications with external organizations, including statements to the press, without prior authorization;

- Disclose or misuse information obtained in the performance of our duties;

- Behave in an arrogant or discourteous manner;

- Participate in illegal, dishonest or improper activities;

- Use our position for personal gain;

- Commit acts of gender-based violence, including sexual exploitation or abuse, or have sexual relations with persons under 18 years of age, or offer money, employment, goods or services in exchange for sexual relations.

- Intentionally damage or appropriate property belonging to the civilian population.

**We acknowledge that failure to comply with these guidelines may**:

- Jeopardize the fulfilment of our mission;

- Entail loss of status as a member of the monitoring and verification mechanism; and

- Result in administrative, disciplinary or penal measures being taken.

**Protocol for the chapter on monitoring and verification: settlement of disputes under the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Guidelines for dispute settlement under the above Agreement between the Government and FARC-EP**

**A.    Management of the ceasefire and laying down of arms**

The primary objective of the monitoring and verification mechanism is to provide a guarantee of compliance with the Ceasefire Agreement, both for the Government and FARC-EP and for the people of Colombia.

In the course of their monitoring and verification duties, the monitoring and verification mechanism's teams will encounter incidents of all kinds, which may or may not be relevant to the verification of the commitments made. As far as such incidents and the response from the mechanism's teams are concerned, it is important for all three components to follow the same criteria. The following section provides a classification of the different kinds of incidents that may be encountered in order to assist members of the mechanism in performing their monitoring and verification duties.

**Irrelevant incidents**

Within the transitional local zones for normalization and transitional local points for normalization in which the monitoring and verification mechanism operates, incidents may arise that have no bearing on the fulfilment or non-fulfilment of the agreements but may still require a response from the mechanism.

This is typically the case with any accidents or emergencies, medical or otherwise, that affect residents of the local area. These are not covered by the mandate of the monitoring and verification mechanism. However, the mechanism's members have a humanitarian duty to help resolve these situations, as far as is possible.

**Relevant incidents**

**I.    Non-compliance that does not constitute violation:**

Relevant incidents are those that constitute non-compliance with commitments made in the Agreement. However, not all cases of non-compliance necessarily represent conscious and deliberate violations of the Agreement.

In this respect, there are three kinds of situation that monitoring and verification mechanism teams may encounter:

(a)    Non-compliance caused by technical problems or other kinds of issues that are beyond the control of the Government and FARC-EP.

• For example: Failure to comply with a deadline for movement due to a logistical problem; entering a restricted area as a result of becoming lost; human error in the registration of weapons, etc.

(b)    Non-compliance caused by miscommunication between commanding officers and subordinates. In particular, despite the efforts incumbent on each party to ensure that all their forces correctly understand their obligations under the Agreement and its protocols, at the start of the ceasefire process it is possible that subordinates may unintentionally commit breaches of the Agreement.

(c)   There is also a possibility at the start of the process that non-compliance may occur as a result of the parties' differing interpretations of certain commitments, not identified and settled by the negotiations Panel, but which present themselves in practice. These cases shall likewise not be held to constitute deliberate violations of the commitments.

## II.   Non-compliance that does constitute violation

Any non-compliance that is committed consciously and deliberately constitutes a violation.

The point of reference for identifying situations that involve major consequences shall be the death of one or more persons or the use of weapons against one of the parties.

Violations themselves may be broken down into two categories:

(a)   Moderate violations, which meet the following criteria:

• Committed by single individuals;

• Committed by subordinates on their own initiative;

• Exceptional;

• Having minor consequences;

(b)   Serious violations, which have one or more of the following characteristics:

• Committed by groups;

• Committed by persons holding positions of command;

• Repeated or systematic;

• Having major consequences.

## III.   Responses from the monitoring and verification mechanism:

The monitoring and verification mechanism has a duty to respond without delay to all cases of non-compliance, whether unintentional or deliberate, moderate or serious, depending on their nature. The response must take the following two forms:

(a)   As a priority, whenever possible, implement any one-time alleviating measures that may be necessary to meet the commitment not complied with, whether this was due to technical reasons, miscommunication, or differing interpretations, and whether it was a moderate or serious violation.

(b)   Implement or promote corrective measures over a longer term in order to address the causes of the non-compliance. In particular:

• For cases of non-compliance resulting from technical or logistical problems, the monitoring and verification mechanism must itself make the necessary arrangements, or recommend these arrangements to the parties, to ensure that these technical problems do not recur.

• For cases of non-compliance resulting from miscommunication between commanding officers and subordinates, the monitoring and verification mechanism must put pressure on the commanding officers in question, or itself take action, to ensure that information and communication regarding the Agreement and its protocols reaches all members of the forces, in the areas where it is deployed.

• For cases of non-compliance resulting from differing interpretations, the monitoring and verification mechanism must, either directly or through other units and with the involvement of the parties, resolve the differences in interpretation, generally by encouraging study of the agreements and adopting new regulations. It is of particular urgency for the monitoring and verification mechanism, at the national level, to settle any differences caused by ambiguities in the text of the agreements and protocols or by other issues that may arise.

**B.   Dispute settlement**

In accordance with Joint Communiqué No. 65 of Havana, 19 January 2016, dispute settlement is among the responsibilities of the international component of the monitoring and verification mechanism. One of the key advantages of the tripartite structure of the monitoring and verification mechanism is that it is possible for both Government and FARC-EP representatives to analyse and evaluate incidents together with the international component, having all the facts and circumstances in which such incidents arise directly available to them.

Conversely, it may prove difficult for the members of the international component of the monitoring and verification mechanism, which represents both parties, to assess the facts in the same manner, regardless of who is involved and who is affected by those facts.

Therefore, right from the stage of monitoring in the field, and particularly in situations involving disagreement between observers from the parties, it is important for the international observer to look beyond the description of the incident and focus on a series of key questions concerning the circumstances and scope of the incident:

(a)   Does the incident have any bearing on the fulfilment of the Agreement and its protocols, and if so which commitments are affected?

(b)   If the incident constitutes non-compliance, do the circumstances indicate that the non-compliance was deliberate or unintentional?

(c)   If the non-compliance was unintentional, what factors caused it and what action can be taken to ensure these factors are not repeated?

(d)   If the non-compliance was deliberate, what is the nature of the violation? (Was it committed by an individual, or by a group; was it committed by subordinates not acting under orders, or by commanding officers; was it exceptional, or systematic; and was its impact major, or minor, as regards fulfilment of the Agreement?)

With these points clarified, the international observer can determine the degree of consensus between the parties regarding the incident. In most cases, there will be consensus within the local monitoring and verification mechanism team. Where differences still remain, these shall above all be considered in relation to how severe the violation is found to be. In order to settle these differences in assessment, the local teams shall refer their report to the regional unit. If the differences are still unresolved by the regional unit, said unit shall refer the report to the national unit, which shall give a final ruling on the matter.

**Protocol for the chapter on monitoring and verification: mandate of the monitoring and verification mechanism under the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Mandate of the monitoring and verification mechanism under the Ceasefire Agreement and mandate of the mechanism's international component regarding the laying down of arms between the Government and FARC-EP**

The Government and FARC-EP agree to set up the monitoring and verification mechanism for the bilateral and definitive ceasefire and cessation of hostilities, and to propose functions to the international component of the monitoring and verification mechanism as regards the verification of the laying down of arms, as enshrined in the "General Agreement to End the Armed Conflict and Build a Stable and Lasting Peace" of 26 August 2012 and in accordance with the above Ceasefire Agreement.

The mechanism will be set in motion under the conditions defined by the Government and FARC-EP. Follow-up of the monitoring and verification mechanism is agreed upon between the Government and FARC-EP.

**Purpose and scope**

To monitor compliance with the Ceasefire Agreement and resolve the various factors that may endanger that Agreement; to address recommendations to the Government and FARC-EP in the event of any violations or incidents concerning the Agreement.

The laying down of arms shall be verified by the international component of the monitoring and verification mechanism on the terms, and subject to the appropriate guarantees, laid down in the protocols of the Agreement.

The monitoring and verification mechanism shall identify and examine, impartially, any facts indicating non-compliance with or a threat to or violation of the commitments set out by the Government and FARC-EP in relation to the rules governing the ceasefire and laying down of arms, field deployments and security measures, on the basis of the Ceasefire Agreement and its annexes and protocols; and inform the Government and FARC-EP of the outcome of its work.

Monitoring and verification functions shall be performed across all units of the monitoring and verification mechanism. The regional and national units shall focus on verification and the local unit shall be concerned with monitoring.

The monitoring and verification mechanism shall commence its activities once the Final Agreement has been signed and shall operate for a period of 12 months, which may be extended at the request of the Government and FARC-EP.

The monitoring and verification mechanism shall be unarmed and shall enjoy full security guarantees in accordance with the provisions of the respective protocols.

**General guidelines and principles**

The monitoring and verification mechanism shall act in keeping with the principles of respect and impartiality in its procedures and recommendations; and with the principles of transparency in the performance of its duties and of no discrimination of any kind.

The Government and FARC-EP shall commit to cooperating with the monitoring and verification mechanism in order to ensure freedom of movement for

the mechanism's members and to provide and facilitate site access as set out in the Ceasefire Agreement, so that they may carry out their duties safely and effectively.

**Composition of the monitoring and verification mechanism**

The mechanism is made up of men and women from the Government, FARC-EP and the mechanism's international component.

The international component is a United Nations political mission made up of unarmed observers, predominantly from member CELAC countries. It shall preside over all mechanism units and is tasked with settling disputes, making recommendations and generating reports, under its current mandate, which it has been granted for the purpose of guaranteeing and bringing impartiality and transparency to the Ceasefire Agreement.

The monitoring and verification mechanism consists of a national unit; eight regional units; and local monitoring units deployed in each of the transitional local zones for normalization (ZVTN) and transitional local points for normalization (ZVTN) established by the Government and FARC-EP.

The national unit includes a steering group made up of two international delegates, two delegates from the Government and two delegates from FARC-EP. The Government delegates shall consist of one civilian representative and one representative of the Colombian armed forces. The international delegates shall be made known to the parties by the Special Representative of the Secretary-General for Colombia. The number of members of the national unit shall be determined in line with administrative, logistical and operational needs. Its headquarters are in the city of Bogotá, although sessions may be held in other cities.

Regional units of the monitoring and verification mechanism include a steering group made up of two international delegates, two delegates from the Government and two delegates from FARC-EP. The number of members of the regional unit shall be determined in line with administrative, logistical and operational needs. The regional units shall be based in the following eight cities: Valledupar, Bucaramanga, Medellín, Quibdó, Florencia, Villavicencio, Popayán and San José del Guaviare.

Local units of the monitoring and verification mechanism include a steering group made up of two international delegates, two delegates from the Government and two delegates from FARC-EP. The number of members of the local unit shall be determined in line with administrative, logistical and operational needs, and with the characteristics of the area, the number of people to be monitored, the topography and the risk factors in each of the ZVTN and PTN.

The local units shall be based near the transitional local zones for normalization (ZVTN) and transitional local points for normalization (PTN).

The internal regulations of the monitoring and verification mechanism shall be established by the national unit once its activities commence. Each component of the mechanism may make personnel changes when circumstances so require.

The monitoring and verification mechanism shall interact with communities, social and political organizations and State institutions at the local, regional and national levels, as they may contribute to its work by providing information, by assisting in raising public awareness of its reports, and by making proposals and suggestions.

**Functions of the national unit**

(a)   To ensure that the monitors and verifiers are deployed at the times and in the areas set out in the Ceasefire Agreement.

(b)   To coordinate the mechanism at the national level and to oversee the activities of the regional and local units to ensure correct internal operation of the mechanism across all units.

(c)   To examine and verify events presumed to constitute non-compliance with the Ceasefire Agreement and its corresponding protocols and annexes. The international component of the monitoring and verification mechanism at the national unit shall verify the process of laying down arms.

(d)   To settle cases in which components of the monitoring and verification mechanism disagree, in order to make appropriate recommendations, which function remains the responsibility of the international component.

(e)   To verify the accuracy of reports received from the regional units, and from communities, civilian authorities and other sources of information at the national and regional levels, concerning presumed violations of or threats against the Ceasefire Agreement.

(f)   To guide the regional unit in its verification of events presumed to constitute violations of or threats against the Ceasefire Agreement, and the recommendations from the national unit.

(g)   To keep the Government and FARC-EP informed and to receive recommendations issued by the former in relation to its monitoring and verification mission.

(h)   To support the activities, functions and design of any new protocols and annexes that the Government and FARC-EP may create as part of its monitoring and verification tasks, and to produce such new protocols and annexes as it deems necessary for the fulfilment of its functions.

(i)   To undertake tasks of strategic communication to the public at the national level and to guide the regional and local units in such matters as may be necessary, maintaining the stance of the mechanism and its transparency.

(j)   To receive all information relevant to the Ceasefire Agreement supplied to it by the Government, FARC-EP and other sources, ensuring that such information is adequately protected and archived.

(k)   To fulfil such other duties as may be assigned to it in the Final Agreement by the Government and FARC-EP, taking account of the mandate of the international component of the monitoring and verification mechanism.

(l)   To present a consolidated report on its activities to the Government, FARC-EP and the public every 30 days.

**Functions of the regional unit**

(a)   Its function is to analyse, evaluate and verify the accuracy of the events recorded in the reports received from the local units, in which the circumstances, causes and context of the events under examination are described; to resolve differences and issue such recommendations as it may deem necessary for the local units to implement.

(b)   In the event that an incident goes beyond the remit of the regional unit, the latter shall send the report to the national verification unit.

(c)    The regional verification unit shall produce internal reports at the request of the national unit, which reports shall include the events subject to examination it has received, as well as the outcomes and suggestions it considers appropriate.

(d)    The regional unit may carry out or supervise occasional field work when, owing to the complexity of the matter in question, the local unit requires support from regional verifiers.

(e)    To perform dissemination and communications tasks as set out in the strategic communications protocol, maintaining the stance of the mechanism as well as its legitimacy and transparency.

(f)    To guide local units in their verification of events presumed to constitute violations of or threats against the Ceasefire Agreement, and the recommendations from the national unit.

**Functions of the local monitoring unit**

(a)    To observe, gather, record and analyse information on the ground in relation to the fulfilment of the Ceasefire Agreement by the Government and FARC-EP, within its remit.

(b)    To observe and confirm movements on the ground by the Colombian armed forces and FARC-EP, in line with adjustments to the numbers of personnel deployed in the field, as well as movements of FARC-EP units to the ZVTN and PTN as stipulated in the Ceasefire Agreement.

(c)    To coordinate with those responsible for the operation of the ZVTN and PTN, to ensure that the mechanism's functions are correctly implemented.

(d)    To draw the attention of the regional unit to matters that may jeopardize the Ceasefire Agreement in the ZVTN and PTN concerned.

(e)    The international component of the monitoring and verification mechanism shall monitor and carry out checks on the possession of weapons by FARC-EP members.

(f)    To perform tasks of strategic communication with the local people regarding such matters as may be necessary, in accordance with the strategic communications protocol.

(g)    To ensure that anyone wishing to make a complaint not within the remit of the monitoring and verification mechanism is referred to the relevant units.

(h)    To comply with all instructions and recommendations received from the regional and national units.

All the monitoring and verification mechanism units are under a duty to coordinate logistically with the Government, to ensure that supplies and maintenance are received by the monitoring and verification mechanism.

**Protocol and annexes to the chapter on deployments in the field and zones in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Operation of the transitional local zones for normalization (ZVTN) and the transitional local points for normalization (PTN) and adjustments to the deployment in the field of the Colombian armed forces**

This protocol lays down the criteria for ensuring the proper deployment in the field of the Colombian armed forces and for the operation of the 20 transitional local zones for normalization (ZVTN) and the 7 transitional local points for normalization (PTN) established for FARC-EP during the process of implementing the bilateral and definitive ceasefire and laying down of arms under the Ceasefire Agreement.

Each PTN will have a camp, a security zone of 500 m to 1 km, a reception area and a local monitoring and verification mechanism base outside the security zone. The size of the PTN will reflect the nature of the terrain, the amount of water and the number of FARC-EP members to be located there.

For the purposes of this protocol, the term PTN will be used to refer to the eight Camps established under the Ceasefire Agreement, in order to differentiate them from the type of camp to be found within the ZVTN.

The ZVTN are territory-based areas that are temporary, transitional, defined, demarcated and agreed in advance. Their boundaries coincide with the boundaries of the rural settlements where they are located. They may be extended or reduced in size by mutual agreement, depending on the settlement where they are located. They are of a reasonable size that allows for monitoring and verification by the monitoring and verification mechanism, and they are surrounded by a 1 km security zone. The criteria governing the ZVTN are defined as follows:

- **Temporary**: the zones and the bilateral and definitive ceasefire and cessation of hostilities will cease operation on day D+180.

- **Transitional**: the purpose of the ZVTN and PTN is to ensure compliance with the Ceasefire Agreement, to enable compliance to be verified, to begin preparations for the reintegration of FARC-EP structures into economic and political life and into society in a way that meets their needs, to enable them to make the transition to legality, and to enable the agreements to begin to be implemented.

- **Defined**: in accordance with agreed criteria and specific objectives, which include facilitation of logistics and enabling monitoring and verification by the monitoring and verification mechanism.

- **Agreed in advance**: they are selected by mutual agreement between the Government and FARC-EP, the aim being to ensure that they satisfy the conditions required in order to achieve their intended objectives.

The criteria and objectives used to establish the PTN are the same as those for the ZVTN. The PTN differ from the ZVTN in that they are smaller — they contain only one camp — and are located in areas where they can help to house the more dispersed FARC-EP structures.

The number of camps in each ZVTN will reflect the number of members to be located there and the conditions on the ground. Each ZVTN will have a single site for storing weapons in containers, a reception area, a local monitoring and verification mechanism base — to be located, where possible, in a neighbouring

village — and the logistics needed to implement the Ceasefire Agreement, as set out in the logistics protocol.

**Operation of the ZVTN and PTN**

In the ZVTN and PTN the full rule of law is guaranteed, and to this end civilian authorities will operate normally, with no restrictions. The ZVTN and the PTN are not to be used for political demonstrations. Meetings may be held to teach people about the process.

Likewise, the normal operation of regional economic, political and social activities is also guaranteed in the life of the communities as they exercise their rights. There is also a guarantee that the community, social and political organisations present in the territories will be able to operate normally in the exercise of their rights, especially in the ZVTN and PTN.

To that end, the residents of these zones will be entitled to unrestricted freedom of movement, except for the FARC-EP camps, and they will be subject only to the rights and duties enshrined in Colombian law.

Each ZVTN and PTN has a reception area for visitors.

Within the ZVTN and the PTN, FARC-EP is responsible for its personnel, including militiamen and women, and for ensuring that they comply with the rules governing the ceasefire and laying down of arms and with the provisions in the chapters, protocols and annexes that comprise the Ceasefire Agreement.

For its part, the Government is responsible for ensuring compliance with the rules governing the ceasefire and laying down of arms and with the provisions in the chapters, protocols and annexes that comprise the Ceasefire Agreement, on the part of the Colombian armed forces and public officials assigned to tasks relating to the Ceasefire Agreement.

In order to begin preparation for the reintegration of FARC-EP into economic, social and political aspects of civilian life in a way that meets their needs, and for their transition to legality, the institutions of the State will carry out the relevant procedures in the ZVTN and PTN as agreed between the Government and FARC-EP.

The field deployment of the Colombian armed forces where the ZVTN and PTN are located will vary by area depending on conditions on the ground and the operational environment. Specific adaptations to local conditions are set out in Annex Y to this Agreement. Any changes to Annex Y must be duly justified and must be notified in advance to the monitoring and verification mechanism.

Regarding the ZVTN and PTN, the field deployment of the Colombian armed forces (as set out in Annex Y) will be monitored and verified by the monitoring and verification mechanism. Armed forces personnel will maintain the necessary coordination with the monitoring and verification mechanism through the local mechanism base.

On day D+180 these zones and the bilateral and definitive ceasefire and cessation of hostilities will cease operation in accordance with the road map (timeline) which has been agreed by the Government and FARC-EP and which is to guide the process for ending the conflict following the signing of the Final Agreement.

**Protocol and annexes to the chapter on deployments in the field and zones — transit routes and coordination of movements in the field in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Transit routes and coordination of movements in the field**

Transit routes are temporary, geographically defined movement corridors created to ensure the safe, rapid and verifiable movement of FARC-EP structures — missions, commissions, tactical combat units and militias — to the ZVTN and PTN.

The transit routes will be available from day D+5. The process of moving all FARC-EP structures to the ZVTN and PTN will take place between day D+5 and day D+30. During this period each FARC-EP structure will move to these zones. Appropriate time will be allowed for transit, which will depend on the distance, terrain and method of transport used. Once a structure is housed in the ZVTN or PTN, the monitoring and verification mechanism will be notified so that the deployment of the Colombian armed forces can be readjusted and the transit routes can be decommissioned.

Under the Ceasefire Agreement between the Government and FARC-EP, for each ZVTN and PTN, on day D+1 a delegate from the Government and a delegate from FARC-EP will supply the international component of the monitoring and verification mechanism with the coordinates for the locations of the units belonging to the Colombian armed forces and FARC-EP so that the necessary steps can be taken to ensure that changes in the deployment of the Colombian armed forces and the movement of FARC-EP structures to the ZVTN and PTN can take place securely under monitoring and verification by the monitoring and verification mechanism. See the annex entitled "Geographical demarcation of the transit routes", which, among other things, sets out the distinctive characteristics of each transit route, thus: 1. Starting point with coordinates; 2. Route description (characteristics); 3. Means of transport; 4. Approximate movement times; 5. Reference points for the monitoring and verification mechanism; and 6. End point (ZVTN or PTN).

The aforementioned structures will be moved in one of three ways, depending on the capabilities and resources available: 1. Cross country (trails or paths); 2. By road or land-based transport networks (using vehicles); 3. Along waterways (by boat). The methods of transport will be defined by mutual agreement between the Government and FARC-EP.

There will be permanent coordination with the monitoring and verification mechanism throughout FARC-EP movements and the preparation of the routes by the Colombian armed forces. The monitoring and verification mechanism will monitor and verify that the procedures are carried out safely, rapidly and in accordance with the rules governing the ceasefire and laying down of arms. The mechanism will carry out its work on a permanent basis and will have reference points on the transit routes from the point where FARC-EP structures begin transit until they reach the ZVTN and PTN.

The Colombian armed forces, in cooperation with the monitoring and verification mechanism, will deploy their personnel so as to guarantee security and prevent incidents during the movement of FARC-EP to the ZVTN and PTN.

**General points regarding transit route design**

(a)   Reference points (latitude and longitude) are to be established for movement over the terrain, to assist the monitoring and verification mechanism in its work.

(b)    The route description must follow the format set out in Annex XX, "transit routes".

(c)    The transit routes are to be kept secret. Their position in the field will be defined using maps and coordinates. Their position will be known to the monitoring and verification mechanism and may NOT may be made public. A duty of confidentiality is mandatory among those involved in the process.

(d)    The Government will provide a proper communication system to allow for coordination between the Colombian armed forces and the monitoring and verification mechanism and between FARC-EP and the monitoring and verification mechanism. It will ensure that separate channels and levels of communication are available for each institution, with joint channels and levels for coordination purposes. Coordination will be managed by the local mechanism base.

(e)    By day D+30, at the latest, all FARC-EP structures must have arrived at their respective ZVTN and PTN, provided transit routes have been made available in time.

(f)    The time taken for this process will depend on the means of transport used to move FARC-EP.

(g)    Transit routes, methods and timings will be defined by mutual agreement between the Government and FARC-EP.

(h)    Movements will be at front level. In all cases there will be a starting point for the movement and an end point in the relevant zones or points. See Annex XX.

(i)    The departure point and the transit routes for FARC-EP will be determined by the location of each unit in relation to the ZVTN or PTN to which it is to move, once the Ceasefire Agreement comes into force.

FARC-EP, in cooperation with the monitoring and verification mechanism, will be responsible for the transport required to move the structures to their respective ZVTN and PTN.

### Annex "Y"

This annex will contain information on the presence in the field of the Colombian armed forces. It will be drawn up once these zones have been fully demarcated.

S/2017/272

**Annex "XX"**

"Geographical demarcation of the transit routes"

| Start | Dept. | Municipality | District | Settlement | Coord. | Departure points | Means of Transport | Route Description | Landmarks |
|---|---|---|---|---|---|---|---|---|---|
| Day D | Cesar | La Paz | San José de Oriente | Xxxxxx | | Caño Frío | 1. Overland 2. Vehicular Transport | **1. Overland** From xxx within the jurisdiction of the municipality of La Paz to the district of Los Laureles within the jurisdiction of the municipality of La Paz<br><br>**2. Vehicular Transport** from Y in the district of Laureles in the municipality of La Paz to the Caño Frio settlement. | |

17-06469

**A-540**

**Protocol for the chapter on security for members of the monitoring and verification mechanism under the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying down of Arms ("the Ceasefire Agreement")**

**Security for members of the monitoring and verification mechanism during implementation of the Ceasefire Agreement**

The protocol contains the measures established jointly by the Government and FARC-EP to ensure the safety of members of the monitoring and verification mechanism teams during the process of implementing the ceasefire and laying down of arms.

1.    Security for members of the monitoring and verification mechanism is provided by the designated State institutions, which will coordinate as appropriate with FARC-EP and the Head of Security for the international component of the monitoring and verification mechanism.

2.    Security measures for members of the monitoring and verification mechanism will take account of logistical and administrative demands and resources and will be implemented in coordination with the mechanism's international component and FARC-EP representatives designated for that purpose.

3.    Protection arrangements for the monitoring and verification mechanism will take account of the characteristics of the terrain, socioeconomic conditions and possible threats identified in each specific area, in accordance with the assessment that is drawn up for each case and the relevant information provided by the Government, FARC-EP and the international component of the monitoring and verification mechanism.

4.    The State security agencies will appraise the situation in context in each of the zones designated for the ceasefire and laying down of arms and will put in place appropriate protection and self-protection measures for members of the monitoring and verification mechanism teams, depending on the nature of their functions.

In particular, they must ensure that travel by members of the monitoring and verification mechanism takes place along safe routes that are free of anti-personnel mines (APMs), improvised explosive devices (IEDs) and unexploded ordnance (UXO) or explosive remnants of war (ERW).

To achieve this, they will take account of comments by FARC-EP and will coordinate as required.

5.    When carrying out their functions, members of the monitoring and verification mechanism must wear the appropriate badges, ID and insignia, as defined with the mechanism's international component. The State will implement the comprehensive measures required in order to safeguard and facilitate their movements and activities countrywide.

6.    Appropriate security and protection for the mechanism's operations bases will be provided by the relevant State agencies, which will take account of comments on security issues by FARC-EP.

7.    Where the monitoring and verification mechanism needs to travel in order to perform its functions it must notify the fact via the designated procedures, and travel arrangements will be coordinated with members of the Colombian armed forces and FARC-EP at the national, regional and local levels. The appropriate means and channels of communication will be in place to enable this to happen.

8.    The Government will put in place all measures required in order to deal with any contingencies and medical evacuations for mechanism members countrywide.

9.    The Government (the Colombian armed forces) and FARC-EP will provide the monitoring and verification mechanism with information on any threats to their security. An early warning monitoring and verification procedure has been implemented to enable threats to the physical safety of everyone involved in the ceasefire and laying down of arms to be neutralised.

10.    Members of the monitoring and verification mechanism will be kept informed, and they undertake to follow security and protection advice given to them by the State security agencies assigned to this task and by FARC-EP.

11.    Inside the ZVTN and PTN, security and protection arrangements for members of the monitoring and verification mechanism will be the subject of coordination between the Government and FARC-EP.

12.    Within the Security zones surrounding the ZVTN and PTN, the monitoring and verification mechanism will be accompanied by police security where circumstances dictate, by mutual agreement between the Government and FARC-EP.

13.    The specific needs of women who require medical attention or evacuation will be addressed, as will the particular risks they face because of their gender.

**Protocol for the chapter on security for delegates and public officials in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying down of Arms ("the Ceasefire Agreement")**

**Security for delegates and public officials during the ceasefire and laying down of arms**

This protocol contains the measures established jointly by the Government and FARC-EP to ensure the safety of delegates of the Government and public officials during the process of implementing the ceasefire and laying down of arms.

1.     Security for Government delegates and public officials is the responsibility of the State security agencies in accordance with the relevant legislation.

2.     Security for Government delegates and public officials covers travel, entry into the transitional local zones for normalization (ZVTN), transitional local points for normalization (PTN) and the surrounding security zones and stays in these areas undertaken in the course of their work on the process of implementing the ceasefire and laying down of arms.

3.     The Government and FARC-EP will notify the monitoring and verification mechanism of any information that indicates a threat to the Government delegates and public officials involved in the process of implementing the ceasefire and laying down of arms.

4.     Government delegates and public officials involved in the process of implementing the ceasefire and laying down of arms will comply with the security and protective measures put in place by the State security agencies responsible for this issue and with recommendations made by FARC-EP.

5.     Where unarmed civilian authorities and public officials enter the ZVTN, PTN and surrounding security zones under agreements between the Government and FARC-EP, they will comply with the security measures laid down in the Ceasefire Agreement.

6.     The specific needs of women who require medical attention or evacuation will be addressed, as will the particular risks they face because of their gender.

**Protocol for the chapter on security for FARC-EP members in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms ("the Ceasefire Agreement")**

**Security for FARC-EP members during the process of implementing the ceasefire and laying down of arms**

The protocol contains the measures established jointly by the Government and FARC-EP to ensure the safety of FARC-EP members during the process of implementing the ceasefire and laying down of arms.

1.    Inside the transitional local zones for normalization (ZVTN) and the transitional local points for normalization (PTN), the security and safety of FARC-EP personnel is the responsibility of FARC-EP commanders.

2.    Outside the camps FARC-EP members will wear civilian clothing and will be unarmed.

3.    FARC-EP will appoint a group of 60 FARC-EP members who can be deployed nationally to carry out tasks related to the Peace Agreement. Travel by FARC-EP members in the course of these tasks will be subject to the security measures agreed between the Government and FARC-EP in subsections 4 and 6 of section 3 ("End of the Conflict") of the Security Guarantees Agreement. FARC-EP members may form part of the security corps entrusted with this task provided they are qualified and authorized to do so.

In addition, for each ZVTN, FARC-EP will appoint a group of 10 FARC-EP members who can be deployed at municipal and departmental level to carry out tasks related to the Peace Agreement. Two protection teams are available per zone to provide protection during travel. Where FARC-EP members leave the ZVTN and PTN, FARC-EP commanders assume joint responsibility.

4.    FARC-EP members who leave a ZVTN or PTN in order to obtain urgent medical attention or specialized medical care that cannot be provided inside these areas will have the necessary means and measures of protection.

5.    The specific needs of women who require medical attention or evacuation will be addressed, as will the particular risks they face because of their gender.

6.    The measures required in order to provide protection during travel will be coordinated with the State security agencies as necessary. Detailed information must be provided in advance on the number of people, departure and return dates, travel routes and specific places to be visited, to enable the necessary coordination to take place.

7.    When travelling, FARC-EP members will have the accreditation needed in order to guarantee them free movement.

8.    The Government will provide the human, logistical, technical, communications and transport resources needed for travel as required under the security and protection arrangements.

9.    The measures put in place to protect FARC-EP members during travel will reflect the level of risk identified by the security and protection teams for each ZVTN or PTN in coordination with FARC-EP and the monitoring and verification mechanism.

10.    There are two protection teams available per ZVTN or PTN to cover the special journeys outside the ZVTN or PTN provided for in the Ceasefire Agreement. In order to guarantee the security measures referred to in that Agreement a

procedure will be established, to be coordinated by the monitoring and verification mechanism, which will include coverage of the following issues:

- Designation for each ZVTN and the PTN of the person responsible on behalf of FARC-EP for authorizing FARC-EP members who are to make the journeys in question and for giving them the appropriate security instructions as provided for in the Ceasefire Agreement.

- Coordination of travel timetables.

- Journey start date and time.

- Risk assessment for the person making the journey.

- Places, routes and timetable for the journey.

- Coordination and provision of transport, logistical and human resources available for the journeys.

- Interagency coordination between the body responsible for providing security and protection for FARC-EP members and other relevant State bodies.

- During these journeys there will be constant communication with the different units of the monitoring and verification mechanism, depending on where those making the journey are staying and the routes used.

**Protocol for the chapter on security for the civilian population in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying down of Arms ("the Ceasefire Agreement")**

**Security for the civilian population during the process of implementing the ceasefire and laying down of arms**

The protocol contains the measures established jointly by the Government and FARC-EP to guarantee the safety of the civilian population and to ensure peaceful coexistence in the transitional local zones for normalization (ZVTN), transitional local points for normalization (PTN) and surrounding security zones during the process of implementing the ceasefire and laying down of arms.

1.    The Government continues to guarantee conditions for peaceful coexistence and security for the civilian population during the process of implementing the ceasefire and laying down of arms and to encourage and support citizen and community engagement mechanisms.

2.    The safety of the civilian population in the ZVTN, PTN and the surrounding security zones during the process of implementing the ceasefire and laying down of arms is founded on human rights measures that will protect the population against potential threats to their lives, personal safety, civil liberties and property.

3.    The Government and FARC-EP will notify the monitoring and verification mechanism of any information regarding threats to the safety of the civilian population, so that the appropriate measures can be taken.

4.    The Government will disclose all confirmation and neutralization activities prompted by early warnings concerning threats to the civilian population, and will coordinate as appropriate with FARC-EP and the monitoring and verification mechanism in order to guarantee the ceasefire and laying down of arms.

5.    While the ZVTN and PTN are in operation the civilian population will not be allowed to carry or possess weapons in those areas or in the security zones.

6.    Security for people entering the ZVTN and PTN is based on the following criteria:

- Each ZVTN and PTN has a reception area to attend to arrivals.

- There are no civilians in the camps, and civilians may not enter the camps at any time.

- With regard to the security of the civilian population, the rules governing the ceasefire and laying down of arms apply.

**Protocol for the chapter on security for movements undertaken by FARC-EP in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying down of Arms ("the Ceasefire Agreement")**

**Security for movements by FARC-EP to the transitional local zones for normalization (ZVTN), and transitional local points for normalization (PTN) during the process of implementing the ceasefire and laying down of arms**

The protocol contains the measures established jointly by the Government and FARC-EP to ensure the safety of the various missions, commissions and tactical combat units of FARC-EP fronts during movements to the ZVTN and PTN.

1.   Security for the movements of FARC-EP structures to the ZVTN and PTN will be based on the following elements: compliance with the rules governing the ceasefire; awareness of the movement plans; effective coordination and secure channels of communication; security measures for the handling and transport of weapons.

2.   On day D+1 a delegate from the Government and a delegate from FARC-EP will supply the international component of the monitoring and verification mechanism with the coordinates for the locations of the units belonging to the Colombian armed forces and FARC-EP so that the necessary steps can be taken to ensure that changes in the deployment of the Colombian armed forces and the movement of FARC-EP structures to the ZVTN and PTN can take place securely under monitoring and verification by the monitoring and verification mechanism.

The monitoring and verification mechanism may accompany these movements if required by the Government and FARC-EP. In that case, for their safety, members of the international component of the monitoring and verification mechanism must comply with the minimum security standards of the United Nations system.

3.   The monitoring and verification mechanism will coordinate as necessary with the Government to ensure that the necessary security measures are in place on the routes used by FARC-EP members to move from where they are based to the ZVTN and PTN.

4.   Movements of FARC-EP members from where they are based to the ZVTN and PTN will be coordinated and monitored by the monitoring and verification mechanism.

5.   When so required and requested by the monitoring and verification mechanism, the Government will provide the logistics and transport needed to move the various missions, commissions and tactical units of the FARC-EP fronts to the ZVTN and PTN.

6.   The movements will take place in three stages, which the monitoring and verification mechanism will agree to and coordinate with the Colombian armed forces and FARC-EP.

1.   **Planning**: Coordination will take place, the participants will be recruited and information will be made available; a reasonable period of time will be allowed for the Colombian armed forces to withdraw and reorganize in order to enable the move to take place; the actors will be informed of the plan to be implemented.

• During this stage, the commanders of the Colombian armed forces in the regions involved will certify to the monitoring and verification mechanism by appropriate means that all units deployed in the areas involved have full knowledge of the plans for the movements. This will be verified by the monitoring and verification mechanism.

- In planning the movements, the monitoring and verification mechanism will have all the necessary information and will coordinate as necessary in order to guarantee security and ensure that there are no incidents during the movements.

- A continuous and comprehensive communications pan, to be coordinated with all those involved in the ceasefire and laying down of arms (the Government, the monitoring and verification mechanism, the Colombian armed forces and FARC-EP), will be implemented for the movements. The plan will ensure that all communications are secure, so as to avoid possible leaks or disruption that could jeopardize the movements.

2. **Implementation**: On day D+1 a delegate from the Government and a delegate from FARC-EP will supply the international component of the monitoring and verification mechanism with the coordinates for the locations of the units belonging to the Colombian armed forces and FARC-EP so that the necessary steps can be taken to enable the movement of FARC-EP structures to the ZVTN and PTN to take place securely under monitoring and verification by the monitoring and verification mechanism.

- That same day (D+1) adjustments will be made to the presence of the Colombian armed forces, to enable the movements to the ZVTN and PTN to take place along the defined routes.

- On day D+5, once the monitoring and verification mechanism has confirmed that the Colombian armed forces have adjusted their presence in the field, the various missions, commissions and tactical combat units of FARC-EP fronts will travel to the ZVTN and PTN, having regard to the security measures laid down in this protocol.

3. **Adjustment**: During this stage, once the movements have been completed, the Colombian armed forces will make the appropriate adjustments to their presence in the field, in accordance with the provisions of the Ceasefire Agreement.

17-06469

A-548

**Protocol for the chapter on security for deployments in the field in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying down of Arms ("the Ceasefire Agreement")**

**Security in the transitional local zones for normalization (ZVTN) and the transitional local points for normalization (PTN) during the process of implementing the ceasefire and laying down of arms**

The protocol contains the measures established jointly by the Government and FARC-EP to guarantee security in the transitional local zones for normalization (ZVTN) and the transitional local points for normalization (PTN).

1.    Security in the ZVTN and PTN is based on the following elements: specific boundaries; a security zone around each ZVTN and PTN; security staff; appropriate physical infrastructure and logistical supplies; secure communications; rules governing peaceful coexistence; basic medical care; and an evacuation plan for emergencies and natural disasters.

2.    The Government and FARC-EP will clearly define the boundaries of the ZVTN and PTN, establishing reference points such as geographical features, coordinates and boundary markers.

3.    While the Ceasefire Agreement remains in force, security in the ZVTN and PTN will be coordinated between the Government and FARC-EP. For forces deployed in the field, security will be coordinated between the Government and the monitoring and verification mechanism.

4.    A one-kilometre (1 km) security zone will be put in place around the ZVTN and PTN in order to avoid incidents or accidents. These security zones will be overseen by the monitoring and verification mechanism. No members of the Colombian armed forces or FARC-EP will be present in the security zones, with the exception of the monitoring and verification teams, who will, where necessary, be accompanied by police security.

5.    In each ZVTN a single camp will be identified within which a specific site will be established for the location of the containers to house the weapons and ammunition belonging to FARC-EP. These sites will be clearly identified, will have the appropriate controls and security measures in place, and will be under the supervision of the international component of the monitoring and verification mechanism. The PTN will have a single site in the camp for the same purpose.

6.    While the ZVTN and PTN are in operation the civilian population will not be allowed to carry or possess weapons. Outside the camps FARC-EP members will wear civilian clothing and will be unarmed.

7.    Outside the camps but inside the ZVTN and PTN there will be a reception area where FARC-EP will receive visitors.

8.    Public officials who provide training for members of FARC-EP in the ZVTN and PTN under the Ceasefire Agreement will wear the appropriate accreditation.

9.    Security issues in the ZVTN and PTN (protection schemes, security mechanisms) will be coordinated with the local monitoring and verification mechanism steering group.

10.   Local bases will have the technical resources required to ensure effective and secure communications with the various units of the Colombian armed forces, the monitoring and verification mechanism and FARC-EP. Communications security measures will be in place to achieve this (encryption, keys, frequencies and transmission times).

11.   An early warning monitoring process will be put in place in the local bases which will be used to receive information and pass it on to the appropriate people in order to neutralize possible threats to members of FARC-EP, the Government, the monitoring and verification mechanism, the civilian population and/or the normal operation of the ZVTN and PTN and the Colombian armed forces deployed in the field.

12.   The Government will take the necessary measures to prevent persons with legal action pending against them from entering the ZVTN and PTN. Under no circumstances will these measures be used to prevent people from visiting the ZVTN and PTN.

13.   If an event or situation arises within a ZVTN or PTN that requires the presence of the national police or any other armed State agency, this will take place in coordination with the monitoring and verification mechanism in accordance with the following procedure:

- When the monitoring and verification mechanism becomes aware of the issue it will begin to coordinate with FARC-EP commanders in the area in question and with the Government.

- The monitoring and verification mechanism will assess the situation and take the process forward insofar as it is responsible for doing so.

- The monitoring and verification mechanism will ask the Government for support from the appropriate agency.

- The agency designated by the Government will contact the monitoring and verification mechanism.

- The monitoring and verification mechanism will coordinate as necessary with FARC-EP to ensure the entry of that agency into the ZVTN or PTN.

- Where public officials enter and remain in the ZVTN and PTN during proceedings, they will be accompanied by members of the monitoring and verification mechanism.

- During the process the monitoring and verification mechanism will be in permanent contact with FARC-EP commanders in the ZVTN or PTN in question.

17-06469

A-550

**Safety protocols for the handling, storage, transport and control of weapons during the process of implementing the ceasefire and laying down of arms**

The protocol contains the measures established jointly by FARC-EP and the international component of the monitoring and verification mechanism to guarantee the secure handling, storage, transport and control of firearms, ammunition and explosives during the process of implementing the ceasefire and laying down of arms. The measures will be monitored and verified by the international component of the monitoring and verification mechanism.

**(a)  Handling**

1.    No explosives, explosive ammunition, hazardous substances or improvised explosive devices may be handled during movements to the ZVTN and PTN or in the camps.

2.    For safety reasons, firearms, ammunition and explosives may not be handled, carried or held inside the dormitories, dining rooms, classrooms, bathrooms or recreation areas in the camps or in the reception area put in place for each ZVTN and PTN.

3.    The safety regulations in the firearms safety code will apply to the carrying, handling and maintenance of firearms.

4.    Unstable weapons will be destroyed by FARC-EP in coordination with the international component of the monitoring and verification mechanism, in accordance with international safety standards. The international component of the monitoring and verification mechanism will certify and notify this procedure.

5.    The sites where unstable material is to be destroyed and the access routes to those sites must be free of anti-personnel mines (APMs), improvised explosive devices (IEDs) and unexploded ordnance (UXO) and explosive remnants of war (ERW).

6.    There must be a paramedic with equipment and medication in attendance at this procedure, and arrangements must be in place for medical evacuation in the event of an accident or medical emergency. These arrangements must be coordinated with the monitoring and verification mechanism.

7.    FARC-EP in each camp will be responsible for ensuring that safety regulations governing the handling of weapons are observed.

**(b)  Storage**

1.    The international component of the monitoring and verification mechanism will establish the appropriate conditions for secure storage of weapons and ammunition inside the ZVTN and PTN, in accordance with the relevant United Nations standards.

**(c)  Transport**

1.    Under no circumstances may unstable weapons be transported to the ZVTN and PTN.

2.    Heavy weapons and munitions will be transported to the ZVTN and PTN in accordance with safety guidelines laid down in international safety standards.

3.    Where necessary, the international component of the monitoring and verification mechanism will coordinate with the Government over the

implementation of safety measures for transporting FARC-EP weapons and ammunition to the ZVTN and PTN.

4.    FARC-EP guarantees that all weapons listed in the information supplied to the international component of the monitoring and verification mechanism will be transported to the ZVTN and PTN.

5.    The removal of weapons from the ZVTN and the PTN to the new storage sites for final disposal will be carried out by the international component of the monitoring and verification mechanism in accordance with United Nations safety standards.

**(d)    Control**

1.    The international component of the monitoring and verification mechanism will undertake the appropriate monitoring and verification controls on personal weapons, weapons held in arsenals and those stored in containers in accordance with the provisions of the Ceasefire Agreement.

2.    FARC-EP undertakes to disseminate the safety protocols governing weapons handling, transport, storage and firearms safety controls to all its members for implementation.

3.    The international component of the monitoring and verification mechanism will, in coordination with FARC-EP, select a secure site within the ZVTN and PTN, free from natural and artificial hazards, to house the containers where FARC-EP's weapons are to be stored.

4.    The international component of the monitoring and verification mechanism will verify compliance with the safety protocols for the destruction of unstable weapons and coordinate with the Colombian armed forces as necessary to ensure the safety of the area.

**Protocol and annexes to the chapter on logistics in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying down of Arms ("the Ceasefire Agreement")**

This protocol contains the procedures established jointly by the Government and FARC-EP to safeguard logistics for the transitional local zones for normalization (ZVTN), the camps (transitional local points for normalization, PTN) and the monitoring and verification mechanism (at the national, regional and local levels) during the process of implementing the ceasefire and laying down of arms.

**Definition of logistics**: Logistics refers to all the material elements to meet specific needs for the operation of the transitional local zones for normalization (ZVTN) and the transitional local points for normalization (PTN) during the process of implementing the ceasefire and laying down of arms and for the operation of the monitoring and verification mechanism in respect of: accommodation, food, kitchens, food stores, dining rooms, classrooms, offices, libraries, reception areas, bathrooms, basic medical and dental care, communications, quartermaster's supplies, men's washing kits, women's washing kits and accessories, sports kit and equipment.

Logistical supplies must take account of women's specific needs.

Logistics must meet the following needs:

1. **Health**. During the process of implementing the ceasefire and laying down of arms basic medical care will be available to meet immediate needs. Care must be provided for pregnant and nursing mothers, as well as general maternal and child care. Specialized and emergency care will also be provided, for which staff may be moved to appropriate medical centres; timely provision of care and safety will be guaranteed.

2. **Supply lines**. These are all the resources and procedures required to ensure that the needs described under the definition of logistics are met, to enable the operation of the ZVTN, the PTN and the monitoring and verification mechanism for the duration of the ceasefire and laying down of arms. They include the supply, transport and distribution of these elements, all of which will be undertaken through private, legal and natural persons.

The Government will issue a public call for tenders to supply, transport and distribute foods and medicines. The tender process will include a stipulation that preference will be given to purchases of food and medicines from the regions where the ZVTN and PTN are located. FARC-EP will designate a delegate to be part of this process at national level.

3. **Communications**. For the ceasefire and laying down of arms, the Government and FARC-EP will define procedures to guarantee the necessary means of communication (primary and alternative means: UHF, VHF and satellite), and will establish frequencies and times to facilitate coordination between the Government, FARC-EP and the monitoring and verification mechanism for the duration of the process of implementing the ceasefire and laying down of arms.

In each zone a delegate from FARC-EP will be responsible for logistics issues and will liaise with the logistics contact in the monitoring and verification mechanism at the local level, who will receive the list of sections required by the ZVTN and PTN, which will be responsible for receiving, verifying and signing the respective lists. The entire logistics procedure will be verified by the monitoring and verification mechanism.

All ZVTN, PTN and monitoring and verification mechanism bases will receive appropriate supplies to enable optimum operation in accordance with the principles of austerity, transparency, reasonableness, efficiency and responsibility.

The Government and FARC-EP have agreed on a list of basic sections that includes food (Annex A) and medicines (Annex B). These will be adjusted to reflect the characteristics of each region where the ZVTN and PTN are located.

To aid planning, logistical requirements in respect of food and medicines will begin to be supplied from day D+30.

17-06469

**A-554**

**Protocol and annexes to the chapter on the laying down of arms in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying down of Arms ("the Ceasefire Agreement")**

The laying down of arms by FARC-EP entails an organized, traceable and verifiable process that is divided into two periods: weapons control and laying down of arms. The laying down of arms process commences upon signature of the Final Agreement.

The laying down of arms includes the following technical procedures: registration, identification, monitoring and verification of possession, collection, storage, removal and final disposal.

- **Registration**: This is the technical procedure under which the international component of the monitoring and verification mechanism will record the quantity and type of weapons received from FARC-EP (under the procedure in Annex A).

- **Identification**: This is the technical procedure under which the international component of the monitoring and verification mechanism will establish the characteristics of FARC-EP weapons. This procedure applies only to the personal weapons carried by FARC-EP members in the camps (see Annex A).

- **Monitoring and verification of possession**: In this process observers from the international component of the monitoring and verification mechanism who are permanently deployed in FARC-EP camps will check that each FARC-EP member staying in a camp is carrying his or her personal weapon and its supply of ammunition. This process is based on the registration and identification undertaken previously.

- **Collection**: This is the technical procedure under which the international component of the monitoring and verification mechanism will receive all weapons from FARC-EP in accordance with the procedure laid down in this Agreement.

- **Weapons storage**: This is the procedure under which the international component of the monitoring and verification mechanism will take the weapons received from FARC-EP, having first registered and marked them for inventory control purposes, and deposit them in the containers provided for this purpose in one camp within each ZVTN and at each of the PTN. The containers will be placed in a restricted area accessible only to the international component of the monitoring and verification mechanism, which will carry out constant monitoring and verification.

- **Weapons removal**: This is the technical procedure under which the United Nations will take charge of the physical removal of the weapons from the ZVTN and PTN. The Government and FARC-EP, in conjunction with the United Nations, will determine where the weapons are to be located. The weapons will be used to build three monuments.

- **Final disposal of weapons**: This is the technical procedure under which FARC-EP weapons will be used to build three monuments: one at United Nations Headquarters, one in the Republic of Cuba and one on Colombian soil, in a place to be determined by the political organization that emerges from the transformation of FARC-EP, in agreement with the Government.

**Procedure**

For the purposes of the laying down of arms, the day on which the Final Agreement enters into force is known as "day D". The laying down of arms involves a planning phase and an implementation phase.

**Planning phase**

Beginning on day D+5, FARC-EP will supply the international component of the monitoring and verification mechanism with information on the weapons in their possession, to enable the component to plan the number and type of containers needed for storing the weapons. That will also enable them to properly plan the monitoring and verification of weapons transport and to proceed with registration, identification, monitoring and verification of possession, collection, storage, removal and final disposal.

The information to be supplied includes:

• The total quantity of weapons by type to be transported to the ZVTN and PTN.

• The quantity of weapons by type belonging to FARC-EP members who are part of the monitoring and verification mechanism and to FARC-EP members authorized to leave the camps in order to carry out tasks related to the peace process (a total of 60 at the national level, plus 10 per ZVTN and up to eight for each PTN).

• The quantity of heavy weapons, grenades, ammunition and militia weapons, by type, to be transported to the ZVTN and PTN between day D+7 and day D+30.

• The quantity and type of unstable weapons to be destroyed and the georeferencing for the dumps (caches).

• Where and when the destruction of unstable FARC-EP weapons will be carried out.

All of this information should enable the monitoring and verification mechanism to draw up detailed plans in conjunction with those responsible for the safety of the process, in order to ensure that the activity is carried out efficiently, safely and with the necessary confidentiality, in accordance with the protocols.

**Implementation phase**

On day D+5 FARC-EP units will begin to move to the appropriate ZVTN and PTN, taking with them their personal weapons and their supply of ammunition.

The monitoring and verification mechanism will monitor and verify this process.

Once they have arrived at the ZVTN and PTN, the international component of the monitoring and verification mechanism will verify that there are no explosives, weapons or elements that should not be permitted to enter the ZVTN or PTN. If any unstable material is detected it will be destroyed at the sites previously selected for that purpose.

An unstable weapon is any weapon that displays external damage due to cracks, dents, indentations or rust, and any weapon oozing explosive material or that displays any other signs to indicate that it would be dangerous to transport it. Homemade weapons, mines and explosives and components for their manufacture will also be deemed unstable weapons.

17-06469

**A-556**

The international component of the monitoring and verification mechanism will then proceed to register and store the personal weapons belonging to FARC-EP members assigned to the mechanism and the personal weapons belonging to FARC-EP members who are to go out on activities related to the peace process. After that, the international component will begin the monitoring of the possession of personal weapons by FARC-EP members who are to remain in the camps.

Between day D+7 and day D+30 FARC-EP will transport all heavy weapons, militia weapons, grenades and ammunition to the ZVTN and PTN. The monitoring and verification mechanism will monitor and verify this process. These weapons, grenades and ammunition will be registered and marked for inventory control purposes, and those that are not going to be carried by individuals will be stored in temporary arsenals under the responsibility of FARC-EP. The international component of the monitoring and verification mechanism will begin the monitoring of these weapons, grenades and ammunition.

All weapons, grenades and ammunition belonging to FARC-EP in the camp must be monitored, either through random checks or by some other method. All monitoring will be carried out in coordination with the FARC-EP commander in each camp. The frequency of monitoring will depend on the quantity of weapons and the situation.

On day D+60 all heavy weapons, militia weapons, grenades and ammunition that were being held in temporary arsenals will be put into storage.

In parallel, between day D+10 and day D+60 FARC-EP will carry out the destruction of the unstable weapons held in dumps (caches) that have previously been georeferenced in accordance with the parameters laid down in the safety protocols. The international component of the monitoring and verification mechanism will verify the destruction of the unstable weapons and will draw up a record detailing the date, time, location (with georeferencing), quantity and type of weapons. At the same time the international component must verify that preparation for the activity have been carried out correctly. The activity must be properly coordinated between FARC-EP, the international component and the Government in view of the logistical and security effort it entails.

All travel by the international component must take place along safe routes that are free of anti-personnel mines (APMs), improvised explosive devices (IEDs) and unexploded ordnance (UXO) or explosive remnants of war (ERW).

To that end FARC-EP will supply the relevant information and there will be full coordination with the Government and the international component of the monitoring and verification mechanism.

All activities involving the transport of weapons will take place in accordance with the safety protocol governing weapons transport.

The collection and storage of personal weapons remaining in the possession of FARC-EP members in the camps will take place in three successive stages:

• D+90: 30 per cent of the total will have been stored

• D+120: another 30 per cent of the total will have been stored

• D+150: the remaining 40 per cent will have been stored

The above steps in the process of the laying down of arms by FARC-EP will take place sequentially, in accordance with the road map (timeline) agreed to by the Government and FARC-EP and which is to guide the end of the process for ending the conflict following the signing of the Final Agreement.

Under arrangements similar to those set out in the previous paragraph, between day D+150 and day D+180, the United Nations will proceed to remove all the stored weapons, once they have been deactivated to prevent their use as weapons of war, and to destroy the grenades and ammunition.

That activity must be properly coordinated between FARC-EP, the international component of the monitoring and verification mechanism and the Government in view of the logistical and security effort it entails.

The international component of the monitoring and verification mechanism will notify the monitoring and verification mechanism when the activity has been completed.

On day D+180 the ZVTN and PTN will cease operation and the bilateral and definitive ceasefire and cessation of hostilities will be considered complete in accordance with the road map (timeline) agreed to by the Government and FARC-EP, which is to guide the process for ending the conflict following the signing of the Final Agreement.

On completion of the process of removing the weapons in accordance with the agreed procedures, the United Nations will certify that the process has been completed and proceed to notify the Government and the general public.

The international component of the monitoring and verification mechanism will inform the mechanism of the completion of each stage in the laying down of arms process, based on the arrangements set out in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying Down of Arms. The information must detail the activities undertaken, in accordance with the information previously supplied to the international component by FARC-EP. In that way, the monitoring and verification mechanism will certify each stage of the process and inform the general public.

17-06469

A-558

## ANNEX A

### Procedure for the registration, identification, marking and storage of weapons

The registration, identification and marking of weapons will be carried out by the international component of the monitoring and verification mechanism as follows:

### Personal weapons

A form containing the following information will be completed for each weapon:

– Type of weapon (machine gun, rifle, pistol, homemade weapon, etc.)

– Calibre (.50, 7.62 mm, etc.)

– Model (M16 A1, AK-47, etc.)

– Name of person carrying the weapon.

• The observer from the international component of the monitoring and verification mechanism will verify the information on the weapon form through a visual inspection of the weapon.

The observer must check that the information on the form includes the following details:

– Type of weapon.

– Calibre.

– Model.

– Name of combatant carrying the weapon.

• The weapon will then be assigned an identification number in the form of a barcode, alphanumeric code or QR code. A label bearing the weapon code will be affixed to the weapon, and an identical label will be placed on the form. The weapons belonging to FARC-EP members assigned to the monitoring and verification mechanism and those belonging to FARC-EP members who are to go out on activities related to the peace process (a total of 60 at national level, plus 10 per ZVTN and up to eight per PTN) will be stored in containers for these purposes. For these purposes there must be coordination over where and when these weapons will be handed over.

• The other combatants will carry their personal weapons, which will be subject to monitoring and verification by the international component of the monitoring and verification mechanism.

• The combatants will then be registered personally, under their combat names. The combatant's name will be entered in the database together with the code for his or her weapon.

• The forms will be securely and confidentially stored. The international component of the monitoring and verification mechanism will be the custodian of information relating to the laying down of arms.

### Heavy weapons, militia weapons, grenades and munitions

The international component of the monitoring and verification mechanism will be responsible for verifying compliance with this protocol, and in so doing will coordinate with the FARC-EP commander in each camp.

- The international component of the monitoring and verification mechanism will proceed to register and identify the aforementioned weapons, grenades and munitions, for inventory control purposes, and will cross-check the information on the forms. The weapons will be assigned an identification number in the form of a barcode, alphanumeric code or QR code.

- On completion of the inspection, the heavy weapons, militia weapons, grenades and munitions will be placed in temporary arsenals.

- The forms will be securely and confidentially stored. The international component of the monitoring and verification mechanism will be the custodian of information relating to the laying down of arms.

- On day D+60 the heavy weapons, militia weapons, grenades and munitions previously held in temporary arsenals will be stored in containers.

**Storage of weapons and ammunition**

Weapons and ammunition will be stored in containers designed for that purpose.

The area designated to house the containers must have the following features:

- It will have a perimeter security system that has been agreed on between the international component of the monitoring and verification mechanism and FARC-EP.

- There will be signs stating that access to the area is restricted.

- The containers or temporary structures will be painted white and will display the United Nations logo. They will have shelves on which to store the weapons, arranged by weapon type to facilitate inventory control.

- The containers will be secured by a double lock system, with one of the keys being held by the international component of the monitoring and verification mechanism and the other by the FARC-EP commander of the ZVTN or PTN in question.

- Perimeter lighting will be installed which will turn on automatically during the hours of darkness and will illuminate the containers and the surrounding area.

- An alarm system connected to the international component of the monitoring and verification mechanism base and the FARC-EP camp command will sound a warning when the container is opened. The warning system will be activated each time a container is opened, except where the system has been switched off to allow for inventory control inspections.

- The observers from the international component of the monitoring and verification mechanism will not handle explosives or munitions except in exceptional cases.

**Other accords and the Bill on amnesty, pardon and special criminal rules**

**Agreement of 7 November 2016**

I.     As part of the process of implementing the right to peace, the contents of the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace, signed on 12 November 2016, the Government shall, either through the special legislative procedure for peace or another enactment should that procedure not be in force, introduce legislation abrogating article 4 of Legislative Act 01 of 2016 and incorporating the following transitional article into the Political Constitution:

"Transitional article XX:

"As part of the process of implementing the right to peace, the contents of the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace, signed on 12 November 2016, that correspond to norms of international humanitarian law or fundamental rights defined in the Political Constitution, and those related thereto, shall be mandatory interpretation parameters and benchmarks for the enactment and validity of the norms and laws for implementation of the Final Agreement.

State institutions and authorities are required to comply in good faith with the provisions of the Final Agreement. Accordingly, the actions of all State bodies and authorities, policy development in accordance with the Final Agreement, and its interpretation and application must remain fully consistent with the accords therein, preserving the contents, commitments, spirit and principles of the Final Agreement.

This article shall enter into force as of today's date and remain in force until the end of the third full presidential mandate following the signing of the Final Agreement."

II.     Automatic prior constitutionality review: Following the entry into force of the laws and legislative acts passed under the special legislative procedure for peace, there shall be a single review of their constitutionality, which shall be automatic. The review of the constitutionality of the legislative acts shall attend only to procedural errors in their enactment. There shall be prior review of statutory laws in accordance with the provisions of article 153 of the Constitution. The time limits for review of these laws and legislative acts shall be one third as long as for the regular procedure and shall not be extended. There shall be a single, automatic review of the constitutionality of the implementation of the Final Agreement through ordinary laws, after the latter enter into force.

III.     The Government and FARC EP agree that, as soon as it has been signed, the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace will be signed as a Special Agreement pursuant to common article 3 of the Geneva Conventions of 1949 and will be deposited with the Swiss Federal Council in Berne or with such body as may replace it in future as the depositary of the Geneva Conventions, completely replacing the text previously deposited and reflecting the scope defined by the International Committee of the Red Cross in its commentary No. 850, reproduced below:

"A peace agreement, ceasefire or other accord may also constitute a special agreement for the purposes of common article 3, or a means to implement common article 3, if it contains clauses that bring into existence further obligations drawn from the Geneva Conventions and/or their Additional Protocols. In this respect, it should be recalled that 'peace agreements' concluded with a view to bringing an end to hostilities may contain provisions drawn from other humanitarian law treaties, such as the

granting of an amnesty for fighters who have carried out their operations in accordance with the laws and customs of war, the release of all captured persons, or a commitment to search for the missing. If they contain provisions drawn from humanitarian law, or if they implement humanitarian law obligations already incumbent on the parties, such agreements, or the relevant provisions as the case may be, may constitute special agreements under common article 3. This is particularly important given that hostilities do not always come to an end with the conclusion of a peace agreement."

IV.   The Government and FARC EP also agree that, following approval of the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace, a presidential statement will be made in the form of a unilateral declaration by the Colombian State to the Secretary-General of the United Nations, citing the resolution of the United Nations Security Council of 25 January 2016, asking the Secretary-General to welcome the Final Agreement and to relate it to Security Council resolution 2261 of 25 January, to prepare an official Security Council document, and to annex the complete text of the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace to resolution 2261.

**Agreement of 9 November 2016**

The Government and FARC-EP hereby agree as follows:

I.   Amnesty, Pardon and Special Criminal Rules Act.

The parties agree that the Government shall submit the proposed bill on amnesty, pardon and special criminal rules, the contents of which are attached to this Agreement, to the Congress of the Republic.

The bill comprises four sections.

The first section concerns its aims and principles, which shall apply to all those subject to the Act.

The second section concerns amnesties, pardons and other special criminal proceedings.

The third section concerns the differentiated special penal proceedings for agents of the State.

The fourth section concerns the final provisions, which shall apply to all those subject to the Act.

The aforementioned four sections shall form a single, indivisible bill.

The aforementioned bill on amnesty, pardon and special criminal rules shall be presented to the Congress of the Republic as soon as possible after the signing of the Final Agreement and shall preferably be dealt with through the procedure laid down in Legislative Act 01 of 7 July 2016, whereby legal instruments are established to facilitate and ensure the legislative enactment and implementation of the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace. An alternate legislative procedure may be followed if the entry into force of the Act can thereby be expedited.

The aforementioned bill shall be prepared in accordance with the special legislative procedure for peace set out in the said Legislative Act.

II.   Executive Secretariat of the special jurisdiction for peace

Both parties undertake to implement the necessary measures to set up the Executive Secretariat of the special jurisdiction for peace as soon as possible, so that the Executive Secretariat may duly receive communications from those subject to the bill mentioned in Item I of this Agreement, wherein they declare that they submit themselves to and make themselves available to the special jurisdiction for peace and to the commitments provided for in the Agreement on the laying down of arms, amongst such other responsibilities as may be agreed by the parties.

III.   Legislative Act for creating the special jurisdiction for peace.

The parties agree that the Government shall submit a draft Legislative Act creating the special jurisdiction for peace to the Congress of the Republic

The Legislative Act creating the special jurisdiction for peace shall be submitted to the Congress of the Republic the day after the entry into force of the Legislative Act 01 of 7 July 2016, whereby legal instruments are established to facilitate and ensure the legislative enactment and implementation of the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace or as soon as possible in the event that the said Legislative Act 01 of 7 July 2016 should not enter into force.

The draft Legislative Act shall contain the following:

1.    Introduction of a temporary article into the Political Constitution whereby the special jurisdiction for peace will be created.

2.    The said temporary article shall contain the constitutional rules on:

(a)    The special jurisdiction for peace, being a special jurisdiction that autonomously and preferentially exercises judicial functions for matters within its jurisdiction, particularly with respect to conduct deemed to constitute a serious breach of international humanitarian law or a serious violation of human rights. It shall apply only to acts committed prior to its entry into force.

(b)    A rule establishing that the Tribunal for Peace is the highest authority and ultimate appeal body of the special jurisdiction for peace.

(c)    The creation of each of the bodies of the special jurisdiction for peace, as well as the number of members of each of them:

(i)    Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct,

(ii)    Judicial Panel for Amnesty and Pardon,

(iii)    Judicial Panel for Determination of Legal Situations,

(iv)    Tribunal for Peace,

(v)    Investigation and Indictment Unit.

3.    Acknowledgement of the power of the justices, who are members of the special jurisdiction for peace, to adopt the rules of that jurisdiction.

4.    The justices and prosecutors of the special jurisdiction for peace shall be Colombian nationals, without prejudice to existing provisions regarding foreign jurists acting as *amici curiae* contained in paragraphs 65 and 66 of the Agreement creating the special jurisdiction for peace.

The justices and prosecutors need not be professional judges, nor shall they be subject to any age restrictions.

5.    The justices of the special jurisdiction for peace shall be empowered to propose to the Congress of the Republic the procedural rules of the special jurisdiction for peace in accordance with paragraph 46 of the Agreement establishing that jurisdiction; those rules shall also include guarantees of the right to counsel and due process, as well as the freedom to choose a lawyer entitled to practise law in any country. Once drafted by the justices of the special jurisdiction for peace, the proposed procedural rules shall be enacted by the Congress of the Republic.

6.    The special system for writs of presentation of constitutional rights before the Constitutional Court in accordance with paragraph 52 of the Agreement creating the special jurisdiction for peace.

7.    The extradition system, through incorporation into the Constitution of the text set out in paragraph 72 of the special jurisdiction for peace agreement, except for the statement "(…) In the Final Peace Agreement (..)" in the last paragraph thereof.

8.    Participation in politics, as set out in paragraph 36 of the special jurisdiction for peace agreement.

9.    The special system for the resolution of conflicts concerning jurisdiction and areas of responsibility.

10.   Operationalization of the special jurisdiction for peace as from the approval of this Legislative Act, without the need for any implementation laws or measures, subject to the approval of the procedural rules and other elements of the rules of the said Jurisdiction.

In addition to the abovementioned constitutional rules, the parties may include other rules in the aforementioned Legislative Act, such as how sentences previously imposed under the ordinary court system in relation to persons and conduct falling within the remit of the special jurisdiction for peace will be handled.

The Follow-up Commission, which is made up of the parties, shall for the purpose of implementing the Final Agreement draft a text of the proposed Legislative Act creating the special jurisdiction for peace or verify that the draft legislation presented in the Congress of the Republic agrees with the provisions of this Agreement.

The Government undertakes not to deal with any application for extradition that may affect the persons referred to in paragraph 72 of the special jurisdiction for peace agreement until such time as the Legislative Act creating the special jurisdiction for peace enters into force.

Both parties agree that during the first year after the entry into force of the Final Agreement, any elements of the "comprehensive system for truth, justice, reparation and non-repetition" omitted from this Agreement or other agreements on policy implementation priorities but included in the Final Agreement shall be incorporated into the Colombian legal system.

**Special Implementing Agreement for the selection of the Executive Secretary of the special jurisdiction for peace and for ensuring its timely commissioning**

Havana, Republic of Cuba, 19 August 2016

This Special Implementing Agreement for the selection of the Executive Secretary of the special jurisdiction for peace and for ensuring its timely commissioning has been adopted by the Government of Colombia and FARC-EP:

1.   In accordance with paragraph 68 of the special jurisdiction for peace agreement of 15 December 2015, the delegations of the Government and FARC-EP on the Negotiation Table have decided, by mutual agreement, to entrust to the United Nations the appointment of the Executive Secretary of the special jurisdiction for peace. The Executive Secretary shall meet the requirements of that Agreement and shall be a Colombian national. The Executive Secretary, who may be a man or a woman, will preferably have experience in the administration of justice. Once selected, he or she shall be confirmed by the selection committee made up of the justices of the special jurisdiction for peace. A decision not to confirm must be passed by such supermajority as may be established in the Agreement creating the said committee.

2.   The Executive Secretary shall be appointed as soon as possible by the officer in charge of the monitoring and verification mechanism of the United Nations, which is the independent mechanism agreed to by the parties.

3.   Until such time as the position of Executive Secretary of the special jurisdiction for peace and its Executive Secretariat are created within the State structure, the Executive Secretary shall temporarily act as a United Nations staff member.

4.   The Government undertakes to afford the Executive Secretary the collaboration required to fulfil his or her temporary duties. On the date of the appointment of the Executive Secretary, the Government shall determine which senior official will act as liaison for the fulfilment of that commitment.

5.   In accordance with paragraph 16 of the aforementioned special jurisdiction for peace agreement, the Government undertakes to create the Executive Secretariat and to make sufficient economic resources available to ensure that the special jurisdiction for peace is commissioned in a timely and effective manner in keeping with the rules governing its implementation.

6.   Once appointed as stipulated in paragraph 1 of this Agreement, the Executive Secretary shall temporarily discharge the following responsibilities: (a) coordinate the plan for the creation and commissioning of the special jurisdiction for peace and the timeline for it to become operational in a timely manner with the Minister of Justice, and make the relevant recommendations to the latter as soon as possible; (b) encourage the adoption of the necessary decisions and measures to ensure that the Judicial Panel for Amnesty and Pardon and the Judicial Panel for Determination of Legal Situations can fulfil their functions from the very day of their establishment; (c) promote the necessary decisions and measures for all bodies of the special jurisdiction for peace, together with its justices and prosecutors, to be able to begin operations in a timely fashion, in suitable facilities, with the technical, administrative, IT and personnel support they will require; (d) foster the necessary coordination with those bodies which, under the agreement creating the special jurisdiction for peace, are to present reports to the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct, so that they can present such reports in a timely manner; and (e) take such other actions as may be required to secure sufficient institutional capacity to enable

the special jurisdiction for peace to efficiently discharge its responsibilities as set out in the agreement creating it, and in particular to securely provide infrastructure, staff recruitment, operationalization of information systems and systems for the management of judicial proceedings, and other technological resources, as well as sufficient resources for the operation of all bodies of the special jurisdiction, both in the city where it will be located and in the places where the justices and prosecutors must go in the performance of their duties.

7.    The Executive Secretary shall also discharge the following responsibilities related to the implementation of the agreements with FARC-EP on the laying down of arms and the granting of amnesties, pardons and special criminal rules, including those particularly concerned with agents of the State: (a) receive expressions of compliance and cooperation with the special jurisdiction for peace; (b) draw up a report for the Judicial Panel for Amnesty and Pardon, the Judicial Panel for Determination of Legal Situations, and the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct of the special jurisdiction for peace, giving the name and precise identification of each of the persons that have expressed a willingness to comply with the special jurisdiction, and providing the necessary basic information, such as the Judicial Panel to which they wish to address themselves, the nature of their petition, the relevant elements for a determination as to whether the conduct mentioned is related to the armed conflict and, if there is a record, where that record may be available to special jurisdiction for peace bodies should they wish to consult it; (c) receive (the original or a copy of, as the case may be) the pledges of commitment signed under agreements on the laying down of arms, Law 418 of 1997 and any other regulations in force or to be adopted in the future on amnesties, pardons and special criminal rules, in particular those relating to agents of the State, and include in his or her report to the special jurisdiction for peace bodies all relevant information about such pledges, to facilitate the timely commencement of the activities of each body. Should the petitioner have signed a pledge of commitment, the file number should be indicated so that it may be readily consulted; (d) receive from the monitoring and verification mechanism information on the actual laying down of arms and include such information in his or her report of the State or special jurisdiction for peace bodies to the extent it is relevant, especially as regards applicants for amnesties and pardons; (e) in his or her report to the special jurisdiction for peace bodies, the Executive Secretary shall group cases in accordance with the parameters set in the special jurisdiction for peace agreement of 15 December 2015, without prejudice to their subsequent extension based on the judgments to be adopted by the Judicial Panels.

8.    The Executive Secretary of the special jurisdiction for peace shall discharge the responsibilities referred to in paragraph 7 of this Agreement, clearly distinguishing between the identification of persons making expressions of compliance and the applications received on the basis of the rules agreed to by the Negotiation Table, that is: (a) In respect of FARC-EP members, based on the lists delivered and verified under the procedure agreed to by the Negotiation Table; (b) In respect of active or retired members of the Colombian armed forces, on the basis of the lists prepared for that purpose by the Ministry of National Defence; (c) In respect of all other persons, on the basis of the relevant judicial ruling.

9.    Where legal proceedings are being taken against a person, relevant information on the latter's compliance with the special jurisdiction for peace shall be submitted to the judicial authorities by the Executive Secretary.

10.    To fulfil his or her responsibilities, the Executive Secretary shall organize and provisionally operationalize the Executive Secretariat of the special jurisdiction for peace in such a way that it will be ready to begin its permanent operations once

created through the procedures established in the Colombian legal system. To that end, he or she shall take measures to establish the headquarters of the Secretariat, organize its infrastructure, staff recruitment, and logistical, technical and IT preparation, and also to obtain adequate resources to finance its functioning and that of the entire special jurisdiction for peace.

11.   This Agreement shall come into effect as soon as it is signed, and shall be null and void if the parties end the current dialogue without reaching a Final Peace Agreement.

12.   Five original and identical copies of this Special Agreement are signed, one for each Party, one for each guarantor country and one to be sent to the Swiss Federal Council, where it shall be deposited and must not be made available to the public until such time as the Final Peace Agreement is signed.

**Agreement to facilitate the fulfilment of the timeline for the laying down of arms process reached by means of the Agreement of 23 June 2016**

Havana, Republic of Cuba, 20 August 2016.

The Government and FARC-EP hereby adopt the following Agreement to facilitate the fulfilment of the timeline for the laying down of arms process, reached on 23 June 2016:

1.    With respect to those FARC-EP members who are to participate in the laying down of arms process, enforcement of arrest warrants is suspended in accordance with the provisions established in article 8 of Law 418 of 1997 as amended by article 1 of Law 1779 of 2016. That suspension shall become effective from the beginning of the move to the transitional local zones for normalization (ZVTN) and shall continue during the said move and up until the culmination of the laying down of arms process or until the Government so decides in the event of non-compliance with the provisions of the Agreement on the laying down of arms.

2.    In addition, the provisions established in the preceding paragraph shall apply to FARC-EP members travelling outside the transitional local zones for normalization (ZVTN) to undertake activities forming part of the peace process.

3.    The two preceding measures shall be applied in accordance with the provisions of paragraph 3, article 88, of Law 418 of 1997 as amended by article 1 of Law 1779 of 2016.

4.    Persons imprisoned for belonging to FARC-EP, with convictions or indictments for offences subject to pardon in accordance with the rules in force on the date when the laying down of arms begins shall be granted the pardon provided in Law 418 of 1997 and its subsequent amendments, solely for such conduct as the laws make pardonable. The pardon shall be granted with effect from the time the laying down of arms process begins.

5.    Persons imprisoned for belonging to FARC-EP, with convictions or indictments for offences that cannot be pardoned at the time the laying down of arms process begins shall, under the provisions of the Penitentiary and Prison Code (Law 65 of 1993) and its associated regulations, be transferred to the transitional local zones for normalization (ZVTN) once the FARC-EP members in the process of laying down arms have been assembled there in compliance with the agreement of 23 June 2016.

The persons transferred shall remain in the transitional local zones for normalization (ZVTN), in a state of detention, under the conditions established in paragraph 7, article 2, of Decree 4151 of 2011 and concordant rules.

Such persons shall be located in areas separate from the camps where the members of FARC-EP in the process of laying down arms are located and may not enter the said camps.

The transfer will be carried out when the Director of the National Penitentiary and Prison Institute receives the certificate issued by the monitoring and verification mission approved by resolution 2261 of the United Nations Security Council, affirming that the necessary facilities have been duly equipped to accommodate the persons transferred.

The National Penitentiary and Prison Institute may enter the transitional local zones for normalization (ZVTN) at any time for the purposes of verifying compliance with the system of transfer, supervision and custody. When the Institute decides to verify the whereabouts of the person transferred, it shall so inform the

monitoring and verification mechanism in order for the mechanism to coordinate the entry in accordance with the protocols agreed to by the Government and FARC-EP.

Before the transfer is carried out, the imprisoned person shall sign an undertaking in which he or she agrees to comply with the system of transfer, supervision and custody in accordance with the provisions established in this Agreement and to submit to the special jurisdiction for peace when it is in operation.

The person transferred shall remain at the disposal of the justice system in the terms set out in the current laws and pursuant to the directive or instructions issued for that purpose by the State Prosecutor General.

6.    The persons to whom the provisions established in this Agreement apply will be members of FARC-EP according to the list supplied to the Government by the person expressly appointed for that purpose by the aforesaid organisation and verified by the Government in accordance with the provisions established in the Final Agreement and the persons classified as members or collaborators of FARC-EP in a court ruling issued prior to the start of the implementation of this Agreement who are not recognized as such.

7.    For the purposes of paragraphs 1, 2 and 3, a person appointed by FARC-EP shall provide the Government with a list expressly indicating the persons to whom paragraph 2 also applies for verification by the Government in accordance with the provisions established in the Final Agreement and subsequently supplied to the monitoring and verification mechanism established in the Agreement on the Bilateral and Definitive Ceasefire and Cessation of Hostilities and Laying down of Arms between the Government and FARC-EP.

8.    For the purposes of paragraphs 4 and 5, a delegate from FARC-EP expressly appointed for that purpose shall formally deliver two lists in writing to the Government as soon as possible, one containing the members of the organization who are imprisoned for any crime and another containing the persons who are imprisoned due to having been convicted or as FARC-EP members or collaborators who are not recognized as such. The lists will be verified by the Government according to the provisions established in the Final Agreement within the shortest time possible in order to fulfil what has been agreed within the established timetable, providing that the lists have been duly supplied. The first list referred to in this section will form part of the final, single list of FARC-EP members covered by the Final Agreement. For the purposes of application of this Agreement, FARC-EP may supply partial lists up to the moment of entry into force of the amnesty legislation.

9.    For the purpose of drawing up the lists referred to in this Agreement, visits by lawyers appointed by FARC-EP to the places where FARC-EP prisoners or those accused of being FARC-EP members are imprisoned will begin immediately in order to collect, based on existing groups, the names and other personal particulars and the details of criminal proceedings of all the persons imprisoned for belonging to or collaborating with FARC-EP. The Negotiation Table will ask the office of the High Commissioner for Peace to supply the information in its possession on the persons imprisoned, charged, accused or convicted for belonging to FARC-EP or accused of being FARC-EP members without being recognized as such. The Government shall provide the Negotiation Table with such information as it possesses or is possessed by the Prosecutor General's Office or the Supreme Council of the Judiciary on persons tried and convicted for acts relating to their membership of FARC-EP or wrongly accused of collaborating with or belonging to FARC-EP.

17-06469

**A-570**

10.   The Government shall issue the regulatory decrees and other relevant administrative rules to enable the transfer to be carried out and to ensure compliance with the rules for supervision and custody established in this Agreement.

11.   This Agreement shall be valid from the moment it is signed and shall be void if the parties conclude the current discussions without reaching a Final Peace Agreement.

### Amnesty, Pardon and Special Criminal Rules Act

#### Section I
#### Aims and principles

#### Chapter I
#### Aim and scope

**Article 1. Aim**. This Act aims to govern amnesties and pardons for political and related crimes, and to adopt differentiated special criminal rules, particularly for agents of the State who have been convicted of, held for trial for or identified as committing punishable acts due to, during, or directly or indirectly related to, the armed conflict.

**Article 2. Scope of application**. This Act shall apply in a differentiated and indivisible manner to anybody who has participated directly or indirectly in the armed conflict, has been convicted of, held for trial for or identified as committing punishable acts due to, during, or directly or indirectly related to, the armed conflict, such acts having been committed prior to the Final Agreement's entry into force. It shall also cover any acts eligible for amnesty, closely linked to the laying down of arms process.

Furthermore, it shall apply to acts committed in the context of political riots or social protest, within the terms set out in this Act.

As far as the members of an armed rebel group are concerned, it shall only apply to members of the group who have signed a peace agreement with the Government, within the terms set out in this Act.

**Article 3. Scope**. All the principles contained in the Agreement creating the special jurisdiction for peace in the context of ending the conflict shall apply in relation to amnesties, pardons and other differentiated special criminal mechanisms for discharging responsibility and primary and ancillary criminal sanctions. In the same way, those principles shall apply in respect of all administrative, disciplinary and fiscal sanctions and to the right of the State not to pursue criminal prosecution. The principles must be applied in a timely manner.

#### Chapter II
#### Applicable principles

**Article 4. Right to peace**. Peace is a right and an obligatory duty. Peace is an essential condition of any right and it is the inescapable duty of Colombians to achieve and preserve it.

**Article 5. Comprehensiveness**. The amnesties, pardons and special criminal rules, including any differentiated treatment for agents of the State, are measures of the comprehensive system for truth, justice, reparation and non-repetition, the main purpose of which is to facilitate the end of the internal armed conflict, contribute to the achievement of a stable and long-lasting peace with guarantees of non-repetition, take decisions that provide full legal certainty for everyone and realize the rights of victims. To that end, the various components and measures of the comprehensive system are interconnected through mechanisms, guarantees and requirements for accessing and maintaining oneself within the special legal proceedings of the special jurisdiction for peace.

All the principles contained in the Agreement creating the special jurisdiction for peace shall apply in respect of amnesties, pardons and other special mechanisms for discharging responsibility and primary and ancillary criminal sanctions. The foregoing shall apply in the same way in respect of all administrative sanctions and

the right of the State not to pursue criminal prosecution. The principles must be applied in a timely manner.

**Article 6. Precedence**. Amnesties, pardons and criminal treatments, such as the discharging of responsibility and criminal and administrative sanctions, or the right of the State not to pursue criminal prosecution laid down in the special jurisdiction for peace agreement, including differentiated treatment for agents of the State, shall take precedence over the acts of any other jurisdiction or proceeding, particularly over criminal, disciplinary, administrative, fiscal or any other type of proceedings, for acts committed in the context of, due to, during, or directly or indirectly related to, the internal conflict.

Amnesty shall be a mechanism for waiving criminal, disciplinary, administrative and fiscal proceedings, the purpose of which is to provide legal certainty to members of FARC-EP, or persons accused of being members of FARC-EP, after the signing of the Final Peace Agreement with the Government and the ending of hostilities, all without prejudice to the provisions of article 40 on annulment of ownership.

With respect to disciplinary or administrative sanctions, amnesties shall also have the effect of cancelling or discharging responsibility or disciplinary or administrative sanctions imposed due to conduct directly or indirectly related to the armed conflict.

**Article 7. Acknowledgement of political crimes**. As a result of the acknowledgement of political crimes and in accordance with international humanitarian law, at the end of hostilities, the Colombian State shall grant the broadest possible amnesty.

By reason of the nature and course of political and related crimes, for all purposes regarding the application and interpretation of this Act, political and related crimes shall be treated in a differentiated manner to common crime. Crimes where the State and its current constitutional system are the victim of the unlawful conduct shall be considered to be political crimes, where they are not committed for personal profit.

Crimes related to political crimes, that refer to acts specifically connected with the prosecution of the rebellion and committed during the armed conflict, as well as acts aimed at facilitating, supporting, financing or concealing the prosecution of the rebellion, shall also be eligible for amnesty.

Such crimes as are classified as common crimes but which also fulfil the foregoing requirements and do not involve unlawful acts committed for personal profit, for personal gain or for the benefit of a third party, shall be considered to be crimes related to political crimes.

**Article 8. Equal, simultaneous, balanced and equitable special criminal treatmen**t. Agents of the State shall not be granted amnesty or pardon. Agents of the State who may have committed crimes during, because of, or directly or indirectly related to the armed conflict before the entry into force of the Final Peace Agreement, shall receive differentiated, equal, equitable and simultaneous special criminal treatment in accordance with this Act.

**Article 9. Duty to investigate, establish the truth, prosecute and sanction**. The provisions of this Act do not preclude the Colombian State from performing its duty to investigate, establish the truth, prosecute and sanction serious violations of human rights and serious breaches of international humanitarian law, as provided for in the special jurisdiction for peace agreement.

**Article 10. Favourability**. In the interpretation and application of this Act, recipients thereof shall be guaranteed the application of the favourability principle.

**Article 11. Due process and procedural guarantees**. In all judicial and administrative proceedings arising from this Act, the procedural principles and guarantees of due process and the right to defence shall be respected.

**Article 12. Legal certainty**. The decisions and resolutions adopted in accordance with this Act have the effect of material res judicata as grounds for legal certainty. They shall be immutable, as a necessary element for achieving a stable and lasting peace. They may only be revised by the Tribunal for Peace.

**Article 13. Contribution to the realization of victims' rights**. The granting of amnesties or pardons or any equal, simultaneous, balanced and equitable special treatment gives no exemption from the duty to contribute individually or collectively to the establishment of the truth or the fulfilment of any reparation obligations that may be imposed by the special jurisdiction for peace.

If, during the five years following the granting of amnesty, pardon or any other equal, simultaneous, balanced and equitable special treatment, the requirements of the Tribunal for Peace to participate in programmes to contribute to victim reparation, or to come before the Truth, Coexistence and Non-repetition Commission or before the Unit for the Search for Persons Deemed Missing, where there is an obligation to appear before the above bodies, are repeatedly and unjustifiably refused, those failing in such obligations shall lose the right for the special sanctions of the special jurisdiction for peace to be applied to them, or the equivalent sanctions provided for in any treatment of those described as special, simultaneous, balanced and equitable, in the event that they are subsequently declared responsible for any of the conduct that may be attributed to them therein.

## Section II
## Amnesties, pardons and other special criminal treatment

## Chapter I
## De jure amnesties

**Article 14. De jure amnesty**. In accordance with this Act, amnesty is granted to anyone who has been involved in the political crimes of "rebellion", "sedition", "riot", "conspiracy" and "seduction, usurpation and unlawful retention of command" or crimes related to them.

**Article 15**. For the purposes of this Act, the following are related to political crimes: seizure of aircraft, vessels or collective means of transport where it is not associated with hijacking/kidnapping; compulsion to commit an offence; breaking and entering of other people's homes; unlawful violation of communications; offer, purchase or sale of any instrument suitable for intercepting private communications between persons; unlawful violation of communications or correspondence of an official nature; unlawful use of communications networks; violation of the freedom to work; slander; libel; indirect slander and libel; damage to third party property; personal falsehood; material falsehood in a public document; obtaining a false public document; agreement to commit an offence; unlawful use of uniforms and badges; threats; instigation to commit an offence; fires; disruption of public, collective or official transport services; possession and manufacture of hazardous substances or objects; manufacture, bearing or possession of firearms, accessories, parts or ammunition; manufacture, bearing or possession of firearms or ammunition subject to restricted or exclusive use by the armed forces, or explosives; disturbance of democratic contests; constraining voters; electoral fraud; document registration fraud; voter corruption; fraudulent vote; contracting without fulfilling legal requirements; violence against a public official; escape; and espionage.

The above list of crimes shall also be taken into account by the Judicial Panel for Amnesty and Pardon of the special jurisdiction for peace, notwithstanding the fact that this Judicial Panel may also consider other conduct to be related to political crime, in accordance with the criteria set out in this Act. The acts that shall under no circumstances be subject to any amnesty or pardon are the ones mentioned in article 22 of this Act.

In implementing the amnesty dealt with by this Act, any aggravating circumstances or amplifying provisions of the criminal offences shall be included.

**Article 16. Personal coverage**. Any amnesty granted by operation of this Act in accordance with the previous articles shall apply as from the day of its entry into force, provided that the crimes were committed prior to the entry into force of the Final Peace Agreement.

It shall apply to the following persons, both Colombian and foreign nationals, who are or have been perpetrators of or participants in attempted or consummated crimes, provided that the following requirements are fulfilled:

1. Those whom the judicial order convicts, puts on trial or investigates because of membership of or collaboration with FARC-EP.

2. Members of FARC-EP, after the Final Peace Agreement with the Government enters into force, in accordance with the lists handed over by representatives appointed by that organization specifically for that purpose, which lists shall be verified as provided for in the Final Peace Agreement. The foregoing applies even though the judicial order does

not convict, put on trial or investigate because of membership of FARC-EP.

3.  Those whose conviction states that the convicted person is a member of FARC-EP, even where he or she is not convicted for a political crime, provided that the crime of which he or she has been convicted fulfils the requirements of being a related action set out in this Act.

4.  Anyone who is or has been investigated, put on trial or convicted for political and related crimes, where it may be deduced from the judicial, fiscal and disciplinary investigations, judicial orders or by means of other evidence, that they were investigated or put on trial because of alleged membership of or collaboration with FARC-EP. In this case, as of the day after this Act enters into force, the party concerned shall petition the Prosecutor or competent Sentence Execution Judge to implement the said amnesty, providing or describing the orders or evidence that prove the foregoing.

**Article 17. Laying down of arms**. In relation to the persons referred to in paragraphs 1 and 2 of the preceding article, who are in the process of laying down arms and who remain in the transitional local zones for normalization or in the agreed camps, the amnesty shall progressively apply to each of them individually, where the recipient has laid down arms in accordance with the timeline and the corresponding registration agreed to for that purpose. Amnesty shall also be granted to them for conduct closely linked to the laying down of arms process.

As regards members of FARC-EP who, because of being imprisoned, are not found in possession of any arms, the amnesty shall apply to each of them individually where the recipient has signed a deed of commitment undertaking not to return to using arms to attack the current constitutional and legal system.

The said deed of commitment shall match the clearly defined text for the laying down of arms process.

**Article 18. Procedure for the implementation of de jure amnesties.**

1.  With regard to those members of FARC-EP who remain in the transitional local zones for normalization or in the camps agreed to under the laying down of arms process and who have neither ongoing trials nor convictions, the President of the Republic shall issue an administrative act implementing the de jure amnesty, when they leave the camps to begin their reintegration into civilian life. Any lists containing the personal data of persons granted amnesty shall be handled as provided for in the Data Protection Act, and cannot be publicly disclosed.

2.  With regard to anyone involved in ongoing trials for the crimes mentioned in articles 14 and 15 of this Act, the State Prosecutor General's Office shall immediately apply for estoppel to the competent judge hearing the case.

3.  With regard to anyone who is already convicted of committing the crimes mentioned in articles 14 and 15 of this Act, the competent sentence enforcement judge shall proceed with implementing the amnesty.

In relation to paragraphs 2 and 3 above, the State Prosecutor General's Office and the Administrative Panel of the Supreme Council of the Judiciary shall coordinate with those responsible for the laying down of arms process the issuance of such rulings or resolutions as are necessary so as not to delay the deadline for bringing the said laying down of arms process to a conclusion.

In any case, the amnesty must be implemented within a period of not more than ten days as from the time this Act enters into force, provided that the recipient has completed the laying down of arms process as provided for in article 17 of this Act and has signed the corresponding deed of commitment.

Should what is stated in articles 16 and 17, paragraph 2, of this Act not happen within a period of forty-five days from the time this Act enters into force, the recipient of the amnesty may apply to the Judicial Panel for Amnesty and Pardon of the special jurisdiction for peace for redress, notwithstanding the use of other legal remedies or legal channels to which he might be entitled.

The judicial officers or authorities in whose offices are handled the criminal, disciplinary, fiscal or other proceedings for the political or related crimes covered by this rule must implement the amnesty as soon as possible, on penalty of committing a breach of discipline.

**Article 19. Effectiveness of the amnesty**: As regards crimes committed prior to the entry into force of the Final Peace Agreement, if, after the amnesty has been implemented, a crime report is submitted for the crimes covered by articles 14 and 15 of this Act, in relation to the persons referred to in article 16, the judicial official shall refrain from initiating the relevant proceedings. The official shall do the same if the crime report refers to conduct closely linked to the laying down of arms process for which an amnesty has been granted.

If, in spite of the foregoing, any judicial officer initiates proceedings contrary to what is laid down in the previous subparagraph, the person may invoke his or her status as a person to whom an amnesty has been granted under the Act as objective grounds for termination of the criminal proceedings.

## Chapter III
### Amnesties or pardons granted by the Judicial Panel for Amnesty and Pardon

**Article 20. Judicial Panel for Amnesty and Pardon**. In all cases that are not subject to de jure amnesty, the decision to grant amnesties or pardons shall depend on the Judicial Panel for Amnesty and Pardon of the special jurisdiction for peace. In accordance with the favourability principle, governed by this Act, and with the provisions of article 6.5 of Additional Protocol II of the Geneva Conventions of 1949, the Judicial Panel shall implement the amnesty or pardon as provided for in this Act and in the agreement creating the special jurisdiction for peace.

In any case, the application for amnesty must be decided within a period of not more than three (3) months since application was made to the Judicial Panel, provided that the recipient has completed the laying down of arms process, as provided for in article 17.

**Article 21. Personal coverage**. Any amnesty granted by the Judicial Panel for Amnesty and Pardon shall apply as from the day of its entry into force of this Act, provided that the crimes were committed prior to the entry into force of the Final Peace Agreement, as well as in relation to any conduct closely linked to the laying down of arms process that is eligible for amnesty.

It shall apply to the following persons, both Colombian and foreign nationals, who are or have been perpetrators of or participants in attempted or consummated politically-related crimes, as provided for in the following article on criteria for being a related action, provided that any of the following requirements are fulfilled:

1. Those whom the judicial order convicts, puts on trial or investigates because of membership of or collaboration with FARC-EP; or

2.  Members of FARC-EP, after the Final Peace Agreement with the Government enters into force, in accordance with the lists handed over by representatives appointed by that organization specifically for that purpose, which lists shall be verified as provided for in the Final Peace Agreement. The foregoing applies even though the judicial order does not convict, put on trial or investigate because of membership of FARC-EP; or

3.  Those whose conviction states that the convicted person is a member of FARC-EP, even where he or she is not convicted for a political crime, provided that the crime of which he or she has been convicted fulfils the requirements of being a related action set out in this Act; or

4.  Anyone who is or has been investigated, put on trial or convicted for political and related crimes, where it may be deduced from the judicial, fiscal and disciplinary investigations, judicial orders or by means of other evidence, that they were investigated or put on trial because of alleged membership of or collaboration with FARC-EP. In this case, as of the day after this Act enters into force, the party concerned shall petition the Prosecutor or competent sentence execution judge to implement the said amnesty, providing or describing the orders or evidence that prove the foregoing.

**Article 22. Criteria for being a related action**. The Judicial Panel for Amnesty and Pardon shall grant amnesties for political or related crimes. Crimes that meet any of the following criteria are understood to be related to political crime.

(a)  Those crimes specifically related to the prosecution of the rebellion, committed during the armed conflict, such as death inflicted in combat consistent with international humanitarian law and the capture of combatants during military operations; or

(b)  Those crimes where the State and its current constitutional system are the victim of the conduct; or

(c)  That conduct aimed at facilitating, supporting, financing or concealing the prosecution of the rebellion.

The Judicial Panel for Amnesty and Pardon shall determine relatedness with political crime on a case-by-case basis.

**Note**: Only those crimes involving the following conduct shall not be subject, under any circumstances, to amnesty or pardon:

(a)  Crimes against humanity, genocide, serious war crimes, hostage taking or other serious deprivation of liberty, torture, extrajudicial executions, forced disappearance, violent sexual intercourse and other forms of sexual violence, child abduction, forced displacement and the recruitment of minors, as provided for in the Rome Statute. In the event that any criminal sentence has used the terms "ferocity", "barbarity" or any such equivalent term, amnesty or pardon shall not be granted exclusively for types of criminal conduct corresponding to those stated herein as not eligible for amnesty.

(b)  Ordinary crimes not related to the rebellion, i.e. those that were not committed in the context of and due to the rebellion during the armed conflict or which were motivated by the opportunity to obtain personal profit, personal gain or benefit for a third party.

The provisions of this article do not prevent conduct that has been independently classified as ordinary crimes from being considered crimes related to

political crimes, provided that they were committed on the basis of a political crime and the rebellion.

"Serious war crime" shall be understood to mean any violation of international humanitarian law committed systematically.

**Article 23**. Where it is transferred from the Judicial Panel for Determination of Legal Situations, the Judicial Panel for Amnesty and Pardon shall grant the pardon that discharges the sanctions imposed, for the following crimes or others, committed in the context of civil disorder or social protest, provided that they are related to political crime, in accordance with the criteria set out in article 22: personal injury resulting in disablement for less than 30 days; damage to third party property; disruption of public, collective or official transport services; obstruction of public highways so as to affect law and order; discharging of firearms; use or throwing of hazardous substances or objects; violence against a public official; disruption of official events; and riot under the Colombian Criminal Code.

**Article 24**. **Procedure and effects**. The amnesties or pardons to which this chapter refers shall be granted on the basis of the list or recommendations that the Judicial Panel for Amnesty and Pardon shall receive, for analysis and for decision making, from the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct.

The Judicial Panel shall grant amnesty or pardon in cases where persons have been convicted or investigated for crimes eligible for amnesty or pardon, both in view of the recommendations made by the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct and ex-officio or ex parte.

The Judicial Panel for Amnesty and Pardon shall analyse each case in accordance with the principles laid down in the special jurisdiction for peace agreement and in this Act as well as in accordance with the assessment criteria laid down in article 22 of this Act and shall decide whether or not such amnesties or pardons are appropriate.

Once the decision granting amnesty or pardon has been rendered, it shall be sent to the judicial authority trying the criminal case for it to fulfil the decision of the Judicial Panel for Amnesty and Pardon and to make the effects of discharging the criminal proceedings, criminal responsibility and criminal sanctions a reality, as appropriate.

Once the decision to grant the amnesties or pardons is firm, it shall become res judicata and may only be revised by the Tribunal for Peace.

Where it is deemed inappropriate to grant the amnesty or pardon, the Judicial Panel for Amnesty and Pardon shall refer the case to the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct or to the Judicial Panel for Determination of Legal Situations, so that based on the determination already made, it may take the appropriate decision in accordance with its powers and jurisdiction.

**Article 25. Submission of lists**. The representatives appointed by FARC-EP specifically for this purpose shall be legitimate representatives for submitting to the authorities, including the judicial authorities, or to the special jurisdiction for peace, the lists of persons who are members of the rebel organization that has signed the Final Peace Agreement, and such lists shall be verified as provided for in the Final Peace Agreement. These lists may be submitted until such time as the Judicial Panel for Amnesty and Pardon of the special jurisdiction for peace has finished examining the legal situation of all members of FARC-EP.

**Article 26. Obtaining additional information**. Where deemed necessary, the Judicial Panel for Amnesty and Pardon may obtain additional information through interviews, document requests and any other means it considers appropriate.

**Chapter IV**
**Jurisdiction and operation of the Judicial Panel for Determination of**
**Legal Situations**

**Article 27. Judicial Panel for Determination of Legal Situations**. The Judicial Panel for Determination of Legal Situations of the special jurisdiction for peace shall have the following functions:

1.    To determine the legal situation of anyone who has gained access to the special jurisdiction for peace, the following being the two possible cases: persons who shall neither be subject to amnesty or pardon nor included in any decision or finding; and persons who need not be called to account before the Tribunal because they are deserving of amnesty or pardon.

2.    To determine how the sentences previously imposed by the judicial system with regard to persons subject to the special jurisdiction for peace shall be treated, including the discharge of responsibilities because the sanction is understood to have been served.

3.    So that swift and full justice may be administered, to determine possible procedural selection and prioritization mechanisms for anyone who does not acknowledge truth and responsibility. In making its determinations, the Judicial Panel shall assess the decisions taken by the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct of the special jurisdiction for peace, with regard to concentrating its functions on the most representative cases, in accordance with the powers and jurisdiction of the said Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct.

4.    To fulfil its duty, describe the relationship of the conduct to the armed conflict.

5.    To take any other decisions needed to determine the legal situation of anyone who has neither been granted amnesty or pardon nor been subject to any decisions on findings.

6.    At the request of the person under investigation, to determine the legal situation of persons who, while not belonging to a rebel organization, may currently be undergoing investigation for conduct that may come under the jurisdiction of the special jurisdiction for peace. The Judicial Panel shall decide whether it is appropriate to refer the case to the Judicial Panel for Amnesty and Pardon, whether it is appropriate to refer it to the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct, or whether in order to determine the legal situation, it is appropriate to waive its right to pursue criminal or disciplinary prosecution — in the latter case also with respect to non-combatant civilians — or to apply any other legal mechanism, as appropriate. The decision determining the legal situation shall become res judicata.

7.    To ensure the efficient, effective and swift operation of the special jurisdiction for peace, the Judicial Panel shall have the widest possible powers to organize its tasks, include working committees, set priorities, collect similar cases and determine in what order it will deal with them, as well as to adopt selection and workload reduction criteria. When exercising these powers it shall take into account the need to prevent serious and representative conduct from remaining unpunished, and also to prevent work overload for the Tribunal.

17-06469

**A-580**

8. To determine the legal situation of anyone who has not been decisively involved in the most serious and representative cases, particularly in relation to the conduct referred to in article 22 of this Act.

9. To receive the appropriate information from social, trade-union and human rights organizations and processes that are part of the Ethnic and Popular Agrarian Summit, where the following crimes are involved, committed in the context of civil disorder or social protest: riot, obstruction of public highways, throwing of hazardous substances, violence against a public official, disruption of public transport, damage to third party property, personal injury and other crimes caused within the framework of the Citizens' Security Act or in social protest. In these cases, the Judicial Panel shall use mechanisms for discontinuing proceedings, with the aim of discharging the action and responsibility, or it may send this information to the Judicial Panel for Amnesty and Pardon for those purposes for which it may have competence.

10. To decide on waiving criminal prosecution against persons who, having directly or indirectly participated in the armed conflict as minors when the unlawful conduct that comes under the jurisdiction of the special jurisdiction for peace was committed, are held responsible for crimes not eligible for amnesty, as provided for in the principles adopted by the United Nations in that regard.

**Article 28. Sphere of personal competence**. Notwithstanding what is laid down for agents of the State in section III of this Act and as provided for in the special jurisdiction for peace agreement, the Judicial Panel for Determination of Legal Situations shall try cases within its competence, in relation to the following Colombian and foreign nationals, whether they are responsible as perpetrators or participants in attempted or consummated crimes:

1. Members of FARC-EP, after the Final Peace Agreement with the Government enters into force, in accordance with the lists handed over by representatives appointed by that organization specifically for that purpose, which lists shall be verified as provided for in the Final Peace Agreement.

2. Persons who, for their conduct in contexts related to exercise of the right to protest or internal disturbances, have been criminally prosecuted, inter alia, for the crimes set out in article 112 (personal injury resulting in disablement for less than 30 days), article 265 (damage to third party property), article 353 (disruption to public, collective or official transport), article 353A (obstruction of public highways affecting law and order), article 356A (discharging of firearms), article 359 (use or throwing of hazardous substances or objects) article 429 (violence against a public official), article 430 (disruption of official events) and article 469 (riot) of the Colombian Penal Code. Other persons convicted of crimes other than those listed above as a result of their participation in protest activities may petition the Judicial Panel for Determination of Legal Situations to use its discretion with respect to their sentences, if they can adduce evidence that the conduct for which they were convicted is not more serious than that set out in the above articles of the Penal Code.

3. Persons who are held for trial or who have been convicted for political or related crimes linked to membership of or collaboration with FARC-EP, without acknowledging that they are part of the aforementioned organization. In this case, the person shall provide the judicial orders or other documents from which it may be inferred that the prosecution or conviction was due to an alleged connection with this organization.

None of the foregoing shall prevent the Judicial Panel for Determination of Legal Situations from exercising its jurisdiction in relation to the persons referred to

in paragraph 63 of the special jurisdiction for peace agreement, in the terms provided for in that Agreement.

**Article 29. Assessment criteria of the Judicial Panel for Determination of Legal Situations**. Any persons to whom crimes committed in the context of and due to the armed conflict are attributed may be subject to the decisions mentioned in this chapter, provided that those crimes do not constitute:

1. Cases of decisive involvement in the following crimes: crimes against humanity, genocide, serious war crimes, hostage taking or other serious deprivation of liberty, torture, extrajudicial executions, forced disappearance, violent sexual intercourse and other forms of sexual violence, child abduction, forced displacement or the recruitment of minors, as provided for in the Rome Statute, notwithstanding the power set out in paragraph 2 of article 27 of this Act.

2. Ordinary crimes that have not been committed in the context of and due to the rebellion during the armed conflict or which have been motivated by the opportunity to obtain personal profit, personal gain or benefit for a third party.

**Article 30. Decisions rendered by the Judicial Panel for Determination of Legal Situations**. Taking into account the stage of the proceedings before any jurisdiction that affects the party appearing, the Judicial Panel for Determination of Legal Situations may make the following decisions, among others that may be within its competence:

1. Waiver of criminal prosecution

2. Cessation of proceedings

3. Suspended enforcement of the sentence

4. Discharge of responsibility because the sanction has been served

5. Any other decisions necessary to determine the legal status

**Article 31. Procedure and effects**. The decisions to which this chapter refers shall be granted on the basis of the referral of cases by the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct. The Judicial Panel for Determination of Legal Situations shall analyse each case in accordance with the assessment criteria of article 29, and shall decide what is appropriate.

Once it is firm, the decision taken shall become res judicata and may only be revised by the special jurisdiction for peace.

If it is considered inappropriate to take any of the decisions indicated in article 30 of this Act, the Judicial Panel for Determination of Legal Situations shall refer the case to the Judicial Panel for Acknowledgement of Truth, Responsibility and Determination of Facts and Conduct, so that, based on the determination already made, it may take the appropriate decision in accordance with its jurisdiction.

**Article 32. Contribution to the realization of victims' rights**. The adoption of any of the decisions indicated in article 30 of this Act gives no exemption from the duty to contribute individually or collectively to the establishment of the truth or the fulfilment of any reparation obligations that may be imposed in accordance with the provisions of the comprehensive system for truth, justice, reparation and non-repetition.

If, during the five years following the adoption of any of the decisions indicated in article 30 of this Act, the requirements of the Tribunal for Peace to

participate in programmes to contribute to victim reparation, or to come before the Truth, Coexistence and Non-repetition Commission or before the Unit for the Search for Persons Deemed Missing, where there is an obligation to appear before the above bodies, are repeatedly and unjustifiably refused, those failing in such obligations shall lose the right for the special sanctions of the special jurisdiction for peace to be applied to them, in the event that they are subsequently declared responsible for any of the conduct that may be attributed to them therein.

## Chapter V
### System of release

**Article 33. Release due to the application of an amnesty or waiver of criminal prosecution**. The granting of amnesty and the waiver of criminal prosecution contemplated in this Act will result in the immediate full release of those persons who have been imprisoned and who have benefited from the above measures.

**Article 34. Conditional release**. When this Act enters into force, the persons referred to in articles 14, 15, 16, 21 and 28 of this Act who are imprisoned, including those who have been convicted of the crimes covered by articles 22 and 23, will be granted conditional release provided that they have signed the undertaking set out in the following article.

**Article 35. Formal undertaking**. The Undertaking to be signed by the persons benefiting from release as provided in this chapter will contain an undertaking to submit to and remain at the disposal of the special jurisdiction for peace, an obligation to inform the special jurisdiction for peace of any change of residence and an undertaking not to leave the country without prior authorization from the special jurisdiction for peace.

The Undertaking must be signed before the Executive Secretary of the special jurisdiction for peace.

**Note**. In addition to the undertakings outlined in this article, persons who are imprisoned for crimes for which no amnesty may be granted, when they have been released due to the application of the provisions contained in article 34, may, in accordance with a decision by the special jurisdiction for peace, be monitored by means of electronic surveillance systems or other systems until the special jurisdiction for peace finally resolves their legal situation.

**Article 36. Procedure**. With regard to rebels belonging to organizations that have signed a Final Peace Agreement and persons who have been imprisoned on the basis of a security measure for political or related crimes in accordance with the provisions of this Act, the competent prosecutor will appear before a judge with guarantee control duties as soon as possible to request conditional release and that judge must verify that the person in question meets the requirements laid down in articles 34 and 35 of this Act and must order that conditional release.

With regard to rebels who belong to organizations that have signed a Final Peace Agreement and persons who have been imprisoned on the basis of a conviction for political or related crimes in accordance with the provisions of this Act, the Judge for Enforcement of Sanctions and Security Measures hearing the case concerning the convicted person must verify that the person concerned meets the requirements laid down in articles 34 and 35 of this Act and must order that conditional release.

If the person has been accused or convicted of crimes for which no amnesty may be granted that took place during and within the framework of the armed conflict, the provisions established in the above paragraphs will be applied with regard to the release and submission to the special jurisdiction for peace until the

special jurisdiction for peace has imposed the relevant sanctions, as appropriate, and that person will remain at the disposal of the special jurisdiction for peace in the places where the process of reintegration into civil life agreed to for the other members of FARC-EP takes place or in other domiciles proposed by those being released, without prejudice to the provisions set out in the note to article 35.

Persons who are imprisoned due to conduct in situations relating to the exercise of the right to protest or internal disturbances in the form of the offences listed in articles 112 (personal injury with incapacity of less than 30 days); 265 (damage to third party property); 353 (disruption of public, collective or official transport services); 353A (obstruction of public highways so as to affect law and order); 356A (discharging of firearms); 359 (use or throwing of hazardous substances or objects); 429 (violence against a public official); 430 (disruption of official events); and 469 (riot) of the Colombian Penal Code and who express their willingness to submit to the special jurisdiction for peace and appear before the Judicial Panel for Determination of Legal Situations to request the application of mechanisms of cessation of proceedings with a view to the extinction of liability shall also be released as soon as possible. In these cases, the following will be competent to decide on their release:

(a)   With regard to persons who have been imprisoned on the basis of a security measure, the competent prosecutor will appear before a judge with guarantee control duties to request conditional release and that judge must verify that the person concerned meets the requirements laid down in articles 34 and 35 of this Act and must order that conditional release.

(b)   With regard to persons who have been imprisoned on the basis of a conviction, the Judge for Enforcement of Sanctions and Security Measures hearing the case concerning the convicted person must verify that the person concerned meets the requirements laid down in articles 34 and 35 of this Act and must order that conditional release.

**Article 37**. All the provisions of this Act will be applicable to the persons, conduct, offences and situations provided therein, regardless of the jurisdiction before which they have been convicted or are being investigated or tried.

Recognizing the sovereignty of other States in the matters to which their competence for penal matters relates and their independence to decide on particular cases, the Government shall inform the competent foreign authorities of the enactment of this Act of Amnesty, attaching a copy thereof so that they may fully ascertain its scope with regard to persons imprisoned or investigated or who are serving sentences outside Colombia due to facts or conduct covered by the contents of this Act.

**Article 38**. The term for submission of accusations or reports concerning the persons referred to in this Act for any act or conduct that may be covered by an amnesty or pardon will become subject to a statute of limitations one year after the special jurisdiction for peace begins to operate, provided that the offence or conduct was committed:

(a)   Prior to the entry into force of the Final Peace Agreement, or

(b)   Up to the moment when the laying down of arms process ends, in the case of conduct closely connected with the fulfilment of that process.

**Article 39**. Once the special jurisdiction for peace has begun to operate, the Judicial Panel for Amnesty and Pardon will be responsible for dealing with requests for the release of any person falling within the scope of an amnesty or pardon. The order

must be immediately fulfilled by the authorities competent to release the person concerned and shall not be subject to any appeal whatsoever.

## Chapter VI
## Effects of amnesty

**Article 40. Effects of amnesty**. Amnesty extinguishes the duty of criminal prosecution and the main and any accessory sanctions, any action for compensation for damages arising from punishable conduct, and responsibility arising from any action for recovery when the person granted the amnesty has performed public duties. The foregoing is without prejudice to the duty of the State to realize the right of victims to full reparation in accordance with Law 1448 of 2011. This is without prejudice to the reparation obligations imposed in accordance with the provisions established in the comprehensive system for truth, justice, reparation and non-repetition.

In any case, the provisions of this article will have no effect on any action for annulment of ownership brought by the State under current rules regarding unlawfully appropriated movable or real property. If the real property affected by the annulment of ownership is owned by the father, mother, brother or sister or spouse of the person granted amnesty and has been habitually used for a long period after acquisition as his or her family home, the burden of proof of unlawful acquisition will rest with the State.

If the ownership of the said property was already annulled before the entry into force of this Act and the decision on annulment of ownership classified the asset as having been acquired with funds deriving from the activities of FARC-EP, and the former owner declares under oath that he or she obtained the asset with lawful funds, he or she may request a review of the judgment ordering the annulment of ownership before the Criminal Division of the Higher Court of the Judicial District that is competent according to the place where the property is located or before the Criminal Appeals Chamber of the Supreme Court of Justice, as appropriate. If the review judgment has not been handed down within one year, it must be adopted in two months, taking precedence over any other matter. The request for review may be instituted within a term of two years from the entry into force of this Act. All requests for review must be signed by a plenipotentiary who signed the Final Peace Agreement.

**Note**. If, due to the acts or conduct for which an amnesty or pardon provided in this Act was granted, there are disciplinary investigations or investigations by a prosecutor in progress or sanctions imposed as a result of such investigations, the amnesties or pardons provided in this Act will cover them. The competent official must issue the decision annulling both the action and the sanction by the relevant legal means as soon as possible. If this does not occur within a term of three (3) months from the entry into force of this Act, the person concerned may request the annulment of the action or sanction before the Judicial Panel for Amnesty and Pardon of the special jurisdiction for peace, without prejudice to the use of any other appeals or legal courses that he or she may consider.

**Article 41. Effects of the waiver of criminal prosecution**. The waiver of criminal prosecution annuls the action and the criminal sanction as well as any action for compensation for damages resulting from the punishable conduct and responsibility arising from any action for recovery. The foregoing is without prejudice to the duty of the State to realize the right of victims to full reparation in accordance with Law 1448 of 2011. This is without prejudice to the reparation obligations imposed in accordance with the provisions established in the comprehensive system for truth, justice, reparation and non-repetition.

If, due to the acts or conduct for which a waiver of criminal prosecution applies, there are disciplinary investigations or investigations by a prosecutor in progress, or sanctions imposed as a result of such investigations, the waiver will cover them. The competent official must issue the decision annulling both the action and the sanction by the relevant legal means as soon as possible. If this does not occur within a term of three (3) months from the entry into force of this Act, the person concerned may request the annulment of the action or sanction before the Judicial Panel for Determination of Legal Situations of the special jurisdiction for peace, without prejudice to the use of any other appeals or legal courses that he or she may consider.

**Article 42. Effects of cessation of proceedings and conditional suspension of enforcement of the sanction**. The cessation of proceedings, the suspension of enforcement of the sanction and other resolutions or decisions required in order to define the legal situation do not annul any action for compensation for damages. The above action or the criminal action will be annulled when that is expressly agreed to by the Judicial Panel for Determination of Legal Situations, which must also rule on the annulment of disciplinary responsibility and responsibility for prosecution.

### Section III
### Differentiated special proceedings with regard to criminal matters for agents of the State

### Chapter I
### Jurisdiction and operation of the Judicial Panel for Determination of Legal Situations

**Article 43. Judicial Panel for Determination of Legal Situations**. The Judicial Panel for Determination of Legal Situations will also be responsible for granting agents of the State a waiver of criminal prosecution as one of the mechanisms for differentiated special proceedings with regard to criminal matters in accordance with the provisions established herein.

The competencies of the Judicial Panel for Determination of Legal Situations provided in section II of this Act will also apply where relevant to agents of the State in order to implement the provisions of this section.

### Chapter II
### Mechanisms for differentiated special proceedings for agents of the State

**Article 44. Mechanisms for differentiated special proceedings for agents of the State**: The Judicial Panel for Determination of Legal Situations of the special jurisdiction for peace, applying the principle of favourable proceedings governed in this Act, will apply any of the mechanisms for final resolution of the legal situation to agents of the State, including the waiver of criminal prosecution, for those who have been convicted, tried or named for punishable conduct due to, during or directly or indirectly relating to the armed conflict in accordance with the criteria established in the following article.

**Article 45. The waiver of criminal prosecution**. The waiver of criminal prosecution is a mechanism for differentiated special treatment with regard to criminal matters for agents of the State that forms part of the comprehensive system whereby criminal actions, criminal responsibility and criminal sanctions are annulled. This is necessary for building up trust and facilitating the end of the internal armed conflict and must be applied in a preferential manner in the Colombian penal system to help achieve a stable, lasting peace.

This mechanism is not appropriate in the case of:

1. Crimes against humanity, genocide, serious war crimes, hostage taking or other serious deprivation of liberty, torture, extrajudicial executions, forced disappearance, violent sexual intercourse and other forms of sexual violence, child abduction, forced displacement and the recruitment of minors, in accordance with the provisions of the Rome Statute.

2. Crimes that were not committed because of, at the same time as or directly or indirectly in relation to the armed conflict.

3. Crimes against the service, discipline and interests of the Colombian armed forces and the honour and security of the Colombian armed forces as established in the Military Penal Code.

**Article 46. Procedure for the application of the waiver of criminal prosecution for agents of the State**. The Judicial Panel for Determination of Legal Situations, ex-officio or ex parte, will resolve the legal situation of agents of the State by means of the application or otherwise of a waiver of criminal prosecution.

Agents of the State who request the application of this mechanism must accompany their request with reports, court rulings, disciplinary, administrative or prosecution reports or administrative documents that describe his or her legal situation and that allow it to be established that they committed the act due to, during, or directly or indirectly related to, the armed conflict.

When the proceedings are instituted officially, the Judicial Panel for Determination of Legal Situations will compile such facts as it deems necessary to form a judgment as to whether the person's conduct took place due to, during, or directly or indirectly related to, the armed conflict.

When the foregoing has been established, the Judicial Panel will order a waiver of criminal prosecution provided that the conduct in question does not constitute a crime against humanity, genocide, serious war crimes, hostage taking or other serious deprivation of liberty, torture, extrajudicial executions, forced disappearance, violent sexual intercourse and other forms of sexual violence, abduction of minors, forced displacement, in addition to recruitment of minors in accordance with the provisions established in the Rome Statute or a crime against the service, discipline and interests of the Colombian armed forces and the honour and security of the Colombian armed forces as established in the Military Penal Code.

When the ruling granting the waiver of criminal prosecution has been issued, it will be sent to the court that is hearing the criminal proceedings in order that the court may fulfil what has been decided by the Judicial Panel for Determination of Legal Situations and implement the annulment of the criminal action, the criminal responsibility and the criminal sanction, as appropriate.

**Article 47. Other effects of the waiver of criminal prosecution**. The waiver of criminal prosecution also gives rise to the following effects:

1. It prevents the institution of new proceedings for the conduct in question.

2. The ruling has the effect of res judicata and may only be reviewed by the Tribunal for Peace.

3. It eliminates the criminal record from the database.

4.  It cancels or extinguishes any disciplinary or administrative responsibility or sanction, or responsibility for prosecution or sanction resulting therefrom, that may derive from the criminal conduct.

5.  It prevents the institution of any action for recovery and impleader against agents of the State, without prejudice to the duty of the State to satisfy victims' right to full reparation.

6.  Its effects are oriented towards the future and it has no retroactive effects in labour, disciplinary, administrative or prosecution terms.

**Article 48. Appeals against rulings of the Judicial Panel for Determination of Legal Situations**: Rulings adopted by the Judicial Panel for Determination of Legal Situations may be made subject to an internal appeal before the same Panel and may only be appealed before the Appeals Section of the Tribunal for Peace at the request of the person against whom the ruling is issued.

### Section III
### System of release

**Article 49. Transitional, conditional early release**. Transitional, conditional early release is a benefit that forms part of the comprehensive system deriving from the differentiated special treatment with regard to criminal matters that is necessary for building up trust and facilitating the end of the internal armed conflict and must be applied in a preferential manner in the Colombian penal system to help achieve a stable and long-lasting peace.

This benefit will be applied to agents of the State who, at the time when this Act enters into force, are detained or have been convicted and who state or accept their submission to the Judicial Panel for Determination of Legal Situations of the special jurisdiction for peace in order to benefit from the mechanism of waiving criminal prosecution.

The said statement or acceptance of submission will be made before the Executive Secretary of the special jurisdiction for peace in the event that the Judicial Panel for Determination of Legal Situations has not begun to operate.

The granting of temporary, conditional, early release is a benefit that does not define the final legal situation within the framework of the special jurisdiction for peace. Only persons who have been finally absolved of responsibility may rejoin the Colombian armed forces.

**Article 50. The beneficiaries of transitional, conditional early release**. Agents of the State that meet the following requirements will be considered as beneficiaries of transitional, conditional early release:

1.  They must have been convicted or tried for punishable acts committed due to, during, or directly or indirectly related to, the armed conflict.

2.  The acts in question must not constitute a crime against humanity, genocide, serious war crimes, hostage taking or other serious deprivation of liberty, torture, extrajudicial executions, forced disappearance, violent sexual intercourse and other forms of sexual violence, abduction of minors, forced displacement, in addition to recruitment of minors in accordance with the provisions established in the Rome Statute unless the beneficiary has been imprisoned for a period equal to or exceeding five (5) years in accordance with the provisions established for alternative sanctions in the special jurisdiction for peace.

3.   They must request or accept, freely and voluntarily, the intention to have recourse to the system of the special jurisdiction for peace.

4.   They must undertake, once the comprehensive system for truth, justice, reparation and non-repetition has begun to operate, to contribute to truth, guarantees of non-repetition and immaterial reparation for victims, and to comply with the requirements of the bodies comprising the system.

**Note 1**. For the purposes of the above sections, the person concerned will sign a document containing an undertaking by him or her to submit to the special jurisdiction for peace and stating the obligation to give notice of all changes of residence, not to leave the country without prior authorization from the special jurisdiction for peace and to remain at its disposal.

The said document must specify the court that is hearing the criminal proceedings, the stage of the proceedings, the crime and the location of the proceedings.

**Note 2**. In the event that the beneficiary is summoned by the comprehensive system for truth, justice, reparation and non-repetition and fails to attend or to fulfil any of the obligations assumed in the undertaking, the release will be revoked. The release may not be revoked for circumstances other than those set out herein.

**Article 51. Procedure for transitional, conditional early release**. The Ministry of National Defence will consolidate the lists of Colombian armed forces personnel who are prima facie in compliance with the requirements for transitional, conditional early release. In drawing up the lists, information will be requested from the ordinary and military criminal jurisdictions and must be received within no more than 15 working days. Once the lists are consolidated they will be submitted to the Executive Secretary of the special jurisdiction for peace, who will verify the lists or modify them should he deem that necessary, and will also verify that the undertaking mentioned in the preceding article has been given. The Executive Secretary of the special jurisdiction for peace will inform the official hearing the criminal proceedings that the beneficiary has fulfilled the requirements in order for the official to grant the transitional, conditional early release referred to in the preceding article, and the official will immediately take the action or decision required in order to implement it.

Failure to comply with the provisions set out herein constitutes a disciplinary fault.

**Article 52. Supervision**. The directors of penitentiaries and prisons from which persons benefiting from transitional, conditional, early release are released will supervise those releases until the Judicial Panel for Determination of Legal Situations establishes the matters within its purview, making use of both ordinary mechanisms and the mechanisms provided in the special jurisdiction for peace.

**Article 53. Final, unconditional release**. The ordinary court that is hearing the criminal proceedings will comply with an order of immediate, unconditional and final release of the beneficiary with the waiver of criminal prosecution issued by the Judicial Panel for Determination of Legal Situations.

## Section IV
### Imprisonment in a military or police unit for members of military and police forces within the framework of the special jurisdiction for peace

**Article 54. Imprisonment in a military or police unit for members of military and police forces**. Imprisonment in a military or police unit for members of military and police forces within the framework of the special jurisdiction for peace is a benefit deriving from the differentiated special treatment with regard to

criminal matters that forms part of the comprehensive system and which is necessary for building up trust and facilitating the end of the internal armed conflict.

This benefit will be applied to members of military and police forces who are detained or convicted and who state or accept their submission to the special jurisdiction for peace, all in accordance with the provisions of the Penitentiary and Prison Code applicable to other public servants.

The said statement or acceptance of submission will be made before the Executive Secretary of the special jurisdiction for peace in the event that the bodies of the Jurisdiction have not begun to operate.

Only persons who have been finally absolved of responsibility may rejoin the Colombian armed forces.

**Article 55. Imprisonment in a military or police unit for members of military and police forces**. Members of military and police forces who, at the time when this Act enters into force, have been imprisoned for less than five (5) years will, in accordance with the provisions established for alternative sanctions in the special jurisdiction for peace, continue to be imprisoned in a military or police unit provided that they comply with the following concurrent requirements:

1.  They must have been convicted or tried for punishable acts committed due to, during, or directly or indirectly related to, the armed conflict.

2.  The crimes in question consist of either crimes against humanity, genocide, serious war crimes, hostage taking or other serious deprivation of liberty, torture, extrajudicial executions, forced disappearance, violent sexual intercourse and other forms of sexual violence, abduction of minors, forced displacement, in addition to recruitment of minors in accordance with the provisions established in the Rome Statute.

3.  They must request or accept, freely and voluntarily, the intention to have recourse to the system of the special jurisdiction for peace.

4.  They must undertake, once the comprehensive system for truth, justice, reparation and non-repetition has begun to operate, to contribute to truth, guarantees of non-repetition, and immaterial reparation for victims, and to comply with the requirements of the bodies comprising the system.

**Article 56. Procedure for imprisonment in a military or police unit for members of military and police forces**. The Ministry of National Defence will consolidate the lists of Colombian armed forces personnel who are prima facie in compliance with the requirements for replacement of house arrest by imprisonment in a military or police unit as described in the preceding article. In drawing up the lists, information will be requested from the National Penitentiary and Prison Institute, which must respond within no more than 15 working days. Once the lists are consolidated they will be submitted to the Executive Secretary of the special jurisdiction for peace, who will verify the lists or modify them should he deem that necessary, and will also communicate with the official hearing the criminal case with respect to the beneficiary's compliance with the requirements, so that the official can authorize the replacement of house arrest by imprisonment in a military or police unit as described in the preceding article; the said official will immediately take the action or decision required in order to implement it.

**Note**. In the event that the beneficiary fails to fulfil any of the obligations assumed in the undertaking or disregards his or her status as a person deprived of liberty, he or she will have the benefit of imprisonment in a military unit revoked. The order may not be revoked for circumstances other than those set out herein.

**Article 57. Supervision**. The Director of the military or police prison, or in his absence the Commander of the Military or Police Unit where members of military and police forces are to continue being imprisoned will exercise control, supervision and verification of the persons benefiting from imprisonment in a military or police unit, making use of both the ordinary mechanisms and the mechanisms provided in the special jurisdiction for peace.

**Section IV**
**Final provisions**
**System of Defence**

**Article 58. System of free legal defence**. The State will offer a system of advice and defence free of charge for the beneficiaries of this Act who allege that they lack sufficient resources for a proper defence with regard to the procedures and actions provided in this Act. That system will provide duly qualified defence lawyers. Subject to a decision by the interested party, he or she may make use of the systems of judicial defence already existing in Colombia, lawyers who are members of the Colombian armed forces, civil employees of the Ministry of Defence, the legal services of the human rights organizations that provide assistance to persons accused or convicted of acts or conduct relating to the conflict or the legal services of the human rights organizations that provided the beneficiary with legal assistance during his or her criminal trial or conviction. The State will establish the necessary financing agreements with the human rights organizations designated by the beneficiaries so that all persons for whom this Act is intended may benefit equally from a system of defence.

**Term**

**Article 59**. This Act shall enter into force the day after its publication. It repeals all contrary provisions. Amnesties, pardons and other special criminal proceedings granted subsequent to the signing of the Final Peace Agreement shall retain their full legal effect when this Act has entered into force, without prejudice to the provisions contained therein.

(*Signed*) Humberto de la Calle        (*Signed*) Iván Márquez
Head of the Government Delegation      Head of the FARC-EP Delegation

(*Signed*)                             (*Signed*)
Cuban Guarantor                        Norwegian Guarantor

**A-592**

For the Government:

(*Signed*) Humberto de la Calle
Head of the Government Delegation

(*Signed*) Sergio Jaramillo                                    (*Signed*) Jorge Enrique Mora

(*Signed*) Óscar Naranjo                                      (*Signed*) María Ángela Holguín

(*Signed*) Frank Pearl                                          (*Signed*) Gonzalo Restrepo

(*Signed*) Roy Barreras


Plenipotentiary Members

For FARC-EP

(*Signed*) Iván Márquez
Head of the FARC-EP Delegation

(*Signed*) Pablo Catatumbo                    (*Signed*) Pastor Alape

(*Signed*) Joaquín Gómez                      (*Signed*) Mauricio Jaramillo

(*Signed*) Bertulfo Álvarez                   (*Signed*) Carlos Antonio Losada

(*Signed*) Ricardo Tellez


Representative Members

17-06469

**A-594**

Signed on 24 November 2016 in Bogotá, Colombia.

(*Signed*)

_____

Juan Manuel Santos Calderón
President of
the Republic of Colombia

(*Signed*)

_____

Timoleón Jiménez
Commander of the FARC-EP
General Staff

_____

# Appendix AJ

UNCLASSIFIED



# 2019
## DRUG ENFORCEMENT ADMINISTRATION
# NATIONAL DRUG THREAT ASSESSMENT

DECEMBER **2019**
DEA-DCT-DIR-007-20

U.S. DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

A-596

UNCLASSIFIED

**2019** NATIONAL DRUG THREAT ASSESSMENT

# Colombian Transnational Criminal Organizations

## Overview

Colombian TCOs continue to influence the U.S. illicit drug market, though to a lesser extent than in the 1980s and 1990s. According to DEA's CSP, the majority of the cocaine seized and tested in the United States is of Colombian origin. Colombian TCOs continue to control the production and supply of cocaine, and rely on a partnership with Mexican TCOs to export cocaine from Colombia to U.S. markets. Mexican TCOs have taken over the role of principal exporters of wholesale cocaine into U.S. markets and currently dominate the wholesale distribution of Colombian cocaine into the United States. Principally, large-scale Colombian TCOs work closely with Mexican and Central American TCOs to export multi-ton quantities of cocaine from Colombia every year. Some smaller Colombian TCOs continue to maintain direct pipelines into the United States using couriers on commercial flights and air cargo to move small amounts of cocaine and heroin. Colombian TCO members also maintain a physical presence in the United States to assist in laundering drug proceeds

## Large-scale Colombian TCOs

Recently, various "Armed Criminal Organizations" (Grupos Armados Organizados or GAOs) and dissident factions of the Revolutionary Armed Forces of Colombia (Fuerzas Armadas Revolucionarias de Colombia or FARC) have dominated the Colombian drug trade. The GAOs, composed primarily of demobilized members of the United Self-Defense Forces of Colombia (Autodefensas Unidas de Colombia or AUC), are presently allied and working with dissident factions of the FARC. Large-scale Colombian TCOs sell multi-ton quantities of cocaine and

smaller quantities of heroin to Mexican TCOs who export those drugs to Central America and Mexico for eventual smuggling into the United States. Colombian TCOs route cocaine and heroin shipments through the Caribbean where local TCOs receive and transport them into the United States and Europe. The most significant Colombian TCO with an impact on U.S. drug markets is:

**Gulf Clan** – The Gulf Clan, also known as Los Urabeños, Clan del Golfo, and Clan Úsuga, functions as a highly structured and centralized criminal enterprise that has evolved into the largest GAO in Colombia with a cohesive national presence. The Gulf Clan relies on drug trafficking activities and a military-style framework to maintain operability. Since emerging in the mid-2000s, the Gulf Clan has expanded throughout northern Colombia and other regions mainly by capitalizing on the demise of rival GAOs. Though it maintains a national reach, the Gulf Clan power base lies in its birthplace region of Urabá in northwest Colombia. From this strategic location, the Gulf Clan sends multi-ton quantities of cocaine via maritime conveyances to nearby Panama and other countries in Central America on a regular basis.

## Collaboration with Mexican TCOs

While Colombian TCOs control the production and shipment of the majority of cocaine destined for consumption in the United States, Mexican TCOs are responsible for its exportation into and distribution throughout the United States. Mexican TCOs work directly with Colombian sources of supply, often sending Mexican representatives to Colombia, Ecuador, and Venezuela to coordinate cocaine shipments.

Transnational Criminal Organizations

UNCLASSIFIED



UNCLASSIFIED

A-598

# Appendix AK

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Stephenson v. Lynch,   Tex.App.-Dallas,   February 15, 2001

704 S.W.2d 919
Court of Appeals of Texas,
Houston (14th Dist.).

MERRILL, LYNCH, PIERCE,
FENNER & SMITH, INC., Appellant,

v.

ALLIED BANK OF TEXAS, Appellee.

No. A14–85–570–CV.
|
Jan. 30, 1986.
|
Rehearing Denied Feb. 27, 1986.

**Synopsis**

Garnishor sought to garnish accounts of debtor. The 80th District Court, Harris County, William Powell, J., entered default judgment and garnishee appealed. The Court of Appeals, Ellis, J., held that garnishor's failure to assert ownership of underlying judgment, which named different judgment creditor, was substantial defect of garnishment procedure and could be challenged by defaulting garnishee on writ of error.

Reversed and rendered.

**Procedural Posture(s):** On Appeal.

West Headnotes (3)

**[1]    Creditors' Remedies 🔑 Presumptions, Inferences, and Burden of Proof**

Garnishor must establish ownership of underlying judgment. Vernon's Ann.Texas Civ.St. art. 4076, subd. 3 (Repealed); V.T.C.A., Civil Practice & Remedies Code § 63.001(3).

2 Cases that cite this headnote

**[2]    Creditors' Remedies 🔑 Failure of Garnishee to Answer or Make Disclosure; Default**

Certain defects in garnishment procedure which are neither fundamental nor jurisdictional are waived when garnishee fails to answer writ before default.

3 Cases that cite this headnote

**[3]    Appeal and Error 🔑 Write of error; restricted appeal**

Garnishor's failure to show that it owned underlying judgment upon which garnishment judgment was based, when judgment creditor had different name from garnishor, was substantial defect which could be challenged by defaulting garnishee on writ of error. Vernon's Ann.Texas Civ.St. art 2255 (Repealed); V.T.C.A., Civil Practice & Remedies Code § 51.013; Vernon's Ann.Texas Rules Civ.Proc., Rule 360, subd. 2.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*919** W. Bruce Monning, Rebecca L. Burt, Dallas, for appellant.

Margaret Streeter, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

OPINION

ELLIS, Justice.

This is an appeal from a default judgment in garnishment entered against Appellant.

Appellee filed an Application for Writ of Garnishment after Judgment to garnish all accounts in Appellant's possession in the name of its debtor, Patrick S. Martin, and/or Patricia Motlow Boyd Martin to collect a judgment obtained by the Bank of Texas against Patrick S. Martin on December 2, 1970. The Bank of Texas merged to become Continental Bank of Texas which became Allied Bank of Texas in 1975.

The amount of that judgment was $25,738.89, together with interest at the rate of ten per cent per year from January 16, 1970 until the date of judgment, plus $2,573.89 in attorney's fees and interest on the total judgment until paid. Martin failed to pay any amount toward the satisfaction of the judgment. Appellant, Merrill Lynch, garnishee below, neither appeared nor answered, and a default judgment in garnishment was rendered against it on November 28, 1984. It is from this default judgment that Appellant seeks a writ of error from this court.

To obtain a writ of error, Appellant must meet three prerequisites. The writ must be filed within six months of the judgment appealed from; the error in the judgment must appear affirmatively on the face of the record; and the plaintiff in error cannot have participated either in person or through counsel in the actual trial of the case. Tex.Rev.Civ.Stat.Ann. art. 2255 (Vernon 1971)[1]; *920 Tex.Rev.Civ.Stat.Ann. art. 2249a (Vernon 1971)[2]; Glenn W. Casey Constr., Inc. v. Citizen's Nat'l Bank, 611 S.W.2d 695, 698 (Tex.Civ.App.—Tyler 1980, no writ); Lewis v. Beaver d/b/a Mid-State Indus., 588 S.W.2d 685, 686 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.). Merrill Lynch did not answer or appear for the trial of this cause. Accordingly, it seeks a writ of error to correct errors of law which were made therein. We reverse the order of the trial court entering the default judgment and render judgment that the writ of error should be granted based on Appellant's first point of error.

In point of error one, Appellant contends the default judgment is reversible on writ of error because the garnishor/appellee, Allied Bank of Texas, failed to show that it owned the underlying judgment upon which the garnishment judgment is based. The writ of garnishment states that Allied Bank of Texas is entitled to the judgment. The application for writ of garnishment incorporates by reference the judgment referring to the Bank of Texas as owner of the judgment. The language in the writ of garnishment indicating ownership by Allied Bank of Texas is contradicted by the actual judgment which is in favor of Bank of Texas. Appellee did not explain anywhere in the record how the judgment passed from Bank of Texas to appellee. We know of no way of assuming, by judicial notice or otherwise, that the mergers forming Allied Bank of Texas served to transfer judgments belonging to Bank of Texas to appellee.

[1]   It has been stated that "the remedy of garnishment is summary and harsh and it follows that such proceedings cannot be sustained unless they are in strict conformity with statutory requirements." Casey Constr., 611 S.W.2d at 700. Article 4076(3)[3] set forth the requirements for obtaining post-judgment garnishment. The garnishor needs to show that he has a "valid, subsisting judgment...." Case law had interpreted this statute as requiring that the garnishor establish ownership of the underlying judgment. See, e.g., Weinstein v. Wilhide Equip. Co., 397 S.W.2d 94, 96 (Tex.Civ.App.—Tyler 1965, no writ); Bartex, Inc. v. Napier, 492 S.W.2d 285, 286 (Tex.Civ.App.—Dallas 1973, no writ). Therefore, unless error has been waived by appellant's failure to appear before default, the garnishment judgment must be reversed for noncompliance with 4076(3).

[2]   [3]   It has been held that the failure to substantially comply with the statutes and rules governing garnishment procedure renders the garnishment judgment void. 17 Tex.Jur.3d, § 374 (1982); Parker-Morgan Lumber Co. v. Parrish, 291 S.W. 266, 267 (Tex.Civ.App.—Beaumont 1927, no writ). Certain defects in the garnishment procedure which are neither fundamental nor jurisdictional are waived when the garnishee fails to answer the writ before default. Hudler-Tye Constr., Inc. v. Pettijohn & Pettijohn Plumbing, Inc., 632 S.W.2d 219, 223 (Tex.App.—Fort Worth 1982, no writ); See Barton v. Montex Corp., 295 S.W. 950, 951 (Tex.Civ.App.—Austin 1927, no writ) (failure to follow a statutory requirement which is a mere irregularity which garnishee might waive is not sufficient to render judgment void). In this case, however, Appellee's assertions of ownership are contradicted by the judgment. We believe such a defect is substantial and can be challenged by the defaulting garnishee on writ of error.

In its post-submission brief, Appellee contends Appellant has waived its right to challenge Allied Bank's capacity to sue in lieu of Bank of Texas by failing to specially except, citing Jauregui v. Jones, 695 S.W.2d 258 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). On writ of error, appellant seeks to overturn the default judgment for noncompliance with 4076(3). Its argument is not based on the affirmative defense of lack of capacity to sue.

*921   Our disposition of point of error No. 1 makes it unnecessary for us to address Appellant's points of error two through nine. We reverse the judgment of the trial court granting the default judgment for a writ of garnishment in

A-600

favor of Appellee Allied Bank and render judgment granting the writ of error.

**All Citations**

704 S.W.2d 919

## Footnotes

1     *Repealed by* Acts 1985, 69th Leg., p. 7218, ch. 959, § 9(1) (eff. Sept. 1, 1985) (current version at Tex.Civ.Practice & Remedies Code § 51.013 (Vernon 1986)).

2     *Repealed by* Order of Dec. 5, 1983 (eff. April 1, 1984) (current version at ⚑ Tex.R.Civ.P. 360(2) (1985)).

3     *Repealed by* Acts 1985, 69th Leg., p. 7218, ch. 959, § 9(1) (eff. Sept. 1, 1985) (current version at Tex.Civ.Practice and Remedies Code § 63.001(3) (Vernon 1986)).

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.    3

**A-601**

# Appendix AL

Case 4:21-cv-00140 Document 61 Filed on 08/13/21 in TXSD Page 683 of 686
Henningsmeyer v. First State Bank of Conroe, 109 Tex. 116 (1917)
195 S.W. 1137

109 Tex. 116
Supreme Court of Texas.

HENNINGSMEYER et al.

v.

FIRST STATE BANK OF CONROE.

No. 3982. *

|

June 20, 1917.

**Synopsis**

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Suit by the First State Bank of Conroe against Fred Henningsmeyer and others. Judgment for plaintiff, and defendants Fred Henningsmeyer and Mary Henningsmeyer appealed to the Court of Civil Appeals, where judgment was affirmed. 192 S. W. 286. On motion to dismiss petition for writ of error. Motion granted.

Hawkins, J., dissenting.

West Headnotes (3)

**[1]** **Appeal and Error** 🔑 **Petition for Rehearing or Bill of Review**

By filing successive motions for rehearing, the time allowed by Rev.St. 🚩 art. 1541, Vernon's Ann.Civ.St. arts. 1742, 1883, for filing petition for writ of error cannot be extended.

9 Cases that cite this headnote

**[2]** **Judgment** 🔑 **During Same Term**

The Court of Civil Appeals has full control over its judgments during its term.

2 Cases that cite this headnote

**[3]** **Motions** 🔑 **Amendment of Orders**

The Court of Civil Appeals has full control over its orders during its term.

**Attorneys and Law Firms**

**\*116 \*\*1137** Howard Bennette and W. N. Foster, both of Conroe, and G. P. Dougherty, of Houston, for plaintiffs in error.

A. L. Kayser, of Conroe, for defendant in error.

**Opinion**

PHILLIPS, C. J.

The judgment of the Court of Civil Appeals was adverse to the plaintiffs in error. Their motion for rehearing was overruled on February 14, 1917. Their counsel, it appears, did not learn of the overruling of the motion until the lapse of more than thirty days after the date of the court's order. They then filed, on April 2, 1917, an amended motion for rehearing, an exact copy of the original, adding only a statement as to the failure of the Clerk to give them notice of the court's action on the motion, and their want of knowledge of its action until more than thirty days had elapsed. The prayer was for a rehearing, but, if that were not granted, that the former order be set aside, 'in order that the right of appellants to have the judgment of the Court of Civil Appeals reviewed by petition for writ of error might be preserved.' On April 11, 1917, the Court of Civil Appeals by the same order, set aside its order overruling the original motion and overruled the amended motion. The petition for writ of error was filed in the Court of Civil Appeals on May 10, 1917.

[1] We think the motion to dismiss should be granted. In order for this court to have jurisdiction upon petition for writ of error, it is required, as a condition precedent, that the petition be filed with the Clerk of the Court of Civil Appeals within thirty days from the overruling of the motion for rehearing in that court. Schleicher v. Runge, 90 Tex. 456, 39 S. W. 279. \*117 The statute on the subject (🚩 article 1541) is imperative, and must be complied with. If merely to have additional time for the filing of the petition for writ of error successive motions for rehearing may be filed, the statute is rendered of no effect.

There is nothing in this record which even remotely suggests that the order that set aside the former order, overruling the original motion, and overruled the amended motion, was for

A-602

Henningsmeyer v. First State Bank of Conroe, 109 Tex. 116 (1917)

195 S.W. 1137

any other purpose than to permit the filing of the petition for writ of error as within the time required by law, in accordance with the appellants' request. We do not think that fact could be ascertained any more certainly than it here appears. Under such circumstances, we regard it as our duty to treat the time of the overruling of the original motion as the date from which should be reckoned the thirty days allowed for the filing of the petition for writ of error.

[2] We wish to add that we do not question the authority of the Court of Civil Appeals **1138 to set aside its former order, or to make, after its original action in a case, any further orders it might deem proper. It has full control of its judgments during its term. Nor have we any purpose to in anywise cast a doubt upon the good faith of its action. To relieve a seeming hardship it doubtless felt constrained to grant the appellants' request.

We simply rule that under the circumstances stated we do not consider its action as binding upon us; and that, to give effect to the statute, our duty, under such circumstances, is to require, as essential to our jurisdiction, that the petition for writ of error be filed within thirty days from the overruling of the original motion for rehearing.

It was not filed within that time, and the motion to dismiss is accordingly granted.

HAWKINS, J. (dissenting).

Does the record in this case justify the Supreme Court in finding and holding, as a matter of fact, that the action of the Court of Civil Appeals for the Ninth Supreme Judicial District, in setting aside its order overruling the first motion for a rehearing, was for the sole purpose of indirectly extending the period of time during which a petition for a writ of error might validly be filed, such action constituting a deliberate fraud upon the appellate jurisdiction of the Supreme Court? In my opinion it does not, and upon that proposition alone I dissent from the order granting the motion to dismiss the appeal for want of jurisdiction in the Supreme Court.

The judgment of the Court of Civil Appeals affirming the judgment of the trial court in favor of appellee, the First State Bank of Conroe (defendant in error), and against appellants Fred and Mary Henningsmeyer *118 (plaintiffs in error), was rendered on December 14, 1916, and its order overruling the original motion for a rehearing was made and entered on

February 14, 1917. Not until more than thirty days later, on May 10, 1917, was the petition of plaintiffs in error for a writ of error filed in the Court of Civil Appeals.

R. S. art. 1541, expressly requires that a petition for a writ of error 'shall be filed with the clerk of the Court of Civil Appeals within thirty days from the overruling of the motion for rehearing'; and it is well settled that failure to file such petition until after the expiration of that stated period is fatal to the appeal. The Supreme Court, in an opinion by Phillips, J., now Chief Justice, said:
'It is essential to the jurisdiction of this court to grant a writ of error that the petition for the writ be filed in the Court of Civil Appeals within thirty days from the overruling of the motion for a rehearing. Schleicher v. Runge, 90 Tex. 456, 39 S. W. 279.' Vinson v. Carter, 106 Tex. 273, 166 S. W. 363.

However, after said original motion for a rehearing had been overruled, appellants filed a second motion for a rehearing which was overruled by the court on April 11, 1917, and, it will be observed, within the statutory period of 30 days next thereafter, said petition for writ of error was filed; and upon these facts arises the contention of plaintiffs in error that their petition for a writ of error was filed seasonably.

The principal ground upon which the motion to dismiss the appeal rests is:

> 'Because it is apparent from the face of the record that the setting aside by said Court of Civil Appeals for the Ninth Supreme Judicial District of its order of date February 14, 1917, overruling plaintiff in error's motion for a rehearing on the 14th day of February, 1917, and overruling plaintiff in error's amended motion for rehearing on the 11th day of April, 1917, was done for the express purpose of enabling plaintiffs in error to avoid the consequences of their own neglect in failing to file in said court their petition for writ of error within thirty (30) days from said 14th day of February, 1917, and said proceedings were and are in direct opposition to rule 65 (67 S. W.

A-603

Henningsmeyer v. First State Bank of Conroe, 109 Tex. 116 (1917)

195 S.W. 1137

xix), governing the practice in the Courts of Civil Appeals.'

But inasmuch as the term of court at which said order overruling said first motion for a rehearing was made had not ended when said order setting aside the order overruling said first motion for a rehearing was entered, and inasmuch as that court unquestionably had authority, at any time during its term, and even of its own volition, and there have been no second motion for a rehearing, to set aside its previous order overruling said first motion for a rehearing, and to grant a rehearing in the cause, there arises, I think, upon the undisputed facts of this case, as shown by the record, a presumption of law that said order of April 11, 1917, setting aside said order overruling the original motion for a rehearing and overruling said second motion for a rehearing was entered by the Court of Civil Appeals in good faith, and that so much thereof **\*119** as set aside said former order was made by that court in the belief that probably, or possibly, there was error in the original judgment of that court in that cause, and that, upon renewed consideration of the questions involved, that court again reached the conclusion that its judgment as originally entered therein was correct, and that, as a consequence, said second motion for a rehearing was overruled, accordingly.

The facts relied upon by the defendant in error to overcome the above-mentioned presumption of good faith upon the part of the Court of Civil Appeals in making its said order of April 11, 1917, are as follows:

In said petition for a writ of error it is stated:

> 'The appellants, thereafter, on January 4, 1917, filed their motion for rehearing in the Court of Civil Appeals, wherein they complained of all of the errors hereinafter assigned, and said motion, after having been duly submitted and considered, was by the Court of Civil Appeals overruled by an order entered on February 14, 1917. On April 2, 1917, the appellants filed an amended motion for rehearing; this motion is an exact copy of the motion filed on **\*\*1139** January 4, 1917, except an addition thereto alleging that the clerk of the court had failed to give

appellants or their attorneys of record any notice of the action of the court in overruling the motion for rehearing, and that neither appellants nor their attorneys had knowledge or notice of the entry of the order overruling appellants' motion until the expiration of more than thirty days from the date of the order, and the motion prayed for a rehearing, or, in the alternative that the order overruling the original motion entered on February 14, 1917, be vacated and set aside in order that the right of appellants to have the judgment of the Court of Civil Appeals reviewed by petition for writ of error might be preserved.'

Said final order, of April 11th, is as follows:

> 'Former order entered on February 14, 1917, overruling motion for a rehearing is set aside; and the amended motion for a rehearing is overruled.'

Rule 65 prescribed by the Supreme Court for Courts of Civil Appeals is as follows:

> 'Upon the rendering of the judgment in the Court of Civil Appeals, as well as upon the making of an order overruling the motion for a rehearing, the clerk shall immediately give notice by postal card to the attorneys of the respective parties of the disposition made of the cause or of the motion, as the case may be, for which service he shall tax the usual fee as a part of the costs in the case. But the mailing of such notices shall not relieve the parties of the responsibility of taking notice of the disposition of the cause or motion, and the failure to receive a notice so mailed shall be no excuse for delay in taking future action as may be desired

A-604

in reference to the case within the time prescribed by the statutes and rules.'

It is therefore clear that failure to file the petition for a writ of error within the statutory period cannot properly be excused, condoned, or disregarded by the Court of Civil Appeals or by the Supreme **\*120** Court upon the sole additional ground for a rehearing pleaded in said second motion. Furthermore, it must be conceded that the fact that, with the exception of the additional statements showing want of notice or knowledge of the overruling of the first motion for a rehearing, the second motion was an exact copy of the first motion for a rehearing, coupled with the fact that said second motion candidly prayed that the former order overruling the original motion for a rehearing be set aside in order that the right of appeal might be preserved, and the further fact that the court undertook, by one and the same order, to set aside its former order refusing a rehearing and to overrule said second motion therefor, do strongly suggest that such final order was not really made by the court solely upon the merits or pretended merits, of said second motion for a rehearing, or in good faith, but, if not for the purpose, still, under such circumstances as to serve, in the language of the attorneys for the defendant in error, 'to cloak the negligence of the plaintiffs in error in failing to file their petition for writ of error within the time required by law.' Indeed that view of the matter is borne in upon my mind so strongly that I might feel impelled to act upon it, as a matter of duty in the protection of the jurisdiction of the Supreme Court, had that court no other protection or recourse; but such is not the case.

Our state Constitution expressly declares:
'The Supreme Court shall also have power, upon affidavit or otherwise as by the court may be determined, to ascertain such matters of fact as may be necessary to the proper exercise of its jurisdiction.' Section 3, art. 5.

R. S. art. 1525, is as follows:

'The Supreme Court shall have the power, upon affidavit or otherwise, as the court may determine, to ascertain such matters of fact as may be necessary to the proper exercise of its jurisdiction.'

The stated power of that court has been exercised in numerous instances. Harris v. Hopson, 5 Tex. 529; Dial v. Rector, 12 Tex. 99; Johnson v. Robeson, 27 Tex. 526; Moke v. Brackett, 28 Tex. 443; Hart v. Mills, 31 Tex. 304; Simmons v. Fisher, 46 Tex. 126; Fine v. Freeman, 83 Tex. 529, 17 S. W. 783, 18 S. W. 963; Abstract Co. v. Bahn, 87 Tex. 582, 29 S. W. 646, 30 S. W. 430; Ellis v. Brooks, 101 Tex. 591, 102 S. W. 94, 103 S. W. 1196. See, also, City of Austin v. Nalle, 85 Tex. 550, 22 S. W. 668, 960. It is peculiarly applicable, I think, to the facts and circumstances of this case, as indicated by the record, and should be appropriately exercised therein preliminarily, in determining, definitely and unmistakably, if possible, whether said final order of the Court of Civil Appeals really was made in good faith or in fraud of the appellate jurisdiction of the Supreme Court.

Whenever conclusive evidence thereon reasonably is obtainable, the **\*121** presumptions of regularity and good faith should attach to all orders of all courts until such presumptions shall have been overthrown.

**All Citations**

109 Tex. 116, 195 S.W. 1137

## Footnotes

\*    Writ of error dismissed by Supreme Court.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.